# 23-814(L)

## 23-855(XAP)

# United States Court of Appeals for the Second Circuit

JESUS SANTIAGO,

*Plaintiff–Appellee–Cross-Appellant*,

v.

SUPERINTENDENT BRIAN FISCHER, individually and as Commissioner of the New York State Department of Corrections and Community Supervision, ANTHONY J. ANNUCCI, individually and as Deputy Commissioner of and Counsel to DOCS, TERRENCE X. TRACY, individually and as Chief Counsel to DOP,

*Defendants–Appellants–Cross-Appellees.*

(*Caption continues inside front cover.*)

On Appeal from the United States District Court for the Eastern District of New York

## JOINT APPENDIX – Volume 2: Pages 249-506

RICKNER PLLC
14 Wall Street, Suite 1603
New York, New York 10005
(212) 300-6506

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8020

*Attorney for Appellee-Cross–Appellant*

*Attorney for Appellants–Cross-Appellees*

*(Caption continues from front cover.)*

ANDREW M. CUOMO, individually and as Governor of the State of New York, ANDREA W. EVANS, individually and as Chairwoman of the New York State Board of Parole, State of New York, JOHN DOES 1-10, DOCS Supervisory, Training, and Policy Personnel, LUCIEN J. LECLAIRE, JR., individually and as former acting Commissioner of DOCS, GLENN S. GOORD, individually and as former acting Commissioner of DOCS, ANTHONY G. ELLIS, II, individually and as former Chairman and Chief Executive Officer of DOP, GEORGE B. ALEXANDER, individually and as former Chairman and Chief Executive Officer of DOP, KEVIN G. LUDLOW, individually and as DOP Commissioner, LISA BETH ELOVICH, individually and as DOP Commissioner, SALLY A. THOMPSON, individually and as DOP Commissioner, ARROYO, individually and as DOP Area Supervisor, WILLIAM MCCARTNEY, individually and as DOP Area Supervisor, MCKINNEY, individually and as DOP Area Supervisor, FLEISCHMAN, individually and as DOP Senior Parole Officer, PAREDES, individually and as DOP Senior Parole Officer, DARRYL STEVENSON, individually and as DOP Senior Parole Officer, J. MASON, individually and as DOP Parole Officer, CYNTHIA JOHNSON, individually and as DOP Parole Officer, P ALVAREZ, individually and as DOP Parole Officer, RICHARD CORRADO, individually and as DOP Parole Officer, COUNCIL, individually and as DOP Parole Officer, ZUNNO, individually and as DOP Parole Officer, JOHN DOES 11-20, DOP Supervisory, Training, and Policy Personnel, ROBERT J. DENNISON, individually and as former Chairman of DOP,

*Defendants.*

# TABLE OF CONTENTS

**Page**

**Volume 1**

Docket Sheet .....................................................................................JA1

First Amended Complaint, dated June 4, 2012 .........................................JA41

    *Selected exhibits*:

    Ex. H  - Arrest Notification, dated Dec. 22, 2005 ................................JA62

    Ex. M  - Parole Revocation Certificate of Disposition,
             dated July 25, 2007 ..................................................JA63

    Ex. N  - Parole Board Release Decision Notice, dated Feb. 4, 2008 ....JA64

    Ex. P  - Notice of Arrest/Warrant Issuance, received by
           Division of Parole Mar. 21, 2008 ............................JA66

    Ex. R  - Parole Revocation Decision Notice, received Oct. 18, 2010.....JA67

Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion
for Summary Judgment, dated Dec. 23, 2016..............................................JA68

Plaintiff's Memorandum of Law in Support of Motion for Summary
Judgment [*omitted*]

    Ex. A  - Community Supervision, Parolee Chrono Report,
           dated Oct. 30, 2014 ..................................................JA72

    Ex. B  - Repository Inquiry (n.d.) ..........................................JA90

    Ex. C  - PVU Notification Form (n.d.), with attachments....................JA97

Declaration of Steven H. Philbrick [in Support of Defendants' Motion
for Summary Judgment], dated Dec. 23, 2016.........................................JA102

i

# TABLE OF CONTENTS

**Page**

**Volume 1**

Declaration of Stephen H. Philbrick (*cont'd*)

    Ex. A  -  Email from Timothy O'Brien to Regional Directors, et al., dated June 4, 2008, with attachment, "Post-Release Supervision Resentencing Initiative" ....................................JA117

    Ex. B  -  DOCCS Inmate Information for Jesus Santiago, dated Aug. 17, 2012 ...............................................JA131

    Ex. C  -  Parolee Chrono Report for Jesus Santiago, dated Oct. 30, 2014 ...............................................JA134

    Ex. D  -  Correction Law § 601-d Notice, dated Sept. 27, 2010 ...........JA151

    Ex. E  -  Post Release Supervision Re-sentencing Order, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010).............................................JA155

    Ex. F  -  Affirmation of Anthony J. Annucci, *State v. Myers*, Index No. 4834-08 (Sup. Ct. Albany County June 4, 2008)...JA157

Declaration of Michael J. Keane [in Support of Defendants' Motion for Summary Judgment], dated Dec. 23, 2016 ................................................JA192

    *Selected exhibits*:

    Ex. A  -  Memorandum from Susan Hendricks, Special Litigation Unit, Legal Aid Society, to Criminal Defense Division Legal Staff, dated Aug. 20, 1998 ...........................................JA200

    Ex. B  -  Complaint for Declaratory Judgment, *State v. Myers*, No. 4834-08 (Sup. Ct. Albany County June 4, 2008) .............JA229

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of Michael J. Keane, dated Dec. 23, 2016 (*cont'd*)

    Ex. C  -  Memorandum of Understanding Between New York
           State Office of Court Administration, the Department
           of Correctional Services and the Division of Parole,
           signed July 2008 ....................................................................JA249

    Ex. D  -  Declaration of Anthony J. Annucci, *Betances v. Fischer*,
           No. 11-cv-3200 (S.D.N.Y. May 8, 2015) ..................................JA254

    Ex. E  -  Declaration of Richard de Simone, *Betances v. Fischer*,
           No. 11-cv-3200 (S.D.N.Y. May 8, 2015) ..................................JA288

    Ex. G  -  Affirmation of Terrence X. Tracy Affirmation, *State v. Myers*,
           No. 4834-08 (Sup. Ct. Albany County June 4, 2008) ...............JA302

    Ex. I  -  Declaration of Anthony J. Annucci, *Earley v. Annucci*,
           No. 08-cv-669 (N.D.N.Y. July 18, 2011) ..................................JA319

Declaration Craig R. Mausler [in Support of Defendants' Motion for
Summary Judgment], dated Aug. 14, 2017.................................................JA327

Defendants' Amended Statement Pursuant to Local Civil Rule 56.1,
dated Aug. 14, 2017 .....................................................................................JA337

Declaration of Michael J. Keane [in Support of Defendants' Motion in
Limine], dated July 13, 2022 [*omitted*]

    Ex. A  -  Transcript of Plea Minutes, *People v. Santiago*, Ind. No.
           1141/00 (Sup. Ct. Kings County May 3, 2002) .......................JA350

    Ex. B  -  Commonwealth of Virginia judicial and probation
           documents.................................................................................JA362

    Ex. C  -  Petition for a Writ of Certiorari, *Fitch v. Earley*,
           No. 06-1429 (U.S. Apr. 25, 2007) (mislabeled as Ex. A) ........JA370

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of Michael J. Keane, dated July 13, 2022 (*cont'd*)

Ex. D - Reply Brief for Petitioner, *Burhlre v. Earley*, No. 06-1429 (U.S. June 7, 2007) (mislabeled as Ex. B) .............................JA386

Ex. E - Brief for Respondent, *People v. Sparber*, 10 N.Y.3d 457 (2008) ...............................................................JA392

Ex. F - Sentence Monitoring Computation Data as of January 11, 2013..............................................................JA447

Revised Joint Pre-trial Order, dated Aug. 31, 2022...................................JA459

Transcript of Hearing, held Oct. 25, 2022..................................................JA470

Excerpts from Transcript of Hearing, held Nov. 18, 2022.........................JA477

Defendants' Suppl. Mem. of Law in Response to Court's Request for Further Briefing on the Relevance of Penal Law § 70.45 to Punitive Damages, dated Nov. 21, 2022 [omitted]

Ex. A - Governor's Program Bill – Memorandum (2008); Assembly Bill No. 11764, 231st Sess. (2008).........................JA490

Proposed Stipulations, filed Nov. 22, 2022.................................................JA501

**Volume 3**

Transcripts of Trial, held Nov. 28–30, 2022..............................................JA507

*Selected Trial Exhibits*

Pl. Ex. 1 - Sentence and Order of Commitment, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County May 15, 2002) ....JA604

iv

# TABLE OF CONTENTS

**Page**

**Volume 3**

*Selected Trial Exhibits* (*cont'd*)

Pl. Ex. 2 - Post Release Supervision Re-sentencing Order, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010) .........................................................JA605

Pl. Ex. 3 - Resentencing Hearing Transcript, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010) ...JA606

Df. Ex. I - Certificate of Release to Post-Release Supervision, dated Nov. 2, 2004................................................................JA612

Jt. Ex. 1 - Joint Stipulations (redacted) ..............................................JA613

Judgment, dated Nov. 30, 2022 ................................................................JA619

Defendants' Notice of Appeal, dated May 16, 2023 ..................................JA620

Plaintiff's Notice of Cross-Appeal, dated May 30, 2023 ...........................JA623

# EXHIBIT C

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE NYS OFFICE OF COURT ADMINISTRATION,
## THE DEPARTMENT OF CORRECTIONAL SERVICES AND
## THE DIVISION OF PAROLE

This is a Memorandum of Understanding (hereinafter "MOU") by and between the Office of Court Administration (hereinafter "OCA") with offices at 25 Beaver Street, New York, New York, the Department of Correctional Services (hereinafter "DOCS") with offices at Building 2, State Campus, Albany, New York; and the Division of Parole (hereinafter "Parole") with offices at 97 Central Avenue, Albany, New York (collectively referred to as the "Parties") for the orderly resentencing of "designated persons" pursuant to Correction Law §601-d.

WHEREAS, in 1998, the New York State Legislature enacted Jenna's Law, which amended the Penal Law to end "indeterminate sentences" (i.e., sentences running between certain minimum and maximum periods set by the court at the time of sentencing) for criminal defendants convicted of violent felonies; and

WHEREAS, Jenna's Law required "determinate" sentences and created a schedule of mandatory terms of post-release supervision (hereinafter "PRS") to be included as a part of the determinate sentences of violent felony offenders; and

WHEREAS, in many cases, defendants were not informed at the time of sentencing that they would be subject to a term of PRS following completion of their determinate sentence, and DOCS therefore factored in terms of PRS as required by the Penal Law when performing time computations for those defendants;

WHEREAS, over time, offenders challenged DOCS' practice of adding PRS to their determinate sentences and courts throughout the State were split on this legal issue, with some finding that PRS automatically was a part of the sentence by operation of law, and others finding PRS had to be expressly imposed by the sentencing court; and

WHEREAS, on April 29, 2008, the New York State Court of Appeals issued two decisions (*Matter of Garner v. DOCS*, 10 N.Y.3d 358 [2008] and *People v. Sparber*, 10 N.Y.3d 457 [2008]) holding that only the sentencing judge has the authority to impose the PRS component of an offender's determinate sentence, but also ruling that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum"; and

WHEREAS, DOCS and Parole, in the months of May and June, identified hundreds of cases of technical violators of post release supervision in state or local custody and, consistent with the holding in *Matter of Garner v DOCS*, sent letters to the sentencing courts requesting resentencing or other appropriate determinations; and

WHEREAS, the Legislature passed and Governor Paterson signed Chapter 141 of the Laws of 2008 (effective June 30, 2008; [hereinafter "the legislation"]), adding, among other provisions, a new §601-d to the Correction Law creating a statutory framework that mandates a comprehensive review by sentencing courts of determinate sentences of every "designated person" (i.e., an inmate in the custody of DOCS and a releasee under the supervision of Parole upon whom a determinate sentence was imposed between September 1, 1998 and July 1, 2008, where the commitment order that accompanied such person does not indicate imposition of a term of PRS, and where the agency does not have sentencing minutes showing that a term of PRS was actually pronounced); and

WHEREAS, §601-d requires: i) that DOCS and Parole notify the sentencing court of every designated person in its custody or under its supervision so that the court may conduct a review; and ii) that the sentencing court, upon such notification, promptly seek to obtain sentencing minutes, plea minutes, and other relevant records which may show that a term of PRS was actually pronounced at sentence, or reconstruct sentencing proceedings if necessary; and

WHEREAS, the Legislature provided as to determinate sentences imposed prior to the effective date of the legislation that every determinate sentence "includes, as a part thereof," a term of PRS, and provided as to determinate sentences imposed on or after the effective date of the legislation, that the sentencing court "shall in each case" state, in addition to the term of imprisonment, a term of PRS; and

WHEREAS, the legislation will result in thousands of cases being referred to sentencing courts across the State, and it will be impractical for the courts to provide a fair and expeditious review of these thousands of cases without an orderly program of coordination, prioritization, and planning;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties do agree as follows:

1. OCA has advised DOCS and Parole that a simultaneous or unstructured referral of all designated persons to the sentencing courts would substantially compromise the ability of the State court system to conduct a fair review of all of the cases under the procedures and timeframes set forth in Correction Law §601-d. Accordingly, to allow for fair and expeditious review, it is necessary for the parties to prioritize cases and establish a schedule for referral of the cases to sentencing courts.

2. In order to ensure the most effective and fair process possible, all designated person letters to the sentencing courts from DOCS or Parole should be routed through the Administrative Judges administering the Judicial District in which the sentencing court is located. The Administrative Judge in each Judicial District, DOCS and Parole shall keep each other informed on the progress of implementation of the legislation, including notifications and resentencing proceedings.

3. DOCS and Parole shall refer cases to the sentencing courts through the Administrative Judge in each Judicial District pursuant to the following priority and schedule:

2

A. Designated persons in DOCS custody solely on the basis of a technical violation of PRS for whom letters were previously sent to the courts, prior to the enactment of the Legislation, requesting resentencing or other appropriate action, who were not resentenced and who are still in DOCS custody as of the date of this MOU, which are estimated to number approximately 400, shall be referred to the sentencing courts as soon as possible but, in any event, not later than July 31, 2008.

B. Designated persons incarcerated in local correctional facilities solely on the basis of a PRS violation warrant for whom letters were previously sent to the courts, prior to the enactment of the Legislation, requesting resentencing or other appropriate action, and who were not resentenced and who are still incarcerated in local correctional facilities as of the date of this MOU, which are estimated to number approximately 100, shall be referred to the sentencing courts as soon as possible but, in any event, not later than by July 31, 2008.

C. Designated persons incarcerated in DOCS or local correctional facilities due to a technical violation of PRS or a PRS violation warrant for whom letters were not sent to the courts prior to the enactment of the Legislation, shall be referred to the sentencing courts by July 31, 2008.

D. Designated persons currently under supervision in the community who were first released to PRS between July 15, 2004 and July 15, 2007, shall be referred to the sentencing courts by October 1, 2008, with no more than 500 cases under this paragraph being referred to sentencing courts prior to September 1, 2008.

E. Designated persons currently under supervision in the community who were first released to PRS between July 16, 2007 and July 15, 2008, shall be referred to the sentencing courts by November 1, 2008.

F. Designated persons released for the first time to PRS between July 15, 2008 and September 1, 2008, shall be referred by Parole to the sentencing courts by November 1, 2008.

G. Designated persons first released to PRS before July 15, 2004, shall be referred to the sentencing courts by December 1, 2008.

H. Notwithstanding the provisions of subparagraphs A through G of this paragraph, designated persons on PRS in the community who have not completed their sentence of imprisonment (i.e., conditional releasees) or who otherwise owe time on their sentence shall be referred to the sentencing courts by December 1, 2008.

I. Designated persons who are going to be released by DOCS for the first time onto post release supervision after September 1, 2008 but before October 1, 2008, shall be referred

3

to the sentencing courts at least 45 days prior to their release date.

J. Designated persons who are going to be released by DOCS for the first time onto post release supervision after October 1, 2008, which are estimated to number approximately 70 to 80 per month, shall be referred to the sentencing courts at least 60 days prior to their release date.

K. Any designated person who has not been referred to the sentencing court prior to his or her subsequent incarceration in a local correctional facility on a PRS violation warrant shall be referred to the sentencing court within 30 days of such re-incarceration.

L. Any designated person who was released and then subsequently returned to DOCS' custody as a result of revocation of PRS, who has not been previously referred to the sentencing court, shall be referred to the sentencing court within 30 days of such return.

4. If at any time an Administrative Judge notifies in writing DOCS or Parole that the present flow of cases into that particular Judicial District is creating or is predicted to create workloads beyond the capacity of such District to provide fair and expeditious review, and, consequently, that the schedule for the flow of designated persons into that Judicial District should be modified, then the schedule provided herein may be modified as to that Judicial District by agreement between that Administrative Judge and those agencies, subject to the approval of OCA.

IN WITNESS WHEREOF, the Parties hereto have caused this Memorandum of Understanding to be executed as of the date indicated below.

DEPARTMENT OF CORRECTIONAL SERVICES

By:      Anthony J. Annucci
Title:   Exec. Dep. Comm. & Counsel
Date:   July 11, 2008

DIVISION OF PAROLE

By:      Terrence Tracy
Title:   Counsel
Date:   July 11, 2008

OFFICE OF COURT ADMINISTRATION

By:      Michael Colodner
Title.   Counsel
Date:   July 8, 2008

4

JA253

# EXHIBIT D



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

PAUL BETANCES, LLOYD A. BARNES,
GABRIEL VELEZ a/k/a GABRIEL BELIZE,
individually and on behalf of all others similarly
situated,

                                         **Plaintiffs,**

        - against -

BRIAN FISCHER, *et al.,*

                                     **Defendants.**

--------------------------------------------------------X

**DECLARATION OF
ANTHONY J. ANNUCCI**

11 Civ. 3200 (SAS)

      ANTHONY J. ANNUCCI declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

      1.    I am the Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"). I am a defendant in this action and submit this declaration in support of defendants' motion for summary judgment based on my personal knowledge and a review of documents pertaining to the matters at issue in this case. I have served as Acting Commissioner since May 1, 2013, and oversee 54 correctional facilities that house approximately 53,000 inmates, and seven different regional bureaus throughout the State that supervise about 35,000 parolees. I also oversee approximately 29,000 employees. DOCCS' total annual budget is approximately $3 billion.[1]

---

[1] I have been employed by DOCCS and its predecessor agency, the Department of Correctional Services ("DOCS" or "the Department"), since 1984. DOCCS was formed in April 2011 by the merger of DOCS and the State Division of Parole ("Parole"). Prior to my appointment as Acting Commissioner, I served as Executive Deputy Commissioner from October 1, 2007 until May 1,

1



2. On August 6, 1998, the New York State Legislature enacted the Sentencing Reform Act of 1998, also known as "Jenna's Law," which extended determinate sentences to first-time felony offenders who were convicted of violent offenses, and also created a schedule of mandatory periods of post-release supervision ("PRS") included as a part of the determinate sentences of violent felony offenders. See Penal Law § 70.45 (McKinney's 1998).[2] Jenna's Law added a new section to the Penal Law, § 70.45, which provided that "[e]ach determinate sentence *also includes, as a part thereof, an additional period of post-release supervision.*" Penal Law § 70.45(1) (McKinney's 1998) (emphasis added).

3. In my capacity as Counsel to, Executive Deputy Commissioner of, and Acting Commissioner of DOCS, I have served on various committees responsible for drafting legislation related to Criminal Procedure, Corrections and Parole. Indeed, I was a member of the committee that drafted the proposed legislation that would become known as Jenna's Law. The statute was drafted with the intent that PRS terms were automatic, and that judges would not be required to pronounce PRS on the record. In fact, when it was first enacted, the statute did not contain the terms "sentencing court," "impose," or "pronounce," and simply mandated that the determinate sentence "includes" PRS. See Penal Law § 70.45(1) (McKinney's 1998).

---

2013. I served as Executive Deputy Commissioner and Counsel until late 2008, and as Deputy Commissioner and Counsel from 1989 through 2007, and was responsible for providing legal services for the day-to-day DOCS operations. I joined the Department in 1984 as Deputy Counsel. From 1980 to 1984, I served as a law assistant to two Acting Supreme Court Justices in New York State Supreme Court, Criminal Term, Kings County. I am admitted to the New York Bar, and have a B.S in Psychology from Fordham University, an M.A. in Criminal Justice from John Jay College of Criminal Justice, and a J.D. from Brooklyn Law School.

[2] The Legislature subsequently extended determinate sentencing and PRS to all drug offenders with the Drug Law Reform Act of 2004, and to those sex offenders who had been subject to indeterminate sentencing with the Sex Offender Management and Treatment Act of 2007.

2

4. Penal Law § 70.45(1) was therefore understood by DOCS, many criminal judges, prosecutors, and defense attorneys to include by operation of law a term of PRS without pronouncement by the sentencing court. Therefore, many sentence and commitment orders issued by court clerks omitted specific mention of the offender's mandatory PRS term.

### DOCS' CALCULATION OF PRS TERMS

5. In an effort to comply with the Penal Law § 70.45, when an inmate sentenced to a determinate sentence pursuant to Article 70 of the Penal Law was received into DOCS' custody, DOCS would enter the determinate sentence into its records, including any statutorily-required term of PRS, by applying Penal Law § 70.45 to the information on the inmate's sentence and commitment order, if silent as to PRS, pursuant to the law as it was understood at the time.

6. Inmates received by DOCS are accompanied by their pre-sentence report, sentence and commitment order, and criminal history report. Although CPL § 380.70 requires the minutes of the sentencing proceedings to be sent to DOCS, in the majority of cases they were not forwarded by the courts. DOCS estimates that it received sentencing minutes well below 50% of the time, and probably closer to 30% of the time. DOCS did not have in its files, therefore, for most inmates – at the reception point or later – a record sufficient to determine whether PRS was pronounced by the sentencing judge if the commitment order was silent regarding PRS. Indeed, in some cases in which DOCS did have the sentencing minutes, PRS had been pronounced by the sentencing court even though the commitment order was silent. In addition, as the Court of Appeals mentioned in Sparber, other court documents may reflect the pronouncement of PRS, such as the court worksheet and file jacket, which did not accompany inmates entering DOCS. DOCS did not receive copies of plea minutes.

7. For eight years, the automatic nature of PRS was not seriously questioned.

3

## EARLEY V. MURRAY

8.    In June 2006, the Second Circuit decided Earley v. Murray, 451 F.3d 71 (2d Cir. 2006), a habeas corpus proceeding in which the Kings County District Attorney represented respondent. The court held that DOCS' practice of administratively calculating the PRS term where the sentencing court did not specifically pronounce PRS violated the Due Process Clause.

9.    The Second Circuit did not release Mr. Earley at that time, but remanded the petition to the district court to determine its timeliness, and held that its ruling did not preclude the District Attorney from moving in the state courts to modify Mr. Earley's sentence to include the PRS term that was not pronounced by the sentencing court.[3] Earley, 451 F.3d at 77.

10.    However, as an executive agency, DOCS could not initiate the remedy of resentencing in 2006, except within narrow circumstances (not including PRS) under § 601-a of the Correction Law. It was not until 2008 when remedial legislation was enacted by the State Legislature that DOCS and Parole were authorized to seek resentencing of individuals in their custody, or under their supervision, whose PRS terms were not pronounced by their sentencing courts. See Corr. Law § 601-d.

## DOCS' RESPONSE TO EARLEY

11.    Soon after the Earley decision, I communicated with the New York State Office of Court Administration ("OCA"). On July 20, 2006, I emailed John Amodeo, who was then Counsel to OCA. See e-mail correspondence between Anthony J. Annucci and John Amodeo, dated July 20, 2006, attached hereto as Exhibit ("Ex.") A.  I requested that Mr. Amodeo put

---

[3] On remand, the district court did not immediately release Mr. Earley, but rather, after determining that the petition was timely, stayed its order for 28 days to permit time for Mr. Earley's sentencing court to resentence him to PRS, in conformance with § 70.45. See Earley v. Murray, 03-CV-3104 (ERK), 2007 U.S. Dist. LEXIS 31942 (E.D.N.Y. May 1, 2007).

together an instructional reminder to all Criminal Term judges advising them to impose the PRS period on the record at sentencing, regardless of the automatic nature of § 70.45.

12.   A final version of an instructional reminder was not issued by OCA until September 2007, which recommended that, in order to avoid future litigation, judges pronounce PRS. The instructional reminder sent by OCA to judges did not direct that judicial pronouncement was required, and acknowledged that "further guidance" was required from the Court of Appeals to "clarify the law in this area." See Memorandum from Michael Colodner to Judges Plumadore and Carey, dated Sept. 18, 2007, attached hereto as Ex. B.

13.   In August 2006, I directed all DOCS Inmate Records Coordinators to inform inmates who questioned their PRS terms that Earley appeared to conflict with a New York State Court of Appeals case, People v. Catu, 4 N.Y.3d 242, 244 (2005), and that thus, DOCS officials were bound by the state Court of Appeals, rather than the lower federal court, pursuant to a New York State Court of Appeals case, People v. Kan, 78 N.Y. 2d 54 (1991). The Court of Appeals in Catu held that PRS was a direct consequence of a plea or guilty verdict, imposed before sentencing, and was indeed "largely automatic." Catu, 4 N.Y.3d at 244.

14.   In September 2006, Judge McLaughlin, sitting as a state Supreme Court Justice, held in People v. Keile, 13 Misc. 3d 1204(A) (N.Y. Sup. Ct. N.Y. Cty. 2006) that a lower federal court's ruling is not binding on state courts, relying on Kan. 78 N.Y.2d at 60. In finding that "New York appellate courts deserve an opportunity to decide whether to follow Earley," Keile concluded that state courts could continue to adhere to the holding that PRS was automatically part of the determinate sentence.

15.   State court decisions such as these created uncertainty as to the reach of Earley.

5

16.     Due to this legal uncertainty, in early 2007, DOCS organized a work group and outlined a plan to undertake a manual review of thousands of inmate files identifying inmates in its custody who potentially did not have judicially pronounced PRS terms. This task was undertaken to prepare the agency in case it would become clear in the future that offenders with administratively imposed PRS would be required to be resentenced.

18.     Theresa Knapp-David, then DOCS' Director of the Office of Classification and Movement, led a manual review of the Department's files. Initially, the DOCS mainframe computer created a master list of cases where determinate terms had been imposed during the period from September 1, 1998, the effective date of Penal Law § 70.45, to March 8, 2007. The purpose of the manual review was to ascertain in each case whether the commitment order itself was silent or noted that the required PRS period was a part of the sentence.

19.     The manual review required an examination of approximately 40,000 commitment orders, each of which contained one or more determinate sentences of imprisonment. The analysis of these historic records began on March 12, 2007, and concluded on April 20, 2007. A total of 39,883 computer notations were entered into DOCS' mainframe computer on a newly-created data field called "PRS." As a result of this project, going forward, the PRS data field was routinely filled in at all of the DOCS reception centers for each new commitment that contained a determinate term of imprisonment, and for which the law required a period of PRS. For each applicable commitment, the following entries were made:

Y = PRS is silent, meaning the commitment was silent regarding PRS;

N = PRS is NOT silent, meaning the commitment indicated PRS; and

H = historic, meaning the inmate had already been released from custody and the file was not available. If the inmate were to be returned to custody in the future, then the field would be updated.

6

20.     Initially, the project encompassed a review of sentence and commitment orders, but was later expanded to document whether DOCS had sentencing minutes available in those cases where the commitment sheet was silent.

21.     This database was updated and maintained after April 2007 to record the status of individuals entering DOCS going forward.

22.     As of January 2008, DOCS staff had made approximately 49,300 entries into the PRS data field. This number included new commitments that were received between the manual cutoff review date and January 4, 2008.

23.     An analysis of this data reveals that there were approximately 41,000 entries where the sentence and commitment orders were "not silent" regarding PRS.

24.     Hence, there were approximately 8,100 entries where the commitment order was silent for PRS, which means that DOCS staff calculated the PRS component of the sentence when the inmate was received at a DOCS reception center. Of this number, at the time the analysis was run, approximately 6,300 inmates remained in DOCS custody, while 1,800 had been released.

## DOCS' RESPONSE to GARNER and SPARBER

25.     On April 29, 2008, the New York Court Appeals decided Matter of Garner v. New York State Dep't of Corr. Servs., 10 N.Y.3d 358 (2008), and People v. Sparber, 10 N.Y.3d 457 (2008). Garner held that New York's procedural law required judicial pronouncement of PRS, but noted that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." Garner, 10 N.Y.3d at 363 n. 4. Sparber held that PRS is the "direct consequence" of the plea,

7

and thus concluded that the failure to pronounce PRS at sentencing is "akin to" a "clerical error." <u>Sparber</u>, at 472. Moreover, the Court of Appeals rejected the remedy of striking the PRS term from the sentence, which it deemed to be a "windfall," and held that the "sole remedy" was to "remit[]to Supreme Court for resentencing and the proper judicial pronouncement of the relevant PRS terms." <u>Sparber</u>, 10 N.Y.3d at 465, 469, 471, 472.

26.    After these decisions were issued, DOCS was immediately prepared to implement a plan to identify every inmate in DOCS' custody whose sentence required PRS and then to identify those whose commitment orders did not satisfy the requirements of <u>Garner</u> and <u>Sparber</u>. While this was a major undertaking, months of preparation by DOCS, dating back to the canvass conducted in early 2007, placed the Department in a position to expeditiously launch the "Post-Release Supervision Resentencing Initiative," attached hereto as Ex. C.

27.    The Post-Release Supervision Resentencing Initiative included review of DOCS' records for thousands of inmates, entering the information in a database, and enlisting the cooperation and guidance of other state agencies, including Parole, the Office of the Governor, OCA, and the Division of Criminal Justice Services in order to identify the scope of the PRS issues and to implement a path toward resolution of the issues as expeditiously as practicable.

28.    Within days of the Court of Appeals' decisions, DOCS secured the cooperation of OCA and, in consultation with other state agencies, was able to address PRS problems by giving notice to the courts and the State's District Attorneys that resentencings of thousands of inmates may be required.  <u>See</u> Memorandum to New York State Administrative Judges from Lawrence K. Marks, regarding Post-Release Supervision, dated May 14, 2008, attached hereto as Ex. D.

29.    DOCS did not have sufficient documentation to determine conclusively whether an inmate's PRS term was judicially pronounced, even where the commitment order was silent

8

as to PRS. In many cases, DOCS did not have the sentencing minutes for potentially affected inmates, and, in some cases where there were sentencing minutes, DOCS' clerical staff believed that PRS was not pronounced, but were later informed by the sentencing court that PRS had been pronounced at sentencing. Due to the massive file review that was necessary following Garner and Sparber, DOCS assigned clerical staff members to conduct the file review, and some staff may have misinterpreted sentencing minutes and other court documents. As noted above, DOCS also does not receive the plea minutes, court worksheet, file jacket, or other court documents that may indicate the judicial pronouncement of PRS.

30. Although DOCS undertook this massive and labor-intensive "Post-Release Supervision Resentencing Initiative," encompassing review of thousands of sentencing documents and sending hundreds of notification letters to courts, DOCS, still had no legal authority to refer individuals in DOCS' custody with potentially flawed PRS terms back to their sentencing courts for resentencing.

31. In order to obtain the legal authority necessary for DOCS to refer the thousands of affected inmates for resentencing, DOCS brought a defendant-class action in the Supreme Court, Albany County, seeking injunctive relief to permit DOCS to refer a class of inmates affected by administratively-imposed PRS terms to courts for resentencing. However, the relief sought by DOCS was denied by the court in State v. Myers, 22 Misc. 3d 809 (S. Ct. Albany Cty. 2008).

### THE 2008 LEGISLATION

32. On June 30, 2008, the Legislature enacted Correction Law § 601-d, remedial legislation addressing the PRS problem. This statute gave DOCS the authority for the first time to refer inmates whose PRS appeared to have not been pronounced by their sentencing courts for

9

resentencing. Under the statute, an inmate could be resentenced to a term of PRS *nunc pro tunc*, or resentenced without a PRS term with the District Attorney's consent. See Corr. Law § 601-d.

33.     In order to conduct resentencings in an orderly and expeditious fashion, DOCS and Parole collaborated with OCA on a "Memorandum of Understanding" that set forth a schedule for resentencing affected inmates in DOCS' custody and affected parolees under Parole's supervision. See Memorandum of Understanding, attached hereto as Ex. R.

34.     Priority was given to those individuals who were in the custody of DOCS based upon a technical violation of PRS and whose commitment orders were silent. I believed that it was reasonable, appropriate, and important to prioritize those inmates who were in DOCS' custody solely on the basis of a violation of an administratively-imposed PRS term.

35.     DOCS maintained that whether inmates were lawfully sentenced to PRS terms should be put before the inmates' sentencing courts, which were in the best position to determine whether an inmate's PRS was judicially pronounced. The sentencing courts, which have access to all the relevant court documents that mention PRS, were clearly in the best position to definitively determine whether an inmate's PRS term was judicially pronounced. Unlike DOCS, the sentencing courts not only had the sentence and commitment order, but, as noted above, also the sentencing and plea minutes, court worksheet, file jacket, and other relevant court documents that indicate whether PRS was judicially imposed. DOCS consistently believed it appropriate to put the matters before sentencing courts, rather than have DOCS, an executive agency, make unilateral determinations as to which inmates' PRS terms were not judicially pronounced.

ANTHONY J. ANNUCCI

Executed on May 8, 2015

10

JA264

# EXHIBIT A





"John Amadeo"
<JAMODEO@courts.st
ate.ny.us>
07/20/06 04:02 PM

To: <AJAnnucci@DOCS.STATE.NY.US>
cc:
Subject: Re: Early v. Murray

Thanks for the heads-up Tony. I'm embarrassed to say that I wasn't aware of the Early case. I will put something together on this for the affected Supreme and County Court Judges. JA

>>> <AJAnnucci@DOCS.STATE.NY.US> 7/20/2006 3:10 PM >>>
John - as you may know, the Second Circuit Court of Appeals issued a recent decision in a case called Early v. Murray, 451 F.3rd 71, which in essence provides that despite the language of Penal Law Section 70.45, if a sentencing court does not affirmatively impose post release supervision (PRS) at the time it imposes the determinate sentence of imprisonment, DOCS is without authority to add the PRS term when the defendant arrives at state prison. We anticipate that in the wake of this decision, numerous inmates will file court actions seeking to eradicate their terms of PRS. As you may also know, there is a Court of Appeals case called People v. Catu, 4 NY3d 242, which holds that if the defendant was not made aware of the PRS aspect of the sentence during the plea allocution, but is imposed at sentencing, the defendant has the right to withdraw his plea. PRS is a direct consequence of a criminal conviction.

While there is nothing that can be done for these cases retroactively, as a precautionary measure to prevent future recurrence of this problem, I was wondering if some type of OCA instructional reminder can be sent to all sitting criminal term judges, which would address both aspects of this problem. I suggest something along the lines of the following:

All criminal term judges are reminded that whenever a determinate sentence of imprisonment is imposed, whether for a violent felony offense or for a drug felony offense, Penal Law Section 70.45 also requires that a period of post release supervision (PRS) be imposed. Recent case law provides that such period can only be imposed on the record by the sentencing judge at the time sentence is pronounced, and cannot subsequently be added by a clerical staff person employed either with the court system or the correctional system. Furthermore, in cases that involve plea bargaining, the defendant must be made aware during the plea allocution of both the term of the determinate sentence of imprisonment to be imposed AND the period of PRS that will be imposed.

Anthony J. Annucci
Deputy Commissioner and Counsel
NYS Department of Correctional Services
518-485-9613

# EXHIBIT B



STATE OF NEW YORK
UNIFIED COURT SYSTEM
25 BEAVER STREET
NEW YORK, NEW YORK 10004
TEL (212) 428-2150
FAX (212) 428-2155

ANN PFAU
Chief Administrative Judge

MICHAEL COLODNER
Counsel

## MEMORANDUM

September 18, 2007

TO: Hon. Jan H. Plumadore
    Hon. Joan B. Carey

FROM: Michael Colodner

SUBJECT: Pronouncing the period of Post-Release Supervision at Sentencing

A series of recent state and federal court decisions dealing with post-release supervision (PRS) — and, in particular, whether PRS is an "automatic" part of every determinate sentence or must be expressly imposed by the Judge at sentencing, — has led to a flood of conflicting trial level decisions addressing whether the NYS Department of Correctional Services (DOCS) has the authority to administratively add a period of PRS to determinate sentences where the court's order is silent with regard to PRS.

In the past, when a commitment order failed to reflect a period of PRS, DOCS simply added it administratively on the ground that a period of PRS is a mandatory component of all determinate sentences. In light of the caselaw spawned by this practice, however, we strongly recommend that all Supreme and County Court Justices and Judges exercising criminal jurisdiction be advised of the importance of specifying the exact period of PRS that a defendant must serve when the court imposes a determinate sentence of imprisonment. Ideally, the court should pronounce the PRS period on the record at sentence, and the court clerk should record that information in the appropriate place on the Sentence and Commitment form. To avoid further litigation in this area, we recommend that this procedure be followed in all cases where a period of post-release supervision is required by law, whether the period of PRS is fixed by statute or is discretionary within an available range of PRS periods.

### Background

Penal Law §70.45(1), provides that "(e)ach determinate sentence also includes, *as a part thereof, an additional period of post-release supervision*" (emphasis added). The precise period of PRS depends on the nature of the crime, the level of felony involved and whether the defendant is a

JHP

OFFICE OF COURT
ADMINISTRATION

SEP 21 2007

ALBANY, N.Y.

#1510

BeBeDEF 1873

first felony offender (see PL §70.45(2)).[1]

The express language of §70.45 fails to require that the sentencing court actually "impose" or "specify" a period of post-release supervision at the time of sentencing, and many judges statewide often make no affirmative mention of the defendant's period of PRS. Moreover, the practice of court clerks in recording the appropriate PRS on the Sentence and Commitment form has been, at best, inconsistent. When defendants have later learned that a period of PRS was either administratively added to their sentence by DOCS or only reflected in a Sentence and Commitment form, they have litigated the lawfulness of the practice. The result has been a growing body of conflicting case law in the trial courts (see generally, People v Davis, ___ Misc.3d ___, WL 2491906) (Sup. Ct., Kings Cty. 2007); People ex rel. White v Warden, 15 Misc.3d 360 (Sup. Ct., Bronx Cty. 2007); People ex re. Johnson v Warden, 15 Misc. 3d 1102(A) (Sup. Ct., Bronx Cty. 2007); People v Edwards, 15 Misc.3d 1115(A) (Sup. Ct., N.Y. Cty. 2007); Matter of Quinones v State Department of Corrections, 14 Misc.3d 390 (Sup. Ct., Albany Cty. 2006)).

Adding to the murky legal waters in this area is that, prior to 2005, the statute expressly fixed the PRS period for all determinate sentences at five years, but provided that the sentencing court could elect to give a shorter period for certain first felony offenders. Several courts construed this language to mean that a five-year period of PRS was automatically added by operation of law unless a sentencing court made an affirmative statement otherwise (see e.g., People v Hollenbach (307 A.D.2d 776 (4th Dept. 2003), lv denied 100 N.Y.2d 642 (2003); People v Crump, 302 A.D.2d 901, 902 (4th Dept. 2003), lv denied 100 N.Y.2d 537 (2003)). When the statute was amended in 2005, the five-year "default" language was removed, and the statute now provides that the sentencing court must set the period of PRS in those cases where a range of periods is set forth. Nonetheless, even the amended statute has a fixed period of PRS for many crimes, most notably for predicate offenders, and the sentencing court is not authorized to alter the period of PRS fixed by the statute (see People v Hill, 39 A.D.3d 1[1st Dept. 2007]). Thus, an argument can still be made that in those cases where the court has no discretion over the period to be set, PRS should be automatically applied to every determinate sentence, regardless of the court's pronouncement.

The Second Circuit, however, has squarely held that the DOCS practice of administratively adding PRS to a defendant's Sentence and Commitment violates due process (see Earley v Murray, 451 F.3d 71, 75, rehearing denied 462 F.3d 147 (2d Cir. 2006)). The court held that the "only cognizable sentence is the one imposed by the judge. Any alteration to that sentence, unless made by a judge in a subsequent proceeding, is of no effect" (451 F.3d at 75). The court also subsequently held that whether the addition of a period of PRS is made administratively by DOCS or by "the operation of New York law" is irrelevant; in either case, "the alteration is of no effect" (462 F.3d at 148).

___

[1] Note that as of April 13, 2007, a new subdivision (2-a) was added to this section as part of the "Sex Offender Management and Treatment Act" (Chapter 7 of the Laws of 2007). The Act established new and significantly longer PRS periods for determinate sentences imposed on all "felony sex offense" convictions.

2

BeBeDEF 1874



Although a Second Circuit opinion is not binding on New York State courts (*People v Kin Kan*, 78 N.Y.2d 54), a number of state courts have grappled with the implications of *Earley*. The Appellate Division, Second Department, has consistently held that where both the sentencing minutes and the Sentence and Commitment form are silent on the period of PRS, the sentence does not include any PRS (*see e.g., People v Sawson*, 38 A.D.3d 563 (2nd Dept. 2007); *People v Sebastian*, 38 A.D.3d 578 (2nd Dept. 2007); *People v Wilson*, 37 A.D.3d 855 (2nd Dept. 2007); *People v Noble*, 37 A.D.3d 622 (2nd Dept. 2007); *People v Smith*, 37 A.D.3d 499 (2nd Dept. 2007). The Appellate Division, First Department, on the other hand, has held that the due process concerns noted in *Earley* are satisfied so long as PRS is reflected on the Sentence and Commitment form filled out by the clerk and signed by the judge (*People v Sparber*, 34 A.D.3d 265 (1st Dept. 2006); *see also, People v Lingle*, 34 A.D.3d 287, 289 (1st Dept. 2006); *People v Rivera*, 36 A.D.3d 563 (1st Dept. 2007); *accord, People v Thomas*, 35 A.D.3d 192 (1st Dept. 2006). The First Department has also taken the position that since any sentence that does not provide for a period of PRS is "unauthorized," the sentence court has the power to correct its ministerial error and may resentence the defendant to a sentence that included the correct period of PRS (*People v Hill, supra*, 39 A.D.3d 1). Yet, at least one trial court has looked to precedent from the Third Department and has upheld the DOCS practice of administratively adding a period of PRS (*Matter of Quinones v State Department of Corrections*, 14 Misc.3d 390 (Sup. Ct., Albany Cty. 2006), *citing Matter of Deal v Goord*, 8 A.D.3d 769 (3rd Dept. 2004)).

Nonetheless, as a result of *Earley* and the recent state court decisions in this area, DOCS reportedly is expending significant time and resources in an effort to identify all determinate sentence cases where PRS was not affirmatively pronounced by the court at the time of sentence. Even in those cases where there is no PRS period stated on the court's commitment order, DOCS cannot determine unequivocally whether PRS was omitted due to a clerical oversight or because the sentencing court simply did not make any pronouncement as to PRS. Although a review of the sentencing minutes might clarify the issue, DOCS advises that the minutes of the sentencing proceeding are not always available, and do not accompany the inmate until thirty days after the inmate is delivered to DOCS (*see* CPL 380.70).

In light of this, and pending further guidance in this area from the State Court of Appeals, DOCS has asked that the superior courts take appropriate steps in future determinate sentence cases to ensure that a specific PRS period is imposed on the record at sentencing and included in the court's written commitment order.

Accordingly, until such time as the New York Court of Appeals clarifies the law in this area, we strongly urge all judges, when imposing a determinate sentence, to state on the record the period of PRS to be served by the defendant and to insure that the clerk records the PRS period on the Sentence and Commitment form (UCS-854) that accompanies the defendant to DOCS.

Please distribute this memorandum to the appropriate Administrative Judges. Any questions regarding this matter may be referred to Paul McDonnell in Counsel's Office at (212) 428-2165.

cc: Hon. Ann T. Pfau
    Paul McDonnell

3

BeBeDEF 1875

# EXHIBIT C



## POST-RELEASE SUPERVISION
## RESENTENCING INITIATIVE

### PURPOSE

The purpose of this document is to detail the cooperative effort that is being undertaken jointly by the Department of Correctional Services (DOCS) and the Office of Court Administration (OCA), in conjunction with the Governor's Office of Counsel, to arrange for the resentencing of numerous individuals presently incarcerated with DOCS. Specifically, this applies to individuals with determinate sentences of imprisonment that require the imposition of post-release supervision (PRS) pursuant to Penal Law Section 70.45, and for whom the sentencing court did not pronounce such period of PRS at the time of sentence.

### HISTORICAL BACKGROUND

Penal Law Section 70.45 was enacted as a part of Chapter 1 of the Laws of 1998 and in pertinent part provides that "[e]ach determinate sentence also includes an additional period of post-release supervision." It applies to all violent felony offenders who committed their crimes on or after September 1, 1998, and who were subject to a determinate sentence of imprisonment. It has since been expanded to also cover drug offenders and those sex offenders who were previously subject to indeterminate sentencing.

When an individual is committed to state prison and delivered to a DOCS reception center, in accordance with Correction Law Section 601(a), the documents that accompany the individual include "a certified copy of the sentence and a certificate of conviction pursuant to Section 380.70 of the Criminal Procedure Law", a copy of the preSentence report, and a copy of the criminal history record.

The sentencing minutes are not delivered with the inmate to a reception center. Instead, in accordance with Section 380.70 of the Criminal Procedure Law (CPL), the sentencing minutes are required to be transcribed and then mailed to DOCS within thirty days of the date of sentence. Though this provision of law is mandatory, DOCS does not always receive a copy of the sentencing minutes. Moreover, at the time of reception, DOCS must perform all reception related responsibilities, which include the calculation of an inmate's sentence whereby all of the potential release dates are determined, e.g., the parole eligibility date where applicable, the conditional release date, and the maximum expiration date, etc.

Each month DOCS receives approximately 1,400 new commitments into its custody, each of whom will require a sentence calculation. This is a separate and distinct category from the hundreds of parole violators, conditional release violators, and post-release supervision violators who are also routinely returned to the custody of DOCS.

Once all of the various reception responsibilities are completed, which generally requires a period of about one week, the inmate is transferred to a general confinement

BeBeDEF 16

facility to continue serving the underlying sentence of imprisonment. It is crucial for DOCS not to cause any delays in the reception process since all such beds are needed to enable DOCS to accept all state-ready inmates in a timely manner from the localities (see CPL section 430.20(1)). Hence, the sentence calculation responsibility must be performed at the time of the reception.

In a recent Court of Appeals case captioned Matter of Garner v. DOCS, ___ NY3d ___, (April 29, 2008), the Court ruled that DOCS was without authority to administratively add PRS to the sentence and that only the sentencing judge is authorized to pronounce the PRS component of a defendant's sentence. The Court also noted that their holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

Prior to the Garner decision, and based upon DOCS' earlier understanding of the requirements of Penal Law Section 70.45, DOCS would calculate the mandatory period of PRS as part of the inmate's sentence at reception, even if the commitment document was silent on the issue of PRS.

## PLANNED COURSE OF ACTION

Now that the Garner decision has finally resolved the issue, DOCS, in accordance with the general principles set forth in Correction Law Section 601-a, is working in tandem with OCA to identify every potential case that would appear to qualify for resentencing, and to provide official notification to the sentencing courts and the district attorneys. It would appear that such resentencing should be pronounced nunc pro tunc to the date the original sentence was imposed.

In order to proceed in an orderly fashion, it has been determined that the first priority must be accorded to those individuals who are in the custody of DOCS based upon a technical violation of PRS, and for whom the commitment document was silent. Several months ago DOCS undertook a huge research project to identify every case that involved both a silent commitment and a period of PRS. In order to do this, DOCS had to manually examine each commitment document for every inmate who was subject to a determinate sentence of imprisonment that required PRS, in order to determine whether it was silent as to PRS.

In the wake of the Garner decision, however, another step is required in order to determine whether or not the court actually failed to pronounce a period of PRS at the time of sentencing. The experience of DOCS has been that in a number of cases where the commitment was silent, a separate review of the sentencing minutes did indicate that the period of PRS was pronounced by the court at sentencing. In all such cases it would appear that a clerical error had been made in the preparation of the commitment document and that the issuance of a new commitment document that would conform to what transpired during sentencing, would correct the defect without the necessity of an actual resentencing procedure. Hence, a review of the sentencing minutes is a prerequisite in every case in order to accurately determine whether resentencing is warranted.

Since DOCS is not always provided with a copy of the sentencing minutes, it is not possible to definitively identify every case where resentencing is warranted. Instead, in those cases where the sentencing minutes are available and the commitment is silent, DOCS can identify definitively each case that would be subject to resentencing. As of May 7, 2008, DOCS identified a total of 166 cases in this category.

In those cases where the commitment is silent but there are no sentencing minutes, DOCS can only bring those cases to the attention of the sentencing courts and the district attorneys as cases that potentially may warrant resentencing. The sentencing courts and district attorneys in turn will have to retrieve and review the sentencing minutes in order to make definitive determinations. As of May 7, 2008, a total of 380 cases have been identified within this category.

In an overall effort to move expeditiously, DOCS has generated lists of both categories of cases by county of commitment, and is providing such lists by e-mail to the concerned district attorney offices, so that the appropriate investigations can be immediately initiated. Formal notifications will separately be mailed both to the sentencing courts and the district attorney offices, which will also include copies of the commitment documents, and where available, the sentencing minutes as well.

# EXHIBIT D



**NEW YORK STATE**
**Unified Court System**

OFFICE OF COURT ADMINISTRATION

ANN PFAU
Chief Administrative Judge

LAWRENCE K. MARKS, ESQ.
Administrative Director

## MEMORANDUM

### May 14, 2008

TO:       Administrative Judges

FROM:   Lawrence K. Marks *LM*

SUBJECT:   Post-Release Supervision

As you may know, the Court of Appeals in two recent decisions (People v. Sparber and People v. Garner, both decided on April 29, 2008) addressed the issue of a trial court's failure to pronounce at sentencing the period of post-release supervision (PRS) that the Penal Law requires be imposed for sentences in certain cases (see Penal Law § 70.45).

These decisions may well require, ultimately, that thousands of currently incarcerated defendants be resentenced. The immediate focus of concern, however, is a group of several hundred defendants who have served their prison terms but have been returned to State prison for committing a technical violation of a condition of their PRS. In the next few days, the State Department of Correctional Services (DOCS) will be sending directly to each of you letters and a proposed order that DOCS has individually addressed to the judges in your court or district who sentenced these defendants (drafts of these materials are attached). These are cases in which DOCS has a copy of the sentencing minutes and the minutes reveal that the PRS period was never pronounced at sentencing or cases in which DOCS does not have a copy of the sentencing minutes and thus is unable to determine if the PRS period was pronounced at sentencing. The numbers of these cases range from as many as 142 in New York County and 107 in Kings County to just a few or even none in the smaller counties.

As you can see in the attached drafts, among other things DOCS will be asking the sentencing judge (1) if DOCS has a copy of the sentencing minutes, to calendar the case and impose the PRS period nunc pro tunc or, if the judge is not prepared to do that, to order DOCS to calculate the term of imprisonment without PSR and (assuming there are no holds) release the inmate without any further supervision; or (2) if DOCS does not have a copy of the sentencing minutes, to acquire the sentencing minutes, and if the minutes reveal that the PRS period was not pronounced at the sentencing then calendar the case and impose the PRS

**BeBeDEF 46**

**JA276**

period nunc pro tunc or order the defendant's release without any further supervision. Of course, the sentencing judges may choose a different course of action if he or she so decides.

When you receive the letters from DOCS, please ensure that they are provided to the individual judges to whom they are addressed. If a judge to whom a letter is addressed is no longer sitting, please assign the case to another judge. In addition, we strongly recommend that your office along with the relevant chief clerk's office coordinate acquisition of the sentencing minutes in those cases in which DOCS has not provided minutes.

Once this first category of cases impacted by the Court of Appeals decisions is processed, I will be sending you additional information proposing how the much larger categories of additional cases might be handled. In the meantime, if you have any questions please let me know. Thank you.

Attach.

cc:    Hon. Ann Pfau
       Hon. Joan B. Carey
       Hon. Jan H. Plumadore
       Maria Logus
       David Sullivan
       NYC Chief Clerks
       District Executives

2

BeBeDEF 47






STATE OF NEW YORK
DEPARTMENT OF CORRECTIONAL SERVICES
THE HARRIMAN STATE CAMPUS — BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y. 12226-2050

BRIAN FISCHER
COMMISSIONER

ANTHONY J. ANNUCCI
DEPUTY COMMISSIONER & COUNSEL

## STANDARD LETTER TO SENTENCING COURT
(Sentencing Minutes in File)

May ____, 2008

Honorable _____

_____ County Supreme Court

N.Y.

Re:   Inmate:        _____
      Ind./SCI #     _____
      DIN #          _____
      NYSID #        _____

Dear Justice _____:

The Department's records indicate that the above-captioned individual was sentenced by you to a ____ year determinate sentence of imprisonment on _____. Penal Law Section 70.45 requires that whenever a determinate sentence of imprisonment is imposed, the court must also impose a period of post-release supervision (PRS). The original sentence and commitment document that was delivered to the Department, a copy of which is enclosed, contained no reference to a period of PRS. A recent review of the sentencing minutes, a copy of which is also enclosed, further confirms that PRS was not pronounced by the Court at the time of the sentence.

Based upon the Department's earlier understanding of the requirements of Penal Law Section 70.45, the mandated period of PRS was calculated as part of this inmate's sentence when such person was originally received into the Department's custody. However, in the recent case Matter of Garner v. DOCS, __ NY3d __, 2008 NY Slip Op 03947, 2008 WL 1860082 (April 29, 2008), the Court of Appeals granted the inmate's Article 78 proceeding against the Department in the nature of a writ of prohibition, ruling that only the sentencing judge is authorized to pronounce the PRS component of a defendant's sentence, and that such pronouncement must be made in court in the defendant's presence. The Garner Court also ruled, however, that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

PRS6-SentMinsInFile.doc

BeBeDEF 48

Based on our review of the sentencing minutes, and consistent with our general practice in cases in which we believe that an inmate's sentence may be illegal, the Department is bringing this matter to the attention of the Court in order to afford to the Court an opportunity to correct the omission by imposing the statutorily mandated period of post-release supervision in the inmate's presence; see People v. Sparber, __ NY3d __, 2008 NY Slip Op 03946, 2008 WL 1860092 (April 29, 2008). This inmate is now in the custody of the Department based upon a violation of PRS when such person was in the community.

We request that the Court calendar this matter and allow the parties to be heard on the question of whether to resentence the inmate. In the event that the inmate is resentenced, it is requested that the Court mail to me a resentencing commitment specifying that the period of PRS is imposed nunc pro tunc to the date of the original sentence.

In the alternative, if the Court is not prepared to calendar the matter for this purpose, then we request that the Court issue an order directing DOCS to calculate the term of imprisonment imposed on the above-numbered indictment/SCI without post-release supervision, and if the inmate is not subject to any other term of imprisonment, hold or detainer, directing DOCS to release the inmate forthwith into the community without any further supervision by the Division of Parole. Both alternatives are included on the proposed Order, allowing the Court to choose one and strike out the other, for the convenience of the Court; in either case, please mail to me a photocopy of the signed order.

By copy of this letter, we are providing formal notification to the District Attorney and the inmate of this matter, and we respectfully urge that it be determined expeditiously. Additionally, the Department requests to be advised as soon as a decision is rendered.

Thank you for your prompt consideration of this matter.

Respectfully yours,

Anthony J. Annucci
Executive Deputy Commissioner

CC: District Attorney's Office
Inmate

PRS6-SentMinsInFile.doc



STATE OF NEW YORK
DEPARTMENT OF CORRECTIONAL SERVICES
THE HARRIMAN STATE CAMPUS – BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y. 12226-2050

BRIAN FISCHER
COMMISSIONER

ANTHONY J. ANNUCCI
EXECUTIVE DEPUTY COMMISSIONER

STANDARD LETTER TO SENTENCING COURT
(Sentencing Minutes Not in File)

May ___, 2008

Honorable _____

_____ County Supreme Court

N.Y.

Re:   Inmate: _____
      Ind./SCI # _____
      DIN # _____
      NYSID # _____

Dear Justice _____:

The Department's records indicate that the above-captioned individual was sentenced by you to a ___ year determinate sentence of imprisonment on _____. Penal Law Section 70.45 requires that whenever a determinate sentence of imprisonment is imposed, the court must also impose a period of post-release supervision (PRS). The original sentence and commitment document that was delivered to the Department, a copy of which is enclosed, contained no reference to a period of PRS. The Department does not have a copy of the sentencing minutes within its files to confirm whether the period of PRS was pronounced by the Court at the time of sentence.

Based upon the Department's earlier understanding of the requirements of Penal Law Section 70.45, the mandated period of PRS was calculated as part of the inmate's sentence when such person was originally received into the Department's custody. However, in the recent case Matter of Garner v. DOCS, ___ NY3d ___, 2008 NY Slip Op 03947, 2008 WL 1860082 (April 29, 2008), the Court of Appeals granted the inmate's Article 78 proceeding against the Department in the nature of a writ of prohibition, ruling that only the sentencing judge is authorized to pronounce the PRS component of a defendant's sentence, and that such pronouncement must be made in court in the defendant's presence. The Garner Court also ruled, however, that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

PRS4-SentMinsNotInFile.doc

 

We are writing to the Court because in this case, as mentioned above, the sentence and commitment document does not refer to a period of PRS. That fact alerts us, and in turn we are alerting the Court, to the possibility that no such term was pronounced at the time of sentencing. On the other hand, we have seen numerous cases in which the sentence and commitment document was silent, and yet the minutes revealed that the sentencing court did indeed pronounce a period of PRS in the defendant's presence. In this case, because we do not have a copy of the sentencing minutes, we cannot tell at this stage whether or not the sentencing court pronounced a period of PRS.

This inmate is now in the custody of the Department based upon a violation of PRS when such person was in the community. We request that the Court obtain and review the sentencing minutes. If upon review of the sentencing minutes, the Court determines that the period of PRS was imposed in the presence of the defendant, then it is requested that the Court mail to me a superseding commitment reflecting the PRS that was imposed; see People v. Sparber, __ NY3d __, 2008 NY Slip Op 03946, 2008 WL 1860092 (April 29, 2008).

In the alternative, if the Court determines that the period of PRS was not so imposed, we ask that the Court calendar the matter and give the parties an opportunity to be heard as to whether it would be appropriate for the Court to correct the omission by imposing the statutorily mandated period of PRS in a resentencing proceeding. In the event the inmate is resentenced, it is requested that the Court mail to me a superseding commitment specifying that the PRS is imposed nunc pro tunc to the date of the original sentence.

A proposed Order is enclosed for the Court's consideration at such time as the Court is able to obtain and review the sentencing minutes. Please mail to me a photocopy of any order issued in this case. By copy of this letter, we are providing formal notification to the District Attorney and the inmate of this matter. The Department respectfully urges that it be determined expeditiously and to be advised as soon as a decision is rendered. Thank you for your prompt consideration of this matter.

Respectfully yours,


Anthony J. Annucci
Executive Deputy Commissioner


CC:    District Attorney's Office
       Inmate

PRS6-SentMinsNotInFile.dec

BeBeDEF 51



STATE OF NEW YORK

_____ COURT, COUNTY OF _____

People v. the State of New York

v.

_____, Defendant.

ORDER

Inmate

Ind./SCI

DIN #

NYSID #

Whereas the New York State Department of Correctional Services (DOCS) has brought to the attention of the Court that DOCS has custody of the above-named inmate, who was Sentenced by the Court to a determinate term of imprisonment on the above-numbered indictment/SCI; that in light of the decisions by the Court of Appeals in the cases of Matter of Garner v. DOCS, ___ NY3d ___, 2008 NY Slip Op 03947 and People v. Sparber, ___ NY3d ___, 2008 NY Slip Op 03946 (April 29, 2008), there may be questions about the lawfulness of the sentence that was imposed, and about whether DOCS improperly computed such sentence; and that in light of such questions, DOCS has requested the Court to calendar this matter for consideration of whether the inmate should be resentenced; and

Whereas the Court has reviewed the sentencing minutes;

[EITHER]

It is hereby ordered that the Clerk add this matter to the Court's calendar of _____, 2008, at _____ in the _____ room, for consideration of whether the inmate should be resentenced, and that the Clerk arrange for counsel for both parties to appear at that date and time;

And it is further ordered that if the Court ultimately determines that the inmate shall be resentenced, or for any other reason determines that the inmate should be present for further proceedings, then DOCS shall comply with any Order to Produce that may be issued by the Court for that purpose;

[OR]

The Court, having considered the information pertaining to this case, including the sentencing minutes, has determined that it will not add this matter to the Court's calendar; that DOCS is hereby ordered to calculate the term of imprisonment imposed on the above-numbered indictment/SCI without post-release supervision; that if the inmate is not subject to any other term of imprisonment, hold or detainer, then DOCS shall release the inmate forthwith into the community without any further supervision by the Division of Parole; and that the Clerk shall notify the parties and DOCS of this Order.

SO ORDERED: _____

Dated: _____

# EXHIBIT E

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE NYS OFFICE OF COURT ADMINISTRATION,
## THE DEPARTMENT OF CORRECTIONAL SERVICES AND
## THE DIVISION OF PAROLE

This is a Memorandum of Understanding (hereinafter "MOU") by and between the Office of Court Administration (hereinafter "OCA") with offices at 25 Beaver Street, New York, New York, the Department of Correctional Services (hereinafter "DOCS") with offices at Building 2, State Campus, Albany, New York, and the Division of Parole (hereinafter "Parole") with offices at 97 Central Avenue, Albany, New York (collectively referred to as the "Parties") for the orderly resentencing of "designated persons" pursuant to Correction Law §601-d.

WHEREAS, in 1998, the New York State Legislature enacted Jenna's Law, which amended the Penal Law to end "indeterminate sentences" (i.e., sentences running between certain minimum and maximum periods set by the court at the time of sentencing) for criminal defendants convicted of violent felonies; and

WHEREAS, Jenna's Law required "determinate" sentences and created a schedule of mandatory terms of post-release supervision (hereinafter "PRS") to be included as a part of the determinate sentences of violent felony offenders; and

WHEREAS, in many cases, defendants were not informed at the time of sentencing that they would be subject to a term of PRS following completion of their determinate sentences, and DOCS therefore factored in terms of PRS as required by the Penal Law when performing time computations for those defendants;

WHEREAS, over time, offenders challenged DOCS' practice of adding PRS to their determinate sentences and courts throughout the State were split on this legal issue, with some finding that PRS automatically was a part of the sentence by operation of law, and others finding PRS had to be expressly imposed by the sentencing court; and

WHEREAS, on April 29, 2008, the New York State Court of Appeals issued two decisions (*Matter of Garner v. DOCS*, 10 N.Y.3d 358 [2008] and *People v. Sparber*, 10 N.Y.3d 457 [2008]) holding that only the sentencing judge has the authority to impose the PRS component of an offender's determinate sentence, but also ruling that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum"; and

WHEREAS, DOCS and Parole, in the months of May and June, identified hundreds of cases of technical violators of post release supervision in state or local custody and, consistent with the holding in *Matter of Garner v DOCS*, sent letters to the sentencing courts requesting resentencing or other appropriate determinations; and

BeBeDEF 12



WHEREAS, the Legislature passed and Governor Paterson signed Chapter 141 of the Laws of 2008 (effective June 30, 2008; [hereinafter "the legislation"]), adding, among other provisions, a new §601-d to the Correction Law creating a statutory framework that mandates a comprehensive review by sentencing courts of determinate sentences of every "designated person" (i.e., an inmate in the custody of DOCS and a releasee under the supervision of Parole upon whom a determinate sentence was imposed between September 1, 1998 and July 1, 2008, where the commitment order that accompanied such person does not indicate imposition of a term of PRS, and where the agency does not have sentencing minutes showing that a term of PRS was actually pronounced); and

WHEREAS, §601-d requires: i) that DOCS and Parole notify the sentencing court of every designated person in its custody or under its supervision so that the court may conduct a review; and ii) that the sentencing court, upon such notification, promptly seek to obtain sentencing minutes, plea minutes, and other relevant records which may show that a term of PRS was actually pronounced at sentence, or reconstruct sentencing proceedings if necessary; and

WHEREAS, the Legislature provided as to determinate sentences imposed prior to the effective date of the legislation that every determinate sentence "includes, as a part thereof," a term of PRS, and provided as to determinate sentences imposed on or after the effective date of the legislation, that the sentencing court "shall in each case" state, in addition to the term of imprisonment, a term of PRS; and

WHEREAS, the legislation will result in thousands of cases being referred to sentencing courts across the State, and it will be impractical for the courts to provide a fair and expeditious review of these thousands of cases without an orderly program of coordination, prioritization, and planning;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties do agree as follows:

1. OCA has advised DOCS and Parole that a simultaneous or unstructured referral of all designated persons to the sentencing courts would substantially compromise the ability of the State court system to conduct a fair review of all of the cases under the procedures and timeframes set forth in Correction Law §601-d. Accordingly, to allow for fair and expeditious review, it is necessary for the parties to prioritize cases and establish a schedule for referral of the cases to sentencing courts.

2. In order to ensure the most effective and fair process possible, all designated person letters to the sentencing courts from DOCS or Parole should be routed through the Administrative Judges administering the Judicial District in which the sentencing court is located. The Administrative Judges in each Judicial District, DOCS and Parole shall keep each other informed on the progress of implementation of the legislation, including notifications and resentencing proceedings.

3. DOCS and Parole shall refer cases to the sentencing courts through the Administrative Judge in each Judicial District pursuant to the following priority and schedule:

2

BeBeDEF 13

 

A. Designated persons in DOCS custody solely on the basis of a technical violation of PRS for whom letters were previously sent to the courts, prior to the enactment of the Legislation, requesting resentencing or other appropriate action, who were not resentenced and who are still in DOCS custody as of the date of this MOU, which are estimated to number approximately 400, shall be referred to the sentencing courts as soon as possible but, in any event, not later than July 31, 2008.

B. Designated persons incarcerated in local correctional facilities solely on the basis of a PRS violation warrant for whom letters were previously sent to the courts, prior to the enactment of the Legislation, requesting resentencing or other appropriate action, and who were not resentenced and who are still incarcerated in local correctional facilities as of the date of this MOU, which are estimated to number approximately 100, shall be referred to the sentencing courts as soon as possible but, in any event, not later than by July 31, 2008.

C. Designated persons incarcerated in DOCS or local correctional facilities due to a technical violation of PRS or a PRS violation warrant for whom letters were not sent to the courts prior to the enactment of the Legislation, shall be referred to the sentencing courts by July 31, 2008.

D. Designated persons currently under supervision in the community who were first released to PRS between July 15, 2004 and July 15, 2007, shall be referred to the sentencing courts by October 1, 2008, with no more than 500 cases under this paragraph being referred to sentencing courts prior to September 1, 2008.

E. Designated persons currently under supervision in the community who were first released to PRS between July 16, 2007 and July 15, 2008, shall be referred to the sentencing courts by November 1, 2008.

F. Designated persons released for the first time to PRS between July 15, 2008 and September 1, 2008, shall be referred by Parole to the sentencing courts by November 1, 2008.

G. Designated persons first released to PRS before July 15, 2004, shall be referred to the sentencing courts by December 1, 2008.

H. Notwithstanding the provisions of subparagraphs A through G of this paragraph, designated persons on PRS in the community who have not completed their sentence of imprisonment (i.e., conditional releasees) or who otherwise owe time on their sentence shall be referred to the sentencing courts by December 1, 2008.

I. Designated persons who are going to be released by DOCS for the first time onto post release supervision after September 1, 2008 but before October 1, 2008, shall be referred

3

to the sentencing courts at least 45 days prior to their release date.

J. Designated persons who are going to be released by DOCS for the first time onto post release supervision after October 1, 2008, which are estimated to number approximately 70 to 80 per month, shall be referred to the sentencing courts at least 60 days prior to their release date.

K. Any designated person who has not been referred to the sentencing court prior to his or her subsequent incarceration in a local correctional facility on a PRS violation warrant shall be referred to the sentencing court within 30 days of such re-incarceration.

L. Any designated person who was released and then subsequently returned to DOCS' custody as a result of revocation of PRS, who has not been previously referred to the sentencing court, shall be referred to the sentencing court within 30 days of such return.

4. If at any time an Administrative Judge notifies in writing DOCS or Parole that the present flow of cases into that particular Judicial District is creating or is predicted to create workloads beyond the capacity of such District to provide fair and expeditious review, and, consequently, that the schedule for the flow of designated persons into that Judicial District should be modified, then the schedule provided herein may, be modified as to that Judicial District by agreement between that Administrative Judge and those agencies, subject to the approval of OCA.

IN WITNESS WHEREOF, the Parties hereto have caused this Memorandum of Understanding to be executed as of the date indicated below.

DEPARTMENT OF CORRECTIONAL SERVICES

By: Anthony J. Annucci
Title: Exec. Dep. Comm. & Counsel
Date: July 11, 2008

DIVISION OF PAROLE

By: Terrence Tracy
Title: Counsel
Date: July 9, 2008

OFFICE OF COURT ADMINISTRATION

By: Michael Colodner
Title: Counsel
Date: July 9, 2008

4

# EXHIBIT E

**JA288**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X
PAUL BETANCES, LLOYD A. BARNES, :
GABRIEL VELEZ a/k/a GABRIEL BELIZE, :
Individually and on behalf of all others similarly :
situated,                                            :        **DECLARATION OF**
                                                     :        **RICHARD de SIMONE**
                              Plaintiffs,            :
                                                     :
                                                     :        11 Civ. 3200 (SAS)
- against –                                          :
                                                     :
                                                     :
BRIAN FISCHER, *et al.*,                             :
                                                     :
                              Defendants.            :
————————————————————————X

     RICHARD de SIMONE declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

     1.    I am the Deputy Counsel in Charge of the Office of Sentencing Review ("OSR") of the New York State Department of Corrections and Community Supervision ("DOCCS") and an attorney admitted to the New York Bar. I submit this declaration in support of defendants' motion for summary judgment based on my personal knowledge and a review of documents pertaining to the matters at issue in this case.

     2.    I have been employed by DOCCS and its predecessor agency, the New York State Department of Correctional Services ("DOCS" or "the Department"), since 1986. DOCCS was formed in April 2011 by the merger of DOCS and the New York State Division of Parole ("Parole"). At the times relevant to this lawsuit, I was counsel to DOCS.

     3.    I have served as Deputy Counsel in Charge of DOCS' OSR since 2015 and as Associate Counsel in Charge of DOCS' OSR between 1995 and 2015. In that capacity, I oversee

1

the day-to-day legal issues involving sentencing and the calculation of release dates for offenders in the custody of DOCS or Parole (now DOCCS). My duties also extend to responding to inquiries from judges, prosecutors, and criminal defense attorneys regarding sentence impositions and calculations, assisting the Attorney General's Office in litigation in the State and federal courts (including Article 78 and habeas corpus proceedings) relating to sentencing issues, and working with the State Legislature regarding changes in sentencing law. My responsibilities have remained the same since 1995 and were not changed following the merger in April 2011.

### JENNA'S LAW

4.     In my work with the State Legislature over the years, I have participated in drafting many pieces of legislation, including the Sentencing Reform Act of 1995.

5.     In 1998, the Governor's Office enlisted the support of DOCS and Parole to draft legislation that became known as "Jenna's Law," which created a schedule of mandatory periods of post-release supervision ("PRS") which were included as a part of the determinate sentences of violent felony offenders. See Penal Law § 70.45 (McKinney's 1998).[1]

6.     The statute was drafted with the intent that PRS would be an automatic component of all determinate sentences imposed upon defendants who were convicted of violent felonies. As such, Penal Law § 70.45(1) was understood by DOCS, many criminal judges, prosecutors and defense attorneys to include, by operation of law, a term of PRS without having been pronounced by the sentencing court, and as a result, many sentence and commitment orders issued by court clerks omitted specific mention of offenders' mandatory periods of PRS.

---

[1]  The Legislature subsequently extended determinate sentencing and PRS to all drug offenders with the Drug Law Reform Act of 2004, and to those sex offenders who had been subject to indeterminate sentencing with the Sex Offender Management and Treatment Act of 2007.

2

7.      Having participated in drafting Penal Law § 70.45, I assisted in implementing the procedures DOCS subsequently followed at the times relevant to this lawsuit when a defendant was sentenced to a determinate term of imprisonment that required a period of PRS, and specifically when a defendant was sentenced to a determinate term of imprisonment and the sentence and commitment order accompanying the defendant did not indicate a PRS term – or was "silent" as to the period of PRS mandated by Penal Law § 70.45.

## DOCS' CALCULATION OF PRS PERIODS

8.      At the relevant times, when an inmate first entered DOCS' custody, an inmate's sentencing information was entered into DOCS' computer system by staff at a reception center facility based upon the inmate's sentence and commitment order. Beginning in 1998, after Jenna's Law was passed, OSR, from DOCS' Central Office in Albany, advised staff in Inmate Records and at reception center facilities of how to determine the periods of PRS mandated by the statute. OSR distributed to the correctional facilities a chart setting forth the applicable periods of PRS, which depended on the felony class of the defendant's instant offense as well as the defendant's status as a first or predicate felon, as set forth in the commitment order. See, for example, a copy of a chart used by Inmate Records staff in January 2007, attached as Exhibit A.

9.      When the Department received a sentence and commitment order that was silent as to PRS, DOCS staff entered the default PRS period under § 70.45(2), which was 3 years for first-time offenders convicted of class D or E violent felonies, and 5 years for all other offenders, in compliance with § 70.45, which included the required PRS period automatically by operation of law. If the sentencing court specified on the commitment order a PRS period other than the default amount, DOCS entered on its records the PRS period so specified.

3

10.    In 2004, the terms of imprisonment authorized by the Penal Law for controlled substance and marihuana felonies changed from indeterminate to determinate. When § 70.45(2) was amended at that time to add PRS periods for such felonies, it was also revised to eliminate the default 3- and 5-year PRS periods for first-time violent offenders. The 5-year default period of PRS for predicate offenders convicted of violent felonies remained unchanged by the 2004 legislative amendment. See Penal Law § 70.45(2) (McKinney's 2004).

11.    After the 2004 amendment to the statute, DOCS changed the manner in which PRS periods were determined for first-time violent felony offenders whose sentence and commitment orders were silent as to PRS. Since § 70.45(2) no longer specified a default PRS period for such offenders, DOCS determined it to be the shortest applicable period authorized by that statute. The PRS range for a first offender convicted of a class D or E violent felony was 1 ½ to 3 years, so the default amount was 1 ½ years. Similarly, the PRS range for a first offender convicted of a class B or C violent felony was 2 ½ to 5 years, so the default amount was 2 ½ years.[2]  When the court specified a different PRS period on the commitment order, DOCS applied the PRS period specified on the commitment order. OSR advised the facilities of these new statutory mandates and provided the facilities with a revised chart outlining how to calculate the PRS term at reception.

12.    DOCS' correctional facilities were required by DOCS policy to enter into the computer system the specified period of PRS from the applicable version of the chart at any given time.

---

[2] DOCS employed the same approach for the three newly enacted PRS ranges for controlled substance and marihuana felonies; the shortest authorized period was deemed to be the default amount. The only period of PRS authorized for a first felony offender convicted of a class D or E controlled substance or marihuana felony was 1 year, so that was deemed to be the default amount.

4

13.     Unless the court had ordered its sentence to be executed as a sentence of parole supervision pursuant to CPL § 410.91, the period of PRS assessed by DOCS would not commence until the inmate's release from imprisonment by DOCS to supervision by Parole.  At that time, DOCS calculated the PRS Maximum Expiration date.  If the person's release was subsequently revoked by Parole, DOCS was required to recalculate the PRS Maximum Expiration date to reflect such revocation.

14.     In the event a court in an Article 78 or habeas corpus proceeding struck the PRS period assessed by DOCS, this Department would recalculate the determinate sentence without PRS.

## DOCS' RESPONSE TO *EARLEY v. MURRAY*

15.     In 2006, after the United State Court of Appeals for the Second Circuit decided Earley v. Murray, a number of inmates and parolees began to challenge their periods of PRS in State courts pursuant to Article 78 and Article 70.  Many State courts at the time did not follow the holding in Earley, and instead followed People v. Catu, 4 N.Y.3d 242 (2005), where the State Court of Appeals held PRS to be "automatic," and where the remedy for an inmate's challenge to PRS on grounds that he had not been advised of the PRS term, was to allow the inmate to withdraw his guilty plea – not to excise PRS from his sentence.

16.     DOCS anticipated at that time that many inmates would send inquiries to facility staff regarding their PRS terms.  DOCS' position was that Earley was in direct conflict with the New York Court of Appeals' ruling in People v. Catu, which rejected expunction of the PRS term, holding instead that PRS was a "direct consequence" of a conviction by plea or verdict, and has a "largely automatic effect on [a] defendant's punishment."  DOCS advised inmates with questions about Earley that, based upon the State Court of Appeals holding in People v. Kan, 78

5

N.Y.2d 54 (1991), where a lower federal court and a state's highest court disagreed on an issue, prevailing state law takes precedence.

17.    Based on this view of law, DOCS continued to enter PRS periods when the commitment orders were silent, and the New York Court of Appeals decision in Catu continued to control, upholding the lawfulness of DOCS' administrative assessment of PRS periods as effected by operation of law even when the commitment orders were silent as to PRS.

18.    Indeed, in Earley v. Murray, the Second Circuit did not expunge petitioner Earley's period of PRS from his sentence, but rather remanded the matter to the district court for further proceedings. The district court did not release Mr. Earley until nearly a year later.

19.    Beginning in August 2006, inmates in DOCS' custody began to challenge, through petitions for habeas corpus or Article 78 relief, DOCS' calculations of PRS. DOCS responded, through the Office of Attorney General, adhering to the law as it then existed. For example, in People ex rel Eaddy v. New York State Dep't of Corrections, a Wyoming County habeas corpus proceeding (Index No. 20331-06), DOCS responded to a petitioner's application for expunction of his PRS term that neither Catu nor Earley had determined that the appropriate remedy for such a challenge was "excising" the PRS term.[3] DOCS took the position that any habeas or Article 78 petitioner at that time was not entitled to any greater benefit than that Earley himself received.

20.    It was apparent that there was much confusion in the State courts of New York between 2006 and 2008 regarding the automatic imposition of PRS. District Attorneys,

---

3 Indeed, had Earley's federal habeas petition been deemed untimely, Earley himself would have remained subject to PRS.

6

**JA294**

however, opposed CPL 440 challenges on grounds that PRS was automatic, and did not seek resentencing of inmates or parolees challenging their PRS periods under Earley.

21.     Finally, in April of 2008, the decisions in Matter of Garner v. N.Y.S. Dep't of Correctional Servs., 10 N.Y.3d 358 (2008) and People v. Sparber, 10 N.Y.3d 457 (2008), clarified that the State Court of Appeals viewed PRS as a State procedural issue, not a federal constitutional issue, and that as a matter of State procedural law, judicial pronouncement of PRS was required. The remedy, as DOCS had maintained, was resentencing before a court, not immediate release.

22.     DOCS launched a "Post-Release Supervision Resentencing Initiative" in an effort to effect the remedy suggested by the courts.

23.     At that time, however, the neither DOCS nor Parole, as executive agencies had express authority to refer any individual for resentencing.

### CORRECTION LAW § 601-d

24.     On June 30, 2008, the State Legislature enacted comprehensive remedial legislation that, for the first time, gave DOCS and Parole the authority to refer inmates whose PRS periods appeared to have not been pronounced by their sentencing courts for resentencing. See Corr. Law § 601-d.

25.     Before the enactment of § 601-d in 2008, the statutory authority for DOCCS to initiate a review of a sentence was limited to defendants who appeared to be sentenced erroneously as second, third or fourth offenders.[4] Thus, DOCS lacked the authority to effect the remedies suggested by Earley, or later by Garner and Sparber. Given the view of many State

---

[4] Said authority was granted by Correction Law § 601-a, which was enacted in 1957. The categories of second, third and fourth offenders ceased to exist when New York's current Penal Law went into effect in 1967.

7

courts that PRS did not have to be judicially pronounced, and DOCS had no statutory authority to initiate reviews regarding the absence of PRS periods on sentence and commitment orders, any notification by DOCS would have been advisory at best.

26. After § 601-d was enacted, however, DOCS and Parole were required to refer individuals for whom the agencies' records indicated may not have been sentenced by a judge to PRS ("designated persons") to their sentencing courts. At resentencing, courts could impose PRS as required by Penal Law § 70.45 or re-impose the determinate sentences without PRS as authorized by the newly enacted § 70.85.

27. In the interim, DOCS and Parole were not authorized to adjust their records unilaterally to reflect sentencings that courts had not imposed PRS, except as provided by § 601-d(6). Thus, neither agency was authorized to release any inmate or parolee until the statutory resentencing procedure was completed, or such release was ordered by the court pursuant to CPLR Article 70 or 78. See Corr. Law § 601-d(8).

28. The 2008 legislation demonstrated the broad scope of remedial action that was necessary for defendants whose determinate sentences did not initially include the PRS periods required by law. In addition to enacting § 601-d, Penal Law § 70.45(1) was amended to require courts to specify at sentencing the PRS periods for determinate terms, County Law § 722(4) was amended to provide assigned counsel for designated persons, the Office of Court Administration was required to promulgate rules and regulations for cases brought pursuant to § 601-d, CPL § 380.70 was amended to clarify the sentencing court's obligation to provide DOCS with sentencing minutes, and Correction Law § 601-a was amended to require DOCS to initiate a review whenever it appeared a person in its custody was erroneously sentenced.

8

29.     The § 601-d resentencing procedure was executed pursuant to a Memorandum of Understanding with OCA and Parole, which prioritized the resentencings to ease the burdens on the State courts.  By the end of 2008, the resentencing process had nearly been completed for designated persons who were either returned to DOCS as PRS violators or who were under the jurisdiction of Parole pursuant to PRS.  Resentencings were then being scheduled for inmates who had not yet been released from their determinate terms, except for absconders or individuals serving time for crimes in other jurisdictions who would be returned to State custody at later dates.

WHEREFORE, defendants' motion for summary judgment should be granted.

RICHARD de SIMONE

Executed on May 8, 2015

9

# EXHIBIT A

Case 1:11-cv-03200-SAS Document 92-1 Filed 05/08/15 Page 1 of 2

Violent felonies: PL 70.02(1).
Determinates are for violent felonies: PL 70.00(6).

COLUMN I: Determinate terms must be imposed on 2VFO: PL 70.04(3) for crimes committed after 10-1-95.

COLUMN II: Determinate terms must be imposed on 2FO whose present sentence is violent: PL 70.06(6) for crimes committed after 10-1-95.

COLUMN III: Determinates terms must be imposed on 1VFO: PL 70.02(3) for crimes committed after 9-1-98.

PRS: Post Release Supervision. For crimes committed after 9-1-98. If commitment is silent, impose the amount underlined.

| | | | | I | II | III |
|---|---|---|---|---|---|---|
| 0608 | Aggr Assault/Peace Off. | B | | 10-25 | 8-25 | 5-25 |
| 1911 | Aggr Sexual Abuse 1 | B | | | | |
| 1700 | Att Arson 1 | B | | PRS | PRS | PRS |
| 1701 | Arson 2 | B | | 1 | 1 | 2 1/2-5 |
| 0600 | Assault 1 (After 11-1-96) | B | | | | |
| 0701 | Burglary 1 | B | | | | |
| 1914 | Crse Sex Conduct Child 1 | B | | | | |
| 2100 | Crim Poss Weap 1 | B | | | | |
| 2121 | Crim Use Firearm 1 | B | | | | |
| 0614 | Gang Assault 1 | B | | | | |
| 4835 | Intim Wit/Vict 1 | B | | | | |
| 4001 | Att Kidnapping 1 | B | | | | |
| 4002 | Kidnapping 2 | B | | | | |
| 0201 | Manslaughter 1 | B | | | | |
| 0102 | Att Murder 2 | B | | | | |
| 0401 | Rape 1 | B | | | | |
| 0501 | Robbery 1 | B | | | | |
| 1901 | Sodomy 1 | B | | | | |

| | | | | I | II | III |
|---|---|---|---|---|---|---|
| 0608 | Att Aggr Assault/Peace Off. | C | | 7-15 | 5-15 | 3 1/2-15 |
| 1911 | Att Aggr Sexual Abuse 1 | C | | | | |
| 1912 | Aggr Sexual Abuse 2 | C | | PRS | PRS | PRS |
| 1701 | Att Arson 2 | C | | 1 | 1 | 2 1/2-5 |
| 0600 | Att Assault 1 (After 11-1-96) | C | | | | |
| 0601 | Assault 1 (Bfrs 10-31-96) | C | | | | |
| 0616 | Aslt PO/Fireman/EMT | C | | | | |
| 0701 | Att Burglary 1 | C | | | | |
| 0702 | Burglary 2 | C | | | | |
| 1914 | Att Crse Sex Conduct Child 1 | C | | | | |
| 2100 | Att Crim Poss Weap 1 | C | | | | |
| 2108 | Crim Poss Weap 2 | C | | | | |
| 2127 | Crim Sale Firearm 1 | C | | | | |
| 2121 | Att Crim Use Firearm 1 | C | | | | |
| 2122 | Crim Use Firearm 2 | C | | | | |
| 0614 | Att Gang Assault 1 | C | | | | |
| 0615 | Gang Assault 2 | C | | | | |
| 4835 | Att Intim Wit/Vict 1 | C | | | | |
| 4002 | Att Kidnapping 2 | C | | | | |
| 0201 | Att Manslaughter 1 | C | | | | |
| 0401 | Att Rape 1 | C | | | | |
| 0501 | Att Robbery 1 | C | | | | |
| 0502 | Robbery 2 | C | | | | |
| 1901 | Att Sodomy 1 | C | | | | |

02-05-99

| | | | | I | II | III |
|---|---|---|---|---|---|---|
| 1912 | Att Aggr Sexual Abuse 2 | D | | 1-7 | 3-7 | 2-7 |
| 1913 | Aggr Sexual Abuse 3 | D | | | | |
| 0601 | Att Assault 1 (Bfrs 10-31-96) | D | | PRS | PRS | PRS |
| 0602 | Assault 2 | D | | 1 | 1 | 1 1/2-3 |
| 0616 | Att Aslt PO/Fireman/EMT | D | | | | |
| 0702 | Att Burglary 2 | D | | | | |
| 1915 | Crse Sex Conduct Child 2 | D | | | | |
| 2108 | Att Crim Poss Weap 2 | D | | | | |
| 2101 | Crim Poss Weap 3 (4,5,6) | D | | | | |
| 2127 | Att Crim Sale Firearm 1 | D | | | | |
| 2128 | Crim Sale Firearm 2 | D | | | | |
| 2130 | Crim Sale Firearm/Minor | D | | | | |
| 2122 | Att Crim Use Firearm 2 | D | | | | |
| 4829 | Intim Wit/Vict 2 | D | | | | |
| 0615 | Att Gang Assault 2 | D | | | | |
| 0502 | Att Robbery 2 | D | | | | |
| 1905 | Sexual Abuse 1 | D | | | | |

| | | | | I | II | III |
|---|---|---|---|---|---|---|
| 2101 | Att Crim Poss Weap 3 (4,5,6) | E | | 3-4 | 2-4 | 1 1/2-4 |
| | | | | PRS | PRS | PRS |
| | | | | 1 | 1 | 1 1/2-5 |

$$1/7 = 364 \times Y + 30 \times M + D$$

| Term | 1/7 of term |
|---|---|
| 00-06-00 | 00-00-26 |
| 02-00-00 | 00-03-14 |
| 03-00-00 | 00-05-06 |
| 03-06-00 | 00-06-02 |
| 04-00-00 | 00-06-28 |
| 05-00-00 | 00-08-20 |
| 06-00-00 | 00-10-12 |
| 07-00-00 | 01-00-00 |
| 08-00-00 | 01-01-22 |
| 09-00-00 | 01-03-14 |
| 10-00-00 | 01-05-06 |
| 11-00-00 | 01-06-28 |
| 12-00-00 | 01-08-20 |
| 13-00-00 | 01-10-12 |
| 14-00-00 | 02-00-00 |
| 15-00-00 | 02-01-22 |
| 16-00-00 | 02-03-14 |
| 17-00-00 | 02-05-06 |
| 18-00-00 | 02-06-28 |
| 19-00-00 | 02-08-20 |
| 20-00-00 | 02-10-12 |
| 21-00-00 | 03-00-00 |
| 22-00-00 | 03-01-22 |
| 23-00-00 | 03-03-14 |
| 24-00-00 | 03-05-06 |
| 25-00-00 | 03-06-28 |
| 30-00-00 | 04-03-14 |
| 40-00-00 | 05-08-20 |
| 50-00-00 | 07-01-22 |

000026

VIOLENT FELONIES Case 1:11-cv-03200-SAS Document 92-1 Filed 05/08/15 Page 2 of 2

PL 70.02(1). Determinate PL 70.00(6)

COLUMN V: Determinate terms must be imposed on 2 VFO: PL 70.04(3) for crimes committed after 10-1-95.

COLUMN D: Determinate terms must be imposed on 2 FO whose present sentence is violent: Penal Law 70.06(6) for crimes committed after 10-1-95.

COLUMN F: Determinate terms must be imposed on 1 VFO: PL 70.02(3) for crimes committed after 9-1-98.

PRS: Post Release Supervision. PL 70.45 (2). For crimes committed after 9-1-98. If commitment is silent, impose the amount underlined.

SCSA: Second Child Sexual Assault. Larger determinate and indeterminate sentences must be imposed on inmates sentenced under PL 70.07(4). See SCSA CHART.

| CLASS B | | V | D. | F |
|---|---|---|---|---|
| 0608 | AGGR ASSAULT 1*O° | 10-25 | 8-25 | 5-25 |
| 0205 | AGGR MANSLAUGHTER 1 * | | | *10-30 |
| 1911 | AGGR SEXUAL ABUSE 1 | | | |
| 1700 | ATT ARSON 1 | PRS | PRS | PRS |
| 1701 | ARSON 2 | 5 | 5 | 2½ -5 |
| 0600 | ASSAULT 1 | | | |
| 0701 | BURGLARY 1 | | | |
| 3035 | CRIM POSS CHEM/BIOL WEAPON 2 | | | |
| 2100 | CRIM POSS WEAP 1 | | | |
| 2117 | CRIM SALE FIREARM 1 | | | |
| 3033 | CRIM USE CHEM/BIOL WEAPON 3 | | | |
| 2121 | CRIM USE FIREARM 1 | | | |
| 1921 | CRIMINAL SEXUAL ACT 1 | | | |
| 1914 | CRSE SEX CONDUCT CHILD 1 | | | |
| 0614 | GANG ASSAULT 1 | | | |
| 3021 | HINDER PROSECUTION TERRORISM 1 | | | |
| 1926 | INCEST 1 | | | |
| 4835 | INTIM WIT/VICT 1 | | | |
| 4001 | ATT KIDNAPPING 1 | | | |
| 4002 | KIDNAPPING 2 | | | |
| 0201 | MANSLAUGHTER 1 | | | |
| 0102 | ATT MURDER 2 | | | |
| 0401 | RAPE 1 | | | |
| 0501 | ROBBERY 1 | | | |

| CLASS C | | V | D | F |
|---|---|---|---|---|
| | ATTEMPT TO COMMIT CLASS B | 7-15 | 5-15 | 3½ -15 |
| 0303 | AGG CRIM NEG HOM** | | | *7-20 |
| 0206 | AGGR MANSLAUGHTER 2* | | | |
| 1912 | AGGR SEXUAL ABUSE 2 | | | |
| 0616 | ASLT:PO/FIREMAN/EMT | PRS | PRS | PRS |
| 0702 | BURGLARY 2 | 5 | 5 | 2½ -5 |
| 3036 | CRIM POSS CHEM/BIOL WEAPON 3 | | | |
| 2108 | CRIM POSS WEAP 2 | | | |
| 2118 | CRIM SALE FIREARM 2 | | | |
| 2120 | CRIM SALE FIREARM/MINOR | | | |
| 2122 | CRIM USE FIREARM 2 | | | |
| 0615 | GANG ASSAULT 2 | | | |
| 3022 | HINDER PROSECUTION TERRORISM 2 | | | |
| 0502 | ROBBERY 2 | | | |
| 3023 | SUPPORT ACT OF TERRORISM 1 | | | |

| | | V | D | F |
|---|---|---|---|---|
| | ATTEMPT TO COMMIT CLASS C | 5-7 | 3-7 | 2-7 |
| 1913 | AGGR SEXUAL ABUSE 3 | | | |
| 1711 | AGGR USE PYROTECHNICS 1 | | | |
| 0602 | ASSAULT 2 | PRS | PRS | PRS |
| 0616 | ATT ASLT:PO/FIREMAN/EMT | 5 | 5 | 1½ -3 |
| 0702 | ATT BURGLARY 2 | | | |
| 3036 | ATT CRIM POSS CHEM/BIOL WEAPON 3 | | | |
| 2108 | ATT CRIM POSS WEAP 2 | | | |
| 2101 | CRIM POSS WEAP 3 (4-8) | | | |
| 2118 | ATT CRIM SALE FIREARM 2 | | | |
| 2120 | ATT CRIM SALE FIREARM/MINOR | | | |
| 2122 | ATT CRIM USE FIREARM 2 | | | |
| 1915 | CRSE SEX CONDUCT CHILD 2 | | | |
| 3011 | FALSELY REPORTING INCIDENT 1 | | | |
| 0615 | ATT GANG ASSAULT 2 | | | |
| 3022 | ATT HINDER PROSECUTION TERRORISM 2 | | | |
| 4829 | INTIM WIT/VICT 2 | | | |
| 3025 | MAKE TERRORISTIC THREAT | | | |
| 3016 | PLACING FALSE BOMB 1 | | | |
| 3017 | PLACE FALSE BOMB 1 | | | |
| 0502 | ATT ROBBERY 2 | | | |
| 1905 | SEXUAL ABUSE 1 | | | |
| 0618 | STALKING 1 | | | |
| 3023 | ATT SUPPORT ACT OF TERRORISM 1 | | | |
| 3024 | SUPPORT ACT OF TERRORISM 2 | | | |

| CLASS E | | V | D | F |
|---|---|---|---|---|
| 2101 | ATT CRIM POSS WEAP 3 (4-8) | 3-4 | 2-4 | 1½ -4 |
| 3012 | FALSELY REPRTNG INCDNT 2 | PRS | PRS | PRS |
| 3018 | PLACE FALSE BOMB 2 | 5 | 5 | 1½ -2 |

1/7 OF TERM [(364 x Y) + (30 x M) + D]/7.   0-6-0: 0-0-26
1: 0-1-22   1-6-0: 0-2-18      2: 0-3-14   2-6-0: 0-4-10
3: 0-5-6   3-6-0: 0-6-2       4: 0-6-28  4-6-0: 0-7-24
5: 0-8-20   6: 0-10-12        8: 1-1-22   9:1-3-14
10:1-5-6   11:1-6-28          12:1-8-20   13:1-10-12
15:2-1-22   16:2-3-14         17:2-5-06   18:2-6-28
19:2-8-20   20:2-10-12        22:3-1-22   23:3-3-14
24:3-5-6   25:3-6-28   30:4-3-14   40:5-8-20   50:7-1-22

BeBeDEF 123863

# EXHIBIT G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY
------------------------------------------------------------X
THE STATE OF NEW YORK, THE NEW YORK :  Case No.: *4834-08*
STATE DEPARTMENT OF CORRECTIONAL
SERVICES, and THE NEW YORK STATE DIVISION :
OF PAROLE,

             :

      Plaintiffs,

                **AFFIRMATION OF**
                **TERRENCE X. TRACY**

  -against-        :

MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON
and MALCOLM CARTER,        :
*individually and on behalf of all others similarly situated*

             :

      Defendants.
------------------------------------------------------------X

THE STATE OF NEW YORK,
COUNTY OF ALBANY:

    TERRENCE X. TRACY, an attorney duly admitted to practice in the courts of the

State of New York, affirms that the following statements are true under the penalties of

perjury:

    1. I currently serve as Counsel to the New York State Division of Parole (the

"Division" or "Parole").

    2. In June 1996, I commenced my employment with the Division as an Associate

Counsel and in December 1996, was appointed to my current position.

    3. Among my duties, I am responsible for the provision of all the legal services that

affect the day-to-day operation of the Division, an agency which supervises approximately

43,000 felony offenders who have been released from State prison (hereinafter

"releasees") through presumptive release, the discretionary grant of parole, conditional

release or release to serve a period of post-release supervision. The Division employs a workforce of approximately 2,200 individuals and has a combined annual operations and capital budget that amounts to approximately $ 225,000,000. The Division's principal office is located at 97 Central Avenue, Albany, New York 12206.

4. I make this affirmation in the paramount interests of the safety and security for the citizens of the State of New York, and in support of an application, through an Order To Show Cause, for a temporary restraining order and preliminary injunction authorizing the Division and the New York State Department of Correctional Services (hereinafter "DOCS") to address in a systematic and orderly manner the retention in or release from DOCS' custody or the Division's jurisdiction certain classes of individuals either in State custody by incarceration or under supervision in the community solely as a result of the terms and conditions of their post-release supervision ("PRS"), such classes being individuals affected by two recent decisions of the New York State Court of Appeals.

5. I have reviewed the recent New York State Court of Appeals decision in Matter of Garner v. New York State Dept. Of Correctional Services, 2008 NY Slip Op 03947, 2008 N.Y. LEXIS 1051 (April 29, 2008) which held that DOCS was prohibited from administratively calculating into an inmate's criminal sentence the period of PRS that attaches to their determinate sentence, even though PRS is a statutorily mandated component of a determinate sentence, (see Penal Law § 70.45[1]), and that PRS can only be part of a criminal defendant's sentence when pronounced by the sentencing judge in open court before the defendant.

6. The decision in Garner bears upon the Division's supervision of releasees who may not have had a period of PRS pronounced as required at their sentencing

2

proceedings, but whose sentences, as calculated by DOCS, did include the mandatory period of PRS prescribed by Penal Law §70.45.

7. The Court of Appeals, moreover, noted in <u>Garner</u> that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." <u>Id</u>. at \*\*8, n. 4. Plainly there are important issues as to whether affected parolees may and should be resentenced.

8. I have also reviewed the decision that the Court of Appeals issued the same day as <u>Garner</u> in a group of cases combined under the lead caption of <u>People v. Sparber</u>, 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053 (April 29, 2008), which addressed issues associated with the manner by which sentences should be remedied where the period of PRS was not pronounced by the sentencing courts. Most noteworthy for the purpose of this action and the attendant request for injunctive relief is the Court of Appeals' ruling that although "the procedure through which PRS was imposed upon these defendants was flawed as it did not comply with the statutory mandate[,] . . . [t]o remedy this error, rather than striking PRS from the sentences... as urged by defendants, these matters must be remitted to Supreme Court for resentencing and the proper judicial pronouncement of the relevant PRS terms." <u>Id</u>. at \*\*2.

9. In order to give effect to sentencing principles established by the Court of Appeals through the aforementioned decisions, the Division has joined in a major initiative, which has included the participation of DOCS, the Office of the Governor of the State of New York, the Office of Court Administration ("OCA"), and the Division of Criminal Justice Services ("DCJS"), dedicated to identifying the scope of the issues created by the <u>Garner</u>

3

**JA305**

and <u>Sparber</u> decisions and implementing a system that will resolve the myriad issues as fairly and expeditiously as practicable.

10. After the Court of Appeals issued its decisions in the <u>Garner</u> and <u>Sparber</u> cases, the Division immediately formed a task force charged with the task of identifying all releasees who are currently being supervised by the Division although their commitment orders did not specify a period of PRS.

11. It appears that the Court of Appeals' decisions could affect as many as 18,000 releasees and could have a significant adverse impact on public safety if the issues they present to both DOCS and the Division, as well as the other State, county and municipal agencies, are not resolved through a careful, methodical process that is expeditious and yet deliberate.

## THE DIVISION'S PRACTICES REGARDING PRS

12. DOCS is the State agency charged with the lawful responsibility for calculating the maximum expiration dates of all felony offenders remanded to its custody who are subsequently released to the Division at some point in the continuum of their sentence. All of the time computations associated with a State inmate's sentence that are calculated by DOCS are stored on its mainframe, an electronic database to which the Division and its employees have access. Apart from simply having access to this database, there is a daily exchange of data between the two agencies so that information generated by DOCS is transferred over to a separate database maintained by the Division. With this information, Division staff is apprised of an inmate's computed release date, maximum expiration date, and for the purpose of this action, the period of PRS.

4

13. When an inmate is scheduled to be released from DOCS' custody to the jurisdiction of the Division, whether through conditional release, PRS or any other kind of release, e.g., parole, that inmate must first meet with the Facility Parole Officer who is employed at the releasing correctional facility to discuss their release plan and conditions of release.

14. All releasees sign a *Certificate of Release to Parole Supervision*, which sets forth the conditions that will govern their supervision while serving PRS, provides reporting instructions, and confirms the approved residence. See Penal Law §§70.40(1)(b); 70.45(3); Executive Law §259-c(2).

15. Once released to PRS, the releasee will be under the Division's jurisdiction, (see Executive Law §259-i[2][b]), and is required to report to their Parole Officer within 24 hours; at each subsequent meeting, the releasee is given instructions as to their next report date. It is virtually impossible for the Division to execute its responsibilities under Article 12-B of the Executive Law and effectively supervise a released felony offender within the community unless appropriate residence and reporting instructions are approved and followed.

16. When a Parole Officer suspects that a parolee has violated the conditions of release in an important respect, parole revocation proceedings are commenced pursuant to Executive Law §259-i(3). Upon the completion of the parole revocation hearing process, where any parole violation charges are sustained, some releasees are returned to DOCS custody for a certain duration of time determined by one of the Division's Administrative Law Judges or a member of the Board of Parole pursuant to 9 N.Y.C.R.R. §8005.20. Other releasees may be released again to continued supervision by the Division. The

5

Administrative Law Judges who preside over parole revocation proceedings draw their jurisdiction from Executive Law §§259-d and 259-i(3); they do not inquire into the legality of the parolee's underlying sentence.

17. Because DOCS is the State agency charged with the responsibility for calculating the maximum expiration dates of all releasees, the Division continues to supervise each releasee until the maximum expiration date, as determined by DOCS, is reached. See Executive Law §259-i(2)(b).

18. The Division maintains centralized files at its office located at 97 Central Avenue in Albany, N.Y. that contain the sentence and commitment papers of the releasees under its jurisdiction. In addition, individual Parole Officers in the field offices throughout the State have copies of the sentence and commitment documents in the files they maintain for releasees under their supervision. However, in nearly all of the above-described files that the Division maintains for those offenders who are currently serving a period of PRS, the Division lacks any court documentation beyond the sentence and commitment order, and is therefore, in no position to make an informed assessment of what transpired in connection with a releasee's sentencing. In this regard, for most releasees, the Division cannot discern with any confidence whether the period of PRS was imposed in the manner prescribed by the Court of Appeals in Garner and Sparber.

19. Given this limitation, coupled with the absence of any statutory authority to terminate a period of PRS, cf. Executive Law §259-j, the Division routinely continues to supervise a releasee who is serving a period of PRS until the maximum expiration date of the sentence, or until the releasee violates a condition of release. Indeed, it has been the standard understanding and practice of the Division that it is without authority to terminate

6

its jurisdiction over a PRS releasee unless: (a) the maximum expiration date has passed; or (b) a court of competent jurisdiction orders the Division to terminate its jurisdiction over the releasee.

20.   The recent decisions of the Court of Appeals, if given the most extreme interpretation - one that the Division submits would be unwarranted - could have the effect of requiring the immediate release of hundreds of returned PRS violators from DOCS' custody and the Division's cessation of PRS supervision for thousands of felony offenders, even though the Legislature mandated that periods of PRS be served as part of their determinate sentences.

22.   A vast majority of the offenders who will be affected by Garner and Sparber decisions are violent felony offenders (Penal Law §70.02), and many are repeat violent felony offenders.  I respectfully submit that in the interest of public safety it is crucial that this Court direct that the status quo be maintained until DOCS and the Division have had the opportunity to review the subjects' individual circumstances, and further, that the sentencing courts and the parties to the criminal cases had the opportunity to entertain the possible resentencing in the proper forum as envisioned by the Court of Appeals in Garner and Sparber.  The impact on public safety could be irreparably severe if such offenders were immediately free of the State's jurisdiction with the State agencies and their local counterparts being effectively deprived of the opportunity to devise a fair, methodic and timely process to remedy PRS sentencing infirmities identified under Garner and Sparber just over one month ago.  Recently, a releasee who had success in having his PRS vacated after prevailing on a habeas corpus petition filed in the Supreme Court, Bronx County, was released without further supervision by the Division, only to be arrested and

7

charged on May 9, 2008 with the murder of woman running a dry cleaning store in Brooklyn, New York. (See Manny Fernandez, Tears and Memories as Business Resumes at Dry Cleaners Where Woman was Killed, N.Y.Times, May 25, 2008, at A29; Scott Shifrel, Loophole Let Thug in Brooklyn Slay Go Free, N.Y. Daily News, May 21, 2008 at 24.) (Attached as Exhibits A and B.)

23. Accordingly, in conjunction with the other consulting State agencies, and in response to the Court of Appeals' decisions, the Division's task force has begun a sweeping review of all of its records pertaining to those releasees who are currently subject to a period of PRS. The Division has begun a screening process in an effort to discover the identities of all releasees whose periods of PRS may not have been established in accordance with Garner or Sparber. Once identified, the Division will be contacting the relevant sentencing courts and District Attorneys' offices by letter so that they have notice that the affected releasee may be appropriate for resentence consistent with the decisions of the Court of Appeals.

24. The Division is working diligently to identify all releasees who may belong to the defendant class as defined in the Complaint. As noted above, as many as 18,000 releasees may be affected in some way by the Sparber and Garner decisions, even though each class member has issues based upon unique circumstances that would require individual resolution before a sentencing court.

25. The Division believes that the Garner and Sparber decisions do not signal a call for immediate and precipitous release of inmates in custody or the termination of supervision if already in the community, for the Court of Appeals remands for resentencing in the Sparber cases, and notes the possibility of resentencing in Garner as well. Rather

8

than immediately ceasing to supervise all releasees whose terms of PRS may have <u>Garner</u> or <u>Sparber</u>-type infirmities, the plaintiffs believe that resorting to the sentencing courts within a reasonable time is appropriate to permit the criminal courts, with input from the District Attorney and defendant, the opportunity to correct errors in a sentence or otherwise pronounce what a defendant's sentence must encompass under applicable law while at the same time uphold the public's expectation for safety within its communities. Simply put, to no degree should public safety be jeopardized while the State of New York endeavors to give legal effect to the Court of Appeals' sweeping decisions rendered just over 30 days ago.

26. The Division is not a party to the criminal cases, and it does not have the capability to recalculate the sentence of any of the members of the defendant class. What the Division can do is alert the appropriate sentencing court and office of the District Attorney that there may be an infirmity with regard to the period of PRS and request that the parties to the criminal proceeding proceed with a resentencing if appropriate.

27. Time is required to coordinate this resentencing effort with the county courts, supreme courts and offices of the respective District Attorneys throughout the State.

28. This affirmation is made specifically in support of plaintiffs' application for an emergency order authorizing the Division to continue to supervise each member of the relevant defendant subclasses described until such time as either: (a) a subclass member has been considered by the sentencing court and resentenced, or not, in conformity with the law, in a forum in which the sentencing court has had a full opportunity to hear from the necessary parties to such resentencing, i.e., the District Attorney and the defendant; or (b) it has become clear that no such proceedings will be held before the sentencing court, and

9

it therefore makes sense for the matter to be resolved pursuant to a comprehensive plan to be submitted for this Court's approval.

29.  The Division should not be forced to administratively determine which of its releasees are subject to lawfully-imposed terms of PRS, or may lawfully be resentenced to such terms.  Those are questions that the courts can and should decide.

30.  Given the above described circumstances, the Division requests that this Court grant an order maintaining the status quo which will allow the Division, consistent with public safety, to continue to supervise the members of the defendant class that are under its jurisdiction for a period of time within which the sentencing courts and District Attorneys' Offices can reasonably commence resentencing proceedings where appropriate.

31.  Any precipitous order to release defendants who are ultimately determined not to be entitled to such relief could well result in irreparable harm to the people of the State of New York.  On the other hand, it is important that releasees who may be entitled to be relieved from their obligation of continued supervision on PRS are granted that relief as soon as practicable.  The process for determining these many cases should be expeditious but accurate.

32.  Therefore, it is essential that a temporary restraining order be issued and that the preliminary injunction be brought on by an order to show cause in order for plaintiffs to address in a systematic and orderly manner the status of all of the inmates and parolees affected by the Garner and Sparber decisions.

10

**JA312**

WHEREFORE, it is respectfully requested that the relief requested be granted.

Dated: June 4, 2008

Terrence X. Tracy

11

# EXHIBIT A

**The New York Times**
nytimes.com



May 25, 2008

## Tears and Memories as Business Resumes at Dry Cleaners Where Woman Was Killed

By **MANNY FERNANDEZ**

Eden Dry Cleaners and Tailoring opened about 8:30 a.m. on Saturday. Kenneth Oh and a friend assisted the first customers. His younger brother, Daniel Oh, and some helpers arrived a few hours later.

Bouquets of flowers were pushed up against the window ledges, and there was still the thinnest of threads running through their mother's sewing machine. It was the first day that the shop, to which their mother had devoted her life, had been open for business since May 15. On May 16, she was found dead in the shop, killed in what the police said was a robbery.

The Ohs' mother, Kyung-Sook Woo, 62, came to the United States from Seoul, South Korea, in the early 1980s and doted on her two sons, her three grandchildren and her little shop called Eden. It sat on the quiet corner of 10th Avenue and Windsor Place in the Windsor Terrace neighborhood of Brooklyn.

Customers — some of whom had been bringing their clothes to her for more than a decade — said her favorite saying was "no problem." She was behind the counter six days a week, usually 12 hours a day, stitching, waving, laughing, talking. She was robbed at least twice when the store was at another location on Windsor Place, but still she kept going. When some customers would bring in their children, Mrs. Woo would step from behind the counter to hug them.

All day on Saturday, some of those same customers came into the store with tears in their eyes. Everyone knew the shopkeeper simply as Linda, and they all had a Linda story.

Before New York's presidential primary, Jackie Gavron, 48, asked Mrs. Woo if she could put a sign in the window in support of Senator Hillary Rodham Clinton; Mrs. Woo agreed, saying that she liked strong women. Jeremy Krevat, 37, was on his way to an interview for a sales job one day last year when he stopped in the store and Mrs. Woo noticed that he was missing a stay in his collar. "She just came over and put one in," he said. He got the job.

On Saturday, people entered the store somewhat timidly, awkwardly, many holding their pink and white claim slips. Grief is hard, and grief in the middle of a transaction over dress shirts is not any easier.

One man apologized for not having his ticket. "I never used to bring my ticket because she knew who I was," he said.

Another man spent several minutes with Kenneth Oh, searching the long racks behind the counter for a suit that he had dropped off for cleaning and alterations. The suit was soon discovered, and Mr. Oh, examining the cuffs of the pants, smiled.

"She did the work," he told the man. "All you got to do is iron. This is the last work she did."

JA315

Last Sunday, the police arrested Jamal Winter, 22, of nearby Park Slope and charged him with murder and robbery in the case. The police said they believe that Mrs. Woo was strangled the night before her body was found.

The day of the attack, she had asked a neighbor to chase away a man who had frightened her by hanging out in front of her shop all day, the neighbor said.

Kenneth Oh, 40, said the motive appeared to involve not money but a car. He said that he had bought his mother a 2008 Honda Accord for Mother's Day, and that the attacker may have had his eye on the car for days. The car, parked near the shop, was missing after the killing. It was found about a block and a half away from the suspect's residence, the police said.

The two brothers later read an article in The Daily News saying that Mr. Winter had served time for robbery and was out of jail at the time of Mrs. Woo's killing because of a legal technicality. They were outraged.

"I don't know why he was released," said Daniel Oh, 38, who owns a nail salon on Long Island.

There has been an outpouring of sympathy and shock in Windsor Terrace over the killing. On Thursday night, about 140 people filled the intersection outside the shop for a vigil.

John Maloney, a retired truck driver who has lived in the neighborhood for all his 67 years, referred to Mrs. Woo not as Linda but as Mom.

"Mom was part of the community," he said. She had operated the business in the neighborhood for 18 years.

Customers also worried about the fate of the store. Kenneth and Daniel Oh told them on Saturday that they would keep the shop open. "We're going to save this business," said Kenneth, a regional sales manager for an international cargo company. The brothers said they would close the store for the coming week, reopening on May 31.

A truck pulled up and parked on Saturday morning. Workers with shovels started digging, and another truck arrived shortly after. A tree was being planted, in memory of Mrs. Woo.

Copyright 2008 The New York Times Company

# EXHIBIT B



# Loophole let thug in Brooklyn slay go free

BY SCOTT SHIFREL
DAILY NEWS STAFF WRITER

Wednesday, May 21st 2008, 4:00 AM

An ex-con charged with killing a beloved Brooklyn dry cleaning store owner was out of jail on the day of the incident because of a legal glitch, sources told the Daily News.

Jamal Winter, 22, was automatically placed on parole by the state Correction Department after completing a five-year sentence for a Poughkeepsie robbery. When he was arrested for a similar robbery in Brooklyn last June, the state Division of Parole ordered him held for a violation.

But a Bronx judge released him from Rikers Island in March on the technicality that the Poughkeepsie judge never specifically ordered parole.

"The court had no discretion," court spokesman David Bookstaver said.

As a result, Winter made $10,000 bail on the Brooklyn robbery and was free when he allegedly robbed and strangled Kyong-Sook Woo in her Windsor Terrace store on Thursday.

Defendants in similar cases were once given "indeterminate" sentences such as three to six years, released after three years, and automatically spent the remainder on parole.

But a change under then-Gov. George Pataki had defendants given "determinate" sentences, such as the five years Dutchess County Judge Thomas Dolan gave Winter in 2002 for robbing a woman and stealing her car.

But Dolan never mentioned parole, according to a court order signed by Bronx Supreme Court Justice Raymond Bruce, who ordered Winter "discharged" on March 6.

sshifrel@nydailynews.com

6/4/2008 1:24 AM

# EXHIBIT I



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
SEAN EARLEY,

                                 Plaintiff,

           -against-

ANTHONY J. ANNUCCI, in his personal and official capacities
as Executive Deputy Commissioner of and counsel to the New
York State Department of Correctional Services; BRIAN
FISCHER Commissioner of the New York State Department of
Correctional Services, in his official capacity and his unofficial
capacity; RICHARD deSIMONE, in his individual capacity and
his official capacity as Associate Counsel in Charge of the Office
of Sentencing Review of the New York State Department of
Correctional Services; LUCIEN J. LECLAIRE, Jr., in his
individual capacity; GLENN S. GOORD, in his individual
capacity; HENRY LEMONS, JR., in his individual capacity and
his official capacity as Chairman and Chief Executive Officer of
the New York State Division of Parole; GEORGE B.
ALEXANDER, in his individual capacity; ROBERT
DENNISON, in his individual capacity; BRION D. TRAVIS, in
his individual capacity; and John and Jane Does 1 – 50, various
training, supervisory and policymaking employees of the New
York State Department of Correctional Services or the New York
Division of Parole, in their individual capacities,

                               Defendants.
-------------------------------------------------------------------------X

**DECLARATION**

9:08-CV-669

FJS/RFT

      ANTHONY J. ANNUCCI, pursuant to 28 U.S.C. §1746, declares under penalty of

perjury, that the following is true and correct:

      1. Since 1984, I have been employed by the New York State Department of Correctional

Services ("DOCS"), which is currently known as the New York State Department of Corrections

and Community Supervision ("DOCCS").[1]

---

[1] In April 2011, through the enactment of Chapter 62 of the laws of 2011, DOCS was merged with
the New York State Division of Parole to form DOCCS. All references herein to "the Department" are to
DOCS prior to the merger and DOCCS subsequent to the merger.

1



2. From 1984 to 1989, I served as Deputy Counsel to the Department. In September 1989, I was appointed Deputy Commissioner and Counsel to the Department and served in that capacity until December 2008. As Deputy Commissioner and Counsel, I was responsible for all of the legal services necessary for the day-to-day operations of the entire correctional system in the State of New York.

3. From October 2007 to the present, I have been Executive Deputy Commissioner for the Department.[2] As Executive Deputy Commissioner, my responsibilities include overseeing all legislative matters and intergovernmental affairs on behalf of the Department; representing the Commissioner at meetings and scheduled events; working on special projects assigned by the Commissioner; overseeing the management of the Department's Division of Classification and Movement, the Research, Planning and Evaluation Unit, and the Victims Services Unit; reviewing and deciding upon applications by foreign-born inmates for transfers to the prison systems of their home countries pursuant to treaties entered into by the United States; and serving as the Acting Extradition Secretary to the Governor.

4. I submit this declaration in reply to the plaintiff's affidavit (docket no. 73) in opposition to defendants' motion (docket no. 63) to dismiss the second amended complaint (docket no. 60) which the court has converted to a motion for summary judgment (see docket no. 66).

---

[2]From October 2007 to December 2008 (when the Commissioner appointed a new Deputy Commissioner and Counsel), I performed the duties of both Executive Deputy Commissioner and Deputy Commissioner and Counsel.

**JA321**

5.  In his affidavit, plaintiff asserts that, in early February 2002, he received the transcripts of his plea and sentence[3] and, "[a]t about the same time, [plaintiff] received notice that DOCS had altered [plaintiff's] sentence by adding a five year period of post release supervision." Plaintiff goes on to assert, "upon information and belief", that "DOCS took this action when it learned, from reviewing the transcripts of [plaintiff's] plea and sentencing proceedings, that the trial court had not included in [plaintiff's] sentence any period of post release supervision." Docket no. 73 ¶¶17-20. There is absolutely no factual basis for these assertions, which are simply inaccurate.

6.  When the Department receives a new inmate, he is accompanied by a copy of his sentence and commitment order, presentence report, and criminal history record. See Penal Law §601(a). It is the Department's standard procedure to review a new inmate's commitment order and enter his sentence information into the Department's database.[4]

7.  As defendants have shown, when the Department received the plaintiff on March 20, 2000, the law was clearly established that Penal Law §70.45 operated automatically to add post-

---

[3]In the second amended complaint, plaintiff stated that he received the minutes of his plea and sentence in March 2002. Docket no. 60 ¶67. Plaintiff does not allege that he sent a copy of the minutes of his plea or sentence to the Department. Indeed, plaintiff's April 14, 2002 letter to the Inmate Records Coordinator at his housing facility (Exhibit "D" to defendants' motion to dismiss (docket no. 63-6); see also docket no. 60 ¶68) does not indicate that the minutes of his plea or sentence were enclosed.

[4]The Department obtains an inmate's sentencing information from his commitment order, which accompanies him to the Department, not from either his plea or sentencing minutes. See Criminal Procedure Law §380.60. The Department does not receive plea minutes. Sentencing minutes are not delivered with the inmate, but are instead separately mailed to the Department, usually a number of weeks after the inmate has already been screened and classified. See Criminal Procedure Law §380.70. The purpose of the requirement that the court provide the Department with sentencing minutes is not for the Department to obtain an inmate's sentencing information, which is contained in the commitment order. Rather, sentencing minutes are to be provided to the Department "so as to be available for, inter alia, parole hearings." See McLaurin v. New York State Board of Parole, 27 A.D.3d 565, 566 (3d Dept.), leave denied, 7 N.Y.3d 708 (2006).

3



release supervision ("PRS") to a determinate sentence.[5]  Accordingly, when the Department

received the plaintiff and his sentence and commitment order (Exhibit "C" to defendants' motion

to dismiss (docket no. 63-5)), which indicated that the plaintiff had been sentenced to a

determinate term of imprisonment based upon his conviction as a second violent felony offender,

the Department would have noted in its records that the plaintiff's sentence included the

statutorily mandated five-year period of PRS.[6]

    8.  Thus, the Department did not "alter" plaintiff's sentence in any way.  Rather, the

Department simply noted that plaintiff's determinate sentence included, by operation of law, a

five-year period of PRS.

    9.  Of course, as Deputy Commissioner and General Counsel, I had no personal

involvement in this process.

    10. Notwithstanding plaintiff's conclusory assertion that I "promulgated the post-release

supervision policy..." (memorandum of law in opposition to motion for summary judgment

(docket no. 75) pp. 12, 14), I never issued any directive to Department staff as to the procedures

to be followed when a commitment order for an inmate sentenced to a determinate term was

silent as to PRS.  Nor was any such directive necessary.  When Department staff noted the

mandatory period of PRS in the Department's records for all inmates sentenced to determinate

terms, they were simply doing that which was directed by the Legislature.  As previously shown,

during the period at issue in this case, the inclusion of PRS in a determinate sentence was

---

    [5]As plaintiff admits, "[t]he inclusion of post release supervision pursuant to New York Penal Law
§70.45 was a direct consequence of the plaintiff's guilty plea." Docket no. 60 ¶106.

    [6]Submitted herewith as Exhibit "V" is a copy of the plaintiff's time computation sheet as of May
6, 2000 (about six weeks after the Department received the plaintiff), which was submitted by the plaintiff
as an exhibit to his federal *habeas corpus* petition (Exhibit "H" to defendants' motion to dismiss (docket
no. 63-10)). Exhibit "V" reflects the sentencing information that was entered into the Department's
database at the time that the plaintiff was received, including the mandatory five-year PRS term.

4

**JA323**



mandated by statute.

11. Plaintiff asserts that, prior to imposing a period of PRS, the Department knew that plaintiff's conviction and sentence were unlawful because the sentencing court failed to advise plaintiff of the mandatory inclusion of PRS in plaintiff's sentence. Docket no. 73 ¶¶21, 23. Plaintiff further asserts that "[w]hen DOCS discovered the oversight made by the sentencing judge in accepting [plaintiff's] guilty plea and in his sentencing, the only proper course would have been to inform the sentencing court, the prosecutor's office and [plaintiff's] defense counsel of the problem." Docket no. 74 ¶25.

12. In fact, as shown above, it was upon the Department's receipt of the plaintiff and his commitment order in March 2000 that the Department noted the statutorily mandated period of PRS in the Department's records.[7]

13. It was not until April 2002 that the plaintiff sent a letter to Roxanne Underwood,[8] the Inmate Records Coordinator at his housing facility (docket no. 63-6; see also docket no. 60 ¶68) complaining that he had not been informed that PRS was an automatic consequence of his guilty plea. I did not learn of the existence of the plaintiff's letter to Ms. Underwood (docket no. 63-6) until after this lawsuit was commenced.

14. As demonstrated in defendants' memorandum of law in support of their motion to dismiss, it was not until March 2005, nearly three years after plaintiff wrote to Ms. Underwood, that the New York Court of Appeals held, for the first time, that the court's failure to advise a

---

[7]As previously noted, it is the sentence and commitment, not the sentencing minutes, from which the Department obtains an incoming inmate's sentencing information. See Criminal Procedure Law §380.60.

[8]Ms. Underwood was named as a defendant in plaintiff's *pro se* complaint (docket no. 1). By stipulation and order dated September 21, 2009 (docket no. 37), the action was dismissed with prejudice as against Ms. Underwood.

5

**JA324**



defendant that PRS is a consequence of his guilty plea requires that his plea be vacated. People v. Catu, 4 N.Y.3d 242 (2005). Docket no. 63-1 p. 23.

15. Further, as demonstrated in defendants' memorandum of law in support of their motion to dismiss, at no time prior to plaintiff's release from custody in June 2007[9] did either the United States Supreme Court or the Second Circuit hold that a criminal defendant has a constitutional right to be told that PRS is a consequence of his guilty plea. Docket no. 63-1 pp. 30-31.

16. Moreover, as demonstrated in defendants' memorandum of law in support of their motion to dismiss, the Department had no authority, much less an affirmative legal duty, to seek to re-sentence or otherwise handle the cases of inmates who had received administrative imposition of PRS until June 2008 when the Legislature amended the Criminal Procedure Law, Penal Law, Correction Law, and County Law (L. 2008 Ch. 141) to provide for the re-sentencing of inmates whose determinate sentences failed to include the mandatory period of PRS. Docket no. 63-1 pp. 23-24, 31-32.

17. In addition, as demonstrated in defendants' memorandum of law in support of their motion to dismiss, even if the Department had the authority and duty to "inform the sentencing court, the prosecutor's office and [plaintiff's] defense counsel of the problem...", the Department's breach of that alleged duty did not cause any harm to the plaintiff. The plaintiff himself notified both the sentencing court and the District Attorney that PRS was not mentioned at the time of plaintiff's guilty plea when he made his motion to vacate the PRS portion of his sentence

---

[9]Plaintiff asserts that "[d]ue to various delays occasioned by actions of DOCS, the District Court's Writ did not issue until June 27, 2007, when [plaintiff] was finally released from the unlawful imprisonment." Docket no. 73 ¶37. In fact, the Department was not a party to plaintiff's federal *habeas corpus* proceeding. Any "delays" in plaintiff's release were the result of stays of the execution of the writ of *habeas corpus* granted by the District Court for the Eastern District of New York at the request of the Kings County District Attorney. *See* defendants' statement pursuant to local rule 7.1(a)(3) (docket no. 67) ¶¶21-27.

6

**JA325**



(Exhibit "E" to defendants' motion to dismiss (docket no. 63-7)).  Docket no. 63-1 pp. 24-25.

18. Finally, as demonstrated in defendants' memorandum of law in support of their motion to dismiss, a defendant who, at the time of his guilty plea, is not advised that his determinate sentence includes a mandatory period of PRS, is entitled to have his plea vacated. However, he is not entitled to "specific enforcement of his original sentence...."  Docket no. 60 ¶73.[10]  Plaintiff was, of course, free to seek vacatur of his guilty plea; however, he chose not to do so.  Rather, plaintiff "clearly expressed... that he wishe[d] to retain the plea and have no aspect of the judgment modified other than his sentence."  Exhibit "F" to defendants' motion to dismiss (docket no. 63-8) p. 2.  This request was appropriately denied by the sentencing court (see docket no. 63-8) and the Appellate Division properly declined to review that decision (see Exhibit "G" to defendants' motion to dismiss (docket no. 63-9)).  Docket no. 63-1 pp. 25-26.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 18, 2011

ANTHONY J. ANNUCCI

---

[10] In June 2008, the Legislature enacted Penal Law §70.85 which, for the first time, authorized the court, on the consent of the District Attorney, to re-sentence an inmate, whose determinate sentence did not include the mandatory PRS term, to the originally imposed determinate term of imprisonment without PRS.  L. 2008 Ch. 141 §2.

7

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JESUS SANTIAGO,                                    :
                                                   :
                              Plaintiff,           :
                                                   :       **DECLARATION OF**
- against –                                        :       **CRAIG R. MAUSLER**
                                                   :
BRIAN S. FISCHER, individually and as              :
Commissioner of the New York State                 :
Department of Correctional Services, et al.,       :       12-CIV-2137 (KAM)(SLT)
                                                   :
                              Defendants.          :
------------------------------------------------------------X

CRAIG R. MAUSLER, pursuant to 28 U.S.C. § 1746, declares under the penalties of

perjury as follows:

      1.     I am employed by the New York State Department of Corrections and Community

Supervision ("DOCCS") as an Assistant Counsel to the New York State Board of Parole.

      2.     Attached as Exhibit A to this Declaration is a "Status Inquiry," report, a current

printout of a computerized screen maintained in the regular course of business by DOCCS for

parolees.

      3.     Exhibit A indicates that plaintiff Jesus Santiago (NYSID 0948840P) was an

absconder from New York, and that his official delinquency date was November 9, 2005. Further,

Exhibit A documents that plaintiff was not available to New York State authorities from that date

in 2005 until June 12, 2007.

      Dated: Albany, New York
            August 14, 2017

                                                    _____
                                          Craig R. Mausler

**JA327**

```
PRODUCTION HMMI20      * * * NYS PAROLE PARTNER/VES * * *      DATE: 08-11-2017
ENTER IDENTIFIER: _____   STATUS INQUIRY - VOP-BRD-JLT
Rec Status CLOSED  Warrant 0332297   B and C   900-07-00737 Housed Loc
Name  SANTIAGO,JESUS                 City Status NONE
NYSID 09488440P                      Available to Parole Warrant 06-12-2007
PON  BK03-7045-7071                  Time Served 01-00  Time owed 00-00-02
                                     Official Delinquency Date  11-09-2005


VOP RECVD ON  11-22-2005          Parole Jail Dates 06-12-2007 08-05-2007
SUPP 1 RECVD            MAILED         Parole Jail Time  00055 In Days
SUPP 2 RECVD            MAILED     Date Sent  08-06-2007
SUPP 3 RECVD            MAILED     Loc Sent    ULSTER
                                  DOCS RT DT  08-06-2007
Incarceration Diversion Program   DOCS RT FAC ULSTER
NONE                              DOCS RT TYP PV
-------------------------- BOARD ACTION ON FINAL --------------------------
Action  NOT REQUIRED              ACTION NOT REQUIRED DUE TO:
Board Member                      CATEGORY 1
                                  SUBSECTION-'1'
Date Signed
Modification
Affirmation Sent  07-25-2007 TO RI JUDICIAL CTR
Misc COPY TO ATTY
F1=SUMMARY F3=HRGS F4=SCHED F5=OVERVIEW F6=PAR F7=ST RDY F9=BEH 1 F10=BEH 2
```

Mauster-1

**JA328**

```
PRODUCTION HMMI40     * * * NYS PAROLE PARTNER/VES * * *     DATE: 08-11-2017
ENTER IDENTIFIER: _____   INITIAL SCHEDULING INQUIRY
Rec Status CLOSED                      Warrant 0332297
Name  SANTIAGO,JESUS                   Present Location ULSTER
NYSID 09488440P                        Original ME Date 11-07-2004
PON   BK03-7045-7071                   Attorney 06548 REBECCA CHEVALIER
PO    CRAWFORD,CLIFFORD


Date Lodged    02-02-2007   Location 950 OUT OF STATE
Refused Papers NO       B and C 9000700737 Housed Location
Preliminary Waived YES on 06-19-2007  ************************************
Interpreter Needed NO  Language      *       SCHEDULED DATES          *
PO Report Day                        *                                *
                                     * HEARING    DATE    LOCATION    *
                                     *                                *
Charges   02 03 04 08 08 11 09 08    * Prelim    WAIVED   RIKERS ISLAND *
                                     *                                *
                                     * Final      07-19-2007 RI JUDCAL CTR 2 *
                                     *                                *
Final Outside Date   09-17-2007      ************************************


F1=SUMMARY F2=VP/BRD F3=HRGS F5=OVERVIEW F6=PAR F7=ST RDY F9=BEH 1 F10=BEH 2
```

Mausler-2

JA329

```
PRODUCTION HMMI50      * * * NYS PAROLE PARTNER/VES * * *      DATE: 08-11-2017
ENTER IDENTIFIER: _____     STATUS INQUIRY - OVERVIEW
NAME SANTIAGO,JESUS                 NYSID 09488440P  RELEASE DT 11-05-2004
WARRANT NO 0332297   ISSUED ON 11-22-2005 LODGED 02-02-2007 AT OUT OF STATE
WANT POSTED NO  CANCELED ON 03-23-2007 FOR OTHER         WARRANT TYPE AB


PRELIMINARY IS WAIVED      ON 06-19-2007 HELD AT RIKERS ISLAND
               BY                      DECISION PROBABLE CAUSE FOUND

DELINQUENCY DATE OF 10-30-2005 BY Area Supvr   MCKINNEY,ARVELLA
          SIGNED 12-12-2005 THE OFFICIAL DELQ DATE IS 11-09-2005

FINAL IS HELD       ON 07-19-2007 HELD AT RI JUDCAL CTR 2
      BY TOMLINSON,RHONDA    DECISION NA/HOLD FOR 012 MTHS
CHARGES & DISP 02/S  03/WP 04/WP 08/WP 08/WP 11/WP 09/WP 08/WP

BOARD ACTION BY                  WAS TO NOT REQUIRED(CAT 1) THE DECISION
            ON               THE REVISED DECISION WAS

RETURNED TO ULSTER        ON 08-06-2007 AS A PV
        PJT STARTED ON 06-12-2007 ENDED 08-05-2007 FOR 00055 DAYS

ULTIMATE DECISION REVOKED          ON 07-19-2007  RECORD STATUS CLOSED
F1=SUMMARY F2=VP/BRD F3=HRGS F4=SCHED F6=PAR F7=ST RDY F9=BEH 1 F10=BEH 2
```

```
PRODUCTION  HMPIA0   * * * NYS DIVISION OF PAROLE * * *      DATE: 08/11/2017
                         PARMIS INQUIRY MENU

NYSID:  .........                |-------------------------------------------
  OR                             |        LATEST RELEASE HISTORY
NAME:   .........................|        FOR NYSID:   09488440P
                                 |
|--------------------------------|   RELEASE                  EFFECTIVE
|         INQUIRY SCREENS        |   DATE          STATUS     DATE
| F1: IDENTIFICATION             |
| F2: ASSIGNMENT    F9:  PO HISTORY |  . 02-01-2008   REVOKED    10-18-2010
| F3: SUPERVISION  F13: PRESS    |  . 11-05-2004   REVOKED    08-06-2007
| F4: CONVICTION   F14: OVERVIEW |
| F5: REL INTERVIEW              |
| F6: CP/TR                      |
| F7: MISCELLANEOUS F17: DCJS SOR |
|--------------------------------|
|         SEARCH FUNCTIONS       |
| F10: NYSID HISTORY   ACTIVE ONLY |
| F11: NYSID SEARCH   F15:  NYSID |
| F12: NAME SEARCH    F16:  NAME  |
|--------------------------------|-------------------------------------------
ENTER A NYSID AND PRESS F1-F7, F9 OR F14 FOR INQUIRY OF LATEST RELEASE
OR TAB TO RELEASE DATE AND PRESS F1-F7, F9 OR F14 FOR INQUIRY OF PRIOR RELEASES
==> FUNCTION KEY PRESSED WAS NOT VALID.
```

**JA331**

Mausler -3

```
PRODUCTION  HMPI80      * * * NYS DIVISION OF PAROLE * * *        Date: 08/11/2017
                            PARMIS OVERVIEW INQUIRY
Name:     SANTIAGO,JESUS                        Status:  REVOKED
NYSID:    09488440P          ABSCONDER HIST. Area:  BROOKLYN III
Address:  RIKERS ISLAND                      A/S:  SMITH,RODNEY
Apt/City: ........ EAST ELMHURST             SPO:  ........................
Zip:      11370-1361 County: ..........      PO:   ........................
Precinct: ...                PERSISTENT VIOLATOR PON:  BK03-7045-7071
Race: OTHER   Hisp: Y Orig Commitment Date: 04/22/2004  Supv Status: DELINQUENT
Sex:  MALE            Time in DOCS:   00/06    Release Type: CR
Wgt:  175 LBS         Shock Case: NO  SORL: N/A  Release Date: 11/05/2004
Hgt:  5'10"           DIN:        04R1624     Sentence:       00/00 03/06
Eye:  BROWN           CR Date:    11/07/2004
Hair: BLACK           Rpt Schedule: NON-REPORT  Owed to ME:  00 00
Age:  35       Crime(s):    CPW-2 >78*         PRS Sentence: 05 00 00
DOB:  06/21/1982                               PRS ME Date: 11/05/2009
FBI:  594832MB2
SSN:  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                              County of Sent:  KINGS
Incarcerated:    YES    Actv Arrests: ..      Closure Reason:  REVOKED
Warrant Issued:  YES    Return Type:  PV      Closure Date:  08/06/2007
Warrant Number:  0332297  Return Date:  08/06/2007
Violation Status: REVOKED AND RETURNED   Fac: ULSTER      Adm DIN: .......
ENTER=Menu   F1=Identification  F2=Assignment    F3=Supervision  F4=Conviction
F5=Rel Intv  F6=CP/TR              F7=Miscellaneous  F9=PO History   F13=PRESS
```

Mauster-4

Case 1:12-cv-02274-KAM-ST Document 75-10 Filed 02/08/18 Page 92 of 102 PageID #: 1545

```
PRODUCTION  HMMI10      * * * NYS PAROLE PARTNER/VES * * *      DATE: 08-11-2017
ENTER IDENTIFIER: _____    STATUS INQUIRY - SUMMARY
Rec Status CLOSED   Warrant 0332297  Controlling Office NYC PVU
Name  SANTIAGO,JESUS                 PRS ME DT  11-05-2009 Est ME DT 06-12-2011
NYSID 09488440P                      Owed To Sent 00 00 02 Owed To PRS 03 11 26
PON   BK03-7045-7071                 DT Issued  11-22-2005 Est CR DT
Area  BROOKLYN III                   Warrant Type AB SPO Auth 0382
PRS2  KOSTNER,DOREEN                  ABS Status CANCEL  Want Can DT 03-23-2007
PRS1  CRAWFORD,CLIFFORD               Date Lodged 02-02-2007 By OTHER
Present Location   ULSTER            Location      OUT OF STATE
Received Date      08-06-2007        DIN       04R1624
Preliminary Hearing WAIVED            Final Hearing HELD
Date       06-19-2007       ..       Final Date    07-19-2007     ..
Officer  ........................    Officer       TOMLINSON,RHONDA
Location RIKERS ISLAND               Location   RI JUDCAL CTR 2
Decision PROB CAUSE                  Decision   NA/HOLD FOR 012 MTHS
Date Sent To Board                   NO Adjournmts 01
Original Delq Date 10-30-2005        Outside Date  09-17-2007  ........
Delq Type     DD AND ARRANGE FINAL   Closure Date  07-19-2007
              ..................     Closure Reason REVOKED
Area Supvr   MCKINNEY,ARVELLA        Attorney REBECCA CHEVALIER
Date Signed  12-12-2005              ................................
Release Date 11-05-2004              ................................
F2=VP/BRD F3=HRGS F4=SCHED F5=OVERVIEW F6=PAR F7=ST RDY F9=BEH 1 F10=BEH 2
```

Mausler -5

JA333

12:1 Case 1:12-cv-02373-KAM-ST Document 90-6 Filed 08/14/16 Page 96 of 102 PageID #: 1546

```
PRODUCTION    HMQG00   * * * NYS PAROLE PARTNER/CMS * * *        DATE: 08/11/2017
                         CUSTODY ADDRESS LIST/COPY

     Enter NYSID: _____

  NYSID: 09488440P   DIN: 04R1624   Name: SANTIAGO,JESUS
                                                      Start      End     Curr
            Facility Name              City      State Date       Date    DIN
  * ***************************** ***************** ** ******* ******* *
  . RIKERS ISLAND                 EAST ELMHURST    NY 09/14/10 10/18/10 Y
  . HAZELTON USP                  BRUCETON MILLS   WV 02/22/10 09/14/10 Y
  . COFFEEWOOD CORR CENTER        MITCHELLS        VA 11/01/09 02/22/10 Y
  . FAIRFAX COUNTY DETENTION CENT. FAIRFAX         VA 08/11/08 11/01/09 Y
  . ALEXANDRIA PD                 ALEXANDRIA       VA 04/23/08 08/11/08 Y
  . OUT OF STATE FACILITY         UNKNOWN          XX 02/02/07 08/06/07 Y




  * ***************************** ***************** ** ******* ******* *
                                                         F7=Up F8=Down
    NO MORE CUSTODY RECORDS FOUND FOR THIS NYSID
    FOR ADDITION CUSTODY INFORMATION PLACE CURSOR ON ADDRESS AND PRESS <ENTER>
  CLEAR=Menu F5=Full F6=Detl F9=Cntc F10=Emp F11=Asso F12=Drug F13=Prog F14=Case
    F15=Print  F16=ALL F17=Res F18=Cus F19=Dep F20=Absc F21=Veh  F23=Educ F24=Intn
```

**JA334**

Case 1:12-cv-02123-KAM-ST Document 90 Filed 08/14/17 Page 94 of 265 PageID #: 1547

```
PRODUCTION    HMQE10  * * * NYS PAROLE PARTNER/CMS * * *      DATE: 08/11/2017
                             ABSCONDER LIST

     Enter NYSID: _____

     NYSID: 09488440P  DIN: 04R1624  Name: SANTIAGO,JESUS
                                                     Start    End    Curr
        Warrant   Apprehended Address               Date     Date   DIN
     *  *******  ******************************************  *******  *******  *
     .  0577832                                     03/14/08  04/23/08  Y
     .  0332297                                     11/22/05  02/02/07  Y




     *  *******  **************************************************  *******  *******  *
                                                               F7=Up  F8=Down
     NO MORE ABSCONDER RECORDS FOUND FOR THIS NYSID
      FOR ADDITION ABSCONDER INFORMATION PLACE CURSOR ON ADDRESS AND PRESS <ENTER>
     CLEAR=Menu  F5=Full  F6=Detl  F9=Cntc  F10=Emp  F11=Asso  F12=Drug  F13=Prog  F14=Case
      F15=Print  F16=ALL  F17=Res  F18=Cus  F19=Dep  F20=Absc  F21=Veh  F23=Educ  F24=Intn
```

Maustre -7

**JA335**

Case 1:12-cv-02197-KAM-ST Document 90-5 Filed 08/13/18 Page 95 of 265 PageID #: 1548

```
PRODUCTION   HMQE20    * * * NYS PAROLE PARTNER/CMS * * *        DATE: 08/11/2017
                           ABSCONDER INQUIRY
  Enter NYSID: _____

  NYSID: 09488440P    DIN: 04R1624   Parolee Name: SANTIAGO,JESUS

  Start Date: 11/22/2005 End Date: 02/02/2007
  Warrant No: 0332297
  End Reason: SYSTEM CLOSED/OTHER ADDR CREATED

  APPREHENDED AT:
     Name: ............................ Type: ...................
     Street: ............................ Apt.: .......... Floor: ..
     City: ............................ State: .......... Zip: .....-....
     Phone: ..............

  Comment: ....................................................................


  ENTER NEW NYSID OR PRESS <CLEAR> TO RETURN TO PAROLEE MENU
  CLEAR=Menu F5=Full F6=Detl F9=Cntc F10=Emp F11=Asso F12=Drug F13=Prog F14=Case
  F15=Print F16=ALL F17=Res F18=Cus F19=Dep F20=Absc F21=Veh  F23=Educ F24=Intn
```

Mausler – 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
JESUS SANTIAGO,                                                    :

                      Plaintiff,          :   Index No. 12-CIV-2137 (KAM)(MDG)
                                 :
        - against -                               :
                                 :   **DEFENDANTS' AMENDED**
                                 :   **STATEMENT**
BRIAN FISCHER, individually and as Commissioner  :   **PURSUANT TO LOCAL**
of the New York State Department of Correctional  :   **CIVIL RULE 56.1**
Services, et. al.,                                                :
                                 :
                     Defendants.          :
------------------------------------------------------------------ X

Pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern

and Eastern Districts of New York, defendants Brian Fischer, Anthony J. Annucci, Robert J.

Dennison, George B. Alexander, Terrence X. Tracy, Kevin G. Ludlow, Lisa Elovich, Sally A.

Thompson, Area Supervisor Arroyo, William McCartney, Area Supervisor McKinney, Meryl

Fleischman, Parole Officer Paredes, Darryl Stevenson, Joan Mason, Cynthia Johnson, Peter

Alvarez, Kimberly Council, and Andrea Evans, (collectively, "Defendants"), hereby submit the

following statement of undisputed material facts which establish the record upon which

defendants, all former or current officials employed by the New York State Department of

Corrections and Community Supervision ("DOCCS"), at the relevant times the Department of

Correctional Services ("DOCS") and the Division of Parole ("Parole"),[1] are entitled to summary

---

[1] The two agencies merged to form DOCCS on March 31, 2011. Defendants are either current or former employees or officials of the New York State Department of Correctional Services ("DOCS") or Division of Parole ("Parole"), at the relevant times separate State agencies, but now merged, as of March 2011, into the New York State Department of Corrections and Community Supervision ("DOCCS"). Reference here is to DOCS and Parole, the entities extant at the relevant times. Defendants include executive officials of DOCS and Parole (Brian Fischer, at certain of the relevant times the Commissioner of DOCS, Anthony J. Annucci, now Acting

1

judgment as follows:

1.      Plaintiff entered DOCS custody after pleading guilty in Kings County Criminal Court to a class C felony, Criminal Possession of a Weapon in the Second Degree, on April 22, 2004, for which he received a determinate sentence of three-and-one-half years. See Declaration of Steven H. Philbrick, dated December 23, 2016 ("Philbrick Decl.") ¶ 51.

2.      Plaintiff's sentence was mandated by State law to include a term of post-release supervision ("PRS"). Plaintiff's sentence had two components, a determinate term of imprisonment, and a term of PRS. In 1998, the Legislature enacted Penal Law § 70.45 (a part of "Jenna's Law") which provided that "[e]ach determinate sentence also includes, as a part thereof, an additional period of post-release supervision." See Penal Law § 70.45 (1).

3.      Jenna's Law also made substantive changes to Penal Law §§ 70.00 and 70.02, which provided that "when a person is sentenced as a violent felony offender pursuant to section 70.02 or as a second violent felony offender pursuant to section 70.04 or as a second violent felony offender on a conviction for a violent felony offense pursuant to section 70.06, *the court must impose a determinate sentence of imprisonment ... and such sentence shall include, as a*

---

Commissioner of DOCCS, but at the relevant times DOCS counsel and Executive Deputy Commissioner, Andrea W. Evans, at certain of the relevant times the Chairwoman of Parole, Robert J. Dennison, at certain of the relevant times the Chairman of Parole, George B. Alexander, at certain times the Chairman of Parole, and Terrence X. Tracy, now Counsel for the Board of Parole (a unit of DOCCS), but at the relevant times, Counsel to Parole) as well as other Parole officials and employees (Kevin G. Ludlow, Lisa Elovich, Sally A. Thompson, Area Supervisor Arroyo, William McCartney, Area Supervisor McKinney, Meryl Fleischman, Parole Officer Paredes, Darryl Stevenson, Joan Mason, Cynthia Johnson, Peter Alvarez and Kimberly Council) (collectively, "Defendants").

*part thereof, a period of post-release supervision in accordance with section 70.45*" (emphasis added).  See Penal Law § 70.00 (6).

4.     It was the practice of courts, court administrators, district attorneys, defense counsel, as well as the executive agencies, to consider PRS as automatically included in a criminal defendant's sentence.  See, e. g., Gastelu v. Breslin, No.  03-cv-1339,  2005  WL 2271933, at *3 (E.D.N.Y. Sept. 12, 2005); and People v. Adams, 13 A.D. 3d 76, 76 (1st Dep't 2004); see also Philbrick Decl., ¶¶ 37, 52.

5.     New York State law required Plaintiff to serve the determinate term of his sentence until November 7, 2004, and at the expiration of that term, was required to serve a PRS term of five years, until November 7, 2009.  See Philbrick Decl., ¶¶ 51-52.

6.     Plaintiff was released from DOCS to Parole on November 7, 2004.  See the DOCCS  website,  Inmate  Information  (nysdoccslookup.doccs.ny.gov),  for  accurate documentation of Plaintiff's release date; see Exhibit B to Philbrick Decl.

7.     At the time of his release to Parole on November 7, 2004, Plaintiff had agreed, pursuant to a Certificate of Release to Parole Supervision, to serve a PRS term until the Maximum Expiration Date of his PRS term, November 7, 2009.  Philbrick Decl., ¶ 52.

8.     Pursuant to Jenna's Law, Plaintiff's sentence carried with it a mandatory term of PRS.  Plaintiff alleges that at sentencing, his sentencing judge did not pronounce on the record

3

the PRS portion of his sentence.  See Sentence and Commitment Order, attached to Plaintiff's First Amended Complaint as Exhibit C (Docket #12).

9.      Inmates are remanded to the custody of DOCS from local jails and enter DOCS' reception centers where, among other things, their sentences are noted in DOCS' computer system on the basis of the Sentence and Commitment order that accompanies them to prison. The record shows that the calculation of PRS into Plaintiff's sentence was made by DOCS officials well prior to Earley, around the time Plaintiff entered into the custody of DOCS after he was sentenced.  See, e. g., Declaration of Anthony J. Annucci, dated May 8, 2015 ("Annucci Decl."), ¶¶ 5-7, attached as Exhibit D to the Declaration of Michael J. Keane, dated December 23, 2016 ("Keane Decl.")  submitted herewith, and the Declaration of Richard deSimone, dated May 8, 2015 ("deSimone  Decl."), ¶¶ 8-13, attached as Exhibit E to the Keane Decl., both submitted in Betances v. Fischer, Southern District of New York Docket No. 11-Civ-3200.

10.      Plaintiff was released by DOCS to Parole on November 7, 2004, and reported to Parole for a period in 2005, but by the end of 2005, and before Earley v. Murray , 451 F. 3d 928 (2d Cir. 2006) was decided in June 2006, Plaintiff had left the jurisdiction of Parole and New York State, and became an absconder, unavailable to New York State authorities.  See Philbrick Decl, ¶ 53; and Exhibit C to Philbrick Decl., "Parolee Chrono Report," specifically notes for 2005.

11.      Plaintiff was arrested by Virginia authorities in 2005, and as a result Plaintiff's PRS term was suspended, to be recalculated after he answered Parole violation charges in the

1

State of New York.  See Philbrick Decl, ¶ 53; and Exhibit C to Philbrick Decl., "Parolee Chrono Report."

11(a).   Plaintiff was delinquent from Parole from November 9, 2005 to June 12, 2007.  See Declaration of Craig R. Mausler, Assistant Counsel to Parole, dated August 14, 2017 ("Mausler Decl."), ¶¶ 2-3; see also "Status Inquiry" Report for Jesus Santiago, dated August 11, 2017, attached as Exhibit A to Mausler Decl.

12.      In June 2007, Plaintiff was again available to New York State and the Division of Parole after he was extradited from the State of Virginia to New York.  Philbrick Decl., ¶ 54; see also Exhibit C to Philbrick Decl., "Parolee Chrono Report," for the entries for June 12, 2007.

13.      At that time, Plaintiff was charged with violations of the terms and conditions of his parole, as, for example, having absconded from Parole and having committed other crimes. See Philbrick Decl., ¶ 55.

14.      After a preliminary and final hearing on those charges, the parole violation charges against Plaintiff were sustained, and he was ordered to return to DOCS to serve a 12-month time assessment.  See Philbrick Decl., ¶ 55.

15.      At that time, Defendants had no knowledge as to whether Plaintiff's sentencing court in 2004 had properly pronounced Plaintiff's term of PRS at sentencing. Parole did not have Plaintiff's sentencing minutes.  See Philbrick Decl., ¶ 64; see also Exhibit D to Philbrick Decl., "Notice Pursuant to Correction Law § 601-d," dated September 27, 2010.

**JA341**

16.     Plaintiff was again released to parole supervision from DOCS' Gouverneur Correctional Facility on January 31, 2008.  <u>See</u> Philbrick Decl., ¶ 56; <u>see also</u> DOCCS "Parolee

3

**JA342**

Chrono Report" for Jesus Santiago, attached to Philbrick Decl., Exhibit C, for the entry for January 31, 2008.

17. At that time, Defendants had no knowledge as to whether Plaintiff's sentencing court in 2004 had properly pronounced Plaintiff's term of PRS at sentencing. Neither DOCS nor Parole had in their possession Plaintiff's sentencing minutes. See Philbrick Decl., ¶ 64; see also Exhibit D to Philbrick Decl., "Notice Pursuant to Correction Law § 601-d," dated September 27, 2010.

18. Plaintiff reported to his Parole Officer in Brooklyn, New York, on February 4, 2008, and was directed to appear again on February 6, 2008. See Philbrick Decl., ¶ 57; see also DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for February 4, 2008.

19. Plaintiff failed to report on February 6, 2008, as required, and once again absconded from Parole and the State of New York. See Philbrick Decl., ¶ 58; see also DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for February 6, 2008.

20. Plaintiff had absconded to Virginia, as Parole was informed by Virginia authorities on April 24, 2008 that Plaintiff had been arrested in Virginia on new criminal charges and was being held in that jurisdiction. See Philbrick Decl., ¶ 59; see also DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for

4

**JA343**

April 24, 2008.

21.  Plaintiff was not available again to New York State authorities until September 14, 2010.  <u>See</u> Philbrick Decl., ¶ 60; <u>see also</u> DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for September 14, 2010.

22.  Plaintiff was in federal prison during some of that time between April 24, 2008 and September 14, 2010.  <u>See</u> Philbrick Decl., ¶ 60; <u>see also</u> DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for September 14, 2010.

23.  Plaintiff was extradited from federal prison in West Virginia.  <u>See</u> Philbrick Decl., ¶ 60; <u>see</u> <u>also</u> DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for September 14, 2010.

24.  Plaintiff was extradited from federal prison in West Virginia to Rikers Island in the City of New York.  <u>See</u> Philbrick Decl., ¶ 60; <u>see also</u> DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for September 14, 2010.

25.  Plaintiff again was charged with violations of his parole terms and conditions, among other things, for absconding.  <u>See</u> Philbrick Decl., ¶ 61.

5

**JA344**

26.     At Plaintiff's final parole revocation hearing, his parole was again revoked, and Plaintiff was ordered returned to DOCS to serve a 38-month time assessment.  See Philbrick Decl., ¶ 62; see also DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl. as Exhibit C, for the entry for October 13, 2010.


27. Parole was informed that Plaintiff owed two years of prison time to the State of Virginia.  See Philbrick Decl., ¶ 63; see also DOCCS "Parolee Chrono Report" for Jesus Santiago, attached to Philbrick Decl., as Exhibit C, for the entry for September 20, 2010.


28.     In September 2010, Parole had no knowledge as to whether Plaintiff's sentencing court in 2004 had properly pronounced a term of PRS at Plaintiff's sentencing.  See Philbrick Decl., ¶ 63; see also Exhibit D to Philbrick Decl., "Notice Pursuant to Correction Law § 601-d," dated September 27, 2010.


29.     On September 27, 2010, at the same time his parole violation charges were pending, and just a week after he once again was returned to the jurisdiction of New York, Parole, after a review of his file, Parole referred Plaintiff to his sentencing court for possible resentencing.  See Philbrick Decl., ¶ 64; see also Exhibit D to Philbrick Decl., "Notice Pursuant to Correction Law § 601-d," dated September 27, 2010.


30.     At that time, it "appeared to the satisfaction of" Parole that Plaintiff was a designated person whose PRS term could not be definitively confirmed as having been pronounced by the sentencing court in 2004.  In accordance with §601-d, Parole sent notice to

6

**JA345**

Plaintiff's sentencing court that Plaintiff may require a resentencing hearing. See Philbrick Decl.,
¶ 64; see also Exhibit D to Philbrick Decl., "Notice Pursuant to Correction Law § 601-d," dated
September 27, 2010.

31.    Parole was required to refer Plaintiff to the sentencing court by statute, and was
not authorized to release Plaintiff until the sentencing court had determined the appropriate
sentence for Plaintiff as a consequence to his 2004 conviction.  See Correction Law § 601-d.

32.    On December 15, 2010, Plaintiff's sentencing court declined to re-sentence
Plaintiff to a term of PRS and stated that "no period of post release supervision constitutes part
of Defendant's sentence."   See Philbrick Decl., ¶ 65; see also "Post Release Supervision Re-
Sentencing Order," dated December 15, 2010, attached as Exhibit E to Philbrick Decl.

33.    Plaintiff was released from DOCS' custody on December 16, 2010.  See Philbrick
Decl., ¶ 66.

34.    Plaintiff could not have been released from Parole supervision at any time until
the Kings County criminal sentencing court resentenced Plaintiff without PRS.  See Philbrick
Decl., ¶¶ 67-69; Keane Decl., ¶¶ 11-13 .

35.    In an event, when Plaintiff would have been released from Parole or DOCS,
Plaintiff could not have been released to the community, as he owed time to the State of Virginia

7

**JA346**

from the time he was returned to New York from federal prison in 2010. <u>See</u> Philbrick Decl., ¶ 67.

36. Parole followed the mandate of Correction Law § 601-d in referring Plaintiff to his sentencing court in 2010. <u>See</u> Philbrick Decl., ¶ 68.

37. Plaintiff also could not have been referred to his sentencing court at the only other time he was available to the State of New York – the period from June 2007 through January 2008 – because there was no mechanism for DOCS or Parole to refer individuals for resentencing until July 2008. <u>See</u> Philbrick Decl., ¶ 68; .

38. DOCS and Parole, as State executive agencies, were not authorized to refer individuals in their custody or under their supervision to criminal courts for resentencing. <u>See</u> Philbrick Decl., ¶ 68.

39. At the time Plaintiff was released to Parole, and until the Legislature enacted §601-d in July 2008, DOCS and Parole were not authorized (and did not have an affirmative duty) to refer or remit individuals in their custody or under their supervision for resentencing, even if, as in Plaintiff's case, their PRS terms may not have been pronounced by their sentencing courts. <u>See</u> Philbrick Decl., ¶ 68; Keane Decl., ¶¶ 14-17.

40. In New York at that time, sentencings and resentencings remained the province of the courts, the District Attorneys, and the criminal defendants – not the executive agencies. <u>See</u>

8

**JA347**

Annucci Decl., ¶ 10.

41.     Correction Law § 601-d applied "to inmates in the custody of [DOCS] and releases under the supervision of [Parole]," and identified as a "designated person" individuals whose sentence and commitment orders do not "indicate imposition of any term of post-release supervision." See Correction Law § 601-d (1).

42.     Based upon Parole's records, Plaintiff appeared to be a "designated person." See Philbrick Decl., ¶ 64.

43.     Correction Law § 601-d provided that "[w]henever it … appear[ed] to the satisfaction of [Parole] that an inmate in its custody or that a release under its supervision, is a designated person, [Parole] shall make notficiation of that fact to the court that sentenced such person, and to the inmate or releasee. See Correction Law § 601-d (2).

44.     Referrals to sentencing courts were made pursuant to the July 2008 Memorandum of Understanding (the "MOU") between the Office of Court Administration and DOCS and Parole. See Keane Decl., Exhibit D; Annucci Decl., Exhibit C, attached to Keane Decl. as Exhibit D.

45.     The July 2008 MOU between the State courts and the executive agencies, DOCS and Parole, contemplated "thousands of cases being referred to sentencing courts across the State," and acknowledged that it would "be impractical for the courts to provide a fair and

9

**JA348**

expeditious review of these thousands of cases without an orderly program of coordination, prioritization, and planning." Accordingly, "designated persons" were categorized in the MOU as follows: the first priority for resentencing was given to incarcerated inmates who had returned to prison after violating PRS conditions of release, a lesser priority was given to parolees who were living in the community, but under supervision, and the least priority was given to inmates and parolees with prospective PRS, and no consideration was given to absconders.  See Keane Decl., Exhibit C, pp. 2-3.

46.    Until December 16, 2010, Plaintiff's PRS term had not been determined by a court to have been unlawful.  Philbrick Decl., ¶¶ 65-66.

Dated: New York, New York
           August 14, 2017

                                        ERIC T. SCHNEIDERMAN
                                        Attorney General of the
                                        State of New York
                                        Attorney for Defendants
                                        By:
                                                  /s
                                        _____
                                        MICHAEL J. KEANE
                                        Assistant Attorney General
                                        120 Broadway, 24th Floor
                                        New York, New York 10271
                                        (212) 416-8550

To:  Robert Laurence Greenberg, Esq.
      Robert L. Greenberg, P.C.
      767 Third Avenue, 24th Floor
      New York, New York 10017
      (646) 360-0077

10

**JA349**

```
                                                                    1
 1  SUPREME COURT OF THE STATE OF NEW YORK

 2  COUNTY OF KINGS:  CRIMINAL TERM:  PART 39

 3  - - - - - - - - - - - - - - - - - x

 4  THE PEOPLE OF THE STATE OF NEW YORK    : Indictment

 5              -against-                  : No. 1141/00

 6  JESUS SANTIAGO,                        :

 7                      Defendant.    :

 8  - - - - - - - - - - - - - - - - - x  PLEA

 9                            120 Schermerhorn Street
                              Brooklyn, New York
10                            May 3, 2002

11  B E F O R E :

12          HONORABLE SHELDON GREENBERG,
                      Justice.
13
    A P P E A R A N C E S :
14
            CHARLES J. HYNES, ESQ.
15              District Attorney - Kings County
            By:  ERNEST M. HAMBROCK, ESQ.
16              Assistant District Attorney
                For the People
17

18
            LAW OFFICES OF MARK ZUCKERMAN
19          By:  MARK ZUCKERMAN, ESQ.
                Brooklyn, New York
20              Attorney for the Defendant

21

22

23
                            Paula Coulote, by
24                          Harry Cahn, RPR
                            Senior Court Reporter
25
```

h/c

**JA350**

Proceedings

2

```
 1              (DEFENDANT ENTERED COURTROOM.)
 2              THE CLERK:  Number 24 on the calendar,
 3    Indictment Number 1141 of 2000, Jesus Santiago.
 4    Defendant incarcerated, produced, before the
 5    Court.
 6              MR. ZUCKKERMAN:  Mark Zuckerman --
 7              THE COURT:  This is for all purposes.
 8              MR. ZUCKKERMAN:  (Continuing) -- -- for
 9    the defendant, Jesus Santiago, 50 Court Street.
10              THE COURT:  May I see the attorneys.
11              (Whereupon, at this point, there was an
12    off-the-record discussion held at the sidebar
13    between Court and counsel.)
14              THE COURT:  On CPW 2, three and a-half
15    is the minimum, that's the offer, concurrent with
16    whatever he's serving.
17         The defendant was being held in federal
18    custody.  Mr. Zuckerman, the defendant was being
19    held in federal custody and the first, really the
20    thing that got this whole thing moving in bringing
21    him here was his letter to me dated December 26,
22    2001, indicating that there's a hold from us and
23    he would like it taken care of.  So all the time
24    that has passed between December 26, when he
25    wrote, I actually got it when I came back after
```

h/c

#1281 P 002/068

03/28/2011 20 56

Proceedings

3

1    Christmas, which was January 2nd, all the time
2    passed since January 2nd and now this is in the
3    process of us bringing him up.  I'll be prepared
4    to make the sentence nun pro tunc, retroactive to
5    January 2nd of this year.  So there's a couple of
6    months in-between.
7              MR. ZUCKERMAN:  There's a disposition.
8              THE COURT:  Do you have an application?
9              MR. ZUCKKERMAN:  Yes, Judge.
10       On behalf of my client, he withdraws his
11   previously entered plea of not guilty and offers
12   to plead guilty to CPW2, Criminal Possession of a
13   Weapon, Second Degree, in full satisfaction of the
14   indictment.
15             THE COURT:  What is your name, sir?
16             THE DEFENDANT:  Jesus Santiago.
17             THE COURT:  Mr. Santiago, is Mr.
18   Zuckerman who is standing there with you your
19   lawyer in this case?
20             THE DEFENDANT:  Yes.
21             THE COURT:  He tells me that you want to
22   change your plea from not guilty to guilty to a
23   Class C violent felony of Criminal Possession of a
24   Weapon in the Second Degree, in exchange for my
25   promise to you that I'll sentence you to the

h/c

Proceedings

4

1    minimum under a Class C violent felony, which is

2    three and a-half years straight time and make the

3    sentence nun pro tunc, that is this would be as of

4    January 2nd, that would be, in effect, the

5    sentence date.

6         This sentence would be concurrent with any

7    time that you are now serving in the federal

8    system or any other system.

9         In addition to the three and a-half years

10   there's a five-year post-release supervision time

11   that will be imposed on a Class C felony.

12        THE DEFENDANT:  They already gave me

13   four years on parole.

14        THE COURT:  I'm not sure how this would

15   work out with Parole.  In effect, it's the same

16   thing.  I don't know.  Most terms are concurrent.

17   I just don't know.  So I couldn't make any

18   promises to you.

19        Is this what you want to do?

20        THE DEFENDANT:  Yes.

21        THE COURT:  Have you had enough time to

22   think about changing this plea and discussing it

23   with your attorney?

24        THE DEFENDANT:  Yes.

25        THE COURT:  If I accept your plea of

h/c

Proceedings

5

1   guilty you are giving up some very important

2   rights. I want to make sure you understand what

3   you are doing.

4       First of all, you have an absolute right to

5   plead not guilty. If you do that this indictment

6   would be going on to a speed public jury trial.

7   If you have a trial you are not called upon to

8   prove to the jury you are innocent. On the

9   contrary. If the District Attorney expects to

10  convict you it's the District Attorney that has to

11  prove to the jury your guilt and they have to

12  prove it beyond a reasonable doubt.

13      If I accept your plea of guilty there's not

14  going to be a trial in this case. So by pleading

15  guilty what you are doing is giving up the

16  opportunity of testing the District Attorney to

17  see if they actually have enough proof to convict

18  you at trial; do you understand that?

19              THE DEFENDANT: Yes.

20              THE COURT: Another right that you have

21  that you give up when you plead guilty is the

22  right to confront your accusers. Here's how that

23  works. If there was a trial of the issue in this

24  case of whether or not you're guilty, as I say,

25  the District Attorney has the burden of proving to

h/c

Proceedings

6

```
1    the jury that you are guilty.  One of the ways
2    they could do that, presumably, would be to call
3    their witnesses to court and have those people
4    testify against you in the presence of the jury
5    and then they would argue to the jury, based on
6    what the witnesses said, that you're guilty.
7         Well, if you had a trial and if anyone did
8    testify against you at trial you then have an
9    opportunity to have Mr. Zuckerman, your attorney,
10   confront and cross-examine these witnesses on your
11   behalf, which might change the view of the
12   evidence.
13        As I said, if you wish to plead guilty
14   there's no trial.  If there's no trial the
15   witnesses don't come in to testify and if they
16   don't testify no one cross-examines them; do you
17   understand?
18             THE DEFENDANT:  Yes.
19             THE COURT:  Another right you have is
20   the right to remain silent concerning the charges
21   in this case.  Nobody can force you to say what
22   happened here or what it is you did to make you
23   plead guilty.  Before I accept your plea and
24   promise you to the sentence what I said I would,
25   you have to give up the right to silence and tell
```

h/c

Proceedings

7

```
 1 │ me what happened; are you agreeing to do that?
 2 │           THE DEFENDANT:  Yes.
 3 │           THE COURT:  The papers that I have in
 4 │ front of me say that this happened January 27 of
 5 │ the year 2000; is that true?
 6 │           THE DEFENDANT:  Yes.
 7 │           THE COURT:  Where did it happen?
 8 │           THE DEFENDANT:  Dean and Kingston.
 9 │           THE COURT:  Dean and Kingston.  That's
10 │ in Brooklyn?
11 │           THE DEFENDANT:  Yes.
12 │           THE COURT:  What happened?
13 │           THE DEFENDANT:  I had got some sneakers,
14 │ I was heading back to downtown and me and my
15 │ friends was supposed to meet up.  I walked around
16 │ the corner and dudes told me take off my leather
17 │ coat and chain.  I backed down and shot him in the
18 │ leg.
19 │           THE COURT:  You shot him in the leg?
20 │           THE DEFENDANT:  Yes.
21 │           THE COURT:  Whose gun did you use?
22 │           THE DEFENDANT:  Mine.
23 │           THE COURT:  Where was that gun?
24 │           THE DEFENDANT:  It was in my top pocket.
25 │           THE COURT:  And, obviously, there was at
```

h/c

Proceedings

8

```
 1     least one bullet in it.  You say you shot him?
 2               THE DEFENDANT:  Yes.
 3               THE COURT:  The fact that you were
 4     resisting an armed robbery is something that, if
 5     it came before the jury, they might find you
 6     guilty of possessing the gun, they might not find
 7     you guilty of possessing it to use it unlawfully
 8     against another person, although, there's a
 9     presumption that anybody who does present a pistol
10     or firearm intends to use it against another
11     person unlawfully.  I don't know what the jury
12     will decide, if you go to trial and you test it
13     you will find out, and if they don't convict you
14     of a higher crime you will be convicted of a C
15     felony.  You could be convicted of an E felony and
16     it could be less punishment.
17          Have you thought about going to trial and
18     possibly see if the jury --
19               THE DEFENDANT:  Your Honor, I'm tired of
20     fighting all these cases and I want to move on and
21     continue with my life.
22               THE COURT:  What type of gun was it?
23               THE DEFENDANT:  .40 caliber Luger.
24               THE COURT:  It was a revolver?
25               THE DEFENDANT:  It's an automatic.
```

h/c

Proceedings

9

```
 1              THE COURT:  That's a handgun?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  I never heard of a .40

 4      caliber.

 5          If I accept your plea of guilty you will have

 6      a felony conviction on your record to the class C

 7      violent felony, Criminal Possession of a Weapon in

 8      the Second Degree.  That's going to be on your

 9      record, as a result of your plea of guilty.  It's

10      the same as if you had a trial and the jury found

11      you guilty.  The effect on you is this.  In the

12      future, after I sentence you in this case, if you

13      were to have committed another felony crime that

14      would be, at least as to this case, your second

15      felony.  This would be your first, the other would

16      be your second.  Second felony offenders face

17      higher punishments than first felony offenders; do

18      you understand?

19              THE DEFENDANT:  Yes.

20              THE COURT:  I intend to sentence you to

21      three and a-half years nun pro tunc, January 2nd,

22      2002, and make that concurrent with the sentence

23      you now are serving.  If I keep my promise to you

24      then you get what you bargain for, then you have

25      no reasons to appeal from these proceedings.
```

h/c

Proceedings

10

```
 1    However, you have a right to appeal and a
 2    successful appeal will knock out this conviction
 3    and overturn this sentence.  I'm not interested in
 4    appeals.  I want to end this case, that's why we
 5    have this plea-bargain.  If I accept this plea are
 6    you willing to give up your rights to appeal from
 7    these proceedings?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  The People recommend
10    acceptance of the plea and imposition of sentence?
11              MR. HAMBROCK:  Yes.
12              THE COURT:  Is there anything you want
13    to tell me?  Now is the time to clear it up.  You
14    still wish to plead guilty to CPW2, violent
15    felony?  There's a paper called right to appeal.
16    If you agree with it, discuss it with Mr.
17    Zuckerman, if you agree to it, sign it.
18              (Whereupon, at this point, there was an
19    off-the-record discussion held between the
20    defendant and his counsel.)
21              THE COURT:  Defendant has and Mr.
22    Zuckerman has signed the waiver.  I'm adding my
23    own signature.  The plea is accepted by the Court.
24    What's the earliest date for sentence?
25    Is the plea, as in indicated and imposition
```

h/c

**JA359**

Proceedings

11

1    of sentence, satisfactory to the People.

2              MR. HAMBROCK:  Yes.

3              THE COURT:  Mr. Zuckerman?

4              MR. ZUCKKERMAN:  Defendant wishes to be

5    sentenced now.

6              THE COURT:  I can't.  I have to have a

7    presentence report.  The earliest date is the

8    13th.

9              MR. ZUCKKERMAN:  What's that, May 13?

10             THE DEFENDANT:  Okay.  Could you call

11   the feds and have them come and pick me up soon as

12   possible?

13             THE COURT:  I can only tell you you're

14   not a welcome guest for them.  They're extending

15   the hospitality.  They want to get you back to the

16   other jurisdiction as fast as you want to get

17   back.

18             MR. ZUCKKERMAN:  Could we have the 14th?

19             THE COURT:  May 14.  May 14 for sentence

20

21

22             (Next page, please.)

23             (Whereupon, at this point, the

24   proceedings were adjourned to MAY 14, 2002, for

25   sentence.)

h/c

Proceedings

12

1          * * * * * *

2              CERTIFIED TO BE A TRUE AND

3              CORRECT TRANSCRIPT OF

4              STENOGRAPHIC NOTES OF PAULA

5              COULOTE, TO THE BEST OF MY

6              ABILITY

7

8

9              _____
               PAULA COULOTE, BY
               HARRY CAHN, RPR
10             Senior Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        h/c

**JA361**




Dec #
1339797

# SENTENCING ORDER

VIRGINIA: **IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

FEDERAL INFORMATION PROCESSING
STANDARDS CODE: **059**

Hearing Date: **December 11, 2008**

Judge: **R. TERRENCE NEY**

**COMMONWEALTH OF VIRGINIA**

versus

**JESUS SANTIAGO**, Defendant

This case came before the Court for sentencing of the Defendant, who appeared in person with his Attorney, Dwight Jones. The Commonwealth was represented by Mark Sullivan. The Defendant appeared while in custody.

On October 1, 2008, the Defendant was found guilty of the following offense(s):

| CASE NUMBER | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION |
|---|---|---|---|
| **FE-2008-1485** | **POSSESSION OF MARIJUANA WITH INTENT TO DISTRIBUTE (F)** | **10/30/2005** | **18.2-248.1** **VCC: NAR-3032-F5** |

The pre-sentence report was considered and is ordered filed as a part of the record in this case in accordance with the provisions of Code § 19.2-299.

Pursuant to the provisions of Code § 19.2-298.01, the Court has considered and reviewed the applicable discretionary sentencing guidelines and the guideline worksheets. The sentencing guideline worksheets and the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.

123
c
pm
pup
Jail
pen

RTN/jah
FE-2008-1485

 

Before pronouncing the sentence, the Court inquired if the Defendant desired to make a statement and if the Defendant desired to advance any reason why judgment should not be pronounced.

The Court **SENTENCED** the Defendant to:

**INCARCERATION.** Incarceration with the Virginia Department of Corrections for the term of: ten (10) years. The total sentence imposed is **Ten (10) years.**

**SUSPENDED SENTENCE.** The Court further **ORDERED** that Eight (8) years of the sentence be suspended, upon the following conditions(s):

**SUPERVISED PROBATION.** The Defendant is placed on probation to commence on his release from incarceration, under the supervision of a Probation Officer for one (1) year, or unless sooner released by the Court or by the Probation Officer. The Defendant shall comply with all the rules and requirements set by the Probation Officer. Probation shall include substance abuse counseling and/or testing, mental health counseling, and alcohol counseling as prescribed by the Probation Officer.

**COSTS.** The Defendant shall pay all costs of this case.

**CREDIT FOR TIME SERVED.** The Defendant shall be given credit for time spent in confinement while awaiting trial pursuant to § 53.1-187 of the 1950 Code of Virginia, as amended.

**SUSPENSION OF OPERATOR'S LICENSE.** By operation of law, the Defendant's privilege to drive in the Commonwealth of Virginia shall be revoked for the period of Six (6) months pursuant to § 18.2-259.1 of the 1950 Code of Virginia, as amended.

**PUBLIC DEFENDER FEE.** Dwight Jones, the Public Defender, who was appointed to represent the Defendant in this case, is allowed a fee of $445.00. This fee is to be assessed as costs as provided in § 19.2-163.2(7) of the 1950 Code of Virginia, as amended.

The Defendant was remanded to the custody of the Sheriff.

Entered on January _____15_____, 2009.

_____
JUDGE R. TERRENCE NEY

RTN/jah
FE-2008-1485

**JA363**

**DEFENDANT IDENTIFICATION:**

**Alias: NONE**
**SSN:** ▊▊▊▊
**DOB:** 06/21/1982
**SEX:** M

**SENTENCING SUMMARY:**

TOTAL SENTENCE IMPOSED: Ten (10) years

TOTAL SENTENCE SUSPENDED: Eight (8) years

**ABSTRACT OF CONVICTION**

ADDRESS: 7228 Stover Drive
           Alexandria, VA 22306
SSN/OL#: ▊▊▊▊ STATE of OPERATOR'S LICENSE: Unknown
STATUTE: 18.2-248.1
VIOLATION: State
OL SURRENDERED: NO
SEX: M
DOO: 10/30/2005
DOB: 06/21/1982





6B-22T

*Commonwealth of Virginia*
## Department of Corrections

**Notification of Release**
**Post/Probation Supervision**
for
**JESUS SANTIAGO VSP 398075**

In accordance with the order of the Circuit Court for the City(ies)/ County(ies) of **FAIRFAX,** your release from the Department of Corrections is directed on **February 11, 2010.**

**Your release plan is:** YOU ARE BEING RELEASED TO YOUR U.S. MARSHAL SERVICES JUDGMENT AND COMMITMENT. YOU ARE TO KEEP THIS DOCUMENT IN YOUR POSSESSION AT ALL TIMES. IF RELEASED FROM INCARCERATION BY BOND, COURT ORDER, OR EXPIRATION OF SENTENCE BY U.S. MARSHAL SERVICES AUTHORITIES, YOU MUST REPORT WITHIN ONE BUSINESS DAY TOLESLEY A. BUBENHOFER, PROBATION & PAROLE DISTRICT 29, 10398 DEMOCRACY LANE, SUITE 101, FAIRFAX, VIRGINIA, TELEPHONE NUMBER [703] 934-0880.

By direction of the Virginia Department of Corrections

*James M. Sisk*

James M. Sisk
Community Release Manager
Division of Operations

**Offenders lose certain civil rights when convicted of a felony and may petition for restoration of civil rights upon completion of their sentence.** You may contact the Secretary of the Commonwealth for information.

CC: **COFFEEWOOD CORRECTIONAL CENTER 210**

I have read (had read and explained to me) the above and by my signature or mark below, acknowledge and understand the requirements upon me.

Inmate: _____ Date: 2/11/10

Witness: _____ Date: 2/11/10

 

jmt

VIRGINIA: IN THE CIRCUIT COURT OF LOUDOUN COUNTY

COMMONWEALTH OF VIRGINIA :

VS. : CRIMINAL NO. 24981-00 and 24981-01

JESUS SANTIAGO :

Social Security No.: ███████     Date of Birth: 06/21/1982

Hearing Date: June 14, 2013     Judge: Thomas D. Horne

Hearing Type: Plea

Attorney for the Commonwealth: Gigi Lawless, Assistant Commonwealth Attorney

Attorney for the Defendant: Derek P. Richmond, retained

Original Charge Description: Count One (1) - Threat to Bomb, Burn or Destroy (F) and Count Two (2) - Assault and Battery of Family Member (M)

Statute/Ordinance Violation Charged: Count One (1) -Virginia Code Section §18.2-83 and Count Two (2) - Virginia Code Section §18.2-57.2

Conviction Offense Description: Count One (1) - Threat to Bomb, Burn or Destroy (F) and Count Two (2) - Assault and Battery of a Family Member (M)

Statute/Ordinance Violation Conviction: Count One (1) - Virginia Code Section §18.2-83 and Count Two (2) - Virginia Code Section §18.2-57.2

Alleged Offense Date: Count One (1) - 01/03/2012 and Count Two (2) – 08/17/2011

Commencing Status of Defendant: in custody

Concluding Status of Defendant: in custody

## O R D E R

On the above date came **Gigi Lawless**, Assistant Commonwealth Attorney, and **Derek P. Richmond**, counsel for the Defendant. Also came the Defendant, **JESUS SANTIAGO**, who stands indicted of the felony and misdemeanor described above and who came in the custody of a Deputy Sheriff.

This case came on this day for entry of a Plea, by Order entered April 9, 2013.

**JA366**

 

The Commonwealth and counsel for the Defendant informed the Court that this case has been the subject of a plea agreement. The Commonwealth filed a written copy of said plea agreement with the Court, the terms of which agreement are agreed to by the Defendant and all legal counsel.

Subject to the approval of the Court, the Defendant was arraigned on the charges of Threat To Bomb, Burn Or Destroy, a felony, as contained in Count One (1) of the indictment and Assault and Battery of Family Member, a misdemeanor, as contained in Count Two (2) of the indictment.

After private consultation with and being advised by legal counsel, the Defendant entered a plea of *guilty* to the each of the charges contained in Counts One (1) and Two (2) of the indictment, which pleas were orally tendered by the Defendant In person.

The Court, after inquiring and being of the opinion that the Defendant fully understood the nature and effect of said pleas entered and of the penalties that may be imposed upon conviction, in addition to confinement and or a fine, carry a wide variety of consequences, including but not limited to, deportation, civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Services, loss of driving privileges, and loss of business licenses, does accept said plea as being freely, voluntarily, and intelligently made, and does agree to abide by the terms and conditions of the plea agreement.

The Commonwealth then presented evidence in support of her *prima facie* case in the form of a written proffer of the facts herein.

The Court, based on the pleas of guilty entered to the charges contained in Counts One (1) and Two (2) of the indictment, and the stipulated evidence presented, finds the Defendant, **JESUS SANTIAGO**, **guilty** of one (1) count **Threat To Bomb, Burn Or Destroy (F)**, **in violation of Virginia Code Section §18.2-83**, as charged in Count One (1) of the indictment and of one (1) count **Assault and Battery of Family Member (M)**, **in violation of Virginia Code Section §18.2-57.2**, as charged in Count Two (2) of the indictment; therefore, it is

**JA367**




**ORDERED** that the Defendant cooperate fully with the requests for information made by the Adult Probation Officer, who is directed to conduct a thorough investigation and to prepare and file a *Pre-Sentence Report* and the *Virginia Sentencing Guidelines* with the Court, **five (5) days prior to sentencing,** as required by law.

The Court and the Defendant did endorse a separate Order directing the Preparation of a Pre-Sentence Report and the Virginia Sentencing Guidelines, and the Clerk provided a copy of this Order to the Office of Adult Probation and Parole.

It is **ORDERED** that this case be continued to **September 27, 2013 at 1:00 P.M. for sentencing.** The Defendant and all legal counsel are **ORDERED** to be present in Court, at that time.

The Court notes that as a part of this Plea Agreement, the Commonwealth previously Nolle Prosequied one (1) count of Stalking, one (1) count of Trespass, and one (1) count of Profane Language over the Airway on March 21, 2013 in the Loudoun County General District Court.

In addition, pursuant to Virginia Code Sections 19.2-310.2 and 19.2-310.3, the Defendant is **ORDERED** to cooperate fully and promptly in providing information and permitting fingerprinting and/or sampling of blood, tissue or saliva as required by this Order. Thereupon the Court and the Defendant endorsed the Order for DNA Analysis to be taken.

And the Defendant is remanded to the custody of the Sheriff.

The Clerk is directed to forward a copy of this Order to the Commonwealth Attorney, Defense Counsel, to the Adult Probation and Parole Office and to the Chief Jailer at the Loudoun County Adult Detention Center, forthwith.

ENTERED THIS ___5ᵗʰ___ DAY OF ~~JUNE~~, 2013

_Thomas D. Horne_

**THOMAS D. HORNE, JUDGE**

CLERK'S CERTIFICATION:
I hereby certify that this document is a true copy of an official record in the Loudoun County Circuit Court Clerk's Office

Gary M. Clemens, Clerk

10/1/13
Date & Seal

Deputy Clerk

*Commonwealth of Virginia*
## Department of Corrections

### Notification of Release
### Post/Probation Supervision
for
**JESUS SANTIAGO     VSP# 1327797**

In accordance with the order of the Circuit Court for the City(ies)/ County(ies) of **LOUDOUN, FAIRFAX,** your release from the Department of Corrections is directed on <u>**May 20, 2015.**</u>

**Your release plan is:** TASHA RODGERS (SISTER), 7228 STOVER DRIVE, ALEXANDRIA, VIRGINIA 22306.

YOU WILL REPORT WITHIN THREE (3) DAYS FROM YOUR RELEASE AS FOLLOWS: TRACEY LAVELY, PROBATION & PAROLE DISTRICT 29, 10398 DEMOCRACY LANE, SUITE 101, FAIRFAX, VIRGINIA, TELEPHONE NUMBER [703] 934-0880.

By direction of the Virginia Department of Corrections

**Wendy K. Brown**
**Community Release Manager**
**Division of Operations**

**Offenders lose certain civil rights when convicted of a felony and may petition for restoration of civil rights upon completion of their sentence. You may contact the Secretary of the Commonwealth for information.**

CC: SUSSEX I STATE PRISON

I have read (had read and explained to me) the above and by my signature or mark below, acknowledge and understand the requirements upon me.

Inmate: _____     Date: 5/20/15

Witness: _____     Date: 5/20/15

# EXHIBIT A

2007 WL 1231539 (U.S.) (Appellate Petition, Motion and Filing)
Supreme Court of the United States.

Robert FITCH, Acting Superintendent of Greene Correctional Facility, Petitioner,

v.

Sean EARLEY, Respondent.

No. 06-1429.
April 25, 2007.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit

**Petition for a Writ of Certiorari**

Charles J. Hynes, District Attorney, Kings County.

Leonard Joblove [*], Victor Barall, Assistant District Attorneys, Kings County District Attorney's Office, 350 Jay Street, Brooklyn, New York 11201-2908, (718) 250-2511.

### *i QUESTIONS PRESENTED

1. Whether, on habeas review, an adjudication of a claim on the merits by a state court can be "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), when (a) this Court, in the decision contrary to which the state court is said to have acted - *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936) - did not announce that the rule of law it was establishing was based on the Federal Constitution (or on other federal law binding on the States in criminal proceedings), and when (b) regardless of whether this Court must be the court to announce the constitutional basis of the rule, the decision of this Court contrary to which the state court is said to have acted does not clearly appear to be based on the Constitution (or on other federal law binding on the States in criminal proceedings), but rather, appears to be based on authority not binding on the States in criminal proceedings.

2. Whether, in light of this Court's decision in *Carey v. Musladin*, 127 S. Ct. 649 (2006), the Second Circuit incorrectly identified the specific holding of the decision in *Wampler* - ven assuming that *Wampler* was based on the Constitution - where the Second Circuit disregarded a circumstance essential to the decision in *Wampler*, namely, that, in that case, the imposition of the penalty at issue was committed to the discretion of the sentencing court; and whether the state court's determination in this case - that a defendant may properly be subjected to a component of a sentence that, by state statute, is mandatory and included in the sentence, even if that component of the sentence was not expressly pronounced by the court at the sentencing proceeding therefore was not "contrary to" *Wampler* within the meaning of 28 U.S.C. § 2254(d)(1).

### *II PARTIES TO THE PROCEEDING

The petitioner in this Court is Robert Fitch, the Acting Superintendent of the Greene Correctional Facility, which is the state prison where Sean Earley is incarcerated. Mr. Fitch is represented in this federal habeas corpus proceeding by Kings County District Attorney Charles J. Hynes, by agreement with the Attorney General of the State of New York. The respondent in this Court is Sean Earley, who, having been convicted of attempted burglary in New York State court, filed the federal habeas corpus petition that is the subject of this litigation.

**\*iii TABLE OF CONTENTS**

QUESTIONS PRESENTED ............................................................................ i

PARTIES TO THE PROCEEDING ................................................................ ii

TABLE OF AUTHORITIES ......................................................................... v

OPINIONS BELOW ..................................................................................... 1

JURISDICTION ............................................................................................ 2

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ............... 2

STATEMENT OF THE CASE ...................................................................... 4

Introduction ................................................................................................... 4

Procedural History of the Case .................................................................... 9

A. The State Court Proceedings .................................................................. 9

B. The Federal Court Proceedings .............................................................. 11

REASONS FOR GRANTING THE WRIT .................................................... 15

I. The Second Circuit's Decision Presents Two Fundamental and Unsettled Questions
Concerning the Proper Interpretation of 28 U.S.C. § 2254(d)(1) ................ 16

*iv II. This Court's Decision in *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), Does
Not State a Rule of Constitutional Law ....................................................... 20

III. The Second Circuit Incorrectly Identified the Holding of *Wampler* ....... 24

CONCLUSION ............................................................................................. 29

APPENDIX

Opinion of the United States Court of Appeals for the Second Circuit, dated June 9, 2006 ......... 1a

Opinion of the United States Court of Appeals for the Second Circuit, dated August 31, 2006 .... 12a

Order of the United States Court of Appeals for the Second Circuit, dated November 27, 2006 ... 18a

Opinion of the United States District Court for the Eastern District of New York, dated
December 31, 2003 ...................................................................................... 20a

Opinion of the United States District Court for the Eastern District of New York, dated June
18, 2004 ....................................................................................................... 22a

Opinion of the New York Supreme Court, Kings County, Criminal Term, dated March 4, 2003 . 33a

**\*v TABLE OF AUTHORITIES**

Cases:

*Boyd v. Archer*, 42 F.2d 43 (9th Cir. 1930) ............................................... 23

*Brown v. Mississippi*, 297 U.S. 278 (1936) ................................................ 21

*Carey v. Musladin*, 127 S. Ct. 649 (2006) .................................................. passim

*Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006) ............................................ passim

*Earley v. Murray*, 462 F.3d 147 (2d Cir. 2006) ........................................... 1, 14

*Estelle v. Williams*, 425 U.S. 501 (1976) .................................................... 25

*Faretta v. California*, 422 U.S. 806 (1975) ................................................. 27

*Harbury v. Christopher*, 536 U.S. 403 (2002) ............................................. 24

*Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936) ....................... passim

*Holbrook v. Flynn*, 475 U.S. 560 (1986) ..................................................... 25

*Kane v. Garcia Espitia*, 546 U.S. 9 (2005) ................................................. 27

*Knowles v. Mirzayance*, 127 S. Ct. 1247 (2007) ........................................ 16

*Lee v. Bickell*, 292 U.S. 415 (1934) ............................................................ 21, 24

*Miller v. Rodriguez*, 127 S. Ct. 1119 (2007) ............................................... 16

*Morehead v. New York*, 298 U.S. 587 (1936) .............................................. 20

*Morrison v. California*, 291 U.S. 82 (1934) ................................................ 21

*Norris v. Alabama*, 294 U.S. 587 (1935) ..................................................... 21

*People v. Benson*, 831 N.Y.S.2d 266 (App. Div. 2007) .............................. 8

*vi People v. Sebastian*, No. 2005-06896, 2007 N.Y. Slip Op. 1903 (App.
Div. Mar. 6, 2007) ........................................................................................ 8

*People v. Smith*, 37 A.D.3d 499, 829 N.Y.S.2d 226 (App. Div. 2007) ......... 8

*People v. Sparber*, 34 A.D.3d 265, 823 N.Y.S.2d 405 (App. Div. 2006) ..... 8

*People v. Thompson*, No. 2002-05990, 2007 N.Y. Slip Op. 2965 (App. Div.
Apr. 3, 2007) ................................................................................................ 8

*Reed v. Farley*, 512 U.S. 339 (1994) ........................................................... 17

| | |
|---|---|
| *Santobello v. New York*, 404 U.S. 257 (1971) | 12 |
| *Schmidt v. Van Patten*, 127 S. Ct. 1120 (2007) | 16 |
| *Snyder v. Massachusetts*, 291 U.S. 97 (1934) | 21 |
| *Tyler v. Cain*, 533 U.S. 656 (2001) | 19 |
| *United States v. Wampler*, 10 F. Supp. 609 (D. Md. 1935) | 20 |
| *United States v. Wells Fargo Bank*, 485 U.S. 351 (1988) | 24 |
| *Wampler v. Hill*, 11 F. Supp. 540 (M.D. Pa. 1935) | 20 |
| *Williams v. Taylor*, 529 U.S. 362 (2000) | 17 |
| *Yarborough v. Alvarado*, 541 U.S. 652 (2004) | 26 |
| United States Constitution: | |
| Fourteenth Amendment | 2 |
| **\*vii** United States Statutes: | |
| Antiterrorism and Effective Death Penalty Act of 1996, Pub. Law No. 104-132, 110 Stat. 1214 (1996) | 5-6 |
| 18 U.S.C. former § 569 | 22, 23 |
| 28 U.S.C. § 1254 | 2 |
| 28 U.S.C. § 2244 | 19 |
| 28 U.S.C. § 2254 | *passim* |
| New York State Statutes: | |
| N.Y. Crim. Proc. Law § 440.20 | 5, 10 |
| N.Y. Penal Law § 70.00 | 1, 4, 9 |
| N.Y. Penal Law § 70.02 | 9 |
| N.Y. Penal Law § 70.04 | 9 |
| N.Y. Penal Law § 70.45 | 1, 3-4, 9 |
| N.Y. Penal Law § 110.00 | 9 |
| N.Y. Penal Law § 110.05 | 9 |
| N.Y. Penal Law § 140.25 | 9 |
| Other Authorities: | |
| Act of Aug. 6, 1998, ch. 1, 1998 N.Y. Laws 1 | 4 |
| Act of Dec. 14, 2004, ch. 738, 2004 N.Y. Laws 1462 | 4 |
| **\*viii** *Gilbert Criminal Law and Procedure 1999* (Matthew Bender 1999) | 4 |
| Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (4th ed. 2001) | 18 |

**\*1 PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Robert Fitch, Acting Superintendent of Greene Correctional Facility in New York (hereafter "the State"), requests that this Court issue a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit that vacated a judgment of the United States District Court for the Eastern District of New York (Korman, C.J.) and remanded the case to that court for further proceedings to determine whether Sean Earley's petition for a writ of habeas corpus had been timely filed. The district court, without addressing the timeliness issue, had denied the petition for a writ of habeas corpus on the merits, holding that the failure of the state court to inform Earley (hereafter, "the defendant" or "Earley"), either at the time of his guilty plea or at the time of his sentencing, that his bargained-for sentence of six years' incarceration would, by the mandatory terms of New York statutory law, include a five-year period of post-release supervision (*see* N.Y. Penal Law §§ 70.00[6], 70.45[1]), did not require, as a matter of federal constitutional law, that the post-release supervision component of the sentence be excised from Earley's sentence.

**Opinions Below**

The citation of the first opinion of the United States Court of Appeals for the Second Circuit is *Earley v. Murray*, 451 F.3d 71 (2d Cir. 2006). The citation of the opinion of the Second Circuit that denied panel rehearing of the appeal is *Earley v. Murray*, 462 F.3d 147 (2d Cir. 2006). The opinions of the United States District Court for the Eastern District

of New York and the  \*2  opinion of the New York Supreme Court, Kings County, are unreported. Each of the above decisions is reproduced in the Appendix to this petition.

## Jurisdiction

The judgment of the United States Court of Appeals for the Second Circuit was entered on June 9, 2006. By papers filed June 22, 2006, the State petitioned the Second Circuit for rehearing en banc and panel rehearing of this case. By opinion dated August 31, 2006, the three-judge panel that had issued the June 9, 2006 opinion denied the petition for rehearing. The opinion of the three-judge panel dated August 31, 2006 did not address the State's petition for rehearing en banc. By order dated November 27, 2006, the Second Circuit denied the petition for rehearing en banc and panel rehearing. This petition for certiorari was filed within the time specified by the order dated February 12, 2007, of the Honorable Ruth Bader Ginsburg, Associate Justice of this Court, which extended the time for the State to file the petition to and including April 26, 2007.

This Court's jurisdiction is invoked under 28 U.S.C. § 1254(1).

## Constitutional and Statutory Provisions Involved

United States Constitution, Fourteenth Amendment:
... nor shall any State deprive any person of life, liberty, or property, without due process of law;

. . . .

 \*3  28 United States Code § 2254:

## State custody; remedies in Federal courts

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
....

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ....

New York Penal Law § 70.45:

## Determinate sentence; post-release supervision.

1. In general. Each determinate sentence also includes, as a part thereof, an additional period of post-release supervision. Such period shall commence as provided in subdivision five of this section and a violation of any condition of supervision

occurring at any time during such period of post-release supervision shall subject the defendant to a further period of imprisonment of at least six months and up to the balance of the remaining period of post-release supervision, not to exceed five years....

**\*4** 2. Period of post-release supervision. The period of post-release supervision for a determinate sentence shall be five years .... [1]

3. Conditions of post-release supervision. The board of parole shall establish and impose conditions of post-release supervision in the same manner and to the same extent as it may establish and impose conditions ... upon persons who are granted parole ....

## STATEMENT OF THE CASE

### Introduction

In 1999, the defendant was charged by a Kings County, New York indictment with burglary and other, lesser crimes. The defendant subsequently agreed to plead guilty to attempted burglary, in exchange for a prison sentence of six years. At the plea proceeding, the court did not advise the defendant on the record that, as a condition of the plea, the defendant's six-year prison sentence also would include, by operation of law (N.Y..Penal Law §§ 70.00[6], 70.45), a five-year term of post-release supervision (sometimes hereafter, "PRS"). When the defendant appeared for sentencing on February 29, 2000, the court imposed the bargained-for sentence of **\*5** six years in prison. The sentencing court did not announce at sentencing that the defendant's sentence of imprisonment also included the five-year term of PRS.

More than one year after his incarceration had begun, the defendant moved in the sentencing court, pursuant to New York Criminal Procedure Law § 440.20, for the five-year term of post-release supervision to be stricken from his sentence, on the ground that that term was not part of the plea agreement and was not announced at the sentencing proceeding. The defendant stated that he did not seek to have his plea vacated; he sought only to have the term of post-release supervision eliminated. The sentencing court denied relief.

Thereafter, the federal district court denied the defendant's petition for a writ of habeas corpus. The Second Circuit reversed, holding that the decision of the sentencing court denying the relief requested by the defendant was "contrary to" this Court's decision in *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936). According to the Second Circuit, *Wampler* holds that "[t]he only cognizable sentence is the one imposed by the judge," and that "[a]ny alteration to that sentence, unless made by a judge in a subsequent proceeding, is of no effect." Therefore, the Second Circuit held, the term of post-release supervision was "a nullity" and "quite simply, never a part of the sentence" (Appendix ["App."] at 7a, 10a). *Earley v. Murray*, 451 F.3d 71, 75, 76 (2d Cir. 2006). The Second Circuit observed that "[a]lthough *Wampler* does not identify the source of the rule that it announces, we believe that it is based in the due process guarantees of the United States Constitution" (App. at 9a n.1). 451 F.3d at 76 n.1.

This case presents two important and still unsettled questions concerning the proper interpretation of the Antiterrorism and Effective Death Penalty Act of 1996 **\*6** ("AEDPA"), Pub. Law No. 104-132, 110 Stat. 1214 (1996). The first question is whether, under 28 U.S.C. § 2254(d)(1), the "clearly established Federal law" upon which the state prisoner bases his claim for habeas relief must be clearly established as a rule of federal law binding on the States in criminal proceedings, *i.e.*, as a rule of constitutional law.

In this case, the Second Circuit identified with certainty what it considered to be the clearly established rule of law announced in *Wampler* - the rule that "[t]he only cognizable sentence is the one imposed by the judge" - but the Second Circuit expressed considerably less certainty about the *source* of the rule, acknowledging that the *Wampler* decision was

silent on that question and stating only that the court "believe[d]" that the source of the rule was the constitutional right to due process (App. at 7a, 9a n.1). 451 F.3d at 75, 76 n.1.

An application for habeas relief under 28 U.S.C. § 2254 may be entertained "only on the ground that [the state prisoner] is in custody in violation of the Constitution or laws or treaties of the United States" (28 U.S.C. § 2254 [a]), which almost invariably means that habeas relief is limited to circumstances in which State criminal proceedings violated federal *constitutional* law. Where the relevant state court rejected the prisoner's claim on the merits, the AEDPA imposes the additional requirement that the state court's rejection of the claim have been "contrary to, or [have] involved an unreasonable application of, clearly established Federal law, as determined by [this Court]." Accordingly, it should follow that for habeas relief to be granted, the rule of law providing the ground for relief must be clearly established by this Court as a rule of federal constitutional law. The decision of the Second Circuit in this case seems to rest, however, on the premise that, so long **\*7** as the rule of law is clearly established, it does not matter whether the constitutional basis of the rule is also clearly established. Thus, this case presents this Court with the opportunity to address this fundamental question concerning the proper interpretation of 28 U.S.C. § 2254(d)(1): whether "clearly established Federal law" means that the law at issue must be clearly established *as* federal law that is binding on the States in criminal proceedings.

This case also presents the related and equally important question of whether a lower federal court may decide for itself, without a pronouncement from this Court, that the source of a rule of law *is* the Federal Constitution. As the Second Circuit recognized, the *Wampler* decision does not refer to any constitutional provision. Inasmuch as 28 U.S.C. § 2254(d) (1) provides that a state prisoner is entitled to habeas relief only upon a showing that the relevant state court made a ruling that was contrary to or involved an unreasonable application of clearly established federal law "as determined by the Supreme Court of the United States," it should follow that only this Court may make the determination that the rule of law at issue is of constitutional dimension.

Finally, assuming that a lower federal court is empowered to decide for itself that a rule of law announced by this Court is a rule of constitutional law, even when this Court did not say that it was, then this case presents the question of whether the Second Circuit correctly concluded that the *Wampler* rule rested on the due process guarantees of the Constitution. *Wampler* did not explicitly hold that it was announcing a constitutional rule, and, indeed, the decision appears to rest on non-constitutional federal authority. Thus, *Wampler* apparently does not state a rule of federal constitutional law.

**\*8** More generally, this case presents the question of whether, in light of this Court's subsequent decision in *Carey v. Musladin*, 127 S. Ct. 649 (2006), the Second Circuit correctly identified the specific holding of *Wampler*. The Second Circuit disregarded a circumstance essential to the decision in *Wampler*, namely, that, in *Wampler*, the choice of whether to incarcerate the defendant for non-payment of a fine was committed to the discretion of the sentencing court. Here, by contrast, the sentencing court had no discretion whatsoever over whether to impose post-release supervision or how long a term of post-release supervision to impose; according to the New York Penal Law, a five-year term of post-release supervision was a mandatory part of the defendant's sentence. Given *Musladin's* implicit teaching that the holdings of this Court should be construed narrowly on habeas review under 28 U.S.C. § 2254, the conclusion of the Second Circuit - that the refusal of the state court, upon the defendant's motion, to eliminate the term of post-release supervision from the sentence was "contrary to" *Wampler* - is simply untenable.

The decision of the Second Circuit in this case will likely affect the validity of the post-release supervision component of hundreds, if not thousands, of sentences imposed by New York courts. *See, e.g., People v. Thompson*, No. 2002-05990, 2007 N.Y. Slip Op. 2965 (App. Div. Apr. 3, 2007); *People v. Sebastian*, No. 2005 -06896, 2007 N.Y. Slip Op. 1903 (App. Div. Mar. 6, 2007); *People v. Benson*, 831 N.Y.S.2d 266 (App. Div. 2007); *People v. Smith*, 37 A.D.3d 499, 829 N.Y.S.2d 226 (App. Div. 2007) (all following *Earley*); *cf. People v. Sparber*, 34 A.D.3d 265, 823 N.Y.S.2d 405 (App. Div. 2006) (distinguishing *Earley*). Accordingly, the petition for a writ of certiorari should be granted, and, at the very least, the judgment of the Second Circuit should be vacated and the case should be remanded to that court **\*9** for further consideration in light of this Court's decision in *Musladin*.

## Procedural History of This Case

### A. The State Court Proceedings

The defendant was charged under New York law with burglary and other, lesser crimes, all arising out of his illegal entry into a Brooklyn home on March 30, 1999. On February 17, 2000, the defendant appeared in the New York Supreme Court, Kings County, with his attorney, and agreed to plead guilty to attempted burglary in the second degree (N.Y. Penal Law §§ 110.00/140.25[2]), a class D violent felony (*see* N.Y. Penal Law §§ 70.02[1][c], 110.05[5], 140.25), in full satisfaction of the charges against him. The court promised the defendant that in exchange for his guilty plea, he would receive a sentence of six years in prison. After an allocution of the defendant, the court accepted the defendant's guilty plea and adjudicated him a second violent felony offender. *See* N.Y. Penal Law § 70.04(1).

Pursuant to New York Penal Law §§ 70.00(6) and 70.45, the defendant's determinate sentence of imprisonment included, by operation of law, a five-year period of post-release supervision. *See* N.Y. Penal Law § 70.00(6) ("a determinate sentence of imprisonment … shall include, as a part thereof, a period of post-release supervision in accordance with section 70.45"); N.Y. Penal Law § 70.45(1) ("Each determinate sentence also includes, as a part thereof, an additional period of post-release supervision"); N.Y. Penal Law § 70.45(2) (mandating a five-year period of post-release supervision under the circumstances of this case). At the plea proceeding, however, the court did not explicitly inform **\*10** the defendant that his sentence would include a period of post-release supervision.

On February 29, 2000, the court sentenced the defendant to the promised term of imprisonment of six years. The court did not explicitly inform the defendant at the sentencing proceeding that his sentence would include a period of post-release supervision.

After his incarceration had begun, the defendant petitioned the New York State Department of Correctional Services to "correct" his inmate records, by removing from those records any reference to PRS. After that unsuccessful effort, the defendant, by papers dated July 11, 2002, moved *pro se* in the New York Supreme Court, Kings County, pursuant to New York Criminal Procedure Law § 440.20, to set aside his sentence. He claimed, in relevant part, that his plea was obtained in violation of due process because the court did not inform him of the post-release supervision consequence of pleading guilty. The defendant stated, however, that he wished to retain his plea. In addition, the defendant argued that post-release supervision was not a legally cognizable part of his sentence because it had not been pronounced by the court at the sentencing proceeding. Accordingly, he asked the court to vacate the sentence and to resentence him to a term of six years in prison with no post-release supervision.

By decision and order dated March 4, 2003, the state court denied the defendant's motion. The court acknowledged that a defendant ought to be informed of the post-release supervision consequence of a guilty plea, but held that because, as a matter of New York law, post-release supervision was a mandatory component of the defendant's sentence, the defendant's request that the court vacate the post-release supervision component of his sentence had to be denied (App. at 33a-35a).

**\*11** The defendant subsequently filed an application for leave to appeal from the order denying his motion to set aside his sentence. By order dated May 19, 2003, the defendant's application was denied.

### B. The Federal Court Proceedings

By papers dated June 17, 2003, the defendant petitioned the United States District Court for the Eastern District of New York for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As in his state court motion, the defendant stated that he wished to retain his guilty plea, and he sought from the district court an order resentencing him to six years in prison

with no post-release supervision. Concerning the timeliness of his petition, the defendant argued that the benchmark date for determining whether the petition was timely was October 5, 2001, when, according to the defendant, he first learned about post-release supervision from fellow inmates whom he overheard discussing PRS.

By memorandum and order dated December 31, 2003, the district court denied the petition as untimely and, in any event, without merit (App. at 20a-21a), Subsequently, the defendant moved for rehearing, stating that the court had decided the case before he had had an opportunity to reply to the State's answer to the petition. In a memorandum and order dated June 18, 2004, the district court granted the defendant's motion for rehearing and reconsidered its rulings both on the timeliness issue and on the merits of the defendant's claim. Following reconsideration, the district court again denied the petition (App. at 22a-23a).

The district court concluded that it should not have resolved the timeliness issue without a hearing, but that the court's alternative basis for its ruling - that the petition was without merit - made a hearing unnecessary. *12 The district court noted that although the decision of this Court in *Santobello v. New York*, 404 U.S. 257 (1971), states that a defendant has a constitutional right to relief for a breach of a promise in a plea agreement (here, the promise that his sentence would be six years in prison and nothing more), *Santobello* does not clearly mandate a particular remedy where the promise is "unfulfillable" in the sense that it is a commitment to produce a result not authorized by law or beyond the power to produce. The district court determined that "it was not unreasonable for the New York courts to conclude, under all of the circumstances, that withdrawal of [the defendant's] plea was the appropriate remedy," even though that remedy "could not have restored [the defendant] precisely to the *status quo ante*" (App. at 23a-27a).

The Second Circuit granted the defendant a certificate of appealability. On June 9, 2006, the Second Circuit vacated the judgment of the district court and remanded the case for a determination of whether the petition was timely filed (App. at 2a, 10a-11a). *Earley v. Murray*, 451 F.3d 71, 76-77 (2d Cir. 2006).

The Second Circuit declared that, following the sentencing judge's imposition of sentence in this case, it was the New York Department of Correctional Services ("DOCS") that had "administratively added" the term of post-release supervision to the defendant's sentence. The Second Circuit held that the state court, in upholding the authority of DOCS to so act, had made a determination that was "contrary to clearly established Federal law as determined by [this Court]" (App. at 3a-9a). 451 F.3d at 73-76. The Second Circuit identified this Court's decision in *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), as setting forth the clearly established law, and stated that the holding of *Wampler* was that "[t]he only cognizable sentence is the one imposed by the *13 judge," and that "[a]ny alteration to that sentence, unless made by a judge in a subsequent proceeding, is of no effect." Therefore, the Second Circuit held, Earley's term of post-release supervision was "a nullity" and "quite simply, never a part of the sentence" (App. at 7a, 10a). 451 F.3d at 75, 76.

The Second Circuit recognized that there were differences between this case and *Wampler*, in that, in *Wampler*, the decision whether to subject the defendant to imprisonment until he paid his fine (a decision made in that case by the clerk of the court) was within the discretion of the sentencing court, while, in this case, state law required that the defendant's sentence include the five-year term of PRS. The Second Circuit held, however, that the distinction was not meaningful because the "broader holding" of *Wampler* - that the only cognizable sentence is the one imposed by the judge - did not depend on whether the sentence was discretionary or mandatory (App. at 6a-7a). 451 F.3d at 74-75.

After holding that the state court's determination was "contrary to" the holding of *Wampler*, the Second Circuit went on to observe in a footnote:

> Although *Wampler* does not identify the source of the rule that it announces, we believe that it is based in the due process guarantees of the United States Constitution.

(App. at 9a n.1). 451 F.3d at 76 n.1. The Second Circuit did not explain the basis for its belief.

The State petitioned the Second Circuit for panel rehearing and rehearing en banc. The State argued that the Second Circuit had misapprehended New York law in stating that DOCS had "administratively added" the term of post-release supervision to Earley's sentence. Rather, the State noted, post-release supervision was, by statutory **\*14** definition, part of every determinate sentence of imprisonment. Thus, the State argued, the Second Circuit's conclusion that the period of post-release supervision was "never a part of the sentence" was incorrect as a matter of New York law.

On August 31, 2006, the State's application for panel rehearing was denied in an opinion (App. at 12a-17a). *Earley v. Murray,* 462 F.3d 147 (2d Cir. 2006). The Second Circuit stated that it made no difference to its analysis whether the sentence had been added by DOCS or whether it was added by operation of law. According to the Second Circuit, *Wampler* stands for the proposition that the only cognizable sentence is the one imposed by the judge (App. at 14a-16a). 462 F.3d at 149-50.

By order dated November 27, 2006, the Second Circuit denied the petition for rehearing en banc and panel rehearing.[2]

## **\*15** REASONS FOR GRANTING THE WRIT

This case presents this Court with an opportunity to resolve two fundamental questions concerning the correct interpretation of the phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," as that phrase is used in 28 U.S.C. § 2254(d)(1). *First,* this case presents the question whether "clearly established" modifies "Federal law" or whether it merely modifies "law." *Second* - assuming that "clearly established" modifies "Federal law" - this case presents the question whether "as determined by the Supreme Court of the United States" means that this Court, as opposed to a lower federal court, must be the court that announces the federal character of the law at issue.

The decision of the Second Circuit in this case appears to interpret the phrase, "clearly established Federal law," to mean that so long as the rule of law is clearly established, it is not necessary, for habeas relief to be granted, that the rule of law be clearly established *as* "Federal law," *i.e.,* as constitutional law (or other federal law) that is binding on the States. The decision of the Second Circuit also appears to rest on the premise that the phrase, "as determined by the Supreme Court of the United States," does not require that this Court have made the determination that the rule of law at issue is a rule of federal constitutional law.

The State is seeking a writ of certiorari because this Court has not had occasion to address either of these questions, which go to the very heart of the standard of federal habeas review and which were incorrectly resolved by the court of appeals.

Additionally, the State is seeking a writ of certiorari because the decision of the Second Circuit, which preceded **\*16** this Court's decision in *Carey v. Musladin,* 127 S. Ct. 649 (2006), is incorrect in light of *Musladin,* even assuming that this Court's decision in *Hill v. United States ex rel. Wampler,* 298 U.S. 460 (1936) - on which the Second Circuit relied as the basis for its decision in this case - indeed constitutes clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(1). Lacking the guidance provided by this Court in *Musladin,* the Second Circuit stated the holding of *Wampler* too broadly and, as a result, erroneously held that this case was governed by *Wampler.* The Second Circuit's erroneous decision may invalidate the post-release supervision component of hundreds, if not thousands, of New York criminal sentences.

For these reasons, the State's petition for a writ of certiorari should be granted, and, at the very least, the Second Circuit's judgment should be vacated and the case should be remanded for further consideration in light of *Musladin. Cf. Knowles v. Mirzayance,* 127 S. Ct. 1247 (2007); *Miller v. Rodriguez,* 127 S. Ct. 1119 (2007); *Schmidt v. Van Patten,* 127 S. Ct. 1120 (2007) (all vacating decisions of courts of appeals and remanding for reconsideration in light of *Musladin*).

### I. The Second Circuit's Decision Presents Two Fundamental and Unsettled Questions Concerning the Proper Interpretation of 28 U.S.C. § 2254(d)(1).

Under 28 U.S.C. § 2254(a), a federal court may grant a state prisoner habeas relief where the prisoner's custody is in violation of the Federal Constitution. A federal court also may grant a state prisoner habeas relief for a violation of federal statutory law or an international treaty (*id.*), but such relief is unavailable unless that other, non-constitutional source of law is binding on **\*17** the States in criminal proceedings. *See generally Reed v. Farley*, 512 U.S. 339 (1994). Thus, except in narrow circumstances not relevant to this case, a state prisoner may obtain habeas relief only by showing that his custody violates the Federal Constitution.

The Antiterrorism and Effective Death Penalty Act of 1996 further limits the circumstances under which a state prisoner may obtain habeas relief. Under 28 U.S.C. § 2254(d)(1) - as amended in 1996 - when a state court has adjudicated the prisoner's claim "on the merits," a federal court may not grant habeas relief unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." This Court has held that "clearly established Federal law" refers to the holdings, as opposed to the dicta, of this Court's decisions, as of the time of the relevant state court's decision. *Musladin*, 127 S. Ct. at 653; *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

For a holding of this Court to constitute "clearly established Federal law" within the intendment of 28 U.S.C. § 2254(d) (1), not only must the rule of law be clearly established, but also, the federal character of the rule of law must be clearly established. This is so because, as a matter of the plain meaning of the words of the statute, "clearly established" modifies "Federal law," not just "law." That is the only syntactically sensible way to read the statute. But additionally, that is the only reading of the statute that is consonant with congressional intent in enacting 28 U.S.C. § 2254(d)(1).

"A prime motivating force in Congress's efforts to reform habeas corpus, culminating in AEDPA's enactment in 1996, was a desire to limit federal review to legal precepts that were binding on the state courts when **\*18** they ruled, and to keep federal courts from applying precepts of their own recent invention." 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.3, at 1432 n.11 (4th ed. 2001) (citing legislative history); *id.* § 32.1, at 1420 n.8 (citing cases holding that federal circuit precedent generally is not binding on state courts). Given that a state prisoner is entitled to habeas relief only upon a showing that he is in custody in violation of the Constitution (or other federal law that is binding on the states in criminal trials), it would make no sense, from the standpoint of congressional intent, for 28 U.S.C. § 2254(d)(1) to be read to require merely that the rule of law (of whatever provenance) be clearly established, when the state courts need only obey the dictates of federal *constitutional* law (or other binding federal law). To effectuate the intent of Congress, not only must the rule of law be clearly established, but the constitutional nature of the rule of law also must be clearly established.

In this case, however, the Second Circuit apparently thought that, for a state prisoner to be entitled to habeas relief, it was sufficient that the rule of law, as determined by this Court, be clearly established, regardless of whether the rule of law was clearly established as a rule of constitutional law. Indeed, after acknowledging that the source of the rule announced in *Wampler* was not identified in the *Wampler* decision, the Second Circuit went on to state, "we *believe* that [the rule] is based in the due process guarantees of the United States Constitution" (App. at 9a n.1). 451 F.3d at 76 n.1 (emphasis added).

The decision of the Second Circuit eviscerates 28 U.S.C. § 2254(d)(1). For the state courts to be bound to follow a decision of this Court, they need to be clearly on notice that the decision is binding on them. Where **\*19** even the Second Circuit cannot say with any certainty that a particular rule announced by this Court is of constitutional dimension, but instead can say only that it "believe[s]" the rule to be of constitutional dimension, then the rule does not qualify as "clearly established Federal law."

Another gross defect in the Second Circuit's decision is that the Second Circuit took it upon itself to determine that the rule at issue was in fact a rule of constitutional law. In so doing, the Second Circuit seems to have overlooked the phrase, "as determined by the Supreme Court of the United States."

Again, as a matter of the plain meaning of the words, the phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," contemplates that *this* Court, and only this Court, make the determination that the rule of law at issue is a rule of federal constitutional law (or other federal law that is binding on the States in criminal trials). *Cf. Tyler v. Cain,* 533 U.S. 656, 663 (2001) (the phrase, "made retroactive to cases on collateral review by the Supreme Court," as used in AEDPA [28 U.S.C. § 2244(b)(2)(A)], means that only this Court has the authority to declare a new rule retroactive). Additionally, the phrase, "as determined by the Supreme Court of the United States," is consonant with congressional intent only if the phrase is read to mean that *this* Court must be the court to announce that the rule of law at issue is a rule of constitutional law; otherwise, the state courts would not be on notice that the rule was binding on them.

This Court did not clearly establish in *Wampler* a rule of constitutional law. As the Second Circuit acknowledged, *Wampler* did not invoke the Constitution as the source of the rule that it was announcing (App. at 9a n.1). 451 F.3d at 76 n.1. Furthermore, not a single one of the *20 cases that this Court relied upon in *Wampler* is based on the Constitution. And, in the almost seventy-one years since this Court decided *Wampler,* this Court has never cited *Wampler* as stating a rule of constitutional law.

Accordingly, because this case raises two basic questions about the proper interpretation of 28 U.S.C. § 2254(d)(1), and because the Second Circuit's interpretation of the statute was fundamentally wrong with respect to both questions, this Court should grant the State's petition for a writ of certiorari.

## II. This Court's Decision in *Hill v. United States ex rel. Wampler,* 298 U.S. 460 (1936), Does Not State a Rule of Constitutional Law.

Even assuming that a lower federal court is empowered under 28 U.S.C. § 2254(d)(1) to determine, in the first instance, that a rule of law announced by this Court is a rule of constitutional law, the Second Circuit erred in determining that *Wampler* was grounded in the due process guarantees of the Constitution.

To begin with, nowhere in the *Wampler* opinion did Justice Cardozo refer to the Constitution; none of the cases that Justice Cardozo cited refers to the Constitution; and none of this Court's several decisions that have cited *Wampler* have cited the case for a constitutional principle.[3] By contrast, numerous other opinions of this Court from the same era as *Wampler,* including opinions authored by Justice Cardozo, refer, without reticence, to the Constitution. *See, e.g., Morehead v. New York,* 298 U.S. 587, 609-15 (1936) (statute establishing minimum wage for female employees violated due process rights of *21 employers); *Brown v. Mississippi,* 297 U.S. 278, 285-86 (1936) (conviction obtained by confessions that were the product of torture violated due process); *Norris v. Alabama,* 294 U.S. 587, 589-99 (1935) (systematic exclusion of blacks from jury service denied black defendant equal protection rights guaranteed by Fourteenth Amendment); *Snyder v. Massachusetts,* 291 U.S. 97, 105-07 (1934) (Cardozo, J.) (setting forth circumstances when due process mandates defendant's presence at a criminal proceeding); *Morrison v. California,* 291 U.S. 82, 88-93 (1934) (Cardozo, J.) (petitioner denied due process by statute placing on him the burden of disproving element of offense); *cf. Lee v. Bickell,* 292 U.S. 415, 425-26 (1934) (Cardozo, J.) (affirming injunction prohibiting enforcement of state statute against complainants, but stating that it was not necessary to address constitutionality of statute, because injunction could be upheld on non-constitutional grounds).

Thus, the absence from the *Wampler* decision of any discussion of due process is strong evidence that due process was not the basis of the decision. Indeed, it appears that no court of appeals, other than the Second Circuit in this case, has ever characterized *Wampler* as a decision based on the Constitution.

Furthermore, a careful reading of *Wampler* leads to the conclusion that the decision in fact is based on federal statutory law or common law. In *Wampler*, the relator Wampler, having been convicted of federal income tax evasion, was sentenced by the Maryland federal district court to serve an eighteen-month term of imprisonment and to pay a $5,000 fine. However, the clerk of the district court - apparently acting in obedience to the long-standing instructions of the judges of the court - issued an order of commitment (a "mittimus") specifying, in addition to the terms of the sentence orally imposed by **\*22** the court, that, in the event that Wampler did not pay the fine, he would remain incarcerated until he did so. Thereafter, Wampler sought to have the condition that had been added by the clerk stricken from the order of commitment. After the sentencing court denied the relief, Wampler sought a writ of habeas corpus from the district court in the district in which he was incarcerated. That court granted the relief and the Supreme Court held that the habeas court was correct. 298 U.S. at 461-63.

One way to read *Wampler* is that the decision stands for the proposition that when the imposition of a sentence entails an exercise of discretion, then the judge (and the judge alone) must be the individual to exercise that discretion, and thus, when a clerk exercises that discretion, he acts in a judicial capacity and in excess of his authority.

Federal statutory law at the time of Wampler's sentencing provided that "*[w]here the judgment directs* that the defendant shall be imprisoned until the fine or penalty imposed is paid, the issue of execution on the judgment shall not operate to discharge the defendant from imprisonment until the amount of the judgment is collected or otherwise paid." *See* 18 U.S.C. former § 569 (emphasis added; cited in *Wampler*, 298 U.S. at 463). Thus, "[i]mprisonment [did] not follow automatically upon a showing of default in payment." 298 U.S. at 463. Rather, the decision whether to direct that the defendant be imprisoned for non-payment of the fine was discretionary with the court, and if the direction for imprisonment was omitted, then the remedy by execution was exclusive. *Id.* at 463-64.

*Wampler* states: "The choice of pains and penalties, *when choice is committed to the discretion of the court*, is part of the judicial function. This being so, it must have expression in the sentence, and the sentence is the **\*23** judgment." *Id.* at 464 (emphasis added). Accordingly, on this reading of *Wampler*, because, by statute, the decision whether to continue the imprisonment of the relator for non-payment of his fine was discretionary with the sentencing judge, the clerk's exercise of this discretion was, in light of the statute, in excess of his authority and, therefore, void. *See Boyd v. Archer*, 42 F.2d 43, 43-44 (9th Cir. 1930) (cited in *Wampler*; holding that, in light of 18 U.S.C. former § 569, clerk's insertion into order of commitment of provision specifying continued incarceration until fine was paid was void).

A second possible reading of *Wampler* is that the decision was concerned merely with the formal question of which of two pieces of paper expresses the will of the court, when there is a conflict. Thus *Wampler*, on this reading, stands for the simple proposition that in any contest between the judgment of conviction (embodying the sentence pronounced by the court) and the order of commitment, regarding what the sentence is, the judgment of conviction prevails.

*Wampler* states: "A warrant of commitment departing in matter of substance from the judgment back of it is void.... The court speaks through its judgment, and not through any other medium. It is not within the power of a judge by instructions to a clerk to make some other medium the authentic organ of his will." 298 U.S. at 465. Moreover, "[a] warrant of commitment spends its force, it fulfills what is at least its primary purpose, upon delivery of the prisoner at the place of his imprisonment. When 'a prisoner is safely in the proper custody, there is no office for a *mittimus* to perform.' " *Id.* at 466 (citations omitted). This second possible reading, like the first, is not grounded in the Constitution.[4]

**\*24** Moreover, in *Wampler*, this Court presumably adhered to the rule that a court should not reach a constitutional issue when the case can be decided on non-constitutional grounds. *See, e.g., Lee v. Bickell*, 292 U.S. at 425; *see also Harbury v. Christopher*, 536 U.S. 403, 417 (2002); *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988). Accordingly, the Second Circuit should not have read *Wampler* as announcing a constitutional rule when the decision does not clearly announce one and when there are other, entirely reasonable, ways to read the decision.

In sum, the conclusion of the Second Circuit that *Wampler* was based on the due process guarantees of the Constitution is unfounded. In any event, the most that can possibly be said for the Second Circuit's conclusion is that it is arguably correct, but that is not a sufficient basis for the granting of habeas relief; 28 U.S.C. § 2254(d)(1) requires that the rule of law disregarded or misapplied by the state court have been "clearly established Federal law." It is far from "clearly established" that *Wampler* states a rule of constitutional law.

### III. The Second Circuit Incorrectly Identified the Holding of *Wampler*.

Even assuming (1) that a lower federal court may determine, in the first instance, that a rule of law announced by this Court is, within the meaning of 28 U.S.C. § 2254(d)(1), a "clearly established" rule of federal constitutional law, and (2) that the Second Circuit correctly concluded that *Wampler* was based on the Constitution, the Second Circuit nevertheless erred in ruling that Earley would be entitled to habeas relief if his petition were timely. Lacking the guidance provided by this Court's subsequent decision in *Carey v. Musladin*, 127 S. Ct. 649 (2006), the Second Circuit stated too **\*25** broadly the holding of *Wampler*.[5] When, in light of *Musladin*, the holding of *Wampler* is correctly stated, Earley's potential entitlement to habeas relief vanishes.

The underlying substantive issue in *Musladin* was whether the defendant was deprived of a fair trial when the court permitted members of the victim's family to sit in the front row of the spectators' section, wearing buttons with a photograph of the deceased victim. The California Court of Appeal rejected the defendant's claim that the buttons deprived him of a fair trial. On habeas review, however, the Ninth Circuit held that the state court's decision involved an unreasonable application of clearly established federal law, as determined by this Court. 127 S. Ct. at 652.

The Ninth Circuit identified two cases, *Estelle v. Williams*, 425 U.S. 501 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986), as the sources of the law that the California court had unreasonably applied. According to the Ninth Circuit, based on the holdings of those two cases, it was objectively unreasonable for the state appellate court to have found that the buttons were not inherently prejudicial to the defendant's right to a fair trial. *Musladin*, 127 S. Ct. at 652.

This Court vacated the judgment of the Ninth Circuit. This Court observed that in contrast to both *Williams* and *Flynn*, which dealt with government-sponsored practices during a trial, the wearing of buttons in the *Musladin* case involved the conduct of spectators. This Court stated that it had "never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id.*

**\*26** Accordingly, this Court held:

Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." § 2254(d)(1). No *holding* of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* to the spectators' conduct here.

*Id.* at 654 (emphasis added).

Thus, *Musladin* emphatically reaffirmed that only the holdings of this Court enter into the question of whether the state courts unreasonably applied federal law. Additionally, this Court characterized narrowly the holdings of the decisions that it was analyzing - drawing a distinction between what the Court had *held* in those decisions and what it merely had stated in those decisions (*id.* at 653) - and characterized narrowly the set of circumstances to which those holdings necessarily applied, drawing a distinction between government-sponsored action and private action. Finally, this Court stated that where its holdings had not addressed a particular set of circumstances, then the refusal of the state courts to extend its holdings to cover that set of circumstances could not be contrary to or an unreasonable application of clearly

established federal law. *Id.* at 653-54; *cf. Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) ("Section 2254[d][1] would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law").

Consequently, the overall approach endorsed in *Musladin* is to treat the holdings of prior decisions of this Court as closely tethered to the particular circumstances of the cases in which those holdings were announced - **\*27** and to reject a more expansive approach to what is "clearly established Federal law." *See also Kane v. Garcia Espitia*, 546 U.S. 9 (2005) (per curiam) (decision of this Court, *Faretta v. California*, 422 U.S. 806 [1975], establishing a right to self-representation, did not say anything about any specific legal aid the State owes a *pro se* criminal defendant; hence, Ninth Circuit erred in holding, based on *Faretta*, that a violation of a law library access right is a basis for federal habeas relief).

Considered in light of the approach taken by this Court in *Musladin*, the holding of *Wampler* is this: "The choice of pains and penalties, *when choice is committed to the discretion of the court*, is part of the judicial function. This being so, it must have expression in the sentence, and the sentence is the judgment." 298 U.S. at 464 (emphasis added). *Wampler* turns on the circumstance that, under the law at the time, the judge had the *option* to continue the defendant's incarceration until his fine was paid, and that if the judge did not exercise that option, then the fine had to be collected in the same manner as any civil judgment. *Wampler* rejected the notion that, where a sentence entailed an exercise of discretion, a court functionary could exercise that discretion, because the exercise of sentencing discretion was inherently a judicial function.

*Wampler* did not purport to answer the question whether, when a particular penalty was *not* committed to the discretion of the court, but instead was *mandated* by statute, nevertheless the imposition of that penalty would be exclusively a judicial function, and that, as such, it would need to be expressed by the judge at sentencing. Indeed, the Second Circuit itself acknowledged that the discretionary character of the penalty at issue in *Wampler* distinguished *Wampler* from this case:

> **\*28** We recognize differences between the facts of *Wampler* and those before us. In *Wampler*, the decision whether to keep the defendant in custody pursuant to a fine was, by law, within the discretion of the sentencing judge. Here, by contrast, state law required that Earley be sentenced to a PRS term.

(App. at 6a). 451 F.3d at 74.

The Second Circuit nonetheless thought that the determination of the state court was "contrary to" *Wampler* because of the "broader holding" of *Wampler* that "[t]he judgment of the court established a defendant's sentence, and that sentence may not be increased by an administrator's amendment" (App. at 7a). 451 F.3d at 75. Setting aside the question of whether the Second Circuit was correct in characterizing Earley's sentence as having been increased by an administrator's amendment, the Second Circuit was clearly incorrect, in light of *Musladin*, in relying on *Wampler*'s so-called broader holding.

*Musladin* eschews the very concept of a "broader holding" when a Supreme Court decision can be understood on the basis of a narrow holding. *Compare Musladin*, 127 S. Ct. at 651-54 (opinion of the Court) *with id. at 656* (Kennedy, J., concurring in the judgment) *and id. at 657-58* (Souter, J., concurring in the judgment). Because *Wampler* did not have to address the question of whether a clerk's amendment to a sentence would be permissible when (as in this case) the amendment - if in fact it was an amendment - was mandated by statute, the language in *Wampler* addressing the invalidity of the order of commitment as a means of establishing the sentence is dictum.

Accordingly, because no *holding* of this Court required the New York State court to apply *Wampler* to **\*29** the circumstances of this case, the determination of the state court, that Earley was not entitled to have the PRS component of his sentence stricken from the sentence, was not "contrary to" *Wampler*.

Therefore, for all of these reasons, this Court should grant a writ of certiorari to resolve the important questions of AEDPA interpretation presented by this case. At the very least, a writ of certiorari should be granted, the judgment of the Second Circuit should be vacated, and the case should be remanded for further consideration in light of this Court's decision in *Musladin*.

## CONCLUSION

## THE PETITION FOR A WRIT OF CERTIORARI SHOULD BE GRANTED.

Footnotes

\*       Counsel of Record for the Petitioner

1       New York Penal Law § 70.45 was enacted in 1998. *See* Act of Aug. 6, 1998, ch. 1, § 15, 1998 N.Y. Laws 1, 5-6. Subdivision 2 of the statute, still in effect at the time of Earley's crime, specified circumstances when the court could impose a term of post-release supervision of less than five years. *See Gilbert Criminal Law and Procedure 1999*, N.Y. Penal Law former § 70.45(2) (Matthew Bender 1999). None of those circumstances is applicable to this case. Subdivision 2 was amended in 2004. *See* Act of Dec. 14, 2004, ch. 738, § 35, 2004 N.Y. Laws 1462, 1478-79. The amendments are not relevant to this case. *See* N.Y. Penal Law § 70.45(2)(a)-(f) (McKinney Supp. 2007).

2       The first decision of the Second Circuit contains an unsupported statement of fact that apparently was based on an allegation in the defendant's *pro se* papers filed with the district court - namely, that, at the time of the defendant's plea, defense counsel, the prosecutor, and the court all were unaware of the existence of the statute mandating post-release supervision (App. at 2a). 451 F.3d at 72.

        Following the remand to the district court, United States District Judge Edward R. Korman referred the matter to United States Magistrate Judge Viktor V. Pohorelsky. At a hearing conducted by the Magistrate Judge on February 26, 2007, the defendant's attorney and her supervisor both testified that, at the time of the defendant's plea, they were well aware of the post-release supervision statute (which, by that time, was more than a year old), and the defendant's attorney further testified that she routinely discussed PRS with her clients when counseling them on whether to accept a plea offer.

        After the hearing, the Magistrate Judge issued a report and recommendation, dated March 14, 2007, in which he recommended that Judge Korman hold that Earley's petition was timely. The State has filed objections to the report and recommendation, and the matter is pending before Judge Korman.

3       Additionally, neither of the lower court decisions in *Wampler* mentioned the Constitution. *See United States v. Wampler*, 10 F. Supp. 609 (D. Md. 1935); *Wampler v. Hill*, 11 F. Supp. 540 (M.D. Pa. 1935).

4       However, as argued below (*see infra* at 27-28), this second reading of *Wampler* is dictum.

5       *Musladin* was decided on December 11, 2006. The Second Circuit decided *Earley* on June 9, 2006, denied panel rehearing on August 31, 2006, and denied rehearing en banc on November 27, 2006.

End of Document                                             © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2007 WL 1685849 (U.S.) (Appellate Petition, Motion and Filing)
Supreme Court of the United States.

Peter BURHLRE, Superintendent of Greene Correctional Facility, Petitioner,

v.

Sean EARLEY, Respondent.

No. 06-1429.
June 7, 2007.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Second Circuit

**Reply Brief for Petitioner**

Charles J. Hynes, District Attorney, Kings County.

Leonard Joblove *, Victor Barall, Assistant District Attorneys, Kings County District Attorney's Office, 350 Jay Street, Brooklyn, New York 11201-2908, (718) 250-2511.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii
ARGUMENT ................................................................................................... 1
CONCLUSION ................................................................................................ 8

## *ii TABLE OF AUTHORITIES

Cases:

*Carey v. Musladin*, 127 S. Ct. 649 (2006) ........................................................ 3, 5, 8

*Deal v. Goord*, 8 A.D.3d 769, 778 N.Y.S.2d 319 (App. Div. 2004) ........................... 5

*Garner v. N.Y. State Dep't of Correctional Servs.*, 831 N.Y.S.2d 923 (App. Div. 2007) ....................................................................................................................... 4

*Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936) ................................... 1, 5

*People v. Crump*, 302 A.D.2d 901, 753 N.Y.S.2d 793 (App. Div. 2003) ..................... 5

*People v. Hill*, 39 A.D.3d 1, 830 N.Y.S.2d 33 (App. Div. 2007), *leave to appeal granted*, 2007 N.Y. App. Div. LEXIS 2797 (Mar. 13, 2007) ..................................... 3

*People v. Lingle*, 34 A.D.3d 287, 825 N.Y.S.2d 12 (App. Div. 2006) ........................ 3

*People v. Sparber*, 34 A.D.3d 265, 823 N.Y.S.2d 405 (App. Div. 2006) ................... 3

*People v. Thomas*, 35 A.D.3d 192, 826 N.Y.S.2d 36 (App. Div. 2006) ..................... 3

*Santobello v. New York*, 404 U.S. 257 (1971) ...................................................... 7

*United States v. Napier*, 463 F.3d 1040 (9th Cir. 2006) ........................................ 2

*United States v. Vega-Ortiz*, 425 F.3d 20 (1st Cir. 2005) ...................................... 2

*iii United States Statutes:

28 U.S.C. § 2254 ............................................................................................... *passim*

New York State Statutes:

N.Y. Penal Law § 70.00 ...................................................................................... 3

N.Y. Penal Law § 70.45 ...................................................................................... 3, 4

Other Authorities:

Act of Aug. 6, 1998, ch. 1, 1998 N.Y. Laws 1 ...................................................... 4

## *1 REPLY BRIEF FOR PETITIONER IN SUPPORT OF PETITION FOR A WRIT OF CERTIORARI

### ARGUMENT

In opposing the petition for a writ of certiorari, Sean Earley ("the defendant") advances a number of meritless contentions, each of which is briefly addressed below.

1. The defendant contends that the petition for a writ of certiorari should be denied because there is no conflict among the federal circuit courts of appeals on the issues presented by the petition. *See* Brief in Opposition ("Br. Opp.") at 6. The defendant is incorrect.

First, the Second Circuit's apparent interpretation of the phrase, "clearly established Federal law, as determined by the Supreme Court of the United States" (*see* 28 U.S.C. § 2254[d][1]), is in conflict with the way that phrase is interpreted by all of the other federal courts of appeals. As the State observed in its petition for a writ of certiorari, the decision of the Second Circuit in this case rests on two fundamentally flawed premises: (1) that so long as the rule of law is clearly established, it is not necessary, for habeas relief to be granted, that the rule of law be clearly established as "Federal law" that is binding on the States, and (2) that 28 U.S.C. § 2254(d)(1) does not require that *this* Court have made the determination that the rule of law at issue is a rule of federal law that is binding on the States. *See* Petition ("Pet.") at 6-7, 15-20. It appears that not a single court of appeals, other than the Second Circuit, has interpreted 28 U.S.C. § 2254(d)(1) in this way.

Second, on the narrower issue of whether, under the holding of *2 *Hill v. United States ex rel. Wampler*, 298 U.S. 460 (1936), a defendant's sentence consists of only those components of the sentence that are explicitly pronounced by the judge at the sentencing proceeding, there is a conflict between the Second Circuit in this case and at least two other courts of appeals. The State has argued that *Wampler* holds no more than that those components of the defendant's sentence that are *discretionary* be pronounced by the sentencing judge; *Wampler* did not hold that those components of the sentence that are mandated by statute, but are not pronounced by the judge, are null and void. *See* Pet. at 27-29. The Second Circuit's holding, that even a mandatory component of a sentence is a nullity, unless explicitly pronounced by the sentencing judge (*see* Appendix ["App."] at 6a-11a, 14a-16a), is contrary to the views of the First and Ninth Circuits, both of which have stated that a sentencing judge need not orally pronounce at the sentencing proceeding those components of a sentence that are mandated by statute. *See United States v. Vega-Ortiz*, 425 F.3d 20, 22-23 (1st Cir. 2005) (defendant who is sentenced to a period of supervised release is on "constructive notice" of those conditions of supervised release that are mandated by statute, regardless of whether judge specifies those conditions in pronouncing sentence); *United States v. Napier*, 463 F.3d 1040, 1042-43 (9th Cir. 2006) (sentence of supervised release implicitly includes mandatory and standard conditions of supervised release, regardless of whether these conditions are orally stated at sentencing proceeding; however, non-standard conditions of supervised release must be pronounced by the sentencing judge).

Thus, although the issues presented by this case would warrant review by this Court even were there no conflict among the circuits, in fact there are conflicts between the Second Circuit's positions and the positions of other courts of appeals. In any event, even if there were no *3 conflict between the Second Circuit and other courts of appeals, that circumstance would not weigh against the reasons for this Court to grant certiorari, vacate the decision of the Second Circuit, and remand the case to that court for further consideration in light of *Carey v. Musladin*, 127 S. Ct. 649 (2006). *See* Pet. at 24-29.

2. The defendant also maintains that since the issuance of the Second Circuit's decision in this case, the courts of New York State have followed that decision, and have "interpreted the *Wampler* rule as binding, repeatedly citing that case in holding that where a judge does not announce PRS, the defendant does not have it" (Br. Opp. at 12). Presumably, the defendant's point is that because the New York courts have concluded that the Second Circuit's decision in this case is correct, this Court should be unconcerned about the disruptions the decision has caused.

However, all of the decisions cited by the defendant in support of that proposition (*see* Br. Opp. at 12) are from the Second Judicial Department of New York's intermediate appellate court, the Appellate Division. The defendant fails to note that the First Judicial Department has not followed *Earley*, and, indeed, has repeatedly rejected the claim that

if a defendant was not informed at sentencing of the mandatory term of post-release supervision that is included in his sentence (*see* N.Y. Penal Law §§ 70.00[6], 70.45[1]), then the term of post-release supervision is not part of his sentence. *See People v. Thomas*, 35 A.D.3d 192, 826 N.Y.S.2d 36 (App. Div. 1st Dep't 2006); *People v. Lingle*, 34 A.D.3d 287, 289-90, 825 N.Y.S.2d 12, 14-15 (App. Div. 1st Dep't 2006); *People v. Sparber*, 34 A.D.3d 265, 823 N.Y.S.2d 405 (App. Div. 1st Dep't 2006); *see also People v. Hill*, 39 A.D.3d 1, 830 N.Y.S.2d 33, 40 n.7 (App. Div. 1st Dep't 2007) (expressly refraining from **\*4** deciding whether to accept the reading of *Wampler* by the Second Circuit in *Earley*), *leave to appeal granted*, 2007 N.Y. App. Div. LEXIS 2797 (Mar. 13, 2007). The other two judicial departments of the Appellate Division, the Third and the Fourth, have not yet ruled explicitly on the issue, and neither has New York's highest court, the Court of Appeals; but the Third Judicial Department has implicitly rejected *Earley*. *See Garner v. N.Y. State Dep't of Correctional Servs.*, 831 N.Y.S.2d 923 (App. Div. 3d Dep't 2007) (holding that Department of Correctional Services did not impose, but merely enforced, the post-release supervision component of defendant's sentence, which was automatically included by statute; hence Department did not "perform[ ] any judicial function").

Thus, the State has a compelling need for guidance from this Court on whether the *Earley* decision - which is undermining an important provision of New York sentencing law - is correct. [1]

**\*5** 3. The defendant disagrees with the State's characterization of the holding of *Wampler* (*see* Pet. at 27). According to the defendant, the Second Circuit correctly identified as the holding of *Wampler* the language in that case to the effect that the only cognizable sentence is the one imposed by the judge and that any component of the sentence not pronounced by the judge is a nullity. *See* Br. Opp. at 7-10.

However, contrary to the defendant's claim, it must be significant to the holding of *Wampler* that, under the law at the time of that case, a federal court could, but did not have to, impose a sentence of imprisonment as a means of effectuating the payment of a fine. Were that provision of the law of no importance to the outcome of *Wampler*, then Justice Cardozo presumably would not have cited the relevant federal statute and various cases interpreting it, and would not have declared that "[t]he choice of pains and penalties, *when choice is committed to the discretion of the court*, is part of the judicial function. This being so, it must have expression in the sentence ..." *Wampler*, 298 U.S. at 463-64 (emphasis added).

In any event, as previously argued (*see* Pet. at 27-29), this Court's decision in *Carey v. Musladin*, 127 S. Ct. 649 (2006), teaches that, when reviewing a state court's decision under 28 U.S.C. § 2254(d)(1), the federal habeas court should construe the holdings of this Court narrowly. Otherwise, the intent of the AEDPA, that state courts not be penalized for failing to follow rules that did not clearly govern their criminal proceedings (*see* Pet. at 17-18), would be thwarted. Thus, even if it would not be incorrect for a federal court to follow the **\*6** "broader holding" (App. at 7a) of a Supreme Court decision when adjudicating the case of a federal prisoner, the federal court must hew to the core holding of the decision when adjudicating the habeas petition of a state prisoner.

4. The defendant also takes issue with the State's assertion that the statutory phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," means (1) that the constitutional (or other federal) character of the rule of law must be clearly established, and (2) that this Court must be the court to announce the constitutional (or other federal) character of the rule of law (*see* Pet. at 6-7, 15-20; Br. Opp. at 11-12). The defendant contends that the State's interpretation of 28 U.S.C. §2254(d)(1) "stretches AEDPA beyond the breaking point," and that it was not illegitimate for the Second Circuit to "reasonably infer[] that *Wampler* was grounded in the due process clause" (Br. Opp. at 11, 12).

However, the State's interpretation of 28 U.S.C. § 2254(d)(1) not only gives the words of the statute their plain meaning, but also gives effect to the intent of Congress in amending the statute in 1996. *See* Pet. at 16-19. Moreover, even if a lower federal court is empowered under 28 U.S.C. § 2254(d)(1) to determine, in the first instance, that a rule of law announced by this Court is a rule of constitutional law, and even if the inference of the Second Circuit that *Wampler*

Burhlre v. Earley, 2007 WL 1685849 (2007)

stands on a constitutional footing is not an unreasonable one, the Second Circuit neglected even to consider whether the constitutional basis of *Wampler* was "clearly established." As previously argued, the alleged constitutional basis of *Wampler* is anything but clear. *See* Pet. at 20-24.

5. The defendant also contends that this in an inappropriate case for a writ of certiorari because, even if the **\*7** Second Circuit erred in ruling in his favor on the basis of *Wampler*, he still would be entitled to relief on the basis of *Santobello v. New York*, 404 U.S. 257 (1971). The Second Circuit did not address the defendant's claim that the state courts unreasonably applied *Santobello* in denying his motion to have the post-release supervision component of his sentence excised from his sentence. *See* Br. Opp. at 13-18.

The State disagrees - as did the district court (*see* Pet. at 11-12) - with the defendant's contention that he would be entitled to habeas relief on the basis of *Santobello*. [2] But even if the defendant were correct that he is entitled to habeas relief under *Santobello*, that circumstance would not militate against granting the State's petition for certiorari. As the State has argued, this case presents substantial issues that warrant this Court's review (*see* Pet. at 15-29), and the decision of the Second Circuit, if it is not corrected, may invalidate the post-release supervision component of countless New York criminal sentences. Moreover, the fact that the Second Circuit did not resolve the *Santobello* issue is no obstacle to this Court's review of the case. If this Court grants certiorari and rules in the State's favor on the issues presented in the petition, or if this Court grants certiorari, vacates the Second Circuit's decision, and remands for further consideration in light of *Musladin*, then upon remand to the Second Circuit, that court could rule on the *Santobello* **\*8** issue. Thus, even if the defendant ultimately were entitled to habeas relief under *Santobello*, the State has a compelling interest in this Court's review of the decision of the Second Circuit.

Accordingly, at the very least, this Court should grant the petition, vacate the judgment of the Second Circuit, and remand the case to that court for further consideration in light of *Carey v. Musladin*, 127 S. Ct. 649 (2006).

## CONCLUSION

### THE PETITION FOR A WRIT OF CERTIORARI SHOULD BE GRANTED.

Footnotes

\*    Counsel of Record for the Petitioner

1    In light of the Second Circuit's decision in this case, judges at sentencing are now routinely pronouncing explicitly the post-release supervision ("PRS") component of the sentence. However, the PRS statute, N.Y. Penal Law § 70.45, was enacted and took effect in 1998 (*see* Act of Aug. 6, 1998, ch. 1, §§ 15, 44, 1998 N.Y. Laws 1, 5-6, 12), and in the period of more than seven and one-half years between the date on which the statute took effect and the *Earley* decision, many defendants were sentenced without being explicitly informed at sentencing of the PRS component of their sentences.

    Contrary to the defendant's assertion (Br. Opp. at 5), the fact that, prior to *Earley*, judges at sentencing did not routinely pronounce explicitly the PRS component of the sentence does not suggest either that the judge and the prosecutor in this case were unaware of the PRS statute or that there was a widespread ignorance among judges or prosecutors of the PRS statute. On the contrary, the most likely explanation for the absence of discussion of PRS at sentencing was that sentencing judges and prosecutors thought - as New York appellate courts did prior to the decision in *Earley* - that this mandatory component of the sentence, which was included by operation of law as a part of the sentence, did not need to be stated explicitly on the record at sentencing. *See Deal v. Goord*, 8 A.D.3d 769, 778 N.Y.S.2d 319 (App. Div. 2004); *People v. Crump*, 302 A.D.2d 901, 753 N.Y.S.2d 793 (App. Div. 2003).

2    Notably, the defendant did not cite or rely on *Wampler* in his briefs to the Second Circuit. Following briefing and oral argument of the case, the Second Circuit directed the parties to submit additional briefs addressing whether the state courts had made a decision contrary to federal law in ruling that the defendant's sentence included a term of post-release supervision, when neither the oral nor the written judgment referred to the term of post-release supervision. This circumstance suggests that the Second Circuit was not inclined to rule in the defendant's favor on his *Santobello*-based claim.

End of Document · © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

12-26-07

21885

*To be argued by*
DAVID M. COHN
(15 Minutes Requested)

# Court of Appeals

## STATE OF NEW YORK

---

## THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

*- against -*

## DANIEL SPARBER,

*Defendant-Appellant.*

---

## BRIEF FOR RESPONDENT

---

ROBERT M. MORGENTHAU
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
Telephone: (212) 335-9000
Facsimile: (212) 335 -9288

MARK DWYER
DAVID M. COHN
 ASSISTANT DISTRICT ATTORNEYS
 *Of Counsel*

DECEMBER 27, 2007

# TABLE OF CONTENTS

                                                                    Page

TABLE OF AUTHORITIES ..............................................................ii

INTRODUCTION ........................................................................ 1

QUESTIONS PRESENTED ............................................................ 4

THE RELEVANT RECORD

    A. The Plea and Sentencing Proceedings ............................... 5

    B. The Appellate Division Decision...................................... 6

POINT

    DEFENDANT'S MANDATORY TERM OF POST-RELEASE
    SUPERVISION IS ENFORCEABLE AND WAS PROPERLY
    IMPOSED. ........................................................................... 8

        A. Under New York law, every determinate prison sentence automatically
        includes a period of post-release supervision, whether or not the judge
        "pronounces" it. ........................................................... 11

        B. The federal constitution does not require oral pronouncement of
        defendant's PRS term. ................................................... 20

            1. The Supreme Court's 1936 decision in *Hill v. United States ex rel.
            Wampler* does not require oral pronouncement of a mandatory PRS
            term. .................................................................... 21

            2. The Second Circuit's recent decision in *Earley v. Murray* is
            distinguishable from the present case and, in any event, should not be
            followed. .............................................................. 34

        C. In any event, even if the judge should have pronounced the PRS term
        at the sentencing hearing and in defendant's presence, the proper remedy
        would be a remand for resentencing, at which the PRS term would be
        orally pronounced. ....................................................... 39

CONCLUSION ........................................................................ 46

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bartone v. United States, 375 U.S. 52 (1963)................................................25-26

Bozza v. United States, 330 U.S. 160 (1947).....................................26-27, 38, 43

Earley v. Murray, 451 F.3d 71 (2d Cir. 2006) ........................... 9-10, 20, 34-39, 44

Earley v. Murray, 462 F.3d 147 (2d Cir. 2006) ............................................. 35, 37

Greene v. United States, 358 U.S. 326 (1959).................................................38

Hill v. United States ex rel. Wampler, 298 U.S. 460 (1936)
..................................................7, 10, 13, 17-18, 20-28, 30, 33-37

Illinois v. Allen, 397 U.S. 337 (1970) .......................................................16

Kennedy v. Reid, 249 F.2d 492 (D.C. Cir. 1957) ...........................................33

Loliscio v. Goord, 263 F.3d 178 (2d Cir. 2001) ............................................36

Meredith v. Gough, 168 F.2d 193 (5th Cir. 1948) ..........................................28

Sanders v. Johnston, 165 F.2d 736 (9th Cir. 1948)........................................24

Smith v. Mann, 173 F.3d 73 (2d Cir. 1999) .................................................36

United States v. A-Abras, 185 F.3d 26 (2d Cir. 1999) .....................................32

United States v. Cofield, 233 F.3d 405 (6th Cir. 2000) ................................ 17, 31

United States v. Jacques, 321 F.3d 255 (2d Cir. 2003) ....................................32

United States v. Jolly, 129 F.3d 287 (2d Cir. 1997) .......................................31

United States v. Jolly, 142 F.3d 552 (2d Cir. 1998) .......................................31

United States v. Marquez, 506 F.2d 620 (2d Cir. 1974) ...................................33

United States v. Martinez, 413 F.3d 239 (2d Cir. 2005) ...................................16

United States v. Moyles, 724 F.2d 29 (2d Cir. 1983) ......................................28

-ii-

United States v. Ortiz-Torres, 449 F.3d 61 (1st Cir. 2006) .......................................... 28, 33

United States v. Pagan, 785 F.2d 378 (2d Cir. 1986) ................................ 17, 32

United States v. Pugliese, 860 F.2d 25 (2d Cir. 1988)...................................28

United States v. Truscello, 168 F.3d 61 (2d Cir. 1999)...............................17, 31

## STATE CASES

Bradley v. State, 864 P.2d 1272 (Nev. 1993)..................................................28, 33

In re Mason, 100 N.Y.2d 56 (2003) ...................................................38

N.C. v. Anderson, 837 So.2d 425 (Fla. App. 2002) .................................28

People ex rel. Johnson v. Warden, 16 A.D.3d 183 (1st Dept. 2005) ..........................39

People ex rel. Townsand v. Superintendent, 115 A.D.2d 678 (2d Dept. 1985) .............30

People v. Adkins, 236 A.D.2d 850 (4th Dept. 1997) .........................................40

People v. Bell, 305 A.D.2d 694 (2d Dept. 2003)......................................39

People v. Boyce, 12 A.D.3d 728 (3d Dept. 2004) ..........................................39

People v. Callahan, 80 N.Y.2d 273 (1992) ..............................................15

People v. Cass, 301 A.D.2d 681 (3d Dept. 2003)...........................................39

People v. Catu, 4 N.Y.3d 242 (2005) .......................................8, 11-14, 17-19

People v. David, 65 N.Y.2d 809 (1985)....................................................13, 41

People v. DeValle, 94 N.Y.2d 870 (2000) .........................................13, 41

People v. Diaz, 212 A.D.2d 412 (1st Dept. 1995) ..........................................40

People v. Dokes, 79 N.Y.2d 656 (1992) ..............................................16

People v. Farrar, 52 N.Y.2d 302 (1981) .......................................18, 44

People v. Fuller, 57 N.Y.2d 152 (1982) ...........................19-20, 23, 40, 43

People v. Garcia, 241 A.D.2d 408 (1ˢᵗ Dept. 1997)............................................29

People v. Green, 54 N.Y.2d 878 (1981) ............................................14

People v. Hill, 9 N.Y.3d 189 (2007) ............................................ 8, 13

People v. Kin Kan, 78 N.Y.2d 54 (1991) ............................................38

People v. Liotta, 274 A.D.2d 751 (3ᵈ Dept. 2000) ............................................29

People v. McClain, 35 N.Y.2d 483 (1974)............................................40

People v. Minaya, 54 N.Y.2d 360 (1981)............................................42

People v. Mullins, 13 A.D.3d 192 (1ˢᵗ Dept. 2004) ............................................29

People v. Murphy, 37 A.D.3d 976 (3ᵈ Dept. 2007)............................................16

People v. Proctor, 79 N.Y.2d 992 (1992) ............................................15

People v. Rodriguez, 261 A.D.2d 331 (1ˢᵗ Dept. 1999) ............................................14

People v. Samms, 95 N.Y.2d 52 (2000) ............................................15

People v. Sandoval, 151 A.D.2d 620 (2ᵈ Dept. 1989)............................................40

People v. Smith, 37 A.D.3d 499 (2ᵈ Dept. 2007) ............................................39

People v. Sparber, 34 A.D.3d 265 (1ˢᵗ Dept. 2006)............................ 2, 6-7, 39, 43

People v. Sparber, 9 N.Y.3d 882 (2007) ............................................ 2, 7

People v. Stepteau, 261 A.D.2d 207 (1ˢᵗ Dept. 1999) ............................................29

People v. Stroman, 36 N.Y.2d 939 (1975)............................................ 40, 43

People v. Sturgis, 69 N.Y.2d 816 (1987) ............................................ 39, 43

People v. Thomas, 75 N.Y.2d 888 (1990) ............................................14-15

People v. Wiggins, 17 A.D.3d 196 (1ˢᵗ Dept. 2005) ............................................40

People v. Williams, 44 A.D.3d 335 (1ˢᵗ Dept. 2007) ............................................ 39, 41

People v. Williams, 87 N.Y.2d 1014 (1996) ............................................ 13, 41

JA397

People v. Wright, 56 N.Y.2d 613 (1982) ........................................................42

State v. Diaz, 673 P.2d 501 (N.M. 1983) ................................................ 28, 33

State v. Hart, 668 So.2d 589 (Fla. 1996) ............................................... 18, 32

Wilkinson v. State, 889 So.2d 110 (Fla. App. 2004) ...................................32

Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88 (1917).............................24

### FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

28 U.S.C. § 2254 .........................................................................................36

Federal Rules of Criminal Procedure Rule 43 ...........................................26

Internal Revenue Code § 2833..............................................................26-27

### STATE STATUTES

CPL 220.10.................................................................................................18

CPL 380.20................................................................................. 14-15, 17, 40

CPL 380.30.................................................................................................15

CPL 380.40............................................................................................14-15, 17

CPL 380.50.................................................................................................14

CPL 380.60.................................................................................................30

CPL 380.70.................................................................................................14

CPL 400.20.................................................................................................15

CPL 430.10.................................................................................................42

CPL 440.20.................................................................................................16

CPL 440.40............................................................................................41-44

-v-

Penal Law § 60.27...............................................................................................................19

Penal Law § 65.10...............................................................................................................19

Penal Law § 70.02...............................................................................................................12

Penal Law § 70.06...............................................................................................................12

Penal Law § 70.45......................................................................................7-8, 11-12, 20, 24

Penal Law § 70.70...............................................................................................................12

Penal Law § 120.10............................................................................................................1-2

## OTHER AUTHORITIES

Ballentine's Law Dictionary, 3<sup>d</sup> ed................................................................................25

Benjamin N. Cardozo, The Nature of the Judicial Process (Yale Univ. Press
    1921).............................................................................................................................24

STATE OF NEW YORK
COURT OF APPEALS

---

THE PEOPLE OF THE STATE OF NEW YORK,

                      Respondent,

      -against-

DANIEL SPARBER,

                Defendant-Appellant.

---

## BRIEF FOR RESPONDENT

## INTRODUCTION

By permission of the Honorable Carmen Beauchamp Ciparick, defendant Daniel Sparber appeals from an April 11, 2002 judgment of the Supreme Court, New York County (Altman, J.), convicting him, upon his plea of guilty, of Assault in the First Degree (Penal Law § 120.10[1]). Defendant was sentenced, as a second violent felony offender, to 15 years in prison and 5 years of post-release supervision. He is currently incarcerated.

At approximately 3:00 a.m. on February 10, 2001, defendant accosted Jessica Vasquez and Eric Garcia inside a nightclub on West 38th Street, in Manhattan. Using a razor blade, defendant slashed both Vazquez and Garcia in the face, severely wounding them. Vazquez required 100 stitches to close wounds to both sides of her face, and Garcia required 80 stitches to close a wound that nearly cut off his ear.

**JA400**

By New York County Indictment Number 1088/2001, filed on February 22, 2001, a grand jury charged defendant with four counts of Assault in the First Degree (two counts for each victim, under Penal Law §§ 120.10[1] and [2]). On January 17, 2002, defendant appeared with counsel before the Honorable Herbert Altman and pleaded guilty to one count of first-degree assault, in full satisfaction of the indictment, in exchange for a determinate sentence of 15 years in prison. On April 11, 2002, the court sentenced defendant to the negotiated term. The Sentence and Commitment Order ("commitment order"), issued that same day, stated that defendant's sentence carried a mandatory 5-year term of post-release supervision ("PRS").

Defendant appealed, arguing that the mandatory PRS term should be stricken from his sentence, because the judge did not orally pronounce it at the sentencing proceeding. The Appellate Division, First Department, unanimously rejected defendant's argument, holding that the 5-year PRS term was automatically included in defendant's sentence by operation of law. See People v. Sparber, 34 A.D.3d 265, 265 (1st Dept. 2006). In addition, the Appellate Division held that the trial court properly imposed the mandatory PRS term by entering it on the commitment order. See id. at 266. On August 9, 2007, the Honorable Carmen Beauchamp Ciparick granted defendant's application for leave to appeal. See People v. Sparber, 9 N.Y.3d 882 (2007).

**JA401**

On appeal to this Court, defendant again argues that the mandatory five-year
PRS term was not properly imposed.

## QUESTIONS PRESENTED

1.    Whether defendant's mandatory 5-year term of post-release supervision, which became part of his sentence by operation of New York law and which was listed on his Sentence and Commitment Order, is nonetheless unenforceable because the trial court failed to pronounce the term orally at defendant's sentencing hearing?

2.    If the sentencing court erred in failing orally to pronounce the mandatory term of post-release supervision, is the appropriate remedy for that error simply to remand so that the court may orally pronounce the term now?

## THE RELEVANT RECORD

### A. The Plea and Sentencing Proceedings

On January 17, 2002, defendant appeared with counsel before Justice Altman. The prosecutor announced that defendant had agreed to plead guilty to first-degree assault in exchange for a negotiated prison term of 15 years (DA: 3).[1] In response to questions from the court, defendant affirmed that he wished to plead guilty, that he was doing so "voluntarily and of [his] own free will," and that he had discussed the plea agreement with his attorney (DA: 6, 16). In addition, defendant confirmed that he was voluntarily relinquishing his rights to a jury trial, to confront and cross-examine the witness against him, to call witnesses in his defense, to testify, and to remain silent (DA: 6-7, 13).

Defendant then admitted that, at approximately 3:00 a.m. on February 10, 2001, he used a sharp object to cause serious physical injury to a man and a woman inside a nightclub, located at 330 West 38th Street in Manhattan (DA: 8, 13, 15).[2] In

---

[1] Parenthetical references designated as "DA" are to defendant's appendix.

[2] At the plea hearing, defendant initially denied his guilt, alleging that his memory was "hazy" and that he had been "drunk" on the night of the incident (see DA: 8-9, 12). Defendant subsequently apologized for his "attitude," reaffirmed his desire to plead guilty, and allocuted to the crime (see DA: 12-15). Additionally, defendant affirmed that, by pleading guilty, he abandoned any defense that he was too intoxicated to form the requisite criminal intent (DA: 13-14).

-5-

**JA404**

addition, the court adjudicated defendant a second violent felony offender, based on his 1995 conviction for weapon possession (DA: 7-8, 16).[3]

On April 11, 2002, defendant appeared with counsel before Justice Altman for sentencing. Defendant declined to address the court, and defense counsel asked only that the court delay execution of the sentence for two months, so that defendant could "see his family" (DA: 18). Counsel noted that the negotiated sentence was "15 years" (DA: 18). The court imposed the promised sentence and delayed its execution until June 7 (DA: 19). On the Sentence and Commitment Order, issued that same day, the court noted that, following his release from prison, defendant would be subject to "5 years of post release supervision" (DA: 20 [Sentence and Commitment Order]).

## B. The Appellate Division Decision

The Appellate Division, First Department, unanimously rejected defendant's contention that the PRS term should be "stricken from the sentence" as a "nullity" because the court had not "pronounced [it] orally, in his presence in open court." See People v. Sparber, 34 A.D.3d 265, 265 (1st Dept. 2006). The Appellate Division began by observing that, "[w]hile the court's failure to advise defendant of the PRS component of his sentence would be a ground for vacatur of the plea . . ., defendant

---

[3] During the colloquy, the prosecutor noted that defendant was eligible for sentencing as a persistent violent felony offender, but as part of the plea agreement, the People did not seek to have defendant sentenced as such (see DA: 10).

-6-

explicitly states that he does not want that remedy." Id. The Appellate Division continued, citing Penal Law § 70.45(1), that "even though the court's oral sentence was silent as to PRS, it necessarily included a five-year term thereof." Id. In addition, the First Department observed that "the court, acting through its court clerk, set forth the PRS provision in the commitment sheet, thereby satisfying any constitutional requirement that a sentence be 'entered upon the records of the court.'" Id. at 266 (quoting Hill v. United States ex rel. Wampler, 298 U.S. 460, 464 [1936]). The Appellate Division found "no constitutional infirmity in the use of a written document to clarify an aspect of a sentence upon which the court's oral pronouncement was silent . . . particularly where, as here, the relevant portion of the written document performs the ministerial function of setting forth a provision already included in the sentence by operation of law." Sparber, 34 A.D.3d at 266.

On August 9, 2007, the Honorable Carmen Beauchamp Ciparick granted defendant's application for leave to appeal to this Court. See People v. Sparber, 9 N.Y.3d 882 (2007).

-7-

POINT

DEFENDANT'S MANDATORY TERM OF POST-
RELEASE SUPERVISION IS ENFORCEABLE AND
WAS PROPERLY IMPOSED (Answering Defendant's
Brief).

A brief summary of the People's argument is appropriate. Section 70.45(1) of
the Penal Law provides that <u>every</u> determinate sentence automatically includes, "as a
part thereof, an additional period of post-release supervision." Applying that
unambiguous language, this Court has held in a series of recent cases, beginning with
<u>People v. Catu</u>, 4 N.Y.3d 242 (2005), that a determinate sentence always includes a
period of PRS, even if the trial court did not mention PRS at the plea hearing or at
sentencing. Just last month, this Court reaffirmed that principle in <u>People v. Hill</u>, 9
N.Y.3d 189 (2007). Here, defendant received a 15-year determinate sentence.
Because he was a second violent felony offender, his sentence automatically included
a PRS term of exactly 5 years. <u>See</u> Penal Law § 70.45(2). The Legislature left the trial
court no discretion in that regard; the 5-year PRS term was mandatory and
unavoidable.

To be sure, the trial court did not inform defendant of the PRS term, either at
the plea hearing or at sentencing. As this Court has recognized, defendant would
have been entitled to request vacatur of his plea, because he was not adequately
informed of this unavoidable statutory requirement when he pleaded guilty. <u>See</u> <u>Catu</u>,
4 N.Y.3d at 244. However, defendant is happy with his plea: he does not wish to

-8-

**JA407**

stand trial for his brutal slashings of the two victims and face possible imprisonment as a persistent violent offender. He does not request vacatur of his plea, nor has he ever sought that remedy. Instead, defendant desires to keep his plea while avoiding a mandatory consequence of his sentence, the 5-year term of post-release supervision.

Defendant's challenges to the imposition of the PRS term can be separated into two categories. First, defendant contends that the PRS term was not imposed in accordance with state law. Defendant asserts that the Criminal Procedure Law requires the judge to "pronounce" any part of the sentence, including a mandatory PRS term, in open court and in the defendant's presence. He argues that the judge erred by failing to "pronounce" the PRS term in his presence at the sentencing hearing (see Defendant's Brief at 7-12). But this state-law procedural challenge is unpreserved, because defendant did not raise it below. Further, as noted above, the mandatory PRS term became part of defendant's determinate sentence by operation of law, regardless of whether the judge "pronounced" it.

In addition, defendant argues that because the judge did not pronounce the PRS term at sentencing, the federal constitution bars its enforcement. Defendant relies on Earley v. Murray, 451 F.3d 71 (2ᵈ Cir. 2006), in which the Second Circuit held unenforceable a PRS term that was not entered anywhere on the court records (see Defendant's Brief at 12-30). However, the Second Circuit's decision conflicts with settled New York law that a PRS term automatically becomes part of a determinate sentence. Moreover, Earley rests its holding on a patent misreading of

-9-

**JA408**

the Supreme Court's 1936 decision in <u>Hill v. United States ex rel. Wampler</u>, 298 U.S. 460 (1936) ("<u>Wampler</u>"). In that case, the Court held that, where the judge has discretion to impose (or not to impose) a sentencing provision, the record must reflect that the judge exercised his or her sentencing discretion. <u>Wampler</u> did not hold that the judge must pronounce a mandatory term, nor did it require oral pronouncement of sentence. Moreover, <u>Wampler</u> does not state a federal constitutional rule; it is a procedural ruling applicable only to federal courts. Hence, the Second Circuit's decision in <u>Earley</u> was incorrect and should not be followed.

In any event, <u>Earley</u> arose under facts far different from those at hand. In <u>Earley</u>, the PRS term was not noted anywhere on the court records; the defendant did not learn about it until the Department of Correctional Services (DOCS) informed him that he was required to serve PRS. Here, in contrast, the court entered the PRS term on the record by stating it on the commitment order. Thus, in contrast to <u>Earley</u>, the PRS term was validly imposed by the court; it was not "administratively added" by DOCS. Courts around the country, federal and state alike, have held that a mandatory condition of a sentence need not be orally pronounced and may be imposed in a subsequent written order. The trial court here followed a well-established practice that comports with constitutional norms.

Finally, even if there were any statutory or constitutional error in the way the PRS term was imposed, the proper remedy would not be to strike the PRS term and

render the sentence illegal. Instead, the case should be remanded for resentencing, so that the judge can "pronounce" the mandatory PRS term.

A. Under New York law, every determinate prison sentence automatically includes a period of post-release supervision, whether or not the judge "pronounces" it.

"Jenna's Law," enacted in 1998, eliminated parole for violent felons, instead requiring determinate prison sentences for most violent crimes. See L. 1998, ch. 1. To ensure that violent felons, after serving their prison sentences, are not released into society unsupervised, a PRS term is included by law as part of every determinate prison sentence. See Penal Law § 70.45(1) ("Each determinate sentence also includes, as a part thereof, an additional period of post-release supervision"); see also Donnino, Practice Commentary to Penal Law § 70.45, McKinney's Cons. Laws of N.Y., Book 39, p. 396 ("For violent felonies committed on or after September 1, 1998, for which a determinate sentence of imprisonment is imposed, a period of post-release supervision . . . is included as part of that determinate sentence"); see generally New York State Legislative Annual (1998), Governor's Program Bill Mem. No. 194 and Approval Mem. No. 25. Based on that clear legislative will, this Court has described a PRS term as a "mandatory," "definite," and "immediate" consequence of a determinate sentence. Catu, supra, 4 N.Y.3d at 244 (emphasis added).

Additionally, the length of defendant's PRS term was set by statute at 5 years. See Penal Law § 70.45(2) ("The period of post-release supervision of a determinate sentence shall be five years"). To be sure, the 1998 version of the statute, which was

-11-

in effect at the time of defendant's crime, allowed the court to impose PRS periods of less than 5 years for defendants sentenced pursuant to section 70.02 of the Penal Law -- that is, first-time felons convicted of violent felonies. See Penal Law §§ 70.45(2) (1998 version).[4] The Legislature, however, provided no other exceptions. See id.[5]

Here, defendant was not a first-time felon: the court adjudicated him a predicate violent felon based on a 1995 conviction. As noted, section 70.45(2) provided no relief from the mandatory 5-year PRS term for second violent felony offenders. Therefore, New York law requires defendant to serve a PRS term of exactly 5 years following his release from prison.

In Catu, 4 N.Y.3d 242, supra, this Court made clear that PRS is automatically imposed, by operation of law, whether or not the sentencing judge mentions a PRS term. In that case, the defendant pleaded guilty in exchange for a 3-year determinate sentence. However, the judge did not inform the defendant -- at any point during the plea or sentencing proceedings -- that the determinate sentence carried a mandatory PRS term. This Court unanimously concluded that, under Penal Law § 70.45, the defendant's sentence nonetheless included a PRS term. See Catu, 4 N.Y.3d at 244.

---

[4] Second violent felony offenders are sentenced pursuant to Penal Law § 70.06.

[5] The current version of section 70.45(2), as amended in 2004, similarly authorizes PRS periods of less than 5 years for first-time felons convicted of violent felonies. See Penal Law § 70.45(2)(e)-(f). In addition, the current statute authorizes PRS terms of less than 5 years for certain drug offenders sentenced pursuant to section 70.70 of the Penal Law. See Penal Law §§ 70.45(2)(a)-(d).

-12-

**JA411**

This Court recently reaffirmed that holding. See People v. Hill, 9 N.Y.3d 189, 190 (2007) (defendant's original 15-year prison sentence automatically included PRS term, even though "[n]o mention was made, either during the plea or during the sentencing" of the "five-year term of postrelease supervision").

To be sure, this Court held in Catu and Hill that a failure by a plea court to mention the PRS term renders the plea unknowing, and thus the defendant is entitled to withdraw his guilty plea. See Hill, 9 N.Y.3d at 191-95; Catu, 4 N.Y.3d at 244-45. However, this Court did not suggest that, as an alternate remedy, the PRS term could simply be eliminated from the defendant's sentence. Indeed, eliminating the PRS term would render a determinate sentence illegal. This Court has refused to countenance illegal sentences, because to do so would subvert the intent of the Legislature. See, e.g., People v. DeValle, 94 N.Y.2d 870, 871 (2000) ("the trial court had inherent power to correct the illegal sentence it initially imposed"); People v. Williams, 87 N.Y.2d 1014, 1015 (1996) (same); People v. David, 65 N.Y.2d 809, 810-11 (1985) (invalidating defendant's sentence of lifetime probation, where trial court did not have statutory authority to impose probation in lieu of imprisonment, even though prosecutor failed to object) (aff'g 102 A.D.2d 551 [2$^d$ Dept. 1984]). Those decisions comport with the holdings of Catu and Hill that Penal Law § 70.45 must be enforced, and that every determinate sentence includes a PRS term by operation of law.

On appeal to this Court, defendant does not dispute the plain language of Penal Law § 70.45, which states that every determinate sentence includes a PRS term. Nor does he deny the holding of Catu that a PRS term is a mandatory, immediate, and unavoidable consequence of a determinate sentence. Nevertheless, defendant contends that the court failed to follow the procedures specified in CPL 380.20 and 380.40(1) when imposing his PRS term. Section 380.20 requires the court to "pronounce" sentence on each count, and section 380.40(1) requires that the pronouncement occur in the defendant's presence (see Defendant's Brief at 8-12). These claims are unavailing.

At the outset, defendant's newfound statutory claims are unpreserved, because he did not raise them below, either at sentencing or in a post-judgment motion to set aside the sentence. Defendant's claimed violations of article 380 of the Criminal Procedure Law are procedural in nature and do not rise to the level of "mode of proceedings" error. In that regard, this Court has enforced the preservation requirement with regard to other procedural rules outlined in CPL article 380. See People v. Thomas, 75 N.Y.2d 888 (1990) (unpreserved claim that the procedures of CPL 380.70 were violated);[6] People v. Green, 54 N.Y.2d 878, 880 (1981) (unpreserved claim that defendant's right to allocution [CPL 380.50] was violated); People v.

---

[6] CPL 380.70 requires that a certificate of conviction and the sentencing minutes be delivered to the defendant's correctional facility within 30 days of the imposition of sentence.

-14-

**JA413**

Rodriguez, 261 A.D.2d 331 (1ˢᵗ Dept. 1999) (finding unpreserved defendant's claim that court violated his right, pursuant to CPL 380.30[1], to be sentenced without unreasonable delay). It is true that this Court has not addressed whether violations of CPL 380.20 and 380.40(1) -- the errors claimed by defendant here -- are subject to the preservation requirement. However, applying Thomas and Green, this Court should require a defendant to preserve a claimed violation of any of the statutory procedures of article 380.

Significantly, defendant's fundamental right to be present at every material stage of the trial was not violated. As defendant does not dispute, he was present at the sentencing hearing. His sole complaint is that the trial court imposed the mandatory, 5-year PRS term by an improper procedure: by recording it on the commitment order instead of announcing it in open court. That procedural claim must be preserved by specific objection. See People v. Samms, 95 N.Y.2d 52, 58 (2000) ("this Court [has] enforced the preservation requirement to defeat defense claims that the trial court failed to comply with [sentencing] procedures"); People v. Proctor, 79 N.Y.2d 992, 994 (1992) (claim that sentencing court did not comply with procedures of CPL 400.20 unpreserved); see also People v. Callahan, 80 N.Y.2d 273, 281 (1992)

(challenges to "the adequacy of the procedures the court used to arrive at its sentencing determination" must be preserved and may be waived).[7]

Applying the preservation rule to violations of sections 380.20 and 380.40(1) would not leave defendants without a remedy. If, after the sentencing hearing, a defendant realizes that the court failed to impose sentence orally on a particular count, he could bring a CPL 440.20 proceeding to set aside the sentence. See, e.g., People v. Murphy, 37 A.D.3d 976 (3d Dept. 2007) (CPL 440.20 proceeding: granting new sentencing hearing for violation of statutory right to pronouncement of sentence). That result makes sense, because if a sentence was not "pronounced" in the correct manner, the trial court can easily cure the error by making the required pronouncement. The defendant should be obliged to seek such a cure before pursuing an appellate claim.

In any event, even if defendant's current claims are reviewable despite his failure to raise them below, he is not entitled to relief. As defendant does not dispute,

---

[7] Notably, it is not clear that a criminal defendant has a constitutional right to be present at sentencing. Of course, the constitution protects a defendant's right to be present at material stages of trial. See People v. Dokes, 79 N.Y.2d 656, 662 (1992); cf. Illinois v. Allen, 397 U.S. 337, 338 (1970) (holding that Sixth Amendment Confrontation Clause guarantees a defendant's right to be present at material stages of trial). However, the Supreme Court has never held that a defendant has a constitutional right to be present at a sentencing hearing. Indeed, the Confrontation Clause, which underlies the constitutional right to presence, does not apply to sentencing proceedings. See United States v. Martinez, 413 F.3d 239, 242 (2d Cir. 2005), cert. denied, 126 S. Ct. 1086 (2006). A defendant's right to be present, therefore, appears to be purely statutory. Regardless, as discussed, defendant was present at sentencing here; his challenge concerns only the procedural manner in which a PRS term should be imposed.

-16-

**JA415**

the court held a sentencing hearing, at which the judge orally pronounced the 15-year prison term in open court, in defendant's presence. Hence, sentence was pronounced in open court. The only question is whether the judge was required also to pronounce the mandatory PRS component. As discussed above, this Court held in <u>Catu</u> and <u>Hill</u> that a PRS term, mandated by section 70.45 of the Penal Law, automatically becomes part of a determinate prison sentence, regardless of whether the court pronounces the PRS term in the defendant's presence. It follows, then, that sections 380.20 and 380.40 of the CPL do not mandate oral pronouncement of the PRS component.

Indeed, oral pronouncement of the mandatory term would have been an empty and pointless formality. For that reason, federal courts have rejected claims that mandatory sentencing provisions must be orally pronounced. <u>See, e.g., United States v. Cofield</u>, 233 F.3d 405, 406-08 (6th Cir. 2000) (written judgment and commitment order properly noted three-year term of supervised release, which was mandated by the sentencing guidelines, even though court had not pronounced it orally); <u>United States v. Truscello</u>, 168 F.3d 61, 62-64 (2$^{d}$ Cir. 1999) (oral sentence need not include standard conditions of supervised release); <u>United States v. Pagan</u>, 785 F.2d 378, 380-81 (2$^{d}$ Cir. 1986) (mandatory special assessment properly need not be pronounced

-17-

**JA416**

orally); see also State v. Hart, 668 So.2d 589, 592-93 (Fla. 1996) (general conditions of probation mandated by law need not be orally pronounced at sentencing hearing).[8]

While acknowledging that his PRS term was set by statute at 5 years, defendant denies that an oral pronouncement would have been "merely a formality" (Defendant's Brief at 26). But defendant's claims of prejudice fall flat. For instance, defendant asserts that he could have asked the court to impose a shorter period of incarceration to compensate for his allegedly "onerous" PRS term (Defendant's Brief at 27). Here, however, defendant could not have sought a shorter prison term at sentencing. Defendant's plea to a single count, in satisfaction of the four-count indictment, required the consent of the People. See CPL 220.10(4)(a). The 15-year prison sentence for that count was part of the negotiated bargain and could not be altered without the People's consent. See People v. Farrar, 52 N.Y.2d 302, 307 (1981) (the prosecutor has the "right to withdraw consent to the plea in the event that the sentence to be imposed is less than originally negotiated by the parties").

Recognizing this fact, defendant asserts that, as an alternative to asking for a shorter prison term, he could have moved to withdraw his plea, since he had not been informed of the PRS requirement (Defendant's Brief at 27). But the lack of an oral pronouncement did not prevent defendant from obtaining a vacatur of his guilty plea.

---

[8] Contrary to defendant's claim, the People do not dispute that the court must hold a sentencing hearing for crimes that carry a specific, mandatory prison sentence (see Defendant's Brief at 21). The People contend only that, as Catu and Hill held, a mandatory PRS term applies whether or not it was orally pronounced.

As this Court made clear in Catu and its progeny, a defendant who was not informed of PRS can obtain that remedy on direct appeal. Here, defendant does not seek vacatur of his plea; he wishes to keep it. Hence, he should not be heard to claim that he was denied the right to ask for his plea back.

Defendant also contends that oral pronouncement of a PRS term might induce a defendant to "take an appeal that he might otherwise forgo" (Defendant's Brief at 27). Here, however, defendant filed a timely notice of appeal and is currently pursuing his direct appeal. Far from suffering prejudice, defendant is attempting to exact a windfall -- nullification of his mandatory PRS term -- on account of the sentencing court's failure to perform a ministerial act.

Finally, defendant's reliance on People v. Fuller, 57 N.Y.2d 152 (1982), is misplaced. In Fuller, the trial judge had been entrusted with "broad" discretion, under sections 60.27 and 65.10 of the Penal Law, to determine the conditions of the defendant's restitution and reparations. See id. at 154-55. Instead of exercising that discretion, the judge directed the probation department to set the conditions. See id. at 155. This Court found that delegation improper, noting the "Legislature's intention" for "Judges and no one else" to set the conditions of restitution. Id. at 157. This Court remanded the case for a new sentencing hearing at which the trial court would exercise its discretion consistent with those statutes. See id. at 158-60.

While Fuller will prove relevant on the question of remedy, see Part C, infra, it otherwise differs starkly from the case at hand. In Fuller, specific provisions of the

-19-

**JA418**

Penal Law instructed the sentencing court to exercise its discretion. The <u>Fuller</u> decision turned on an analysis of those particular statutes. In contrast to the restitution provisions at issue in <u>Fuller</u>, the Legislature made PRS mandatory and automatic. Further, the Legislature left sentencing courts no discretion to set the length of the PRS term for second violent felony offenders, like defendant, who receive determinate prison sentences. <u>See</u> Penal Law § 70.45(2). Hence, unlike in <u>Fuller</u>, the Legislative will would not be served here by requiring oral pronouncement of the PRS term.

In short, under New York law, defendant's 5-year PRS term was a mandatory, automatic, and immediate consequence of his determinate prison sentence. The PRS term applies regardless of whether the trial court "pronounced" it at the sentencing hearing.

<u>B. The federal constitution does not require oral pronouncement of defendant's PRS term.</u>

Defendant next argues that, under federal due process principles, "the only valid sentence is that orally pronounced by the sentencing judge on the record in the defendant's presence" (Defendant's Brief at 16). Defendant relies on the Supreme Court's 1936 decision in <u>Hill v. United States ex rel. Wampler</u>, 298 U.S. 460 (1936) ("<u>Wampler</u>"), and the Second Circuit's recent decision in <u>Earley v. Murray</u>, 451 F.3d 71 (2$^d$ Cir.), <u>reh'g denied,</u> 462 F.3d 147 (2006), <u>cert. denied,</u> 127 S. Ct. 3014 (2007). In truth, neither of those cases requires the result that defendant seeks.

-20-

**JA419**

1. The Supreme Court's 1936 decision in *Hill v. United States ex rel. Wampler* does not require oral pronouncement of a mandatory PRS term.

Defendant cites Wampler in support of his claim that a PRS term is valid only if announced by the trial judge in open court (Defendant's Brief at 14-16). But contrary to defendant's contention, Wampler concerned a quite different issue: the exercise of a discretionary judicial function by a non-judicial officer.

In Wampler, the defendant was convicted of two counts of tax evasion. The judge sentenced him orally to an aggregate prison term of 18 months, an aggregate fine of $10,000 ($5,000 on each count), and costs. Wampler, 298 U.S. at 461-62. The court then issued a written judgment that mirrored the oral sentence. See id. at 464. However, in the warrant of commitment sent by the court clerk to the federal penitentiary, the clerk added a provision that, if the defendant defaulted on payment of the fines or costs, he would "stand further committed until the payment of said fines and costs or until discharged by due process of law." Id. at 462.[9]

The defendant petitioned for a writ of habeas corpus, challenging the provision that he remain incarcerated pending payment of the fines and costs. The Supreme Court granted the defendant's petition, holding that the court clerk had improperly added the provision to his sentence. See Wampler, 298 U.S. at 463-67. At the outset, the Court stressed that "[i]mprisonment does not follow automatically upon a

---

[9] In the District of Maryland, in which the defendant was convicted, the clerk inserted this requirement on the commitment order as a general practice, unless directed otherwise by the court. See id. at 462.

-21-

**JA420**

showing of default in payment." <u>Wampler</u>, 298 U.S. at 463. No law <u>required</u> that the defendant remain imprisoned if he defaulted on payment of the fines or costs; rather, that determination rested within the discretion of the sentencing judge. <u>See id.</u> at 463 ("In the discretion of the court the judgment may direct also that the defendant shall be imprisoned upon a showing of default in payment").

The Supreme Court continued that "the choice of pains and penalties, <u>when choice is committed to the discretion of the court</u>, is part of the judicial function." <u>Wampler</u>, 298 U.S. at 464 (emphasis added). Hence, if the sentencing court has discretion to impose (or not to impose) a provision, such a provision is valid only if it has "expression in the sentence, and the sentence is the judgment." <u>Id.</u> In other words, a discretionary sentencing provision is valid only if it is "entered upon the records of the court." <u>Id.</u>[10] Because the records of the sentencing court did not contain the provision that the clerk added to the warrant of commitment, the provision on the warrant was "void" and could not authorize the defendant's continued detention. <u>See id.</u> at 465. The Court explained that the warrant served only as "convenient evidence for the protection of the jailer" and could well be "lost or destroyed" once the prisoner arrived at his destination. <u>See id.</u> at 467.

---

[10] The Court added that a sentencing condition generally imposed by "settled usage" or "tradition" must still be reflected in the court records. The court explained that such traditions are not "published" or "reduced to writing," and therefore they lack "the formal safeguards that protect against mistake and perhaps against oppression." <u>Id.</u> at 465-66.

Significantly, the Court rejected the suggestion that the failure of the judge to "orally pronounce[]" the provision at the sentencing hearing rendered it invalid. On the contrary, the Court described the lack of an oral pronouncement, standing alone, as "unimportant." The critical question was whether the discretionary condition had been "entered upon the records of the court." See Wampler, 298 U.S. at 464-65.

In short, Wampler, a federal equivalent of People v. Fuller, supra, held only that a court clerk cannot add a discretionary provision to the sentence absent specific direction from the judge. Wampler did not address mandatory provisions imposed by operation of law; it addressed only those provisions for which the sentencing judge has a "choice." Wampler, 298 U.S. at 464. Wampler further rejected the notion that an oral pronouncement of sentence is required, holding only that the sentence must be reflected on the court records.

Applying Wampler to the present case, defendant deserves no relief from his legally-mandated period of post-release supervision, for three independent reasons. First, the Wampler rule is limited to discretionary sentencing provisions. Wampler does not require courts to pronounce mandatory provisions that apply by operation of law. Second, Wampler merely states a rule of federal procedure; it does not state a constitutional rule applicable to state court judgments. Third, Wampler is distinguishable from the present case, because defendant's PRS term here was validly entered on the court's records.

To begin, as discussed, defendant's PRS term was mandatory: it automatically became part of defendant's sentence by operation of the New York Penal Law. Hence, there was no need for the sentencing judge to "pronounce" the PRS term, either orally or in a written sentencing order, because it was already included in the sentence by statutory command. Critically, as discussed, the sentencing court had no discretion to choose the length of defendant's PRS term. Because he was a second felony offender convicted of a violent felony, his PRS term was set by law at 5 years. See Penal Law § 70.45(2). It would be empty formalism to require an official court pronouncement of this mandatory provision. Wampler did not hold that the constitution demands such a meaningless ritual. Indeed, Justice Cardozo, who authored Wampler, was an ardent critic of empty formalism. See Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91 (1917) ("The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal"); Benjamin N. Cardozo, The Nature of the Judicial Process, p. 66 (Yale Univ. Press 1921) ("the demon of formalism tempts the intellect with the lure of scientific order").[11]

---

[11] As early as 1948, a federal appeals court explained Wampler as holding that, where a trial court has discretion, it must exercise that discretion. See Sanders v. Johnston, 165 F.2d 736, 737 (9th Cir. 1948) (recognizing that the key to the Wampler decision was the "failure of the court to render its judgment relative to the imposition of a fine") (emphasis added).

Next, Wampler does not support defendant's claim for an independent reason: it did not announce a constitutional rule. Wampler reviewed a federal criminal conviction; it did not involve review of a state judgment. Justice Cardozo did not invoke the Due Process Clause, or any other constitutional provision, to justify the Court's result. The Court did not even use the term "due process" in its discussion. Instead, Justice Cardozo engaged in a technical discourse on the nature of a federal judgment, a federal warrant of commitment, and the "mittimus." See Wampler, 298 U.S. at 463-67.[12] Surely, Justice Cardozo would have invoked due process if he meant to announce a constitutional rule. By instead phrasing the opinion in technical language, he signaled that the decision concerned a federal common law rule of sentencing procedure, not a broad constitutional principle. Thus, Wampler cannot be used to overturn a state criminal judgment.

In addition to Wampler, defendant cites Bartone v. United States, 375 U.S. 52 (1963), in support of his claim that the judge must orally pronounce even "mandatory aspects of the sentence" (Defendant's Brief at 24). But defendant's reliance on Bartone too is misplaced. There, the Court held that the trial judge improperly added extra time (1 day) to the defendant's 1-year sentence without him present. Thus, the Court ordered the sentence corrected. See id. at 53-54. As in Wampler, however,

---

[12] A "mittimus" is a "warrant of authority . . . for confining a person to prison or jail." Ballentine's Law Dictionary, 3d ed. (on Lexis).

<u>Bartone</u> did not establish a constitutional rule applicable to state courts. Instead, the <u>Bartone</u> Court based its decision on Rule 43 of the Federal Rules of Criminal Procedure, as well as the Court's "broad powers of supervision" over federal judgments. <u>See</u> <u>id.</u>

Moreover, like <u>Wampler</u>, <u>Bartone</u> did not hold that the trial court must pronounce <u>mandatory</u> aspects of a sentence. In <u>Bartone</u>, the judge's addition to the defendant's sentence was not mandated by statute. The judge could legally have left the sentence as orally pronounced. Here, in contrast, the PRS term was mandatory and imposed by operation of law. Under those circumstances, there was no need for the court to impose it in defendant's presence.

Nor does defendant's reliance on <u>Bozza v. United States</u>, 330 U.S. 160 (1947), help him. In that case, the defendant was convicted of a federal tax crime under section 2833(a) of the Internal Revenue Code, which required him both to pay a fine and to serve a term of imprisonment. <u>See</u> <u>id.</u> at 65. Specifically, the statute required that the defendant pay a fine of "not less than $100 nor more than $5,000" and to serve a prison term of "not less than thirty days nor more than two years." 26 U.S.C.A. Int. Rev. Code § 2833(a) (1939). At the sentencing hearing, however, the court imposed a prison term only and neglected to impose a fine. A few hours later, the judge recalled the defendant to the courtroom and imposed the statutory minimum fine of $100. <u>See</u> <u>Bozza</u>, 330 U.S. at 165-66. The Supreme Court rejected the defendant's contention that the judge violated his double jeopardy rights by

recalling him to impose the fine. See Bozza, 330 U.S. at 166-67. The Court held that the defendant should not be able to "escape punishment" because the court had "committed an error in passing [on] the sentence." Id. at 166. Bozza obviously does not support defendant's argument here that his PRS term here should be deemed a nullity, because the court failed to pronounce it. To the contrary, Bozza held that a defendant cannot escape punishment because of the sentencing court's procedural error.

Contrary to defendant's argument, Bozza did not hold that a "mandatory fine" must be specifically pronounced by the judge (see Defendant's Brief at 23-24). The Supreme Court in Bozza did not address whether the judge was required to call the defendant back to the courtroom to impose the fine; it held only that this procedure did not violate the Double Jeopardy Clause. See Bozza, 330 U.S. at 166-67. Moreover, the amount of the fine faced by the defendant in Bozza was not "mandatory." While the defendant faced a mandatory minimum fine of $100, the judge had discretion to impose a fine of up to $5,000. See 26 U.S.C.A. Int. Rev. Code § 2833(a) (1939). Hence, the court was required to exercise its discretion, on the record, in setting the fine.

In any event, even if mandatory provisions must be entered on the court records, that was properly done here. As discussed, Wampler rejected the notion that every provision of a sentence must be orally pronounced, describing the lack of an oral pronouncement, standing alone, as "unimportant." Instead, the critical question

is whether the discretionary condition has been "entered upon the records of the court." See Wampler, 298 U.S. at 464-65.

Following Wampler, courts have held that the constitution does not require oral pronouncement of the sentence. See, e.g., N.C. v. Anderson, 837 So.2d 425, 427 (Fla. App. 2002) (holding that there is no constitutional right to oral pronouncement of sentence); Meredith v. Gough, 168 F.2d 193 (5th Cir. 1948) (holding that written sentences were "regular and valid"). Indeed, in some jurisdictions, the written sentence controls over the oral one. See, e.g., Bradley v. State, 864 P.2d 1272, 1275 (Nev. 1993); State v. Diaz, 673 P.2d 501, 502 (N.M. 1983).

While, as a matter of practice, federal courts generally follow the oral sentence if it conflicts with a written order, federal courts will enforce a written sentence that clarifies or adds detail to an oral pronouncement. See United States v. Pugliese, 860 F.2d 25, 30 (2d Cir. 1988) (written sentence properly ordered terms consecutive where oral sentence had not addressed that matter); United States v. Moyles, 724 F.2d 29, 30 (2d Cir. 1983) (under federal practice, written sentencing order may "resolv[e] ambiguities" in orally pronounced sentence if there is no direct conflict). Further, a court may correct an erroneous oral sentence in a written judgment. See United States v. Ortiz-Torres, 449 F.3d 61, 74-75 (1st Cir. 2006) (where oral sentence wrongly stated length of supervised term as 3 years instead of 5 years, court's correct written judgment controlled: statute and plea agreement placed defendant on notice of mandatory 5-year term).

Applying these standards here, the court validly placed the PRS term on the record by writing it on the commitment order, which was issued on the same day as defendant's sentencing hearing. In New York, a commitment order is a court record that has legal effect. It is prepared contemporaneously to the sentencing hearing, bears the judge's name, and is retained in the court file. Because it is contained in the official court file, the commitment order is part of the trial and appellate record. Appellate courts frequently look to the commitment order to resolve ambiguities in a defendant's sentence. A commitment order, therefore, is more than a document prepared for the convenience of the jailer. It is a legally binding record akin to the written judgments that federal courts routinely issue.

The Appellate Division has repeatedly recognized the legal significance of commitment orders. See People v. Stepteau, 261 A.D.2d 207, 208 (1st Dept. 1999) (reading the "commitment sheet," the "sentencing minutes," and other relevant documents "together" to determine what sentence had been imposed by the judge); People v. Garcia, 241 A.D.2d 408, 408 (1st Dept. 1997) (noting that the "commitment sheet" was part of the record), aff'd, 92 N.Y.2d 869 (1998). In fact, reviewing courts in New York occasionally order corrections to the commitment sheet, demonstrating that it is a significant legal document formally detailing the sentence of the court. See People v. Mullins, 13 A.D.3d 192 (1st Dept. 2004) (ordering amendment to commitment sheet); People v. Liotta, 274 A.D.2d 751, 754 (3d Dept. 2000) (remanding for determination whether commitment order should be corrected);

People ex rel. Townsand v. Superintendent, 115 A.D.2d 678, 679 (2<sup>d</sup> Dept. 1985) (noting that petitioner could seek correction of commitment order if it contained an error).

In response, defendant cites CPL 380.60, which states that a "certificate of conviction showing the sentence pronounced by the court, or a certified copy thereof, constitutes authority for execution of the sentence." Because the statute refers to the "sentence pronounced by the court," defendant argues that a certificate of conviction can only "memorialize the court's judgment" and not add to it (see Defendant's Brief at 17). However, a certificate of conviction is an entirely different document from a Sentence and Commitment Order. CPL 380.60 does not refer to Sentence and Commitment Orders and says nothing about their legal significance. As demonstrated, the Sentence and Commitment Order is part of the sentence pronounced by the court. Nor is a commitment order akin to the federal warrant of commitment at issue in Wampler, which did not constitute part of the court record. As the Wampler Court explained, the federal warrant was not part of the sentence but was prepared merely for the purpose of delivering the prisoner to "his place of imprisonment." See Wampler, 298 U.S. at 466. In contrast, a commitment order in New York is retained in the court's permanent file and becomes part of the record.

To be sure, the judge does not sign the commitment order personally; it is signed by the court clerk instead. Here, in accord with that practice, Justice Altman's name appears on the top of commitment order, and it was signed at the bottom by

the clerk (see DA: 20). While defendant finds this fact significant (see Defendant's Brief at 17), no rule requires a judicial signature on every court order. A commitment order, which bears the judge's name and is signed by the clerk, is binding.[13]

Hence, because defendant's PRS term was written on the commitment order, it was entered on the court records and formed part of the official judgment. The sentence reflected on the commitment order is binding and enforceable. Similarly, federal courts regularly enforce mandatory terms listed on written sentencing orders, even where those terms were not mentioned orally at the sentencing proceeding. See United States v. Cofield, 233 F.3d 405, 406-08 (6th Cir. 2000) (written judgment and commitment order properly noted 3-year term of supervised release, which was mandated by the sentencing guidelines, even though court had not pronounced it orally: failure of court to pronounce term orally, if error at all, was harmless);[14] United States v. Truscello, 168 F.3d 61, 62-64 (2d Cir. 1999) (oral sentence need not include standard conditions of supervised release: proper for court to list those conditions in

---

[13] Notably, this Court's slip opinions bear the signature of the Clerk of Court, not of the Judges.

[14] Cofield cited a Second Circuit decision, United States v. Jolly, 129 F.3d 287, 289-90 (2d Cir. 1997), which held that an oral sentence did not control over a written one when there was a strong possibility that the court had misspoken at the sentencing hearing. That decision was vacated on rehearing, when the government consented to have the written sentence amended to match the oral one. See United States v. Jolly, 142 F.3d 552 (2d Cir. 1998) (on rehearing). Contrary to defendant's contention (Defendant's Brief at 24 n. 4), the parties' ultimate agreement in Jolly did nothing to undermine the Sixth Circuit's reasoning in Cofield. Indeed, the Jolly court did not repudiate its initial decision. The government merely acknowledged that the trial court had not, in fact, misspoken. The Second Circuit's initial reasoning remained sound. See 142 F.3d at 552-53.

written judgment and commitment order); United States v. Pagan, 785 F.2d 378, 380-81 (2<sup>d</sup> Cir. 1986) (mandatory special assessment properly imposed by written judgment and commitment order; no need for oral pronouncement); see also State v. Hart, 668 So.2d 589, 592-93 (Fla. 1996) (general conditions of probation mandated by law need not be orally pronounced at sentencing hearing and may be imposed in written probation order: state statutes and rules provide defendants with "constructive notice" of the conditions); Wilkinson v. State, 889 So.2d 110, 110-11 (Fla. App. 2004) (where defendant received sentence of life in prison, court was not required orally to impose condition that defendant must serve 25 years before becoming eligible for parole: that condition was mandated by statute and was properly noted in sentencing documents). Even conditions that are merely "recommended" need not be orally pronounced. See United States v. Jacques, 321 F.3d 255, 265 (2<sup>d</sup> Cir. 2003) ("recommended" conditions of supervised release, as well as mandatory ones, may be imposed in written sentencing order).

Defendant asserts broadly that an oral sentence always controls over a written one (see Defendant's Brief at 19-20). But in fact, the cases cited by defendant stand for more limited propositions. For instance, some federal courts give preference to an oral sentence that conflicts with a written order. See, e.g., United States v. A-Abras, 185 F.3d 26, 29-30 (2<sup>d</sup> Cir. 1999) (as government conceded, where oral sentence and written judgment conflicted regarding terms of payment of fine, oral sentence controlled over written judgment issued outside defendant's presence);

Kennedy v. Reid, 249 F.2d 492 (D.C. Cir. 1957) (oral sentence conflicted with commitment papers). As noted, however, that is not a constitutional rule or even a universal rule of practice. See Bradley v. State, supra, 864 P.2d at 1275; State v. Diaz, supra, 673 P.2d at 502. Indeed, a written sentence may correct an obvious error in an oral one. See United States v. Ortiz-Torres, supra, 449 F.3d at 74-75.

Additionally, some courts have held that a court may not impose a discretionary condition in a written judgment that was not announced in the defendant's presence. See United States v. Marquez, 506 F.2d 620, 621-23 (2d Cir. 1974) (cited by defendant) (oral sentence controlled over written judgment, where written judgment included an additional discretionary condition that defendant remain incarcerated until fine paid). But once again, this rule is limited to discretionary conditions.

Here, in contrast to the cases cited by defendant, the commitment order did not conflict with the oral sentence. Nor did it add a discretionary provision. It merely included an additional component, the 5-year PRS term, which was mandated by statute.

In short, Wampler expressly limited its holding to discretionary sentencing provisions. In contrast, the mandatory PRS term here was automatically imposed by operation of state law. Requiring the court to "pronounce" this mandatory provision would amount to empty formalism. In addition, Wampler did not announce a constitutional rule. In any event, unlike in Wampler, the PRS term here was validly

entered on the court records. Thus, contrary to defendant's assertion, his PRS term was imposed in a manner consistent with the federal constitution.

### 2. The Second Circuit's recent decision in *Earley v. Murray* is distinguishable from the present case and, in any event, should not be followed.

Nevertheless, defendant contends that a recent Second Circuit case, Earley v. Murray, 451 F.3d 71 (2ᵈ Cir. 2006), supports his claim that a mandatory PRS term must be orally pronounced (see Defendant's Brief at 12-14). However, Earley does not apply here, because it arose under different facts. In any event, this Court should not follow the Second Circuit's decision in Earley, because it conflicts with New York law and rests on an incorrect reading of the Supreme Court's decision in Wampler.

The Second Circuit's decision in Earley can be briefly summarized. In that case, the defendant pleaded guilty in exchange for a promised sentence of 6 years in prison. The judge did not mention PRS during the plea negotiations or at the sentencing hearing, nor was a PRS term included on the written judgment or the commitment order. However, after the defendant began serving his prison sentence, the Department of Correctional Services (DOCS) informed him that he was required to serve a 5-year PRS term. See Earley, 451 F.3d at 72-73. Relying on the Supreme Court's 1936 decision in Wampler, supra, the Second Circuit held that the PRS term could not be enforced because it was not reflected anywhere in the court's records. The court reasoned that the judge had the sole authority to add the PRS term to the defendant's sentence, and that DOCS could not enforce a PRS term unless the judge

had pronounced it. See Earley, 451 F.3d at 75-77. While recognizing that PRS was mandatory under New York law, the court held that even a legally mandated sentencing provision is not "cognizable" unless specifically "imposed by the sentencing judge." Id. at 74-75. On rehearing, the Second Circuit adhered to its decision. See Earley v. Murray, 462 F.3d 147, 149-50 (2$^d$ Cir. 2006) (on rehearing).

The facts of the present case differ significantly from those of Earley. In Earley, the PRS term was not entered on the commitment order, the sentencing transcript, or anywhere else on the court's records. DOCS enforced the PRS term without any oral or written order directing it to do so. See Earley, 451 F.3d at 72-73. Here, in contrast, the commitment order stated expressly that defendant's prison sentence would be followed by 5 years of PRS. As discussed in Part B(1), supra, that commitment order formed part of the official court record. Hence, in sharp contrast to Earley, DOCS did not "administratively add" the PRS term to defendant's sentence here. The term was entered on the commitment order, a legally binding court record. Earley, then, has no application to the case at hand.

Moreover, in addition to being distinguishable, Earley should not be followed, because it badly misread the Wampler holding in two ways. First, contrary to Earley's holding, Wampler did not pronounce a constitutional rule. Second, while Wampler required that the sentencing court expressly impose discretionary provisions, it said nothing about mandatory ones.

To begin, as discussed in Part B(1), <u>supra</u>, <u>Wampler</u> announced only a federal procedural rule, not one of constitutional magnitude. Justice Cardozo used technical language of federal procedure and never once mentioned "due process." <u>See</u> <u>Wampler</u>, 298 U.S. at 463-67. In fact, the Second Circuit recognized in <u>Earley</u> that "<u>Wampler</u> does not identify the source of the rule that it announces." <u>Earley</u>, 451 F.3d at 76 n. 1. But in the same breath, the court ignored the significance of that observation, stating that it "believe[d]" that <u>Wampler</u> rested on due process grounds. <u>Id.</u> The Second Circuit identified no basis for that "belief" other than its own surmise.

This Court should not defer to the Second Circuit's "belief" about the basis for the <u>Wampler</u> decision, as the Second Circuit's belief is belied by a fair reading of that decision. Moreover, the Supreme Court is not deemed to establish a constitutional rule, binding on the states, unless its intent is clear. In that regard, federal habeas corpus relief is available only for violations of a defendant's "clearly established" federal constitutional rights, as defined by Supreme Court precedent. <u>See</u> 28 U.S.C. § 2254(d)(1); <u>see also</u> <u>Smith v. Mann</u>, 173 F.3d 73, 77 (2$^d$ Cir. 1999) (where petitioner's claim was not of "constitutional dimension," it was not cognizable on habeas corpus review); <u>cf.</u> <u>Loliscio v. Goord</u>, 263 F.3d 178, 188 n. 5 (2$^d$ Cir. 2001) ("State violations of federal common law rules are generally not cognizable in federal habeas proceedings."). Because <u>Wampler</u> did not clearly establish a constitutional rule, <u>Earley</u> was wrong to hold it binding on the states.

-36-

Next, as discussed in Part B(1), <u>supra</u>, <u>Wampler</u> held only that the judge must personally impose <u>discretionary</u> components of a sentence. The Supreme Court took pains to note that the sentencing provision at issue was not mandated by law, and thus the judge was required to determine, in the exercise of his discretion, whether to impose it. <u>See Wampler</u>, 298 U.S. at 463-64. To be sure, the Court stated that the "only sentence known to the law is the sentence or judgment entered upon the records of the court." <u>Wampler</u>, 298 U.S. at 464. However, the Court made that statement in the context of discussing discretionary provisions. The Court clearly stated as its holding that "the choice of pains and penalties, <u>when choice is committed to the discretion of the court</u>, is part of the judicial function." <u>Wampler</u>, 298 U.S. at 464 (emphasis added).

In <u>Earley</u>, the Second Circuit acknowledged the <u>Wampler</u> Court's specific language about discretion. Nevertheless, <u>Earley</u> seized on a single phrase, <u>Wampler</u>'s statement about the "only sentence known to the law," to hold that even mandatory components of a sentence must be entered on the court records. <u>See Earley</u>, 451 F.3d at 74-75; <u>see also Earley</u>, <u>supra</u>, 462 F.3d at 149 (on rehearing). By focusing on that single quote, taken out of context, <u>Earley</u> missed the actual, quite specific holding of <u>Wampler</u>: that a judge may not delegate an exercise of discretion to a court clerk. By contrast, requiring the judge to recite every mandatory component of a sentence

would elevate form over substance -- the type of empty formalism that Justice Cardozo loathed.[15]

Hence, Earley was wrongly decided and should not be followed. Decisions of the lower federal courts, including the federal circuit courts, are not binding on this Court. See People v. Kin Kan, 78 N.Y.2d 54, 60 (1991); see also In re Mason, 100 N.Y.2d 56, 58 (2003). Because the Second Circuit's incorrect analysis is not binding, this Court should continue to apply its established precedents holding that a mandatory PRS term automatically becomes part of a defendant's sentence. Contrary to defendant's claim, he does not deserve a windfall -- nullification of his PRS term -- from the sentencing court's failure to make a formalistic pronouncement. As the Supreme Court stated in Bozza, "the Constitution does not require that sentencing should be a game, in which a wrong move by the judge means immunity for the prisoner." Bozza, 330 U.S. at 166-67 (1947).[16]

---

[15] Greene v. United States, 358 U.S. 326 (1959), cited both in defendant's brief and in the Earley opinion (see Defendant's Brief at 11; Earley, 451 F.3d at 75), is far afield from the case at hand. In Greene, the defendant raised various challenges to the validity of his sentence, which covered 15 counts and included a confusing mishmash of concurrent and consecutive sentences. See Greene, 358 U.S. at 327-28. As part of its argument, the government asserted the trial court had imposed only a single aggregate sentence, not separate sentences on each of the 15 counts. The Court rejected that argument, noting that the sentencing record showed 15 individual sentences and constituted the "sentence known to law." See id. at 329 (internal quotations omitted). Greene did not address the question at issue here: whether due process requires a sentencing court orally to pronounce mandatory components of a sentence.

[16] As evidenced by the lower court's decision in the present case, the First Department, even after Earley, has continued to follow pre-existing New York law that a

(Continued...)

C.  In any event, even if the judge should have pronounced the PRS term at the sentencing hearing and in defendant's presence, the proper remedy would be a remand for resentencing, at which the PRS term would be orally pronounced.

As discussed, the judge had no obligation to "pronounce" the mandatory PRS term at the sentencing hearing and in defendant's presence.  But even if the court had a statutory or constitutional obligation to do so, the proper remedy is not, as defendant argues, to expunge the PRS term.  That would create an unlawful sentence, which cannot stand.  Instead, the appropriate remedy would be a remand for a new sentencing hearing, at which the PRS term would be orally pronounced.

The remedy for a violation of the defendant's right to pronouncement of sentence has always been a remand to the trial court for resentencing.  See People v.

_____

(...Continued)

mandatory PRS term automatically becomes part of a determinate sentence.  See Sparber, 34 A.D.3d at 265.  The First Department has held further that, if the sentencing court enters the PRS term on the written record (for example, on the commitment sheet), it merely "performs the ministerial function of setting forth a provision already included in the sentence by operation of law."  Sparber, 34 A.D.3d at 266; but cf. People v. Williams, 44 A.D.3d 335, 335 (1st Dept. 2007) (remanding for resentencing where length of PRS term was not mandatory and court did not announce the length of the PRS term at the sentencing hearing).  The Second Department, in contrast, has apparently acquiesced to Earley.  See People v. Smith, 37 A.D.3d 499 (2d Dept. 2007).

Prior to Earley, it was undisputed that the sentencing court's failure to mention PRS did not entitle the defendant to have the term expunged.  See People ex rel. Johnson v. Warden, 16 A.D.3d 183 (1st Dept. 2005) (aff'g 4 Misc. 3d 535 [Sup. Ct., Bronx Co. 2004]) (upholding denial of state writ of habeas corpus, where PRS term had not been expressly imposed by the judge); People v. Boyce, 12 A.D.3d 728, 729 (3d Dept. 2004) (a defendant is not entitled to reduction or elimination of PRS term based on sentencing court's failure to mention it; rather, the defendant's "only remedy" is "the opportunity to withdraw his plea"); People v. Bell, 305 A.D.2d 694 (2d Dept. 2003) (where defendant did not wish to set aside his guilty plea, he was not entitled to have his PRS term expunged based on trial court's failure to inform him of it); People v. Cass, 301 A.D.2d 681, 681 (3d Dept. 2003) (same).

Sturgis, 69 N.Y.2d 816, 817-18 (1987) (remitting case to trial court for resentencing where sentencing judge failed to specify the sentence on each count, in violation of CPL 380.20); People v. Adkins, 236 A.D.2d 850, 851 (4th Dept. 1997) (same); People v. Sandoval, 151 A.D.2d 620, 621 (2d Dept. 1989) (same). Similarly, resentencing is the appropriate remedy for a violation of the defendant's right to be present at the sentencing hearing. See People v. Stroman, 36 N.Y.2d 939, 940-41 (1975) (remitting for resentencing where defendant was improperly sentenced in absentia); People v. Wiggins, 17 A.D.3d 196 (1st Dept. 2005) (remanding for new sentencing hearing where court altered defendant's sentence without him present). The same remedy applies for a violation of the defendant's right to address the court at sentencing. See People v. McClain, 35 N.Y.2d 483, 490 (1974) (a defendant's "sole remedy" for the violation of his right to allocution "is to be remanded for resentencing"); People v. Diaz, 212 A.D.2d 412, 413 (1st Dept. 1995) (remanding for new sentencing hearing where defendant was denied his statutory right to address the court at sentencing).

Likewise, in People v. Fuller, supra, 57 N.Y.2d 152, this Court ordered a new sentencing hearing where the sentencing court failed to exercise its judicial function, by permitting the probation department to set the conditions of the defendant's restitution. See id. at 154-55, 158-60. Applying that same logic to the present case, if announcing the PRS term on the record was part of the judicial function, the case should be remanded so that the trial judge can make the required pronouncement.

Defendant is thus wrong to suggest that the trial court gets one chance only to "pronounce" sentence. The court's failure to pronounce a portion of the sentence, or to do so in the defendant's presence, does not reduce the sentence to a "nullity" (see Defendant's Brief at 30). Put another way, defendant cannot obtain relief from his mandatory PRS term because the sentencing judge failed to say a few magic words. At most, the case should be remanded for the sentencing court to make the required pronouncement. Notably, the First Department has endorsed that precise remedy when a sentencing court had discretion to set the length of a PRS term but failed to exercise that discretion. See People v. Williams, supra, 44 A.D.3d at 335.

Further, because the PRS term is mandatory, nullification of the term would render defendant's sentence illegal. This Court historically has refused to countenance illegal sentences. As discussed in Part A, supra, the court has inherent authority to correct an illegal sentence at any time. See DeValle, supra, 94 N.Y.2d at 871 ("the trial court had inherent power to correct the illegal sentence it initially imposed"); Williams, supra, 87 N.Y.2d at 1015 (same). In fact, an illegal sentence cannot stand even if the prosecutor acquiesces to it. See David, supra, 65 N.Y.2d at 810-11 (invalidating illegal sentence even though prosecutor failed to object).

Defendant argues that it is too late to correct his sentence, because the People did not "move for correction within the requisite one-year period" after it was imposed (Defendant's Brief at 32). Defendant apparently refers to CPL 440.40, which provides that the People may move the trial court to correct an "invalid" sentence

"[a]t any time not more than one year after the entry of judgment." CPL 440.40(1). However, the present case involves a direct appeal brought by defendant, not a post-judgment motion by the People. The one-year limitation period of section 440.40(1) thus does not apply.

Even apart from that, as this Court explained in People v. Wright, 56 N.Y.2d 613, 615 (1982), CPL 440.40 does not "affect the court's inherent power to correct an invalid sentence." Instead, the "one-year limitation in CPL 440.40 is designed to restrict the People's ability to move to set aside an illegal sentence." Id. This Court stressed that section 440.40(1) "should not be read to place a similar restriction on the court's inherent ability to correct its own errors." Id.; see also Preiser, Practice Commentaries to CPL 440.40, McKinney's Cons. Laws of N.Y., Book 11A, p. 146 ("The one year restriction in subdivision one is a bar solely to a motion by the People. It does not limit the inherent power of the court to correct its own errors"). Nor can it restrict this Court's ability to apply the appropriate remedy to an error identified by defendant on direct appeal.[17]

---

[17] Also, CPL 430.10 does not bar correction of defendant's sentence. That section provides that, if a defendant's sentence is "in accordance with law," it may not be altered after it has commenced, except if the alteration is "specifically authorized by law." CPL 430.10 does not bar correction of an illegal sentence, because a defendant who receives an illegal sentence has not been sentenced "in accordance with law." See People v. Minaya, 54 N.Y.2d 360, 364 (1981) (CPL 430.10 applies only to sentences that are "not defective" and "does not alter the power of a court to correct errors or mistakes concerning sentences").

It is important to reiterate that defendant misstates the nature of his claim. The debate here does not concern what defendant's sentence actually "is": as discussed, a 5-year PRS term automatically became part of defendant's sentence by operation of law. The error, if any, was procedural: the sentencing court failed to say aloud what Penal Law § 70.45 mandated. Nothing in CPL 440.40 limits this Court's authority to remand for a procedural fix. In addition, double jeopardy principles would not preclude a remand for pronouncement of the PRS term. See Bozza, supra, 330 U.S. at 166-67 (rejecting double jeopardy claim where court initially neglected to impose mandatory fine and later recalled defendant to the courtroom to impose the required fine). As the Supreme Court explained, a defendant should not be able to "escape punishment" because the lower court had "committed an error in passing [on] the sentence." Id. at 166. That is particularly true here, where on remand, the lower court would simply articulate a component of the sentence that already existed as a necessary adjunct to defendant's determinate prison term.[18]

---

[18] Nor would this Court grant affirmative relief to a non-appealing party by ordering a remand. The People are not seeking relief; it is defendant who seeks relief from the failure orally to articulate his mandatory, 5-year PRS term. In that regard, the trial court imposed the PRS term on the commitment order, and the Appellate Division affirmed that sentence, expressly holding that defendant's sentence includes a PRS term. See Sparber, 34 A.D.3d at 265-66. Defendant asks this Court to invalidate the Appellate Division's order. In response to defendant's claim for relief, this Court has authority to order a remand for resentencing, should it determine that there was error below. Indeed, that is the proper remedy to accord a defendant for the failure to pronounce sentence. See Sturgis, 69 N.Y.2d at 817-18; Fuller, 57 N.Y.2d at 158-60; Stroman, 36 N.Y.2d at 940-41.

In Earley, the Second Circuit declared that its ruling was "not intended to preclude the state from moving in the New York courts to modify [the defendant's] sentence to include the mandatory PRS term." Earley, 451 F.3d at 77. Hence, a remand for "pronouncement" of the PRS term would satisfy the Second Circuit's concerns. To be sure, the Second Circuit speculated that CPL 440.40(1) might preclude the New York courts from correcting the defendant's sentence. See id. at 77 n. 2. As discussed, however, CPL 440.40(1) does not restrict the court's inherent power to correct an illegal sentence, or the powers of the appellate courts.

Finally, if this Court orders a remand, it should not disturb defendant's 15-year prison sentence. As discussed, the 15-year term was a condition of the plea bargain, and it cannot be shortened without the People's consent. See Farrar, 52 N.Y.2d at 307. Because the People do not consent to a modification of the prison sentence, defendant has no right to "advocate for a shorter prison term" (Defendant's Brief at 32 n. 6). Defendant does not seek vacatur of his plea, which was the only available remedy for the trial court's failure to inform him of the mandatory PRS term. Thus, the sole purpose of a remand would be for the court to pronounce the mandatory PRS term.

<p style="text-align:center">*     *     *</p>

In sum, the mandatory 5-year PRS term automatically became part of defendant's determinate sentence by operation of New York law. Contrary to defendant's claim, neither state law nor the federal constitution required oral

pronouncement of the PRS term. Further, the PRS term was validly entered on the court records, in the commitment order. Therefore, defendant's PRS term was properly imposed. In any event, if there were any statutory or constitutional error in the imposition of the PRS period, the case should be remanded for the sentencing court orally to "pronounce" the mandatory PRS term.

## CONCLUSION

The order of the Appellate Division should be affirmed. Alternatively, the case should be remanded to the sentencing court for oral pronouncement of the mandatory PRS term.

Respectfully submitted,

ROBERT M. MORGENTHAU
District Attorney
New York County

BY: _____

DAVID M. COHN
Assistant District Attorney
Of Counsel

MARK DWYER
DAVID M. COHN
            Assistant District Attorneys
                    Of Counsel

December 27, 2007

<u>PRINTING SPECIFICATIONS STATEMENT</u>

The word count for this brief is 11414, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word 2003. The brief is printed in Garamond, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 13 points in the footnotes.

Case 1:12-cv-02123-RWS Document 75, 17/06/2023 05729/22, Page 206 of 126 PageID #: 2430

```
HAZNC   540*23 *              SENTENCE MONITORING           *    11-18-2021
PAGE 001        *              COMPUTATION DATA              *    12:14:47
                               AS OF 01-11-2013
```

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


```
FBI NO...........: 594832MB2            DATE OF BIRTH: 06-21-1982  AGE:  39
ARS1.............: DEV/FT REL
UNIT.............:                      QUARTERS.....:
DETAINERS........: YES                  NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 12-17-2012

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE: 01-11-2013 VIA FT REL


```
                    RELEASE AUDIT COMPLETED ON 06-05-2012 BY DSCC
-----------------------------PRIOR JUDGMENT/WARRANT NO: 040 -----------------------
COURT OF JURISDICTION...........: VIRGINIA, EASTERN DISTRICT
DOCKET NUMBER...................: 1:01CR251
JUDGE...........................: ELLIS
DATE SENTENCED/PROBATION IMPOSED: 11-16-2001
DATE SUPERVISION REVOKED........: 05-17-2012
TYPE OF SUPERVISION REVOKED.....: REG
DATE COMMITTED..................: 06-21-2012
HOW COMMITTED...................: COMMIT OF SUPERVISED REL VIOL
PROBATION IMPOSED...............: NO
```

```
                  FELONY ASSESS  MISDMNR ASSESS  FINES          COSTS
NON-COMMITTED.:  $100.00        $00.00          $00.00         $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

```
-----------------------------PRIOR OBLIGATION NO: 010 -----------------------
OFFENSE CODE....:  409    21:841 & 846 SEC 841-851
OFF/CHG: COUNT 2: POSSESSION WITH THE INTENT TO DISTRIBUTE "CRACK"
         COCAINE / 21 USC 841(A)(1)-- SRT VIOLATOR
```

```
SENTENCE PROCEDURE..............: SUPERVISED RELEASE VIOLATION PLRA
SENTENCE IMPOSED/TIME TO SERVE.:   9 MONTHS
CLASS OF OFFENSE................: CLASS C FELONY
DATE OF OFFENSE................: 05-03-2001
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

**JA447**

```
   HAZNC   540*23 *          SENTENCE MONITORING        *    11-18-2021
 PAGE 002         *          COMPUTATION DATA           *    12:14:47
                               AS OF 01-11-2013
```

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


-------------------------PRIOR COMPUTATION NO: 040 -----------------------

COMPUTATION 040 WAS LAST UPDATED ON 06-01-2012 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 06-05-2012 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 040:   040 010

DATE COMPUTATION BEGAN.........: 05-17-2012
TOTAL TERM IN EFFECT...........:     9 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:     9 MONTHS
EARLIEST DATE OF OFFENSE........: 05-03-2001

JAIL CREDIT....................:     FROM DATE      THRU DATE
                                   04-12-2012     05-16-2012

TOTAL PRIOR CREDIT TIME.........: 35
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: 01-12-2013
ELDERLY OFFENDER TWO THIRDS DATE: 10-13-2012
EXPIRATION FULL TERM DATE.......: 01-12-2013
TIME SERVED....................:     9 MONTHS
PERCENTAGE OF FULL TERM SERVED..: 99.6
PERCENT OF STATUTORY TERM SERVED: 99.6

ACTUAL SATISFACTION DATE........: 01-11-2013
ACTUAL SATISFACTION METHOD......: FT REL
ACTUAL SATISFACTION FACILITY....: DEV
ACTUAL SATISFACTION KEYED BY....: LAA

DAYS REMAINING..................: 0
FINAL PUBLIC LAW DAYS...........: 1


G0002       MORE PAGES TO FOLLOW . . .

[2]

Case 1:12-cv-02137-RWS Document 75, 1776/2013 08/29/22, Page 208 of 265 PageID #: 2432

REGNO..: 45026-083 NAME: SANTIAGO, JESUS

--------------------------------- PRIOR DETAINERS: ---------------------------

DETAINER NO..: 005
DATE LODGED..: 06-22-2012
JURISDICTION.: STATE OF VIRGINIA
AUTHORITY....: PD FAIFAX COUNTY/WARRANT DESK
CHARGES......: PROBATION VIOLATION ON AN ORIGINAL CHARGE OF POSSESSION OF MAR
               IJUANA WITH INTENT TO DISTRIBUTE

DATE RELEASED: 01-11-2013

DETAINER NO..: 006
DATE LODGED..: 11-14-2012
JURISDICTION.: STATE OF VIRGINIA
AUTHORITY....: JENNIFER GRAVES, WARRANTS SECTION 703 777-0627
CHARGES......: FELONY WARRANT THREAT TO BOMB, SIX MISD WARRANTS FOR DOMESTIC
               ASSAULT, PHONE THREATS 2 CTS, STALKING 2 CTS, AND TRESPASSING

G0002      MORE PAGES TO FOLLOW . . .

**JA449**

```
HAZNC  540*23 *          SENTENCE MONITORING           *    11-18-2021
PAGE 004       *          COMPUTATION DATA              *    12:14:47
                            AS OF 09-09-2010
```

REGNO..: 45026-083 NAME: SANTIAGO, JESUS

```
FBI NO..........: 594832MB2
ARS1............: DEV/FT REL         DATE OF BIRTH: 06-21-1982  AGE:  39
UNIT............:
DETAINERS.......: YES                QUARTERS....:
                                     NOTIFICATIONS: NO
```

HOME DETENTION ELIGIBILITY DATE: 08-20-2010

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE:  09-09-2010 VIA FT REL

REMARKS........: RELEASE AUDIT COMPLETED ON 02-19-2010 BY DSCC
-----------------------PRIOR JUDGMENT/WARRANT NO: 030 -----------------------
COURT OF JURISDICTION..........: VIRGINIA, EASTERN DISTRICT
DOCKET NUMBER..................: 1:01CR00251-001
JUDGE..........................: ELLIS
DATE SENTENCED/PROBATION IMPOSED: 11-16-2001
DATE SUPERVISION REVOKED.......: 06-06-2008
TYPE OF SUPERVISION REVOKED....: REG
DATE COMMITTED.................: 03-23-2010
HOW COMMITTED..................: COMMIT OF SUPERVISED REL VIOL
PROBATION IMPOSED..............: NO

```
                  FELONY ASSESS MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00       $00.00          $00.00       $00.00
```

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO    AMOUNT: $00.00

-----------------------PRIOR OBLIGATION NO: 010 -----------------------
OFFENSE CODE....:  381    21:841 SCH II NARCOTIC
OFF/CHG: COUNT 2: POSSESSION WITH THE INTENT TO DISTRIBUTE "CRACK"
         COCAINE / 21 USC 841(A)(1)-- SRT VIOLATOR

SENTENCE PROCEDURE............: SUPERVISED RELEASE VIOLATION PLRA
SENTENCE IMPOSED/TIME TO SERVE:   7 MONTHS
TERM OF SUPERVISION...........:   2 YEARS
CLASS OF OFFENSE..............: CLASS C FELONY
DATE OF OFFENSE...............: 05-03-2001

G0002     MORE PAGES TO FOLLOW . . .

**JA450**

[4]

Case 1:12-cv-02137-KAM-SD Document 71-17 76/2023 857297/22, Page 250 of 265 PageID #: 2434

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


------------------------PRIOR COMPUTATION NO: 030 -------------------------

COMPUTATION 030 WAS LAST UPDATED ON 02-19-2010 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 02-19-2010 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 030:   030 010

DATE COMPUTATION BEGAN..........: 02-11-2010
TOTAL TERM IN EFFECT............:      7 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:      7 MONTHS
EARLIEST DATE OF OFFENSE........: 05-03-2001

JAIL CREDIT.....................:     FROM DATE        THRU DATE
                                     04-22-2008       04-22-2008

TOTAL PRIOR CREDIT TIME.........: 1
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: 09-09-2010
ELDERLY OFFENDER TWO THIRDS DATE: 07-01-2010
EXPIRATION FULL TERM DATE.......: 09-09-2010
TIME SERVED.....................:      7 MONTHS
PERCENTAGE OF FULL TERM SERVED..: 100.0
PERCENT OF STATUTORY TERM SERVED: 100.0

ACTUAL SATISFACTION DATE........: 09-09-2010
ACTUAL SATISFACTION METHOD......: FT REL
ACTUAL SATISFACTION FACILITY....: HAZ
ACTUAL SATISFACTION KEYED BY....: MHB

DAYS REMAINING..................: 0
FINAL PUBLIC LAW DAYS...........: 0

REMARKS.......: EOS 02-11-2010,THEREFORE, DCB IS 02-11-2010.




G0002      MORE PAGES TO FOLLOW . . .

5

Case 1:12-cv-02123-RA-SDA Document 75, 1776/2020 857290/22, Page 61 of 126 PageID #: 2435

```
   HAZNC  540*23 *          SENTENCE MONITORING        *    11-18-2021
PAGE 006        *          COMPUTATION DATA           *    12:14:47
                            AS OF 09-09-2010

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


-------------------------------- PRIOR DETAINERS: ----------------------------

DETAINER NO..: 004
DATE LODGED..: 08-25-2010
JURISDICTION.: STATE OF NEW YORK
AUTHORITY....: NY DIV OF PAROLE
CHARGES......: VIOLATION OF PAROLE WARRANT #577832
DATE RELEASED: 09-09-2010
```

```
G0002       MORE PAGES TO FOLLOW . . .
```

JA452

[6]

```
   HAZNC   540*23 *           SENTENCE MONITORING        *   11-18-2021
PAGE 007       *           COMPUTATION DATA          *   12:14:47
                           AS OF 06-04-2007

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


FBI NO..........: 594832MB2          DATE OF BIRTH: 06-21-1982  AGE:  39
ARS1............: DEV/FT REL
UNIT............:                     QUARTERS.....:
DETAINERS.......: YES                 NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 05-12-2007


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE:  06-04-2007 VIA FT REL

-------------------------PRIOR JUDGMENT/WARRANT NO: 020 -----------------
COURT OF JURISDICTION..........: VIRGINIA, EASTERN DISTRICT
DOCKET NUMBER..................: 1:01CR00251-001
JUDGE..........................: ELLIS
DATE SENTENCED/PROBATION IMPOSED: 11-16-2001
DATE SUPERVISION REVOKED.......: 11-09-2006
TYPE OF SUPERVISION REVOKED....: REG
DATE COMMITTED.................: 01-23-2007
HOW COMMITTED..................: COMMIT OF SUPERVISED REL VIOL
PROBATION IMPOSED..............: NO


              FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00      $00.00          $00.00       $00.00

RESTITUTION...: PROPERTY: NO  SERVICES: NO       AMOUNT: $00.00

-------------------------PRIOR OBLIGATION NO: 010 -----------------------
OFFENSE CODE....: 381    21:841 SCH II NARCOTIC
OFF/CHG: COUNT 2: POSSESSION WITH THE INTENT TO DISTRIBUTE "CRACK"
         COCAINE / 21 USC 841(A)(1)-- SRT VIOLATOR

SENTENCE PROCEDURE.............: SUPERVISED RELEASE VIOLATION PLRA
SENTENCE IMPOSED/TIME TO SERVE.:    8 MONTHS
TERM OF SUPERVISION............:   30 MONTHS
CLASS OF OFFENSE...............: CLASS C FELONY
DATE OF OFFENSE................: 05-03-2001




G0002       MORE PAGES TO FOLLOW . . .
```

[7]

**JA453**

Case 1:12-cv-02137-KAM-SMG Document 75, 11/06/2023 07:27:02, Page 213 of 265 PageID #: 2437

```
   HAZNC   540*23 *            SENTENCE MONITORING          *    11-18-2021
PAGE 008          *            COMPUTATION DATA             *    12:14:47
                               AS OF 06-04-2007
```

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


------------------------PRIOR COMPUTATION NO: 020 ------------------------

COMPUTATION 020 WAS LAST UPDATED ON 01-03-2007 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 01-04-2007 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 020:   020 010

DATE COMPUTATION BEGAN..........: 11-09-2006
TOTAL TERM IN EFFECT............:    8 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:    8 MONTHS
EARLIEST DATE OF OFFENSE........: 05-03-2001

JAIL CREDIT.....................:      FROM DATE    THRU DATE
                                       10-30-2005   11-17-2005
                                       10-25-2006   11-08-2006

TOTAL PRIOR CREDIT TIME.........: 34
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 0
TOTAL GCT EARNED................: 0
STATUTORY RELEASE DATE PROJECTED: 06-04-2007
ELDERLY OFFENDER TWO THIRDS DATE: 03-16-2007
EXPIRATION FULL TERM DATE.......: 06-04-2007
TIME SERVED.....................:      7 MONTHS    30 DAYS
PERCENTAGE OF FULL TERM SERVED..: 100.0
PERCENT OF STATUTORY TERM SERVED: 100.0

ACTUAL SATISFACTION DATE........: 06-04-2007
ACTUAL SATISFACTION METHOD......: FT REL
ACTUAL SATISFACTION FACILITY....: HAZ
ACTUAL SATISFACTION KEYED BY....: TEM

DAYS REMAINING..................: 0
FINAL PUBLIC LAW DAYS...........: 0

                   FINAL AUDIT COMPLETED BY DSCC ON 01-04-2007



G0002       MORE PAGES TO FOLLOW . . .

[8]

**JA454**

Case 1:12-cv-02137-RWM-SD Document 75, 1776/2020 037239/22, Page 94 of 126 PageID #: 2438

```
REGNO..: 45026-083 NAME: SANTIAGO, JESUS


--------------------------------- PRIOR DETAINERS: ---------------------------------

DETAINER NO..: 002
DATE LODGED..: 02-02-2007
JURISDICTION.: STATE OF NEW YORK
AUTHORITY....: STATE OF NEW YORK - DIVISION OF PAROLE
CHARGES......: PAROLE VIOLATION
DATE RELEASED: 06-04-2007


DETAINER NO..: 003
DATE LODGED..: 05-10-2007
JURISDICTION.: STATE OF VIRGINIA
AUTHORITY....: FAIRFAX COUNTY POLICE DEPARTMENT
CHARGES......: FTA - SELL/DIST. MARIJUANA; POSS W/ INTENT TO SELL;
               POINTING/BRANDISHING FIREARM
```

```
G0002      MORE PAGES TO FOLLOW . . .
```

JA455

[9]

```
   HAZNC   540*23 *           SENTENCE MONITORING          *     11-18-2021
   PAGE 010        *          COMPUTATION DATA             *     12:14:47
                              AS OF 04-12-2004

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


FBI NO..........: 594832MB2           DATE OF BIRTH: 06-21-1982  AGE:  39
ARS1............: DEV/FT REL
UNIT............:                      QUARTERS.....:
DETAINERS.......: YES                  NOTIFICATIONS: NO

HOME DETENTION ELIGIBILITY DATE: 01-01-2004


THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S PRIOR COMMITMENT.
THE INMATE WAS SCHEDULED FOR RELEASE:  04-12-2004 VIA GCT REL

---------------------PRIOR JUDGMENT/WARRANT NO: 010 -----------------
COURT OF JURISDICTION..........: VIRGINIA, EASTERN DISTRICT
DOCKET NUMBER..................: 1:01CR00251-001
JUDGE..........................: ELLIS
DATE SENTENCED/PROBATION IMPOSED: 11-16-2001
DATE COMMITTED.................: 01-08-2002
HOW COMMITTED..................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED..............: NO


               FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00       $00.00          $00.00       $00.00

RESTITUTION...: PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

---------------------PRIOR OBLIGATION NO: 010 -----------------------
OFFENSE CODE...:  381     21:841 SCH II NARCOTIC
OFF/CHG: COUNT 2: POSSESSION WITH THE INTENT TO DISTRIBUTE "CRACK"
         COCAINE / 21 USC 841(A)(1)

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:   37 MONTHS
 TERM OF SUPERVISION............:    4 YEARS
 CLASS OF OFFENSE...............: CLASS C FELONY
 DATE OF OFFENSE................: 05-03-2001
```

G0002      MORE PAGES TO FOLLOW . . .

**JA456**

[10]

```
HAZNC  540*23 *            SENTENCE MONITORING            *    11-18-2021
PAGE 011          *          COMPUTATION DATA             *    12:14:47
                             AS OF 04-12-2004

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


-------------------------PRIOR COMPUTATION NO: 010 -------------------------

COMPUTATION 010 WAS LAST UPDATED ON 01-29-2004 AT ALP AUTOMATICALLY

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
PRIOR COMPUTATION 010:   010 010

DATE COMPUTATION BEGAN..........: 11-16-2001
TOTAL TERM IN EFFECT............:   37 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:    3 YEARS        1 MONTHS
EARLIEST DATE OF OFFENSE........: 05-03-2001

JAIL CREDIT.....................:    FROM DATE      THRU DATE
                                     06-12-2001     11-15-2001

TOTAL PRIOR CREDIT TIME.........: 157
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 90
TOTAL GCT EARNED................: 90
STATUTORY RELEASE DATE PROJECTED: 04-12-2004
ELDERLY OFFENDER TWO THIRDS DATE: 07-02-2003
EXPIRATION FULL TERM DATE.......: 07-11-2004
TIME SERVED.....................:    2 YEARS      10 MONTHS      1 DAYS
PERCENTAGE OF FULL TERM SERVED..: 92.0
PERCENT OF STATUTORY TERM SERVED: 100.0

ACTUAL SATISFACTION DATE........: 04-12-2004
ACTUAL SATISFACTION METHOD......: GCT REL
ACTUAL SATISFACTION FACILITY....: ALP
ACTUAL SATISFACTION KEYED BY....: MAH

DAYS REMAINING..................: 90
FINAL PUBLIC LAW DAYS...........: 0




G0002       MORE PAGES TO FOLLOW . . .
```

[1]

```
   HAZNC  540*23 *            SENTENCE MONITORING        *   11-18-2021
   PAGE 012 OF 012 *          COMPUTATION DATA           *   12:14:47
                              AS OF 04-12-2004

REGNO..: 45026-083 NAME: SANTIAGO, JESUS


-------------------------------- PRIOR DETAINERS: -----------------------------
DETAINER NO..: 001
DATE LODGED..: 07-22-2002
JURISDICTION.: STATE OF NEW YORK
AUTHORITY....: N.Y. DEPT. OF CORRECTIONS
CHARGES......: CRIMINAL POSSESSION OF A WEAPON 2ND DEGREE
               INDICTMENT # 1141-00 / CC TO FEDERAL SENTENCE
SENTENCE.....: 3 YEARS 6 MONTHS
DATE RELEASED: 04-12-2004




S0039       ALL CURRENT COMPS ARE SATISFIED
```

[12.]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**JESUS SANTIAGO,**

                Plaintiff,

    -against-                         Index No. 12-CV-02137 (KAM) (ST)

**BRIAN FISCHER, individually and as**
**Commissioner of the New York State**
**Department of Corrections and Community**
**Supervision, et. al.,**

                Defendants.

---

### REVISED JOINT PRE-TRIAL ORDER

    **1.**      Caption: The full caption of the action.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**JESUS SANTIAGO,**

                Plaintiff,

    -against-                         Index No. 12-CV-02137 (KAM) (ST)

**BRIAN FISCHER, individually and as**
**Commissioner of the New York State**
**Department of Corrections and Community**
**Supervision, ANTHONY J. ANNUCCI,**
**individually and as Deputy Commissioner of**
**and Counsel to DOCS, TERRENCE X.**
**TRACY, individually and as Chief Counsel to**
**DOP,**

                Defendants.

---

**JA459**

**2.**     Parties and Counsel: The names, addresses (including firm names), telephone, and fax numbers of trial counsel.

**Plaintiff: Jesus Santiago**, who can be contacted through his counsel, Rob Rickner, Rickner PLLC, 14 Wall Street, Suite 1603, New York, New York 10005, Tel: 212-300-6506, Fax: 888-390-5401.

**Defendants:** Brian Fischer, Anthony Annucci, and Terrence Tracy, who can be contacted through their counsel, Michael J. Keane, Office of the Attorney General of the State of New York, 28 Liberty Street, 18th Floor, New York, New York 10005, Tel: 212-416-8550, Fax: 212-416-5671

**3.**     Jurisdiction: A brief statement by plaintiff as to the basis of subject matter jurisdiction and a brief statement by each party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.

There is federal question jurisdiction as the claims arise under 42 U.S.C. § 1983.

**4.**     Claims and Defenses: A brief summary by each party of the claims and defenses that the party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.

**Plaintiff:** There are no claims or defenses, as such, as the only issue at trial is damages.

**Defendants:** Defendants claim that the issues remaining for trial include whether Plaintiff is entitled to damages for failing to take reasonable steps to attempt to have Plaintiff resentenced to or to attempt to relieve him of post-release supervision ("PRS") in the period between June 12, 2007, and February 6, 2008.  This Court, in its decision dated September 23, 2019, found

Defendants liable for failing to make these attempts. In its decision dated September 23, 2019, the Court held that damages could not be decided as a matter of law and that issues of fact existed for trial as to whether Plaintiff was entitled to more than nominal damages of $1.00 or to punitive damages.

Trial includes determining issues as to whether "the actions of others might inform any assessment of causation for specific injuries claimed by" Plaintiff, including whether "the district attorneys and judges [who] ultimately rejected compliance [with <u>Earley</u>]," would have prevented prompt resentencing. *Betances v. Fischer*, 837 F.3d 162, 174 (2d Cir. 2016).

Defendants contend that the issues for trial are whether Defendants, for not promptly referring Plaintiff for a resentencing hearing, caused Plaintiff any damages, and if so, what damages, and in what amount, if any.

First, Plaintiff is not entitled to any damages, as Defendants were not the proximate cause of Plaintiff's claimed damages, as other government actors in state and federal criminal justice systems, including in the State of New York, the State of Virginia, and the United States District Court for the Eastern District of Virginia, caused Plaintiff's continuing incarceration and supervision.

Second, and alternatively, Defendants' defenses include (1) that Plaintiff is limited to nominal damages, because, if had he received the process he was due (a prompt resentencing), he would have served the same PRS term; (2) that Plaintiff cannot meet his burden to prove that Defendants caused him any compensatory damages, as any such damages were caused by other government actors, including district attorneys and courts, by resisting resentencings; and (3) that Plaintiff is not entitled to punitive damages, as the record does not support any claim for punitive damages.

3

**JA461**

Further, Defendants' defenses include that Plaintiff failed to mitigate any damages he claims, and that he is not entitled to damages as he was a fugitive from justice, and that he is estopped from his claims for damages by the doctrines of collateral estoppel and/or res judicata.

Defendants were denied a grant of qualified immunity, although Defendants reserve the right to renew their claim for qualified immunity if appropriate.

Defendants no longer assert defenses that certain of Plaintiffs' claims for damages are barred by the statute of limitations.

Plaintiffs' claims against other Defendants, including George Alexander, Robert Dennison, Anthony Ellis, Andrea Evans, Glenn Goord, Lucien LeClaire, Kevin Ludlow, Mark Mantei, Sally Thompson, Richard Corrado, Jean Zunno, Lisa Elovich, Martin Arroyo, William McCartney, Arvella McKinney, Meryl Fleischman, Claudio Paredes, Darryl Stevenson, J. Mason, Cynthia Johnson, Peter Alvarez, and Kimberly Council were dismissed for lack of personal involvement by this Court in its September 30, 2017 Memorandum and Order. 5.

**5.** Damages and Relief: A brief statement of the categories, method of calculation, and amounts of damages claimed or other relief sought, and the opposing party's position.

**Plaintiff:** Plaintiff seeks compensatory damages for the pain and suffering endured during his wrongful incarceration, damages for his loss of liberty,[1] and punitive damages. These damages are not amenable to a specific mathematical calculation.

**Defendants:** Defendants contend that Plaintiff is not entitled to any damages, as Defendants were not the proximate cause of Plaintiff's claimed damages, and that, in any event, Plaintiff is limited to nominal damages, because, if had he received the process he was due (a

---

[1] Plaintiff contends that damages for loss of liberty are separate from compensatory damages for pain and suffering. *See Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004).

**JA462**

prompt resentencing), he would have served the same PRS term.[2]  Further, Plaintiff has no

damages because his federal and State of Virginia sentences were concurrent to his State of New

York sentence, and his life would not have changed even if he had not served PRS during the

relevant time.  Defendants further contend that the record does not support any claim for punitive

damages.

**6.**     Jury or Bench Trial: A statement by each party as to whether the case is to be

tried with or without a jury, proposed number of jurors, and the number of trial days needed.

**Plaintiff:** This case should be tried before a jury, 8 jurors total. All jurors should

deliberate, with 6 jurors being sufficient for a verdict. At most, two days of trial will be needed.

**Defendants:** This case should be tried before a jury, 8 jurors, including 2 alternates, all of

whom will deliberate.  Defendants do not consent to a less than unanimous verdict.  Trial will

last 4 days.

**7.**     Consent to Magistrate Judge: A statement as to whether all parties have consented

to trial of the case by a Magistrate Judge. The statement shall not identify which parties have or

have not consented.

The parties have not agreed to trial before a magistrate.

**8.**     Stipulations: Any stipulations or statements of fact or law which have been agreed

to by all parties.

**Plaintiff:** No stipulations have been agreed upon, but judgment has been entered as to

liability against all Defendants, which needs to be reflected in the jury instructions before trial.

**Defendants:** No stipulations have been agreed upon, but Defendants contend that

---

[2] Defendants contend that footnote 1 misapplies *Kerman* and that Plaintiff is not entitled to "loss of liberty" damages
for the time spent on PRS, as his right "sounds in procedural due process." *Sudler v. City of New York*, 689 F.3d 159,
170 (2d Cir. 2012).  See also *Warren v. Pataki*, 823 F.3d 125, 143 (2d Cir. 2016); *Farrar v. Hobby*, 506 U.S. 103,
112 (1992) (citing *Carey v. Piphus*, 435 U.S. 247 (1978)).

**JA463**

numerous stipulations of undisputed law and facts should be adopted, including, but not limited to, stipulations with respect to the concurrent supervision of Plaintiff by federal and State of Virginia and State of New York authorities, and specifically the fact that Plaintiff's federal supervision for a 2001 conviction and sentence in the Eastern District of Virginia, and that his State of Virginia supervision for a 2005 conviction and sentence in Fairfax County were concurrent to his New York State PRS.[3]

9. **Witnesses:** A schedule by each party designating names and addresses of fact and expert witnesses whose testimony is to be offered in its case in chief, and possible witnesses whose testimony may be offered only for impeachment or rebuttal purposes, together with a brief narrative statement of the expected testimony of each listed witness. Only listed witnesses will be permitted to testify except when prompt notice has been given and a lack of prejudice and good cause are shown.[4]

**Plaintiff:** Plaintiff will call Plaintiff Jesus Santiago as a witness as to his damages.

**Defendants:** Defendants will call the following witnesses, who can be communicated with through counsel for Defendants:

**Defendants themselves:**

Anthony Annucci – will testify as to the DOCS response to PRS and Plaintiff's case

Brian Fischer – will testify as to the DOCS response to PRS and Plaintiff's case

Terrence Tracy – will testify as to the Parole response to PRS and Plaintiff's case and his referral for resentencing

---

[3] The factual and legal impact of the out-of-state sentences, in part admitted by Plaintiff in responses to Request for Admission, may require resolution, if not stipulated, through an additional motion *in limine*.

[4] Revisions to this proposed pre-trial order reflect in large part Defendants' paring of their witness list. Plaintiff has not had the opportunity to review this paring, and reserves the right (and has Defendants' consent) to make whatever appropriate revisions, modifications or objections he may find necessary.

**Counsel for DOCS and the New York State Division of Parole:**

Richard de Simone – former counsel to DOCS, will testify as to the DOCS response to PRS and Plaintiff's case, and specifically the computation of Plaintiff's New York sentence and how it affected or was affected by sentences imposed by other jurisdictions

**Parole Officers Who At Relevant Times Supervised Plaintiff[5]:**

Parole Officer Peter Alvarez – will testify as to Plaintiff's experience on PRS, and specifically his 2005 parole violations in New York[6]

**Potential Impeachment Witnesses:**

**Administrative Law Judge Presiding Over Revocation Hearing**

The Hon. Rhonda Tomlinson – will testify as to Plaintiff's 2007 revocation hearing

**United States Probation Officer for the Eastern District of New York**

Federal Probation Officer Frank Khoury will testify as to Plaintiff's experience on federal probation

**Former Counsel to the State Office of Court Administration**

If necessary, the Hon. Paul McDonnell will testify as to the response of the State Court system to PRS

**Assistant United States Attorney for the Eastern District of Virginia**

If necessary, a witness will testify as to the federal sentence and probation of Plaintiff

---

[5] Defendants' witnesses are identified from Plaintiff's parole supervision chronological notes. All competent witnesses are listed because all are subject to availability on any designated trial date.

[6] If Peter Alvarez is unavailable, Defendants will call one (or possibly more, if necessary) of the following: Parole Officer Cynthia Johnson, parole Officer Kimberly Counsel, Parole Officer Claudio Paredes, Senior Parole Officer Meryl Fleischman, Senior Parole Officer Darryl Stevenson, Area Supervisor Arvella McKinney, Area Supervisor Doreen Kostner, or Area Supervisor William McCartney, to testify as to the subject matter indicated.

**JA465**

**Assistant District Attorney for Fairfax County of the Virginia Commonwealth**

If necessary, a witness will testify as to the Plaintiff's 2008 Virginia sentence

**10.** Deposition Testimony: A designation by each party and copies of deposition testimony to be offered in its case in chief, with any cross-designations and objections by any other party.

**Plaintiff:** Plaintiff has no designations, but reserves the right to use deposition testimony for cross-examination, and if a witness is so impeached, may seek to have the relevant deposition portion entered as evidence.

**Defendants:** Defendants have no designations, but reserve the right to use deposition testimony for cross-examination, and may seek to have the relevant deposition portion entered as evidence.

8

**JA466**

**11.** Exhibits: A schedule by each party designating all exhibits to be offered in

evidence and if not admitted by stipulation, the party or parties that will be offering them.

[remainder of Individual Rules section omitted]

| Exhibit # | Exhibit Description | Offering Party | Opposing Parties' Objections |
|---|---|---|---|
| 1 | Sentence and Order of Commitment | Plaintiff | |
| 2 | 12/15/2010 Revocation Order | Plaintiff | |
| 3 | 9/27/2010 § 601-d Notice | Plaintiff | |
| 4 | Parole Revocation Certificate of Disposition | Plaintiff | |
| 5 | 12/15/2010 Resentencing Transcript | Plaintiff | |
| A | Penal Law §§ 70.45, 70.00, 70.02, 70.04, 70.06 (1998) – Jenna's Law | Defendants | |
| B | Docket Sheet Va. E. D. 00-000251 | Defendants | |
| C | 1/27/00 NYPD Arrest Notification | Defendants | |
| D | Kings County Indictment No. 1141/00 | Defendants | |
| E | 5/3/02 Kings County Plea Minutes | Defendants | |
| F | 5/15/02 Kings County Sentencing Minutes | Defendants | |
| G | Sentence and Order of Commitment Received by Ulster Correctional Facility 4/22-04 | Defendants | |
| H | 7/8/04 CR Release Report | Defendants | |
| I | 11/07/2004 Certificate of Release to Parole | Defendants | |
| J | Parole Chronological Notes (computerized) for J. Santiago | Defendants | |
| K | Fairfax County, Virginia, Criminal Information Details for J. Santiago, Code Violations 18.2-248.1 (Felony), 18-248 (Felony), 18.2-282 (Misdemeanor) for Offense Date 10/31/05; 19.2-128 (Felony) for Offense Date 1/9/06; 19.2-128 (Felony), 19.2-128 (Felony) for Offense Date 6/25/08 | Defendants | |
| L | Prince William County, Virginia, Criminal Information Details for J. Santiago, Code Violations 18.2-91 (Felony) for Offense Date 9/24/06,18.2-91 (Misdemeanor) for Offense Date 9/24/06; 19.2-306 (Revocation of Sentence) for Offense Date 4/13/07 | Defendants | |
| M | Richmond County, Virginia, Criminal Information Details for J. Santiago, Code Violations 19.2-306 (Revocation of Sentence) for Offense Date 4/13/07 | Defendants | |

9

**JA467**

| N | Fairfax County Revocation of J. Santiago 8-year Suspended Sentence 12/12/11 by the Hon. R. Terrence Ney | Defendants | |
| O | Virginia DOC Sentence Summary on 2005 Offense and 2008 Fairfax County Sentence | Defendants | |
| P | Virginia DOC Sentence Summary on 2005 Offense and 2008 Fairfax and Loudon County Sentences | Defendants | |
| Q | 12/11/08 Fairfax County Sentencing Order for 2005 Offense | Defendants | |
| R | Fairfax County Police Wanted Fugitives | Defendants | |
| S | Parole Status Inquiry Screenshots for J. Santiago 2007 Parole Violation | Defendants | |
| T | Violation of Parole Papers for 2007 Parole Revocation Proceeding for J. Santiago | Defendants | |
| U | 7/25/07 Certificate of Disposition of Parole Revocation Hearing of 7/9/07 | Defendants | |
| V | 2/04/08 Parole Board Release Decision Notice pursuant to interview of 1/29/08 | Defendants | |
| W | 2/2/08 Certificate of Release to Parole | Defendants | |
| X | 2007 Kings County District Attorney Petition for Supreme Court Review of *Earley v. Murray* | Defendants | |
| Y | 2007-2008 New York County Attorney Briefing to the New York State Court of Appeals in *People v. Sparber* | Defendants | |
| Z | Complaint in *State v. Myers*, filed in Albany County, June 2008 | Defendants | |
| AA | 2008 Amendments to Jenna's Law, including Penal Law § 70.45 and Correction Law § 601-d | Defendants | |
| BB | Memorandum of Understanding dated July 2008 entered into by the Division of Parole, the Department of Correctional Services, and the New York State Office of Court Administration | Defendants | |
| CC | 3/21/08 Notice of Arrest Warrant Issued 3/14/08 by the Division of Parole | Defendants | |
| DD | Violation of Parole Papers for 2010 Parole Revocation Proceeding for J. Santiago | Defendants | |
| EE | Violation of Parole Papers for 2010 Parole Revocation Proceeding for J. Santiago | Defendants | |
| FF | 10/01/10 Parole Revocation Decision Notice | Defendants | |
| GG | 9/27/10 Division of Parole Notice Pursuant to Corr. Law § 601-d | Defendants | |
| HH | 12/15/10 Kings County Post-release | Defendants | |

10

**JA468**

| | | | |
|---|---|---|---|
| | Supervision Resentencing Order | | |
| II | 12/15/10 Minutes of Resentencing Hearing | Defendants | |
| JJ | 7/23/12 Fairfax County Police Department Detainer on J. Santiago | Defendants | |
| KK | 1998 Legal Aid Society Memorandum to LAS attorneys regarding Jenna's Law | Defendants | |

Dated:  New York, New York
         August 31, 2022

RICKNER PLLC
Attorney for Plaintiff

*/s/ Rob Rickner*
Rob Rickner

14 Wall Street, Suite
1603 New York, New
York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
rob@ricknerpllc.com

LETITIA JAMES
Attorney General for the State of New York
Attorney for Defendants

*/s/ Michael J. Keane*
Michael J. Keane
Assistant Attorney General
28 Liberty Street
New York, New York 10005
Phone: (212) 416-8550
michael.keane@ag.ny.gov

11

1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2
     ------------------------------x
 3                                       12-CV-2137(KAM)
     JESUS SANTIAGO,
 4                                       United States Courthouse
              Plaintiff,                 Brooklyn, New York
 5
              -versus-                   October 25, 2022
 6                                       4:00 p.m.
     CUOMO ET AL,
 7
              Defendants.
 8
     ------------------------------x
 9
          TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
10         BEFORE THE HONORABLE KIYO A. MATSUMOTO
               UNITED STATES DISTRICT JUDGE
11
12   APPEARANCES
13
     For the Plaintiff:      RICKNER PLLC
14                           14 Wall Street
                             New York, New York 10005
15                           BY:  ROBERT RICKNER, ESQ.
16
     For the Defendant:      OFFICE OF THE ATTORNEY GENERAL
17                           120 Broadway
                             New York, New York 10271
18                           BY:  MICHAEL KEANE, ESQ.
19
     Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
20                           Phone:  718-613-2268
                             Email:  RivkaTeich@gmail.com
21
     Proceedings recorded by mechanical stenography.  Transcript
22   produced by computer-aided transcription.
23
24
25
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

STATUS CONFERENCE                     2

```
 1        (Telephone conference)
 2        THE COURTROOM DEPUTY:  Status conference,
 3   12-CV-2137.  Vincent Santiago vs. Brian Fisher individually
 4   and as Commissioner of the New York State Department of
 5   Corrections and Community Supervision, Anthony J. Annucci,
 6   individually and as Deputy Commissioner of counsel, Karen S.
 7   Tracy, individually and as Chief Counsel to DOP.
 8        Will counsel on behalf of the plaintiff state your
 9   appearance, please.
10        MR. RICKNER:  Rob Rickner, Rickner PLLC.
11        Good afternoon, your Honor.
12        THE COURT:  Good afternoon.
13        THE COURTROOM DEPUTY:  And who do we have for the
14   defendant?
15        MR. KEANE:  For the defendant, Michael Keane from
16   the Office of the Attorney General.
17        Good afternoon, your Honor.
18        THE COURT:  All right.  Thank you.
19        Now, Mr. Keane, I think we scheduled this conference
20   at your request because you had sought an adjournment of the
21   trial date, which was set some time ago.
22        I guess what I would ask you, sir, is to explain in
23   more detail why your cases pending before the Second Circuit,
24   Vincent vs. Annucci and Aponte vs. Perez, are going to obviate
25   the need for a trial.
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

STATUS CONFERENCE                     3

```
 1        MR. KEANE:  Thank you, your Honor.  I will try to
 2   explain it as clearly but also as concisely as I can.
 3        The issue in Vincent and in Aponte is an issue that
 4   addresses whether compensatory damages are available in a due
 5   process case, a procedural due process case, where the
 6   contention is that had the same result occurred, had the
 7   complaining party received the due process he was entitled to,
 8   that in such a case, that party would be entitled only to
 9   nominal damages and not compensatory damages.  That issue is
10   at the forefront of the Vincent appeal, certainly.  It is also
11   one of the two main issues in the Aponte appeal.
12        Both of those cases were argued before the Second
13   Circuit back in January and February, and we believe that a
14   decision in those cases is likely soon.  Our appeals bureau
15   tells me they would we might have received a decision by the
16   end of August a few months ago, and, therefore, they think it
17   is imminent.
18        That case, Vincent particularly, will determine --
19   the circuit will determine whether plaintiffs in cases arising
20   out of post-release supervision where the issue is what would
21   have happened to them had they been sent for resentencing
22   earlier than they were, whether there would have been a
23   difference in their experiences.
24        I know your Honor addressed this issue in part and
25   distinguished a prior circuit case, Hassell v. Fischer a few
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

STATUS CONFERENCE                     4

```
 1   years ago, noting that in the Hassell case, distinct from
 2   Mr. Santiago's case here, Mr. Hassell had been resentenced
 3   nunc pro tunc to the original PRS term, and so your Honor
 4   determined that that issue was not resolved by Hassell.
 5        We believe that Vincent raises the exact issue that
 6   your Honor distinguished here, which is an individual who was
 7   not resentenced nunc pro tunc and, in fact, resentenced
 8   without post-release supervision, whether that individual
 9   would be entitled to seek more than nominal damages.
10        Therefore, we think it would be efficient to wait
11   for that decision, because if -- certainly if defendants
12   prevail on that issue, that will change the nature of the
13   trial.  If defendants do not prevail on that, then that
14   presents a completely different posture for defendants in
15   terms of pursuing settlement.
16        In this case, also, this is also a -- we think a
17   material difference that does matter, different from Hassell.
18   In Hassell, Mr. Hassell was resentenced after the enactment of
19   a new statute in 2008.  The period of liability that we're
20   talking about in this case is a period that preceded the
21   statute, and that would have been a period where, indeed,
22   there was no option for the state court or for the district
23   attorneys or the defendant, the criminal defendant, to seek a
24   sentence without post-release supervision.  And that issue is
25   also before the circuit on -- that Vincent involves a period
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

**JA470**

STATUS CONFERENCE                5

1  of time before the statute was amended to make it permissible
2  to be resentenced without post-release supervision, and we
3  think that has -- that makes a difference.
4         In addition, the *Aponte* case also raises the
5  question of resentencing before the statute was amended, and
6  ultimately, the resentencing in the *Aponte* case was vacated
7  under a subsequent New York state case which invalidated
8  Aponte's sentence.  But it remains the record that in Aponte's
9  case, the resentencing occurred before the statute was -- did
10 permit a sentence without post-release supervision.
11        We think that those two cases, once disposed by the
12 circuit, will frame the issues in the district court in
13 several of these cases, including, for example, the pending
14 class action case in the Southern District of New York which
15 had already been scheduled for trial in October of this year
16 but which was adjourned pending resolution of further briefing
17 and motions in limine in that case before Judge Lehrburger, so
18 the trial is now tentative scheduled for the first quarter of
19 2023.  We have a conference in the --
20        THE COURT:  You're going further than I need.
21        MR. KEANE:  I'll finish with this, your Honor.
22        The class action case is scheduled for status
23 conference to discuss trial dates.  I think it's November 18.
24        THE COURT:  I'm not quite sure what is still at
25 issue in the context?

STATUS CONFERENCE                6

1         MR. KEANE:  Essentially the same issue that is at
2  issue here, which is whether compensatory damages or nominal
3  damages are what the plaintiffs are entitled to attempt to
4  prove, along with the same causation issues that are raised in
5  this case and in *Vincent* and in *Aponte*.
6         THE COURT:  My understanding was that the Court in
7  *Vincent* did consider the anger, frustration, depression that
8  he suffered for the 686 post-Early, E-A-R-L-Y, days in
9  custody.  Right?  And he also noted that his sentences for
10 Violent Repeater Act, which was unlawfully imposed, were
11 grossly disappropriate to the trivial violation.
12        The plaintiff in our case, you know, we're not
13 talking about nearly two-year sentence.  What we're talking
14 about is a period from June 2007 to February 2008.
15        I think it was raised whether he should rate *Aponte*
16 *vs. Perez* to talk about proximate cause, right?  And I think
17 I've already ruled -- it's been so long ago -- but I believe I
18 ruled that the defendants were reliable in my case.  For the
19 period June 12, 2007, to February 6, 2008, those dates.  I
20 found that the defendants were aware of their obligations to
21 address the unlawfully imposed PRS and had kept it over the
22 plaintiff, who could have taken steps to relieve the plaintiff
23 of the unlawfully imposed PRS.  And they could have sought new
24 sentencing from the judge or from -- asked the DA to do it.
25 And I think the Second Circuit ruled in one of those cases --

STATUS CONFERENCE                7

1  whether it was earlier, I can't recall -- that if the
2  officials had simply done that, they would have been off the
3  hook.
4         I'm not going to have you argue to the jury that
5  somebody other than the three defendants are responsible for
6  the extra time that Mr. Aponte would have spent, because
7  that's the law of the case.
8         MR. KEANE:  We're not seeking, your Honor, to
9  relitigate liability.
10        THE COURT:  Well, it sounds like that to me in some
11 of your pretrial motions.  If you're not, then that's great.
12 I think the plaintiff also --
13        MR. KEANE:  And I understand there is a distinction,
14 and we are aware that -- and conscious of the fact that
15 liability has been found.
16        But it is entirely possible, and we think it's the
17 case here, that a defendant can be liable for a constitutional
18 violation but at the same time may not be liable for the
19 alleged or the claimed damages.  That happens frequently where
20 a constitutional violation has been found and the damages
21 would be limited to a dollar.  That would be --
22        THE COURT:  Give me an example where this happens so
23 frequently.  Honestly, I'm not hearing what you're saying in
24 real life.
25        MR. KEANE:  Well, in real life, I can point to a

STATUS CONFERENCE                8

1  case before Judge Raykoff, *Bailey v. Pataki*, Warren V. Pataki,
2  where convicted sex offenders challenged the process pursuant
3  to which they were detained in state prison beyond their
4  sentences, and they were detained because they were deemed by
5  the state office of mental health and the state Department of
6  Corrections supervision to have been dangerous to the
7  community.
8         And the defendants were found liable to have
9  violated the rights of these convicted felons because the
10 process that they were afforded to determine whether they were
11 dangerous was a process that was procedurally flawed.  The
12 case went to trial.  After the finding of liability, and the
13 issues were causation, it was found that had the appropriate
14 procedure been followed --
15        THE COURT:  Can I ask you something?  I'm sorry to
16 interrupt you.  But the *Thompkins* case -- this is a decision
17 dated March 14, 2022?
18        MR. KEANE:  Yes, your Honor.
19        THE COURT:  The Court says that:  The Second Circuit
20 has determined that loss of liberty is a distinct form of
21 damages for which general damages may be recovered.
22        In Kerman:  The individual plaintiff, Kerman,
23 brought an action against the New York City police officer who
24 ordered Kerman be detained and involuntarily hospitalized for
25 psychiatric observation.  The jury found that Kerman's Fourth

STATUS CONFERENCE 9

1 Amendment rights had been violated and awarded him only
2 nominal damages. The trial court denied Kerman's motion for a
3 new trial and the damages on his Fourth Amendment claim. The
4 Second Circuit reversed and held that while Kerman was not
5 entitled to a new trial regarding damages for claims related
6 to physical pain, mental suffering, and medical expenses, he
7 was entitled to a new trial with respect to compensatory
8 damages for his loss of liberty.
9         That sounds like compensatory damages for a due
10 process loss of liberty claim to me.
11         MR. KEANE:  Your Honor, we don't read Kerman as
12 controlling in that case in that way.  Kerman is a long,
13 complicated case, I think authored by Judge Kearse.  But we
14 would note that the flaw in the district court in Kerman was
15 that the district court there determined that damages were
16 nominal as a matter of law, and we understand the Second
17 Circuit decision in Kerman to have remanded.  And I believe
18 this is consistent with what Judge Lehrburger is framing the
19 issue for trial in the Betances, which is that the plaintiff
20 in Kerman and the plaintiffs in the Betances, should be given
21 the opportunity to prove compensatory damages at trial.  But
22 that doesn't mean that the defendants would be precluded from
23 arguing that the damages in such a case are nominal rather
24 than compensatory.  I think that is the distinction.
25         Now, Kerman did not ultimately go to trial on the

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 10

1 compensatory damages.  As I recall from my research, I believe
2 it settled with the City of New York.  And I think what our
3 argument here is that the availability of interposing
4 causation arguments and the arguments on compensatory as
5 opposed to nominal damages is still an issue that is to be
6 resolved in Betances.  Indeed, it is the issue in Vincent.
7 And I believe perhaps one reason all the parties in the
8 Betances are content to wait until next year for trial is that
9 the counsel in the Betances, who, for example, wrote the
10 amicus brief in Vincent, are quite aware of how pivotal
11 Vincent and, to a lesser extent, Aponte could be in those
12 cases.
13         THE COURT:  Let's hear from the plaintiff in this
14 case now.  Thank you.
15         Plaintiff doesn't want to delay the trial.  Do you
16 want to be heard?
17         MR. RICKNER:  That's correct.  I would not want to
18 delay the trial, and much more specifically, my client very
19 much does not want to delay the trial.
20         With respect to the multiple appeals, we are at
21 roughly a dozen Second Circuit cases.  The state has
22 consistently lost them, I believe with the exception of the
23 Hassell case -- I mean on this PRS issue.
24         There will always be another Second Circuit appeal
25 to wait for.  Aponte is a damages-only trial.  I have no doubt

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 11

1 that there will be a lengthy appeal afterwards.  I can't
2 imagine the state wouldn't.  So the idea of waiting for one
3 more Second Circuit case I just don't think works here.
4         Addressing the Pataki case, Pataki was another no
5 harm/no foul defense.  But there was a very key difference,
6 which is that they actually had the evidence to prove it up.
7 Here, they didn't even try to sentence my client for years
8 afterwards, and when they did, the judge denied it.
9         Now, the idea of trying to put in front of the jury
10 some sort of many-years-earlier hypothetical about what might
11 have happened had they bothered to tried to fix this -- and by
12 the way, there is nothing requiring Annucci continue to impose
13 PRS after finding out it was unconstitutional to do so.  It
14 was imposed by their will; it could have been withdrawn by it.
15 There was no necessity of them violating my client's
16 constitutional rights.
17         THE COURT:  Sir, the jury is not going to speculate
18 about that.
19         MR. RICKNER:  Then I'm not going to keep arguing
20 about it.  Thank you very much, your Honor.
21         THE COURT:  I'm not going to ask the jury to
22 speculate what might have happened if only somebody had done
23 X, Y, Z.  That's not the world we live in the court of law.
24         MR. RICKNER:  I agree, very much so.  Thank you,
25 your Honor.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 12

1         I see that unless I'm grossly mistaking the law,
2 this is a case about compensatory damages.  The speculation
3 argument, as your Honor just said, is out.  There's no
4 contribution.  There's no "I need to share these damages with
5 someone else" type argument in Section 1983 cases.  It's joint
6 and several liability.  So even in the hypothetical that they
7 could say, well, you know, it really also is the prosecutor or
8 somebody else and there's a bunch of people under this tent
9 who should also be liable, that just simply doesn't operate in
10 1983 cases.  That's why in every case, all compensatory
11 damages are linked up to one person, to one line on the
12 verdict form.
13         THE COURT:  Did you read the Kerson (sic) case?  I'm
14 not quite sure whether the defendant is describing to the
15 decision, but Kerson, I thought, was pretty clear.  Maybe I'm
16 misreading it, but I thought in the content the magistrate
17 judge decided Kerson and said, look, compensatory damages are
18 available.
19         Is there anything I'm missing?
20         MR. RICKNER:  You mean Kerman?
21         THE COURT:  Yes.  Sorry.  Kerman.
22         MR. RICKNER:  Yes, Kerman.  I believe -- and I'm
23 going to read this out because I've been pulling it up.
24         It says:  Where the conduct of the defendant
25 responsible for the deprivation was found to be unlawful, we

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE                    13

```
 1   have held that plaintiff is entitled to compensatory, not
 2   merely nominal damages.  Which is, I think, a more complicated
 3   way to say that they reversed because he only got nominal
 4   damages.  It's more than they were -- that compensatory
 5   damages were available.  The fact that they proved up the
 6   liberty violation meant that you had to get compensatory
 7   damages.
 8         So citing it for the proposition that only nominal
 9   damages should be available, I cannot dissect the case that
10   way.  It doesn't work.
11         THE COURT:  We've had other trials in this
12   courthouse where there's a loss of liberty and a due process
13   claim and the jury has awarded compensatory damages.  They
14   have also awarded nominal damages, but they're not restricted
15   to only awarding nominal damages.
16         MR. RICKNER:  I happen to read Kerman to say if you
17   prove a liberty violation, you have to impose compensatory
18   damages.  Nominal damages -- and there's a Supreme Court case
19   on this very recently -- really operates as a jury-imposed
20   declaratory judgment.  It's a jury simply symbolically
21   identifying that plaintiff has proven up his claim -- for his
22   constitutional violation, that is.
23         We already have summary judgment in favor of the
24   plaintiff.  That action has already taken place.
25         I would object to a nominal damages jury instruction
```

STATUS CONFERENCE                    14

```
 1   at all.  Perhaps the jury will come out with one dollar on
 2   their own and say that's what my client's compensatory damages
 3   are; we don't value them at very much.  I would surprised by
 4   that, but I wouldn't eliminate it as a possibility.
 5         But my reading of Kerman -- and this is, just for
 6   the record, 374 F.3d 93, and I'm looking at the case:
 7         It says you are entitled to compensatory, not merely
 8   nominal damages if you prove up a deprivation of liberty.  And
 9   I believe we are here.
10         So that's it.  That's the ball game.  Nominal
11   damages are off the table in certainly all of defendant's
12   proposed evidence.
13         MR. KEANE:  May I?
14         THE COURT:  Yes, go ahead.
15         MR. KEANE:  We do fundamentally disagree with
16   plaintiff's counsel on the meaning of Kerman and its
17   application here.
18         I think we agree, we concede, that as a matter of
19   law, nominal damages are not available.  But as a matter of
20   charging a jury, a jury may consider nominal and a jury may
21   consider compensatory.  We don't think as a matter of law
22   either is mandated by Kerman.  We think that's a misreading of
23   Kerman.
24         But, indeed, that is exactly the issue that is on
25   appeal in Vincent and to some extent the issue in Aponte.  In
```

STATUS CONFERENCE                    15

```
 1   Aponte the Court awarded only nominal damages of a dollar, and
 2   the Second Circuit will be addressing those.
 3              Therefore, we do think whether we go to trial the
 4   day before Thanksgiving or not, whatever happens in those
 5   cases is going to have an effect on this case.
 6         Now, I recognize that, as Mr. Rickner says very
 7   well, there will be always be an appeal.  Well, I think that
 8   we are at the end of the road on appeals to the circuit.  The
 9   circuit has what is the remaining crystalized kernel of an
10   issue before it, and I can say that we here at this office
11   feel that it is going to be dispositive of all these cases.
12         I would note with some understanding but with some
13   criticism that this case was in abeyance for about a year
14   while Mr. Santiago himself, about a year ago or so ago, got
15   rid of one of his lawyers and hired another one and then
16   wasn't able to appear for court conferences for an entire
17   summer and then finally only got everything -- almost withdrew
18   the case and then got things together that -- this delay most
19   recently is really on Mr. Santiago himself.
20         THE COURT:  Well, listen, sir, the defendants are
21   not blameless.  You also aggressively stayed this case while
22   things were pending in the Second Circuit.  I distinctly
23   remember that.
24         MR. KEANE:  That is correct, your Honor.  And --
25         THE COURT:  This is an old case.  It's filed in
```

STATUS CONFERENCE                    16

```
 1   2012.  I want to get this case finished.  And if somebody
 2   doesn't like the verdict, they're going to appeal it anyway.
 3         So let's just get it done.  Maybe by the time we
 4   have appealed the verdict, the circuit will have spoken.
 5         MR. KEANE:  Your Honor, if I could only point out
 6   the other concern that we had, and I don't think it would
 7   be -- you know, to put this case over until, for example,
 8   January would be --
 9         THE COURT:  Well, the problem is I have other trials
10   in January.  Sorry.
11         MR. KEANE:  And --
12         MR. RICKNER:  As do I, your Honor.
13         MR. KEANE:  As I pointed out in my letter to the
14   Court, I too have trials.  But as I pointed out, my co-counsel
15   on the case, Rebecca Durden, has jury duty that week and she
16   can't adjourn it.  She's been working on this and all of the
17   other post-release supervision cases that we have pending.
18         On that ground, I would alternatively request that
19   the trial be adjourned.  To me, to this office, the issues
20   are, we think, clear that the Second Circuit decision in
21   Vincent and Aponte will have direct bearing on this case, and
22   they could obviate the need for a trial.
23         THE COURT:  Sir, you say Aponte is important because
24   that goes to your argument that the defendants in our case are
25   not the proximate cause of plaintiff being in custody.  But
```

**JA473**

STATUS CONFERENCE 17

1  I've already ruled on that. The whole issue of whether other
2  state actors other than the defendants in this case caused
3  plaintiff's damages, that is an issue that's been resolved in
4  this case. So *Aponte* doesn't really, I don't think, have any
5  bearing on this case.
6      You are saying that *in Vincent* the issue is whether
7  the violation is limited to nominal damages. We have Second
8  Circuit cases -- (audio interruption) -- compensatory damages
9  available for due process. I don't think that's the only
10  Second Circuit case out there that stands for that
11  proposition.
12      You know, in these trials, if someone is not at
13  liberty and there's a jury verdict, I've never been told, and
14  I've never instructed a jury, that they're restricted in
15  damages to nominal. So I don't really think that issue is
16  live, really.
17      I don't know what else is at stake in *Vincent*, and I
18  don't have an explanation as to why they haven't issued a
19  decision if it was over in January, but I think the Second
20  Circuit has spoken on the damages issue.
21      MR. KEANE: And, indeed, I would like to address
22  that.
23      THE COURT: Look, sir, I don't think this case
24  should be adjourned. I don't just understand the reason.
25  Because if I don't try this case in November, I can't try it

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 18

1  in December; I have two trials. I have two trials in January
2  and so on and so forth.
3      I accept this date. The state refuses to settle.
4  That's fine. That's your prerogative. But I'm going to try a
5  case that as of next year will be my oldest case. It's an
6  11-year-old case. I want this case tried, and whatever issues
7  you disagree with or want to raise before the circuit, you can
8  do that.
9      MR. KEANE: Well, your Honor, if I may -- and I
10  understand the scheduling issues. We have very complicated
11  scheduling issues here too.
12      THE COURT: I gave notice quite some time ago as to
13  the trial date. You know, to sit here and wait until last
14  week to tell me another problem I think doesn't move me very
15  far.
16      MR. KEANE: Well, your Honor, I apologize for that.
17  Certainly I should have raised it, and certainly my chain of
18  command will tell me that I should have raised it a couple
19  months ago.
20      THE COURT: We talked about the trial date -- I know
21  we did -- when we set it.
22      MR. KEANE: I understand that, your Honor, and I
23  think our -- we guessed wrong on the timing of the circuit.
24  And with respect to one of the fundamental facts that we
25  believe the jury should be informed of is that Mr. Santiago,

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 19

1  at the time of the liability in question, had he been
2  resentenced at that time, he could only have received the same
3  sentence that he had, in fact, received, and in fact the
4  sentence he bargained for in his plea agreement. The plea
5  minutes are clear. He was told by the judge you're going to
6  get five years of post-release supervision, and he accepted
7  that as a condition of his plea for -- you know, a guilty plea
8  to a lesser crime in exchange for a sentence, he got the
9  determinate sentence plus the post-release supervision.
10      THE COURT: But the judge said that, sir, but he
11  didn't impose it. Okay? The judge said that. It was part of
12  the plea agreement. The judge did not impose it.
13      If the official felt that he should have had it,
14  they should have sent him to resentence it. They didn't.
15      So you can't go back and ask the jury to ask to
16  suppose, we don't know. Because actually, when they went back
17  for sentencing, the judge didn't impose it. He didn't impose
18  it the first time and then the second judge who sentenced him
19  did not impose it on him. It didn't happen. So it's not
20  going to be something the jury is going to be allowed to
21  speculate about.
22      MR. KEANE: But, Your Honor, if I may, the reason
23  the judge could give him a sentence at resentencing that did
24  not include the post-release supervision is that the
25  resentencing occurred after July 2008, when the law permitted

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 20

1  the judge to do that. Before July 2008, the period of
2  liability in question, Mr. Santiago's Court could not have
3  given him a sentence without the post-release supervision.
4      THE COURT: Yes, that may be true, but the judge did
5  it. The judge did not impose post-release supervision. The
6  judge should have done it, but he didn't do it. So it's not
7  an issue that I think needs to be rehashed.
8      The fact of the matter is and what the jury will
9  hear is the fact that the law may have required it, but the
10  judge did not impose it. Instead, these three defendants
11  imposed it. They're not judges. And even after the Second
12  Circuit said this is not lawful, these folks need to go back
13  for resentencing, nobody sent him back for resentencing. The
14  people who could have sent him back for resentencing are the
15  three defendants who had custody of him and should have done
16  it, and they didn't. It's very simple.
17      So what we're talking about is a loss of liberty
18  between June 12, 2007, and February 5, 2008. That's only
19  seven months or so, less than seven months.
20      So we're going to try the case, and the jury will
21  ascribe a value to that loss of liberty. I think it's a
22  pretty straightforward case.
23      MR. RICKNER: I agree, your Honor.
24      May I ask a practical question?
25      THE COURT: Wait. Who's speaking now?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

**JA474**

STATUS CONFERENCE 21

1 MR. RICKNER: This is Rob Rickner for the plaintiff.
2 My apologies.
3 THE COURT: Yes, sir.
4 MR. RICKNER: I see this as essentially a
5 one-witness case. And I don't know what your Honor's ruling
6 is going to be with respect to their argument he would have
7 been in prison anyway because he went to prison for a parole
8 violation based on the same incident afterwards, I believe
9 both in state and federal prison in Virginia. There's nothing
10 in the record to suggest he got a discount because he had
11 already served time in New York. If anything, I think he
12 probably served more time because you tend to have a higher
13 punishment when you're deemed to have done more things wrong.
14 If I am successful and your Honor rules that none of
15 that comes in, I think this is a one-witness case about my
16 client talking about his time incarcerated and the day he went
17 and the day he went out, along with whatever Mr. Keane has for
18 cross-examination. It's not clear to me if the individual
19 defendants are even planning on showing up to trial.
20 THE COURT: Well, you're supposed to put in the
21 schedule of the witnesses. Plaintiff is going to call
22 Santiago. Defendants will call the following witnesses: Mr.
23 Annucci, Mr. Fisher, Mr. Tracy as their witnesses. I'm
24 assuming they will show up for trial.
25 But the other thing I think that the parties need to

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 22

1 think about is stipulations. I think they should be engaging
2 in more stipulations about the facts, because I think they're
3 incontestable. He received a sentence of X. He then had
4 these other issues in the state -- at one point it says West
5 Virginia and then it says Virginia -- wherever it was, it was
6 a state conviction and post-release supervision and also
7 federal issues in Virginia.
8 But now we have this discrete period of time, and it
9 seems to me that the jury should be able to quantify that
10 based on the testimony. Plaintiff won't like this, but I'm
11 leaning toward, because that is the law, allowing evidence of
12 his past incarcerations prior to this one to come into
13 evidence, because it does bear on damages directly. They're
14 not going to necessarily know no why he was in custody;
15 they're just going to know that he was in custody, and then
16 they will know either a state facility, New York, Virginia,
17 West Virginia, or federal court.
18 So you ought to be talking about stipulations as to
19 when he was in, when he was out, how much supervised release
20 he had, when that supervised release ended. Those are
21 determinable facts based on judicial records that both parties
22 should be able to verify and agree upon.
23 And then I think this is a straightforward case.
24 We've got four witnesses total, maybe a few more. There will
25 not be a lot of witnesses testifying about what could have

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 23

1 happened X, Y, and Z. We're not going there.
2 So I expect that everybody is busy; everybody have
3 trials and people have their civic year to serve jury duty. At the
4 time of conference in June of this year when I set the trial
5 date, only Mr. Keane showed up or appeared on behalf of the
6 defendant. You didn't enter an appearance for this colleague,
7 Rebecca Durden. I don't think you mentioned her at all, if
8 she's made an appearance on the docket.
9 MR. KEANE: She made an appearance.
10 THE COURT: Okay. Good. Well, she didn't appear at
11 the pretrial conference where we set the date in June, and her
12 name wasn't mentioned. I didn't hear about her until
13 recently.
14 MR. KEANE: Your Honor, again, that will be blamed
15 on me, and I'm perfectly happy to take that blame. We are a
16 busy office. Rebecca Durden has been assigned to the Betances
17 class action. Ms. Durden has been in this office for 29
18 years. She was involved in this case for at least the past
19 four years, if not beyond that.
20 THE COURT: Okay. I have great respect for her.
21 She sounds like a very experienced colleague, but she's
22 engrossed in the Betances litigation, the class action.
23 As I said, this is a pretty straightforward case.
24 I'm not seeing her name anywhere else on the docket, but she's
25 appeared at conferences; she's made submissions to the Court.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE 24

1 I'm just not seeing her here on the docket.
2 But I understand that colleagues are important, and
3 she may be of great assistance. It's just I'm not going to
4 change this trial date because I have too many other trials
5 backed up, and there's no way this case will be tried before
6 late next year if I don't try this case when I scheduled it.
7 We will find jurors to sit.
8 MR. KEANE: Your Honor, obviously I've made my
9 argument. I'm the losing party here. I appreciate that. I
10 wish it could be different on a personal level. It is --
11 MR. RICKNER: I believe we lost Mr. Keane
12 mid-sentence.
13 THE COURT: Hopefully he'll call back in. We'll
14 hold for a minute.
15 (Pause.)
16 THE COURT: Does plaintiff's counsel have a
17 cellphone number that we call Mr. Keane to get him back on the
18 line?
19 MR. RICKNER: I do. One second. I believe he
20 called me on it before.
21 (Pause.)
22 MR. RICKNER: I believe he's calling in shortly. I
23 made contact.
24 THE COURT: Thank you.
25 (Pause.)

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

**JA475**

STATUS CONFERENCE                    25

1    THE COURT:  Are you back with us, Mr. Keane?

2    MR. KEANE:  Yes.  I apologize for that, your Honor.

3  Mr. Rickner said that you lost me in mid-sentence.  I don't

4  know what happened.  I'm in my office and the office phone

5  suddenly went dead, but I'm on a cellphone now, so that should

6  be at least more reliable.

7    What I was trying to do when I was speaking was to

8  reiterate my concerns that I do think that the framework for

9  trial will be altered by disposition of the pending appeals,

10 and I also reiterated my concern about accommodating my

11 colleague, and I think your Honor heard that.

12   What I also was saying that this is my office's

13 problem.  Yes, I know, but I have major briefing on a class

14 action unrelated to this case or any case like it that is due

15 in the Southern District of New York on November 15, and in

16 negotiating stipulations for the trial in less than a month, I

17 will not be permitted even to turn to those until that

18 briefing is done.  In the process, I will be forfeiting my

19 own -- what I think is hard -- on vacation time between now

20 and then, but that, of course, is not the Court's concern.

21   What I would suggest, and maybe I will make the plea

22 to Mr. Rickner, that perhaps if he consented to the

23 magistrate, who could accommodate us at a trial convenient for

24 us in January or February, that perhaps that would be

25 acceptable to Mr. Rickner if, indeed, that can be worked out.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE                    26

1    THE COURT:  You should discuss that offline, because

2  I don't think the Court should not be knowledgeable about who

3  is agreeing or not agreeing.

4    I note that the pretrial scheduling order, the joint

5  pretrial order, says plaintiff says that two days will be

6  needed for trial; the defendant says four days.

7    So, look, I'm trying to get this done.  It needs to

8  get done.  If we selected a jury in November the day before

9  Thanksgiving --

10   If I could accommodate you, I would, but honestly,

11 we set this back in December, and none of this was brought to

12 my attention at the time.  At this point I'm feeling that I

13 don't have alternatives.  You've put me in a bit of a corner

14 here.

15   So we can select the jury on the 23rd, the day

16 before Thanksgiving, as we planned.  We'll start the trial

17 November 28th and continue on until we're finished.  That's

18 what we'll do.  And then since it's only a week that is

19 needed, I'll be in a position to start the next trial, which

20 starts December 5th.

21   We're all trying to do our best.  Because of COVID,

22 we all have backlogs.  We all have more work than we would

23 like.  We all have to sacrifice vacations and holiday time.

24 It's a harsh reality, but certainly I provided sufficient

25 notice, and we're going to try to do our best.  All right?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE                    27

1    So I will have decisions for you, but I've told you

2  at least where I think we're headed with some of these

3  motions.

4    We're not going to have any evidence about

5  alternative theories of causation or speculative "what if this

6  had happened."

7    The issues are pretty simple.  It's what are the

8  damages for the loss of liberty between June 12, 2007, and

9  February 6, 2008.  And until the Second Circuit says we didn't

10 mean what he said in *Kerson* or any other cases regarding

11 compensatory damages, I think compensatory damages isn't on

12 the table.

13   So what I would suggest you do, Counsel, is try

14 really hard to resolve this case.  I haven't had any

15 indication that anyone is trying to settle the case, and

16 that's fine if it's not going to be settled, but I want

17 stipulations to be filed.  If Mr. Keane can't do it, find

18 someone else who can do it.  If his colleague, his esteemed

19 colleague, who knows this area so well, she can do the

20 negotiations or she can engage with plaintiff's counsel and

21 just stipulate about dates and sentences and what authority

22 had him in custody and what authority had him under

23 supervision.  These are all determinable, so please take care

24 of this.

25   Is there anything else we need to address?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

STATUS CONFERENCE                    28

1    MR. RICKNER:  No, your Honor.  Thank you very much.

2    THE COURT:  Have a good day, everybody.  Thank you.

3    (Whereupon, the matter was concluded.)

4         *  *  *  *  *

5  I certify that the foregoing is a correct transcript from the

6  record of proceedings in the above-entitled matter.

7  */s/ Rivka Teich*
   Rivka Teich, CSR RPR RMR FCRR

8  Official Court Reporter
   Eastern District of New York

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

**1**

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ---------------------------------x
                                           12-CV-2137(KAM)
 3   JESUS SANTIAGO,
                                           United States Courthouse
 4           Plaintiff,                    Brooklyn, New York

 5        -versus-                         November 18, 2022
                                           12:00 p.m.
 6   SUPERINTENDENT BRIAN FISCHER, ET AL.,

 7           Defendants.

 8   ---------------------------------x

 9       TRANSCRIPT OF CIVIL CAUSE FOR PRETRIAL CONFERENCE
           BEFORE THE HONORABLE KIYO A. MATSUMOTO
10             UNITED STATES DISTRICT JUDGE

11   APPEARANCES

12   Attorney for Plaintiff: RICKNER PLLC
                             14 Wall Street, Suite 1603
13                           New York, New York 10005
                             BY:  ROBERT H. RICKNER, ESQ.
14

15   Attorney for Defendants: OFFICE OF THE NEW YORK STATE ATTORNEY
                              GENERAL
16                            120 Broadway
                              New York, New York 10271
17                            BY:  MICHAEL J. KEANE, ESQ.
                                   REBECCA DURDEN, ESQ.
18

19
     Court Reporter:         Georgette K. Betts, RPR, FCRR, CCR
20                           Phone:  (718)804-2777
                             Fax:    (718)804-2795
21                           Email:  Georgetteb25@gmail.com

22

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

**7**

PROCEEDINGS

```
 1            MR. RICKNER:  Yes.

 2            THE COURT:  -- just because of the statute.

 3            MR. RICKNER:  Yes.

 4            THE COURT:  All right.  Well, I think this is one

 5   case over the years, many years that I've done this where I

 6   cannot for the life of me understand why it hasn't settled,

 7   but we won't waste any more time since the parties aren't

 8   going to be settling this case.

 9            All right, let's go through the motions.  ECF number

10   176 are the defendants' motions in limine.  The defendants

11   seek to preclude the plaintiff from offering speculation that

12   he would have been relieved of PRS or at liberty given Penal

13   Law 70.45 and his sentences imposed by courts in the federal

14   system.

15            Now, just as I have precluded and will preclude both

16   sides from offering speculative arguments and asking the jury

17   to speculate about matters that never occurred, neither the

18   plaintiff nor the defendant will be allowed to speculate about

19   what would have happened had the plaintiff been referred for

20   resentencing.

21            MR. RICKNER:  Understood, your Honor.  Just to be

22   clear, you mean referred for resentencing at an earlier date.

23            THE COURT:  Yes.

24            MR. RICKNER:  Because he was referred for

25   resentencing --
```

**8**

PROCEEDINGS

```
 1            THE COURT:  Yes.

 2            MR. RICKNER:  -- and we intend to bring that up.

 3            THE COURT:  Yes.

 4            I think injecting New York Penal Law 70.45 will

 5   inject confusion.  We all know what the law provided, but we

 6   all know, based on this tortured history that the defendants,

 7   the remaining defendants did not comply with the Constitution

 8   in failing to either bring him back for resentencing in a

 9   timely manner, or vacating his illegally imposed post-release

10   supervision.  So...yes?

11            MR. KEANE:  Your Honor, if I may, the relevance of

12   Penal Law 70.45 in this case, and we agree that speculation as

13   to what would have happened, your Honor is precluding, its

14   relevance here, however, is that defendants are being sued for

15   punitive damages.  The defendants have a constitutional right

16   therefore to explain to the jury why they did or why they did

17   not take action as they did and in that way Penal Law 70.45 is

18   front and center to all of those claims.

19            THE COURT:  The Second Circuit disagrees with you,

20   sir --

21            MR. KEANE:  Your Honor --

22            THE COURT:  -- right?

23            MR. KEANE:  -- the Second Circuit disagrees as a

24   matter of what they said is that 70.45 would not be automatic

25   and the defendants were supposed to make an attempt to urge
```

**9**

PROCEEDINGS

```
 1   the state courts to engage in resentencing.  We accept that

 2   that's what the Second Circuit said.  But what the jury should

 3   be informed of, and what the defendants are entitled to

 4   explain to the jury, is what the reasons were that they did

 5   not take action at the times that Mr. Santiago alleges they

 6   should have taken action.  That they are clearly entitled to

 7   explain themselves.

 8            MR. RICKNER:  If I may be heard?

 9            THE COURT:  Yes.

10            MR. RICKNER:  Briefly.

11            THE COURT:  Let me just say that I'm not

12   appreciative of the State Attorney General's office repeatedly

13   making arguments that the Second Circuit has rejected numerous

14   times and I've rejected in prior decisions.  You know, it's

15   just really mind boggling, but go ahead let me hear from

16   Mr. Rickner, okay.  You've had your say.

17            MR. RICKNER:  I don't know that -- one minor comment

18   which is to say it would be confusing for the jury for them to

19   imply they had the authority to follow 70.45 and implement it

20   when clearly they didn't because that was reserved for the

21   judiciary.  And I think that's the heart of the matter, but I

22   certainly agree with your Honor.

23            THE COURT:  I think it's just going to be confusing

24   to the jury.  You know, the fact that the law required the

25   judge to impose post-release supervision when the judge failed
```

PROCEEDINGS                                                    10

1    to do so.  The whole point is that these defendants should
2    have gone back to the judge and said, please resentence this
3    person, he should have gotten post-release supervision, but
4    they did not have the authority and they knew they didn't have
5    the authority based on the *Earley* and *Betances* decisions that
6    they could not unilaterally impose it.  They did not have the
7    authority to do it, it violated the Constitution.  So to say
8    that the law required it when the judge failed to impose it is
9    just going to make -- it's really kind of pointing the finger
10   at someone else.
11         What the Second Circuit has held is that they had
12   the duty to go back to court or to vacate the post-release
13   supervision requirement.  That's what the Second Circuit has
14   held and I'm following the Second Circuit.
15         MR. KEANE:  Your Honor, the Second Circuit said that
16   they had a duty to either send him back, urge a sentencing
17   court to subject him to resentencing, or in the Second
18   Circuit's language was or otherwise relieve him of burdens of
19   post-release supervision.  The Second Circuit also said, quite
20   clearly in a number of cases, that the obligation of
21   defendants was not to release the individual --
22         (Court reporter asks for clarification.)
23         MR. KEANE:  The Second Circuit said they were not
24   required to release the individual, they were required to
25   refer him for resentencing.  And as the Second Circuit said,

PROCEEDINGS                                                    11

1    quite clearly, if the state court did nothing with that
2    referral, they would have had qualified immunity.  What they
3    are on hook for is not sending a letter that nobody had to
4    read.  That's what the liability is.  But liability is not the
5    liability for the speculation that had that letter been sent,
6    he would have been ultimately released.
7          THE COURT:  Look, the plaintiff and the defendant
8    are both precluded from offering any argument that had he been
9    resentenced at the time when it would have been appropriate
10   that he would have been either relieved of post-release
11   supervision or it would have been imposed.  That's not going
12   to be admissible.  And the Second Circuit, you're exactly
13   right, the Second Circuit said that the defendants cannot
14   shift the blame to the DAs or the state court judges because
15   they themselves were responsible in the first place for not
16   imposing post-release supervision because they didn't have
17   authority to do it.  And once they were told by the Second
18   Circuit that they didn't have authority and that doing so
19   violated the Constitution, they should have gone back to the
20   Court, the sentencing court or some other state court to ask
21   that the defendant be resentenced or they should have
22   withdrawn the post-release supervision.  These defendants did
23   not do that.
24         The Second Circuit has already made findings on
25   these three defendants, so, no, nobody -- you're arguing

PROCEEDINGS                                                    12

1    against the fact that I granted your motion, so Mr. Keane, I
2    think we can move on.
3          MR. KEANE:  Your Honor, if I may, we're not
4    rearguing liability --
5          THE COURT:  No, but you're arguing -- I granted your
6    motion to preclude the plaintiff from offering speculation
7    that he would have been relieved of PRS or would have been at
8    liberty.  I'm granting that motion.  So why are you arguing?
9          MR. KEANE:  I'm just, your Honor, trying to clarify
10   to make clear our defendants will be permitted, your Honor, to
11   explain why they didn't send that letter?
12         THE COURT:  No.  At the time they were on notice
13   from the Second Circuit of what they had to do.  Simply
14   because they believed that the law required it doesn't absolve
15   them from the fact that the Second Circuit had held that
16   you -- that the defendants, individual defendants did not have
17   the authority to make that call.  There are two things they
18   could have done, according to the Second Circuit.  Go back to
19   the sentencing judge or withdraw the illegally imposed
20   post-release supervision.
21         MS. DURDEN:  Your Honor, if I could just add, I
22   think it's a slightly different issue that Mr. Keane is
23   addressing, is that if this was just a case about compensatory
24   damages, then the intent of the individual defendants would
25   not be relevant to any determination by the jury, but to the

PROCEEDINGS                                                    13

1    extent that the plaintiff is seeking punitive damages that
2    their conduct was malicious and wanton, then the intent of the
3    defendants and why they chose to act in the manner that they
4    did is highly relevant to a determination as to whether the
5    intent was willful, it was malicious or if it was, you know,
6    more a mistake.  That goes to punitive damages not
7    compensatory.
8          THE COURT:  But it wasn't a mistake, they knew what
9    their obligations were.  There are emails where they said we
10   don't care what the Second Circuit said, we're not going to
11   comply.
12         MS. DURDEN:  But that's a finding for -- that goes
13   to liability that doesn't go to punitive damages.  The jury
14   has a right to hear what the defendants were thinking at the
15   time that they were making these decisions and the jury gets
16   to determine whether they believed that those actions were
17   malicious, whether they were willful, whether they fall within
18   the punitive damage standard that's given during the jury
19   instruction, which is completely different than a finding of
20   liability based on that information which is why they're
21   entitled to -- the plaintiff is entitled to compensatory
22   damages.  But if you're going to ask for punitive damages
23   where you're going through the actual mindset of the
24   individual defendants, then the jury has a right to hear what
25   they were thinking and, you know, why they made those

**JA478**

## PROCEEDINGS — 14

1  decisions. The jury may disagree that the way in which they
2  came to this decision was malicious. They may just think it
3  was, you know, stupid, like, they weren't thinking it through,
4  but that wouldn't lead to a finding necessarily of punitive
5  damages, which is in addition to the compensatory, which the
6  Second Circuit has already determined liability on.
7      So the intent -- I mean, you know, if plaintiff
8  withdraws a punitive damages claim, then your Honor is correct
9  that none of this matters, but if he's seeking punitive
10  damages, then the defendants have a right to explain
11  themselves as to why they did it.
12      THE COURT: These are lawyers, at least two of the
13  defendants are lawyers. They well understood that the Second
14  Circuit had told them that their acts were unconstitutional.
15  Even -- and the Second Circuit had also considered their
16  reasons that Penal Law 70.45 mandated the imposition of
17  post-release supervision. The Second Circuit has already
18  ruled that that argument does not really absolve them of their
19  actions. Now, I don't know whether Mr. Rickner is planning to
20  ask for punitive damages, it has not come up. But I think
21  that, Mr. Rickner, you haven't stated really one way or the
22  other, I think the only fights that I've resolved were the
23  compensatory damage issue, right --
24      MR. RICKNER: Well, I --
25      THE COURT: -- whether the plaintiff is limited to

## PROCEEDINGS — 15

1  nominal damages.
2      MR. RICKNER: That would be correct. I did put in a
3  punitive damages --
4      THE COURT: Charge.
5      MR. RICKNER: -- instruction. I do not currently
6  have authority to withdraw it. However, I would say that the
7  only testimony I plan to elicit on this point is the fact that
8  they're attorneys, the fact that they were aware of the order
9  and the fact that they didn't comply. If that isn't enough in
10  the jury's mind to show the kind of wrongdoing for an award or
11  in the Court's mind if the award is granted and it is removed
12  so be it, but I don't plan on going any further precisely
13  because I do not want to mire the jury in confusion as though
14  the Second Circuit's orders were not mandatory, they didn't
15  apply, that there was something else going on. Because it
16  seems to me that the heart of this is that if they are allowed
17  to put in that type of evidence, the jury is going to think
18  well, wait, even though the Second Circuit said one thing and
19  they're binding authority in this matter on this
20  constitutional issue, maybe there's another thing out there
21  that we just haven't heard about and that ends up being,
22  essentially, and, you know, hope that accidental jury
23  nullification of the issue, which I think would be
24  inappropriate.
25      MS. DURDEN: Your Honor, we addressed this similar

## PROCEEDINGS — 16

1  issue in a case *Bailey v. Pataki* before Judge Rakoff where
2  there was already a finding of liability and the judge
3  instructed the plaintiff's counsel, that should you choose to
4  go for punitive damages, you run the risk that the jury is
5  going to determine that, despite the finding of liability,
6  that damages are not necessarily warranted. And each of the
7  individual defendants were permitted to explain their
8  rationale even in a situation, which is similar to this one,
9  where there was a state court and a federal court decision,
10  and the individual defendants were allowed to explain how they
11  came to the decision making and, in fact, the jury did not
12  award damages in that case other than a dollar, but because --
13  because the plaintiff had made the defendants' intent and on
14  the punitive damages relevant, the defendants were permitted,
15  unless the Court is instructing the jury as a matter of law
16  that, you know, punitive damages are warranted, which
17  obviously defendants would object to, the defendants should
18  have an opportunity to explain what they did and why and
19  especially in light of the fact, you know, as counsel has just
20  pointed out, you know, Commissioner Fischer is not an attorney
21  and yet he's a defendant in this case. He should have an
22  opportunity to explain why he did and how he --
23      THE COURT: Yet you want him to say that I was
24  motivated by my understanding of the state law?
25      MS. DURDEN: No, he's going to explain what was

## PROCEEDINGS — 17

1  going on in the agency at the time that he took over the
2  commissioner position, what he knew about PRS, what he knew
3  about the Second Circuit decision and how they came to the
4  determination as to what they were going to do.
5      His -- all of intent of the three individuals is
6  highly relevant on punitive damages, if the jury -- for the
7  jury to make a decision that it was wanton and malicious and
8  falls within the legal standard necessary to be met for
9  punitive damages.
10      Plaintiff doesn't have the opportunity to say, you
11  know, we believe we're entitled punitive damages, you heard
12  they did what they did and then deny the defendants an
13  opportunity to actually explain why they did what they did.
14  If they are going to make an affirmative argument that they
15  are entitled to punitive damages, then the defendants have an
16  opportunity to defend against it.
17      THE COURT: Well, he wasn't going to touch -- well,
18  let me put it this way, I'm looking through your memorandum of
19  law which is document number 178. Tell me what page, because
20  I must have missed it, where you rely on Judge Rakoff's
21  rulings and the facts in that case?
22      MS. DURDEN: I don't think Mr. Keane did -- that was
23  a case that I handled.
24      THE COURT: All right. I mean, he had his chance --
25  I mean, you know, this is what happens. Mr. Keane comes in

PROCEEDINGS                    18

1   here, and this is not the first time, making arguments that
2   were not raised before, talking about cases that are not
3   before the Court.  He was given two opportunities on behalf of
4   his clients to make summary judgment motions, that's rare.
5   But he made two summary judgment motions both of which were
6   not successful.  He wanted to make a third, believe it or not,
7   at last conference.  You know, I think that to the extent --
8   plus, as you know, Judge Rakoff's decisions are not binding on
9   me.  But I think this will just confuse the jurors.  I think
10  to the extent that Mr. Rickner has proffered what his evidence
11  will be on punitive damages and it is sufficient to have the
12  defendants testify, if they want to make an excuse as to why
13  they didn't do what the Second Circuit said they should have
14  done, the Second Circuit addressed this Penal Law and said it
15  doesn't matter, it's not relevant.
16          It doesn't absolve them so, you know, unless we
17  start, you know, instructing the jury that the Second Circuit
18  has already ruled that reliance on Penal Law 70.45 is not a
19  basis to --
20          MR. KEANE:  Your Honor, the Second Circuit addressed
21  liability.  The Second Circuit did not address entitlement to
22  punitive damages.
23          THE COURT:  Did not what?
24          MR. KEANE:  Did not address entitlement to punitive
25  damages.  And in the *Betances* case punitive damages were not

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS                    19

1   at issue.  In this case, as Mr. Rickner said, punitive damages
2   are being sought and as a matter of constitutional right, any
3   individual defendant who -- or against whom punitive damages are
4   sought is entitled to defend himself, and they should be
5   allowed to explain what they did.
6          That was not before the Second Circuit.  The second
7   Circuit just said you didn't do what you were supposed to do,
8   you're liable.  But it did not opine on whether their conduct
9   was worthy of punitive damages.
10          THE COURT:  Okay.  Mr. Keane, point out in your
11  brief where you made that argument about --
12          MR. KEANE:  Well, your Honor --
13          THE COURT:  -- your client's constitutional right
14  with regard to punitive damages?
15          MR. KEANE:  -- he did not argue punitive damages.
16  We did not argue to dismiss punitive damages in our brief.
17  He's made the assertion, we expect to go to trial and defend
18  punitive damages.
19          THE COURT:  I'm asking you where --
20          MR. KEANE:  We're not seeking to --
21          THE COURT:  -- where did you argue that Penal Law
22  70.45 was critical to your clients' constitutional right to
23  defend against the punitive damages?  Where do you say that,
24  sir?
25          MR. KEANE:  Well, your Honor, it's a given.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS                    20

1          THE COURT:  Just point out the page.  Is it there or
2   isn't it?  I don't want to hear anything more, just tell me
3   the page, please.
4          MR. KEANE:  Well, it wasn't an issue.  I cite Penal
5   Law 74[sic] on page 2 and 10.  And I say --
6          THE COURT:  I can read it, sir.  Let me just look
7   for it.
8          Page 2 just sets forth your argument that plaintiff
9   should not be allowed to argue at trial that under 70.45 he
10  could have been resentenced, okay.  I already ruled in your
11  favor on that.  So you said page 10?
12          MR. KEANE:  Yes, page 10, first paragraph.
13          THE COURT:  You're incorrect when you make the
14  statement that the record shows that had plaintiff been
15  referred for resentencing before July 1, 2008 he would, upon
16  any resentencing, have received the same PRS term he served.
17  That's just not true.  There is no record evidence of that and
18  the Second Circuit has really rejected that argument.  So I'm
19  not sure -- this does not go to punitive damages and some
20  constitutional right by the defendants to be able to bring up
21  Penal Law.
22          You're making statements as if they're correct, but
23  the record does not show -- in fact, it shows the opposite.
24  It does not show that they would have gotten the same
25  sentence.  Nobody is going to be allowed to speculate that if

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS                    21

1   only X had happened, some other result would have occurred.
2   So this is a symmetrical ruling that neither the plaintiff nor
3   the defendant can offer any speculative arguments that the
4   plaintiff would have or would not have received PRS had he
5   been resentenced in a timely manner.
6          MR. KEANE:  Your Honor, we understand that and we
7   will certainly of course abide by your Honor's ruling --
8          THE COURT:  Okay, let's move on.
9          MR. KEANE:  -- all we're asking for here is an -- I
10  think context is important, the jury ought to know what we're
11  talking about and it would be appropriate, we think, for the
12  jury to hear what Penal Law 70.45 said in 1998 through 2008,
13  and then what Penal Law 70.45 said after it was amended in
14  1998.  And no speculation but --
15          THE COURT:  All right.  If you want to just
16  stipulate --
17          MR. KEANE:  -- context is important, Judge.
18          THE COURT:  -- what the law was at various points
19  with regard to this section, that's fine.  I think that's just
20  a stipulated, nondisputable state of affairs.
21          MR. RICKNER:  I guess as long as it's clear that the
22  stipulation is simply a statement of what the law is, yes,
23  absolutely, of course, we can't dispute what that is, but any
24  even hint that that bound or authorized or granted the
25  defendants the power or obligation -- they're really saying

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

**JA480**

PROCEEDINGS 22

1 obligation, I don't even think they have the power, let alone
2 the obligation to do anything, now we're back into this sort
3 of speculative problem. So I don't really see -- it's
4 difficult for me to understand how we put that law up in front
5 of the jury and say anything about it except that the Second
6 Circuit and all of the relevant courts have found that the
7 defendants are not allowed to do anything with respect to this
8 law. They don't have the authority, or some phrasing like
9 that. Otherwise we're just back to confusion.
10          THE COURT: I mean, this whole problem arose, as you
11 know, because, you know, neither DAs nor judges ordered
12 post-release supervision even if a law said that they should
13 have. And given that, the defendants took it upon themselves,
14 in the face of the absence of such an order by a judge,
15 decided to impose it themselves. That's the problem. And
16 that's what's been held to be unconstitutional by the Second
17 Circuit.
18          So, you know, whether or not that law was there, the
19 point is the judge neglected -- I don't even want to use the
20 word neglect, the judge in his or her judgment did not impose
21 post-release supervision. And it was not up to the defendants
22 to impose it. So even if they, in their heart of hearts,
23 believed that a law required it, what the Second Circuit has
24 ruled is that they should have gone back to the judge to ask
25 that it be imposed in a resentencing, but they should have not

PROCEEDINGS 23

1 have imposed it and if they did impose it they should have
2 vacated it. That's what the Second Circuit has held.
3          So I'm going to move on now, Mr. Keane. I don't
4 know what else -- you haven't directly raised your point about
5 Judge Rakoff in another case where he held that punitive
6 damages would entitle the defendants to say that, well, we
7 thought the law was X and that's why we didn't go back.
8          MS. DURDEN: Your Honor, I don't think the argument
9 we're making is that they are going to say we thought, you
10 know, the law was X. It's going to explain the actions that
11 they took after *Earley*, which we understand the Court has
12 already found to have been improper, but for a punitive damage
13 charge it states that you get it if an actor or is malicious
14 done if it is prompted by ill will or spite toward the injured
15 person. So the individual defendants should have an
16 opportunity to explain why they took the actions that they
17 took. There was no ill will or spite towards --
18          THE COURT: Well, he's not going to be -- if that's
19 the case, I don't know that Mr. Rickner even has evidence that
20 any of the individual defendants had ill will, acted out of
21 ill will or spite toward Mr. Santiago.
22          Do you have any evidence of that?
23          MR. RICKNER: I don't -- your Honor, I don't have
24 any evidence --
25          THE COURT: Did they even know who he was? The

PROCEEDINGS 24

1 point is --
2          MR. RICKNER: Like I said, I don't have any evidence
3 that I even know that they even know who Mr. Santiago was --
4          THE COURT: Exactly.
5          MR. RICKNER: -- my evidence is --
6          THE COURT: Exactly.
7          MR. RICKNER: -- that they were told it's
8 unconstitutional and they did it anyway and then one of the
9 did it anyways was Mr. Santiago along with about 2,000 other
10 people.
11          MR. KEANE: But then, your Honor, if there's no
12 basis for punitive damages in this case, why is it even in?
13 We could avoid this entire discussion if -- if Mr. Santiago
14 withdraws his punitive damages claim.
15          THE COURT: The instructions will be that the jury
16 has to find that each of the individual defendants, in order
17 to be held liable for punitive damages, they must find there's
18 evidence in the record to show that each of the individual
19 defendants act with ill will and spite toward Mr. Santiago.
20 And if they get up and testify that they don't even know who
21 this person was, they had no knowledge of him, they deny
22 acting with any ill will toward him in particular --
23          MR. RICKNER: Well, I agree, your Honor, and I think
24 that if it's your Honor's position, which by way the way may
25 be legally correct, that simply saying that they knew it was

PROCEEDINGS 25

1 unconstitutional and that there was some group of people who
2 were going to be influenced by this is not enough for punitive
3 damages, then your Honor will tell -- well, the jury just
4 won't hear about it, because it will just be removed from the
5 charge.
6          THE COURT: Yes. I mean, I'm thinking I would like
7 at the charging conference to see if there's any record of any
8 hint of malice or ill will or spite toward Mr. Santiago that
9 these three persons harbored.
10          MR. RICKNER: I --
11          THE COURT: But I don't think you can make the case
12 based on what you've just said, sir. I mean, you all know the
13 case better than I do, but at the charging conference I may
14 not give that punitive damage instruction.
15          MR. RICKNER: I understand that, your Honor.
16          THE COURT: You're telling me that your client won't
17 let you. I don't know -- does your client really understand
18 the difference between compensatory and punitive damages?
19          MR. RICKNER: Yes, I believe he does.
20          THE COURT: All right. And you're telling me he
21 does not authorize you to withdraw it.
22          MR. RICKNER: Yes, although I don't know that I
23 fully discussed the nuanced the fact -- and to be clear, this
24 is a research question for me as well, as to whether or not in
25 effect ignoring a constitutional violation for a specific

**JA481**

PROCEEDINGS                                    26

1   person even if you don't know which specific people would be
2   influenced is not enough to support a punitive damages award.
3   As I said, as I sit here before this conversation, I have not
4   drilled down on that exact issue and of course I will.
5            It seems possible that if somebody says this is
6   unconstitutional and you say yeah, well, I'm going to do it
7   anyway and 2,000 people are going to be affected, that's
8   enough to award punitive damages even if you don't happen to
9   know the specific person.  But if I'm wrong about that, I'm
10  wrong about that.
11           THE COURT:  Okay.
12           MS. DURDEN:  Your Honor, can we just clarify then,
13  are the defendants going to be limited in their testimony to
14  just basically saying I worked for DOCCS, it was during this
15  period and I don't know Mr. Santiago?
16           THE COURT:  No, I haven't made that ruling.
17           MS. DURDEN:  Okay.  I just don't want to put someone
18  on the stand and have them testify to more than is being
19  permitted.  And --
20           THE COURT:  You know what?  You won't like this, but
21  if you want to be heard on this specific issue you should
22  submit something to me by noon on Monday.  I'll give you --
23  both of you have simultaneous.
24           So I'm granting both -- I'm precluding both sides
25  from offering speculation about what would have happened had

PROCEEDINGS                                    27

1   Mr. Santiago been timely brought before a court for
2   resentencing.  This new argument that comes up for the first
3   time today that somehow the defendants' understanding of 70.45
4   bears on their exposure for punitive damages will be given --
5   will held in abeyance.  I will allow briefing on this point.
6   But I'm telling you right now, I'm going to have no patience
7   for re-litigating the substantial time and decisions that I've
8   issued and the Second Circuit in *Earley*, *Betances* and all
9   these other cases.  This is just for me I cannot comprehend
10  why a state agency would act this way, honestly.  You're
11  lawyers for the people of New York and it's just -- maybe you
12  don't want to open the flood gates on your class actions but
13  so be it.
14           The second motion the defendants make is to
15  preclude -- to permit defendants to introduce the evidence as
16  to Penal Law 70.45 and plaintiff's sentences imposed by courts
17  in the federal system and the State of Virginia.
18           They don't make -- the defendants don't make any
19  arguments about punitive damages anywhere in their papers,
20  and, Mr. Keane, I wish you would just be more willing to
21  answer questions that are posed to you about your papers and
22  your arguments you've made and those that are just coming up
23  for the first time in court, but defendants basically contend
24  that the evidence will establish that the eight months that
25  plaintiff served on post-release supervision in New York was

PROCEEDINGS                                    28

1   also a period of time in which plaintiff would have been
2   required to serve sentences for convictions in the State of
3   Virginia and the Eastern District of Virginia.
4            (Continued on the next page.)

PROCEEDINGS                                    29

1   (Cont'g.)
2            THE COURT:  Now, the point that we have to
3   understand is that had the defendants not violated the
4   plaintiff's constitutional rights, he would not have served
5   those sentences in New York State for violations of
6   post-release supervision that was illegally imposed.  Because
7   they hadn't bothered to get him resentenced and had not
8   obtained a lawful judicial imposition of post-release
9   supervision.
10           This particular aspect of the defendant's motion in
11  limine me will be denied.
12           I will allow the plaintiff's sentences imposed by
13  courts in the federal district court and the State of Virgina
14  to be entered into the record that he was serving sentences
15  from the State of Virgina and from the Federal District Court
16  in Virginia, but it doesn't change the fact that -- and the
17  reason I'm admitting it because I believe it is relevant to
18  damages, but it doesn't change the fact that he also was in
19  jail under a state violation of post-release supervision.  He
20  spent time in jail.  So I'm denying the 70.45 point on this.
21           MR. RICKNER:  If I can be heard.  Obviously, I
22  appreciate the denial and I'm not going to argue against it.
23           I will say that the -- for damages, I believe the
24  relevant determination is time he served before and I will
25  concede there was time certainly before.  The -- factually, he

PROCEEDINGS     30

1   went back to jail and served time in Virginia afterwards. So
2   that wouldn't be relevant to the time -- to damages,
3   compensatory damages or the time he spent in jail beforehand.
4   My understanding it was, is that prior time in jail in one way
5   or another makes you used to it. Even though I never actually
6   seen any factual basis to this, may be a day or too, but prior
7   time in jail makes you used to it, so it doesn't hurt as much.
8   This is time he served afterwards and there's no indication he
9   got a discount. I reviewed the documents. He served his time
10   in New York, which was improper. Then he served his time in
11   two places in Virginia, which was proper and he got the full
12   amount for those two times.
13       So I think that it is relevant for damages and I do
14   think it creates some confusion with what I believe their
15   argument is. Well, he would have been in jail anyway, so
16   don't give him any money. And that's actually not -- there's
17   nothing in the factual record that would show he would have
18   been in jail anyway. So that's speculative, which would be
19   the substance of my opposition on this point.
20       MR. KEANE: And your Honor, we're not seeking
21   speculation. What we are simply trying to do is show these
22   are in the stipulations that Mr. Rickner and I worked out. We
23   have the timeline, but the timeline establishes, and the jury
24   should be aware of and instructed on, and we should be allowed
25   to testify about, the fact that no matter what happened with

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS     31

1   New York, Mr. Santiago was on concurrent terms of federal
2   supervised release and Virginia supervision. There were three
3   jurisdictions supervising him.
4       So we know, as a matter of fact, that his New York
5   supervision was concurrent with his other two jurisdiction.
6   He would have been on supervision. Now, we are not saying
7   that the June 12 to February 2, 2008 period of time, June 12,
8   2007 to February 2, 2008, we are not saying that he would have
9   been -- he would have served that specific frame of jail time.
10   We're not saying the record shows that at this time. He was
11   in New York and that was time that your Honor has said we are
12   liable for and we're not trying to get out of that time, but
13   it is relevant for damages.
14       But certainly that he was on supervision. And after
15   he was returned to the State of Virginia in the federal
16   system, he served more penalties down there. In addition, the
17   only reason he came back to New York was that he had committed
18   a crime in Virginia. He was an absconder from New York. The
19   only reason he ends up back in New York is that --
20       THE COURT: Just one moment. Sorry. One moment.
21       Go ahead.
22       (Pause in the proceedings.)
23       MR. KEANE: The only reason he ends up back in New
24   York is that he committed a crime, I believe it was in Fairfax
25   County, Virginia. And it was there that the authorities in

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS     32

1   Virginia picked him up and that's how he ended up coming back
2   through extradition to New York. Now, had he -- and
3   defendants should be able to tell the jury, had he not
4   committed the Fairfax County, Virginia offense, we wouldn't
5   have received him.
6       THE COURT: You what?
7       MR. KEANE: We wouldn't have received him up here in
8   New York. That period of time is, you know, he comes back to
9   New York only because he committed a crime down in Virginia.
10       THE COURT: No, but he served a term in prison in
11   New York because of the defendants unconstitutional acts. So
12   it doesn't matter whether it was before or during, none of the
13   crimes in Virginia, both state in federal, were completely
14   separate. They were sentenced separately. The timeframes may
15   have been shifted because he was in jail in New York. But
16   what is undeniable is he spent time in prison in New York, in
17   state custody in Virginia and in federal custody in Virginia.
18   He was sentenced on November 16, 2001 in the Eastern District
19   of Virginia to four years of federal -- I'm sorry, 37 months
20   of incarceration, plus four years of supervised release.
21       He was in prison illegally in New York because of
22   the illegal imposition of post-release supervision. And so,
23   it gets difficult to say that only prior prison should count
24   towards damages because he well knew in 2001 at the time of
25   his sentence that he would be serving 37 months in custody and

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS     33

1   another four years on supervised release, right. Now, he had
2   a detainer at the time. He came back to New York to answer
3   the Kings County bench warrant. He pled to this offense in
4   2002, the state offense. And, you know, I'm just -- he
5   received three and a half years in custody and no
6   supervision -- posttrial supervision -- post-release
7   supervision from the Judge.
8       MR. KEANE: I'm sorry, your Honor, the last.
9       THE COURT: He received no post-release supervision
10   from the Kings County judge.
11       MR. KEANE: I think he did.
12       THE COURT: From the Kings County judge.
13       MR. RICKNER: Right.
14       THE COURT: That's the whole problem we have here.
15       MR. KEANE: I see.
16       THE COURT: Upon his release, the defendants
17   illegally sentenced him to post-release supervision Or imposed
18   it.
19       MR. KEANE: And your Honor, we accept that in the
20   2010 resentencing. The Judge at that time stated there was no
21   evidence of post-release supervision at the plea of sentencing
22   back in 2002 -- well, I'm sorry, 2004 when he came back. But
23   there is evidence, the plea notes, which is our first exhibit,
24   show that the judge at the plea hearing said, three and a half
25   years sentenced, five years post-release supervision, but

*SHERNELLE GRIFFITH - Official Court Reporter*

**JA483**

PROCEEDINGS                                   34

1   said -- he said I really don't know how that works.  There was
2   some discussion.  We reviewed the plea minutes as if it was
3   quite clear he was going to get five years of post-release
4   supervision.  I know Mr. Santiago and Mr. Ricker think it's
5   not clear.
6          THE COURT:  Well, the judge who resentenced him
7   didn't agree with you.  He said that there's no evidence that
8   there was post-release supervision.  So the judge who saw this
9   on resentencing did not agree with you frankly.
10         MR. KEANE:  And our defendants were not at that
11  resentencing.  And our defendants had no reason to be at
12  resentencing.  They are prison officials.
13         THE COURT:  So what does that have to do with
14  anything?
15         MR. KEANE:  Well --
16         THE COURT:  Why is that even relevant?
17         MR. KEANE:  Well, we could argue that the
18  resentencing judge got it wrong.
19         MR. RICKNER:  I --
20         THE COURT:  Well, okay.  Fine.  You could have,
21  would of, should of, but you didn't.  Okay.  We are dealing
22  with what happened, not what could have happened.
23         All right.  Just please, Mr. Keane.
24         MR. RICKNER:  Briefly, your Honor.
25         One, and I don't know if Mr. Keane meant to imply

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                   35

1   this or not, just to be clear.
2          I did enter into stipulations if they were factually
3   correct.  I didn't mean that to be mean it was also post-sale
4   admissible.  I thought it was a tool for your Honor to use not
5   in acknowledgement of what the jury was going to hear on the
6   particular issues.
7          THE COURT:  Usually stipulations are read to the
8   jury and a copy of it is marked as an exhibit given to the
9   jury.
10         MR. RICKNER:  I believe in the last draft, as it
11  came in close to midnight and I didn't see the last email, I
12  had a line in it that said that we do not necessarily agree to
13  that.  You know, I understood this -- and perhaps I was wrong.
14  I understood this to be for this purpose so that at least when
15  we're trying to decide which cross-examination about prior
16  incarceration is important, other things about the factual
17  record that it would be cleared before your Honor, you'd know
18  what we agreed on.  So I'm sorry if it wasn't clear.  I
19  thought it was in the document submitted.
20         THE COURT:  It says, "Plaintiff has negotiated
21  certain revisions, but otherwise objects to the admission os
22  many of them as irrelevant and excluded by the Court's ruling
23  to date on the motions in limine.
24         So look, may be we should figure out which ones you
25  do object to.

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                   36

1          MR. RICKNER:  Absolutely.
2          THE COURT:  Looking at the most recent version,
3   which is document number 193-1 filed on November 11th.
4          MR. KEANE:  Yes, your Honor.
5          MR. RICKNER:  To be clear, your Honor, I didn't have
6   the benefit of all of your current motions in limine rulings
7   before reaching an agreement, which is why I was vague.
8          THE COURT:  Okay.  Let's go through it because this
9   is going to the jury, but do you want to hear my other
10  rulings.
11         MR. RICKNER:  Well, yes, I do.
12         THE COURT:  Okay.  Well, which do you want do first?
13  I mean, if your stipulations were dependent on my
14  rulings on the motions in limine then may be you should hear
15  my motions in limine rulings first.
16         MR. RICKNER:  Agreed.
17         THE COURT:  Okay.  So the first basis of the
18  defendants motion in limine is going to be briefed over the
19  weekend and you're going to submit something to me by Monday
20  by noon.  Not to revisit anything that I've already ruled on
21  with regard to --
22         MR. KEANE:  Yes, your Honor.
23         THE COURT:  -- your first -- the 70.45.
24         It seemed to me that the statute doesn't really
25  matter.  What really matters is the defendants either were or

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                   37

1   not were not aware of the Second Circuit ruling that what they
2   had done was unconstitutional and they needed to fix it in one
3   or two ways.  That's what's relevant to damages and that's
4   what's relevant to punitive damages.  It doesn't matter what
5   the law says, really.  They acted illegally and the Second
6   Circuit has determined that.  But, you know, again, the way
7   this case has been litigated and defended is just the most
8   frustrating experience to have lawyers make these arguments
9   and refer to other cases that were never made to a Court in a
10  timely way despite being given opportunities to make motions.
11         All right.  So I guess what I'm having trouble with
12  grafting, Mr. Rickner, is your argument and I agree with you,
13  that only the -- generally, only the incarceration before the
14  incarceration at issue should go to damages.  It doesn't
15  matter what happened afterwards, right.
16         But I guess my question is, are you relying on a
17  strict timeline as to what happened like when he was in jail
18  for the New York parole violation or are you saying that he
19  would have been in jail earlier in the State of Virginia, but
20  for the defendants violation.
21         MR. RICKNER:  Well --
22         THE COURT:  Because the bottomline is in my view was
23  that he was in jail unlawfully on the New York State violation
24  as post-release supervision.
25         MR. RICKNER:  Yes.

*SHERNELLE GRIFFITH - Official Court Reporter*

**JA484**

PROCEEDINGS 38

1    I obviously agree with that. I think that the case
2  law supports an argument that prior periods of incarceration
3  lessens the blow of the time that he did spend incarcerated.
4  And, therefore, the fact of those incarcerations when he went
5  in and when he came out are relevant. I do not believe that
6  the other circumstances are relevant. Why he was in custody
7  falls into more impeachment and these are very old. They're
8  not crimes of dishonesty. And, therefore, I think the federal
9  rules are pretty clear. That comes out. So absolutely. Was
10  he in jail from next date to next date, yes. Was he in jail
11  from next date to next date, yes.
12    And then the time that he spent incarcerates
13  illegally and that's obviously the issue, everything that
14  comes afterwards except to the extent it might be allowed for
15  impeachment because I acknowledged the 2016, you know,
16  conviction -- I believe it's the 2016 conviction is within 10
17  years. So at least the fact of conviction, I think the
18  grounds for it are too prejudicial to come in, but the fact of
19  conviction would be appropriate for impeachment. Going beyond
20  that subset, I think it is inappropriate because it's not
21  relevant for damages and it doesn't work for impeachment and
22  those are the only two ways this happens.
23    For example, the fact that he was on parole. Now,
24  there could be a case where my client says, I was out and I
25  had all these restrictions and I hated it. And you said,

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS 39

1  Well, no. You already had them from federal court and
2  Virginia State Court, so I get to bring that in. That would
3  make sense to me, but the timeline I'm talking about here is
4  the time he's locked up. And the -- for example, I believe he
5  had a federal probation officer to report to while he was
6  locked up. It's not how it works. So therefore, it's not
7  relevant.
8    That's my position, your Honor.
9    THE COURT: Now, I understand your point. If he
10  testifies, Oh, after my first conviction I had a clean record.
11  I was fine. I had no other criminal justice contact, then
12  yes, he's opened the door and he's going to be impeached.
13    MR. RICKNER: Yes.
14    THE COURT: Or if he says, You know, anything about
15  denying that he was under suppression.
16    MR. RICKNER: Exactly.
17    THE COURT: But otherwise, I agree that the fact the
18  2016 conviction can come in, that he was convicted in 2016.
19  And that he received -- well, I don't even know if it's
20  important for him to receive -- the jury to know that he had a
21  particular sentence.
22    MR. RICKNER: Right.
23    He was sentenced to a felony.
24    THE COURT: I beg your pardon?
25    MR. RICKNER: Yes. He pled guilty. He was

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS 40

1  sentenced pursuant to a felony. And to the extent that shows
2  untrustworthiness, the jury can consider it.
3    MR. KEANE: Your Honor --
4    THE COURT: How much time did he receive for that
5  one?
6    You know what, it's not even in your stipulation.
7    MR. RICKNER: I got it wrong. It is actually 2013,
8  not 2016.
9    THE COURT: Oh, okay.
10    MR. RICKNER: That's my mistake.
11    THE COURT: Okay. This is paragraph 65 of document
12  number 193-1 stipulation. "On July 5, 2013, Mr. Santiago
13  pleaded guilty in connection with a 2011 State of Virginia of
14  charges striking his wife and stalking and was committed to
15  the State of Virginia Department of Corrections."
16    I would delete striking and stalking his wife.
17  Okay. So we'll delete the words "of striking his wife and
18  stalking," and "was committed to the State of Virginia
19  Department of Corrections." That's admissible. That's it.
20    MR. RICKNER: It's proper impeachment, but not to be
21  a stipulated, I guess.
22    THE COURT: No.
23    MR. KEANE: Your Honor, we agree it's proper
24  impeachment, but we believe that his other convictions and his
25  other incarcerations are relevant and -- in the whole

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS 41

1  situation of his seven months of up here in New York.
2    THE COURT: But not after -- not after he served
3  that term. Before, yes. Not after.
4    MR. KEANE: The only issue with the after is that
5  his -- some of his convictions were retroactive in the State
6  of Virginia.
7    MR. RICKNER: But the point for damages is, was he
8  in a box beforehand.
9    THE COURT: Yes, exactly.
10    You know, look, your client frankly, I hope you've
11  told him, he's not likely to be viewed very sympathetically by
12  the jury.
13    MR. RICKNER: Without disclosing confidences --
14    THE COURT: I'm not asking you to disclose
15  confidences. I'm just saying, there's chance, a good chance,
16  they're going to get nominal damages because, you know, he had
17  quite a bit of trouble with the law.
18    MR. RICKNER: Your Honor, I've had the talk.
19    THE COURT: All right. Well --
20    MR. RICKNER: Not the first client I've gone down
21  this road with.
22    THE COURT: Okay. Well, the point is that whether
23  something was done retroactively or whatever. I think what's
24  important is, the plaintiff -- I'm sorry. The defendants can
25  inquire or cross-examine him regarding his prior time in

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    42

1  custody before this time that he spent in New York State
2  custody pursuant to the unlawful act of the defendants.
3            All right.  Item number two of the defendant's
4  motion in limine:
5            To permit defendants to argue that they were not the
6  cause of any damages to plaintiffs and to introduce evidence
7  of the positions taken by the district attorneys in State
8  Courts as to post-release supervision.
9            This is denied as far as introduction of evidence on
10  the DA and State Courts.
11           Based on the Betances v. Fischer, where the Second
12  Circuit found there's liability and legal causation for damages
13  exist, the Second Circuit has addressed pointing the finger at
14  district attorneys and State Courts, in that they specifically
15  ruled that had the defendants actually moved or informed the
16  DAs or the State Court that a particular defendant had to be
17  resentenced and nothing was done, end of story, they did what
18  they were supposed to do.  That didn't happen here.  So --
19           MR. KEANE:  And your Honor, and again, we're not
20  asking to shift liability.  We are asking simply to be allowed
21  to tell that story and may hinge on what happens with the
22  punitive damages claim, but our -- I'll proffer this, our
23  defendants are going say they asked the DAs about resentencing
24  and the DA said we are not going to resentence him.  And the
25  reasons the DA's said were very clear.  So our clients are

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    43

1  going to say, it was futile to send anything to a judge that
2  the DA's weren't going to cooperate.
3            THE COURT:  The Second Circuit held that some
4  defendants were in fact resentenced.  They did make that
5  request.  They didn't do it with regard to certain defendants.
6  And unless they can show they specifically asked the DA to
7  resentence Mr. Santiago or the district -- I mean the trial
8  Court to resentence Mr. Santiago, they cannot argue that we it
9  was futile.  The Second Circuit found that in certain
10  instances the defendants had taken that step and they were
11  rejected and that was the end of their liability.  So --
12           MR. KEANE:  Your Honor, if I may, I don't believe
13  the Second Circuit held that at all.  There was no evidence in
14  any of the post-release supervision cases that anyone was
15  resentenced during this time period.  And I don't believe the
16  Circuit made that statement.
17           THE COURT:  Well, I just read it and it was in my
18  decision so I'm going to go back and find it.  I'll ask my law
19  clerk to also look.
20           I'm looking at the decision dated September 23rd.
21  Okay.  This is my decision dated September 23, 2019, on page
22  25, defendants -- this is in the context of -- I'm sorry, of
23  nominal damages.  But defendants briefed noted that
24  "Resentencing generally did not take place until the June 2008
25  enactment of correction law Section 601-D.  Defendants did

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    44

1  allege that no resentencing took place at all or that
2  resentencing would not have taken place had they complied with
3  their obligations.  They cite just one instance in the Early
4  case where the Kings County DA expressly declined to pursue a
5  similarly situated plaintiff's resentencing.  And although
6  defendants assert that throughout the period relevant to
7  plaintiff, the New York State law allowed for every individual
8  with a flawed PRS term to be resentenced to PRS, they do not
9  establish that this would have happened to plaintiff."
10           So there's no evidence that the defendants or anyone
11  acting at their direction tried to get Mr. Santiago sentenced
12  and they were rejected.  And the fact that they can point to
13  only one instance in a case doesn't mean that the judge would
14  have denied resentencing in this case.
15           MR. KEANE:  And we agree that there's no evidence
16  that any efforts were made with respect to Mr. Santiago.  We
17  do note Betances itself held, 837 F. 3d at 166, Early was met
18  with resistance by district attorneys and administrative court
19  officials.  And some New York courts were inconsistent in
20  adhering to Early thus the -- and the Circuit said, "The
21  actions of others might inform any assessment of causation."
22           But we agree with your Honor, that there was no
23  specific effort made with respect to Mr. Santiago during the
24  seven months of his reincarceration in New York.  But we
25  submit, your Honor has ruled on this, we submit that it would

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    45

1  be appropriate for defendants to explain their reasons why and
2  it's right there.  They were not met with resistance.  It's
3  not like they didn't ask and they didn't say --
4            THE COURT:  How many cases do they ask for
5  resentencing and received resistance?
6            MR. KEANE:  Your Honor, that's the story that
7  Commissioner Annucci can tell.
8            THE COURT:  Well, that's just hearsay.
9            How can I allow that?
10           MR. KEANE:  Well, Mr. Annucci can say that he sent
11  emails to the Office of Court Administration urging them to
12  and notifying them of the Early decision and he can testify --
13  and yes, I suppose it is hearsay, but the point is he can say
14  he made these efforts.  He wasn't simply ignoring the Early
15  decision.  He made -- and he can cite to you, you know, as he
16  followed the saga of all of this between 2006 and 2008 when he
17  launched the resentencing issues.  But those are the efforts
18  made and in defense of his actions, but in defense of his
19  liability, but in defense of these claims of punitive damages,
20  he should be allowed to explain the efforts that he made.
21           THE COURT:  You know, Mr. Keane, I'm just -- I
22  respectfully have to reject your argument.  It's not an
23  argument that comports with the Second Circuit's findings.
24  The Second Circuit has stated that the three defendants;
25  meaning, the same three defendants here, became aware of Early

*SHERNELLE GRIFFITH - Official Court Reporter*

**JA486**

PROCEEDINGS                                                                46

1    One's holding at different times and noted that Annucci,
2    despite, "immediately understanding Early One's holdings,
3    deliberately refused to change DOCS procedures to bring them
4    into compliance." Bentances Two, 837 F. 3d at 167, 171." And
5    in fact, again quoting the Second Circuit, in August 2006,
6    Annucci emailed DOCS personnel to inform them that DOCS would
7    not follow Early One.
8              In early 2007, Annucci arranged for DOCS personnel
9    to manually review inmate files to determine whether
10   sentencing and commitment orders reflected PRS terms and
11   flagged those that did not. Despite obtaining this
12   information, Mr. Annucci did not take steps to remove
13   administrative PRS terms or seek resentencing until after the
14   New York State Court of Appeals decisions in Garner and
15   Sperber, id at 157 to 169.
16             So Mr. Keane, I know you're trying to be a zealous
17   advocate. What you're doing honestly feels like you are
18   asking this Court to rehash and question and refuse to follow
19   what the Second Circuit has already ruled. It doesn't -- it's
20   just simply not appropriate for them to now argue that there
21   they're not the cause of damages and that DA's in State Courts
22   were not opened to them. They have no evidence. There's no
23   evidence that they even tried with regard to Mr. Santiago.
24   They're aware of Early One. He admitted that he wasn't going
25   to follow it and he also did a review, knew who needed to be

PROCEEDINGS                                                                47

1    resentenced, and just did nothing. I'm sorry. This is not
2    coming in.
3              MR. KEANE: Your Honor.
4              THE COURT: Mr. Keane, what?
5              MR. KEANE: I'm sorry.
6              None of that -- none of the record in Betances is
7    the record here.
8              THE COURT: But the Second Circuit, he made
9    statements under oath and the Betances has ruled on given what
10   Mr. Annucci said and did under oath. No, he's not going to be
11   able do this. I'm sorry --
12             "In July of 2007, Fischer directed Annucci to
13   respond to an inmate who asked about his term of
14   administratively imposed PRS. Annucci explained that Early
15   was, "contrary to state appellate case law," and that when
16   states and federal courts reach different results regarding
17   state law, the state case law takes precedence over federal
18   case law in court until the Supreme Court addresses the
19   issue." That was a letter that he wrote on July 2, 2007 to
20   Mr. Smith who made an inquiry about an inmate's you know,
21   complaint that he had an illegal PRS sentence.
22             And you say it's not part of the record. It's in my
23   decision and it was before me and I ruled on it and I relied
24   on it and it is in the record. And with regard to,
25   Mr. Terry -- Tracey. I'm sorry. The Second Circuit in the

PROCEEDINGS                                                                48

1    Betances citing extensively from Mr. Tracey's deposition
2    testimony in which he stated he became aware of and understood
3    Early in late 2006, concluded that Tracey had "affirmatively
4    decided to continue DOP's former approach where DOP would not
5    investigate whether it was supervising a parolee with an
6    administrative PRS term, in contradiction of Early." Betances
7    Two, 837 F. 3d at 158, 171.
8              It's in my decision. I ruled that the Second
9    Circuit has made these determination and I'm not going to
10   allow you to argue that the district attorney in the State
11   Courts were the ones who caused the damages. All right.
12             MR. KEANE: Your Honor, respectfully we disagree.
13             THE COURT: I know you do. I know you do but, I've
14   ruled. Okay.
15             MR. KEANE: Your Honor, I think what we need
16   clarification on is what will you permit our defendants to
17   testify.
18             THE COURT: This is -- you know your case. I'm not
19   going to tell you what they can testify to. You made a motion
20   of limine asking for specific items to be allowed and I'm
21   making rulings. Okay. So I'm not telling you, Mr. Keane,
22   what your clients can testify to. I'm ruling on your motions
23   in limine. I have no idea what you're going to present on
24   direct. I have no idea. So how can I tell you that. You're
25   the trial lawyer here, not me.

PROCEEDINGS                                                                49

1              But blaming the DA's and the State Court is not
2    going to be appropriate. And you're going to confuse the jury
3    in any event and the jury is going to think where are the
4    DA's, where are the State Court judge, why of you they
5    defendants? Should we give discount off of our damages
6    because other people are involved? No. That's not what's
7    going on here and I'm not going to confuse the jury. It's
8    irrelevant. It's been ruled upon by the circuit and it's not
9    coming in.
10             All right. Now, the fourth point defendants want to
11   permit them to introduce evidence that plaintiff would have
12   been incarcerated or would have been serving terms of
13   supervision in any event even if plaintiff had not been
14   serving post-release suppression. This is more of the same.
15             Pardon me.
16             MR. RICKNER: Same argument.
17             THE COURT: Yes. And it's also denied for the same
18   reasons.
19             It's not relevant in 401. And I think it is
20   confusing and prejudicial under 403 and it's not coming in.
21             MR. KEANE: And just -- we have the same objection.
22             THE COURT: I know. That's fine.
23             The fifth point is to permit defendants to offer
24   evidence of plaintiff's criminal and parole history, including
25   plaintiff's criminal convictions and parole violations in New

PROCEEDINGS                                                    50

1   York, Virginia, and the federal system.  And as we've ruled,
2   their criminal history is relevant to damages up until the
3   time that Mr. Santiago was in unlawful custody pursuant to the
4   acts of the defendants.
5           What I'd like to have admitted is he was in custody,
6   you know, on X date for X amount of time.  We don't need to go
7   into the knitty gritty of why he was in custody.
8           MR. RICKNER:  Agreed.
9           THE COURT:  Pardon me?
10          MR. RICKNER:  I just said agreed.
11          THE COURT:  Yes.
12          There seems to be a stipulated timeline.  I'm hoping
13  we are not going to have an issue of that as long as that
14  timeline stops as of the date of his state law incarceration.
15          MR. RICKNER:  Yes, your Honor.
16          And I believe we can reach a stipulation that in
17  effect trims out some of the details of the incarceration is
18  reduced to the fact that the incarceration comports with your
19  in limine ruling.
20          THE COURT:  I think what's relevant is the damages
21  the plaintiff is going to try to prove in this case.
22          The sixth item is to require plaintiff to bear the
23  burden of proof that his life would have been different had he
24  been resentenced at an earlier date.
25          Denied.

*SHERNELLE GRIFFITH - Official Court Reporter*

---

PROCEEDINGS                                                    51

1           I mean, basically you're asking him to prove
2   something that is speculative.  He can testify about his
3   damages, the pain and suffering, mental -- whether he had
4   mental pain and suffering, emotional pain and suffering,
5   whether he had any physical injuries as a result of an assault
6   in the jail, or an accident in the jail.  I think this is so
7   overbroad, and so nebulous, and so beyond what I can even try
8   to comprehend what the defendant's are getting at.  He has to
9   prove his damages basically.  Not that his life would have
10  been different had he been resentenced at an earlier date.
11  Because let's not forget, he was resentenced and he didn't
12  have post-release suppression.  So the jury would have to make
13  several leaps of speculative findings, which they are not
14  allowed to do.
15          MR. KEANE:  And we understand that this is a
16  procedural due process case and that is the standard jury
17  instruction had plaintiff received the due process he was
18  entitled to, what would have happened.
19          THE COURT:  We ruled on that already.
20          Did you read my decisions at all before you make
21  these motions?
22          MR. KEANE:  Yes, your Honor.
23          THE COURT:  Okay.  I explained why the case you
24  relied on was completely in opposite and explains why that
25  argument was a nonstarter.  There's no way that you can prove

*SHERNELLE GRIFFITH - Official Court Reporter*

---

PROCEEDINGS                                                    52

1   that were he brought for resentencing earlier that he would
2   have gotten PRS, nunc pro tunc.  You just can't make that leap
3   of speculation.  The plaintiff has to prove that he was
4   injured because of defendant's constitutional violations and
5   that what -- at Grand Juries he testifies about that resulted
6   from his time in custody, unlawful custody, is what the jury
7   will hear and not because his whole life would have been
8   different.
9           Who can even prove that?  I mean, how would you even
10  prove that?
11          MR. KEANE:  Well, your Honor, we can establish as a
12  matter of fact that in the criminal statute that governs
13  here --
14          THE COURT:  You're going to have to speak up, sir.
15          MR. KEANE:  I'm sorry.
16          What we would point to in the first instance is the
17  statute, Penal Law 70.45, that required during his
18  post-release suppression up until June 30, 2008, any
19  resentencing that would have taken place in the State of New
20  York up to that point would have, if it were a lawful
21  sentence, would have been a sentence that included the
22  post-release suppression.
23          THE COURT:  But --
24          MR. KEANE:  After 2008, you could get a sentence
25  without post-release suppression upon the consent of the DA.

*SHERNELLE GRIFFITH - Official Court Reporter*

---

PROCEEDINGS                                                    53

1           THE COURT:  Again, you're -- I don't want to say
2   you're making things up, but there's no evidence.  In fact,
3   there's contrary evidence that judge's did, I think, there was
4   one instance that I referred to in my decision --
5           MR. KEANE:  Well, your Honor.
6           THE COURT:  -- where a judge -- excuse me.  I let
7   you speak.  Are you going to jump up and --
8           MR. KEANE:  I'm sorry, your Honor.
9           I was going to point to the Early decision itself is
10  an example of your Honor's -- where somebody was
11  resentenced -- well, wasn't given a resentencing by the
12  Brooklyn DA.
13          (Continued on the following page.)
14
15
16
17
18
19
20
21
22
23
24
25

*SHERNELLE GRIFFITH - Official Court Reporter*

**JA488**

54

PROCEEDINGS

1          THE COURT:  That's not the point.  Your point was --
2    I thought your point was that anyone who would have been
3    brought for resentencing would have gotten PRS, that was your
4    point.
5          MR. KEANE:  Well, no, my point was that's what the
6    law required.
7          THE COURT:  Yes, it might have but the judges
8    weren't necessarily imposing PRS, okay, they just weren't.
9          MR. KEANE:  Yes, we understand.
10         THE COURT:  The judge here didn't.  All right.
11   We're now going to go to plaintiff's motion *in limine*, I think
12   we've gone through all of defendants.
13         Plaintiffs move to exclude plaintiff's criminal
14   history to limit the use of the history for impeaching
15   plaintiff.
16         Now, again, I think his prior convictions go
17   directly to damages up until the date of his incarceration.
18         MR. RICKNER:  Consent.
19         THE COURT:  And we're not going to allow post time
20   in custody that follows his New York State parole sentence.
21   Older convictions may be admissible if I determine that they
22   were probative of an issue before me and that the probative
23   value outweighs the prejudicial effect, but I think we've
24   already ruled on this.
25         MR. RICKNER:  Yes, I agree, your Honor.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

**JA489**

GOVERNOR'S PROGRAM BILL

**PROGRAM BILL #7 3 R**
**REVISED**

2008

#### MEMORANDUM

AN ACT    to amend the criminal procedure law, the penal law,
the correction law and the county law, in relation to
post-release supervision

#### Purpose:

This bill provides a framework for a prompt, fair, and careful response to recent decisions in which the Court of Appeals struck down longstanding practices for determining the supervision terms of violent felons.

#### Summary of Provisions:

Sections 1 and 1-a of the bill amend Criminal Procedure Law §380.70 to specify that it is the court that is responsible for delivery of sentencing minutes to the Department of Correctional Services ("DOCS").

Section 2 of the bill adds a new §70.85 to the Penal Law to apply to certain cases in which determinate sentences were imposed between 1998 and 2008, and in which the sentencing court failed to explicitly state that a term of post-release supervision ("PRS") was being imposed. The bill allows a re-sentencing court, on consent of the district attorney, to impose the originally imposed determinate sentence without any period of PRS.

Section 3 of the bill amends Penal Law §70.45(1) to modify procedural provisions for determinate sentences to be imposed in the future. It replaces a provision that such sentences automatically include supervision terms with one that requires courts to state such terms explicitly in the course of pronouncing sentence.

Section 4 of the bill amends Correction Law §601-a to expand the duty of DOCS to facilitate re-sentencing of inmates whose original sentence was unlawful.

Section 5 of the bill adds a new Correction Law §601-d that applies to cases possibly in need of resentencing because the term of PRS may not have been pronounced by the court. It provides an orderly procedure for bringing such cases to the attention of the court, ensuring their prompt resolution, and directing DOCS and the Division of Parole ("Parole") to take appropriate steps in light of court proceedings. In particular, the new Correction Law §601-d includes the following subdivisions:

- Subdivision 1 defines "designated person" to mean an inmate sentenced to a determinate sentence that was required to include a term of PRS, but for whom the sentencing papers suggest that the required term may not have been pronounced at sentencing.

- Subdivision 2 requires DOCS and Parole to give notice of such designated persons to the criminal courts that originally sentenced them. Rather than set strict timelines within which the agencies must complete the process of review and notification, it allows them to conduct a prompt but orderly review, prioritized for different groups according to the relative needs, and urgency of review, as to each group.

- Subdivision 3 provides that when a sentencing court that has received such notice learns that a term of PRS was actually pronounced at the sentence, the court shall send the relevant information, including a superseding commitment order, to the parties.

- Subdivision 4 requires the sentencing court to appoint counsel for the defendant, obtain necessary information, and schedule proceedings to consider re-sentencing. Courts are required to issue written orders within 40 days of receiving the notice, unless additional time is allowed on the consent of the defendant, or, when there are extraordinary circumstances, in 10-day extensions on the motion of the district attorney.

- Subdivision 5 provides for the parties to be notified of the court's decision.

- Subdivision 6 provides that when the court does not re-sentence the defendant within the statutorily allowed time, the records of DOCS and Parole shall reflect that a term of PRS has not been imposed.

- Subdivisions 7 and 8 relate to whether remedies in the bill are exclusive, and preserve the ability of defendants to seek relief in other kinds of actions.

Section 6 of the bill amends Correction Law §722 to provide for assigned counsel to assist defendants in re-sentencing proceedings.

Section 7 of the bill authorizes the Office of Court Administration to promulgate regulations for the fair and expeditious consideration of re-sentencing cases.

Section 8 of the bill sets out the severability clause.

Section 9 of the bill sets forth an immediate effective date.

2

JA491

## Existing Law:

Criminal Procedure Law §380.20 provides that the court must pronounce sentence in every case where a conviction is entered.

Penal Law §70/45(1) provides that each determinate sentence "also includes, as a part thereof, an additional period of post-release supervision."

## Statement in Support:

In 1998, the New York State Legislature enacted Jenna's Law, which was named for Jenna Grieshaber, a twenty-two-year-old nursing student who was murdered by a violent felon released from prison after serving only two-thirds of his sentence. Jenna's Law amended the Penal Law to end "indeterminate sentences" – i.e., sentences running between certain minimum and maximum periods set by the court at the time of sentencing – for criminal defendants convicted of violent felonies. Instead, Jenna's Law required "determinate" sentences, and also created a schedule of mandatory terms of PRS to be included as a part of the determinate sentences of violent felony offenders.

In many cases, judges informed defendants, at the time of sentencing, that they would be subject to a period of PRS following completion of their determinate sentence; in other cases, they did not, and DOCS simply included the PRS pursuant to the terms of the Penal Law. Over time, offenders challenged DOCS's calculation of PRS as part of their determinate sentence, and courts throughout the State were split on this legal issue – with some finding that PRS automatically was a part of the sentence by operation of law, and others finding PRS had to be expressly imposed by the sentencing court.

On April 29, 2008, the New York State Court of Appeals issued two decisions (Matter of Garner v. DOCS and People v. Sparber) that finally resolved some of the legal issues associated with the imposition of PRS. Most notably, the Court ruled that only the sentencing judge has the authority to impose the PRS component of an offender's determinate sentence, and that the period of PRS must be stated by the judge at the time of sentencing in the offender's presence. The Court in Garner also ruled, however, that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

Since then, DOCS and Parole have undertaken major initiatives to bring the relevant cases to the attention of the sentencing courts, so that those courts can make decisions about re-sentencings. The initiatives have already had some success in arriving at resolution of individual cases, but it has become clear that it would be hard to reach resolutions of all the relevant cases through such initiatives alone.

3

This bill provides a statutory framework that facilitates and mandates a comprehensive review. The framework will allow DOCS and Parole to obtain definitive judicial guidance as to which defendants are to remain subject to PRS and which are not. It provides for a process that can be deliberate and orderly, yet fair and expeditious.

The massive burden of identifying which inmates and releasees shall be referred to the courts is not made subject to strict time limits. Within the universe of inmates and releasees, there are many different circumstances, and many difficulties obtaining the necessary information. Therefore, it would be hard to specify across-the-board deadlines in a way that provides sufficiently for both promptness and feasibility. The bill thus allows DOCS and Parole to identify classes among inmates and releasees that may require different levels of urgency in review and judicial resolution, and to structure the review process accordingly. The diligence with which these agencies have undertaken their PRS initiatives to date provides reassurance that they will identify and refer to courts most promptly those inmates and releasees for whom judicial resolution is most urgent. For example, some inmates may be serving unlawful determinate sentences for which the conditional release date is necessarily many months or even years from now. This bill allows the DOCS review process to be prioritized so that the cases of such inmates can be timely and fairly resolved, but DOCS can first devote its resources to more pressing cases, such as those in which inmates are scheduled for release in the near future, or are being held on violations of PRS terms that were administratively added by DOCS.

The need for prompt but orderly resolution is also served by the provision in the bill that authorizes the Office of Court Administration to promulgate regulations for judicial consideration of these cases. It would be difficult for the courts to provide fair and expeditious adjudication if thousands of cases were simultaneously added to the system without coordination, prioritization or planning.

Judicial guidance to DOCS and Parole is crucially important because, for example, the absence of sentencing minutes may make it impossible in many cases for the agencies to know whether PRS was properly imposed at the time of sentence. Such matters are appropriate for judicial resolution. There would be unacceptable consequences for public safety if custody or supervision ended when it should be continued, and an infringement on individual liberty if custody or supervision continued when it should end.

The bill also addresses an issue arising from the Court of Appeals decision in People v. Catu. When a defendant who pleads guilty has not been informed that the sentence would include a term of PRS, the defendant may later seek for the plea to be vacated. This bill allows the District Attorney to consent to re-sentencing to the previously imposed determinate term without any term of PRS. By allowing defendants in this situation the benefit of their plea bargains, there should be no need for the pleas to be vacated.

4

The bill not only provides effective relief as to unlawful sentences imposed in the past, but also makes related improvements going forward. Current statutory language seems to reflect an intent that PRS arise automatically as a part of every determinate sentence. The bill replaces that approach with a requirement that sentencing courts explicitly state terms of PRS when imposing determinate sentences. This is a more open and transparent way of ensuring that defendants are sufficiently informed about their sentences. Other benefits include an enhanced ability for DOCS to facilitate correction of other kinds of unlawful sentences.

## Budget Implications:

This bill has no appreciable fiscal impacts beyond those that otherwise would have resulted from the two recent Court of Appeals decisions. Those decisions also contemplated re-sentencing for the same population of individuals, resulting in the same impact with respect to DOCS transportation costs, costs associated with the provision of defense counsel, operational costs borne by the courts and the supervision responsibilities of the Division of Parole.

## Effective Date:

This act shall take effect immediately.

5

**STATUS:**

**A11764** Rules (Aubry)      Same as S 8714  NOZZOLIO

Criminal Procedure Law

TITLE....Enacts provisions relating to post-release supervision

06/23/08  referred to codes

06/23/08  reported referred to rules

06/24/08  reported

06/24/08  rules report cal.780

06/24/08  substituted by s8714

      **S08714 NOZZOLIO**

      06/23/08  REFERRED TO RULES

      06/24/08  ORDERED TO THIRD READING CAL.2184

      06/24/08  MESSAGE OF NECESSITY - 3 DAY MESSAGE

      06/24/08  PASSED SENATE

      06/24/08  DELIVERED TO ASSEMBLY

      06/24/08  referred to codes

      06/24/08  substituted for a11764

      06/24/08  ordered to third reading rules cal.780

      06/24/08  message of necessity - 3 day message

      06/24/08  passed assembly

      06/24/08  returned to senate

      06/25/08  DELIVERED TO GOVERNOR

**BILL TEXT:**

## STATE OF NEW YORK

11764

## IN ASSEMBLY

June 23, 2008

Introduced by COMMITTEE ON RULES -- (at request of M. of A. Aubry,
Lentol, Silver) -- (at request of the Governor) -- read once and
referred to the Committee on Codes

AN ACT to amend the criminal procedure law, the penal law, the
correction law and the county law, in relation to post-release super-
vision

The People of the State of New York, represented in Senate and Assem-
bly, do enact as follows:

1    Section 1. Section 380.70 of the criminal procedure law, as amended by
2  section 3 of part D of chapter 56 of the laws of 2008, is amended to
3  read as follows:
4  § 380.70 Minutes of sentence.
5    In any case where a person receives an indeterminate or determinate
6  sentence of imprisonment, a certified copy of the stenographic minutes
7  of the sentencing proceeding, a certificate of conviction specifying the
8  section and, to the extent applicable, the subdivision, paragraph and
9  subparagraph of the penal law or other statute under which the defendant
10  was convicted and a copy of any order of protection or temporary order

**JA495**

Case 1:12-cv-02137-RMSD Document 175, 198-6/29 filed 11/21/22, Page 255 of 126 PageID #: 2608

```
11  of protection issued against  the defendant at the time of sentencing
12  must be delivered by the court to the person in charge of  the  institu-
13  tion  to  which the defendant has been delivered within thirty days from
14  the date such sentence was imposed; provided, however, that  a  sentence
15  or commitment is not defective by reason of a failure to comply with the
16  provisions of this section.
17    § 1-a.  Section  380.70  of the criminal procedure law, as amended by
18  section 4 of part D of chapter 56 of the laws of  2008,  is  amended  to
19  read as follows:
20  § 380.70 Minutes of sentence.
21    In  any  case  where  a  person  receives an indeterminate sentence of
22  imprisonment or a reformatory or alternative local reformatory  sentence
23  of  imprisonment,  a  certified  copy of the stenographic minutes of the
24  sentencing proceeding and a copy of any order of protection or temporary
25  order of protection issued against the defendant at  the time of sentenc-
26  ing must be delivered by the court to the person in charge of the insti-
```

        EXPLANATION--Matter in italics (underscored) is new; matter in brackets
                       [-] is old law to be omitted.

                                                                LBD12093-02-8

JA496

Case 1:12-cv-02137-RAM-SD Document 75, 19896/2912d 11/31/22, Page 286 of 126 PageID #: 2609

A. 11764                                    2

1  tution to which the defendant has been delivered within thirty days from
2  the date such sentence was imposed; provided, however, that a sentence
3  or commitment is not defective by reason of a failure to comply with the
4  provisions of this section.
5      § 2. The penal law is amended by adding a new section 70.85 to read as
6  follows:
7  **§ 70.85 Transitional exception to determinate sentencing laws.**
8      **This section shall apply only to cases in which a determinate sentence**
9  **was imposed between September first, nineteen hundred ninety-eight, and**
10 **the effective date of this section, and was required by law to include a**
11 **term of post-release supervision, but the court did not explicitly state**
12 **such a term when pronouncing sentence. When such a case is again before**
13 **the court pursuant to section six hundred one-d of the correction law or**
14 **otherwise, for consideration of whether to resentence, the court may,**
15 **notwithstanding any other provision of law but only on consent of the**
16 **district attorney, re-impose the originally imposed determinate sentence**
17 **of imprisonment without any term of post-release supervision, which then**
18 **shall be deemed a lawful sentence.**
19     § 3. Subdivision 1 of section 70.45 of the penal law, as amended by
20 section 4 of part E of chapter 56 of the laws of 2007, is amended to
21 read as follows:
22     1. In general. [Each] **When a court imposes a** determinate sentence
23 [also includes, as a part thereof,] **it shall in each case state not only**
24 **the term of imprisonment, but also** an additional period of post-release
25 supervision **as determined pursuant to this article**. Such period shall
26 commence as provided in subdivision five of this section and a violation
27 of any condition of supervision occurring at any time during such period
28 of post-release supervision shall subject the defendant to a further
29 period of imprisonment up to the balance of the remaining period of
30 post-release supervision, not to exceed five years; provided, however,
31 that a defendant serving a term of post-release supervision for a
32 conviction of a felony sex offense, as defined in section 70.80 of this
33 article, may be subject to a further period of imprisonment up to the
34 balance of the remaining period of post-release supervision. Such maxi-
35 mum limits shall not preclude a longer period of further imprisonment
36 for a violation where the defendant is subject to indeterminate and
37 determinate sentences.
38     § 4. Section 601-a of the correction law, as amended by chapter 508 of
39 the laws of 1991, is amended to read as follows:
40     § 601-a. Return of persons erroneously sentenced for the purpose of
41 resentence. Whenever it shall appear to the satisfaction of the [warden
42 of any state prison] **department** based on facts submitted on behalf of a
43 person sentenced and confined in a state prison, that any such person
44 has been erroneously sentenced [as a second, third or fourth offender],
45 it shall [become his] **be the** duty **of the department** to communicate with
46 the district attorney of the county in which such person was convicted.
47 If upon investigation, such district attorney believes that the person
48 has been so erroneously sentenced, he**or she** shall notify the [warden of
49 the state prison wherein such person is confined] **department**. The
50 [warden] **department** thereupon shall notify the sheriff of the county, or
51 in counties within the city of New York or the county of Westchester,
52 the commissioner of correction of such city or county from which such
53 person was committed, who shall remove such person from such prison and
54 cause him **or her** to be taken before the court in which he **or she** was
55 sentenced for the purpose of resentence. The cost and expense of the

**JA497**

A. 11764                          3

1  return of such person necessarily incurred shall be a charge against the
2  county from which he or she was committed.
3      § 5.  The  correction law is amended by adding a new section 601-d to
4  read as follows:
5      § 601-d. Post-release supervision; certain cases.  This section  shall
6  apply  only to inmates in the custody of the commissioner, and releasees
7  under the supervision of the division of parole, upon whom a determinate
8  sentence was imposed between September first, nineteen  hundred  ninety-
9  eight, and the effective date of this section, which was required by law
10  to include a term of post-release supervision:
11     1.  For  purposes  of  this  section,  such a person shall be deemed a
12  "designated person" if the commitment order that accompanied such person
13  does not indicate imposition of any term  of  post-release  supervision;
14  provided,  however,  that  if such agency with custody of or supervision
15  over such person has the sentencing minutes that show  that  a  term  of
16  post-release  supervision  was  actually  pronounced  at  sentence, such
17  person shall not be deemed a designated person.
18     2. Whenever it shall appear to the satisfaction of the department that
19  an inmate in its custody, or to the  satisfaction  of  the  division  of
20  parole  that  a  releasee under its supervision, is a designated person,
21  such agency shall make notification of  that  fact  to  the  court  that
22  sentenced such person, and to the inmate or releasee.
23     3.  If a sentencing court that has received such notice, after review-
24  ing the sentencing minutes, if available, is or  becomes  aware  that  a
25  term  of  post-release  supervision  was in fact pronounced at the prior
26  sentencing of such person, it shall issue a superseding commitment order
27  reflecting that fact, accompanied by a written explanation of the  basis
28  for  that  conclusion, and send such order and explanation to the agency
29  that provided the notice, to the defendant,  and  to  the  attorney  who
30  appeared  for  the defendant in connection with the judgment or sentence
31  or, if the defendant is currently represented  concerning  his  or  her
32  conviction  or  sentence  or  with  respect to an appeal from his or her
33  sentence, such present counsel.
34     4. (a) If the sentencing court shall not  have  issued  a  superseding
35  commitment order, reflecting imposition of a term of post-release super-
36  vision,  within  ten days after receiving notice pursuant to subdivision
37  two of this section, then the sentencing court  shall  appoint  counsel
38  pursuant  to section seven hundred twenty-two of the county law, provide
39  a copy of the notice pursuant to subdivision two of this section to such
40  counsel, and calendar such person for a  court  appearance  which  shall
41  occur  no  later  than twenty days after receipt of said notice. At such
42  court appearance, the court shall furnish a copy of such notice and  the
43  proceeding  date  pursuant  to  paragraph (c) of this subdivision to the
44  district attorney, the  designated  person,  assigned  counsel  and  the
45  department or the division of parole.
46     (b)  The  court shall promptly seek to obtain sentencing minutes, plea
47  minutes and any other records and shall provide copies  to  the  parties
48  and  conduct  any  reconstruction  proceedings  that may be necessary to
49  determine whether to resentence such person.
50     (c) The court shall commence a proceeding to  consider  resentence  no
51  later  than  thirty  days after receiving notice pursuant to subdivision
52  two of this section.
53     (d) The court shall, no later than forty days after  receipt  of  such
54  notice,  issue  and  enter  a written determination and order, copies of
55  which shall be immediately provided to the district attorney, the  desig-
56  nated person, his or her counsel and the department or the  division  of

Case 1:12-cv-02137-KAM-ST Document 198-16 Filed 05/28/22 Page 258 of 265 PageID #: 2611

A. 11764                                4

1  parole along with any sentencing minutes pursuant to section 380.70 of
2  the criminal procedure law.
3      (e) The designated person may, with counsel, knowingly consent to
4  extend the time periods specified in paragraphs (c) and (d) of this
5  subdivision. The people may apply to the court for an extension of ten
6  days on the basis of extraordinary circumstances that preclude final
7  resolution within such period of the question of whether the defendant
8  will be resentenced. The department or the division of parole shall be
9  notified by the court of any such extension.
10     5. The court shall promptly notify the agency that referred a desig-
11 nated person whenever it (a) resentences the defendant to a sentence
12 that includes a term of post-release supervision; or (b) determines that
13 it will not resentence the defendant under this section or otherwise.
14 Upon the conclusion of the proceeding, the court shall furnish the
15 parties and the agency that referred the designated person with an accu-
16 rate copy of the current order of commitment for the person.
17     6. In any case in which the department or division of parole notifies
18 the court of a designated person, and has not been informed that the
19 court has made a determination in accordance with paragraph (d) of
20 subdivision four of this section (unless extended pursuant to paragraph
21 (e) of such subdivision), then such agency may notify the court that it
22 has not received a determination and, in any event, shall adjust its
23 records with respect to post-release supervision noting that the court
24 has not, in accordance with subdivision four of this section, imposed a
25 sentence of post-release supervision.
26     7. When the department complies with this section as to a person
27 confined in state prison, it need not separately follow the procedures
28 set forth in section six hundred one-a of this article.
29     8. Nothing in this section shall affect the power of any court to
30 hear, consider and decide any petition, motion or proceeding pursuant to
31 article four hundred forty of the criminal procedure law, article seven-
32 ty or seventy-eight of the civil practice law and rules, or any author-
33 ized proceeding.
34     § 6. Subdivision 4 of section 722 of the county law, as amended by
35 section 1 of part J of chapter 62 of the laws of 2003, is amended to
36 read as follows:
37     4. Representation according to a plan containing a combination of any
38 of the foregoing. Any judge, justice or magistrate in assigning counsel
39 pursuant to sections 170.10, 180.10, 210.15 and 720.30 of the criminal
40 procedure law, or in assigning counsel to a defendant when a hearing has
41 been ordered in a proceeding upon a motion, pursuant to article four
42 hundred forty of the criminal procedure law, to vacate a judgment or to
43 set aside a sentence or on a motion for a writ of error coram nobis, or
44 in assigning counsel pursuant to the provisions of section two hundred
45 sixty-two of the family court act or section four hundred seven of the
46 surrogate's court procedure act, or in assigning counsel to a defendant
47 when a case has been calendared for consideration of resentencing pursu-
48 ant to subdivision four of section six hundred one-d of the correction
49 law or when a court is otherwise called upon to consider whether a prop-
50 er term of post-release supervision was imposed as part of a determinate
51 sentence, shall assign counsel furnished in accordance with a plan
52 conforming to the requirements of this section; provided, however, that
53 when the county or the city in which a county is wholly contained has
54 not placed in operation a plan conforming to that prescribed in this
55 subdivision or subdivision three of this section and the judge, justice
56 or magistrate is satisfied that a conflict of interest prevents the

Case 1:12-cv-02137-KAM-ST Document 198-16 Filed 11/28/22 Page 259 of 265 PageID #: 2612

A. 11764                                    5

1  assignment of counsel pursuant to the plan in operation, or when the
2  county or the city in which a county is wholly contained has not placed
3  in operation any plan conforming to that prescribed in this section, the
4  judge, justice or magistrate may assign any attorney in such county or
5  city and, in such event, such attorney shall receive compensation and
6  reimbursement from such county or city which shall be at the same rate
7  as is prescribed in section seven hundred twenty-two-b of this article.
8  When a case has been calendared for consideration of resentencing pursu-
9  ant to subdivision four of section six hundred one-d of the correction
10 law or when a court is otherwise called upon to consider whether a prop-
11 er term of post-release supervision was imposed as part of a determinate
12 sentence, the attorney appointed should be the attorney who appeared for
13 the defendant in connection with the judgment or sentence or, if the
14 defendant is currently represented concerning his or her conviction or
15 sentence or with respect to an appeal from his or her conviction or
16 sentence, such present counsel.
17     § 7. The office of court administration shall promulgate such rules
18 and regulations as may be necessary to ensure the fair and expeditious
19 consideration of cases brought pursuant to section 601-d of the
20 correction law, as added by section five of this act.
21     § 8. If any provision of this act or the application thereof to any
22 person or circumstances is held invalid, such invalidity shall not
23 affect other provisions or applications of the article which can be
24 given effect without the invalid provision or application, and to this
25 end the provisions of this act are declared to be severable.
26     § 9. This act shall take effect immediately; provided, however, that
27 section three of this act shall not apply to sentences imposed prior to
28 the effective date of this act; and provided further that the amendments
29 to section 380.70 of the criminal procedure law made by section one of
30 this act shall be subject to the expiration and reversion of such
31 section pursuant to subdivision d of section 74 of chapter 3 of the laws
32 of 1995, as amended, when upon such date the provisions of section one-a
33 of this act shall take effect.

JA500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
JESUS SANTIAGO,

                              Plaintiff,

        - against -                              12-CV-2137 (KAM) (SLT)

CUOMO, et al.,                                   PROPOSED STIPULATIONS

                              Defendants.
-----------------------------------------------------------------

        Pursuant to the Order of the Hon. Kiyo A. Matsumoto, Plaintiff Jesus Santiago and

Defendants Brian Fischer, Anthony Annucci, and Terrence Tracy, hereby submit the following

stipulations of fact and law:

        1.      Jesus Santiago, the plaintiff in this action, at the relevant times, was an individual

incarcerated in the New York State Department of Corrections and Community Supervision

("DOCCS"), then known as two agencies, the Department of Correctional Services ("DOCS") and

the Division of Parole ("Parole").

        2.      In or around the first week of February, 2000, Mr. Santiago was arrested and

incarcerated until March 13, 2000.

        3.      Mr. Santiago was arraigned for that offense on March 13, 2000, in Kings County

Criminal Court, under Indictment No. 1141/2000, and released on bond pending a criminal trial.

        4.      On May 3, 2001, Mr. Santiago was incarcerated in federal prison.in the State of

Virginia.

        5.      On June 12, 2001, Mr. Santiago was taken into federal custody in Alexandria, Virginia

and incarcerated in in the Eastern District of Virginia.

        6.      On November 16, 2001, Mr. Santiago pleaded guilty in the United States District

Court for the Eastern District of Virginia.

1

**JA501**

7. Mr. Santiago was sentenced on November 16, 2001 in the United States District Court for the Eastern District of Virginia, to 37 months of incarceration in the Federal Bureau of Prisons followed by 4 years of federal supervised release.

8. Mr. Santiago was transferred to Hudson Correctional Facility in New York on January 2, 2002.

9. On May 3, 2002, Mr. Santiago pleaded guilty under Indictment No. 1141/2000 in the Kings County Criminal Court before the Hon. Sheldon Greenberg.

10. Judge Greenberg could not sentence Mr. Santiago that same day because the Kings County District Attorney had not yet prepared a pre-sentence report.

11. Sentencing was scheduled for May 14, 2002.

12. A Class C felony was required by New York State Penal Law §70.45 (a part of the 1998 "Jenna's Law") to include a five-year term of post-release supervision, as the statute provides that "[e]ach determinate sentence also includes, as a part thereof, an additional period of post-release supervision." See Penal Law § 70.45 (1). [stipulated as to the law, but pending decision by the court as to admissibility]

13. Penal Law §§ 70.00 and 70.02 provided that "when a person is sentenced as a violent felony offender pursuant to section 70.02 or as a second violent felony offender pursuant to section 70.04 or as a second violent felony offender on a conviction for a violent felony offense pursuant to section 70.06, *the court must impose a determinate sentence of imprisonment ... and such sentence shall include, as apart thereof, a period of post-release supervision in accordance with section 70.45*" (emphasis added). See Penal Law § 70.00 (6). [stipulated as to the law, but pending decision by the court as to admissibility]

14. On May 14, 2002, Mr. Santiago was sentenced in Kings County Criminal Court to a 3 ½ year term of incarceration.

15.     At Mr. Santiago's sentencing on May 14, 2002, there was no mention of post-release supervision.

16.     After his sentencing in Kings County Criminal Court, Mr. Santiago was returned to the United States Bureau of Prisons to complete his federal sentence.

17.     Mr. Santiago's New York State sentence from the Kings County Criminal Court ran concurrently to his federal sentence.

18.     On April 7, 2004, Mr. Santiago was released from the United States Bureau of Prisons to the custody of New York State DOCS to complete his New York State sentence from the Kings County Criminal Court in 2002.

19.      On April 22, 2004, upon entry to a New York State DOCS prison reception center, Mr. Santiago's New York State sentence was noted in DOCS' computer system, and calculated for a release date, his "maximum expiration date," after crediting his sentence with time served in federal prison.

20.     Mr. Santiago's maximum expiration date for his New York State sentence from the Kings County Criminal Court was November 7, 2004.

21.     On November 7, 2004, Mr. Santiago was released from New York State DOCS to the New York State Division of Parole to serve post-release supervision.

22.     New York State DOCS calculated that Mr. Santiago was to serve post-release supervision until November 7, 2009.

23.     At the same time, Mr. Santiago was required to serve a 4-year term of federal supervised release in connection with his sentence from the United States District Court from the Eastern District of Virginia.

24.     Mr. Santiago's federal supervised release from the Eastern District of Virginia was transferred to the United States Probation Office for the Eastern District of New York, in Brooklyn,

3

because he remained in New York to serve his post-release supervision from his New York sentence on parole under the supervision of the New York State Division of Parole.

25.     Mr. Santiago's federal supervised release ran concurrently to his New York State post-release supervision.

26.     Mr. Santiago was released from New York State DOCS November 4, 2004, on condition that he adhere to certain conditions of release, including, for both his federal supervised release, and his New York State post-release supervision, that he not leave the State of New York.

27.     On October 30, 2005, Mr. Santiago was arrested in Fairfax County, Virginia.

28.     Mr. Santiago was incarcerated in Fairfax County, Virginia from October 30, 2005 to November 17, 2005.

29.     On June 9, 2006, the United States Court of Appeals for the Second Circuit ruled that post-release supervision in New York must be imposed at sentencing by a judge, and not calculated by DOCS.

30.     The Second Circuit ruled that a sentence that contained a post-release supervision term that was calculated by DOCS, and not imposed by a judge violated due process rights under the United State Constitution.

31.     On November 9, 2006, Judge Ellis of the Eastern District of Virginia sentenced Mr. Santiago to 8 months of incarceration, to be followed by 30 months of federal supervised release.

32.     Mr. Santiago served his 8 months of incarceration in Hazelton Federal Prison in West Virginia.

33.     On June 6, 2007, Mr. Santiago was released from the Bureau of Prisons in West Virginia and extradited to New York to answer Division of Parole charges that he violated the terms and conditions of New York State post-release supervision.

34.     On July 19, 2007, Mr. Santiago pleaded guilty to violations of his post-release

4

**JA504**

supervision before an Administrative Law Judge of the New York State Division of Parole, and received a time assessment of 12 months of incarceration.

35.     On August 6, 2007, Mr. Santiago was returned to Ulster Correctional Facility in New York State DOCS.

36.     Mr. Santiago's 12-month time assessment was credited with 55 days of jail time served in Rikers Island from June 12, 2007 to August 5, 2007.

37.     On February 2, 2008, Mr. Santiago was released to post-release supervision from Gouverneur Correctional Facility in New York State DOCS.

38.     On July 5, 2013, Mr. Santiago pleaded guilty to 2011 State of Virginia charges and was committed to the State of Virginia Department of Corrections.

39.     On May 20, 2015, Mr. Santiago was released from Virginia State prison.

40.     On October 30, 2017, Defendants Fischer, Annucci and Tracy were found liable to Mr. Santiago for violating his constitutional rights to due process for not referring him to his Kings County criminal sentencing court in the period from June 12, 2007 to February 6, 2008, a period when he was in the custody of DOCS or the New York State Division of Parole.

Dated: New York, New York
         November 22, 2022

<div style="margin-left: 50%;">

LETITIA JAMES
Attorney General of the
State of New York
<u>Attorney for Defendants</u>
By:
_____/s_____
MICHAEL J. KEANE
REBECCA DURDEN
Assistant Attorneys General
28 Liberty Street, 18th Floor
New York, New York 10005
(212) 416-8550

</div>

5

**JA505**

To: Robert Rickner, Esq.

**JA506**