# 23-814(L)

## 23-855(XAP)

# United States Court of Appeals for the Second Circuit

JESUS SANTIAGO,

*Plaintiff–Appellee–Cross-Appellant*,

v.

SUPERINTENDENT BRIAN FISCHER, individually and as Commissioner of the New York State Department of Corrections and Community Supervision, ANTHONY J. ANNUCCI, individually and as Deputy Commissioner of and Counsel to DOCS, TERRENCE X. TRACY, individually and as Chief Counsel to DOP,

*Defendants–Appellants–Cross-Appellees.*

(Caption continues inside front cover.)

On Appeal from the United States District Court for the Eastern District of New York

## JOINT APPENDIX – Volume 3: Pages 507-end

RICKNER PLLC
14 Wall Street, Suite 1603
New York, New York 10005
(212) 300-6506

LETITIA JAMES
 *Attorney General*
 *State of New York*
28 Liberty Street
New York, New York 10005
(212) 416-8020

*Attorney for Appellee-Cross–Appellant*

*Attorney for Appellants–Cross-Appellees*

*(Caption continues from front cover.)*

ANDREW M. CUOMO, individually and as Governor of the State of New York, ANDREA W. EVANS, individually and as Chairwoman of the New York State Board of Parole, State of New York, JOHN DOES 1-10, DOCS Supervisory, Training, and Policy Personnel, LUCIEN J. LECLAIRE, JR., individually and as former acting Commissioner of DOCS, GLENN S. GOORD, individually and as former acting Commissioner of DOCS, ANTHONY G. ELLIS, II, individually and as former Chairman and Chief Executive Officer of DOP, GEORGE B. ALEXANDER, individually and as former Chairman and Chief Executive Officer of DOP, KEVIN G. LUDLOW, individually and as DOP Commissioner, LISA BETH ELOVICH, individually and as DOP Commissioner, SALLY A. THOMPSON, individually and as DOP Commissioner, ARROYO, individually and as DOP Area Supervisor, WILLIAM MCCARTNEY, individually and as DOP Area Supervisor, MCKINNEY, individually and as DOP Area Supervisor, FLEISCHMAN, individually and as DOP Senior Parole Officer, PAREDES, individually and as DOP Senior Parole Officer, DARRYL STEVENSON, individually and as DOP Senior Parole Officer, J. MASON, individually and as DOP Parole Officer, CYNTHIA JOHNSON, individually and as DOP Parole Officer, P ALVAREZ, individually and as DOP Parole Officer, RICHARD CORRADO, individually and as DOP Parole Officer, COUNCIL, individually and as DOP Parole Officer, ZUNNO, individually and as DOP Parole Officer, JOHN DOES 11-20, DOP Supervisory, Training, and Policy Personnel, ROBERT J. DENNISON, individually and as former Chairman of DOP,

*Defendants.*

# TABLE OF CONTENTS

**Page**

**Volume 1**

Docket Sheet ......................................................................................JA1

First Amended Complaint, dated June 4, 2012 ..........................................JA41

*Selected exhibits*:

Ex. H  -  Arrest Notification, dated Dec. 22, 2005 ...................................JA62

Ex. M  -  Parole Revocation Certificate of Disposition,
dated July 25, 2007 ....................................................................JA63

Ex. N  -  Parole Board Release Decision Notice, dated Feb. 4, 2008  ....JA64

Ex. P  -  Notice of Arrest/Warrant Issuance, received by
Division of Parole Mar. 21, 2008 ..............................................JA66

Ex. R  -  Parole Revocation Decision Notice, received Oct. 18, 2010.....JA67

Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion
for Summary Judgment, dated Dec. 23, 2016..............................................JA68

Plaintiff's Memorandum of Law in Support of Motion for Summary
Judgment [*omitted*]

Ex. A  -  Community Supervision, Parolee Chrono Report,
dated Oct. 30, 2014 ....................................................................JA72

Ex. B  -  Repository Inquiry (n.d.) ..........................................................JA90

Ex. C  -  PVU Notification Form (n.d.), with attachments.....................JA97

Declaration of Steven H. Philbrick [in Support of Defendants' Motion
for Summary Judgment], dated Dec. 23, 2016...........................................JA102

# TABLE OF CONTENTS

**Page**

**Volume 1**

Declaration of Stephen H. Philbrick (*cont'd*)

    Ex. A  -  Email from Timothy O'Brien to Regional Directors, et al., dated June 4, 2008, with attachment, "Post-Release Supervision Resentencing Initiative" ....................................JA117

    Ex. B  -  DOCCS Inmate Information for Jesus Santiago, dated Aug. 17, 2012 ................................................JA131

    Ex. C  -  Parolee Chrono Report for Jesus Santiago, dated Oct. 30, 2014 ................................................JA134

    Ex. D  -  Correction Law § 601-d Notice, dated Sept. 27, 2010 ...........JA151

    Ex. E  -  Post Release Supervision Re-sentencing Order, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010)............................................JA155

    Ex. F  -  Affirmation of Anthony J. Annucci, *State v. Myers*, Index No. 4834-08 (Sup. Ct. Albany County June 4, 2008)...JA157

Declaration of Michael J. Keane [in Support of Defendants' Motion for Summary Judgment], dated Dec. 23, 2016 ................................................JA192

    *Selected exhibits*:

    Ex. A  -  Memorandum from Susan Hendricks, Special Litigation Unit, Legal Aid Society, to Criminal Defense Division Legal Staff, dated Aug. 20, 1998 ...........................................JA200

    Ex. B  -  Complaint for Declaratory Judgment, *State v. Myers*, No. 4834-08 (Sup. Ct. Albany County June 4, 2008) .............JA229

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of Michael J. Keane, dated Dec. 23, 2016 (*cont'd*)

    Ex. C  -  Memorandum of Understanding Between New York State Office of Court Administration, the Department of Correctional Services and the Division of Parole, signed July 2008 .......................................................................JA249

    Ex. D  -  Declaration of Anthony J. Annucci, *Betances v. Fischer*, No. 11-cv-3200 (S.D.N.Y. May 8, 2015) ....................................JA254

    Ex. E  -  Declaration of Richard de Simone, *Betances v. Fischer*, No. 11-cv-3200 (S.D.N.Y. May 8, 2015) ....................................JA288

    Ex. G  -  Affirmation of Terrence X. Tracy Affirmation, *State v. Myers*, No. 4834-08 (Sup. Ct. Albany County June 4, 2008) ...............JA302

    Ex. I  -  Declaration of Anthony J. Annucci, *Earley v. Annucci*, No. 08-cv-669 (N.D.N.Y. July 18, 2011) ....................................JA319

Declaration Craig R. Mausler [in Support of Defendants' Motion for Summary Judgment], dated Aug. 14, 2017.................................................JA327

Defendants' Amended Statement Pursuant to Local Civil Rule 56.1, dated Aug. 14, 2017 .....................................................................................JA337

Declaration of Michael J. Keane [in Support of Defendants' Motion in Limine], dated July 13, 2022 [*omitted*]

    Ex. A  -  Transcript of Plea Minutes, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County May 3, 2002) .......................JA350

    Ex. B  -  Commonwealth of Virginia judicial and probation documents.................................................................................JA362

    Ex. C  -  Petition for a Writ of Certiorari, *Fitch v. Earley*, No. 06-1429 (U.S. Apr. 25, 2007) (mislabeled as Ex. A) ........JA370

# TABLE OF CONTENTS

**Page**

**Volume 2**

Declaration of Michael J. Keane, dated July 13, 2022 (*cont'd*)

Ex. D - Reply Brief for Petitioner, *Burhlre v. Earley*, No. 06-1429 (U.S. June 7, 2007) (mislabeled as Ex. B) .............................JA386

Ex. E - Brief for Respondent, *People v. Sparber*, 10 N.Y.3d 457 (2008) ..............................................................JA392

Ex. F - Sentence Monitoring Computation Data as of January 11, 2013..............................................................JA447

Revised Joint Pre-trial Order, dated Aug. 31, 2022...................................JA459

Transcript of Hearing, held Oct. 25, 2022...................................................JA470

Excerpts from Transcript of Hearing, held Nov. 18, 2022.........................JA477

Defendants' Suppl. Mem. of Law in Response to Court's Request for Further Briefing on the Relevance of Penal Law § 70.45 to Punitive Damages, dated Nov. 21, 2022 [omitted]

Ex. A - Governor's Program Bill – Memorandum (2008); Assembly Bill No. 11764, 231st Sess. (2008).........................JA490

Proposed Stipulations, filed Nov. 22, 2022.................................................JA501

**Volume 3**

Transcripts of Trial, held Nov. 28–30, 2022...............................................JA507

*Selected Trial Exhibits*

Pl. Ex. 1 - Sentence and Order of Commitment, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County May 15, 2002) ....JA604

iv

# TABLE OF CONTENTS

**Page**

**Volume 3**

*Selected Trial Exhibits* (*cont'd*)

Pl. Ex. 2 - Post Release Supervision Re-sentencing Order, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010) ........................................................JA605

Pl. Ex. 3 - Resentencing Hearing Transcript, *People v. Santiago*, Ind. No. 1141/00 (Sup. Ct. Kings County Dec. 15, 2010) ...JA606

Df. Ex. I - Certificate of Release to Post-Release Supervision, dated Nov. 2, 2004................................................................JA612

Jt. Ex. 1 - Joint Stipulations (redacted) ..............................................JA613

Judgment, dated Nov. 30, 2022 ..............................................................JA619

Defendants' Notice of Appeal, dated May 16, 2023 ...................................JA620

Plaintiff's Notice of Cross-Appeal, dated May 30, 2023 ...........................JA623

```
                                                                    1

 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3
 4   JESUS SANTIAGO,                    :12-CV-2137 (KAM)

 5        Plaintiff,                    :

 6                                      :United States Courthouse
     -against-                           Brooklyn, New York
 7                                      :
                                         November 28, 2022, Monday
 8                                      :9:00 a.m.
     BRIAN FISCHER, individually       :
 9   and as Commissioner of the
     New York State Department of       :
10   Corrections and Community
     Supervision, et al.,               :
11
          Defendants.                  :
12

13   - - - - - - - - - - - - - - - X

14        TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
            BEFORE THE HONORABLE KIYO A. MATSUMOTO
15            UNITED STATES DISTRICT COURT JUDGE

16   A P P E A R A N C E S:

17   For the Plaintiff:    RICKNER, PLLC
18                          14 Wall Street, Suite 1603
                            New York, New York 10005
19                     BY:  ROBERT HOWARD RICKNER, ESQ.
                            STEPHANIE PANOUSIERIS, ESQ.
20
     For the Defendant:    STATE OF NEW YORK
21                         OFFICE OF THE ATTORNEY GENERAL
                           LETITIA JAMES
22                         28 Liberty Street
                           New York, New York 10005
23                     BY:  MICHAEL J. KEANE, ESQ.
                       BY:  REBECCA A. DURDEN, ESQ.
24

25
```

Michele D. Lucchese, RPR, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
MLucchese@DNYhmail1.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

```
                    Proceedings                               2

 1        THE COURT:  This is civil cause for jury trial,
 2   Jesus Santiago versus Cuomo, et al., 12 civil 2137.
 3        One question I have is do we want to change the
 4   caption to the three remaining defendants?  Do the parties
 5   have a view of that?
 6        MR. RICKNER:  Plaintiffs' view is I thought we
 7   actually did that in the JPTO or we planned to.  I have no
 8   objection.  I don't need Cuomo's name confusing the jury.
 9        THE COURT:  All right.  So what we are going to do
10   is I will name each individual defendants then.  I won't give
11   their titles when I call the case.  Is that all right?
12        MR. RICKNER:  That's fine.
13        THE COURT:  And the next thing I wanted to advise
14   you of is we have already lost a juror to COVID --
15        MR. RICKNER:  Oh, no.
16        THE COURT:  -- over the weekend.  That's Juror No.
17   4.  The name of the juror is Andrew Loo.  He tested positive
18   -- well, he started feeling ill on Saturday and tested
19   positive.  We excused him.  So we're down to seventh.  So we
20   will proceed with seven.
21        I'd like to also make sure that I reintroduce
22   everybody so they have the full attention.
23        I'm going to be reading the same description of the
24   case that I did during voir dire and I will introduce the two
25   lawyers.
```

Michele Lucchese, RPR, CRR
Official Court Reporter

```
                    Proceedings                               3

 1        Ms. Jackson when we call the case, we are going to
 2   call it with the first name et al., so it will be Santiago
 3   versus Fischer et al. and I will introduce all of the parties.
 4        THE COURTROOM DEPUTY:  Okay.
 5        THE COURT:  So I want to make sure I have everybody,
 6   Michael Keane, Rebecca Durden, Brian Fischer.
 7        And is there anyone else?
 8        MS. DURDEN:  From counsel's side, no.
 9        THE COURT:  So what I do is when I introduce you,
10   each of you can stand as your name is called, including the
11   parties.
12        Are all of the jurors here yet Ms. Jackson?
13        THE COURTROOM DEPUTY:  Yes, Judge.
14        THE COURT:  Great.  We can get started.  Did you
15   tell them about sitting socially distancing, every other seat?
16        THE COURTROOM DEPUTY:  I told them every other seat.
17        THE COURT:  Yes, Mr. Keane.
18        MR. KEANE:  Your Honor, we have one housekeeping
19   detail.
20        THE COURT:  Yes.
21        MR. KEANE:  The parties stipulated as to certain
22   facts of law.
23        THE COURT:  Yes.
24        MR. KEANE:  And we expect to refer to those
25   stipulated facts in our opening statements.  I imagine Mr.
```

Michele Lucchese, RPR, CRR
Official Court Reporter

```
                    Proceedings                               4

 1   Rickner will too.
 2        Will there come a time, however, when the jury can
 3   be read those stipulated --
 4        THE COURT:  Well, it ought to be --
 5        MR. RICKNER:  My understanding was it was going back
 6   with the jury instructions.
 7        THE COURT:  No.  It's going to be read in as a joint
 8   exhibit to the jury.
 9        MR. RICKNER:  Okay.
10        THE COURT:  If would be helpful, the plaintiff's
11   counsel can read it in as you open.  How would you like to do
12   it?  Or would you like me to read it in?  How would you like
13   me to do it?
14        MR. KEANE:  I think we would prefer to have Your
15   Honor read it in so it looks like a neutral statement.
16        THE COURT:  All right.  So just to be clear, this is
17   ECF document No.  271, filed November 22nd.
18        MR. KEANE:  Yes.
19        MR. RICKNER:  My only question is when would this
20   been read in, at the end, the beginning?
21        THE COURT:  No, because you're referring to it in
22   your opening statements, I'll read it after I swear the
23   jurors, give them their preliminary instructions and introduce
24   parties, the lawyers and a synopsis of a case and then I'll
25   read the stipulation.  I'm going to call this Joint Exhibit
```

Michele Lucchese, RPR, CRR
Official Court Reporter

```
                    Proceedings                    5

 1   No. 1.  Is that all right?
 2           MR.  KEANE:  That's fine.  My preference would be to
 3   read it at the beginning of evidence.  I have no problem with
 4   Mr. Keane referring to it because we know that it will be
 5   admitted into evidence.
 6           THE COURT:  So then you will read it in.
 7           MR. RICKNER:  At the beginning of the plaintiff's
 8   case, no problem.
 9           THE COURT:  Well, that's when the evidence starts.
10           MR. KEANE:  Your Honor, I think it would be more
11   clear for the jurors to have you read it in.
12           THE COURT:  All right.  I'll read it in.
13           MR. RICKNER:  Understood, Your Honor.
14           THE COURT:  The jurors are going to be entering
15   through that door.
16           Good morning.
17           THE JURY:  Good morning.
18           THE COURT:  All jurors are present.  Please have a
19   seat.
20           Good morning, members of the jury.
21           THE JURY:  Good morning.
22           THE COURT:  I'm going to ask you now to take an oath
23   to sit as jurors.  Ms. Jackson will administer the oath.
24           THE COURTROOM DEPUTY:  Good morning, jurors, please
25   raise your right hand.
```

```
                 Preliminary Instructions            6

 1           (Jury sworn.)
 2           THE COURT:  Good morning, members of the jury, I
 3   hope you all had a restful Thanksgiving holiday.
 4           Now that you have been sworn as jurors, I will give
 5   you some preliminary instructions to guide you as you
 6   participate as jurors in this trial.
 7           Some of the statements I make may sound repetitive
 8   and you will hear them again at the end of the case, but the
 9   reason they're being repeated is because they're important.
10           It will be your duty as jurors to find from the
11   evidence what the facts are.  You and you alone are the judges
12   of the facts.  You will then have to apply the facts as you
13   find them to the law as I provide it to you.  I alone am the
14   judge of the law and you must follow the law as I provide it
15   whether or not you agree with it.  Nothing that I may say or
16   do during the course of this trial is intended to indicate or
17   should be taken by you to indicate what your verdict should
18   be.  The evidence from which you will find the facts will
19   consist of sworn testimony of witnesses, documents and other
20   things received into the record as an exhibit, and any other
21   facts that the lawyers agree to or stipulate to or that the
22   Court may instruct you to find.
23           Certain things are not evidence and you must not
24   consider them when you begin your deliberations.  I will list
25   some of those for you now:  First, statements, arguments and
```

```
                 Preliminary Instructions            7

 1   questions by the lawyers are not evidence.  Objections to
 2   questions are not evidence.  Lawyers have an obligation to
 3   their clients to make objections when they believe that
 4   evidence is being offered for an improper purpose under the
 5   rules of evidence.  You should not be influenced by the
 6   objection or by my ruling on it.  If the objection is
 7   sustained, ignore the question.  If the objection is
 8   overruled, treat the answer from the witness in response to
 9   that question as you would any other part of that witness'
10   testimony.
11           You may not consider any answer more significant
12   simply because counsel objected and I overruled the objection.
13           If you were instructed that some item of evidence is
14   received only for a limited purpose, you must follow that
15   instruction.  Testimony that I have excluded or stricken from
16   the record or told you to disregard is not evidence and you
17   should not consider it.  Just hit the erase button and forget
18   about it.
19           Anything that you may have seen or heard outside of
20   the courtroom is not evidence and must be disregarded.  You
21   alone are to decide the case solely on the evidence presented
22   in this courtroom during the trial.
23           There are two kinds of evidence which you may
24   consider, direct and circumstantial evidence.  Direct evidence
25   is direct proof offered to support a fact, such as testimony
```

```
                 Preliminary Instructions            8

 1   of an eyewitness or somebody with knowledge of the facts.
 2           Circumstantial evidence is proof of facts from which
 3   you may infer or conclude that other facts exist.
 4           I will give you further instructions about direct
 5   and circumstantial evidence at the end of this case, but keep
 6   in mind that you may consider both kinds of evidence.
 7           As jurors, it will be up to you to decide which
 8   witnesses to believe, which witnesses not believe and how much
 9   of any particular witness testimony to accept or reject.  I
10   will give you some guideline for determining the credibility
11   of witnesses at the end of the case.
12           Although we will try to avoid instances, there may
13   be times when counsel or the Court will ask you to be excused
14   when arguments or objections are made.  These arguments may
15   include matters of evidence that the Court may eventually
16   exclude.  These arguments may also involve legal issues that
17   are not the province of the jury.  The reason that I ask you
18   to step out is to assure that you will not hear legal evidence
19   or legal arguments that are not properly considered.
20   Oftentimes, rather than asking you to get up and step out,
21   unless you want a break, I will also have conferences here at
22   sidebar and we put on that white noise that you heard during
23   voir dire.
24           Now, I am going to refresh you on the nature of this
25   case, and introduce you to the parties.  This is a civil case
```

```
                    Preliminary Instructions              9

 1   commenced by Jesus Santiago who may be referred to as the
 2   plaintiff or Mr. Santiago.
 3           Mr. Santiago, if you would rise just so the jurors
 4   will know who you are.
 5           Thank you, sir.
 6           Representing Mr. Santiago are attorneys Robert
 7   Howard Rickner of Rickner, PLLC and Stephanie Panousieris,
 8   also of Rickner, PLLC.  Mr. Santiago, the plaintiff will be
 9   appearing during this trial.
10           There are three defendants in this case, all of whom
11   are administrators of New York State Correctional Services or
12   parole agencies:  Brian Fischer, then the commissioner of the
13   previous entity known as the New York State Department of
14   Correctional Services.  Thank you, sir.  Anthony Annucci, then
15   Chief Counsel to the New York State Department of Correctional
16   Services, now acting commissioner of the present entity, the
17   New York State Department of Corrections and Community
18   Supervision, also referred to as DOCCS, or D-O-C-C-S, and
19   Terrence Tracy, then Chief Counsel to the New York State
20   Division of Parole; the three defendants will be appearing at
21   this trial.  Some may have to be excused during the trial
22   because of official business that they must attend to.
23           Representing the defendants are attorneys Michael J.
24   Keane and Rebecca Durden of the New York State Attorney
25   General's Office, Briana Koehler, a paralegal and law intern
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions             10

 1   will be assisting at trial and sitting at the table.
 2           This is a civil action brought by plaintiff Jesus
 3   Santiago who seeks damages for injuries allegedly sustained
 4   when the three defendants caused the administrative imposition
 5   of a sentence of post-release supervision, also refer to as
 6   PRS, from the on plaintiff for the time period between June
 7   12, 2007 to February 6, 2008.  The sentence of post-release
 8   supervision imposed by the defendants has been found to be
 9   illegal and unconstitutional and that is no longer in dispute.
10   Mr. Santiago spent approximately seven months, as I said,
11   between June 12, 2007 and February 6, 2008 in prison as a
12   result of the illegally imposed post-release supervision.
13   Your duty as jurors at this trial is to determine whether Mr.
14   Santiago is entitled to monetary damages.  And if so, the
15   amount of damages he will receive for the defendants'
16   violations of his constitutional rights.
17           Now, a few words about your conduct as jurors.
18   First, I instruct you that during the trial, you are not to
19   discuss this case with anyone or permit anyone to discuss the
20   case with you.  You should not even discuss the case when you
21   adjourn to the jury room or take your breaks.  Don't discuss
22   what you see or hear in the courtroom at all with anyone.  The
23   time for that will be at the end of the case when you are
24   given your instructions on the law and are asked to begin your
25   deliberations.  But for now, keep an open mind, keep a fair
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions             11

 1   mind towards both parties, listen carefully to the evidence
 2   and observe the demeanor of all of the witnesses.
 3           If someone asks you what you are doing here, you
 4   should simply say I've been selected to serve as a juror in a
 5   civil case and have been instructed by the judge not to
 6   discuss this case.
 7           Until you retire to the jury room at the end of the
 8   case to deliberate your verdict, you simply may not talk about
 9   this case.  I know that many of you use cell phones,
10   smartphones and the internet and other tools of technology.
11   You must not talk to anyone about this case or use these tools
12   to communicate electronically with anyone about the case.
13   This includes your family and friends.  You may not
14   communicate with anyone about the case on your cell phone
15   through e-mail, your Blackberry, iPhone or other smartphone,
16   text messaging, Twitter, or through any blog or website,
17   through the internet chat room or by way of any other social
18   network websites, including but not limited to, FaceBook,
19   SnapChat, Instagram, Linkedin, YouTube, et cetera, et cetera.
20           I've also instructed the parties they're not to have
21   any contact with members of the jury.  Therefore, if you see
22   any of the parties or their lawyers in the hallways or in the
23   elevators or on the street surrounding this courthouse or even
24   just on an evening stroll, please don't be offended if they
25   look away and keep walking because they are supposed to do
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions             12

 1   that.  They are not to talk to you at all.  This is the best
 2   method of avoiding any possible appearance of impropriety and
 3   ensuring absolute impartiality of you as jurors in this trial.
 4   If there is contact, please bring it to my attention or Ms.
 5   Jackson private as soon as you can.
 6           Second, please do not read or listen to anything
 7   touching on this case in any way.  This includes any
 8   newspapers, magazines, radio, television or internet pop-ups.
 9   If, while serving on this jury, as I said, if anyone attempts
10   to contact up, please let me know.
11           If you are approached by anyone who asks you about
12   the case, Ms. Jackson or my law clerk, Ms. Wong, or myself can
13   be contacted.  If it becomes necessary to report such an
14   incident, do not discuss this with any of your fellow jurors,
15   but merely bring it to our attention as soon as you can.
16           During the course of the trial, you must not conduct
17   any independent research about this case, the matters in the
18   case and the individuals or organizations involved in this
19   case.  In other words, you should not consult any
20   dictionaries, reference materials, search the internet, any
21   websites, blogs, or any other electronic means.
22           It is important that you decide this case solely on
23   the evidence that the parties may present during the trial in
24   this courtroom.  Do not try to find out any information from
25   any other source.
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions              13

1              You may not visit or view any locations where the

2   alleged incident took place.

3              Finally, do not form any opinion until all of the

4   evidence is in.  Please keep an open and fair mind until you

5   start your deliberations at the end of the case.  Only at that

6   time may you express your opinions to your fellow jurors.

7   These admonitions apply even when we are in recess over night

8   and I will repeat them every time we break.

9              If you want to take notes during the course of the

10  trial, you may do so and we will provide you with notebooks

11  and pens.

12             Is there anyone else who want to take notes?  All

13  right.

14             It is difficult to take notes and pay attention to

15  what the witnesses are saying and observe their demeanor at

16  the same time.  If you do decide to take notes, be sure your

17  note-taking does not interfere with or distract you from

18  listening to and observing and considering all of the

19  evidence.  Also, if you do take notes, do not discuss them

20  with anyone before you begin your deliberations and do not

21  show your notes to anybody.  If you do take notes, we will ask

22  you to leave your notebooks on your chair every time we take a

23  break and we will collect it and keep it safe and secure.

24  Notes may not be taken out of the courtroom at any time.

25             If you chose not to take notes, and it seems that
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions              14

1   most of you are choosing not to do so and that's fine,

2   remember it is your individual responsibility to listen

3   carefully to all of the evidence.  You cannot give this

4   responsibility to someone else who may have taken notes.  We

5   depend on each of your judgments for all of you and you must

6   remember that the evidence in this case is what you will be

7   considering.

8              The trial will now begin.

9              First, I'll read a stipulation.

10             Well, let me back up.  First, each party will be

11  invited to make an opening statement, which is simply an

12  outline of what they expect the evidence to show to help you

13  understand the evidence as it is admitted.  The plaintiff will

14  go first, then the defendant's attorney will make an opening

15  statement.

16             Opening statements are not evidence.  You may

17  consider the opening statement as a preview or a trailer of

18  what is to come.  This is what each side expects the evidence

19  to show, but there will not be arguments about what

20  conclusions you should reach based on the evidence.

21             The plaintiffs will then present their witnesses.

22  But before they start witness presentation, I'll read to you

23  what is called a stipulation or agreement by both of the

24  parties regarding the facts of this case.  That stipulation or

25  agreement will be facts that you should accept and a written
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Preliminary Instructions              15

1   stipulation will be brought to you when you begin your

2   deliberations.

3              The plaintiffs will then present their witnesses,

4   which is called direct examination.  Then there may be further

5   questions asked of the witness by the defense.  This is called

6   cross-examination.  Then there may be further direct

7   examinations by the plaintiff of the witnesses that the

8   plaintiff calls.  This process will be repeated for each

9   witness, so direct, cross, redirect, recross.

10             Following the plaintiff's case, the defendants will

11  present direct testimony of witnesses whom the plaintiffs may

12  then cross-examine.  It is also possible that the witnesses

13  called by the plaintiff will also be witnesses that the

14  defense wants to call.  So they will present the evidence at

15  that time, the testimony of the witnesses, and that will avoid

16  repetition for having to recall the witnesses.

17             After all of the evidence is in, the attorneys will

18  each tell the Court and you that they have rested, meaning

19  they have finished with their presentation of the evidence.

20             The attorneys will then present their closing

21  arguments or summations.  In that process, they will summarize

22  the evidence and argue as to result that you should reach

23  based on the evidence.  I will then instruct you on the law.

24  And after that, you will retire to deliberate on your verdict.

25  We will now proceed with the next step in this trial, which is
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                 Opening Statement - Mr. Rickner           16

1   opening statements by the parties.

2              Does the plaintiff wish to make an opening

3   statement?

4              MR. RICKNER:  Yes, Your Honor, thank you.

5              THE COURT:  All right.

6              OPENING STATEMENT - MR. RICKNER

7              MR. RICKNER:  Good morning, jury.  Thank you so much

8   for coming and being willing to hear testimony for my client

9   Jesus Santiago.  This is a case about the abuse of power.

10  This case is about unelected bureaucrats violating the

11  Constitution and locking my client up for seven months, 239

12  days, and the damage it caused to Mr. Santiago.

13             This constitutional violation was so clear that the

14  Court has already issued a ruling that the three defendants:

15  Anthony Annucci, Terrence Tracy, and David Fischer are liable

16  for what they did.  In effect, they've already been found

17  guilty.

18             Now, here's what the evidence is going to show and

19  how we got to this point and the damages that it caused.  The

20  Department of Correctional Supervision starting adding terms

21  of post supervision -- post-release supervision -- what you

22  may think of as parole -- to some sentences starting in 1998.

23  Now, the key is these were not sentences that were imposed by

24  a judge.  These were additions to the sentences imposed by the

25  judge that were, in fact, imposed by the Department of
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
              Opening Statement - Mr. Rickner            17
 1   Correctional Services even though they had no authority to do
 2   so.  Now, inevitably, some people who had those illegal
 3   sentences added to violated the terms of their post-release
 4   supervision, and that meant that they had to go back and get
 5   locked up and get punished for it even though they should have
 6   never had that term post-release supervision in the first
 7   place.
 8        Now, one of those people, and he is not a party
 9   here, but there is one man who actually challenged this
10   conduct.  His name is Sean Early.  He challenged this illegal
11   sentence that he received all the way up to the Second Circuit
12   Court of Appeals.  That is one step away from the Supreme
13   Court.  And on June 9, 2006, the Second Circuit, a federal
14   court, issued a powerful ruling.  It said that the only
15   cognizable sentence, the only legitimate sentence is the one
16   that the judge puts down.  They said that DOCS isn't allowed
17   to add to that sentence and, in fact, if the Department of
18   Correctional Services adds to the sentence, that addition is a
19   nullity.  It means it didn't exist, shouldn't be acted on,
20   doesn't mean anything.
21        But the defendants here, all high-ranking officials
22   in the New York prison system at the time did not treat those
23   post-release supervision terms that they added as a nullity.
24   People kept getting locked up.  And, unsurprising, Mr.
25   Santiago was one of those people.
```

```
              Opening Statement - Mr. Rickner            18
 1        Now, Mr. Annucci, Anthony Annucci, he was the
 2   attorney for the Department of Correctional Services at the
 3   time.  Mr. Tracy was the attorney for the Division of Parole.
 4   And later on, the Division of Parole and Department of
 5   Correction came together into one agency, which is now the
 6   Department of Correction and Community Supervision, but the
 7   important part is Mr. Tracy at the time was an attorney for
 8   the Division of Parole, the people who oversee post-release
 9   supervision.
10        And then there's Mr. Fischer.  He was the
11   commissioner for the Department of Correctional Services and
12   each one of them knew what the federal court said, the Second
13   Circuit Court of Appeals had ruled, and they kept locking
14   people up.
15        Now, a year later, a year after the Second Circuit's
16   ruling in Early, Mr. Santiago became a victim of their
17   unconstitutional policies.  See, he was given a sentence of
18   three-and-a-half years flat, no post-release supervision was
19   included as part of the sentence, but DOCS added it anyway.
20   And a year later, they used that sentence, after being told by
21   the federal courts that they should have never imposed it,
22   they used that to lock him up for that 239 days.
23        Now, prison tour, and I'm going to let Mr. Santiago
24   say that with details I could never give you.  First he was
25   imprisoned in the notorious Rikers Island facing violence,
```

```
               Opening Statement - Mr. Keane             19
 1   horrible conditions, and then he was moved to State custody,
 2   even spending time in solitary confinement.  Now, this wasn't
 3   his first time in custody.  You're going to hear stipulations.
 4   His criminal record is what it is.  But you're going to hear
 5   something else from Mr. Santiago, it doesn't get any easier.
 6   You don't get used to being locked up and having every part of
 7   your liberty taken away from you.  It just doesn't get any
 8   better.  So what we are going to ask you to consider and to
 9   think about is really what those 39 days were like for Mr.
10   Santiago and what the value of that is and what the pain and
11   suffering he experienced and should be compensated for, for
12   that wrongful imprisonment.
13        And at the end of this trial, after all of the
14   evidence is in, I'm going to give you a closing statement and
15   I'm going to tell you I'm going to ask for compensation and
16   I'm also going to ask for punitive damages, meaning damages to
17   tell the defendants never to do this again.
18        Thank you very much and I appreciate your attention
19   to this case.
20        THE COURT:  Do the defendants wish to give an
21   opening statement?
22        MR. KEANE:  Yes, Your Honor.
23        THE COURT:  All right.
24            OPENING STATEMENT - MR. KEANE
25        MR. KEANE:  Thank you.
```

```
               Opening Statement - Mr. Keane             20
 1        Good morning, members of the jury.
 2        On behalf of defendants Anthony Annucci, Acting
 3   Commissioner of the Department of Correctional -- I'm sorry,
 4   the Department of Corrections and Community Supervision, who
 5   was, at the relevant times, the counsel to the Department of
 6   Correctional Services, and on behalf of Brian Fischer, the
 7   former Commissioner of the Department of Correctional
 8   Services, and on behalf of Terrence Tracy, who is the former
 9   counsel to the Division of Parole, Rebecca Durden and I, from
10   the Office of Attorney General Lettitia James, we very much
11   appreciate your service here today.
12        You have just heard the plaintiff describe his view
13   of the case.  In a nutshell, it just isn't what the plaintiff
14   says it is.  And I would like to correct for you at this
15   opening some of the sometimes that have been made.  They are
16   not a part of this case, but we must respond to them.
17        This is not a case about the abuse of power.  It's
18   not a case about unelected bureaucrats.  It is about three
19   individuals who were trying to do their job in a very complex
20   set of circumstances and facts that you will hear about.
21        First, they were not found guilty of anything.  That
22   is an inappropriate word.  They have been found liable.  There
23   is a difference.  And they are liable, yes.  We agree they
24   have been found liable by this Court.  But we submit they are
25   liable for nothing.  They did their jobs as best as they could
```

Opening Statement - Mr. Keane                    21

1  and you will hear from them about how they did their jobs.
2        Plaintiff is correct, that beginning in 1998, a
3  version of parole called post-release supervision was placed
4  on certain individual's sentences, that is individuals who
5  were convicted of certain felony offenses.  Mr. Santiago
6  belonged to that class of individuals and you will hear -- the
7  evidence will show that he was convicted and sentenced
8  pursuant to a plea agreement in the year 2002.  And at that
9  time, this period of post-release supervision was being added
10  to sentences.  And what that means, at that time, there were
11  two parts to every sentence.  There was an incarceration
12  period and then there was a supervision period.
13        Now, before 1998, this period of supervision was
14  called a period of parole.  It got renamed in 1998.  And the
15  practice at that time, you will hear, was that the Department
16  of Correctional Services, DOCS, D-O-C-S, would calculate this
17  period into sentences.
18        Now, counsel talked about a case, and I will come
19  back to that case, called *Earley*, a case called *Earley v
20  Murray* in the Second Circuit.
21        But to go back to Mr. Santiago and this case, what
22  happened here, how did we get here?  Mr. Santiago was arrested
23  in Kings County, Brooklyn, February, late January of the year
24  2000.  He was arraigned in March of that year.  He was
25  incarcerated for a period of time awaiting that -- those

Opening Statement - Mr. Keane                    22

1  charges, and then he was released on bond and permitted to
2  await his trial, which was to take place in October of 2000 in
3  Kings County.  He did not show up for that trial in October.
4  He was gone.  Later, a year later, he is arrested in the State
5  of Virginia, and he is arrested on federal criminal charges,
6  and what happens is he faces those charges in the Eastern
7  District court, a federal court in the State of Virginia.  He
8  is sentenced in that jurisdiction to a period of three years
9  of incarceration in federal prison and his sentence includes a
10  four-year period of what the Federal Government calls
11  supervised release.
12        Now, we call it here in New York, post-release
13  supervision.  It is confusing.  You will hear terms bandied
14  about, but it's all basically the same parole supervision.
15  You're supervised by a parole officer or a probation officer.
16        And Mr. Santiago started to serve that sentence in
17  2001, a three-year sentence was going to go up to sometime in
18  2004.  Then, Mr. Santiago is away, but he still got Kings
19  County Brooklyn charges that he has to answer to because that
20  arrest in 2000, February of 2000 just doesn't vanish.  It's
21  going to come back to him at some point.  So, he arranges to
22  get transferred back to Kings County for a period of time so
23  he can deal with those charges.  It's a good move.  He writes
24  a letter to the judge, says I want to take care of this, get
25  it behind me, and he is transferred back to a place called

Opening Statement - Mr. Keane                    23

1  Hudson Correctional Facility.  And he comes into court across
2  the street here, to Kings County Criminal Court, and there,
3  for the February 2000 crime, he pleads guilty to an offense
4  and he receives a sentence of three-and-one-half years.  Now,
5  it is a plea of guilty.
6        Now, the way the system works is there's a plea
7  hearing and then there's a sentencing hearing, and when
8  individuals plead guilty, they waive their rights to a trial
9  and usually they work out a deal that reduces whatever risk
10  they might have if they were to go to a trial in front of a
11  jury.
12        So, Mr. Santiago does a deal and the deal he gets is
13  he will get a sentence of three-and-a-half years for the
14  offense he committed and that sentence the judge permits to be
15  concurrent, that is parallel, run alongside his federal
16  sentence.  And what is more, instead of serving that three
17  years in State of New York prison, he goes back to serve that
18  sentence in the federal prison down in Virginia, ultimately
19  West Virginia.
20        Now, his federal sentence is three years.  His state
21  sentence is three-and-a-half years.  So there's a half-year
22  gap there.  So when his sentence down in federal prison
23  concludes, he gets transferred -- well, extradited up to New
24  York and admitted to the New York State Department of
25  Correctional Services in order to serve that last several

Opening Statement - Mr. Keane                    24

1  months to complete his state sentence.  So that's where our
2  defendants come in.
3        He comes into our custody in April of 2004.  The
4  procedure is in the Department of Correctional Services, when
5  individuals come into State prison and there are dozens of
6  prisons statewide, individuals go to what is colloquially
7  called a hub, and they go in for a few days, a couple weeks to
8  get evaluated for programs, jobs in prison and such.  And at
9  the same time, the evidence will show, that DOCS calculates
10  the individual's sentence at that time.  And, so, at that
11  time, they credited Mr. Santiago with all the time that he
12  spent in federal custody.
13        And they also document that, pursuant to the
14  practice at the time, there's going to be a period of
15  post-release supervision, which, for Mr. Santiago, was a
16  five-year period of post-release supervision.  Now, that was
17  2004.  In 2004 no court, state, federal, no court had held
18  that this practice was unconstitutional.  No court said that.
19        Now, Mr. Santiago goes into the system and the
20  lawfulness of that period of time is ultimately decided in --
21  by this Court in 2017.  But go back to 2004.  Mr. Santiago
22  serves his post-release supervision then, from 2004 until his
23  sentence expires, and for him, the sentence expired in
24  November of 2004.  There is no question here about the
25  lawfulness of his term of incarceration in the year 2004, and

Opening Statement - Mr. Keane                    25

1   there's no question about the lawfulness of his incarceration
2   in the federal system.
3           But back to 2004, November of 2004, Mr. Santiago is
4   released then to post-release supervision, parole, and when he
5   gets released, he signs what is called a certificate of
6   release to post-release supervision.  In that certificate of
7   release, he agrees to abide by certain conditions.  There are
8   13 very general conditions that apply, one of them
9   significantly is that he will not leave the State of New York.
10  One of them is that he will not engage in conduct that
11  threatens the safety or security of himself or others.  The
12  other is that he will report to his parole officer any
13  contact he has with law enforcement in the context of an
14  arrest or other such involvement.  Pretty simple conditions.
15  He is not to leave the State of New York.
16          Now, at the same time, the evidence will show that
17  his federal sentence, which he got back in 2001, three years,
18  plus four years of supervised in the federal system.  So, you
19  do the math and you got federal parole, federal probation,
20  federal supervised release that will go from at least November
21  2004 up to November 2008.  That's the federal.
22          When he is released in November of 2004 the State,
23  he has five years of post-release supervision.  And doing the
24  math there, the estimated date for that would be November
25  2009.  He is serving those periods of supervision

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Opening Statement - Mr. Keane                    26

1   concurrently.  They run parallel to each other.  They overlap.
2   But because he is in New York City, he can't be supervised out
3   of the Eastern District in Virginia.  So what the Eastern
4   District of Virginia does is they transfer his supervision
5   from the Federal Government to the Eastern District of New
6   York, this district that we are all sitting in right now.
7           So that's the way that it was supposed to happen.
8   He is subject to the condition that he not leave the State of
9   New York without permission of his parole officers, both the
10  federal and the State.
11          Now, what happens, Mr. Santiago is arrested in the
12  State of Virginia in October 2005.  He has left contact with
13  his parole officers here in 2005.  By 2005, he is down in
14  Virginia.  He is no longer in New York.  That is a violation
15  of his post-release supervision and a violation of his federal
16  supervision.
17          Now, he's arrested down in Virginia, but New York
18  can't get him back.  People lost track of him.  He can't be
19  found down in Virginia because, although he is arrested, he is
20  gone.
21          Eventually, the Federal Government in the Eastern
22  District of Virginia catches up with him and he is
23  re-incarcerated in Virginia in federal prison for violating
24  the terms and conditions of his federal release.  So, when
25  that period ends, it is June 12, 2007.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Opening Statement - Mr. Keane                    27

1           June 12, 2007, he is extradited from Virginia again,
2   from the Federal Government back up to New York State, where
3   he will have to answer his charges that he violated his
4   parole, his post-release supervision conditions up here by,
5   among other things, getting himself arrested in Virginia in
6   2005 and leaving the State sometime in 2005, among other
7   charges.  That 2005 violation is now in front of the Division
8   of Parole, which will address those charges with Mr. Santiago.
9           So what happens?
10          As you will hear the evidence here, when people are
11  arrested for parole violations, they are entitled to something
12  called due process.  They are entitled to, among other things,
13  a preliminary hearing.
14          (Continued on following page.)
15
16
17
18
19
20
21
22
23
24
25

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Opening Statement - Keane                    28

1   (Continuing.)
2           MR. KEANE:  They are entitled to a final parole
3   revocation hearing.  At the final parole revocation hearing,
4   an individual is entitled to an attorney to defend against the
5   charges that parole was violated.
6           Mr. Santiago had all of that.
7           What happened?  Mr. Santiago comes into New York
8   and, yes, he's held at Rikers Island.  And there begins, June
9   12th, 2007, begins this eight-month period of time about which
10  he complains and for which he seeks money damages against
11  these individual defendants.
12          But, Mr. Santiago waives his preliminary hearing,
13  which makes sense because if you know you're dead in the
14  water, you might as well get moved onto your final parole
15  revocation, don't delay, because, understandably, Mr. Santiago
16  wanted this done and over with.
17          And then while he's represented by a lawyer at his
18  final parole revocation hearing, which occurs July 19th of
19  2007, just, you know, a little over five weeks after -- after
20  he's brought up from Virginia, Mr. Santiago pleads guilty to
21  violating his parole.
22          Now, he could have gone to a full, contested
23  evidentiary hearing and he could have tried to beat the
24  charges, but he didn't.  He pleaded guilty and an
25  administrative law judge within the New York State Division of

Opening Statement - Keane                29

1   Parole assessed him a penalty of 12 months of re-incarceration
2   for his violation.
3       And so then, Mr. Santiago went from -- in August of
4   2007, went from Rikers Island and he went up to a hub upstate.
5   He was processed and he spent most of his time up at a New
6   York State facility called Gouverneur Correctional Facility.
7   He spent some time going through another facility called
8   Orleans.
9       At no time did Mr. Santiago complain to anybody
10  about his post-release supervision.  He could have done a
11  number of things.  He was represented by a lawyer at his final
12  hearing and there are things that Mr. Santiago could have
13  done.  The evidence will show, and you will hear testimony,
14  about what Mr. Santiago could have done.
15      But the point is that what Mr. Santiago is seeking
16  damages for is a situation that he, in fact, brought upon
17  himself.  And we respectfully submit, members of the jury,
18  that it -- it is Mr. Santiago who brought this on himself.
19  Had he not been arrested in Virginia in 2005, he would never
20  have come up here for those eight months.  If he had just
21  simply abided by the law that applies to all citizens, he
22  would not have been returned to New York.
23      Now, one other point that, unfortunately, I must go
24  back to counsel raised the specter of a federal Second
25  Circuit case called Earley v. Murray.

SAM   OCR   RMR   CRR   RPR

Opening Statement - Keane                30

1       Respectfully, that case doesn't say what counsel
2   said it says.
3       And while it is true that DOCCS-calculated
4   post-release supervision was found in June of 2006 to be
5   unconstitutional, that case, and the facts of that case are
6   clear, and because counsel brought it up I may talk about the
7   facts of that case.  The Second Circuit in that case said this
8   is unconstitutional, but it gets sent back to the district
9   court in this building where the district attorney who was
10  handling the case was permitted an entire year, an entire
11  twelve months to decide whether to seek resentencing to
12  correct the sentence.  And that is, to correct the sentence
13  from one that had a DOCCS-calculated period of post-release
14  supervision to a sentence that had a judge-imposed period of
15  post-release supervision.
16      Now, I will stop there, but it is not as simple as
17  counsel said.  And, in fact, when this period was calculated
18  into Mr. Santiago's sentence, no court had found this
19  post-release supervision as calculated by DOCCS to have been
20  unconstitutional.  That didn't happen until June of 2006.
21      Now, it is true when he came back into New York
22  custody in 2007, this federal case had found that period as
23  DOCCS calculated to be unconstitutional.  That is not at issue
24  here, what is at issue is these eight months.
25      And in concluding, members of the jury, and thank

SAM   OCR   RMR   CRR   RPR

Proceedings                31

1   you for your attention because this is very complicated and we
2   appreciate your attention, what Mr. Santiago experienced was
3   brought on by himself.  And, again, had he not been arrested
4   in Virginia, he wouldn't have been back here in 2007, 2008.
5       And with that, members of the jury, I will conclude
6   my opening remarks.
7       Thank you.
8       THE COURT:  All right, thank you.
9       Members of the jury, I am now going to read what
10  we've marked as Joint Exhibit Number 1.  This is the start of
11  the presentation of the evidence.
12      Joint Exhibit Number 1 is a stipulation or an
13  agreement by the parties as to certain facts, and these facts
14  you should accept as being +established.
15      Plaintiff Jesus Santiago and Defendants Brian
16  Fischer, Anthony Annucci, and Terrence Tracy hereby submit the
17  following stipulations of fact and law:
18      1.  Jesus Santiago, the plaintiff in this action, at
19  the relevant times was an individual incarcerated in the New
20  York State Department of Corrections and Community
21  Supervision, then known as two agencies, the Department of
22  Correctional Services and the Division of Parole.
23      2.  In or about the first week of February 2000,
24  Mr. Santiago was arrested and incarcerated until March 13th,
25  2000.

SAM   OCR   RMR   CRR   RPR

Proceedings                32

1       3.  Mr. Santiago was arraigned for that offense on
2   March 13th, 2000 in Kings County Criminal Court under
3   Indictment number 1141/2000, and released on bond pending a
4   criminal trial.
5       4.  On May 3rd, 2001, Mr. Santiago was incarcerated
6   in federal prison in the state of Virginia.
7       5.  On June 12th, 2001, Mr. Santiago was taken into
8   federal custody in Alexandria, Virginia, and incarcerated in
9   the Eastern District of Virginia.
10      6.  On November 6th, 2001, Mr. Santiago pleaded
11  guilty in the United States District Court for the Eastern
12  District of Virginia.
13      7.  Mr. Santiago was sentenced on November 16th,
14  2001, in the United States District Court for the Eastern
15  District of Virginia, to 37 months of incarceration in the
16  Federal Bureau of Prisons, followed by four years of federal
17  supervised release.
18      8.  Mr. Santiago was transferred to Hudson
19  Correctional Facility in New York on January 2nd, 2002.
20      9.  On May 3rd, 2002, Mr. Santiago pleaded guilty to
21  the Indictment 1141/2000 in the Kings County Criminal Court
22  before the Honorable Sheldon Greenberg.
23      10.  Judge Greenberg could not sentence Mr. Santiago
24  that same day because the Kings County district attorney had
25  not yet prepared a pre-sentence report.

SAM   OCR   RMR   CRR   RPR

Case 23-814, Document 76, 10/06/2023, 3578791, Page16 of 124
Case 1:12-cv-02137-KAM-ST   Document 217   Filed 03/24/23   Page 33 of 287 PageID #: 2857
Case 1:12-cv-02137-KAM-ST   Document 217   Filed 03/24/23   Page 34 of 287 PageID #: 2858

Proceedings                                    33

11.  Sentencing was scheduled for May 14th, 2002.

12.  A Class C felony was required --

MR. RICKNER:  Objection.

MR. KEANE:  Your Honor, I believe Your Honor made a ruling that that paragraph would be deleted.

THE COURT:  Yes, Paragraph 12.  Disregard what I started to say, please.

MR. RICKNER:  And 13.

THE COURT:  All right.  We are going to have to get a redacted copy of this stipulation.

MR. KEANE:  We have that, Your Honor, and we'll submit it.

I think the next paragraph, too, is also.

THE COURT:  14, Paragraph 14, correct?

MR. KEANE:  Yes.

THE COURT:  Okay.

MR. RICKNER:  Yes.  Yes, Your Honor.

THE COURT:  The jury should disregard anything you might have heard.

On May 14th, 2002, Mr. Santiago was sentenced in Kings County Criminal Court to a three-and-a-half-year term of incarceration.

As at Mr. Santiago's sentencing on May 14th, 2002, there was no mention of post-release supervision.

16.  After his sentencing in Kings County Criminal

---

Proceedings                                    34

Court, Mr. Santiago was returned to the United States Bureau of Prisons to complete his federal sentence.

17.  Mr. Santiago's New York State sentence from Kings County Criminal Court ran concurrently, or at the same time, to his federal sentence.

18.  On April 7th, 2004, Mr. Santiago was released from the United States Bureau of Prisons to the custody of the New York State DOCS, to complete his New York State sentence from Kings County Criminal Court in 2002.

19.  On April 22nd, 2004, upon entry to a New York State DOCS Prison Reception Center, Mr. Santiago's New York State sentence was noted in DOCS' computer system and calculated for a release date, also known as his maximum expiration date, after crediting his sentence with time served in federal prison.

20.  Mr. Santiago's maximum expiration date for his New York State sentence from the Kings County Criminal Court was November 7th, 2004.

21.  On November 7th, 2004, Mr. Santiago was released from New York State DOC, Department of Corrections, to the New York State Division of Parole, to serve post-release supervision.

22.  New York State DOC calculated that Mr. Santiago was to serve post-release supervision until November 7th, 2009.

Proceedings                                    35

23.  At the same time, Mr. Santiago was required to serve a four-year term of federal supervised release in connection with his sentence from the United States District Court from the Eastern District of Virginia.

24.  Mr. Santiago's federal supervised release from the Eastern District of Virginia was transferred to the United States Probation office for the Eastern District of New York in Brooklyn because he remained in New York to serve his post-release supervision from his New York sentence on parole under the supervision of the New York State Division of Parole.

25.  Mr. Santiago's federal supervised release ran concurrently to his New York State post-release supervision.

26.  Mr. Santiago was released from New York State DOC November 4th, 2004, on condition that he adhere to certain conditions of release, including for both his federal supervised release and his New York State post-release supervision, that he not leave the State of New York.

27.  On October 30th, 2005, Mr. Santiago was arrested in Fairfax County, Virginia.

28.  Mr. Santiago was incarcerated in Fairfax County, Virginia, from October 30th, 2005 to November 17th, 2005.

29.  On June 9th, 2006, the United States Court of Appeals for the Second Circuit ruled that post-release

---

Proceedings                                    36

supervision in New York must be imposed by a sentencing judge and not calculated by DOCS.

30.  The Second Circuit ruled that a sentence that contained a post-release supervision term that was calculated by DOCCS was not -- and not imposed by a judge, violated due process rights under the United States Constitution.

31.  On November 9th, 2006, Judge Ellis, of the United States District Court for the Eastern District of Virginia, sentenced Mr. Santiago to eight months of incarceration to be followed by 30 months of federal supervised release.

32.  Mr. Santiago served his eight months of incarceration in Hazelton Federal Prison in West Virginia.

33.  On June 6th, 2007, Mr. Santiago was released from the Bureau of Prisons in West Virginia and extradited to New York to answer the Division of Parole charges that he violated the terms and conditions of his New York State post-release supervision.

34.  On July 19th, 2007, Mr. Santiago pleaded guilty to violations of his post-release supervision before an administrative law judge of the New York State Division of Parole and received a time assessment of 12 months of incarceration.

35.  On August 6th, 2007, Mr. Santiago was returned to Ulster County Correctional Facility in New York State DOCS.

SAM    OCR    RMR    CRR    RPR

JA515

```
                        Proceedings                    37
1           36.  Mr. Santiago's twelve-month time assessment was
2    credited with 55 days of jailtime served in Rikers Island from
3    June 12th, 2007 to August 5th, 2007.
4           37.  On February 2nd, 2008, Mr. Santiago was
5    released to post-release supervision from Gouverneur
6    Correctional Facility in New York State DOCS.
7           38.  On July 5th, 2013, Mr. Santiago pleaded guilty
8    to 2011 state of Virginia charges and was committed to the
9    State of Virginia Department of Corrections.
10          39.  On May 20th, 2015, Mr. Santiago was released
11   from Virginia State Prison.
12          40.  On October 30th, 2017, defendants Fischer,
13   Annucci, and Tracy were found liable to Mr. Santiago for
14   violating his constitutional rights to due process for not
15   referring him to his Kings County criminal sentencing court in
16   the period from June 12th, 2007 to February 6th, 2008, a
17   period when he was in custody of DOC for the New York State
18   Division of Parole.
19          All right, members of the jury, how are we doing?
20          Do you need a break or are you ready to proceed with
21   hearing witness testimony?
22          If you need a break, please raise your hand.
23          All right, we will proceed.
24          Is the plaintiff ready to call his first witness?
25          MR. RICKNER:  Yes, Your Honor.

                SAM    OCR    RMR    CRR    RPR
```

```
                        Proceedings                    38
1           The plaintiff calls the plaintiff, Jesus Santiago.
2           THE COURT:  All right, sir, please step up to the
3    witness stand.
4           THE COURTROOM DEPUTY:  And raise your right hand.
5           Do you solemnly swear or affirm that the testimony
6    you are about to give before the Court shall be the truth, the
7    whole truth, and nothing but the truth?
8           THE WITNESS:  Yes, I do.
9           (Witness sworn.)
10          THE COURTROOM DEPUTY:  Please have a seat and state
11   and spell your name, please, for the record.
12          THE WITNESS:  Jesus Santiago, J-E-S-U-S,
13   S-A-N-T-I-A-G-O.
14          THE COURT:  All right, sir, you may proceed.
15          MR. RICKNER:  Yes.  How is the volume?
16          Can I be heard by the court reporter and everyone he
17   also?
18          THE COURT:  Yes.
19          MR. RICKNER:  Okay, thank you very much.
20
21          (Continued on the following page.)
22
23
24
25

                SAM    OCR    RMR    CRR    RPR
```

```
                Santiago - direct - Rickner           39
1    JESUS SANTIAGO,
2         called as a witness by the Plaintiff, having been first
3         duly sworn/affirmed by the Courtroom Deputy, was examined
4         and testified as follows:
5    DIRECT EXAMINATION
6    BY MR. RICKNER:
7    Q    Mr. Santiago, how old are you?
8    A    40.
9    Q    And where did you grow up?
10   A    Brooklyn, New York.
11   Q    What part of Brooklyn?
12   A    Crown Heights.
13   Q    Now, I'd like to bring you back to 2002.
14          In 2002, did you plead guilty to an offense and were
15   you sentenced to three-and-a-half years in prison?
16   A    Yeah --
17          THE COURT:  Sir, please, you need to keep your voice
18   up.
19          THE WITNESS:  I'm sorry.
20          THE COURT:  You can go a little closer to the mic --
21          THE WITNESS:  Yes.
22          THE COURT:  -- but keep your voice up, please.
23          THE WITNESS:  Okay.
24          THE COURT:  Would you please repeat your answer to
25   the question?

                SAM    OCR    RMR    CRR    RPR
```

```
                Santiago - direct - Rickner           40
1           THE WITNESS:  I'm sorry, can he ask the question
2    again?
3    BY MR. RICKNER:
4    Q    I'm just asking in 2002, did you plead guilty to an
5    offense with determinant flat sentence of three-and-a-half
6    years?
7    A    Yes.
8    Q    When you pled guilty, did you also agree to a period of
9    post-release supervision?
10   A    No.
11   Q    Did you -- were you already under the supervision of the
12   federal courts?
13   A    Yes.
14   Q    Did you discuss that with the judge during your plea?
15   A    Yes.  I spoke with the Honorable Sheldon Greenberg and I
16   expressed to him that I was already on federal probation, if I
17   could not receive the PRS, because they were already
18   supervising me.  And he felt like because the situation, as
19   the conversation we had on record, that it wasn't --
20          THE COURT:  Excuse me, sir, there is a rule against
21   people testifying about what someone else said outside of this
22   courtroom.  So --
23          THE WITNESS:  If it's part of the record I can.
24          THE COURT:  Well, it is considered hearsay unless
25   the parties are willing to stipulate to what this conversation

                SAM    OCR    RMR    CRR    RPR
```

```
                    Santiago - direct - Rickner              41

 1   was.
 2          MR. RICKNER:  Well, I believe this conversation is
 3   in a document that they're offering as evidence, so...
 4          THE COURT:  The whole conversation?
 5          MR. RICKNER:  Yes.
 6          THE COURT:  All right.
 7          MR. KEANE:  Your Honor, we believe we should be able
 8   to cross-examine the witness on the contents of that document
 9   and show it to the jury.
10          THE COURT:  All right.
11          MR. KEANE:  We've -- obviously, he's opened the door
12   to discussing what actually happened at the plea hearing.
13          THE COURT:  All right.  So, you had a conversation
14   with Justice Greenberg.
15          THE WITNESS:  Yes.
16          THE COURT:  During your plea hearing or was this at
17   your sentencing?
18          THE WITNESS:  Plea hearing.
19          THE COURT:  All right, thank you.
20          Please proceed.
21   BY MR. RICKNER:
22   Q    Now, during your later sentencing, did the judge actually
23   impose, while he was on the bench, a term of post-release
24   supervision?
25   A    No, no.
```

```
                    Santiago - direct - Rickner              42

 1   Q    Now, we discussed earlier that or in the stipulations in
 2   2006 you spent eight months in custody, in federal custody.
 3          Was that due to a parole violation?
 4   A    Yes.  Basically, what happens is one PRS, which is the
 5   State of New York PRS violates the other one.  So, it's not
 6   like you have to do anything else.
 7          I left out of the State of New York, which basically
 8   is a technical violation.  I had nowhere to live in New York.
 9   My wife and everything was in Virginia, so, I -- I went home.
10   After a while, I just had no where to live.
11   Q    Understood.
12          Now, just what I want to make clear for the record,
13   you also spent 239 days in custody as the result of a
14   violation of the state PRS, is that right?
15   A    That's correct.
16   Q    Did you get any discounts --
17   A    Actually, it was a little bit more.
18          THE COURT:  Wait.  Let's let the lawyer finish his
19   question before you start to answer.  So, wait until he's
20   finished, and then the lawyer should also wait for your
21   answer, before he asks the next question.
22          THE WITNESS:  I'm sorry, ma'am.
23          MR. RICKNER:
24          THE COURT:  That's all right.  Just take it easy and
25   listen carefully.
```

```
                    Santiago - direct - Rickner              43

 1   BY MR. RICKNER:
 2   Q    So what I'm asking is did you get any discount on your
 3   federal sentence because you were also going to do time for
 4   the parole violation in New York State?
 5   A    No.  It's absolutely impossible for you to run any
 6   probation violation concurrent with the other.  So when you
 7   serve one, you just serving that one.
 8   Q    Okay.
 9   A    It's impossible.
10   Q    So just to be clear, the 239 days that you did in state
11   custody, that was extra time?
12   A    Exactly.
13   Q    Now, I'd like to bring you back to June of 2007 when you
14   got to Rikers Island.
15          Now, when you first get to Rikers Island, where did
16   you go?
17   A    Well, the first thing I remember about going there --
18   well, at any time you go in there, it's the fear of going
19   across the bridge.  It's like almost like when you get there,
20   it's like shuffling the deck.  You know, you just never know
21   what you're gonna get, what's gonna happen.  That is an
22   extremely dangerous place.
23          Upon entry of going in reception, I was just trying
24   to call my wife to let my wife know where I was located at.
25   And, basically, a guy told me to get off the phone inside the
```

```
                    Santiago - direct - Rickner              44

 1   cell.
 2          The guy who cleans up, that works for the
 3   correctional officers, basically, while I had my back turned
 4   on the phone swung through the bars and hit me in my face.
 5   When he did it, I turned around and I'm like -- looked up to
 6   see who hit me.  The CO was standing behind the inmate and
 7   he's like:  Get off the phone.
 8          I'm like:  I just got the phone.  I didn't even get
 9   a chance to use the phone to call anybody.  I'm just trying to
10   use the phone.
11          And he's like:  Get off the phone, you already used
12   the phone.
13          I was like:  I didn't use the phone.  You could ask
14   anybody in here, I didn't use the phone.
15          So, at that point he tells me to step out.  So when
16   I step out the cage, because they have like a little cage
17   where they hold you in when they doing their classification
18   and they sending you from unit to unit, so basically he told
19   me step out.  I step out.  He grabbed me by the back of my
20   shirt.  And there's cameras all down there.  He grabbed me by
21   the back of my shirt, bringing me in the back.
22          And I kind of resisted because I see he's pulling me
23   in the back by myself and there's -- nobody is back there.  So
24   I put up a little bit of kind of a tussle to get him off me.
25   I'm like trying to get back to the cell where everybody else
```

**JA517**

Santiago - direct - Rickner                45

1   is at.

2           Another CO comes over, helps him grab me.  They drag

3   me into the back room.  The first guy swings and I move back.

4   The other CO rushed from the side, he hits me in my side.  I

5   kind of collapse.  And then they just -- they just pounce --

6   pounce on me.

7           What happened, what stopped them was the captain,

8   they had said:  Captain walking.

9           Any time a captain works on -- on Rikers Island or

10  anywhere else they'll always yell:  A captain walking, white

11  shirt walking.  And things of that nature to warn the COs that

12  the captain is coming.

13          So, he hear the captain is walking.  They rush out

14  the cell.  They close the cell.  The captain does the walk and

15  she sees me back there.  She's like:  What are you doing back

16  there?  And she sees me all bruised up.

17          I said:  The two correctional officers, they jumped

18  me.  I said:  An inmate punched me through the bars and they

19  pulled me in the back and jumped me because they're saying I

20  used the phone, and I didn't use the phone.

21          After we are going, the -- the -- the captain takes

22  me to medical.  They do the medical thing.  They check me out.

23  They see I got a few bumps and bruises or whatever the case

24  may be.

25          She's like:  You want to put a report in?

SAM    OCR    RMR    CRR    RPR

---

Santiago - direct - Rickner                46

1           I said:  Yes.  I put the report in.

2           From that point -- after she leaves, because they

3   leave me in medical with the doctor and, he's, you know, I

4   guess, fake patching me up or whatever, the correctional

5   officer comes back and they're like:  Yeah, the homies gonna

6   know you in here snitching, too.

7           So, when I get up to the unit -- when you get to the

8   unit there's a unit here (indicating) and there's a unit on

9   this side (indicating) and there's a door in between.

10  Sometimes the correctional officers will open that door.  When

11  they open that door, the other inmates on the other side can

12  see you.  The inmate that was pushing the broom downstairs

13  that punched me through the cell, through the cell gate, and

14  there's just bars, you could reach your hand in and hit

15  somebody if they're close.  When he -- when we're upstairs he

16  sees me through the door, tell the other gang members.

17          And what it is, is you not in a gang.  I've never

18  been in a gang.  I have nothing to do with any.  You're there

19  by yourself.  You're at their will.  They pretty much run the

20  house.  That's just what it is.

21          You don't have any -- you know, you pretty much have

22  to protect yourself and whatever.  It is what it is.

23          So, I got, you know, into multiple altercations, you

24  know, trying to protect myself in the bathroom, people trying

25  to jump on me.  And I'm pretty sure it's documented.  I'm

SAM    OCR    RMR    CRR    RPR

---

Santiago - direct - Rickner                47

1   pretty sure somebody along the way, there's plenty of video

2   cameras at Rikers Island, I can't make this stuff up.

3   Q   So, there are multiple different parts, what -- one to

4   step back.

5           You were just talking about the intake area, is that

6   correct to say?

7   A   Yes.

8   Q   Now, what facility inside Rikers Island were you at?

9   A   I believe it was C-74.

10  Q   Is that part of AMKC?

11  A   Oh, actually, no.  I think it was -- no, OBCC I think it

12  was, actually.

13  Q   Now, you were there on a parole violation and you had a

14  lawyer, is that correct?

15  A   If that's what you want to call them, yeah.

16  Q   My question is:  Did that lawyer ever tell you that the

17  term of supervised release that you had was unconstitutional?

18  A   No, they didn't tell me any of that, never.

19  Q   Did you ever hear from your lawyer or anyone else about

20  the Earley case and his habeas petition?

21  A   No, sir.

22  Q   Now, on July 19th, 2007, did you plead guilty to

23  violations of post-release supervision?

24  A   I was trying to get off Rikers Island.

25  Q   So, first, that's a yes?

SAM    OCR    RMR    CRR    RPR

---

Santiago - direct - Rickner                48

1   A   Yes.

2   Q   Okay.  Now, why did you plead guilty to that parole

3   violation?

4   A   I was just trying to get off of Rikers Island as fast as

5   possible.

6   Q   And after plead -- did you plead guilty on July 19th,

7   2007?

8   A   I believe so, yes.

9   Q   On August 6th, 2007, were you taken to Ulster

10  Correctional?

11  A   Yes.

12  Q   Now, I'd just like to go back for a bit.

13          What was the food like at Rikers Island in 2007?

14  A   I never went to the mess hall.  So to avoid altercation,

15  I never went to the mess hall at all.  So, basically I ate the

16  stuff that's in our commissary.

17  Q   What kind of foods did you get in the commissary?

18  A   Noodles.

19  Q   Now, when you say "noodles," would those be the square

20  Ramen packets or the cups?

21  A   Yeah, it's like square Ramen packets.

22  Q   And you lived off that for a month?

23  A   Quite some time.

24  Q   Now, what were the beds like where you got to sleep?

25  A   Completely open.

SAM    OCR    RMR    CRR    RPR

**JA518**

```
                    Santiago - direct - Rickner              49

1    Q    And when you say "completely open," how many people were
2    around you?
3    A    Could be 50, 60.
4    Q    Did those people sometimes get into fights with each
5    other?
6    A    All the time.
7    Q    Did that happen in the middle of night?
8    A    Absolutely.
9    Q    Did you know necessarily when a fight was coming?
10   A    No, you didn't know.  It just -- everything just sparks,
11   like, instantly.  They just -- it just -- it just goes
12   sometimes.
13   Q    Now, at the time where was your family living?
14   A    Virginia.
15   Q    Were they able to come up to visit you while you were at
16   Rikers?
17   A    I told my wife not to come.
18   Q    Why is that?
19   A    One second.  I didn't want her to come because I didn't
20   want her seeing me in that condition.
21   Q    Now, how did you get from Rikers Island to Ulster
22   Correctional?
23   A    They transferred me on the bus.
24   Q    Okay.  Could you describe the bus for me?
25        THE COURT:  Excuse me one second.  I am just going
```

```
                    SAM     OCR    RMR    CRR    RPR
```

```
                    Santiago - direct - Rickner              50

1    to move the microphone.
2         THE WITNESS:  I'm sorry.
3    A    It's change -- its just a bus, a metal bus with seats in
4    it.
5    Q    Are you restrained during the trip?
6    A    Yes, you're shackled from hand and feet.
7    Q    Does the bus make multiple stops?
8    A    No.
9    Q    How long did it take to get from Rikers to Ulster County,
10   do you think?
11   A    Maybe an hour or two.
12   Q    And when you got to Ulster County, what happened?
13   A    When I got to Ulster, you go through reception.  They --
14   they do your bloodwork, your process and stuff like that.
15        THE COURT:  Can you get closer to the microphone --
16        THE WITNESS:  I'm sorry.
17        THE COURT:  -- or pull it closer to you?
18   A    They do your blood process, you know, stuff like that.
19   You do intake.  And then they put you in the unit.
20   Q    Could you describe that unit for me?
21   A    It's an open unit, a bunch of lockers.  It's an open space.
22   Q    Did you have a particular cell you were assigned to?
23   A    I had a cubicle I was assigned to.
24   Q    And how many people were in your unit?
25   A    Maybe about the same amount, 60, 70.  It's pretty
```

```
                    SAM     OCR    RMR    CRR    RPR
```

```
                    Santiago - direct - Rickner              51

1    consistent.
2    Q    And were there fights that you witnessed at Ulster County?
3    A    No.
4    Q    Would you say -- how was the food at Ulster Correctional?
5    A    I mean, again, I didn't eat.  I didn't eat.  I had a hit
6    on me, so I didn't go to chow.  I had a hit put on me that
7    traveled from Rikers Island to wherever I went.
8    Q    Does that relate to the fight that you talked about when
9    you first got to Rikers?
10   A    Yes.
11   Q    Was this related to a gang having a problem with you?
12   A    Yes, refusing to give my sneakers up when I didn't want
13   to give up my sneakers in Rikers Island.  There was another
14   situation.  It's a bunch of different -- different things.
15   Going back and forth to court, you get caught in those.  Those
16   intake tanks when you travel back and forth to court, it's
17   constant fighting.  People trying to rob you, steal even your
18   shirt, your pants, anything.
19   Q    Now, when you were at Ulster County did your family come
20   and visit?
21   A    No.
22   Q    How often did you get to use the phone?
23   A    I used the phone in Ulster.  I think -- I think possibly
24   I might have had one visit, maybe.  I think I got one visit
25   from my wife while I was up there, possibly.
```

```
                    SAM     OCR    RMR    CRR    RPR
```

```
                    Santiago - direct - Rickner              52

1    Q    Now --
2    A    Ulster -- Ulster is a different environment because the
3    COs isn't heavy handed there.  So, what they try to do, they
4    try to catch you in the bathrooms in there, but the CO's do a
5    little bit more walking in there.  They are a little bit
6    more -- you know, they're watchful.  They are a little bit
7    more watchful, so it's harder to get you.
8         So, I didn't go out to the yard and I kind of just
9    stayed in the unit.
10   Q    Now, did you get assaulted by COs while you were in
11   Ulster County?
12   A    Yeah.  I mean it wasn't that bad as the situation in
13   Rikers Island, but they -- they rough you up a little bit.
14        They took me because I didn't make my bed properly
15   one morning and the guy gave me a little flack, and when I
16   woke out I was on the wrong side of the bed, they locked me up
17   and put me in the box.
18        And, you know, when they took me to the box, they
19   slammed me up against this little blue mat a little bit, you
20   know, face first or whatever the case may be, but I didn't
21   really get injured or nothing like that.  It was just, I guess
22   they roughed me trying to show me what that was about.
23   Q    Now, you mentioned "the box."
24        Was there a time when you were placed into the SHU,
25   the Supervised Housing Unit?
```

```
                    SAM     OCR    RMR    CRR    RPR
```

```
                    Santiago - direct - Rickner          53

 1   A     Yes.
 2   Q     Is that like solitary confinement?
 3   A     Yes.
 4   Q     So, tell me about that.
 5   A     When I went to Gouverneur Correctional Facility, which
 6   was my last and final destination in the State of New York,
 7   it's like 35 miles from the Canadian line, when I went up
 8   there, it was in the winter as well.  It's a little bit more
 9   active out there than in Gouverneur and as far as what the
10   inmates are capable of doing.
11         So, I just tried to stay out of the chow hall.  I
12   didn't go to chow hall at all.  You can check all the records,
13   I never been to the chow hall.  I stayed out chow hall.
14         I never went to the yard, except for one time.  When
15   I went out there, and I was like I seen it wasn't safe.  I
16   never went back out there again.  I just stayed in the unit.
17         And I took a recycling job so I could recycle inside
18   the housing unit so I didn't have to go outside.  And,
19   basically, the correctional officer came to me one day and was
20   like:  Santiago, you got to shovel outside.
21         And I was like:  Sir, it's not part of my -- it's
22   not part of my job detail.
23         And he was like:  I don't care.  Go out there and
24   shovel the snow or you're going to the box.
25         So I explained to him that I had sickle cell and
```

SAM     OCR     RMR     CRR     RPR

```
                    Santiago - direct - Rickner          54

 1   that, you know, I have my medical paper work to prove I have
 2   sickle cell.  He didn't care.  He was like:  Well, you go or
 3   you go to the box.  So, pretty much he sent me to the box.
 4         And I stayed in the box for the rest of the time
 5   until I went home.  I just stayed there.
 6         When I was in the box with my cellmate, I think he
 7   was in on this, he was -- he did something where, like, he was
 8   in this room with me.  They put me in the cell with this guy
 9   and he thinks that I'm gonna attack him.
10         When I come in there I'm like:  Dude, I don't know
11   you.  I don't have no problem with you.
12         And he's like:  Well, every time they put somebody
13   in here they try and attack me.
14         I'm like:  Dude, I'm not here for that.  I'm just
15   trying to go home.
16         So, it was kinda weird.  We hung for a little while
17   because he grabbed me briefly when he walked away and we were
18   kind of tussling on the ground and I'm like:  What's wrong
19   with you, dude?  Like, I don't have no problem with you.
20         And he's like:  Every time they put somebody
21   different in the room, they try to get me.
22         So, after we kind of got to the point where he
23   wasn't worried about me and I kinda wasn't worried about him,
24   I just stayed there until I went home.
25         (Continued on the following page.)
```

SAM     OCR     RMR     CRR     RPR

```
                    Santiago - Direct - Mr. Rickner        55

 1   DIRECT EXAMINATION
 2   BY MR. RICKNER:
 3   Q     How long were you in the SHU?
 4   A     I don't even remember.  Maybe at least a month, at least.
 5   Q     Now, I'd like you to tell me in your own words, what is
 6   it like to lose your liberty and to be incarcerated?
 7   A     It's like being buried alive.  You there, but you don't
 8   exist.  You not doing nothing.  You not moving forward.  You
 9   just there and you just like -- I think what a lot of people
10   miss, like they don't understand, is that the system is not
11   correcting people, it's not correcting.  It just makes
12   everything worse.  It's bad.  It's horrible in there.
13   Q     Now, this wasn't your first period of incarceration.  Do
14   you think the prior time you spent in custody made these --
15         THE COURT:  Excuse me.  May I just ask Counsel to
16   use direct forms of questioning.
17         MR. RICKNER:  Understood.
18         THE COURT:  Who, what, where, explain, tell us,
19   et cetera.
20         MR. RICKNER:  My apologies, Your Honor.
21         THE WITNESS:  Sorry, Your Honor.
22   Q     Did your prior time in custody make these 239 days any
23   easier, harder, something else?
24   A     No, not really easier.  Seems like they get worse.  It
25   gets worse and worse.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Santiago - Direct - Mr. Rickner        56

 1   Q     Now, prior to June 12th, 2007, were you ever taken to
 2   Kings County Criminal Court to be resentenced, to add a period
 3   of post-supervised release?
 4   A     Yes.
 5   Q     Are you saying that was before June 12, 2007 or after?
 6   A     Oh, no.  It was in two thousand --
 7         THE COURT:  Wait, sir.
 8         THE WITNESS:  I'm sorry.
 9   A     It was on -- I don't remember the actual dates.  There's
10   just so many dates that have been thrown around.
11         You said -- when was the actual date, you said?
12   I'm sorry, I can't -- I don't understand.
13         MR. RICKNER:  If I may.
14         Actually, can I -- I believe these are all
15   stipulated to.  Can I move exhibits 1, 2 and 3 into the
16   record?
17         THE COURT:  Are these stipulated or plaintiff's
18   exhibits.
19         MR. RICKNER:  Well, they're plaintiff's exhibits and
20   there's been no objection.
21         THE COURT:  Any objection?
22         MR. KEANE:  No objection, Your Honor.
23         THE COURT:  All right.  We will admit and publish
24   Plaintiff's Exhibits 1 through 3.
25         MR. RICKNER:  I was actually not going to publish at
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Santiago - Direct - Mr. Rickner                57



1  this time.
2          THE COURT:  Oh.
3          MR. RICKNER:  I'd like to use Exhibit 3 to show to
4  my client to refresh his recollection.
5          THE COURT:  Wait.
6          Ms. Jackson, it is on the screen.
7          Thanks.
8  Q   Can you see this exhibit on the screen, Mr. Santiago?
9  A   Yes.
10 Q   Do you see the date there?
11 A   December 15th, 2010.
12 Q   Does this refresh your recollection as to when you were
13 resentenced?
14 A   Yes.
15 Q   Okay.
16         THE COURT:  All right.  That is Plaintiff's Exhibit
17 3.
18         MR. RICKNER:  Yes.
19 A   That's the resentencing here.
20 Q   Exactly.
21 A   Okay.
22 Q   Now, prior to June 12th, 2007, were you ever taken to
23 Kings County Criminal Court for resentencing?
24 A   No.
25 Q   Now, when you did go for resentencing in 2010, did the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Santiago - Direct - Mr. Rickner                58

1  judge add a period of post-release supervision?
2  A   No.  He apologized and told me that I wasn't supposed to
3  be there and that they were supposed to release me, but I
4  didn't get released.  They released me like two days later,
5  after the judge had to reorder again.  They still held onto
6  me.
7          MR. RICKNER:  Thank you, Mr. Santiago.
8          I have no further questions for my witness at this
9  time.
10         THE COURT:  All right.
11         How is the jury?  Do you need a break now or are you
12 ready to proceed with the cross-examination of Mr. Santiago?
13         If anyone needs a break, please raise your hand, we
14 will take a short break, ten minutes or so.
15         All right.  Please proceed, Mr. Keane, with the
16 cross-examination.
17         MR. KEANE:  Your Honor, before I begin, there are
18 two exhibits I would like to refer to on the ELMO just as
19 Counsel did.
20         One is the plea minutes.
21         THE COURT:  Can you just identify them by letter and
22 then by type of document.
23         MR. KEANE:  Yes.
24         And I think they have been stipulated to.
25         THE COURT:  All right.  Tell us what it is, please.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                59

1  Defendants' Exhibit what?
2          MR. KEANE:  It's Defendants' Exhibit F and
3  Defendants' Exhibit I.
4          THE COURT:  All right.  Does plaintiff's counsel
5  have any objection to admitting these two exhibits, F and I?
6          MR. RICKNER:  Hold on.  I'd just like to take a
7  quick look at them.
8          No objection on F.  I believe it's already been
9  admitted as Plaintiff's 3.
10         I would just like to take a quick look at...
11         MR. KEANE:  Thank you, Your Honor.
12         THE COURT:  Hold on.  He is still checking Defense
13 Exhibit I.
14         MR. RICKNER:  Hold on.
15         MR. KEANE:  Exhibit I is the certificate of release
16 and we are submitting it redacted, with the nature of the
17 offense blacked out.
18         MR. RICKNER:  Okay.  That's excellent.  That's not
19 the version I was provided before.  May I see it, please?
20         MS. DURDEN:  Here.
21         MR. RICKNER:  Thank you very much.
22         MS. DURDEN:  You're welcome.
23         MR. RICKNER:  Oh, I see.  Thank you very much.
24         THE COURT:  No objection, sir?
25         MR. RICKNER:  No objection.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Santiago - Cross - Mr. Keane                60

1          THE COURT:  Mr. Rickner?
2          MR. RICKNER:  No objection.
3          Thank you, Your Honor.
4          THE COURT:  The Court receives in evidence
5  Defendants' Exhibits F and I.
6          MR. KEANE:  Thank you, Your Honor.
7          (Defendants' Exhibits F and I received in evidence.)
8  CROSS-EXAMINATION
9  BY MR. KEANE:
10 Q   Good morning, Mr. Santiago.
11 A   Good morning.
12 Q   You can hear me?
13 A   Yes.
14 Q   Now, Mr. Santiago, you were arrested in 2000 for an
15 incident that occurred in Brooklyn, New York, correct?
16 A   Yes.
17 Q   And you were incarcerated after that arrest until
18 March 13th of 2000; is that correct?
19 A   Yes.
20 Q   And you were arraigned on March 13th and then released on
21 bond; is that correct?
22 A   I would say this:  I'm not going to remember every last
23 date for every last thing.  So if you ask me date by date,
24 it's a possibility the record shows that, yes.
25 Q   Now, you had a trial scheduled where the charges pursuant

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
              Santiago - Cross - Mr. Keane          61
 1  to that arrest and arraignment was to be held; is that
 2  correct?
 3  A    That's correct.
 4  Q    And you did not appear at that trial; is that correct?
 5  A    That's also correct.
 6  Q    And isn't it correct that you were in the state of
 7  Virginia in -- when you were arrested the following year for
 8  an offense in Virginia; is that correct?
 9  A    That's correct.
10  Q    And isn't it correct that once you were arrested for the
11  offense in Virginia, you were incarcerated by the federal
12  authorities in Virginia?  Is that correct?
13  A    That's correct.
14  Q    And while you were in federal custody, in federal prison
15  down in Virginia, isn't it correct that you understood that
16  you were facing charges in New York?  Is that correct?
17  A    That's correct.
18  Q    And you took it upon yourself, did you not, to write to
19  the judge in that case; is that correct?
20  A    Correct.
21       THE COURT:  "That case" meaning which case?
22       MR. KEANE:  I'm sorry.
23  Q    In the case for which you were arrested in Brooklyn, New
24  York in the year 2000?
25  A    Yes.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
              Santiago - Cross - Mr. Keane          62
 1  Q    And you wanted to get those charges resolved while you
 2  were still in federal custody; is that correct?
 3  A    Yes.
 4  Q    And you wrote to the judge in that case to try to resolve
 5  those charges, correct?
 6  A    That's correct.
 7  Q    And isn't it true that then you were transferred to
 8  New York so that you could take care of those charges,
 9  correct?
10  A    Correct.
11  Q    And once you resolved those charges before the judge in
12  New York, you went back to federal custody, correct?
13  A    Correct.
14  Q    And now I would like to go back to some of your testimony
15  about what happened in 2002.
16       You were transferred to New York to take care of
17  those Kings County charges, correct?
18       You --
19       THE COURT:  One question at a time.
20       Do you want an answer?
21       MR. KEANE:  Yes.
22       THE WITNESS:  I don't know what the question is.
23  I'm sorry, Your Honor.
24       THE COURT:  It was:  You were transferred to
25  New York in 2002 to take care of those charges, correct?
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
              Santiago - Cross - Mr. Keane          63
 1       THE WITNESS:  Yes, that's correct.
 2  Q    And you went before the judge in Kings County, Kings
 3  County Criminal Court, just across the street here, in May of
 4  2002, correct?
 5  A    That's correct.
 6  Q    And you attended a plea hearing, correct?
 7  A    Correct.
 8  Q    And that was before Judge Sheldon Greenberg, correct?
 9  A    Correct.
10  Q    Now I am going to show you the first page of Defendants'
11  Exhibit F, which has been admitted into evidence.  I am going
12  to put it on the screen.
13       And if you look at that -- I'm sorry, it would be
14  Defendants' Exhibit -- bear with me for the moment.
15       It is Defendants' Exhibit E.  I apologize.
16       MR. RICKNER:  Well, objection to -- I'm not
17  consenting to its admission at this point.  If you want to
18  show it to my client, that's fine.
19       MR. KEANE:  All right.
20       Your Honor, I would like to -- may I approach the
21  witness?
22       THE COURT:  Yes.
23  Q    I will show you, sir, what is marked for identification
24  as Defendants' Exhibit E.
25       THE COURT:  Could you tell us for the record what it
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
              Santiago - Cross - Mr. Keane          64
 1  is, please, sir.
 2       MR. KEANE:  It is a transcript of a Supreme Court of
 3  the State of New York, County of Kings, Criminal Term
 4  proceeding before the Honorable Sheldon Greenberg and it is
 5  dated May 3rd, 2002.
 6       THE COURT:  Thank you.
 7  Q    Now, sir, is that May 3rd, 2002 transcript a transcript
 8  of a hearing you attended in May of 2002?
 9  A    Yes, that's correct.
10       MR. KEANE:  Your Honor, I would move the Exhibit E,
11  Defendants' Exhibit E into evidence.
12       MR. RICKNER:  No objection, provided there is
13  redactions for material that the Court has already excluded.
14       MR. KEANE:  And I believe, Your Honor, the
15  redactions have been made.
16       THE COURT:  All right.  You might want to show
17  plaintiff's counsel the redacted version so he does not have
18  any issue with it.
19       Let's just do this subject to -- the witness will
20  testify from the redacted version; is that correct, Mr. Keane?
21       MR. KEANE:  That's correct, Your Honor.
22       THE COURT:  All right.
23       Has Counsel been given a copy yet?
24       MR. KEANE:  Ms. Koehler is showing him a copy now,
25  Your Honor.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                  Santiago - Cross - Mr. Keane          65

1            MR. RICKNER:  Thank you very much.
2            And to speed things along, can you just tell me
3     which page you're planning on looking at?
4            MR. KEANE:  I am going to look at pages 2 and 3.
5     And 4.  We'll probably go through the entire document.
6            MR. RICKNER:  I'm fine with it.
7            Your Honor, I'm fine with him questioning the
8     witness, just that it not be shown to the jury until I have
9     had a second to look over this.
10           THE COURT:  Well, I wish you would all have taken
11    care of this before the trial, but we will admit Exhibit E,
12    subject to plaintiff's approval of the redacted version, and
13    he has consented to questioning proceeding on this exhibit.
14           Go ahead, Mr. Keane.
15           MR. KEANE:  Yes.  Thank you, Your Honor.
16    Q    Mr. Santiago, I showed you this page with the caption of
17    The People of the State of New York against Jesus Santiago,
18    dated May 3rd, 2002.  You testified that this is the
19    transcript of your hearing before Judge Greenberg.  It was a
20    plea hearing.
21           Is this the hearing in which you negotiated a plea
22    with the district attorney and in front of Judge Greenberg?
23    A    Yes.
24    Q    I would like you to turn to page 2 of that document and
25    at the bottom of page 2.
```

                  Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                  Santiago - Cross - Mr. Keane          66

1            The Court --
2            THE COURT:  Starting with line what?  14?
3            MR. KEANE:  I'm sorry.  Starting with line 14.
4            MR. RICKNER:  Your Honor, I just object to it being
5     shown to the jury until I have a chance to approve for
6     redactions, which I believe it is currently.
7            THE COURT:  Oh.  All right.
8            MR. RICKNER:  Thank you, Your Honor.
9            MR. KEANE:  Your Honor, perhaps we should take a
10    five-minute break to permit plaintiff to...
11           THE COURT:  Does the jury want a break right now?
12           All right.  Why don't you just proceed with your
13    questioning.  The witness can see the exhibit, the lawyers can
14    see the exhibit, the jury will not be shown the exhibit.  So
15    just ask him questions starting with where you were, page 2,
16    line 14.
17    Q    Mr. Santiago, on page 2, line 14, the Court states that
18    three and a half is the minimum and that was the offer which
19    would be concurrent with whatever else you're serving.
20           Was that your understanding of the sentence you were
21    negotiating?
22    A    I was negotiating for the three and a half years ran
23    concurrent with my federal sentence, but that doesn't include
24    or have anything to do with probation or PRS --
25    Q    Yes.
```

                  Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                  Santiago - Cross - Mr. Keane          67

1     A    -- parole.
2     Q    If you could look, sir, to the next page, page 3,
3     starting with line 21.
4            There, the Court tells you that in exchange for the
5     Court's promise to you that you would be sentenced to the
6     minimum three and a half years, straight time, and it would be
7     nunc pro tunc to January 2nd.
8            Why is it nunc pro tunc to January 2nd?
9     A    Because I wrote the judge.
10    Q    And that was the date that you wrote the judge to set
11    this plea agreement, this plea negotiation up.
12           And then --
13           THE COURT:  Wait, sir.  Do not make statements.
14    Asks questions.  Okay?  Ask him a yes or no.  What you are
15    doing is you are making statements, not waiting for him to say
16    if he agrees or disagrees.  You are just talking.
17           MR. KEANE:  Understood, Your Honor.
18    Q    Now, Mr. Santiago, please look at page 4.
19           On the next page, isn't it true the judge states
20    that the sentence would be concurrent with any time served in
21    the federal system?  Is that correct?
22           That is at lines 6, 7 and 8.
23    A    Yes, that's correct.
24    Q    And then, sir, if you could look at lines 9, 10 and 11,
25    Judge Greenberg states -- isn't it true that he states that in
```

                  Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                  Santiago - Cross - Mr. Keane          68

1     addition to the three and a half, there is a five-year
2     post-release supervision that will be imposed?
3     A    No.  He said it was a possibility.
4     Q    Well, sir, if you look at that paragraph --
5     A    I know what the record says.
6            THE COURT:  Sir, let's just wait for the question
7     before you answer it.  Do not talk over each other.
8     Q    Isn't it true, sir, that in lines 9, 10 and 11 of that
9     page, the judge does not state that this is a possibility?
10           THE COURT:  What is a possibility?
11           MR. KEANE:  Mr. Santiago stated that 9 -- lines 9,
12    10 and 11 were framed by the judge as a possibility.  And I am
13    asking Mr. Santiago isn't it true that nowhere on lines 9, 10
14    and 11 does the judge state the word "possibility."
15    Q    Is that true?
16    A    No -- yes, that's true.
17    Q    So, in fact, isn't it true that the judge told you here
18    that there would be a five-year post-release supervision
19    imposed?
20    A    In the total sentencing minutes, no, it's not true.
21    That's not correct.
22    Q    But on this page, isn't it correct that the judge stated
23    there will be five-year post-release supervision?
24    A    In this actual line, yes.  But in the total sentencing
25    minutes, no, sir.
```

                  Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Santiago - Cross - Mr. Keane            69

 1   Q    Now, sir, you accepted a plea in this case instead of
 2   going to trial; is that correct?
 3   A    That's for three and a half years.
 4   Q    And then, sir, isn't it true that you were not sentenced
 5   on May 3rd, 2002?
 6   A    I believe so.
 7   Q    And isn't it true that the judge could not sentence you,
 8   Judge Greenberg could not sentence you on that day because the
 9   district attorney had not prepared a presentence report?
10   A    That's correct.
11   Q    And you wanted to get sentenced that day, correct?
12   A    That is correct.
13   Q    Because you wanted to get back to federal custody in
14   Virginia, correct?
15   A    And get off Rikers Island.  That's correct.
16   Q    But the judge couldn't let you do that at the time
17   because you needed the presentence report, correct?
18   A    That's correct.
19   Q    So you were not sentenced until two weeks after that; is
20   that correct?
21   A    That's correct, sir.
22   Q    And at the sentencing two weeks later, were you sentenced
23   by Judge Greenberg?
24   A    No.
25   Q    And why not?
```

```
                    Santiago - Cross - Mr. Keane            70

 1   A    Because he had got in a car accident.
 2   Q    So you had a different judge at that time?
 3   A    Yes.
 4   Q    But you were sentenced on May 14th, 2002?
 5   A    Yes.
 6   Q    And what happened after May 14, 2002?  Did you get
 7   transferred back to Virginia?
 8   A    Yeah, I went back to Virginia.  I served my time there.
 9   Q    So, Mr. Santiago, you went back to Virginia and you were
10   going to serve the New York state sentence until your federal
11   sentence expired; is that correct?
12        In other words, your New York state sentence was
13   concurrent to your federal sentence; is that correct?
14   A    That's for initial time, yes.
15   Q    Yes.
16   A    Initial charge.  Three and a half years, around
17   37 months.  37 months.  Concurrent with 37 months of federal
18   time.
19   Q    And it is true also that your federal time included four
20   years of federal supervised release; is that correct?
21   A    That's correct.  In a whole other jurisdiction.
22   Q    And there came a time, sir, when your federal sentence
23   expired, correct?
24   A    That is correct.
25   Q    And isn't it true that was April of 2004?
```

```
                    Santiago - Cross - Mr. Keane            71

 1   A    Approximately.
 2   Q    And in April of 2004, isn't it correct that you were
 3   transferred, extradited to New York state to serve the
 4   remainder of your New York state sentence in New York state?
 5   A    That is correct.
 6   Q    And when you came back to New York, you were sent to
 7   correctional facilities upstate; is that correct?
 8   A    That is correct.
 9   Q    And the --
10   A    Hutchins ((phonetic)).  Hutchins Correctional Facility.
11        THE COURT:  I beg your pardon?
12        THE WITNESS:  He's looking for the facility, I
13   think.
14        THE COURT:  Just wait for the question.
15   Q    And isn't it true, sir, that when you were transferred
16   back to New York state to serve the remainder of your term in
17   New York state, your New York state sentence expired in
18   November of 2004?
19   A    That's correct.
20   Q    And in November of 2004, you were released to
21   post-release supervision, correct?
22   A    Well, yeah.  Part of my release from Governor, they
23   present me with these papers.
24        They was like:  You have probation.
25        I was like:  No, I don't.
```

```
                    Santiago - Cross - Mr. Keane            72

 1        They were like:  Yes, you do.  You have to sign
 2   this.  You have to sign this.
 3   Q    Well, you signed a certificate of release to post-release
 4   supervision; is that correct?
 5   A    They require you to sign it.  They force you to sign it,
 6   otherwise you won't be released, it's not possible for you to
 7   be released.  So you have to sign it.
 8   Q    But you did sign that certificate of release?
 9   A    Absolutely, to become free.
10   Q    And that certificate of release was dated November 5th of
11   2004?
12   A    I believe so.
13   Q    And at that time, isn't it true, sir, that -- and I will
14   show you what has been admitted as Defendants' Exhibit I, as
15   redacted.
16        If you look at the bottom of that page, there is a
17   date in November of 2004.  And isn't it true that those were
18   conditions of your release that you agreed to upon signing
19   that document?
20        MR. RICKNER:  Objection.
21        THE COURT:  One word, the basis of the objection,
22   please.
23        MR. RICKNER:  Can I get two?
24        THE COURT:  Yes, but is there something that needs
25   to be said outside the presence of the jury at sidebar?
```

**JA524**

```
               Santiago - Cross - Mr. Keane          73

 1        MR. RICKNER:  Can we do a quick sidebar, Your Honor?
 2     THE COURT:  Fine.
 3        (Sidebar.)
 4        (Continued on the next page.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                         Sidebar                     74

 1        (Sidebar conference held on the record in the
 2     presence of the Court and counsel, out of the hearing of the
 3     jury.)
 4        MR. RICKNER:  Mr. Santiago never signed this.
 5        MR. KEANE:  He did.  He did sign it.  It's a bad
 6     copy.
 7        MR. RICKNER:  Well, I think that needs to be worked
 8     out, whether or not he signed this document, before he starts
 9     asking him to cosign the things that are -- that's my
10     objection.
11        THE COURT:  There is no signature there, at least a
12     visible signature.
13        This is Exhibit I at the bottom.
14        MR. KEANE:  That's it.
15        THE COURT:  Well, ask him if he remembers signing
16     it.  All right?
17        And then if he says yes, then you can ask him.
18        MR. RICKNER:  I would just ask that he is shown the
19     whole document.
20        THE COURT:  Yes.
21        You are only showing this much, by the way.
22        MR. KEANE:  Oh.
23        THE COURT:  So ask him if he recalls signing this
24     document with the conditions.  You can ask him generally,
25     without reference to the document.  If he says yes, he does
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                         Sidebar                     75

 1     remember signing it, then you can ask him questions.  If he
 2     does not remember signing it, then, you know, you are going to
 3     have to come up with a version that has his signature.
 4        MR. RICKNER:  Can I get my copy?
 5        Thank you very much.
 6        (Sidebar ends.)
 7        (Continued on the next page.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
               Santiago - Cross - Mr. Keane          76

 1     BY MR. KEANE:
 2     Q    Mr. Santiago, if you look at Defendants' Exhibit I, at
 3     the top it is captioned Determinate Post-Release Supervision.
 4     It is a certificate of release to post-release supervision.
 5        Does this look like the document you signed when you
 6     were released from DOCCS in November of 2004?
 7        MR. RICKNER:  Objection; complete.
 8        THE COURT:  Overruled.
 9     A    Mr. Keane, to be perfectly honest with you, this is
10     12 years I've been doing this, so...
11        THE COURT:  Do you recall signing a document
12     entitled Determinate Post-Release Supervision in
13     November 2004?
14        THE WITNESS:  That's what I'm saying.  It's
15     12 years, I don't remember.  I signed a lot of papers.
16        THE COURT:  You said earlier that you were forced to
17     sign the document?
18        THE WITNESS:  Yeah.  We are forced to sign a lot of
19     stuff.
20        THE COURT:  What document do you recall --
21        THE WITNESS:  They shove stuff in front of you,
22     Your Honor.
23        THE COURT:  What document was it that you recall
24     signing or that you claim you were forced to sign?
25        THE WITNESS:  I know I signed a plea agreement when
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

**JA525**

```
                    Santiago - Cross - Mr. Keane              77

 1   I was standing in front of the judge.
 2              And I know when I went in the back, they said
 3   something about pretrial stuff and I signed all that.
 4              THE COURT:  When you were released in November 2004
 5   --
 6              THE WITNESS:  Oh, okay.
 7              THE COURT -- from state custody at Governor's
 8   facility, what documents do you recall signing?
 9              THE WITNESS:  A release form, my regular release
10   forms.
11              They give you a stack of papers, Your Honor,
12   honestly.  I'm not trying to be funny.
13              THE COURT:  Do you recall signing a document where
14   post-release supervision ---
15              THE WITNESS:  Possibly.
16              THE COURT:  -- conditions were put before you?
17              THE WITNESS:  Possibly.  Yes, Your Honor.
18              THE COURT:  Do you recall signing it?
19              THE WITNESS:  Possibly, yes.  I don't remember, but
20   it's a possibility.
21              I don't see my -- is my signature on here?
22              THE COURT:  Well...
23              THE WITNESS:  This signature is questionable,
24   Your Honor.  I'm being honest.  I could show you my I.D.
25              THE COURT:  No, you do not have to do that.  The
```

```
                    Santiago - Cross - Mr. Keane              78

 1   lawyers are presenting the evidence.  Okay?
 2              THE WITNESS:  Okay.
 3   Q    Mr. Santiago, when you were released from DOCCS in 2004,
 4   you did sign a document that had conditions of release on it,
 5   did you not?
 6   A    Yeah, possibility, yes.  Yes.
 7   Q    And I think you testified a couple of minutes ago that
 8   you wouldn't have been released if you hadn't signed?
 9   A    They gave me a bunch of papers.  And if you don't sign
10   all this stuff, they don't release you.  You just sign
11   everything, like I just want to go home.
12   Q    And you understood, did you not, that when you were
13   released, you were subject to conditions of release; is that
14   correct?
15   A    At that point, to be honest with you, I didn't care.  I
16   just wanted to become free.
17              THE COURT:  Well, that is not the question; not
18   whether you cared, but whether you were aware.
19              THE WITNESS:  I'm telling him the emotional part.
20              THE COURT:  No, I know.  He is asking you a question
21   about your awareness that you were on post-release supervision
22   when you were released in November 2004.
23              THE WITNESS:  Yes.
24   Q    And did you understand that one of those conditions was
25   that you were not to leave the state of New York?
```

```
                    Santiago - Cross - Mr. Keane              79

 1   A    Yes.
 2   Q    And while you were on post-release supervision at this
 3   time -- that is, 2004, 2005 -- did you leave the state of
 4   New York?
 5   A    Yes.
 6   Q    And isn't it fair to say that you were in violation of
 7   your post-release supervision at that point?
 8   A    Yes.
 9   Q    And isn't it true that if you were in violation of your
10   post-release supervision, you were subject to arrest and
11   re-incarceration if you were found, by an administrative law
12   judge, to have violated those conditions?
13   A    I would assume so.
14   Q    But you were not found in 2004, 2005 or 2006 to be in
15   violation of the terms and conditions of your New York
16   post-release supervision, correct?
17   A    I hadn't gotten violated until like a year later.
18   Q    But isn't it true that you were not in New York between
19   -- again until 2007?  Is that correct?
20   A    That is correct.  But my parole officer also knew that I
21   had no home at the time.
22   Q    But your parole condition was that you not leave the
23   state of New York, correct?
24   A    Yes.
25   Q    Now, you came back to the state of New York in June of
```

```
                    Santiago - Cross - Mr. Keane              80

 1   2007, correct?
 2   A    Yes.
 3   Q    And you came back to the state of New York from your
 4   incarceration in federal prison in Virginia, correct?
 5   A    That's correct.  Probation violation.
 6   Q    Now, you violated the terms of your federal probation and
 7   you served eight months in federal prison in Virginia, correct?
 8   A    Yes.  Based upon New York violation, police contact is
 9   considered a violation.
10   Q    And when you came back to New York then, you had lost
11   your liberty in Virginia for that eight months, correct?
12   A    Yes, I assume so.
13   Q    And, in fact, you had lost your liberty in the state of
14   Virginia and the state of New York for three years in federal
15   prison and another half a year in New York state prison by
16   that time, correct?
17   A    I believe we already had this question.
18              THE COURT:  Well, sir, he is conducting a
19   cross-examination.  He is allowed to go over questions that
20   might have been asked and answered on direct.
21   A    Yes, sir.  Yes.  Yes, sir.
22   Q    So when you testified earlier today that loss of liberty
23   is what you described it as, your liberty has been lost
24   through lawful procedure, correct?
25   A    No.  (Continued on the next page.)
```

```
                    Santiago - cross - Keane              81

1    CROSS-EXAMINATION (Continuing)
2    BY MR. KEANE:
3    Q    Well, Mr. Santiago, your three-and-a-half years, your
4    three years in federal prison, that was not unlawful, was it?
5    A    No.  Federal prison, no.
6    Q    That was lawful incarceration?
7    A    Absolutely.
8    Q    The time that you spent in New York serving the rest of
9    your three-and-a-half year determinant sentence, that was
10   lawful incarceration; isn't that correct?
11   A    Yes.
12   Q    You also have spent additional time incarcerated in other
13   jurisdictions; correct?
14              MR. RICKNER:  Objection.
15              THE COURT:  Overruled.
16   A    Actually, no, same two jurisdictions.
17   Q    Well, sir, you have served time in --
18              THE COURT:  Let's put a timeframe on this, please.
19              MR. KEANE:  The stipulated facts of the case
20   indicate that Mr. Santiago was incarcerated from 2013 to 2015
21   in the State of Virginia.
22   A    Yes.  I said that already, sir.
23   Q    That was a State prison?
24   A    You go through a State facility to get to the federal
25   facility, sir.
```

```
                    Santiago - cross - Keane              82

1    Q    And you have been in numerous facilities, have you not?
2    A    Yes, in New York City.
3    Q    Well, and in other -- and in Virginia as well?
4    A    You have to go through classification, just like any
5    other processing.  Sometimes with the federal facility it's a
6    little bit longer, so they transfer you quite a bit before you
7    actually get your classification to get to your destination.
8    Q    But my question, sir, is you have served time not only in
9    New York State prisons and New York City prisons, but also in
10   the State of Virginia prison system; is that correct?
11   A    Yes.
12   Q    And you served time in those prisons because you were
13   convicted of State of Virginia crimes; correct?
14   A    Yes.
15   Q    And your time in federal prison was because you committed
16   federal crimes; correct?
17   A    Yes.
18   Q    And your --
19   A    A state charge, term federal, but go ahead.
20   Q    And your time in New York State prison is on account of
21   you're having committed crimes in New York; correct?
22   A    Excuse me?
23   Q    The time you served in New York State prison was on
24   account of you having committed crimes in New York;
25   correct?
```

```
                    Santiago - cross - Keane              83

1    A    Yes.
2    Q    Now, you testified earlier today about the time you spent
3    on Rikers Island.
4    A    Yes.
5    Q    Now, you would agree, sir, would you not, that Rikers
6    Island is operated by the City of New York?
7    A    That's correct.
8    Q    It is not operated by the State of New York?
9    A    That is correct.
10   Q    And you would agree that our defendants have nothing to
11   do with operating New York City prisons; correct?
12   A    Completely false.  It's one system.
13   Q    Well, sir --
14   A    Completely false.  That's one system, sir.
15   Q    Sir, I -- that may be your view.  But isn't it true that
16   Rikers Island --
17   A    That's false.
18   Q    -- is a New York City system --
19              THE COURT:  Let him finish, please.
20   Q    Isn't it true that Rikers Island is a New York City
21   system?
22              THE COURT:  If you know.
23   A    No, I don't know.
24   Q    And when you said that there was an incident on Rikers
25   Island, isn't it true that you did not file any lawsuit
```

```
                    Santiago - cross - Keane              84

1    against any individual at Rikers Island on account of what you
2    testified earlier happened to you there?
3    A    No, but I requested the records from you.
4    Q    But, sir, my question is you never filed a lawsuit about
5    what you claim happened at Rikers Island; correct?
6    A    That's why I'm here now.
7    Q    Sir, you have filed lawsuits complaining about injuries
8    to you in addition to this lawsuit; correct?
9    A    Excuse me?
10   Q    Well, you filed lawsuits when you claim that you have
11   suffered injuries at the hands of --
12   A    Absolutely.
13   Q    And, so, for example --
14              THE COURT:  Wait.  Excuse me.
15              Again, please don't interrupt the question.
16              Mr. Keane was asking have you filed lawsuits when
17   you suffered injuries at the hands of -- and then it was cut
18   off.  I don't know at the hands of whom.
19   Q    At the hands of City officials?
20   A    Oh, yes, absolutely.
21   Q    And --
22   A    My teeth got knocked out, my ribs broken, my --
23   Q    And that had nothing to do with the defendants in this
24   case; correct?
25   A    No.
```

```
                  Santiago - cross - Keane              85

 1   Q    Your answer is no?
 2   A    No.  They ain't have nothing do with this.
 3   Q    Now, isn't it true that when you were sent Upstate --
 4   A    Oh, I'm sorry.  I'm sorry.  Can you ask me that question
 5   -- actually -- you know, never mind.  It's fine.
 6   Q    And when you were sent Upstate to Gouverneur Correctional
 7   Facility ultimately, when you were admitted into the
 8   Department of Correctional Services, you are issued an inmate
 9   handbook; correct?
10   A    Yes.
11   Q    And you are given the opportunity -- if there is some
12   condition in the system that you want to complain about, you
13   are permitted to file a grievance as to a complaint you might
14   have?
15   A    Yes.  I filed one in Rikers Island.  The captain came
16   down and filed a complaint.
17   Q    But I'm talking about in the New York State system, sir.
18             You're allowed to file a grievance in the New York
19   State correctional system as well; correct?
20   A    It's rare.
21             THE COURT:  Sir, the question is whether you are
22   aware that you are allowed to file a grievance in the New York
23   State --
24             THE WITNESS:  Yes, I am.
25             THE COURT:  -- system?
```



```
                  Santiago - cross - Keane              86

 1             Now you are cutting me off.  You need to stop.
 2             THE WITNESS:  I'm sorry.
 3             THE COURT:  Listen to the question and then you can
 4   give your answer.
 5   Q    And, sir, you didn't file any grievance while you were in
 6   the New York State correctional system between August of 2007
 7   and February of 2008, isn't it true?
 8   A    Yes, that's true.
 9   Q    But you could have, correct?
10   A    Yes.
11   Q    Now, isn't it also true, sir, that you were represented
12   by an attorney when you were subjected to parole revocation
13   proceedings; isn't that correct?
14   A    That's correct.
15   Q    And when you came into New York in June of 2007, you were
16   given access to a process where you could challenge the parole
17   charges that were lodged against you; correct?
18   A    Correct.
19   Q    And it's true that you waived your preliminary hearing at
20   that time?
21   A    Correct.
22   Q    And by doing that, your final hearing was expedited;
23   correct?
24   A    I....
25   Q    Instead of taking 90 days between the preliminary hearing
```

```
                  Santiago - cross - Keane              87

 1   and the final hearing, you got one on July 19th?
 2             THE COURT:  Got one what?
 3   Q    You got a preliminary hearing, I mean, a final hearing on
 4   July 1, 2007?
 5   A    Yes, if that's what the records show.
 6   Q    You were represented by a lawyer at that hearing;
 7   correct?
 8   A    Yes.
 9   Q    And you pleaded guilty to a parole violation; correct?
10   A    Yes.
11   Q    And you could have gone to a full evidentiary hearing;
12   correct?
13   A    Yes.
14   Q    But you chose not to?
15   A    Correct.
16   Q    And also at that time you never talked to your lawyer
17   about post-release supervision; correct?
18   A    I really didn't speak to the lawyer at all until we
19   walked into the room at the last second.  They come in the
20   room for 30 seconds and they walk out.
21   Q    In fact, Mr. Santiago, going back to the way you got
22   yourself back from the federal system into New York in 2002,
23   you wrote a letter to a judge back in 2002 to get your State
24   of New York plea arranged; correct?
25   A    Yes.  The idea came from my lawyer.
```

```
                  Santiago - cross - Keane              88

 1   Q    Okay.  Well, you could have done the same thing in 2007;
 2   correct?
 3   A    Possibly.
 4   Q    You could have written to a judge?
 5   A    Possibly.
 6   Q    And -- but you didn't do that, and you could have --
 7   correct?
 8             THE COURT:  Yes or no?
 9             THE WITNESS:  Yes.
10             THE COURT:  You didn't write or you did write?
11             THE WITNESS:  No, I didn't write.
12   Q    And you would agree, sir, that none of these defendants
13   knows you personally, correct?
14   A    Not that I know of.
15   Q    In addition, sir, you could have talked to your lawyer
16   about filing a lawsuit about post-release supervision at that
17   time; correct?
18   A    Correct.
19   Q    But you didn't do that, did you?
20   A    I didn't think of it.
21   Q    But you have, as you said here today, talked to lawyers
22   about filing other lawsuits; correct?
23   A    Yeah.
24             MR. KEANE:  I have no further questions at this
25   time.
```

**JA528**

```
               Santiago - cross - Keane            89

1          THE COURT:  All right.  How are the jurors doing at
2    this time?  Do you want a little break or see if we have some
3    redirect?
4          If you want a break, raise your hand, otherwise we
5    will keep going.
6          THE JURY:  No.
7          THE COURT:  These are hardworking jurors.  Thank
8    you.  All right.  Let's have some redirect, if you would like,
9    Mr. Rickner.
10         MR. RICKNER:  I would like.  Thank you very much,
11   Your Honor.
12         THE COURT:  Okay.
13         MR. RICKNER:  Can I please have the Elmo set up so
14   that my client can see the document that I put down and the
15   Court but not the jurors.
16         THE COURTROOM DEPUTY:  Yes, give me a second.
17         THE COURT:  What exhibit is this, sir?
18         MR. RICKNER:  My apologies.  This is page 4 from
19   Exhibit E.
20         THE COURT:  Defense Exhibit E?
21         MR. RICKNER:  Yes, and there are some redactions we
22   are going to propose to the defendant, but I do want to
23   address lines 12 through 20 with my client.
24   REDIRECT EXAMINATION
25   BY MR. RICKNER:
```

```
              Santiago - redirect - Rickner        90

1    Q    Now, you were asked about lines 9 through 11 on this
2    document; is that correct?
3    A    Yes.
4    Q    Okay.  Please describe to me what happened, the
5    conversation with the judge right afterwards, lines 12 to 20.
6    A    12....
7          They already gave me four years of parole.
8          I'm not sure how this will work out with parole.  In
9    fact, it is the same thing, I don't know.  Most terms are
10   concurrent.  I just don't know, so I couldn't make any
11   promises to you.  Is this what you want to do today?
12         Yes.
13   Q    Okay.  And just for clarity, the first lines, they
14   already gave me four years on parole, who said that?
15   A    Me.
16   Q    And the line that started I'm not sure how this would
17   work out with parole, who said that?
18   A    That's the judge.
19   Q    Okay.  Did you ever affirmatively consent to
20   post-supervised release during your plea?
21   A    No, and he didn't give it to me.
22   Q    Now, while you were incarcerated between June 12, 2007
23   and February 6th of 2008, did you learn about the
24   constitutional ruling in Earley?
25   A    No.
```

```
              Santiago - redirect - Rickner        91

1    Q    Did you have any idea that the Second Circuit had ruled
2    the term of post-release supervision that you had been given
3    unconstitutional?
4    A    Absolutely not.
5          MR. RICKNER:  No further questions, Your Honor.
6          THE COURT:  Any recross, sir?
7          MR. KEANE:  None from us, Your Honor.
8          THE COURT:  All right.  Thank you, Mr. Santiago.
9    You may step down.
10         THE WITNESS:  Thank you, ma'am, sorry.
11         (Witness leaves the stand.)
12         THE COURT:  All right.  Are you ready to call your
13   next witness?
14         MR. RICKNER:  Could I get a five-minute break for
15   some water?
16         THE COURT:  All right.  At this time, let's give the
17   members of the jury a quick break.  Please refresh yourselves
18   in the jury room.  Please do not talk about the case at all.
19         For those of you who have a notebook, please leave
20   it face down on your chairs.  Thank you.
21         (Jury exits the courtroom.)
22         THE COURT:  All right.  Is there anything that you
23   need to deal with while the jury is out on this break?
24         MR. KEANE:  If there are any other redacted
25   exhibits that are going to be introduced, I would like a
```

```
              Santiago - redirect - Rickner        92

1    binder of them as quickly as possible, and I do have some
2    recommendations for Exhibit E, some additional redactions.
3          THE COURT:  Okay.  Why don't you work that out as
4    soon as you can.  That should have been worked out before
5    today.  We have whiteout tape if you need it.  And I think we
6    will be able to redact the paragraphs out of the stipulation.
7    I won't eliminate the paragraph numbers because I want them to
8    align with what I read, but we will redact the contents of
9    those two paragraphs.
10         All right.  And just so I understand, the parties
11   are in agreement that his post-custody in New York State
12   resulting from the parole violations, any post-release custody
13   is going to be included within that stip; correct?
14         MR. RICKNER:  Yes.
15         MR. KEANE:  Yes.
16         THE COURT:  Good.  Let's take ten minutes.  Thank
17   you.
18         (Recess taken.)
19         THE COURT:  Have a seat, please.  We are going to
20   check to see if the jurors are all back.
21         MS. DURDEN:  Your Honor, one matter, can the
22   Commissioner take off his mask to testify?
23         THE COURT:  If he would like to, sure.
24         That goes for the attorneys too.  When you address
25   the jury as long as you maintain distance, you can have your
```

```
            Santiago - redirect - Rickner          93

 1   mask off.  I don't want anyone to have issues with breathing
 2   or speaking.
 3           (The jury enters the courtroom.)
 4           THE COURT:  All right.  Please have a seat, members
 5   of the jury.  Thank you.
 6           Counsel, are you ready to call your next witness?
 7           MR. RICKNER:  I am, Your Honor.
 8           THE COURT:  All right.  Who are we calling, please?
 9           MR. RICKNER:  Counsel for the plaintiff calls
10   defendant Anthony Annucci.
11           We also have binders that may be referred to on
12   cross but are not being introduced into evidence.  We have a
13   copy for everyone.
14           THE COURT:  All right.  Thank you.  Mr. Annucci,
15   please come forward to the witness stand.
16           THE COURTROOM DEPUTY:  Please raise your right hand,
17   sir.
18           (Witness sworn.)
19           THE COURTROOM DEPUTY:  You may have a seat, and
20   please state and spell your full name for the record, please.
21           THE WITNESS:  My name is Anthony J. Annucci, spelled
22   A-N-N-U-C-C-I.
23           MS. PANOUSIERIS:  Your Honor, may I approach?
24           THE COURT:  Yes, please.
25           You may proceed, Mr. Rickner.
```

```
            Annucci - direct - Rickner            94

 1   ANTHONY J. ANNUCCI,
 2           called as a witness, having been first duly
 3           sworn/affirmed, was examined and testified as follows:
 4   DIRECT EXAMINATION
 5   BY MR. RICKNER:
 6   Q    Mr. Annucci, is it correct to say that you are Acting
 7   Deputy Commissioner at the Department of Correction and
 8   Community Supervision?
 9   A    Correct.
10   Q    The Department of Correction and Community Supervision is
11   an agency that was created when the Department of Correctional
12   Services and the Division of Parole were merged into one
13   entity; right?
14   A    Correct.
15   Q    As of 2016, you have effectively been in charge of both
16   agencies now that they are combined into one?
17   A    Correct.
18   Q    Now, you have been the acting commissioner for six years?
19   A    Since May 1, 2013.
20   Q    Oh, so for nine years?
21           (Witness nods.)
22   Q    Now, you're an attorney licensed in New York; is that
23   correct?
24   A    I'm now retired, yes.
25   Q    You retired your law license?
```

```
            Annucci - direct - Rickner            95

 1   A    Yes.
 2   Q    Okay.  When did you retire your law licensed?
 3   A    I'm sorry.  I didn't retire the law license.  I'm not
 4   considered a practicing lawyer anymore.  I don't practice.
 5   Q    To be clear, as you sit here today, you are still a
 6   licensed attorney in the State of New York?
 7   A    Correct.
 8   Q    Okay.  And you graduated law school in 1980; is that
 9   correct?
10   A    Correct.
11   Q    And after working for some State Court judges in Kings
12   County, you started at the Department of Correctional Services
13   in 1984; is that right?
14   A    Correct.
15   Q    And the position you started at in 1984 was deputy
16   counsel; is that right?
17   A    Correct.
18   Q    And in 1989, you received a promotion to deputy
19   commissioner and counsel; is that right?
20   A    Correct.
21   Q    In 2006, you were still the deputy commissioner and
22   counsel for the Department of Correctional Services; is that
23   right?
24   A    Correct.
25   Q    Now, would it be accurate to say that the Department of
```

```
            Annucci - direct - Rickner            96

 1   Correctional Services' policies have to conform with the
 2   United States Constitution?
 3   A    Yes.
 4   Q    And is it correct to say that part of your job in 2006
 5   was to make sure that the policies of Department of
 6   Correctional Services conformed to the United States
 7   Constitution?
 8   A    Yes.
 9   Q    And that includes the due process clause; right?
10   A    Yes.
11   Q    People in criminal proceedings have a right to due
12   process; is that correct?
13   A    Yes.
14   Q    Now, starting in 1998, is it correct to say that the
15   Department of Correction had a policy of adding a term of
16   post-release supervision administratively to people with
17   determinant sentences even if the sentence and commitment
18   order did not indicate that post-release supervision was part
19   of the sentence?
20   A    Yes.
21   Q    Okay.  So just to be clear, the Department of
22   Correctional Services was adding post-release supervision to
23   peoples' sentences starting in 1998?
24   A    Yes.
25   Q    Now, a determinant sentence just means that the person
```

**JA530**

```
              Annucci - direct - Rickner              97

1    serves the exact amount of time that they received less any
2    good time credits; is that correct?
3    A    Yes, a determinant sentence in whole or half years.
4    Q    And that's different from an indeterminant sentence,
5    which could be something like 7 to 14 years, where theirs is a
6    range of how much time they might serve?
7    A    Yes.
8    Q    Okay.  Now, as of January 2008, the Department of
9    Correctional Services had added post-release supervision to
10   about 8,000 people who had determinant sentences; is that
11   right?
12   A    I believe that's accurate.
13   Q    Now, on June 9, 2006, the Second Circuit issued an order,
14   a ruling in a case called Earley v Murray; is that right?
15   Q    Now, that was a habeas corpus petition; right?
16   A    Yes.
17   A    Yes.
18   Q    And to be clear, a habeas corpus petition is a way for
19   incarcerated people to challenge their convictions as
20   unconstitutional in federal court; is that right?
21   A    Yes.
22   Q    Now, the defendant in that case was Timothy Murray;
23   right?
24   A    I believe so.
25   Q    And he was a warden of the prison where Mr. Earley was
```

```
              Annucci - direct - Rickner              98

1    incarcerated?
2    A    I believe so.
3    Q    That's the procedure, in a habeas corpus petition, that
4    the defendant or respondent is the person who is currently the
5    warden of who's holding them; right?
6    A    Yes.
7    Q    And Warden Murray was somebody who worked for the
8    Department of Correctional Services; right?
9    A    Yes.
10   Q    According that order, in February of 2000, Mr. Earley was
11   given a determinant sentence, a fixed sentence of six years by
12   the judge without any post-release supervision; is that right?
13   A    I believe so.
14   Q    Now, sometime afterwards, between February of 2000 and
15   February of 2002, Department of Correctional Services added an
16   additional five years of post-release supervision to his
17   sentence; right?
18   A    I'm sorry, to whose sentence?
19   Q    To Mr. Earley's sentence.
20   A    I have no personal knowledge of what happened in that
21   particular case.
22   Q    Is it safe to say that following the Earley decision in
23   2006, the Department of Correctional Services and later the
24   Department of Corrections and Community Supervision, has been
25   in constant litigation regarding what the Earley case means;
```

```
              Annucci - direct - Rickner              99

1    right?
2    A    Yes.
3    Q    And you were an attorney for the Department of
4    Correctional Services in 2006; right?
5    A    Yes.
6    Q    And, so, would it be fair to say that you read the Earley
7    decision very carefully after it came down?
8    A    Yes.
9    Q    In fact, you had read that decision by -- within at least
10   a month after it came out; right?
11   A    Yes.
12   Q    Probably a bit sooner?
13   A    I don't know if it was sooner.  I think within a month is
14   approximately accurate.
15   Q    Well, did reviewing the Earley decision refresh your
16   recollection?
17   A    No.
18   Q    So -- and to be clear, on tab 2, I have a copy of the
19   Earley decision for you to read.
20        Would you like to look at it to refresh your
21   recollection?
22   A    If you're asking me will it refresh my recollection as to
23   when I was made aware of it, it won't.
24   Q    That's not the question and I apologize.
25        THE COURT:  The proper way to refresh recollection
```

```
              Annucci - direct - Rickner              100

1    is for the witness to state that he or she doesn't recall
2    something, then you can refer them to a document, ask them to
3    read it and ask if that refreshes your recollection.
4         MR. RICKNER:  Yes.
5         THE COURT:  But so far this gentleman hasn't said he
6    doesn't recall anything other than exactly when he became
7    aware of it.
8         MR. RICKNER:  Understood, Your Honor.  I was, in
9    fact, jumping back to my earlier question.
10   Q    Now, my understanding of your testimony is you don't
11   remember whether or not DOCS administratively added a
12   five-year term of post-release supervision to Earley's
13   sentence?  You don't remember one way or another?
14   A    I don't remember one way or the other.
15   Q    Would looking at the Earley decision help refresh your
16   recollection?
17        It's on tab two.  I would like to direct you to the
18   first page, first full paragraph in the second column, the
19   bottom sentence.
20   A    I've read it.
21   Q    Now, does that refresh your recollection as to whether or
22   not Department of Correctional Services administratively added
23   a five-year term of post-release supervision to Earley's
24   sentence?
25   A    It indicates that it was added in 2002.
```



```
                    Annucci - direct - Rickner            101

 1   Q    When you read the decision in Earley in 2006, you
 2   understood that the Constitution places limits on the process
 3   by which somebody can be incarcerated; right?
 4   A    Yes.
 5   Q    And as we established, part of your job was to make sure
 6   that the Department of Correctional Services followed the
 7   Constitution; right?
 8   A    Yes.
 9   Q    Now, in Earley, isn't it true that the Second Circuit
10   ruled that, I quote, "The sentence imposed by the Court on
11   Earley was six years in prison. The judgment authorized the
12   State to incarcerated him for six years and no more. Any
13   addition to that sentence not imposed by the judge was
14   unlawful."
15          Is that one of the holdings in Earley?
16   A    Yes.
17   Q    And the Second Circuit went on and said, I quote, "The
18   only cognizable sentence is the one imposed by the judge. Any
19   alteration to that sentence, unless made by a judge in a
20   subsequent proceeding, is of no effect."
21          Is that one of the holdings in Earley?
22   A    Yes.
23   Q    And the Second Circuit continued --
24          MS. DURDEN:  Objection, Your Honor.  If he is going
25   to continue reading, it should be placed into evidence.
```

```
                    Annucci - direct - Rickner            102

 1          THE COURT:  You want the case placed into evidence?
 2          MS. DURDEN:  Well, if he's going to be reading bits
 3   and pieces of it, then the entire document should be before
 4   the jury.
 5          THE COURT:  All right.  Do you want to offer it into
 6   evidence?
 7          MR. RICKNER:  I wasn't planning on it.  I only have
 8   one other quote.
 9          THE COURT:  Well, why don't you move it into
10   evidence.  What exhibit is this?
11          MR. RICKNER:  This will be Plaintiff's Exhibit 4.
12          THE COURT:  It is admitted, Plaintiff's Exhibit 4 is
13   admitted without objection, and, in fact, at the request of
14   the defendants.
15          (Plaintiff's Exhibit 4 received in evidence.)
16          MR. RICKNER:  I don't have a clean copy of it.  We
17   will mark it afterwards if that's all right, Your Honor.
18          THE COURT:  It's in your notebook.
19          MR. RICKNER:  The version that I have in my notebook
20   has a bunch of highlighting.
21          THE COURT:  All right.
22   Q    And Earley continues with a holding that says, If a
23   sentencing court does not affirmatively impose post-release
24   supervision at the time it imposes the determinant sentence of
25   imprison, DOCS is without authority to add the PRS term."
```

```
                    Annucci - direct - Rickner            103

 1          Is that one of Earley's holdings?
 2   A    Yes.
 3   Q    In fact, the Second Circuit called the administratively
 4   imposed sentence a nullity; right?
 5   A    Yes.
 6   Q    A nullity is like something that doesn't exist; right?
 7   A    Yes.
 8   Q    And you'd agree with me that you cannot impose
 9   incarceration on somebody based on a sentence that's a
10   nullity; right?
11   A    Yes.
12   Q    And as early as July 20, 2006, you started sending people
13   e-mails about the Earley case; is that right?
14   A    Yes.
15   Q    In fact, you sent an e-mail about the Earley case to an
16   attorney named John Amodeo, A-M-O-D-E-O; right?
17   A    Yes.
18   Q    Now, at the time Mr. Amodeo worked for the New York State
19   court system; right?
20   A    Yes.
21   Q    In fact, he was the Assistant Deputy Counsel For Criminal
22   Justice at the Office of Court Administration?
23   A    Yes.
24   Q    And you told him that you expected people to start
25   challenging their post-release supervision because of the
```

```
                    Annucci - direct - Rickner            104

 1   Earley decision; right?
 2   A    Among other things, yes.
 3   Q    In fact, in that e-mail, you recognized that the
 4   Department of Correctional Services was without the authority
 5   to impose post-release supervision absent a direction from a
 6   judge on the record; right?
 7   A    I'd have to look at that e-mail.
 8   Q    Would looking at that e-mail refresh your recollection?
 9   A    Yes.
10   Q    I'd like to turn you to page five, or tab five, excuse
11   me, and looking at the numbers on the bottom, it is JA-55.
12   And look at the first full paragraph of the e-mail that you
13   sent to Mr. Amodeo, please.
14          THE COURT:  Can we get a date?
15          THE WITNESS:  You said tab five?
16          THE COURT:  Tab five, and it's page number JA-55 at
17   the bottom.
18          MR. RICKNER:  That's the July 20, 2006 e-mail, I
19   believe is your question.
20          THE COURT:  You can look at mine.
21          MR. RICKNER:  Thank you very much, Your Honor.
22          THE WITNESS:  I'm sorry, go ahead.
23   Q    Can you please review to yourself the first full
24   paragraph of the e-mail that you sent on July 20, 2006 to
25   refresh your recollection.
```

Annucci - direct - Rickner                    105

1   A   Yes.
2   Q   Now, isn't it true that you told Mr. Amadeo -- Amodeo --
3   Mr. Amodeo.
4   Q   Isn't it true that you told Mr. Amodeo that the
5   Department of Correctional Services is without authority to
6   add post-release supervision unilaterally when the defendant
7   arrives at State prison?
8   A   I told Mr. Amodeo that was the ruling of the Second
9   Circuit.
10  Q   Well -- now, as an attorney you are familiar with the
11  Supremacy Clause?
12  A   Yes.
13  Q   And you understand the federal courts have the last word
14  on the Federal Constitution?
15  A   Yes.
16  Q   And you understand that the Second Circuit is an appeals
17  Court one step away from the Supreme Court; right?
18  A   Yes.
19  Q   And, in fact, in *Earley*, the respondent filed for a writ
20  of certiorari to the Supreme Court and the Supreme Court
21  denied it leaving the decision in place; right?
22  A   I believe that's correct.
23  Q   Now, after *Earley*, the Department of Correctional
24  Services started a manual review of about 40,000 sentencing
25  commitment orders to determine if the Department of

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Annucci - direct - Rickner                    106

1   Correctional Services had any documentation showing that the
2   post-release supervision had been included in the sentence; is
3   that right?
4   A   Yes.
5   Q   That took about four to six weeks to complete initially?
6   A   Yes.
7   Q   You started it March 12th of 2007?
8   A   I believe so.
9   Q   And the initial review was done April 20, 2007; right?
10  A   I believe so.
11  Q   And, in fact, thousands of the sentence and commitment
12  orders for determinant sentences did not include post-release
13  supervision, they were silent?
14  A   I believe that's accurate.
15  Q   Right.  And in those cases where the sentencing
16  commitment order was silent as to post-release supervision,
17  the Department of Correctional Services added it; right?
18          THE COURT:  What timeframe are we talking about?
19          MR. RICKNER:  Correct.
20          THE COURT:  What timeframe, sir?
21          MR. RICKNER:  Prior to June 12, 2007.
22  A   When it was silent, it was added, yes.
23  Q   Now, prior to June 12, 2007, you never told the
24  incarcerated people that their sentence violated Earley;
25  right?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Annucci - direct - Rickner                    107

1   A   Correct.
2   Q   In fact, you didn't do it prior to February 6, 2008;
3   right?
4   A   Correct.
5   Q   In fact, you didn't start telling -- withdrawn.
6          You didn't direct DOCS to start people that *Earley*
7   had declared their sentences unconstitutional for years later?
8   A   Correct.
9          THE COURT:  Well, when you say years, can you be
10  more specific, please?
11          MR. RICKNER:  Approximately two years later.
12          THE COURT:  Okay.
13  Q   Is that correct?
14  A   Yes.
15  Q   Now, following *Earley* and going through 2008, the
16  administratively imposed post-release supervision, the
17  post-release supervision applied by the Department of
18  Correctional Services, remained as part of the sentences in
19  the Department of Correctional Services system; right?
20  A   Unless a court order vacated it.
21  Q   Right, but absent a Court's order for that specific
22  person, all of those people who sentencing commitment orders
23  were silent as to post-release supervision kept having
24  post-release supervision as part of their sentences in the
25  system; right?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Annucci - direct - Rickner                    108

1   A   Yes.
2   Q   Now, that mainframe of peoples' sentences is also
3   available to the Division of Parole; is that right?
4   A   I believe so, yes.
5   Q   And, in fact, it's also available to agencies around the
6   country; is that right?
7   A   Yes.
8   Q   And if somebody has post-release supervision terms in
9   that system that they are violating, they could end up getting
10  incarcerated; right?
11  A   Yes.
12  Q   Now, after reading *Earley*, you made policy decisions for
13  the Department of Correctional Services; right?
14  A   Yes.
15  Q   And one of those decisions was, in effect, a
16  non-decision, meaning that you decided to just keep the
17  existing system of imposing post-release supervision in place;
18  right?
19  A   Consistent with State Court decisions.
20  Q   That's not my question.  My question is following *Earley*,
21  did you keep the system that already existed in place, meaning
22  that these post-release supervision terms applied
23  administratively by DOCS only were going to stay in place?
24  A   Yes.
25  Q   Now, you don't know Mr. Santiago, do you?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Annucci - direct - Rickner          109

 1   A    No.
 2   Q    In fact, you probably don't remember the names of many of
 3   the 8,000 people who had post-release supervision
 4   administratively applied to them; right?
 5   A    Correct.
 6   Q    But you knew that if those people violated that
 7   post-release supervision that was declared unconstitutional in
 8   Earley, they could end up locked up; right?
 9   A    Yes.
10   Q    In fact, a lot of people did get locked up, over 100?
11   A    I don't know the correct number.
12   Q    Now, isn't it true that Mr. Santiago was imprisoned June
13   12, 2007 precisely because the Department of Correctional
14   Services kept its policy of enforcing these unconstitutional
15   terms of post-release supervision in place?
16   A    Yes.
17   Q    Now, before June 12, 2007, you never asked a judge to
18   re-sentence Mr. Santiago; right?
19   A    Correct.
20   Q    And none of your assistants or staff did that either;
21   right?
22   A    Not that I am aware of.
23   Q    And you never asked a judge or a district attorney --
24   withdrawn.
25           You never asked a district attorney to re-sentence
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Annucci - direct - Rickner          110

 1   Mr. Santiago, did you?
 2           THE COURT:  What?  Wait.  I'm sorry.
 3           MR. RICKNER:  I asked a bad question.  I apologize.
 4   May I rephrase?
 5           THE COURT:  Strike that.  Yes.
 6   Q    Prior to June 12, 2007, you never wrote an assistant
 7   district attorney in Kings County telling them to apply to
 8   have Mr. Santiago resentenced, did you?
 9   A    No.
10   Q    Did any of your staff do that?
11   A    Not that I am aware of.
12   Q    Now, prior to June 12, 2007, when there was an obvious
13   error in the sentence, it was the Department of Correctional
14   Services's practice to inform the judge and district attorney
15   of the error; right?
16   A    When we were aware of an error, yes.
17   Q    Now, in this case, on September 30th of 2017, you were
18   found liable for violating Mr. Santiago's constitutional
19   rights; is that right?
20   A    I believe so.
21   Q    You say you believe so.  Is there a some uncertainty in
22   your mind as to whether or not you have been found liable?
23   A    I have been informed of that by my lawyers.
24   Q    Have you reviewed the district court's opinion finding
25   liable?
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Annucci - direct - Rickner          111

 1   A    Can you tell me the name of the case?
 2   Q    This one, Santiago v. Fischer?
 3   A    No, I did not review that.
 4   Q    And, so, to be clear, you came here to court without
 5   reviewing an opinion finding you liable?
 6   A    I reviewed any documents my lawyers asked me to review in
 7   this case.
 8   Q    Okay.  So, as an attorney, you weren't curious at all
 9   about the Court's reasoning for finding you liable?
10   A    I was told the reasoning behind it.  I didn't have to
11   read the full decision.
12           MR. RICKNER:  No further questions, Your Honor.
13           THE COURT:  All right.  Do we have some cross?
14           MS. DURDEN:  Your Honor, can we have a quick
15   sidebar?
16           THE COURT:  Yes.
17           (Sidebar held; continues on next page.)
18
19
20
21
22
23
24
25
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                              Sidebar                    112

 1           (Sidebar.) (Sidebar.)
 2           MS. DURDEN:  Your Honor, counsel has asked Mr.
 3   Annucci a number of questions which we believe require
 4   testimony that Your Honor has previously ruled is
 5   inadmissible, for instance, why the Department started adding
 6   PRS in 1998, what type of -- what kind of constant litigation
 7   there was about the meaning of Earley, what actions he took
 8   after the ruling in the Second Circuit.  Those were all
 9   questions that were asked by counsel that we believe we have a
10   right to respond to.
11           MR. RICKNER:  Well, I disagree.  I essentially went
12   through the decision in Betances in Your Honor's order.
13           THE COURT:  Well, you discussed in front of the jury
14   just the Earley decision.  I don't think you mentioned
15   Betances before the jury.
16           MR. RICKNER:  That's correct, what I mean, though,
17   is I followed the Betances's analysis of the Earley decision,
18   which was also Your Honor's analysis and I conformed to Your
19   Honor's rulings.  I never mentioned Jennis or Jenna's law.
20           MR. KEANE:  Jenna.
21           MR. RICKNER:  I never mentioned 70.45, and I kept my
22   cross-examination purely to what happened.
23           I don't believe I asked a single why question.  I
24   just said did this happen, which I think accurately presented,
25   and he cosigned it.  That's where I went.  So I think that
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                        Sidebar                        113

1    revisiting Your Honor's rulings would be -- is unnecessary.
2         THE COURT:  Because I'm trying to think what
3    specifically you think you need go back and cover.
4         MS. DURDEN:  Your Honor, I think the jury has the
5    right to know why DOCS starting putting the administrative PRS
6    when individuals came in.  You know, right now it's just out
7    there that, you know, some people woke up one morning and
8    decided that they were going to administratively add PRS when,
9    in fact, it was the Department's belief that it was by
10   operation of law because of what's in the statute.
11        MR. RICKNER:  That's not the issue.  I apologize.
12        THE COURT:  The point is as of Earley, they knew
13   they couldn't do it.
14        MS. DURDEN:  Right.
15        THE COURT:  So I think the jury has been told
16   already that he had an administrative imposition of PRS before
17   Earley and that Earley specifically advised the defendants in
18   that case, including Mr. Annucci, that that practice was not
19   appropriate.  So I think it's fair ground to say that he
20   continued to do it, and really the issue for Mr. Santiago is
21   whether the defendant should have sought resentencing or just
22   vacate it and deem null and void the imposition of PRS.
23        MS. DURDEN:  Yes, Your Honor, but I believe that
24   these questions go towards whether Commissioner Annucci
25   intentionally ignored the constitutional right for punitive
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                        Sidebar                        114

1    damages purposes.  So the question of you were in constant
2    litigation and you didn't do this, you didn't do that, the
3    jury should be able to hear what, in fact, was done and why
4    actions weren't taken rather than leaving them with the
5    impression that the decision came across their desk and they
6    looked at it and threw it on the side.
7         It is not as if they weren't taking action.  They
8    weren't taking the action that the Court required and everyone
9    understands that and no one is going to argue that there is
10   liability.  But that doesn't mean that for purposes of
11   punitive damages the actions that they took aren't relevant
12   when counsel has now given the jury the impression that it was
13   just a complete disregard of the decision.
14        MR. RICKNER:  It's not a disregard.  He just didn't
15   follow it.
16        MR. KEANE:  If I could add, counsel has opened the
17   door far beyond this case.  He is talking about people for
18   whom post-release supervision was added after the Earley
19   decision.  As Your Honor noted, Mr. Santiago is a case where
20   it was added before.  The only question should be what
21   happened after Earley and specifically with respect to Mr.
22   Santiago.
23        We are not re-litigating the class action in this
24   courtroom.
25        THE COURT:  How about I instruct the jury they
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                        Sidebar                        115

1    should disregard and we will strike any testimony about
2    whether DOCS has imposed PRS after Earley?
3         MR. RICKNER:  Okay.
4         THE COURT:  Okay.  The imposition, not vacating or
5    re-sentencing, but just whether DOCS continued to impose.  I
6    am striking that and telling them to disregard it and that is
7    not an issue in this case.
8         MR. RICKNER:  That's fine.
9         MR. KEANE:  And then may Mr. Annucci testify as to
10   why he didn't take steps -- and I understand it is a
11   revisitation of liability and we were precluded from going
12   there by Your Honor --
13        THE COURT:  Well, Betances is pretty clear, that
14   they're liable.  I mean, it's not just me.
15        MS. DURDEN:  Yes.
16        MR. KEANE:  We understand.
17        THE COURT:  It is a Second Circuit case.
18        MR. KEANE:  We understand that --
19        THE COURT:  I don't know why --
20        MR. KEANE:  But by bringing up -- it is one thing
21   Your Honor's decision, their interaction was -- is what gave
22   rise to the liability and that's what our stipulations
23   establish.
24        THE COURT:  Well, Betances also ruled that the fact
25   that they didn't vacate their PRS terms or seek resentencing
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                        Sidebar                        116

1    is what exposed them to liability.
2         MR. KEANE:  We understand that.  And what Betances
3    says is what they should have done is back in 2006 written
4    letters.
5         Now, with respect to punitive damages, it is
6    relevant as to why they didn't write those letters and Mr.
7    Annucci should be allowed to answer well, you know, why didn't
8    you write a letter on behalf of Mr. Santiago at that time.
9         THE COURT:  What would he say?
10        MR. KEANE:  Well, I believe he would say that they
11   are -- they don't have a role in resentencing.  They didn't
12   think it was, you know -- and that didn't come until later.
13   That's the problem, the 601D letter that is an exhibit
14   proffered by defendants is pursuant to a statute that wasn't
15   passed until 2008.
16        THE COURT:  We are not going to revisit prior
17   rulings.  I think that I can strike the testimony regarding
18   what DOCS did following Earley in interpretation of
19   imposing --
20        MR. RICKNER:  New sentences on new people.  I'm
21   sorry.
22        THE COURT:  -- and instruct the jury that that is
23   not an issue in this case.  All right.
24        And in terms of -- you know, this is the thing, the
25   Second Circuit found they were liable in Betances and in
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

**JA535**

```
                         Sidebar                    117

1   Earley, and they specified that had they only asked the DA or

2   judge to re-sentence and if they were met with resistance,

3   they would not be liable.  They made that specific finding and

4   that's what I have been operating under, under the Second

5   Circuit's guidance on that.

6        MR. KEANE:  That's correct, Your Honor.

7        THE COURT:  So he admitted he didn't do it and I

8   don't think the why is necessary because the Second Circuit

9   has already said that a lot of those excuses are not valid.

10       MR. KEANE:  But for punitives, that's what we're

11  saying.

12       MS. DURDEN:  The why for punitives is not -- the why

13  for liability and the why for punitives is not necessarily the

14  same.

15       THE COURT:  Well, you seem to be focusing on your

16  motion in limine or, at least, in your motions regarding

17  punitives and whether they had malicious intent or ill motive.

18  It's not an issue.

19       MS. DURDEN:  But it's the standard that counsel

20  mentioned, which is the intentional recklessness and disregard

21  for the rights of an individual.

22       THE COURT:  Yes.  Exactly.  That was not briefed in

23  your papers, but that is what I understood the basis for your

24  punitive damages to be.  You were focused solely on the

25  illegal motive, or malicious motive or intent.  I forgot what
```

```
                         Sidebar                    118

1   the exact phrase was, but this isn't what it's about.  It's

2   about reckless indifference to the rights of others.

3        MR. KEANE:  Even under callous disregard, the reason

4   why he should be able to explain why --

5        THE COURT:  What is he going to say?

6        MR. KEANE:  Well, he is going to say, you know, we

7   reached out to the OCA --

8        THE COURT:  Well, it's already on the record.

9        MR. KEANE:  It's on the record.  But he will also

10  say that the district attorneys were arguing until they were

11  blue in the face --

12       THE COURT:  No.

13       MR.  KEANE:  -- that PRS is mandatory.

14       THE COURT:  No.

15       MR. KEANE:  And the D.A.s who were not going to do

16  anything.

17       THE COURT:  There's no evidence in the record that

18  this is so and you are relying on hearsay statements.  We

19  don't know how many D.A.s, which DA.  And it might go to his

20  motive and intent, but there's no evidence that you have

21  presented and you could have, but you didn't.

22       MR. KEANE:  Your Honor, we tried.  We proffered the

23  district attorneys' briefs.

24       THE COURT:  But you didn't have an affidavit.  You

25  didn't have an affidavit from any witness, including Mr.
```

```
                         Sidebar                    119

1   Annucci saying I reached out to many, many D.A.s and these

2   D.A.s came back and said no, we're not doing it.

3        You could have presented evidence as part of your

4   motion practice.  You didn't.  Let's just move on.

5        I have made my ruling.  I'm not going to rehash in

6   the middle of a trial and open up a door to a whole new set of

7   evidence where you had not one, not two, but several

8   opportunities to make your arguments.  You had two summary

9   judgment motions.  You could have raised it there.  You had

10  motion in limines.  You could have raised it there.  And you

11  were given a fourth opportunity to brief this just before

12  Thanksgiving.  You didn't raise those arguments.  You didn't

13  present evidence.  The answer respectfully is no.

14       MR. KEANE:  We respectfully reserve our objections.

15       THE COURT:  I understand.

16       MR. KEANE:  Thank you, Your Honor.

17       THE COURT:  That's what you do.

18       MR. RICKNER:  Thank you, Your Honor.

19       (End of sidebar conference.)

20       (Continued on the next page.)

21

22

23

24

25
```

```
                   Annucci - direct - Rickner        120

1   (continuing.)

2        (In open court - jury present.)

3        THE COURT:  Members of the jury, I told you earlier

4   that there may be times when I will strike evidence, testimony

5   from the record which has the effect, basically, of you

6   hitting the delete button and disregarding the testimony.

7        With regard to any testimony as to what Mr. Annucci

8   did or didn't do after 2008, you should disregard that

9   testimony -- I'm sorry, after 1998 you should disregard that

10  testimony and put it out of your mind.

11       MR. KEANE:  Your Honor, I think you meant after

12  2006.

13       THE COURT:  Okay, I'm sorry.  No, I didn't mean

14  after 2006.

15       The question was, and I don't want to keep putting

16  this in the jurors' minds, but basically whether the DOC

17  continued to impose terms of post-release supervision after

18  Earley.

19       That is not what's at stake here in this case.  The

20  Department of Corrections imposed post-release supervision

21  before the Earley decision in 2006.  So, whether DOCS

22  continued to impose post-release supervision after the Earley

23  decision in 2006, that should be disregarded.

24       (Continued on the following page.)

25                         ///
```

```
                    Annucci - cross - Durden            121

1    CROSS-EXAMINATION
2    BY MS. DURDEN:
3    Q    Good afternoon, Commissioner Annucci.
4    A    Good afternoon.
5    Q    And, Commissioner, what is your present position with the
6    Department of Correctional Services?
7    A    I am the acting commissioner for the New York State
8    Department of Corrections and Community Supervision.
9    Q    And when did you first begin working for DOCCS?
10   A    In October of 1984 as deputy counsel.
11   Q    And your next position was deputy commissioner and
12   counsel?
13   A    Yes, in 1989.  And I believe in either 2006 or '7, I
14   became executive deputy commissioner.
15   Q    As deputy commissioner and counsel, what were your duties
16   and responsibilities?
17   A    In general, to oversee all of the legal services
18   necessary for the operations of the day-to-day correctional
19   system -- at the time about 60 different correctional
20   facilities; all the matters pertaining to legislation, to
21   litigation, real property matters, advice, administrative
22   rules and regulations, directives.  Everything related to
23   day-to-day operations.
24   Q    And how large a staff did you have when you were deputy
25   commissioner and counsel?
```

```
                    Annucci - cross - Durden            122

1    A    I believe in the neighborhood of 15 or 16 attorneys.
2    Q    But your next position was executive deputy commissioner?
3    A    Yes.
4    Q    And for how long did you hold that position?
5    A    I think it was a little under four years.
6    Q    And your duties and responsibilities as executive deputy
7    commissioner?
8    A    I was the number two person in the agency.  The
9    commissioner at the time was Brian Fischer, so I was akin to
10   being his right-hand man.  I would take on special
11   responsibilities.  I would represent him on different
12   occasions, such as there was a commission on sentencing review
13   that I represented him on.
14        I continued to play a role in drafting a lot of
15   legislation and other matters of importance, special projects
16   for the agency.
17   Q    And as acting commissioner, what are your duties and
18   responsibilities?
19   A    I have oversight over the entire system, which consists
20   of both all the correctional facilities, presently 44
21   correctional facilities and about 31,200 incarcerated
22   individuals, and all the community supervision bureaus, seven
23   different major bureaus and approximately 24,000 parolees
24   under supervision right now.
25   Q    And during your tenure with DOCCS, are there any
```

```
                    Annucci - cross - Durden            123

1    particular areas that you were focused on?
2    A    There's a lot of different areas that I focused on, but
3    I -- but I focused a lot on legislation, especially sentencing
4    reform legislation to allow individuals to earn early release
5    through such programs of the Shock Incarceration Program,
6    Merit Time Program, Limited Credit Time Allowance under the
7    Rockefeller drug law amendments.
8    Q    And what is the Limited Credit Time Allowance and Merit
9    Time Program?
10   A    Limited Credit Time Allowance Program allows individuals
11   to earn a six-month reduction in their sentence, mostly it
12   applies to violent felony offenders.
13        The Merit Time Program allows individuals to earn
14   merit time credit of either one-sixth off the minimum
15   sentence; or if they're serving a drug determinant sentence,
16   they can get an additional one-seventh reduction off their
17   sentence.
18   Q    And, Commissioner, you just testified that right now
19   there are 44 correctional facilities and approximately 31,000
20   incarcerated individuals.
21        Do you recall what that number was at the time you
22   became commissioner?
23   A    I think it was about 55 -- between 55,000 and 60,000.
24        THE COURT:  Incarcerated?
25        THE WITNESS:  Incarcerated individuals, yes.
```

```
                    Annucci - cross - Durden            124

1    BY MS. DURDEN:
2    Q    And how many correctional facilities were there in May of
3    2013, approximately, if you remember?
4    A    I think approximately 60.
5    Q    And what, if anything, do you attribute the decrease in
6    the incarcerated population to?
7    A    There are a number of factors.
8         Clearly, there's been a dramatic reduction in crime
9    in this state.  There's been a lot more judicious application
10   of prosecutions.  The Rockefeller drug laws dramatically
11   reduced the number of drug offenders in state prison.  At one
12   time we had about 24,000, and that number has been reduced to
13   now below 6,000, I believe.
14        And the early release programs helped get out --
15   people out of prison earlier, so that reduced the number, the
16   programs that I just described.
17   Q    And, Commissioner Annucci, have you ever been recognized
18   for the work that you do with Department of Corrections and
19   Community Supervision?
20   A    Yes, I received a number of awards and recognitions over
21   the years.
22   Q    Can you briefly describe those?
23   A    In January of last year I received the Michael Francke
24   Award from the Correctional Leaders Association.  That is an
25   association that consists of every corrections commissioner in
```

Annucci - cross - Durden                125

1   the country, some large jails, and some jurisdictions outside
2   of mainland America.  And this was for a lifetime achievement
3   award, contributions in the field of corrections.
4            I have twice been recognized by the New York State
5   Bar Association; once for outstanding contribution in the
6   field of corrections, once for excellence in public service.
7            I've even received an award from incarcerated
8   individuals at Sing Sing Correctional Facility, an
9   organization called Voices From Within.
10           I received an award from the New York State
11  Minorities in Criminal Justice as well for my leadership over
12  the years.
13  Q    Now, when you were deputy commissioner and counsel, had
14  you ever met Mr. Santiago?
15  A    No.
16  Q    Were you ever aware of Mr. Santiago?
17  A    No.
18  Q    And now Mr. Santiago, I'm sure you were just here when he
19  testified that he was at Gouverneur's Correctional Facility.
20       What kind of facility is Gouverneur's?
21  A    Gouverneur Correctional Facility is what we call a medium
22  security cookie-cutter facility.  We call it a cookie-cutter
23  facility because we were able to build and operate them in a
24  very short period of time when we had to rapidly expand.
25           It is a correctional facility in St. Lawrence

SAM     OCR     RMR     CRR     RPR

Annucci - cross - Durden                126

1   County.  It is spread out on about 55 acres.  There are
2   multiple buildings where people can receive education,
3   vocational instruction.  There's a horticulture building.
4   There is indoor recreation and outdoor recreation.  The
5   outdoor recreation, I believe, has about four basketball
6   courts, handball courts, bocce ball courts.  I think a
7   combination football field and other purpose, softball.
8   Indoor recreation has a gymnasium for basketball and other
9   recreational activities.
10           And there is a large mess hall and areas where
11  individuals can go and visit the law library, the general
12  library, have visits in the visiting room, et cetera.
13  Q    And can you please describe the physical layout of a
14  housing unit at Gouverneur's Correctional Facility?
15  A    In Gouverneur it's dormitory-style housing.  It would be
16  right now about 50 inmates per multiple occupancy unit.
17  Q    So, they are not -- so the incarcerated population is not
18  in cells at Gouverneur's Correctional Facility?
19  A    No, not unless they commit an infraction and then are
20  separated.
21  Q    And how would you describe the difference between, say,
22  Gouverneur's Correctional Facility and Sing Sing Correctional
23  Facility, which was also mentioned earlier?
24  A    Sing Sing Correctional Facility is a maximum security
25  facility.

SAM     OCR     RMR     CRR     RPR

Annucci - cross - Durden                127

1            The difference between a maximum security facility
2   and a medium security facility is that there's many more
3   security protocols in the physical configuration of the
4   institution.  Confinement is in single cells.  Everybody is in
5   a cell, and movement is much more controlled.
6            Whereas, in a medium security facility it is much
7   more wide open, not just the living quarters, but the
8   movement.  A typical medium security facility would almost
9   look like a small college in upstate New York, except for the
10  secure perimeter fencing that surrounds it.
11  Q    And going back to the medium security correctional
12  facilities, are programs offered there for the incarcerated
13  population?
14  A    Yes.  We have a full array of academic programming and
15  vocational programming.  Depending upon what the individual's
16  academic achievement is before they came to prison, they might
17  get adult basic education.  We try to move everybody to the
18  point where they can qualify for their high school
19  equivalency.
20           There is, at least at Gouverneur, some college
21  programming that's delivered through , I believe,
22  correspondence courses.  And then there's a full array of
23  vocational programming, such as electrical trade, floor tile,
24  building maintenance.  A number of trades that we want the
25  individual to learn so that they have the maximum chance of

SAM     OCR     RMR     CRR     RPR

Annucci - cross - Durden                128

1   getting employed when they are released from incarceration.
2   Q    Now, turning to Mr. Santiago, he testified that when he
3   was at Rikers Island, he was assaulted.
4            Is Rikers Island part of the New York State
5   correctional system services?
6   A    No, it is separate and distinct entirely.
7   Q    Are the officers there trained at all by the State?
8   A    No, they are not.
9   Q    Does the State have any oversight over Rikers Island?
10  A    Not my agency.  There would be potential oversight from
11  the State commissioner of correction, but that's a different
12  entity altogether.
13  Q    Mr. Santiago also said that he had encounters with
14  correction officers while he was at Gouverneur's Correctional
15  Facility.
16           Is there any way for an incarcerated individual to
17  complain about behavior of an officer if he believes he's been
18  mistreated at all?
19  A    Yes, there are many ways.
20           One of the ways, of course, is to file a grievance.
21  They can write letters to any individual of authority,
22  starting with myself, my office.  They can typically write to
23  the superintendent.
24           Every superintendent and every member of his
25  executive team must make regular rounds.  They must talk to

SAM     OCR     RMR     CRR     RPR

```
                    Annucci - cross - Durden              129

 1   incarcerated individuals.  They are supposed to keep their
 2   hand on the pulse and if anybody is acting inappropriately,
 3   the matter is to be investigated and we are to take
 4   disciplinary action against any officer who would in any way
 5   act abusive toward an incarcerated individual.
 6   Q     And you mentioned the word "rounds."
 7               Can you please state what you mean by that?
 8   A     Yes.  Superintendents and members of the executive team
 9   have to regularly tour every area of a correctional facility.
10   We keep track of that through logbooks.
11               We know that -- if I go to a facility and want to
12   see if my executive teams have been making regular rounds, I
13   can see their signatures in red so that we can easily
14   determine that, yes, they have been making regular rounds.
15               That is the only way to -- to keep your hand on the
16   pulse and know the temperature of a facility.  And you will
17   quickly find out if there's any problem, such as the heat
18   isn't working right or the way to get into sick call is too
19   long; or visiting -- visitors are being processed in -- into
20   the facility, it's taking too long; or the commissary is
21   running out of stock items that the population wants.
22               The only way to really be aware of what's going on
23   in a correctional facility is not just to sit in your office
24   and read the letters that come in, but to really make regular
25   rounds, talk to the population, and sense how things are going
```

```
                    Annucci - cross - Durden              130

 1   there.
 2   Q     And is there a unit within DOCCS outside of the facility
 3   that has the ability to investigate allegations of misconduct
 4   by officers?
 5   A     Yes.  The unit is now called the Office of Special
 6   Investigations.  It is headed by a deputy commissioner who
 7   reports directly to me.  And these are individuals that are
 8   empowered to look into any allegations of abuse, inappropriate
 9   relationships, introduction of contraband into correctional
10   facilities, et cetera.  And we will bring cases and,
11   ultimately, seek prosecution of any individual who violates an
12   incarcerated individual's rights.
13   Q     And to your knowledge does the Office of Special
14   Investigation ever receive complaints directly from the
15   incarcerated population?
16   A     Many times.
17   Q     Now, we know in this case, Commissioner, that you've been
18   held liable with respect to Mr. Santiago for not referring him
19   to resentencing.
20               My question is after the Earley decision was
21   rendered, was there any concerns regarding the incarcerated
22   population who remained incarcerated with the unlawful PRS?
23   A     There were many concerns and we took a number of
24   different actions.
25               The document that was referenced earlier was my
```

```
                    Annucci - cross - Durden              131

 1   attempt to get the Office of Court Administration to put out
 2   an instructional memo to every judge in this state about what
 3   the content of Earley was and what their requirements were, so
 4   that going forward there would be no more mistakes of that
 5   nature.
 6   Q     And did you during that period of after Earley ever
 7   receive inquiries from any of the incarcerated population
 8   regarding the Earley decision and their unlawful PRS?
 9   A     I might have.  I can't recall specific letters.
10   Q     Do you know whether any of the incarcerated population
11   took actions to have their unlawful PRS terminated after the
12   Earley decision was rendered?
13   A     I know that a number of them were able to bring legal
14   actions in state court or federal court, Article 78s in the
15   form of mandamus where they were directing us, and we would
16   get an order and we'd have to move PRS, habeas actions, with
17   the same type of results.
18   Q     And if you received a court order stating that the
19   individual's PRS had been terminated, what, if anything, was
20   DOCCS required to do?
21   A     We immediately complied with the order.
22               THE COURT:  Well, what specifically did you do to
23   comply?
24               THE WITNESS:  I'm sorry?
25               THE COURT:  What specifically when you say we
```

```
                    Annucci - cross - Durden              132

 1   immediately complied with the order, what specifically did you
 2   do to comply?
 3               THE WITNESS:  It depended upon what the order said.
 4   If the order said that remove any administrative PRS and if
 5   the individual was in our custody solely on that PRS, we would
 6   release him.
 7               If he was still serving his underlying determinant
 8   sentence of imprisonment, but the order still said remove the
 9   PRS, then we would just remove the PRS and he would continue
10   serving his sentence of imprisonment until he was lawfully
11   released, either at his conditional release date or his
12   maximum expiration date.
13   Q     And, Commissioner Annucci, after the Earley decision was
14   rendered, at any time did you act intentionally to keep the
15   incarcerated individuals with unlawful PRS incarcerated?
16               MR. RICKNER:  Objection.
17               THE WITNESS:  Can you repeat that?
18               MS. DURDEN:  Yes, I need to rephrase that.
19   BY MS. DURDEN:
20   Q     In the actions that you took after the Earley decision
21   was rendered, were any of those actions taken with the intent
22   to keep the incarcerated population with unlawful PRS
23   incarcerated longer?
24   A     No.
25               MS. DURDEN:  May I have a moment, Your Honor?
```

```
                    Annucci - redirect - Rickner            133

 1          THE COURT:  Yes.
 2          (Pause.)
 3          MS. DURDEN:  No further questions, Your Honor.
 4          Thank you, Commissioner.
 5          THE COURT:  All right, thank you.
 6          Do you have any further questions, Mr. Rickner?
 7          MR. RICKNER:  I do, just briefly.
 8   REDIRECT EXAMINATION
 9   BY MR. RICKNER:
10   Q    Gouverneur's Correctional Facility, is there a fence
11   around those 55 acres?
12   A    Yes.
13   Q    That's a yes, around the whole facility?
14   A    There's property outside of the perimeter, but for the --
15   for the main part of the correctional facility, most of it
16   there is a secure perimeter fence, yes.
17   Q    Okay.
18          And inside of Gouverneur's -- and on those fences at
19   Gouverneur's Correctional Facility, is there barbed wire?
20   A    Yes, it's called razor ribbon.
21   Q    Right, because if you try to climb out, it is going to
22   cut you, right?
23   A    If you try to climb out, you will get severely cut.
24   Q    And there is a thick door at the front with a big lock on
25   it, in sum and substance, right?

                SAM    OCR    RMR    CRR    RPR
```

```
                    Annucci - redirect - Rickner            134

 1   A    In sum and substance, yes.
 2   Q    Right.  You can't get out if you're incarcerated there,
 3   right?
 4   A    That's the idea.
 5   Q    Very few people have ever escaped, right?
 6   A    A few have, not from Gouverneur that I can recall, but a
 7   few have escaped over the years.
 8   Q    But the point being, if you're incarcerated there, you
 9   are without your liberty inside that facility, right?
10   A    You have liberty within the facility.
11   Q    But you don't have any liberty to get out of the
12   facility, right?
13   A    Correct.
14   Q    And while you're there, your personal belongings are
15   searched periodically by correctional officers, right?
16   A    Yes.
17   Q    And, in fact, beyond your personal belongings, your body
18   is searched, right?
19   A    Depending on the circumstances.
20   Q    In fact, people there are strip-searched, right?
21   A    After -- after a visit, yes.
22   Q    Right.  You say after a visit.
23          So if somebody comes and has their loved one visit,
24   afterwards they get strip-searched?
25   A    Yes.

                SAM    OCR    RMR    CRR    RPR
```

```
                    Annucci - redirect - Rickner            135

 1   Q    So if you have contact with a loved one inside that
 2   facility, that means that somebody is going to take your
 3   clothes off and look at your genitals, right?
 4   A    It -- it's an examination of the naked body.
 5   Q    Now, one of the reasons you do those strip-searches is
 6   because people bring in drugs, right?
 7   A    Among others things.
 8   Q    Yes.  Among other things are actually weapons, right?
 9   A    Yes.
10   Q    In fact, you frequently search people at Gouverneur's
11   Correctional Facility because you're looking for weapons,
12   right?
13   A    Yes.
14   Q    And people at Gouverneur's Correctional Facility get
15   stabbed by incarcerated people, right?
16   A    I don't know if there's been any stabbings at Gouverneur.
17   Q    In 2007, do you know if there were any stabbings in
18   Gouverneur?
19   A    I can't speak specifically to that.
20   Q    Did anybody die in 2007 at Gouverneur?
21   A    I don't know.
22          THE COURT:  Do you mean of natural causes or of a
23   stabbing-type incidents?
24          MR. RICKNER:  Thank you.
25   BY MR. RICKNER:

                SAM    OCR    RMR    CRR    RPR
```

```
                    Annucci - redirect - Rickner            136

 1   Q    Did anybody die -- has any -- to your knowledge, in the
 2   last two decades has anybody died from violence at Gouverneur?
 3   A    I can't speak to Gouverneur.  I can tell you that on an
 4   average -- on an annual basis we average about under two
 5   homicides a year, in the whole system.
 6   Q    Now, inside of the correctional facilities that the
 7   Department of Correctional Services supervised in 2007-2008,
 8   gangs were a problem, right?
 9   A    Gangs are always a problem in any correctional system.
10   Q    Right.  And specifically in Gouverneur from 2007 to 2008,
11   there were gangs, right?
12   A    I can't speak with first-hand knowledge of what gangs
13   were or were not present at Gouverneur in that -- in those
14   years.
15   Q    Okay.
16          Do the gangs that you face in correctional
17   facilities include the Crips?
18          MS. DURDEN:  Objection, Your Honor.
19          THE COURT:  Sustained.
20   BY MR. RICKNER:
21   Q    Now, you mentioned earlier that after Earley people
22   started bringing legal action to gain their freedom, is that
23   right?
24   A    Yes.
25   Q    Okay.  And sometimes that included an Article 78, right?

                SAM    OCR    RMR    CRR    RPR
```

**JA540**

```
                Annucci - redirect - Rickner        137

1    A    Yes.
2    Q    For the jurors, an Article 78 is a procedure that
3    incarcerated people can use to, among other things, challenge
4    their sentence, right?
5    A    Yes.
6    Q    And the defendants or respondents in those cases, those
7    Article 78s, they fought those cases, right?
8              THE COURT:  You're not objecting?
9              MS. DURDEN:  No, I took it back.
10             THE COURT:  You can answer, sir.
11   A    I didn't have first-hand knowledge of how those papers
12   were responded to.
13   Q    Okay, but you also don't have first-hand knowledge that
14   the Department of Correctional Services was saying, yes,
15   you're correct, under Earley this should be changed, right?
16   A    I have no personal knowledge of that.
17   Q    And you have no personal knowledge of that because you
18   never issued a directive that made sure that happened, right?
19   A    I did not issue such a directive.
20   Q    And people also challenged their sentences in federal
21   court using the habeas procedure we discussed earlier, right?
22   A    I believe so.
23   Q    Now , the reason that people had to use Article 78s and
24   habeas to get out of their terms of post-release supervision,
25   and sometimes incarceration, was because the Department of
```

```
                Annucci - redirect - Rickner        138

1    Correctional Services kept the post-release supervision terms
2    on the books after Earley, right?
3    A    That's, in part, correct.
4    Q    Right.  Meaning that the reason people needed to go to
5    court to challenge their commitment was because the Department
6    of Correctional Services was not taking action themselves,
7    right?
8    A    We were taking actions.
9    Q    You were not lifting the post-release supervision out of
10   the sentence and out of the mainframe when it was
11   administratively imposed after Earley, right?
12   A    We did not have complete records in every case.
13   Q    But you weren't doing it in any case, right?
14   A    We were assembling a lot of records.
15   Q    Prior to February 6th, 2008, you hadn't removed, on the
16   Department of Correctional Services' own volition any of those
17   post-release supervision terms that had been administratively
18   imposed, right?
19   A    I believe so.
20   Q    Now, is it fair to say that a layperson, somebody
21   incarcerated, can't take legal action if they don't know they
22   have a case?
23   A    Lay persons, yes, I think that's correct.  If they are
24   unaware of their rights, they can't take legal action to
25   enforce them.
```

```
                Annucci - redirect - Rickner        139

1    Q    Right.  And you weren't directing the correctional
2    facilities to put up a notice in all of the prisons:  Take a
3    look at the Earley decision, maybe you have a lawsuit, maybe
4    you should get out; you never did anything like that, right?
5    A    That information would be contained in our law libraries.
6    They get law journals and they get the decisions of the
7    circuit courts and there is paralegals to advise and help
8    craft legal papers.
9    Q    Okay.
10   A    Plus Prisoner's Legal Services helps them as well.
11   Q    Okay.  So you're saying that the remedy was to search
12   through tens, if not hundreds, of thousands of decisions and
13   work this out themselves?
14             MS. DURDEN:  Objection, Your Honor.
15             THE COURT:  Sustained.
16             MR. RICKNER:  All right.
17             No further questions, Your Honor.
18             THE COURT:  All right.
19             Do you have anymore questions, Ms. Durden?
20             MS. DURDEN:  Nothing further, Your Honor.
21             THE COURT:  All right, sir, you're excused.  Thank
22   you.  You may step down.
23             (Witness steps down.)
24             THE COURT:  I am thinking at this time it might be
25   an appropriate time to give the jurors a lunch break.
```

```
                Annucci - redirect - Rickner        140

1              I would ask you to take no more than one hour.
2    Please do not talk about the case with anybody.
3              We can do a shorter lunch break if you prefer.  We
4    can do 45 minutes if the jurors would prefer.
5              What would you prefer?  Raise your hands if you want
6    a 45-minute break.
7              All right, that's everybody.  All right, 45 minutes
8    it shall be.  We'll see you back in the jury room at 1:45, and
9    please don't talk about the case.
10             (Jury exits.)
11             THE COURT:  Have a seat, please.
12             I wanted to get a sense of when we might have the
13   charging conference, but before we do that, I'd like to just
14   remind the parties about the Second Circuit's decision in the
15   case Betances, which I believe was the case that the Second
16   Circuit decided on September 16th, 2016, and this is regarding
17   the liability of the three defendants.
18             So, I am just going to read portions of this
19   decision so that the parties understand why we are not going
20   to relitigate the whys of what the defendants maybe did or did
21   not do.
22
23             (Continued on the following page.)
24
25
```

```
                                          Proceedings                    141

 1            THE COURT (CONTINUING):  The Second Circuit.  This
 2   is 837 F.3d 162.
 3            After analyzing each of the defendants after Earley
 4   I was issued, the Second Circuit stated, at page 168:  In
 5   short, the three defendants decided not to comply with Earley
 6   I, although they understood the meaning of its holding and
 7   that its holding applied to their departments.  As a result,
 8   after our decision in Earley I, DOCS continued to violate its
 9   holding prospectively by entering statutorily required PRS
10   terms when sentence and commitment orders were silent, and
11   both DOCS and DOP continued to violate it retrospectively by
12   taking no steps to cease enforcing PRS terms that had been
13   added to sentences by DOCS employees.
14            Then the Court went on to decide whether or not the
15   defendants were entitled to qualified immunity in this case.
16            Under the section that starts with Discussion at
17   page 171 of the decision, the Court states:  The questions we
18   must resolve in this appeal are narrow.  Our court has already
19   concluded that Earley I itself clearly established that when
20   the sentencing court has not included PRS in a defendant's
21   sentence, DOCS may not add that term without violating federal
22   law, citing Vincent, 718 F.3d at 168.
23            The Second Circuit continues:  The Court also deemed
24   clear DOCS's constitutional obligation to at least attempt to
25   cease its administrative and custodial enforcement PRS terms
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                                          Proceedings                    142

 1   that had been unlawfully held under Earley I.  Earley is being
 2   cited at pages 172 to 173.
 3            And the Second Circuit continues:  The only
 4   questions for us to resolve are, one, at what point in time
 5   would the defendants have reasonably known that DOCS's and
 6   DOP's actions violated federal law and, two, whether, after
 7   the defendants reasonably would have known that their conduct
 8   violated federal law, they made an objectively reasonable
 9   effort to comply with the holding of Earley I.
10            And then they go through each of the defendants and
11   try to determine when Mr. Annucci, Mr. Fischer and Mr. Tracy
12   understood the import of Earley.
13            They state:  Considering the dates in the light most
14   favorable to the defendants, we assume that Tracy understood
15   the holding of Earley I by December 31st, 2006 and Fischer by
16   January 31st, 2007.  As for Annucci, although he indisputably
17   understood Earley I as a June 20th 2006, we conclude that he
18   could reasonably have waited to take action until August 31st,
19   2006, the date on which we issued Earley II, denying the
20   motion for rehearing.
21            And then they send the case back for further
22   fact-finding about dates that Mr. Tracy and Mr. Fischer
23   understood the holding of Earley, and again reiterated that
24   the parties could not be held responsible for failing to take
25   action before August 31, 2006.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                                          Proceedings                    143

 1            Then the Court analyzes the defendants' effort to
 2   comply with Earley I.  And they say, this is at page 172:  All
 3   three confirmed -- this is all three defendants, confirmed
 4   that their noncompliance was not the result of oversight or
 5   confusion.  They understood that Earley I required them to
 6   change their practices but affirmatively decided not to do so.
 7            And it was based on that language in Betances and
 8   the party's submission and the arguments that they made
 9   regarding whether or not state law should be considered or
10   instructed or admitted in this case that I found that it
11   should not be admitted, because the Circuit was pretty clear
12   that what the defendants knew and should have done and whether
13   they intentionally or just mistakenly or through oversight or
14   confusion decided not to take action.
15            Now, with regard to the charging conference, when do
16   the parties think that they will be resting and we should hold
17   the charging conference?
18            MR. RICKNER:  I'm going to stick my neck out here
19   and say at the speed we've been going and depending on whether
20   or not Your Honor wants a hard 4:30 stop or not or something
21   else, I think we could do it today; it's not out of the
22   question.  Of course, if Your Honor wanted to do it tomorrow,
23   that would be fine.  And candidly, if Your Honor has a draft
24   for us to review, I wouldn't mind an evening to look at it.
25   But obviously, that's within the Court's discretion.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                                          Proceedings                    144

 1            THE COURT:  Well, we are going to post a version of
 2   the charges.  I will say that some of the charges require
 3   additional research.
 4            One issue that I think is not resolved from your
 5   submissions is whether or not we ask the jury a two-part
 6   question on damages, assuming they find that damages should be
 7   awarded, whether or not the defendants should be found jointly
 8   and severally liable or, if not, whether they should apportion
 9   damages.  What I want to avoid is any possibility that they
10   award, you know, a triple recovery in the same amount for each
11   defendant.  It seems to me that if they find that the
12   defendants are jointly and severally liable, we could ask the
13   jurors to determine which defendant is responsible for the
14   total or a portion thereof.  The parties have not really given
15   us a lot of input on this issue.
16            MR. RICKNER:  That's fair, Your Honor.
17            At least in other cases under Section 1983, my
18   understanding is that joint -- there's no contribution and
19   there's generally not an apportionment of damages when the
20   damages themselves cannot be discretely divided.  Obviously in
21   a case where one person punches somebody in the street,
22   somebody else punches them in a cell, that's not joint and
23   several liability.  But here we have a course of conduct in
24   one block of damages, I believe for compensatory damages there
25   should only be one line.  And that's how it's done in any
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                              145

1  every other 1983 trial I've done.  For punitive damages, that
2  is obviously individualized if Your Honor gets the charge.
3       THE COURT:  Does Mr. Keane have any different view?
4       MR. KEANE:  I think while generally Section 1983
5  liability is joint and several, the issue here may not be so
6  much about joint and several liability, but an issue of
7  contribution as to damages.  While liability may be joint and
8  several, it does appear that there could be comparative
9  faults, various contributory factors.  There are two different
10 agencies working here.  One of the other --
11      THE COURT:  You might want to think about whether
12 you need to advise your clients about possible conflict if one
13 is going to be pointing a finger at another.  That is an
14 issue.
15      And also, it would be nice to have the Second
16 Circuit authority for both the plaintiff's and the defendants'
17 positions.
18      MR. RICKNER:  Yes, Your Honor.
19      THE COURT:  I agree with you that certainly one
20 damage award would be simpler and the punitive damages might
21 have to be -- if they decide to award them, might have to be
22 separately awarded.
23      MR. RICKNER:  I think that's mandatory.  I mean, I
24 do believe that the law is that punitive damages have to be
25 individualized, they could not be grouped.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                              146

1       With respect to contribution and indemnity, I
2  believe the best analysis I am aware of is Judge Dearie's case
3  that I cited in my motion in limine papers but don't have
4  memorized, where he denied effectively impleader to allow a
5  contribution type award.
6       And with respect to I think on the *Dunton* issue, the
7  conflict issue that you've just raised, I do think we should
8  get a statement on the record from each one of the defendants
9  that there is no conflict and that they're okay proceeding.
10 And if that has to be now or after break, I understand, but I
11 would just like that hammered out in stone now that it's been
12 brought up.
13      THE COURT:  Well, it seems to me that -- I was
14 surprised to hear what the defendant said just then about
15 asking the jury maybe to find that one is more liable than the
16 other or that --
17      MR. KEANE:  Well, Your Honor, I think what we mean
18 is, and I don't think it --
19      THE COURT:  What?
20      MR. KEANE:  I think what we mean here, Your Honor,
21 and I don't think it applies in this case necessarily, but
22 Your Honor has brought up *Betances*, for example.  In *Betances*,
23 one of the defendants was not even employed by the Department
24 of Correctional Services for the period of liability.  In this
25 case, all three defendants were employed by their respective

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                              147

1  agencies.  So I think that is not a big issue.  We will
2  discuss it, but I don't think that's something we are
3  concerned about.
4       With the punitive damages, I think we have to look
5  into that issue.  And it's got to be individual, obviously.
6       THE COURT:  Yes.
7       MR. RICKNER:  We agree.
8       MR. KEANE:  So we don't take issue with that.
9       I would, since Your Honor does refer to both *Earley*
10 and *Betances* with respect to the jury charges, one issue that
11 we believe must be advanced is that both *Earley* and *Betances*
12 expressly state that this is a procedural due process case,
13 and we have requested a jury charge that reflects a charge
14 that sets forth the procedural due process consideration for
15 the jury.
16      THE COURT:  Do you mean the liability for procedural
17 due process violation?
18      MR. KEANE:  Yes.
19      THE COURT:  No, sir.  Sorry.
20      MR. KEANE:  I'm sorry, Your Honor?
21      THE COURT:  Liability is not an issue here, sir.
22      MR. KEANE:  Well, I understand.  But for damages, we
23 believe that the standard should be the same, that --
24      THE COURT:  Well, at the oral argument the Second
25 Circuit did not state whether, in fact, they question whether

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                              148

1  it was procedural or substantive due process, so I think I am
2  not certainly going to go out on a limb and tell the parties
3  or the jury what they need to decide when the Second Circuit
4  is still resolving this issue.
5       MR. KEANE:  Respectfully, we submit that we believe
6  the Second Circuit has since clarified that it is procedural
7  due process.
8       MR. RICKNER:  But in either event, that's a
9  liability question, not a damages question.
10      THE COURT:  Right.  Exactly.
11      You have got to stop hashing liability over and over
12 again, Mr. Keane.  It is just really taking time.  I think
13 what you should be focusing on with regard to your clients is
14 -- if there are damages issues that you have not fully
15 provided or authorities that support your positions that you
16 are taking, I will look at those.  It will delay the
17 finalization and the posting of the draft.  What I would like
18 to do is mark, as Court Exhibit No. 1, the proposed jury
19 instructions with authorities so that the parties can check
20 those authorities and decide whether they agree or disagree.
21 But really, the time to have given the authority for all of
22 the instructions that you want has passed a long time ago.  We
23 are scrambling all the time at the last minute, over our
24 holiday weekend I will add, to try to accommodate these
25 last-minute requests that were never briefed despite umpteen

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    149

1   opportunities since this case was filed in 2012 to bring these
2   issues to the Court's attention.  I had hoped to post the
3   charges, draft charges today, end of day, along with a verdict
4   sheet, but it was not clear to me, with regard to the
5   compensatory damages, what the parties were thinking.
6           In any event, I think we are going to go ahead and
7   try to meet our obligations to keep this case on track.  And
8   honestly, I could find that anything else is waived and we are
9   done because there are limits as to how much you should be
10  asking me to decide at the last minute when you think of some
11  other reason that you want to add an argument or to add a
12  charge.
13          All right.  So we will hopefully charge the jury
14  sometime tomorrow afternoon?  Is that what you are thinking?
15          MR. RICKNER:  I think that's very likely,
16  Your Honor.
17          And, I'm sorry, I do want to revisit the conflicts
18  issue.  Because I believe Mr. Keane got almost there, but not
19  all the way.
20          I understand that these people who were employed at
21  the time for the liability period, I believe he's suggesting
22  that that means that there would be an indemnification.  If
23  they're willing to set that in stone, I think that addresses
24  the conflict of interest, but --
25          THE COURT:  Indemnification by the State of the

Proceedings                                    150

1   defendants?
2           MR. RICKNER:  Yes.  Exactly.
3           THE COURT:  I guess I assumed it worked like the
4   Corp. Counsel, that they usually do indemnify but we do not
5   tell the jury that.
6           MR. RICKNER:  No.  No, no, no, no, no.  I'm just
7   saying for the purposes of the conflict, if the State is
8   promising to pay the whole tab, then they can point fingers to
9   each other without ultimately damaging themselves and
10  therefore the conflict is, assuming that they agree, relieved.
11          THE COURT:  But would the State pay punitive
12  damages?
13          MR. RICKNER:  I don't know.  That's why I wanted to
14  bring this up because, as I said, Mr. Keane got part of the
15  way there, but I think implying indemnity may solve the issue.
16  But I would like a statement on the record that all of the
17  defendants understand there is absolutely no conflict and
18  they're okay going forward.
19          THE COURT:  I think one of the factors that the jury
20  can consider in awarding punitive damages is the resources of
21  the defendant, and I do not have any evidence on that.  It
22  does not appear there is going to be any evidence on that.
23          MR. RICKNER:  No.  And it wasn't my intention to
24  bring it out, precisely because we don't know whether or not
25  there's going to be indemnification or not, so we don't really

Proceedings                                    151

1   have an answer to the question.
2           THE COURT:  Well, somebody on the Attorney General
3   side of the table should know the answer.
4           MS. DURDEN:  To the indemnification question?
5           THE COURT:  Yes.
6           MS. DURDEN:  The decision is not made until after a
7   verdict is rendered.  And then pursuant to Public Officers
8   Law, Section 17, it requires the agency to make a
9   determination and provide it to the comptroller.  And we can
10  never say with 100 percent certainty that an action will be
11  indemnified, a verdict will be.
12          THE COURT:  So that being said, where does that
13  leave you on the instructions and determining whether or not
14  there is a conflict that the defendants are willing to waive?
15          MS. DURDEN:  Your Honor, I don't believe there is a
16  conflict.  But if we could just have, you know, until we come
17  -- we'll come back five minutes early and give a definitive
18  answer, I think that would save a lot of time.
19          THE COURT:  All right.  Why don't you come back ten
20  minutes early.  So at 1:35, please.  All right?  Thank you.
21          MR. RICKNER:  Thank you, Your Honor.
22          (Recess taken.)
23          (In open court; jury not present.)
24          THE COURT:  May I be brought up to date on what the
25  defendants have decided regarding joint and several liability

Proceedings                                    152

1   and how the verdict sheet and instructions may be best
2   representative of the law, the proper statement of law.
3           MR. KEANE:  We think joint and several liability is
4   appropriate and there is no issue as to that.
5           MR. RICKNER:  To be clear, we agree one line, one
6   damages on the compensatory, then broken into three for the
7   punitives.
8           MR. KEANE:  That's correct.
9           THE COURT:  All right.  Assuming we get to punitive.
10          MR. RICKNER:  Yeah, but at least for the stated law
11  now.
12          THE COURT:  Would you agree, Mr. Rickner, that one
13  of the elements that the jury should consider is the resources
14  of the defendant against punitive sought?
15          MR. RICKNER:  That this comes down to the
16  indemnification question and the resources of the defendant.
17          THE COURT:  No, no, to separate, separate inquiry.
18          MR. RICKNER:  I do agree.
19          THE COURT:  I believe that courts, when they review
20  punitive damages awards, have noted that the jurors may
21  consider a defendant's resources in determining whether or not
22  punitive damages are likely to deter or overly punish a
23  defendant.
24          MR. RICKNER:  I agree with you, Your Honor.
25  However, I do not think that testimony on that specific

```
                    Proceedings                    153
1   subject is required for a punitive damages award.  And indeed,
2   and this is largely because of the City of New York's
3   indemnification policy --
4            THE COURT:  The State of New York, by the way.
5            MR. RICKNER:  I agree.  I mean, I'm saying that my
6   experience with the City of New York has been that that
7   testimony -- in fact, typically, both sides argue that the
8   resources should not be discussed.  I'm not allowed to
9   cross-examine on indemnification, they're not allowed to plead
10  poverty, and so you end up with a sort of neutral position.
11  Is it something that the jurors can consider?  You're
12  absolutely right on the law.  Just in this particular
13  instance, I don't think it's something that the jurors will be
14  considering, unless I hear something radically different right
15  now.
16           THE COURT:  All right.  Just to avoid any doubt that
17  we're not going to have jurors trying to listen to argument
18  that maybe one defendant is more liable than the other, we
19  will then instruct them that they should, if they decide
20  damages beyond nothing or a dollar are warranted, they should
21  state the amount for compensatory and then decide whether or
22  not punitive should be awarded and, if so, against which
23  defendant and in what amount.
24           MR. RICKNER:  Yes.
25           THE COURT:  All right.
```

```
                    Proceedings                    154
1            MR. KEANE:  Yes.
2            THE COURT:  Okay.  We will bring the jury in then.
3   Thank you.
4            (Jury enters.)
5            THE COURT:  All jurors are present.
6            Please have a seat.
7            Is the plaintiff prepared to call his next witness?
8            MR. RICKNER:  Plaintiff is.
9            We call Defendant Terrence Tracy.
10           THE COURT:  Hello, sir.
11           THE WITNESS:  Good afternoon.
12           (Witness sworn.)
13           THE COURTROOM DEPUTY:  Please state your name for
14  the record, please.
15           THE WITNESS:  My name is Terrence, T-e-r-r-e-n-c-e;
16  middle initial X; last name Tracy, T-r-a-c-y.
17           THE COURT:  Thanks.
18           THE WITNESS:  You're welcome.
19           MS. PANOUSIERIS:  Your Honor, may I approach?
20           THE COURT:  Yes.
21           You may proceed, sir.
22           MR. RICKNER:  Thank you, Your Honor.
23
24           (Continued on the next page.)
25
```



```
                 Tracy - Direct - Mr. Rickner          155
1   TERRENCE X. TRACY, having been first duly sworn/affirmed, was
2   examined and testified as follows:
3   DIRECT EXAMINATION
4   BY MR. RICKNER:
5   Q    Mr. Tracy, are you still a licensed attorney in New York?
6   A    I am.
7   Q    When did you graduate law school?
8   A    I got out of Fordham University in 1983.
9   Q    And after working at Fordham, you worked for a judge in
10  the Northern District, right?
11  A    Yes, I did.
12  Q    That's a federal judge, right?
13  A    Yes.
14           THE COURT:  Northern District of New York?
15  Q    Northern District of New York, right?
16  A    Yes, the Northern District of New York.
17  Q    Slow down for a second.  I'm going fast, too.
18       And that was Judge Foley; is that correct?
19  A    Yes.  Judge James T. Foley.
20  Q    And eventually you became an attorney at the Division of
21  Parole; is that right?
22  A    Yes.
23  Q    When did you become an attorney at the Division of
24  Parole?
25  A    I believe it was in June of 1996, thereabouts.  I was
```

```
                 Tracy - Direct - Mr. Rickner          156
1   hired to serve as the deputy counsel at the Division of
2   Parole.
3   Q    And between 1996 and 2006, did you get a promotion of any
4   kind?
5   A    I did.
6   Q    And what was that promotion?
7   A    I was promoted to the position of counsel.
8   Q    Would that be the highest lawyer at the Division of
9   Parole?
10  A    It was.
11           THE COURT:  I'm sorry, what year, sir?
12           THE WITNESS:  It was in December of 1996.
13           THE COURT:  Thank you.
14           THE WITNESS:  You're welcome.
15  Q    So from December of 1996 until, in fact, you left the
16  agency, you held the highest role as an attorney at the
17  Division of Parole?
18  A    I did.
19  Q    Okay.  Now, the Division of Parole is now part of the
20  Department of Corrections and Community Supervision, right?
21  A    Well, technically the Division of Parole, when the new
22  agency called the Department of Corrections and Community
23  Supervision was created in 2011, that agency was abolished,
24  the old Division of Parole; it was abolished and the functions
25  of that agency were transferred over into the newly-created
```

**JA545**

Tracy - Direct - Mr. Rickner                    157

1   agency.

2   Q    Okay.  Thank you for the nuance.

3        But just to make this simple, in 2006, for example,

4   the Division of Parole was responsible for supervising people

5   who were on parole, right?

6   A    Yes.

7   Q    Within New York state?

8   A    Within New York state and also individuals from other

9   states whose supervision had been transferred under the

10  Interstate Compact.

11  Q    And part of that parole responsibility included people

12  who had been given a term of post-release supervision, right?

13  A    Correct.

14  Q    Now, typically when somebody out of state has their

15  parole violated, they're extradited, right?

16  A    After they are -- if they have been -- have they been

17  arrested in another state or have they just absconded?

18  Q    Well, let's say somebody is arrested in another state or

19  has finished a sentence in another state.

20  A    Okay.

21  Q    Would they then be extradited, typically?

22  A    Following that, yes.  If we had issued a parole violation

23  warrant and it had been watched on the individual at that

24  outside jurisdiction, another state's jurisdiction, when they

25  were no longer subject to that state's criminal process and

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                    158

1   sentence, then they would be extradited back to New York

2   state.

3   Q    Right.  And when they were extradited back to New York

4   state, typically they would go to Rikers Island, right?

5   A    Typically they would go to the county jail where they

6   were supervised or where the violation occurred.

7        For individuals who were, in large part, who were

8   being supervised in the New York City metropolitan area, if

9   they are extradited back from another jurisdiction, they would

10  go to Rikers Island, yes.

11  Q    So if somebody is being supervised in Kings County and

12  they get extradited from out of state, they would be brought

13  to Rikers Island, right?

14  A    Yes.

15  Q    And to the extent that there's any parole hearing or

16  litigation about the violation of the parole, that actually

17  takes place at Rikers Island, right?

18  A    Yes.  We had a sort of courthouse set up there for the

19  administrative law judges to adjudicate the parole violations

20  there on Rikers Island.

21  Q    Right.  And it sometimes can take quite a long time in

22  order to adjudicate a parole violation on Rikers Island,

23  right?

24  A    It could, depending upon how the case was processed.  It

25  could be very quick, depending upon how the attorneys agreed

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                    159

1   to a resolution.  Or if it was a contested matter, it could

2   take some time.

3   Q    And after a parole violation is resolved, it then takes

4   some time for the person to then go upstate to wherever their

5   correctional facility is, right?

6   A    Well, after they are -- after the parole violation

7   process is completed and the administrative -- and the

8   presiding administrative law judge has rendered a

9   determination, in this instance what you're alluding to, which

10  is parole was revoked and they're remanding the individual

11  back for a period of reincarceration called a time assessment,

12  then we would notify the Department of Correction -- the

13  then-Department of Correction Services that the individual was

14  state-ready, so that they could take the individual, come get

15  the individual or have the individual transferred to a state

16  facility in short order.

17  Q    Right.  And sometimes that could take two or three weeks,

18  right?

19  A    It could have.

20  Q    And to be clear, the time that somebody would spend at

21  Rikers Island potentially was something you were aware of in

22  2006 and 2007, right?

23  A    Yes.

24  Q    Now, is it correct to say that the Division of Parole's

25  policies have to conform with the United States Constitution?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                    160

1   A    Yes.

2   Q    And is it correct to say that one of your jobs as counsel

3   for the Division of Parole was to make sure that the Division

4   of Parole's policies followed the Constitution?

5   A    It was my job to advise my superiors as to what the law

6   called for and to see that we did our best to comply, yes.

7   Q    Right.  And you were the highest-ranking attorney, right?

8   A    Yes, I was.

9   Q    Okay.  Now, sometime in the latter part of 2006, you

10  became aware of the *Earley* decision from the Second Circuit,

11  right?

12  A    I did.

13  Q    Now, after *Earley*, you understood that post-release

14  supervision had to be pronounced by the Court, not added by

15  the Department of Correctional Services, right?

16  A    That was my understanding, is that the defendant had to

17  be apprised of post-release supervision as being a part of

18  their sentence, yes.

19  Q    When you say -- and it's not just that they know about

20  it, it's that a judge said it during sentencing while the

21  judge was on the bench, right?

22  A    My understanding of *Earley* at that time was not as clear

23  as you're saying it.

24       My understanding, when I read *Earley*, is that if the

25  individual was unaware of the period of post-release

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                          161

1   supervision attached to their sentence, then that was the
2   problem.  If they had no clue, never heard about it, then
3   that's a problem.
4   Q    Now, following the *Earley* decision, did you review the
5   actual order itself, carefully?
6   A    Which order?
7   Q    The first *Earley* decision in 2006.
8   A    I read it.  I read it.  When you say carefully, I pretty
9   much read everything carefully, but I read it.
10  Q    Now, isn't it correct to say that in *Earley*, the Second
11  Circuit said that the judgment authorized the state, in the
12  *Earley* case, that is, to incarcerate him for six years and no
13  more, quote, "any addition to that sentence not imposed by the
14  judge was unlawful"?
15  A    That's my recollection.
16  Q    So the judge has to actually impose the sentence, right?
17  A    Correct.
18  Q    And if the judge doesn't impose the sentence and the
19  Department of Correctional Services adds to that sentence,
20  that addition is a nullity, right?
21  A    That's what the Second Circuit determined, yes.
22  Q    Okay.  Now, after *Earley* came down, you knew that the
23  Department of Correctional Services -- withdrawn.
24       After *Earley* came down, you knew that the Department
25  of Correctional Services kept the administratively-imposed

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                          162

1   post-supervised release in their sentencing mainframe, right?
2   A    They did.
3   Q    And there's a sentencing mainframe that, in fact,
4   catalogues all of the sentences and parole conditions and
5   everything else in 2006, 2007, 2008, right?
6   A    Well, we had two different mainframes.  They had a
7   mainframe that in short was called FPMS, which was --the
8   Department of Correctional Services, they were the proprietary
9   owners of a mainframe that I'll refer to as FPMS, and that
10  contained information about the individual's sentence, crime
11  of conviction, matters associated with the facilities they
12  went to.  And we maintained another system at the Division of
13  Parole with respect to parolees.  These two systems were
14  shared by both agencies so we could, in large part, see what
15  was in FPMS, absent some medical matters, mental health issues
16  and vice versa.  They could see matters on our mainframe that
17  were related to the individual's supervision and any parole
18  violations that they may have sustained.
19  Q    And the mainframe that was maintained by the Department
20  of Correctional Services would tell you, for example, what
21  somebody's determinate sentence was and any term of
22  post-supervised release in the relevant time period between
23  2006 and 2008?
24  A    That's correct.
25  Q    Okay.  Now, following *Earley*, that mainframe was updated

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - Direct - Mr. Rickner                          163

1   with a column, a PRS indicator that said whether or not the
2   sentence and commitment order had post-supervised release or
3   was silent; is that right?
4   A    I do recall, yes, there was a field that was added which
5   was a wired end, yes or no, that would indicate whether it was
6   or was not indicated on the sentence and commitment order.
7   Q    Right.  And so if there was no post release indicated on
8   the sentence and commitment order but somebody had
9   post-release supervision on their sentence, you could tell
10  that DOCCS had added it, right?
11  A    Yes.
12  Q    Now, after *Earley*, you understood that the sentence and
13  commitment orders needed to be reviewed to determine whether
14  or not post-release supervision was actually part of the
15  sentence, right?
16  A    Among many -- among other things, yeah, I knew that you
17  needed to take a look at the sentence and commitment order to
18  ascertain if it had been put down at the time of sentencing.
19  Q    Okay.  Now, in 2006, you never contacted DOCCS counsel to
20  discuss *Earley*, did you?
21  A    No, I didn't.
22  Q    And in 2006 and 2007, you never changed any of the
23  Department of Parole's policies to conform with *Earley*, right?
24  A    We did not change our policies as to keeping people under
25  supervision, no.  (Continued on the next page.)

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Tracy - direct - Rickner                              164

1   DIRECT EXAMINATION
2   BY MR. RICKNER:
3   Q    So, just to be clear, if somebody was given an
4   administrative term of post-release supervision by DOCS, in
5   2007, that would still be enforced; right?
6   A    Correct.
7   Q    And that could include issuing a warrant for extradition;
8   right?
9   A    Yes.
10  Q    It could include, in fact, a term of incarceration
11  afterwards; right?
12  A    It could.
13  Q    Now; isn't it correct that you personally did not take
14  any action because you believed that it was the Department of
15  Correctional Supervision's responsibility to keep track of
16  sentencing, not the Division of Parole?
17  A    At that time, it was my understanding that the Department
18  of Corrections was the primary agency that was responsible for
19  executing an individual's sentence and memorializing on the
20  appropriate mainframe.
21  Q    But you never discussed that with Mr. Annucci in 2006 or
22  2007?
23  A    No, I didn't.
24  Q    All right.  Now, before June 12, 2007, did you or anybody
25  in your staff ask a judge to re-sentence Mr. Santiago?

Michele Lucchese, RPR, CRR
Official Court Reporter

**JA547**

```
                    Tracy - cross - Keane              165

1    A     No.  I have no recollection of anyone in my office or
2    myself asking anyone, asking the Court to re-sentence him.
3    Q     Before June 12, 2007, did you ever ask a district
4    attorney to apply for resentencing for Mr. Santiago?
5    A     I have no recollection of doing that.
6              MR. RICKNER:  And I have no further questions.
7              THE COURT:  All right.  Any cross?
8              MR. KEANE:  Yes.  Thank you.
9    CROSS-EXAMINATION
10   BY MR. KEANE:
11   Q     Good afternoon, Mr. Tracy.
12   A     Good afternoon, Mr. Keane.
13   Q     I will try to pick up where counsel left off, but I'm
14   going to try to turn your attention to this case and this case
15   specifically.
16             You just testified that -- about documents and
17   computer main frames and basically data that the Division of
18   Parole had at the relevant time.
19   A     Yes.
20   Q     Going back to the time relevant to this case, which is
21   2007, 2008, what data did the Division of Parole have with
22   respect to any individual who was serving a term of
23   post-release supervision?
24   A     All we had was what was on the FPMS mainframe, which, as I
25   indicated, was the sentence, you know, the determinant term,
```

```
                    Tracy - cross - Keane              166

1    or at that time they were still indeterminant sentences being
2    handed down by some courts, the sentence, the period of
3    post-release supervision, the facility we're at, and the only
4    document that we routinely received with the individual when
5    they were transferred over to our agency for supervision was a
6    copy of the sentencing commitment order.
7    Q     Now, the sentencing commitment order is a very specific
8    document; is that correct?
9    A     It is.  It's a document that is prepared in the court
10   where the individual is convicted and then thereafter
11   sentenced.
12   Q     I would like to show you what has been admitted as
13   Plaintiff's Exhibit 1, the sentencing commitment order from
14   judge, Justice Gustin Reichbach that is dated May 14, 2003.
15             MR. KEANE:  I'm going to put that on the screen.
16   Counsel, I have a copy that is the same as Plaintiff's Exhibit
17   1 that is Defendant's D.  It is redacted.
18             THE WITNESS:  Okay.
19   Q     Mr. Tracy, could you look at that document --
20   A     Yes.
21   Q     -- is this what a sentencing commitment looks like?
22   A     Yes.  That is a sentencing commitment that would come out
23   of the criminal court.
24   Q     And if you could, down at the bottom of the page, there
25   is a place for remarks.  Do you understand or could you
```

```
                    Tracy - cross - Keane              167

1    explain to the jury what that means, non pro tunc, January 2,
2    2002?
3    A     Yes, that -- when a court would indicate non pro tunc to
4    that and then referencing that date, that means that this
5    sentence would begin to run back in time, so that it's playing
6    pretend as if you were back then, nun pro tunc is a Latin
7    phrase, then as is now, or something like that.  So,
8    basically, the sentences are starting to run from that date
9    provided by the court in the remarks section.
10   Q     So Mr. Santiago would have his three-and-a-half year term
11   begin on January 2, 2002 even though he didn't get sentenced
12   until May 14th of 2002?
13   A     That's correct.
14   Q     Now, this sentencing commitment order, does it tell you
15   whether Mr. Santiago received a sentence of post-release
16   supervision?
17   A     It does not.
18   Q     And what does define whether Mr. Santiago had a term of
19   post-release supervision?  Is there a document?
20   A     My -- my recollection from that time was post-release
21   supervision could have been mentioned at sentencing but never
22   have made its way to a document.  So it was more than just one
23   piece of paper that -- this is my impression -- that was
24   dispositive of the issue, of whether post-release supervision
25   had been imposed or mentioned at the time of sentencing.
```

```
                    Tracy - cross - Keane              168

1    Q     I'd like to show you what's been admitted as Defendant's
2    Exhibit E, and that is the --
3              MR. RICKNER:  Do they have the redactions added
4    earlier?
5              MR. KEANE:  They have the redactions added.
6    Q     I would like to show you the first page of that, the May
7    3, 2002 plea minutes --
8    A     Yes.
9    Q     -- that Mr. Santiago testified to earlier today.
10   A     That's what I see here.
11   Q     Now --
12   A     That appears to be the first page of the plea
13   proceedings.
14   Q     And you heard the testimony from Mr. Santiago?
15   A     I did.
16   Q     And you saw the language in Defendant's Exhibit E where
17   the judge stated that there would be post-release supervision?
18   A     I saw that, yes.
19   Q     Now, based on the sentencing commitment and the plea
20   minutes, would you have been able to determine, as a Division
21   of Parole official, that post-release supervision actually had
22   been imposed at sentencing?
23   A     My impression from looking at the plea minutes and not
24   having the sentencing minutes from when the judge, the other
25   judge actually sentenced Mr. Santiago, it appears to me that
```

**JA548**

Tracy - cross - Keane                    169

1  the Court here in Kings County contemplated a period of
2  post-release supervision, that five-year period attaching to
3  the three-and-a-half-year determinant sentence, and then there
4  was colloquy that followed on that same page about how it runs
5  and the judge indicated I don't know how the State runs that
6  concurrently.  And my impression from reading that here today
7  and the testimony about that is that the Court could not tell
8  Mr. Santiago or his attorney how a New York State period of
9  post-release supervision that had just been referenced, that
10 five-year period, would run in connection with the supervised
11 release he was serving for his federal conviction.
12 Q    Okay.
13          THE COURT:  May I ask?
14          MR. KEANE:  Yes.
15          THE COURT:  Did your employees have a copy of this
16 transcript of May 3rd when they put the post-release
17 supervision on to Mr. Santiago's sentencing?
18          THE WITNESS:  The Division of Parole did not have
19 these minutes, Your Honor.
20          THE COURT:  Okay.  So this is just your impression --
21          THE WITNESS:  Correct.
22          THE COURT:  As you read this transcript today?
23          THE WITNESS:  Yes, Your Honor.  This is the first
24 time I have seen that.
25          THE COURT:  So it doesn't explain what or why the

Tracy - cross - Keane                    170

1  post-release supervision was imposed back in 2003, was it?
2  2002?
3          THE WITNESS:  2002.
4          THE COURT:  Excuse me.  Yes.
5  Q    Actually, Mr. Tracy, you heard the testimony earlier
6  today, Mr. Santiago came back into the State system in 2004.
7  And would it be fair to say that it was in 2004 that his
8  post-release supervision was calculated into his sentence?
9  A    Yes.
10 Q    But that wasn't your agency that did that calculation?
11 A    No, no.  Our agency did not impose periods of
12 post-release supervision.
13 Q    And that was done by the Department of Correctional
14 Services?
15 A    Uh-huh.  Yes.
16 Q    To go back to your answer, was it your understanding that
17 the sentencing commitment order was not sufficient to
18 determine whether or not post-release supervision was actually
19 imposed in the sentence?
20 A    Yes.  From our agency standpoint, the sentencing
21 commitment order did not end the discussion as to whether or
22 not post-release supervision had been imposed at sentencing.
23 Q    And who would be the authority that could definitively
24 decide whether post-release supervision was actually in the
25 sentence?

Tracy - cross - Keane                    171

1  A    Well, really it goes back to the sentencing court that
2  could actually impose that.  That -- the Court has records
3  that I don't have, never had.  And they were the ones who, as
4  I read Earley, the matter was remanded back.  The courts were
5  the ones, we always envisioned, that would be the ones to deal
6  with this period of post-release supervision, either imposing
7  it or lifting it.
8  Q    So, at this time, you did not believe that the Division
9  of Parole --
10          THE COURT:  Sir, don't lead this witness, okay.
11 Q    Well, did you believe --
12          THE COURT:  No.  What did you believe.
13 Q    What did you believe with respect to whether you could
14 unilaterally release any individual?
15 A    I do not believe that the Division of Parole was in a
16 position to unilaterally discharge an individual from their
17 period of post-release supervision.
18 Q    And we heard a lot about this Earley decision.  You
19 stated that you read Earley.
20 A    I did.
21 Q    Now, did you come to an understanding about whether
22 Earley required you to take any action with respect to
23 individuals?
24 A    I did not read Earley as immediately requiring me to
25 discharge individuals from post-release supervision when the

Tracy - cross - Keane                    172

1  sentence commitment order was silent as to that portion of the
2  sentence.
3  Q    And what was your understanding of what happened to
4  Earley himself?
5  A    My understanding was that Mr. Earley was remanded back to
6  the Court of original jurisdiction, to a criminal Court for
7  further proceedings consistent with the Second Circuit's.
8  Q    And do you recall, having read Earley and other
9  decisions, what happened with Mr. Earley?
10 A    I believe Mr. Earley may not have been given post-release
11 supervision, but I'm not certain of what the outcome was
12 following remand.
13 Q    But was Mr. Earley released after he was -- well, after
14 the Second Circuit decided the case?
15 A    I don't recall, Mr. Keane.
16 Q    And --
17 A    He may have been after a period of time, but I'm not
18 certain.  It may have been a period of time when it went back.
19 I'm not actually certain.
20 Q    And to go back to why it went back, what was your
21 understanding of why it went back down to the district court?
22 A    My -- so that the Court could make a determination as to
23 whether or not federal habeas corpus relief should be granted
24 and the individual be alleviated for serving that period of
25 post-release supervision.

Tracy - cross - Keane                               173

1  Q   And, now, to go back to another point that you just made
2  and it's relevant to Mr. Santiago, Mr. Santiago, as you heard
3  earlier, was on New York State post-release supervision?
4  A   Yes.
5  Q   And he was also on federal supervised release.
6  A   Yes.
7  Q   Those two periods of supervision, how do they work?
8  A   They work -- in this instance, for Mr. Santiago, from his
9  records, it appears that everything was running concurrently.
10 So while he was serving his federal sentence in -- with
11 respect to the supervised release, he similarly was serving a
12 period of post-release supervision here in New York based on
13 his Kings County conviction and satisfying that as well.
14 Q   And turning back to the relevant period, 2007 to 2008,
15 could you describe for the jury what the parole revocation
16 process entails?
17 A   Yeah.  The parole revocation process is one where the
18 Division of Parole can -- when there's reason to believe --
19 the parole officer has reason to believe that an individual
20 has violated their conditions of release, one or more of their
21 conditions of release in an important respect, they are able
22 to -- when they go to their superiors and report this through
23 a bureau analysis report outlining the supervision history and
24 the nature of the behavior that is now of concern, a warrant
25 for the individual's retaking can issue administratively.  The

Tracy - cross - Keane                               174

1  Division of Parole statutorily was authorized to issue those
2  warrants.  It did not have to go to a court for the issuance
3  of a warrant, much like you see in the New York State
4  probation model.
5      And when the individual was taken into custody,
6  pursuant to law, they are to be placed in local correctional
7  facility.  So if you want to use the example of someone who is
8  still in New York State who leaves, let's say, they are in New
9  York City and they are found up in Onondaga County, up in
10 Syracuse where they shouldn't be, they're an absconder, they
11 will be placed in the Onondaga County jail and the parole
12 violation process will play out there.  That's just the situs
13 of the hearing.
14     What happens is that the individual is served with a
15 notice of violation and they are advised of their right to a
16 preliminary hearing.  A preliminary hearing is conducted
17 within 15 days of the individual's retaking for purposes of
18 deciding whether or not there's probable cause on at least one
19 of the charges.
20     The individual has the right, however, to waive the
21 preliminary hearing if they chose to.  And by doing so, the
22 statute provides that that, by operation of law, establishes
23 probable cause on the charges.
24     If, as in this instance, like Mr. Santiago waived
25 his right to a preliminary hearing, probable cause is

Tracy - cross - Keane                               175

1  established and the matter is then put down for a final
2  revocation hearing.
3      The final revocation hearing is a true adversarial
4  hearing where Mr. Santiago has a right to counsel.  If he is
5  indigent, one will be assigned to represent him.  The Division
6  of Parole is represented by what we call a parole revocation
7  specialist.  It is not an attorney.  It is someone who has
8  risen up through the ranks and chooses to have that job.  And
9  then the presiding judge is an administrative law judge who is
10 an attorney who hears the case.  And there are rights of
11 confrontation and cross-examination, the right to produce
12 evidence, to introduce witnesses, any testimony that you feel
13 is appropriate.  And after -- and a transcript is made of
14 every hearing.  It has to be memorialized in a transcript.
15     After that hearing takes place, the administrative
16 law judge is to determine whether or not one or more of the
17 charges has been sustained by a preponderance of the evidence
18 of the evidence.  It's not a beyond a reasonable doubt.  It's
19 more of like what you see in civil court, preponderance of the
20 evidence.
21     And if the individual is found to have not violated
22 the conditions of release, they are -- the warrant is lifted
23 and they are let to go back out.
24     They are also allowed to plead guilty at a final
25 revocation hearing if they chose.

Tracy - cross - Keane                               176

1      I'm just giving you the contours if it's a full
2  case.
3      If an individual is found to have violated parole,
4  the administrative law judge can do a number of things.  The
5  administrative law judge can issue a type of decision that we
6  call a revoke and restore, which means technically there's a
7  revocation on your record, which you are immediately being
8  restored to supervision, so you go back out to your community
9  status.
10     The judge can also revoke your release and remand
11 you to a drug treatment program or some other program that
12 they think as an alternative to incarceration is more
13 appropriate given the circumstances of the violation and the
14 individual supervision history.
15     And then, finally, the judge, if they sustain one or
16 more of the violations, can direct that the individual be
17 returned to State custody to serve the time assessment, which
18 is a period of incarceration.
19 Q   Now, you mentioned --
20 A   I should add after that process plays out, the individual
21 has a right to pursue an administrative appeal with my office,
22 counsel's office processed all those, and they could challenge
23 the final revocation hearing on any one of a number of bases.
24 We would issue findings and recommendations to the New York
25 State Parole, and three board members would have to review

Tracy - cross - Keane                    177

1  that and either affirm, reverse, or modify the disposition

2  below.

3  Q    So even if the individual was returned to DOCS to serve a

4  so-called time assessment, that individual can appeal at that

5  point?

6  A    Yes.

7  Q    Going back to something you just said earlier, you

8  mentioned certain programs that the administrative law judge

9  could recommend.

10 A    Uh-hum.

11 Q    Can you describe what those programs are?

12 A    Yes.  We had a number of programs with the Center For

13 Employment Opportunities, CEO, down here in New York City, the

14 Vera Institute and others that would address situations that

15 were rather unique, particularly for individuals -- it's a

16 phrase not used anymore, the MICA cases, which is mentally ill

17 chemical abuse substance disorders, you know, instances where

18 it would be harsh -- I shouldn't say harsh -- inappropriate

19 given the needs of the individual to send them back to State

20 prison.

21      So we would use some of these programs as

22 alternatives to incarceration and we would work with local

23 entities who partnered with us who actually would come out to

24 Rikers Island and meet with members from the Legal Aid Society

25 who had a contract with the State of New York to provide

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Tracy - cross - Keane                    178

1  representation at Rikers Island and us to talk about what

2  their programs offered and encourage us to make use of these

3  because these were people who, you know, come from the social

4  sciences and believed that these programs were best suited to

5  address the need of the individual under supervision given

6  their violative behavior, criminal history and their

7  supervision history.

8  Q    And were there drug treatment programs?

9  A    Yes.

10 Q    And were there anti-aggression programs?

11 A    Yes.

12 Q    And -- now, going back to this period of time, 2007,

13 2008, were you aware at this time in your role as counsel to

14 the Division of Parole that there were individuals who were

15 serving post-release supervision who made legal challenges to

16 their post-release supervision?

17 A    Yes.  My office did receive case -- a number of lawsuits

18 that were brought under Article 70 of the New York Civil

19 Practice Laws and Rules, or Article 78 of the New York Civil

20 Practice Laws and Rules, challenging these periods of

21 post-release supervision that they were serving.

22 Q    And do you recall -- this is 2007, 2008, it's a year

23 after the *Earley* decision -- what was the volume?

24 A    It wasn't overwhelming, but it was sizeable.  It was

25 sizable.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Tracy - cross - Keane                    179

1  Q    And -- and to go back to those actions, if a judge

2  decided that someone's post-release supervision was to be

3  relieved of post-release supervision, what would the Division

4  of Parole do?

5  A    We would abide by the judge's order and relieve the

6  individual of that period of post-release supervision and they

7  would be released to the community without having to be under

8  our jurisdiction and we would work with the bureau to let them

9  know that this individual is no longer under supervision.  So,

10 close your file, enter it on -- I think it was called the PAR

11 system, that the individual is discharged, we would enter into

12 your mainframe system that the individual was being

13 discharged, because that's how we would show that there's

14 nothing to be served any longer and we would fully comply with

15 the Court's order.

16 Q    Now, you mentioned Article 78.  You mentioned Article 70,

17 habeus corpus.

18 A    Uh-hum.

19 Q    Are you aware of a Criminal Procedure Law Statute 440?

20 A    Yes, there is a -- Section 440 of the Criminal Procedure

21 Law allows individuals who have been convicted of a crime and

22 sentenced to collaterally attack their conviction and related

23 sentence.

24 Q    Were you aware of CPL 440 actions?

25 A    I was aware of some, but we were not made party to the

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Tracy - cross - Keane                    180

1  440 application.

2  Q    Who are the parties to the 440 applications?

3  A    The District Attorney's Office that prosecuted the case.

4  There was also a lot of discussion about the *Earley*

5  decision itself.  That was, as was pointed out earlier, a

6  federal habeas petition.

7  Q    Yes.

8  Q    And do you recall who the parties to that petition were?

9  A    My recollection is that the office of the -- it was

10 either the Queens or Kings County District Attorney's Office

11 appeared in that matter.  We did not appear in that matter.

12 Q    And going back to *Earley*, did *Earley* involve more than

13 one individual?

14 A    No, it was a singular petitioner --

15 Q    And --

16 A    Just one petitioner.

17 Q    And when you refer to the Article 78s and the Article

18 70s, did those actions -- did those proceedings involve

19 individuals as well?

20 A    Yes, those were proceedings where you had one petitioner.

21 Q    So at this time there were -- your division responded to

22 individual actions brought by individuals seeking to relieve

23 themselves of post-release supervision?

24 A    Yes.

25 Q    And it's your testimony that your division complied with

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                 Tracy - redirect - Rickner            181

 1   the orders that any court granted with respect to any one
 2   individual?
 3   A    Yes.
 4            MR. KEANE:  I have no further questions.
 5            THE COURT:  All right.
 6            Any redirect, Mr. Rickner?
 7            MR. RICKNER:  Yes, Your Honor.
 8   REDIRECT EXAMINATION
 9   BY MR. RICKNER:
10   Q    Now, if I understand it, your testimony just now was in
11   the period 2006 through 2008, you did not necessarily have
12   enough information to know whether a period of supervised
13   release was constitutionally or unconstitutionally applied by
14   the Department of Correctional Services?
15   A    That's my impression.  We lacked sufficient documentation
16   to know what had transpired in the criminal court.
17   Q    Now, is the Division of Parole responsible for issuing
18   parole warrants for extradition?
19   A    We issue a parole violation warrant if we have to
20   actually -- if someone is opposing extradition, then all that
21   paperwork would actually have to come out of the governor's
22   office to effect an extradition.  We work with their office
23   and get the individual extradited.
24            But if the individual was awaiting extradition, on
25   the authority of our warrant, we could bring the individual
```

```
                 Tracy - redirect - Rickner            182

 1   back from another jurisdiction here to the State of New York
 2   so that the case could be heard.
 3   Q    In either instance, the first step is the Division of
 4   Parole issues the warrant you just described; right?
 5   A    Correct.  Yes.
 6   Q    And at the time, in June of 2007, you knew that the
 7   information about post-release supervision that you were
 8   relying on might be inaccurate, some of the sentences might be
 9   unconstitutional; right?
10   A    I knew that.  That was a possibility.
11   Q    Right.  And you never went and got Mr. Santiago's
12   sentencing minutes to find out if it was part of the sentence;
13   right?
14   A    I did not.
15   Q    In fact, you didn't instruct your division to do that
16   ever before issuing bench warrants in 2006, 2007, 2008?
17   A    I don't recall us doing that.
18   Q    Right.  So you know that you might have no lawful
19   authority to issue a warrant and lock this person up but the
20   division kept doing it; right?
21   A    I knew there may well be a person out there for whom we
22   issued a warrant who had never heard about post-release
23   supervision at all at the time of sentencing.  Yes, sir.  I
24   knew that.
25   Q    And you kept doing it; right?
```

```
                 Tracy - redirect - Rickner            183

 1   A    We maintained the policy of supervising them and if need
 2   be, commenced the violation process.
 3   Q    Now, you mentioned Article 78.  Was it actually your
 4   division that would oppose the Article 78's challenging?
 5   A    My office worked -- the attorneys who actually appeared
 6   was the Office of the Attorney General.  We worked in concert
 7   with the Office of the Attorney General in those matters.  I
 8   did not appear as the attorney-of-record in the courtroom.
 9   Q    Understood.  But following early 2006, 2007, 2008, you
10   start seeing these Article 78s challenging post-release
11   supervision because you're working with the Attorney General's
12   Office in responding; right?
13   A    Yes.
14   Q    And you fought those cases; right?
15   A    Well, we did -- to -- I can't agree with the use of the
16   word fight.
17            Our hope -- we maintained that we did not have an
18   adequate record in many instances and we also, most
19   frequently, asked the Article 78 court to remand the matter to
20   the court -- the criminal court, the Court of original
21   jurisdiction for further proceedings because of the paucity of
22   records to make this determination as to whether or not
23   post-release supervision was ever mentioned at sentencing or
24   in the course of the proceedings leading up to the sentencing.
25   Q    But there are Article 78s where, included as part of the
```

```
                 Tracy - redirect - Rickner            184

 1   Article 78s, was the sentencing minutes themselves, so you
 2   knew post-release supervision had never been imposed and you
 3   -- and the Attorney General's Office opposed those petitions
 4   anyway; right?
 5   A    I'm aware in some cases where post-release supervision
 6   was mentioned at the time of -- was not mentioned at the time
 7   of sentencing --
 8   Q    Right.
 9   A    -- and not on the order, yes.  And we maintained that the
10   matter should be remanded back to the court.  If that's
11   opposing, that's what we did.
12   Q    Okay.  And to be clear, you have the actual sentence in
13   your hand because of this Article 78, somebody is locked in
14   prison and they stay in prison; right?
15   A    They would have remained incarcerated, yes.
16   Q    And that's because of a policy that you personally approved;
17   right?
18   A    I and my superiors.
19   Q    On September 30th of 2017, you were found liable for
20   violating Mr. Santiago's constitutional rights, isn't that
21   true?
22   Q    In this court?
23   Q    In this court.
24   A    By -- yes, in this case, yes.
25   Q    Right.  And you read the order?
```

```
                  Tracy - redirect - Rickner        185
1    A    I did.
2              MR. RICKNER:  No further questions.
3              THE COURT:  Any more questioning from the Attorney
4    General?
5              MR. KEANE:  No, Your Honor.  Nothing from us.
6              THE COURT:  All right.  Sir, you are excused.  You
7    may step down.
8              THE WITNESS:  Thank you.
9              (Witness excused.)
10             THE COURT:  How are our jurors doing?
11        Okay, good.  Are you ready for your next witness,
12   Mr. Rickner?
13             MS.:  Yes, Your Honor, I will be handling it.
14   Plaintiff calls Brian Fischer to the stand, please.
15             THE COURT:  Thank you.
16             THE COURTROOM DEPUTY:  Please raise your right hand.
17             (Witness sworn.)
18             THE COURTROOM DEPUTY:  Please have a seat.
19             (Continued on following page.)
20
21
22
23
24
25
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                  Fischer - direct - Panousieris     186
1    (Continuing.)
2              (Witness takes the stand.)
3              THE COURTROOM DEPUTY:  State and spell your name
4    please.  Brian, B-R-I-A-N, Fischer, F-I-S-C-H-E-R.
5              THE COURT:  Please proceed.
6              MS. PANOUSIERIS:  Your Honor, if I may pass up
7    binders for the witness as well.
8              THE COURT:  Of course.  You might want to retrieve
9    what binders are up there.
10             MR. RICKNER:  Your Honor, may I approach?
11             THE COURT:  Yes.
12
13             (Continued on the following page.)
14
15
16
17
18
19
20
21
22
23
24
25
```

SAM    OCR    RMR    CRR    RPR

```
                  Fischer - direct - Panousieris     187
1    BRIAN FISCHER,
2         called as a witness by the Plaintiff, having been first
3         duly sworn/affirmed by the Courtroom Deputy, was examined
4         and testified as follows:
5    DIRECT EXAMINATION
6    BY MS. PANOUSIERIS:
7    Q    Good afternoon, Commissioner Fischer.
8    A    Good afternoon.
9    Q    So, you were the commissioner of New York State
10   Department of Correctional Services, what became the
11   Department of Correction and Community Supervision from
12   January 2007 to April 2013, is that correct?
13   A    April 2013, yes.
14   Q    And you first started with DOCCS in 1975, is that right?
15   A    That's correct.
16   Q    So, in the time between 1975 and your promotion to
17   commissioner in 2007, you held a number of positions within
18   the agency, including superintendent of one of the facilities,
19   Sing Sing Correctional Facility.
20        Is that correct?
21   A    That is correct.
22   Q    And it was during your time, in your tenure as
23   superintendent at Sing Sing when the Second Circuit decided
24   the Earley case, is that correct?
25   A    Yes.
```

SAM    OCR    RMR    CRR    RPR

```
                  Fischer - direct - Panousieris     188
1    Q    In 2006?
2    A    Correct.
3    Q    So you were actually going through the interview process
4    to become commissioner in 2006, weren't you?
5    A    In 2007 there was a -- I was interviewed by Governor --
6    Elect -- Governor-Elect Spitzer and his committee.
7    Q    The interview process did not take place in 2006?
8    A    Sorry, say that again.
9    Q    The interview process did not take place in 2006?
10   A    Yes, end of 2006.
11   Q    Shortly after you became commissioner in January of 2007,
12   you were made aware of the Second Circuit's holding in the
13   Earley case, correct?
14   A    Correct.
15   Q    And, in fact, it was your co-defendant who testified
16   earlier, Acting Commissioner Annucci, who was DOCCS's counsel
17   at the time, who informed you of all of the issues raised by
18   Earley, correct?
19   A    That's correct.
20   Q    You were specifically made aware that the decision in
21   Earley affected your agency's policy concerns PRS,
22   post-release supervision?
23   A    Correct.
24   Q    And you knew from these conversations with Mr. Annucci
25   and others in counsel's office, that the decision held that
```

SAM    OCR    RMR    CRR    RPR

**JA553**

Fischer - direct - Panousieris          189

1  any sentence not made by a judge was a nullity under the
2  federal Constitution?
3  A    Correct.
4  Q    So to be clear, in 2007 you understood that if DOCCS had
5  imposed PRS, the Second Circuit had determined that sentence
6  to be a nullity?
7  A    Correct.
8  Q    So, Commissioner, if I'm calculating correctly, you
9  worked for DOCCS for almost four decades, correct?
10 A    Yes.
11 Q    And during that time it's safe to say that you understood
12 you had an obligation to uphold the Constitution of the United
13 States?
14 A    That is correct.
15 Q    And, in fact, it was a huge objective of your job to make
16 sure that you were upholding the Constitution of the United
17 States, correct?
18 A    Correct.
19 Q    So, at the beginning of 2007, you'd just become
20 commissioner, you've learned about the Earley decision, and
21 you just testified that you knew you had an obligation to
22 follow the Constitution.
23      That's a correct summary of your testimony?
24 A    Correct.
25 Q    So knowing all of this, that you had an obligation to

Fischer - direct - Panousieris          190

1  follow the Constitution, that DOCCS' imposition of PRS is a
2  nullity, and that any PRS that was sentenced by DOCCS violated
3  due process, you made the decision to keep PRS in place for
4  those that DOCCS had already imposed upon, is that correct?
5  A    That is correct.
6  Q    So you did this even though you knew that individuals,
7  like my client Mr. Santiago, may have been remanded from
8  serving an illegal PRS sentence and might end up back in
9  prison, even though that sentence was a nullity?
10 A    Correct.
11 Q    So, Commissioner, today, as you sit here today you
12 understand that Mr. Santiago was, in fact, one of these
13 individuals who was remanded after getting an unlawful PRS
14 sentence?
15 A    Correct.
16 Q    And in June 2007, you know now sitting here today that
17 Mr. Santiago was rearrested and sent back to prison for
18 violating the terms of that illegal PRS that DOCCS imposed
19 upon him?
20 A    That is correct.
21 Q    So, you know this, in part, Commissioner, I would
22 presume, because on September 30th, 2017, this Court found you
23 liable for violating the constitutional rights, personally
24 liable for violating my client's constitutional rights, is
25 that correct?

Fischer - direct - Panousieris          191

1  A    I was not aware of that until recently.
2  Q    When did you become aware that you were found liable for
3  violating Mr. Santiago's constitutional rights?
4  A    I became aware of this particular case last month.
5  Q    So, in the years since 2017, since this Court made a
6  decision holding you liable, you never read the decision that
7  made that finding of liability?
8  A    Not that I recall.
9  Q    After learning about it last month, did you read the
10 decision that was made in 2007 --
11      THE COURT:  '17.
12      MS. PANOUSIERIS:  Oh, I'm sorry, apologize.  Thank
13 you, Your Honor.
14 Q    -- in 2017 finding you liable, did you read it after you
15 found out?
16 A    I did not.
17 Q    So to this day, you have not read the decision of the
18 Court finding that you violated Mr. Santiago's constitutional
19 rights?
20 A    Correct.
21 Q    Commissioner, prior to 2007, did you ever go to a judge,
22 write to a judge, and ask Mr. Santiago to be resentenced?
23 A    No.
24 Q    Did you ever approach a district attorney and ask them to
25 facilitate a resentencing for Mr. Santiago?

Fischer - cross - Durden          192

1  A    No.
2  Q    Did you take any action whatsoever to help facilitate the
3  resentencing of Mr. Santiago?
4  A    No.
5      MS. PANOUSIERIS:  That's all the questions I have,
6  Your Honor.
7      THE COURT:  Anything else?
8      MS. DURDEN:  Yes, Your Honor.
9  CROSS-EXAMINATION
10 BY MS. DURDEN:
11 Q    Good afternoon, Commissioner Fischer.
12 A    Good afternoon.
13 Q    Commissioner Fischer, when you first started with DOCCS
14 in 1975, what position did you hold?
15 A    I came from department -- another agency called Narcotic
16 Addiction Control Commission.  I was assistant director of a
17 drug treatment facility, but I was converted over to a deputy
18 superintendent in November 1975 in Corrections.
19 Q    And your educational background, can you just say what
20 your degree is in?
21 A    I have a Bachelor's degree in psychology and a Master's
22 Degree in guidance and counseling, and a Master's Degree from
23 New York Theologic -- Theological Seminary in professional
24 studies.
25 Q    Is it fair to say that you began your career with DOCCS

```
                    Fischer - cross - Durden            193

1   in the program area versus the security?
2   A    Correct.
3   Q    And what would be the difference between the two?
4   A    A program deputy superintendent handles the counseling
5   services and treatment services, transitional services, as
6   opposed to security.  A deputy for security's almost exclusive
7   needs are to handle day-to-day operational security matters.
8   Q    Now, you became commissioner in 2007.
9        What was your position immediately before that
10  promotion?
11  A    Superintendent of Sing Sing.
12  Q    Between the position of superintendent at a maximum
13  security prison and commissioner, are there other positions in
14  the hierarchy?
15  A    Yeah, there are -- there are assistant commissioners and
16  deputy commissioners and commissioner.
17  Q    So when you began in 2007, was there a learning curve?
18  A    Excuse me?
19  Q    Was there a learning curve?
20  A    Absolutely.
21  Q    And as commissioner, what were your duties and
22  responsibilities when you took over as that position?
23  A    Well, in 2000 -- 2007 my job was, obviously, to oversee
24  the entire agency dealing with programs, training,
25  appointments of superintendents and deputy superintendents.
```

                SAM     OCR     RMR     CRR     RPR

```
                    Fischer - cross - Durden            194

1        But I also -- in 2007, the legislature enacted a law
2   called the Sex Offender Management Treatment Act.  And one of
3   my primary duties was to work with the Office of Mental Health
4   and create a program to treat, and then ultimately release,
5   sex offenders who were adjudicated.
6        In addition, during that time we were also doing the
7   Prison Rape Elimination Act, a lot of activity going on there
8   to reduce bad behavior on the part of offenders and staff.
9        But the -- but the most important one actually was
10  initiating the closing of facilities.  And while I was
11  commissioner, we closed twelve facilities.
12  Q    And do you recall what the incarcerated population was at
13  the time you became commissioner?
14  A    It was about 53,000.
15  Q    And when you retired as commissioner?
16  A    It was about 3,000.
17  Q    And what, if anything, do you attribute the decrease of
18  correctional facilities and the incarcerated population to?
19  A    Primarily, changes in the law; primarily the draconian
20  Rockefeller drug law changes.  Less people were coming in and
21  more people were being released.
22  Q    And have you received any honors for your work with the
23  Department of Corrections and Community Supervision?
24  A    Not from the department, but from outside agencies.
25  Q    Yes.  From your work as a commissioner within DOCCS.
```

                SAM     OCR     RMR     CRR     RPR

```
                    Fischer - cross - Durden            195

1   A    Before I was awarded the Warden of the Year from the --
2   from the North American Correctional Association.  And I've
3   been an award -- got an award from the New York Bar
4   Association, and the -- the Thomas Osborne Award from the
5   Osborne Association.
6   Q    What is the Osborne Association?
7   A    They're a nonprofit agency that provides services to
8   individuals incarcerated and individuals who have been
9   released, and work with the families on many, many issues.
10  Q    And just briefly going back to your time at Sing Sing
11  Correctional Facility, did you develop any programs while you
12  were there?
13  A    At -- in the '90s, Corrections created a work release
14  program and I was required and -- to basically implement,
15  create and implement a work release program statewide where we
16  would allow -- let people leave every day and come back at
17  night.  They could go out, see their family, get a job.  So
18  that was a work release program.
19  Q    Now, to your knowledge was Mr. Santiago ever brought to
20  your attention when you were commissioner?
21  A    No.
22  Q    You were asked whether you ever contacted any district
23  attorneys to re-sentence Mr. Santiago.
24       Did you ever contact district attorneys on behalf of
25  any of the incarcerated population?
```

                SAM     OCR     RMR     CRR     RPR

```
                    Fischer - cross - Durden            196

1   A    No.
2   Q    Now, Mr. Santiago testified that while -- when he was at
3   Gouverneur's he didn't go to the yard or to meals because, if
4   I remember correctly, there was a hit on him.
5        Is there any way for an incarcerated individual to
6   identify enemies when they come into the system?
7   A    Yes.
8   Q    And how is that done?
9   A    The individual goes to a supervisor and -- and says
10  someone else, names the person, and is investigated.  After
11  it's found to be legit, an enemies list is created and one or
12  the other individual would be moved.
13  Q    And if an incarcerated individual believes that they are
14  in danger, is there any housing where they can go for their
15  own protection?
16  A    Yes, we call that protective custody.
17  Q    Now, Mr. Santiago also testified that he spent a month in
18  the Special Housing Unit after refusing to shovel.
19       Can an incarcerated individual be housed in a
20  Special Housing Unit for a month just based on the word of an
21  officer that he refused a direct order?
22  A    No.  A -- what we call a ticket has to be written, a
23  violation ticket, if you would.  And then in order to go to
24  SHU, there has to be a due process program where he goes
25  before a hearing officer, presents his side of the story.  The
```

                SAM     OCR     RMR     CRR     RPR

Fischer - cross - Durden                197

1  officer who may have written the ticket will also present his
2  testimony.  And then a decision is made whether or not he
3  needs to be placed in special housing or not.
4  Q    And are the incarcerated individuals allowed to present
5  witnesses at their hearing?
6  A    Yes.
7  Q    And Mr. Santiago stated that he didn't shovel because of
8  a medical reason.
9        Would an incarcerated individual be permitted to
10  raise the medical reason during the course of the hearing?
11  A    Absolutely.
12  Q    Can an incarcerated individual appeal the sentence to the
13  Special Housing Unit?
14  A    Yes.
15  Q    And to whom do they appeal?
16  A    To the superintendent first, and then higher up if
17  necessary.
18  Q    And can the incarcerated individuals also bring an
19  Article 78 to challenge the result of a disciplinary
20  determination?
21  A    Yes.
22  Q    Now, when you were commissioner, did you have the
23  authority to release an individual if it came to your
24  attention that they were being held pursuant to an unlawful
25  PRS sentence?

SAM     OCR     RMR     CRR     RPR

Fischer - cross - Durden                198

1  A    Absolutely not.
2  Q    And during the time that you were commissioner, are you
3  aware of when individuals who had unlawful PRS imposed were
4  released?
5  A    Yes.
6  Q    And under what circumstances?
7  A    When I -- in 2'07 I was apprised of the situation and the
8  decisions that were made both by courts and by legislature.
9  So, I was aware of the circumstances.
10  Q    And so, when -- if an individual came with a court order,
11  would that individual be released?
12  A    With a court order?
13  Q    Yes.
14  A    Yes.
15  Q    And, Commissioner Fischer, did you at any time act in a
16  manner to intentionally keep those with unlawful PRS
17  incarcerated?
18  A    No.
19        MS. DURDEN:  May I have a moment, Your Honor?
20        THE COURT:  Yes.
21        (Pause.)
22        MS. DURDEN:  No further questions.
23        Thank you, Commissioner.
24        THE COURT:  All right.
25        Any questions?

SAM     OCR     RMR     CRR     RPR

Fischer - redirect - Panousieris          199

1        MS. PANOUSIERIS:  Briefly, Your Honor.
2        THE COURT:  Okay.
3  REDIRECT EXAMINATION
4  BY MS. PANOUSIERIS:
5  Q    Commissioner, you testified there was a learning curve
6  for your position in 2007, is that accurate?
7  A    Yes.
8  Q    Did you feel qualified for the position?
9  A    Excuse me?
10  Q    Did you feel qualified for the position of commissioner
11  when you took it?
12  A    I was qualified, yes.
13  Q    So, you also testified that you worked with the Office of
14  Mental Health, so you're fairly familiar with the mental
15  health of the incarcerated and the programs that are available
16  to them?
17  A    Yes.
18  Q    So you also understand that there are very serious
19  dangers associated with being in prison?
20  A    Yes.
21  Q    Like fights?
22  A    Excuse me?
23  Q    Like fights?
24  A    Fights?  Sometimes.
25  Q    Assaults?

SAM     OCR     RMR     CRR     RPR

Fischer - redirect - Panousieris          200

1  A    (No response.)
2  Q    Assaults?
3  A    Yes.
4  Q    And you mentioned rape a minute ago?
5  A    Correct.
6  Q    In 2007, was rape an issue in the Department of
7  Correction within the facilities?
8  A    Not necessarily, no.  We were more concerned with
9  inappropriate behavior, not necessarily rapes.  But the Prison
10  Rape Elimination Act was a federal law that each agency, each
11  state agency had to comply with.
12  Q    You mentioned that rape was an issue for both staff and
13  incarcerated individuals?
14  A    Correct.
15  Q    So it was a concerning enough issue that you needed to
16  take steps to alleviate the problem?
17  A    Yes.
18  Q    You mentioned a process for reporting some -- you called
19  it an enemy list.
20        Does it have a particular name this list that you
21  were referring to?
22  A    We called it Enemies List.
23  Q    And you have to know the identity of the persons who are
24  threatening you or attacking you in order to tell a
25  corrections officer about that?

SAM     OCR     RMR     CRR     RPR

```
                    Fischer - redirect - Panousieris       201

1    A    That's correct.
2    Q    So, if you are an unaffiliated individual, meaning you
3    don't belong to a gang, and you don't necessarily have another
4    gang that is a rival gang, how would that individual gain
5    protection?
6    A    He would still have to speak to somebody, preferably a
7    supervisor.
8    Q    And if an individual is -- when an individual, rather, is
9    moved from place to place, facility to facility, or dorm to
10   dorm, and encounters the same kind of violence, that person
11   does not necessarily have a remedy if they're not -- if they
12   don't know the identities of their attackers, correct?
13   A    Correct.
14   Q    You testified that you had absolutely no authority to
15   release anyone from their improperly DOCCS-imposed PRS, is
16   that what you testified to?
17   A    Yes.
18   Q    But you did have the ability, and actually the
19   responsibility, to effectuate the -- either the release or the
20   resentencing after Earley, correct?
21   A    That -- it is my understanding that only a judge could
22   re-sentence an individual and either impose or remove
23   post-release supervision.  It was not within my authority to
24   do that.
25   Q    So, Commissioner, you testified earlier when we talked
```

SAM     OCR     RMR     CRR     RPR

```
                    Fischer - redirect - Panousieris       202

1    before that you understood that Earley made it a nullity for
2    PRS to be -- rather if it was imposed by DOCCS that it was
3    automatically a nullity, correct?
4    A    Correct.
5    Q    That means it doesn't exist?
6    A    Correct.
7    Q    And your position is you needed a court order in order to
8    do something about it?
9    A    Yes.  There was no -- I had no authority, nor would I
10   ever release individuals without a court order or a judge
11   making a determination.
12   Q    But the decision in Earley was a court order, correct?
13   A    It was a court order on a particular case.
14        In my understanding of it was that we had to find a
15   process by which we could correct the problem that was created
16   by our using -- adding PRSs to certain sentences.
17   Q    And you testified earlier that you took no such steps,
18   you made no such processes that assisted Mr. Santiago in his
19   release?
20   A    Not at all.  In Mr. Santiago's case, yes.  In his
21   particular case, yes.
22        MS. PANOUSIERIS:  No further questions, Your Honor.
23        MS. DURDEN:  Nothing further, Your Honor.
24        THE COURT:  All right, sir, you are excused.  Thank
25   you very much.
```

SAM     OCR     RMR     CRR     RPR

```
                              Proceedings               203

1              (Witness steps down.)
2              THE COURT:  Is the plaintiff ready to call its next
3    witness?
4              MR. RICKNER:  No, it's not.  The plaintiff rests.
5              THE COURT:  All right, thank you.
6              When a plaintiff rests, as I noted before, that
7    means that the plaintiff has finished its presentation of the
8    evidence.
9              Is the defense ready to proceed with its case?
10             MS. DURDEN:  Your Honor, we'd like to make an
11   application to The Court at the close of plaintiff's case.
12             THE COURT:  All right, that's fine.
13             Will the defense be presenting any witnesses today?
14             MS. DURDEN:  No, Your Honor.
15             THE COURT:  Well, at this time I am
16   going to give the jurors a break and we will hear from the
17   defendants' counsel.
18             Please don't talk about the case.  We will be back
19   to you momentarily to let you know whether you will be
20   returning to the courtroom for more evidence or whether we
21   will adjourn for the day.
22             So, we'll get back to you soon.  Please don't talk
23   about the case.
24             (Jury exits.)
25             THE COURT:  All right, have a seat.  I am happy to
```

SAM     OCR     RMR     CRR     RPR

```
                              Proceedings               204

1    hear from the defendants.
2              MS. DURDEN:  Your Honor, at this time the defendants
3    move to dismiss plaintiff's punitive damage claim on the
4    grounds that there is insufficient evidence to go to a jury to
5    determine whether punitive damages are warranted.
6              As recognized, there's been no testimony of evil or
7    malicious intent directed towards Mr. Santiago.  Also, with
8    respect to the reckless disregard of the individual rights,
9    there's been no testimony to establish that there was a
10   reckless disregard.
11             There's basically been no testimony whatsoever as to
12   the reasons taken behind the actions of the individual
13   defendants.  The sole issue is liability, which has previously
14   been determined, and the issue here is damages.  And the only
15   thing the jury knows is that a statute came out -- I mean
16   excuse me, the decision came out and they didn't take
17   immediate action to rectify it.
18             But the actions that they did take are not before
19   the jury, and so there is insufficient evidence for a jury to
20   consider whether the actions of the defendants was of
21   conscious or reckless disregard of the rights of Mr. Santiago.
22             Your Honor, I should also mention none of the three
23   defendants actually know Mr. Santiago prior to coming to
24   court.
25             THE COURT:  Do you want to be heard?
```

SAM     OCR     RMR     CRR     RPR

```
                        Proceedings                205

1          MR. RICKNER:  Just briefly, Your Honor.

2          What defendants are positing is a rule that says if

3   I hurt one person, I can be liable for punitive damages.  If I

4   do it to ten-thousand people, I get off scot-free because I

5   can't even remember any of their names.

6          And I think that's, frankly, offensive to the law.

7   And more importantly, the Second Circuit in the, I believe,

8   Smith case that I cited in my letter brief in the 70.45

9   briefing specifically says recklessness is on the table.  That

10  you can award punitive damages for recklessness.

11         And, in fact, that's all we're looking for here.

12  We're not claiming evil and malicious intent.  They didn't

13  know him.  What they did is the equivalent of throwing a brick

14  off the top of a building into a crowded street.  They have no

15  idea who's going to get hurt, but you know what, you know

16  somebody is going to get hurt.  And that, I submit, under the

17  Supreme Court's ruling is sufficient for a punitive damages

18  award.

19         That's what I've got.

20         MS. DURDEN:  And, Your Honor , if I can respond.

21         There's been no testimony that the actions that they

22  took were reckless because there's been no testimony as to why

23  they took the actions that they did.

24         I understand completely that there's a finding of

25  liability, that they failed to comply in a timely manner, but
```

```
                        Proceedings                206

1   there's been no testimony that their actions were reckless

2   because there's been no testimony as to what actually was --

3   was being done during that time period.

4          For the jury to conclude that they were reckless,

5   they have to have some information as to, okay, we got this

6   decision in, there were meetings, you know, there was

7   ill-advised -- obviously, based on the Court's decision --

8   decisions made with respect to how to interpret the decision.

9          I mean counsel, himself, brought up the fact during

10  Commissioner Annucci's testimony that there was a lot of

11  litigation because everyone was confused how to read Earley.

12         So, it's hard to find recklessness when counsel,

13  himself, in his questioning posed the -- posed the fact that

14  this wasn't as if the decision came in and they said:  You

15  know what, we're gonna just make sure these people stay locked

16  up.  That's not what happened here, and there's no evidence

17  from which the jury can find that there was recklessness on

18  behalf of any of the defendants.

19         THE COURT:  Anything else, Mr. Rickner?

20         MR. RICKNER:  Just briefly.

21         They used the word unlikely, which I actually

22  disagree with in this context.  But in any event, that is a

23  concession that it's not impossible.

24         THE COURT:  Unlikely -- wait.

25         MR. RICKNER:  That it is unlikely that a jury could
```

```
                        Proceedings                207

1   find recklessness, that's what I heard.

2          MS. DURDEN:  Then I misspoke.  It's impossible on

3   these facts.

4          MR. RICKNER:  Okay.  Then I would say it's not

5   impossible on these facts.

6          And moreover, you don't need testimony regarding

7   somebody's subjective intent to find intent.  We put people

8   away for murder based on what they did, and jurors are allowed

9   to presume, to beyond a reasonable doubt, based on what

10  actually happened, what they meant to do.

11         So we can easily get to recklessness here.  A jury

12  could make that determination.  There is enough in the record.

13         THE COURT:  Well, why don't you tell me since you

14  have the burden.

15         What evidence is there?

16         She is saying there is not enough evidence to give

17  an instruction on punitive damages and, in fact, asked me to

18  dismiss the punitive damages claim.

19         MR. RICKNER:  Understood, Your Honor.

20         THE COURT:  So tell me what evidence you have.

21         MR. RICKNER:  Here's what we're going to emphasize

22  in closing on this point.

23         Earley comes down and it has a very specific

24  instruction that PRS terms are a nullity, they don't exist.

25  And all three of them acknowledged that they knew that.
```

```
                        Proceedings                208

1          All three of them also acknowledged that the

2   policies that they put in place -- that had been in place had

3   DOCCS and, in effect, the Division of Parole through the

4   connection that they have, putting these PRS terms in, even

5   though the judge hadn't sentenced them.

6          After Earley comes out, it's clear what they put in

7   their mainframe, what they were relying on, and what

8   ultimately results in actions that caused my client's

9   incarceration were a nullity, except they didn't treat them

10  like a nullity.

11         And it's true they were given an option, and really

12  this came into the qualified immunity analysis, which isn't

13  what's in front of the jury at all.  What's in front of the

14  jury is, at least for punitive damages, is whether or not I

15  think they followed Earley.  And it gave them two options:

16  You let them out or you fix the problem, which really would

17  only apply if they were still incarcerated lawfully based on a

18  determinant sentence rather than being released.  Right?

19         Because if somebody is out on post-release

20  supervision and that post-release supervision is a nullity,

21  they still shouldn't be going to their parole officer anymore.

22         Now that's not this case, but that's effectively

23  what happened in Betances.

24         A jury can look at all of those factors and say, you

25  know what, these people, high-ranking officials, were
```

```
                        Proceedings                   209

1    reckless.  They acted in reckless disregard to people's

2    rights.

3              Because it was clear, the Second Circuit following

4    decisions like Wampler where they said even a clerk at the

5    judge's direction couldn't make this correction.  They simply

6    weren't allowed to do it.  This simply didn't exist.

7              And so, with that, the policy stays in place despite

8    knowing that people's rights are being violated by it.  That

9    gets me there.  And all of that is in the record.  Even the

10   Wampler comment, which is in Earley.

11             THE COURT:  All right, I mean I think what we have

12   here is admissions by the defendants that they were aware of

13   Earley.  That despite being aware of Earley, in terms of what

14   actions they took, they didn't specify what they actually did.

15             What I didn't allow to come in was introduction of

16   the penal law, 45-point whatever it was, as a reason because

17   the penal law may have mandated that PRS be imposed, but

18   Earley in 2006 made very clear that it had to be imposed by a

19   judge and that PRS terms imposed by DOCCS were null and void.

20             Yet, after Earley, as set forth pretty painstakingly

21   in Betances, each of the defendants was aware of it and each

22   of the defendants decided to ignore it.

23             Betances doesn't tell us exactly what they did do.

24   The defendants didn't testify here today what they did do,

25   what they were not allowed to do was to testify that they
```

SAM    OCR    RMR    CRR    RPR

```
                        Proceedings                   210

1    didn't take action because of the penal law.  That is not the

2    reason.

3              Betances suggests, in fact I believe it says that

4    what they should have done is either seek re-sentencing by

5    requesting either the DA or the Court re-sentence; and if the

6    DA or the Court then refused that request, they said that

7    would have been fine and the end of the inquiry for each of

8    the defendants.

9              But each of them testified that they didn't do

10   anything of that nature.  They didn't -- none of the

11   defendants caused a letter or an application to be made to the

12   judge asking that there be a re-sentencing.  And then none of

13   the defendants took acts or steps to vacate the DOCCS-imposed

14   post-release supervision.

15             Mr. Fischer testified that he didn't have authority

16   to vacate post-release supervision that had been imposed by

17   DOCCS, yet DOCCS without authority imposed post-release

18   supervision.  And Betances made clear that DOCCS should have

19   vacated those PRS terms.

20             So, whether that amounts to recklessness, it seems

21   to me that punitive damages may be awarded, not just for the

22   evil and malicious intent, but also for reckless disregard of

23   one's constitutional rights.

24             And Earley made clear that the Constitution had been

25   violated by the imposition of post-release supervision by
```

SAM    OCR    RMR    CRR    RPR

```
                        Proceedings                   211

1    DOCCS.

2              So, it appears that actions could have been, but

3    were not, taken.

4              Now, as I ruled previously, the criminal law that

5    the defendants sought to introduce was not admissible, but

6    what did the defendants do to implement Earley or to comply

7    with Earley, it is true it is not before the Court, but the

8    punitive damages, I believe, cannot be foreclosed based on

9    this record.

10             Now, if the defendants want to submit a case, they

11   may do so.  I just want to make sure I know what we're doing,

12   so that we can either excuse the jury or not.

13             Did you want to put on evidence?

14             MS. DURDEN:  May we have just a moment, Your Honor?

15             THE COURT:  Yes.

16             (Pause.)

17             MR. KEANE:  Your Honor, may we have five minutes

18   outside just to discuss because we are having a hard time

19   hearing each other?

20             THE COURT:  All right, five minutes.

21             MR. KEANE:  Thank you, Your Honor.

22             (Recess taken.)

23               (In open court - jury not present.)

24             THE COURT:  Yes, Ms. Durden.

25             MS. DURDEN:  Yes, Your Honor.  We are going to call
```

SAM    OCR    RMR    CRR    RPR

```
                        Proceedings                   212

1    Commissioner Annucci for a very limited series of questions.

2    So, it won't be long.

3              THE COURT:  All right, so we will then ask the jury

4    to come back and indicate that the defense will call

5    Mr. Annucci in their case.

6              I just want to go on the record, Smith versus Wade,

7    a Supreme Court case decided in 1983 in which the Supreme

8    Court found that a plaintiff need only prove that defendants

9    acted recklessly or in disregard of plaintiff's rights or

10   intentionally violated federal law.

11             Quoting:  "Reckless or callous disregard for the

12   plaintiff's rights, as well as intentional violations of

13   federal law, should be sufficient to trigger a jury's

14   consideration of the appropriateness of punitive damages."

15             I think that the plaintiff has made a sufficient

16   showing in that regard, but certainly the defendants have an

17   opportunity to present their defensive case and to provide

18   other information.

19             Just to be clear, my ruling that was issued, I

20   believe it was just before Thanksgiving or just after

21   Thanksgiving, clarified that the reason that 70-45 motion by

22   the defendants was denied was because they really did not

23   specify what evidence they intended to present.  And I

24   believed it was a back-end or a run-around of the prior

25   liability determination.
```

SAM    OCR    RMR    CRR    RPR



Proceedings                              213

1     What the law was doesn't excuse what _Earley_ and the

2  Second Circuit found in _Betances_ to be violations of the

3  constitutional rights of the plaintiff.

4     So with that, we'll bring the jury in.

5

6     (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

Annucci - Direct - Ms. Durden                214

1     (Jury enters.)

2     THE COURT:  All right.  All jurors are present.

3  Please have a seat.

4     Members of the jury, now that the plaintiff has

5  rested, the defense is given an opportunity to present

6  testimony in support of the defendants.

7     And with that, I will ask Ms. Durden whether she has

8  any witnesses the defense would like to call.

9     MS. DURDEN:  Yes, Your Honor.  We call Commissioner

10  Annucci.

11     THE COURT:  All right.  Sir?

12     Mr. Annucci, welcome back.  You are still under

13  oath, sir.

14     THE WITNESS:  Yes.

15  DIRECT EXAMINATION

16  BY MS. DURDEN:

17  Q    Mr. Annucci, what if any action did you take after the

18  _Earley_ decision was rendered to come into compliance with the

19  decision?

20  A    There were a series of labor-intensive actions that we've

21  taken in the wake of _Earley_, following a number of internal

22  meetings.  We recognized that the reach of _Earley_ was very

23  wide-ranging because the law that PRS was based on dated back

24  to 1998.  And every year, approximately 1400 new commitments

25  come into our system, every month.  Every month, 1400.  And

Annucci - Direct - Ms. Durden                215

1  the individuals that were receiving determinate sentences of

2  imprisonment would be potentially affected.  We had no way to

3  know by simply doing a computer run.  This had to be a

4  labor-intensive effort to manually examine every single

5  commitment that we had where a determinate sentence of

6  imprisonment had been imposed.

7     Then we had to see if we had the sentencing minutes.

8  And the sentencing minutes do not come to us when an

9  individual is delivered into our custody.  They are separately

10  transcribed and there's a requirement that they be mailed to

11  the Department of Corrections.  Thereafter, we place them in

12  the incarcerated individual's file.  Many times, this is

13  something that was honored in the breach rather than the

14  performance.  We also had to ensure that judges, when they --

15  or the stenographers, rather, when they transcribed the

16  minutes, put down the NYSID number on the cover.  If they

17  simply put down the name of the then-defendant and an

18  indictment number, that's not an identifier that we use, so we

19  may end up with minutes that we could not match up with the

20  appropriate individual.  That is something I started years

21  ago, to have the Office of Court Administration ensure judges

22  do that.

23     THE COURT:  Could you also explain to the jury what

24  the NYSID number is and what it is an acronym for, please.

25     THE WITNESS:  Yes, Your Honor.

Annucci - Direct - Ms. Durden                216

1  A    A NYSID number is a unique identifier that the Division

2  of Criminal Justice Services assigns to every individual who

3  gets fingerprinted.  So that is a number that matches with our

4  own internal system of DIN numbers.  Every individual that

5  comes into our system gets a unique number.  It's called the

6  department identification number.  The front two digits would

7  be the year of commitment, like '98, followed by a letter of

8  the alphabet, like A or B, to indicate what reception center

9  they came in.  And then the number of which they were

10  admitted, so 001, 002, 00, you know, et cetera, for that

11  particular year.

12     So there was a huge, painstaking process manually

13  that had to be undertaken.  We had to call people from

14  correctional facilities to start the process just to get a

15  handle on the potential reach of _Earley_.

16     At the same time, I had reached out to the Office of

17  Court Administration shortly after _Earley_ was issued, and I

18  practically begged the chief attorney there to work with the

19  head of OCA and put out an instruction statewide -- there are

20  62 different counties in this state, a number of judicial

21  districts -- so that every judge would know that _Earley_

22  was now a constitutional interpretation by the Second Circuit

23  and to ask each judge, when they're imposing a determinate

24  sentence of imprisonment, to pronounce on the record the

25  period of post-release supervision.

Annucci - Direct - Ms. Durden          217

1   So while we were undertaking this, I was also
2   getting letters from incarcerated individuals. I would
3   explain to them, yes, *Earley* is a decision, but there is other
4   different confusion out there. And at the same time you are
5   free to commence your own legal action either as an Article 78
6   or habe and if you grant your relief, we would be bound by it.
7   So those were the steps in a nutshell that we've
8   taken to try and master the resources we would need to bring
9   about ultimate compliance here.
10  Q   And when you said that you were compiling sentencing
11  minutes and other documents back during this time period, are
12  we talking about paper copies or electronic copies?
13  A   We're talking about doing -- these are paper copies of
14  the commitments. They had to be examined.
15  And then we gave instructions to every inmate
16  records coordinator in all of our correctional facilities.
17  And the instruction was, any time you examine any incarcerated
18  individual's file for whatever reason, and these are the
19  equivalent of lawyers in our correctional facilities, they
20  have to do all kinds of legal obligations with respect to
21  every individual, but whenever they pick up a file for any
22  reason, if a new sentence comes in, if an order to show cause
23  is filed, whatever it is, they also have to examine whether or
24  not sentencing minutes are in the file and then enter into our
25  computer the appropriate yes-or-no that we do have the

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Direct - Ms. Durden          218

1   sentencing minutes. So in this way, we would start to amass
2   all the information we would need on mass to do an out reach
3   to every single county in the state. This required
4   cooperation with the Division of Criminal Justice Services,
5   then the Division of Parole, and the Office of Court
6   Administration, and the Department of Correctional Services to
7   work together collaboratively to develop a comprehensive
8   process to potentially bring all of these cases back to court.
9   Q   And when you say the Office of the Court Administration,
10  that's the State agency that oversees the New York State Court
11  System?
12  A   Yes.
13  Q   And Commissioner Fischer was asked if the imposition of
14  PRS was a nullity, why then couldn't DOCS just release those
15  where it was determined they have unlawful PRS?
16  Can you answer that question?
17  A   Two reasons.
18  The first reason is that even when you had a silent
19  commitment, there was no PRS indicated. If we didn't have the
20  sentencing minutes, it could very well have been pronounced in
21  the sentencing minutes and the clerk simply didn't enter it on
22  the commitment. And we did find a number of cases like that.
23  Secondly, we felt ultimately that the D.A., the
24  judge and the defense lawyer who were involved in the original
25  sentence, they were the parties that had to be brought

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Direct - Ms. Durden          219

1   together, come together and make the appropriate determination
2   what relief should be done and we would immediately abide by
3   it.
4   MS. DURDEN: May I have one moment, Your Honor?
5   THE COURT: Yes.
6   (Pause in proceedings.)
7   Q   Commissioner, do you recall how many files you had to
8   canvas in order to come up with a list of those who --
9   A   I think it was about 40,000.
10  Q   And your final -- and the final list of those with the
11  unlawful PRS, what was the number?
12  A   I think it was in the neighborhood of 8,000.
13  Q   And those 40,000 files had to be reviewed manually?
14  A   Yes.
15  MS. DURDEN: Nothing further.
16  Thank you, Commissioner.
17  THE COURT: May I ask a question of Commissioner
18  Annucci.
19  Sir, when somebody was being violated for violating
20  their PRS term, was any attempt made at that time, after
21  *Earley*, to determine whether or not they had administratively
22  imposed post-release supervision or whether a judge had done
23  it?
24  THE WITNESS: No, Your Honor.
25  But I do know that when we organized this broad

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Cross - Mr. Rickner          220

1   plan, we prioritized those individuals in terms of certain
2   classes who would be most deserving of immediate relief and we
3   worked that out with the Office of Court Administration.
4   THE COURT: All right. So because during this
5   period after *Earley* some individuals like Mr. Santiago were
6   brought back before the parole board for a hearing, right,
7   whether or not they would have violated and whether they
8   needed to get an additional assessment for time in prison, at
9   that point, knowing that *Earley* had issued, was there any
10  attempt to locate sentencing minutes or judgments to determine
11  whether or not individuals were facing that possibility?
12  THE WITNESS: Your Honor, we weren't doing it from
13  the bottom up. We were doing it from the top down, so to
14  speak, if I can make myself clear like that, because it was
15  just so many cases that were involved. This cases back to 1998
16  and there was people, you know, thousands in our system, that
17  we had to look at it that way.
18  THE COURT: All right. Thank you.
19  MR. RICKNER: If I may inquire?
20  CROSS-EXAMINATION
21  BY MR. RICKNER:
22  Q   Now, if I understand your testimony, Acting Commissioner
23  Annucci, the Department of Correctional Services was supposed
24  to get a copy of the sentence along with the sentencing and
25  commitment, right?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner        221

 1   A    No.  The testimony was, when someone is delivered to a
 2   reception center, they come with a sentencing -- sentence and
 3   commitment document and a presentence report, which I didn't
 4   testify to earlier.  Separately, the CPL provides that a
 5   transcript of the sentencing minutes must be made within
 6   30 days of sentence and then mailed to DOCS.
 7   Q    Right.  So but the understanding is, somebody comes into
 8   your custody, into DOCS custody, the documentation you have,
 9   you have the sentence and commitment and, from a different
10   source, the sentencing minutes, right?
11   A    Not when they come in through the reception center.
12   Q    At some point within 30 days after they come into
13   custody, you get --
14   A    People come well after that.
15   Q    Hold on.
16              THE COURT:  Okay.  Let him finish his question
17   before you answer, sir.
18              THE WITNESS:  Yes, Your Honor.  Sorry.
19   Q    My question is, and I think you just testified, there's
20   30 days to put together the transcript and then it is supposed
21   to be sent to DOCS, right?
22   A    Yes.
23   Q    All right.  That did not always happen, right?
24   A    Right.
25   Q    And, in fact, this has been a problem for decades, right?
```

```
                    Annucci - Cross - Mr. Rickner        222

 1   A    Yes.
 2   Q    Right.
 3        So DOCS has known for decades that it is missing the
 4   sentencing minutes even though that is the true and only
 5   sentence that somebody received, right?
 6   A    We've known for years that we're missing sentencing
 7   minutes in a lot of cases.
 8   Q    And, in fact, there are a substantial number of lawsuits
 9   where people allege that they were held longer than they were
10   supposed to and it turns out it's because DOCS never got a
11   copy of the sentence, right?
12   A    I'm not aware of any situation where somehow sentencing
13   minutes required somebody to be held longer than they should
14   have been.
15   Q    No, but my point is that there are lawsuits where people
16   claim that they were over-detained because DOCS made a mistake
17   in the sentence when they put it into their mainframe system,
18   right?
19   A    I'm not aware of that.
20        I'm aware of where some individuals were denied the
21   benefit of judicial recommendations, for example, for early
22   parole that were made in the sentencing minutes which should
23   have been made available to the Board of Parole, et cetera.
24   Q    Okay.  So my point is, is that because DOCS doesn't
25   always get the sentencing minutes themselves, sometimes there
```

```
                    Annucci - Cross - Mr. Rickner        223

 1   are mistakes in the sentences, right?
 2   A    Yes.
 3              THE COURT:  May I just be clear for the jury.
 4        Could you explain sentencing minutes, as opposed to
 5   the sentencing orders, so the jury understands the minutes?
 6              THE WITNESS:  Yes, Your Honor.
 7        When someone is sentenced before a judge, there is a
 8   stenographer in the same manner that you see a stenographer
 9   here.  They take a verbatim transcript.  The defendant is
10   given an opportunity to make statements via the sentencing.
11   If it's a plea, the assistant district attorney usually says
12   the agreed upon plea is a three and a half year determinate
13   sentence, et cetera, and the defendant is given an opportunity
14   to make a statement prior to sentencing.  And then the judge
15   will add whatever he or she wants to add to the record and
16   then pronounce what the official sentence is.
17        The clerk of the court then creates an official
18   document that outlines what the sentence is.  And I believe
19   you may have seen or will see one of the exhibits where
20   there's a section for remarks; the judge can add comments that
21   they want the department to be aware of with respect to
22   someone's commitment.  That is the official document that
23   arrives when someone is delivered to a state correctional
24   facility, as is the presentence report which is a document
25   that's prepared to tell about the background of the
```

```
                    Annucci - Cross - Mr. Rickner        224

 1   individual, the circumstances of the crime, the position of
 2   the crime victim, et cetera.
 3        And then there's a separate criminal history record
 4   that tells the entire record of the individual, and that is
 5   demarcated with what I called the NYSID number.  That's the
 6   Division of Criminal Justice Services fingerprint record that
 7   is created for every individual.
 8        Those are the documents that arrive together with
 9   the individual when he arrives at a reception center in state
10   corrections.
11              THE COURT:  Thank you.
12   Q    But just to be clear --
13              MR. RICKNER:  And this is previously marked as
14   Exhibit A, if I could just put it on the screen.
15   Q    This is an example of a sentence and order of commitment,
16   right?
17   A    Yes.
18   Q    Now, that is a summary, in effect, of what happened
19   during the actual sentencing, right?
20   A    Yes.
21   Q    Right.  Because the actual sentencing, a judge is up on
22   the bench, there's the defendant with his attorney, or her
23   attorney, and there's a court reporter who takes it down,
24   right?
25   A    Yes.
```

```
                    Annucci - Cross - Mr. Rickner          225

 1   Q    And that's the real sentence, right?
 2   A    Yes.
 3   Q    And what I just put up as an Exhibit A, or Exhibit 1, the
 4   sentence and order of commitment is just a summary of that
 5   sentence, right?
 6   A    Yes.
 7   Q    And for decades, DOCS knew that they only had the
 8   summary, they didn't have the actual sentencing minutes for
 9   all of the people that were incarcerated, right?
10   A    Yes.
11   Q    Okay.  And so I think you would agree with me that DOCS
12   can only incarcerate somebody when they have lawful authority
13   to do so, right?
14   A    Yes.
15   Q    Silence by a judge is not lawful authority.  It has to be
16   something that's actively imposed, right?
17   A    Yes.
18   Q    Okay.  Now, after Earley, you initiated this manual
19   review that we discussed before, right?
20   A    Yes.
21   Q    Okay.  And you went through about 40,000 records in about
22   six weeks ending in March of 2007?
23   A    I believe that's correct.
24   Q    And you found thousands of cases where you didn't have
25   any evidence that post-release supervision was included on top
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner          226

 1   of a determinate sentence, right?
 2   A    Well, we had a lot of cases without the sentencing
 3   minutes, so we couldn't know definitively.
 4   Q    Hold on.
 5        What I'm saying is, after that review, the records
 6   available to DOCS showed that there were thousands of people
 7   where the sentence and order of commitment was silent as to
 8   post-release supervision, right?
 9   A    Yes.
10   Q    Okay.  And you didn't have the sentencing minutes, right?
11   A    For a lot of those cases, correct.
12   Q    Right.  So this problem had been going on for decades,
13   but just now you realize, okay, wait, we need the sentencing
14   minutes to know whether or not we're allowed to keep somebody
15   in prison?
16        Is that what happened?
17   A    No, I wouldn't characterize it that way.
18   Q    All right.  Well, to be clear, you had no affirmative
19   indication for thousands of people that the Department of
20   Correctional Services was allowed to keep them to restrain
21   their liberty through post-release supervision, right?
22   A    Yes.
23   Q    So in the absence of this information, you continued to
24   restrain people's liberty through post-release supervision,
25   right?
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner          227

 1   A    Yes.
 2   Q    Right.  You took that silence and decided it was
 3   affirmative, right?
 4   A    At that time, yes.
 5   Q    Okay.  And the reason you didn't know one way or another,
 6   is because for decades you hadn't been collecting all the
 7   sentencing minutes you needed, right?
 8        MS. DURDEN:  Objection.
 9        THE COURT:  I would sustain that objection.
10   Q    Now, you testified that this was a -- that Earley, you
11   immediately recognized it had a wide-ranging breach, right?
12   A    Yes.
13   Q    All right.  And some people wrote you letters and said:
14   I think I was illegally incarcerated.  I want to challenge
15   this.
16        Right?
17   A    Yes.
18   Q    Now, your response was:  Go to court.
19        Right?
20   A    Yes.
21   Q    Okay.  Now, in Earley, the Court stated that any
22   post-release supervision instituted administratively by DOCS
23   was a nullity, right?
24   A    Yes.
25   Q    So you had people coming to you, writing you letters
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner          228

 1   where their sentence was a nullity and you said go to court,
 2   right?
 3   A    Similar to what was done in Earley, went back to court.
 4   Q    Right.  So even though you were told by the Second
 5   Circuit that the post-release supervision administratively
 6   applied by DOCS was a nullity, your response was still we are
 7   not letting you out of jail unless you get a court order,
 8   right?
 9   A    The response was the appropriate entity to make the final
10   decision here is the court, just the way it was in Earley.
11   Q    Right.  You administratively imposed -- not you, but DOCS
12   administratively imposed post-release supervision, right?
13   A    Yes.
14   Q    In many cases?
15   A    Yes.
16   Q    And then they took the position that you can't take away
17   that -- even though we did it without authority, we lack
18   authority to take it away, right?
19   A    Yes.
20   Q    And, in fact, you had to go all the way to court in order
21   to get that, right?  That's what you told people?
22   A    Yes.
23   Q    But what you didn't tell people was that you had
24   administratively imposed post-release supervision, 2006, 2007,
25   2008, right?
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner          229

 1   A    Yes.
 2   Q    So you had this database of 8,000 people who very well
 3   might have had mistakes because you didn't have the sentencing
 4   minutes, but instead of informing each of those 8,000 people,
 5   you stayed silent and the people who did come to you, you said
 6   go to court; is that right?
 7   A    I wouldn't characterize it that way.
 8   Q    Okay.  Well, you discovered 8,000 errors, give or take,
 9   during this review, right?
10   A    Yes.
11   Q    Okay.  And at that time, 2006, 2007, 2008, you never
12   wrote letters to all of those 8,000 people saying, you know
13   what, you might not be legally imprisoned?
14   A    I responded to many letters.
15   Q    Okay.  But only if they thought to reach out to you.  You
16   never went out and told them, right?
17   A    There were ample legal materials being made available in
18   law libraries, there was pro se publications by PLS, law
19   journal articles.  They were very much aware of what was going
20   on through our law libraries.
21   Q    To be clear, that wasn't the question I asked.
22        The question I -- you have the database information,
23   right?  You have a database of these 8,000 people after your
24   review, right?
25   A    Yes.
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Cross - Mr. Rickner          230

 1   Q    Okay.  And these are people that you know where they are.
 2   In fact, you, if you access the database, because they're
 3   either -- because they're incarcerated or there's post-release
 4   supervision or something else, these are people that you can
 5   find, right, for the most part?
 6   A    Yeah, but it changes every day.
 7   Q    Okay.  But you could have written a letter to all of
 8   those people and said, hey, you know what, there might be a
 9   problem here; you could go get an Article 78, you should get a
10   habeas, you should get a lawyer, you should get out.  You
11   could have said something like that, right?
12   A    I don't believe I could have said something like that,
13   no.
14   Q    You couldn't have gone out and told these people that
15   there's a chance that it's illegal to hold them?
16   A    No.
17   Q    Okay.  Now, you spoke about outreach, right?
18   A    Yes.
19   Q    You spoke to the District Attorney's Office, right?
20   A    Yes.
21   Q    Did you tell them to inform all 8,000 people that they
22   might have had illegally-imposed sentences in 2006, 2007?
23   A    No, I didn't inform the district attorneys.
24   Q    Besides going to look in the law library, did you do
25   anything to inform incarcerated people of their rights with
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Redirect - Ms. Durden        231

 1   respect to Earley in 2006, 2007, 2008?
 2   A    Only by responding to individual letters.
 3   Q    Okay.  If somebody figured it out themselves and wrote
 4   you a letter, you might respond, right?
 5   A    I would always respond to every letter that was written
 6   to me.
 7   Q    And your response was not I'm sorry, your sentence is a
 8   nullity; your response was go to court, right?
 9   A    No, the response was more elaborate than that.
10   Q    Well, when people wrote you letters and showed that they
11   had illegally-imposed post-release supervision, you still sent
12   them to court, you didn't let them out, right?
13   A    Correct.
14        MR. RICKNER:  No further questions.
15        MS. DURDEN:  Yes, Your Honor.
16   REDIRECT EXAMINATION
17   BY MS. DURDEN:
18   Q    Commissioner, there's been a lot of questions about
19   Earley and the Court finding that the PRS was a nullity.
20        In that particular case, upon finding that the PRS
21   imposed upon Mr. Earley was a nullity, did the Second Circuit
22   immediately release Mr. Earley?
23   A    No.
24   Q    Do you know what happened in that case?
25   A    They remanded it back to the original sentencing court
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

```
                    Annucci - Redirect - Ms. Durden        232

 1   and I believe it took a year to finally decide what to do in
 2   that case, what the appropriate action was.  And I believe
 3   ultimately he was resentenced without PRS, but it took a
 4   period of time.  He was not immediately released by the order
 5   of the Second Circuit.
 6        THE COURT:  Was he still in custody though serving a
 7   term?
 8        Was Mr. Earley still in custody during this period
 9   serving a term of incarceration on his remaining sentence?
10        THE WITNESS:  I'm not sure, Your Honor.
11        THE COURT:  Thank you.
12   Q    Now, you mentioned the CPL.  Can you just state what that
13   is for the jury?
14   A    Stands for Criminal Procedure Law.
15   Q    And you stated that there's a responsibility for the
16   sentencing court to print up the sentencing minutes and send
17   them to DOCS?
18   A    That is correct.  That is an obligation on the judiciary.
19   Q    So would that fall under the Office of Court
20   Administration?
21   A    Yes.
22   Q    Does DOCS have any responsibility for preparing the
23   sentencing minutes?
24   A    No.
25   Q    So being aware that the judiciary often didn't follow the
```

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Redirect - Ms. Durden          233

1   CPL, what if anything, could you do?

2   A    When I would teach CLE courses to district attorneys, the

3   defense bar, sometimes to judges, I would remind them of the

4   importance of the sentencing minutes, that they are important

5   in many respects because they are instructional to us and,

6   therefore, since taxpayers are paying money for stenographers

7   to transcribe these, we should make every attempt to have it

8   done, comply with the law and get them to us. It's very

9   important that we have as much information as possible with

10  each individual defendant being sent to state prison.

11  Q    And Commissioner, did there come a time when you did

12  write or someone within your office did write letters to the

13  incarcerated population who had unlawful PRS?

14  A    Yes.  There did come a time where we, as part of this big

15  undertaking to organize with the Office of Court

16  Administration and identify classes of individuals, I believe

17  each one did get a letter.

18  Q    And what was the ultimate action taken with respect to

19  the 8,000 or so incarcerated individuals who had the unlawful

20  PRS?

21  A    They were referred back to the District Attorney's, the

22  sentencing court.  And we prepared appropriate letters for

23  each case to make it as expeditious as possible so that the

24  judge would have the ability to say remove PRS; and if there's

25  no other holds, immediately release him, here is a new

Andronikh M. Barna, Official Court Reporter, RPR, CRR

---

Annucci - Redirect - Ms. Durden          234

1   commitment with the PRS of record, here's the shorter period

2   of PRS.  Whatever the outcome was, we tried to make it as

3   simple and as straightforward as possible so we could bring

4   about the results that the Court determined appropriate

5   without undue delay.

6         MS. DURDEN:  One moment, Your Honor.

7         THE COURT:  At what point in time did this occur

8   when you -- first of all, when you sent out the letters to the

9   individuals who had gotten the PRS imposed, at what point in

10  time was that?

11        And also, when did you refer these 8,000 folks to

12  either the D.A. or the sentencing court, or both?

13        THE WITNESS:  Your Honor, I'm going to have to go

14  back to my records to check with certainty, but I'm thinking

15  it's about 2008 that it was done.

16        THE COURT:  That both things were done, that you

17  both sent letters to?

18        THE WITNESS:  Yeah, we started -- we started I think

19  in the spring assembling everything and organizing them by

20  county and letting the District Attorney's know how many cases

21  they had in each county.  So Kings County would have X number,

22  New York County would have X number.  And I think we also got

23  points of contact with state judges, administrative judges in

24  each district so that we can try and make this as streamlined

25  as possible and as organized as possible.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

---

Annucci - Redirect - Ms. Durden          235

1         THE COURT:  So spring of 2008, sir?

2         THE WITNESS:  I think.  It's been so many years, I

3   have to go back to my records.

4         THE COURT:  All right.  And that was for both, as I

5   said, the letters going to the incarcerated individuals who

6   might have had PRS unlawfully?

7         THE WITNESS:  Yeah, I have to double-check exactly

8   how we did it.  We could have done it with a notice or, you

9   know, letters directly to them.  I have to go back and check

10  my records.  It's been a while.

11        THE COURT:  Okay.  Thank you.

12  Q    So Commissioner Annucci, is it fair to say that while

13  DOCS did not take immediate action as determined by the Court,

14  in the end, the 8,000 individuals received the same outcome

15  that Mr. Earley did?

16        MR. RICKNER:  Objection.

17        THE COURT:  Can you give me a basis, please.

18        MR. RICKNER:  Leading.

19        THE COURT:  All right.  Rephrase the question,

20  ma'am.

21  Q    So Commissioner Annucci, just again, what was

22  Mr. Earley's final relief?

23  A    I believe he was released without post-release

24  supervision.

25  Q    Resentenced?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

---

Annucci - Recross - Mr. Rickner          236

1   A    Resentenced, yes.

2   Q    And what was the ultimate relief obtained by the 8,000 or

3   so individuals who were held within the incarcerated

4   population?

5   A    It depended.  Some of them had periods of post release

6   pronounced on the record.  Some of them had resentence without

7   post-release supervision.  Some were immediately released as a

8   result.  Many of them were still in the system and hadn't

9   reached their released dates, but we had the record correctly

10  reflect whether they had PRS or no PRS.

11  Q    So they were all resentenced?

12  A    Yes, to the best of my knowledge.

13        MS. DURDEN:  Thank you, Commissioner.

14        THE COURT:  All right.  Anything else?

15        MR. RICKNER:  Just briefly.

16  RECROSS EXAMINATION

17  BY MR. RICKNER:

18  Q    Acting Commissioner Annucci, isn't it correct, according

19  to Defendant's Exhibit K, that Mr. Santiago didn't get a

20  notice about the problem with his post supervised release --

21  post-release supervision until September 27th, 2010?

22  A    I don't have that exhibit in front of me.

23  Q    Would it refresh your recollection to see it?

24  A    Yes.

25        MR. RICKNER:  If I can show this to the Acting

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Recross - Mr. Rickner          237

1   Commissioner?

2           THE COURT:  Yes?  Please.

3           MR. KEANE:  May we do a sidebar, Your Honor?

4           THE COURT:  All right.

5           (Sidebar.)

6           (Continued on the next page.)

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Sidebar          238

1           (Sidebar conference held on the record in the

2   presence of the Court and counsel, out of the hearing of the

3   jury.)

4           MR. KEANE:  Mr. Santiago, he left the jurisdiction

5   after he was released in 2008 and he was not available to the

6   Division of Parole until 2010.  Mr. Annucci may not be aware

7   of that because he was remanded and extradited to the Division

8   of Parole.  Now, the reason he was not in the jurisdiction, he

9   was incarcerated in another jurisdiction.  He was unavailable

10  to Parole, and Parole could not have had him resentenced at

11  the time he was away.  And that was from 2008 until 2010.

12          Defendants are precluded from post 2008 -- precluded

13  from discussing, excepting in the instance of his sworn

14  conviction in 2013, 2015, the history after that.  So we tried

15  to sustain within the rules and we would request that this

16  line of questioning be stricken.

17          THE COURT:  I think it is -- I mean, I will hear

18  from you.  Go ahead.

19          MR. RICKNER:  The fact is, they could have sent him

20  a letter saying there was a problem with his post supervised

21  release.  They knew where he was; he was incarcerated.  That

22  isn't the issue.  The point is whether or not they notified

23  anybody, not any other procedural things.  The point is, he

24  should have been allowed to take his own action, having found

25  out about this.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Sidebar          239

1           THE COURT:  So you are contending that they knew

2   where he was after he left New York, they could have notified

3   him earlier, in the spring of 2008, when they notified many

4   other defendants and that this individual's relocation outside

5   of New York did not affect that obligation?

6           MR. RICKNER:  Actually, my only point I'm trying to

7   make.

8           THE COURT:  Does not really go to damages because he

9   was in custody anyway.

10          MR. RICKNER:  My point is, wasn't spring of 2008.  I

11  think it took a lot longer for people to get these letters.

12  I'll back up.

13          MR. KEANE:  In all fairness, the *Betances* decision

14  does document that 8,000 letters went out between May of 2008

15  and December 31st of 2000.  There were people like

16  Mr. Santiago who were pushed back because they were not

17  available, but we didn't have a chance to develop that record.

18  And Mr. Tracy testified it's his signature in the letter, but

19  indeed the authorization for that letter, which was Correction

20  Law 601-b, which was enacted in 2000, specified that the

21  letter was required when an individual was in custody or under

22  supervision, and he was not in custody.

23          MR. RICKNER:  I'm backing up.

24          THE COURT:  I am ruling in your favor.

25          And he is backing off.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Sidebar          240

1           So I think, in any event, I would preclude it

2   because it would mislead and confuse the jury.  So I am going

3   to strike the question.

4           MR. RICKNER:  Fine.

5           THE COURT:  If you have something else you can ask.

6           MR. RICKNER:  I do.

7           (Sidebar ends.)

8           (Continued on the next page.)

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Recross - Mr. Rickner                241

1    THE COURT:  The last question asked by plaintiff's

2    counsel is withdrawn.

3        The jury should disregard it and it is stricken and

4    should not be considered.

5  BY MR. RICKNER:

6  Q    Now, you said it was the spring of 2008 that these

7    letters started being sent out; is that right?

8  A    I think so, but I can't recall with absolute certainty.

9  Q    If I told you that it was April 29th, 2008, would that

10   refresh your recollection?

11  A    Not necessarily.

12  Q    Do you have any reason to believe it was before then?

13  A    I can't recall one way or the other.

14  Q    Now, prior to February 6, 2008, did you ever instruct

15   DOCS facilities to put a poster up in the law library

16   regarding *Earley*?

17  A    I can't remember specifically.

18  Q    Did you ever put out a newsletter to the incarcerated

19   people telling them about *Earley* prior to February 6, 2008?

20  A    We helped distribute a newsletter that was put out by

21   Prisoners' Legal Services and they may very well have written

22   about *Earley*.

23  Q    Okay.  Somebody else might have said something.  I'm

24   asking if your agency did anything.

25  A    I don't believe so.

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Annucci - Recross - Mr. Rickner                242

1  Q    Okay.  So it's your testimony that prior to the spring of

2    2008, despite having a list of 8,000 people who might have

3    illegally-imposed post-release supervision, you took no

4    affirmative steps to inform those people of what happened?

5  A    Other than writing back to those who wrote to me.

6  Q    Right.  Besides the people who specifically reached out

7    to you?

8  A    Correct.

9        MR. RICKNER:  No further questions.

10       (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                243

1  (Continuing)

2        THE COURT:  Anything else, Ms. Durden?

3        MS. DURDEN:  No, Your Honor.

4        THE COURT:  All right.  Sir, you are excused.

5        THE WITNESS:  Thank you.

6        THE COURT:  Thank you.

7        Do you have any more witnesses, Ms. Durden?

8        MS. DURDEN:  The defense rests, Your Honor.

9        THE COURT:  All right.  At this time, members of the

10   jury, both sides have rested.  I will excuse you for the day.

11   I believe tomorrow we will spend the morning with the lawyers

12   discussing some legal issues, so you need not return to the

13   courthouse tomorrow until, let's say, two o'clock.

14       At that time you will hear the closing arguments of

15   the parties.  And then, if there's time, I will instruct you

16   on the law.  I can also ask you to come at 1 o'clock.  Is

17   there a preference, 1 o'clock versus two o'clock?  All right.

18   If there is no preference, I will ask you to come at 1:30, and

19   if you are willing to work until 5:30, that would be terrific.

20   Can everyone work until 5:30.  Very good.  Thank you very much

21   for your service.

22       Please don't talk about the case.  I will see you

23   tomorrow at 1:30.  Ms. Jackson will tell you whether to report

24   to the jury room or the downstairs second floor jury room.

25       Thank you.  Have a good night.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                244

1        (Jury exits the courtroom.)

2        Have a seat.  All right.  We will try to post the

3    jury charges based on your submissions and based on our review

4    of the law this evening.  You should review it, watch for it

5    and review it.  We will start bright and early at 9:00 a.m.

6    tomorrow morning.  Make sure you have reviewed it.  What I

7    would like to do is go through each charge.  If no one has any

8    comments, we keep moving and moving and moving.  Probably the

9    most important to all of you would be the statement of the

10   law.  However, you should also pay attention to anything else

11   regarding the instructions, how they weigh credibility and how

12   they are to conduct their deliberations.  Also, take a careful

13   look at the jury's verdict sheet, which will also be posted as

14   Court Exhibit 1A.  The charge will be Court Exhibit 1 on the

15   docket and the verdict sheet will be Court Exhibit 1A.

16       Also, make sure you consult with Ms. Jackson

17   regarding all admitted exhibits.  If you haven't moved them in

18   during this trial, they are not admitted even if you might

19   have stipulated or had no objections.  So if they have been

20   moved in, they're admitted.  If they haven't been moved in,

21   they're not admitted.

22       THE COURTROOM DEPUTY:  And I believe Plaintiff's

23   Exhibit 3 was not moved.

24       MS. PANOUSIERIS:  Your Honor, he moved them all into

25   evidence together 1 through 3.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings 245

1   THE COURT:  Yes.  I recall Exhibit 3 being moved in.
2   One that I don't recall being admitted is the one you most
3   recently mentioned.  I think it was marked but not admitted.
4       MR. RICKNER:  Oh, I was --
5       THE COURT:  Were you just showing to refresh
6   recollection?
7       MR. RICKNER:  The latter.
8       THE COURT:  So that's not in evidence.  We need
9   clean copies.  We need redacted copies.  And I will also work
10  with my clerk to redact the stipulation, those two paragraphs
11  as we discussed and that will go back to the jury as well.
12      MS. PANOUSIERIS:  Your Honor, would you like a clean
13  copy of the *Earley* decision as well since Ms. Durden asked for
14  it to be admitted?
15      THE COURT:  Yes, any attorney markings don't belong
16  in any of the documents.
17      MR. RICKNER:  I will make a clean one.
18      THE COURT:  Very good.  We've marked that as
19  Plaintiff's Exhibit 2.
20      MR. RICKNER:  Exhibit 4.
21      THE COURT:  Okay.  All right.
22      MS. PANOUSIERIS:  Plaintiff's Exhibit 4.
23      THE COURT:  Thank you.
24      MS. DURDEN:  Your Honor, we need to renew our motion
25  on the record for dismissal for punitive damages.  We believe

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings 246

1   based on Commissioner Annucci's testimony, as well as
2   Counselor Tracy that there is no evidence that it was either a
3   reckless indifference or an intentional violation of Mr.
4   Santiago's or anybody else's who has subjected to PRS's
5   rights.
6       MR. RICKNER:  I think that every piece of evidence
7   that I cited before, which the jury is entitled to, plus a few
8   new things about their failure to consider sentencing minutes,
9   the jury could come to the same conclusion they could based on
10  the evidence that was in plaintiff's case and, therefore,
11  perhaps based on the new testimony, the jury will disagree,
12  that doesn't change what should be charged.
13      THE COURT:  Well, what I think we didn't have until
14  the defense put on a case was any evidence about what the
15  defendants did, what the plaintiff had elicited from the
16  defendants during their case-in-chief was that they didn't do
17  X Y, and Z.  But what the defense did in examining Mr. Annucci
18  is present evidence as to what the defendants did do simply
19  because they couldn't get a sentencing transcript, that
20  doesn't necessarily fall at the defendants' feet.  If the
21  Court, by law, was required to prepare a sentencing transcript
22  and get the minutes and send them within 30 days, that is not
23  the fault of the defendants.  They did receive sentencing
24  minutes in some cases, but not in all cases.  So I don't think
25  that it would be appropriate to state that they failed to

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings 247

1   obtain them.
2       MR. RICKNER:  Well, I think that by allowing that
3   circumstance to go on for, by their admission, decades, that's
4   a long time for a problem this important to fester.  And I
5   think that, coupled with the other testimony, they say they
6   didn't have enough information, but they hadn't had enough
7   information for years.  It just didn't -- it wasn't an
8   immediate problem where they needed to determine whether or
9   not some of these sentences were accurate en masse until they
10  found out that they were violating peoples' rights.  I still
11  think that based on that testimony a punitive damages
12  instruction on recklessness is appropriate.
13      THE COURT:  Well, I will think about it and let you
14  know whether or not the defense motion would be granted and
15  whether or not -- if it's denied, whether an instruction will
16  be made to the jury.
17      MS. DURDEN:  If I could just briefly respond to the
18  sentencing minutes.
19          It's a problem that's been going on, you know, for
20  decades, but as Commissioner Annucci testified, he could not
21  force the State judiciary to do what the penal law required
22  that they chose not to follow.  So DOCS should not be held
23  responsible because the State judiciary, in effect, was
24  violating penal law by not complying with the.
25      THE COURT:  I mean, I think any party or any

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings 248

1   nonparty can order sentencing minutes, right, which is what
2   happens all the time in our court.  The press sometimes orders
3   transcripts, et cetera.  But in this case, that wasn't done
4   apparently, according to Mr. Annucci.  Interesting question,
5   but I don't believe that, you know, in terms of an analog in
6   federal law, there's no obligation of the sentencing court to
7   prepare sentencing minutes and send them to the federal
8   facility where a defendant may be designated.  If that is the
9   law in New York, again, that law is not directed at DOCS; it's
10  directed at the judiciary.  So I'm not sure that that really
11  weighs in favor of a punitive damage charge.  I will think
12  about it carefully and let you know my decision tomorrow.
13      MR. RICKNER:  And a related consideration, which is
14  that if you do decide that a punitive damages charge is not
15  appropriate, I believe the only issue for is on my client's
16  damages, meaning specifically how he felt emotionally from
17  June 12 to February 6, what he experienced physically.
18          If their motion is granted, their closing should not
19  be a rehash of effectively all the testimony and also the
20  opening about all of this procedural misegoss, which, as far
21  as I can tell, is only relevant to punitive damages because
22  the rest of it -- because it doesn't go to his compensatories, it
23  doesn't go to his emotional state or his physical experience
24  that he had.
25      MS. DURDEN:  Your Honor, if we don't have to argue

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                    Proceedings                    249

1    that, you know, they are punitive damages, then obviously my

2    closing will be focused on if Mr. Santiago is entitled to any

3    damages, and if so, how much.

4          MR. RICKNER:  Well, that's two ways of getting at

5    the same question.  But going through all of the different

6    procedural machinations that we spent a fair amount at this

7    trial going through, I don't think that should be part of the

8    closing.

9          It really should be limited to the damages portion

10   of a closing statement without any reference to all of the

11   other factors which go to liability.  And I understand if Your

12   Honor isn't ready to rule right now, but it's our position

13   that if we don't get to put punitive damages on, the ending

14   inquiry is going to be very limited.

15         MS. DURDEN:  If we are not addressing punitive

16   damages, Your Honor, obviously we are not going to be talking

17   about Earley and the steps that the defendants took after

18   that.  We would be focused on Mr. Santiago's damages claim.  I

19   mean, I think that's self-evident.

20         MR. RICKNER:  If we have an accord, we have an

21   accord.

22         THE COURT:  All right.  You need to just talk to

23   each other, sometimes through me, but it seems like you're all

24   on the same frame of mind.  I will give it some thought

25   tonight.
```

```
                    Proceedings                    250

1          I think that, you know, this is a very unique case,

2    as you know, and punitive damages usually come up in the

3    context of some gross violation by a state official or someone

4    acting under color of state law, excessive force, gross

5    indifference to a serious medical need of somebody who is

6    incarcerated and unable to get help or attention, medical

7    attention for themselves, that kind of thing, but I'm not sure

8    that, based on this record, that punitive damages ought to be

9    floated before the jury.  So I will let you know.

10         MR. RICKNER:  We respectfully disagree.  If I can

11   retrieve the binders before we leave them.

12         THE COURT:  Including the ones you gave me?

13         MR. RICKNER:  If you want to keep them.

14         THE COURT:  I will give them back to you at the end

15   of the trial.

16         MR. RICKNER:  All right.

17         THE COURT:  Until then, I would like to hold on to

18   them if that's all right.

19         MR. RICKNER:  That's all right.  I will make a

20   mental note.

21         THE COURT:  All right.  Is there anything else?

22   Okay, I will see you at 9:00 a.m. tomorrow morning.  Please

23   don't be late.

24         MS. PANOUSIERIS:  Goodnight, Your Honor.

25         (Matter adjourned to November 29, 2022 at 9:00 a.m.)
```

```
                                                   251
```

|   |   I N D E X   |   |
|---|---|---|
| 2 | **WITNESS** | **PAGE** |
| 3 | **OPENING STATEMENT - MR. RICKNER** | **16** |
| 4 | **OPENING STATEMENT - MR. KEANE** | **19** |
| 5 | **JESUS SANTIAGO** | |
| 6 | DIRECT EXAMINATION BY MR. RICKNER | 39 |
| 7 | CROSS-EXAMINATION BY MR. KEANE | 60 |
| 8 | REDIRECT EXAMINATION BY MR. RICKNER | 89 |
| 9 | **ANTHONY J. ANNUCCI** | |
| 10 | DIRECT EXAMINATION BY MR. RICKNER | 94 |
| 11 | CROSS-EXAMINATION  BY MS. DURDEN | 121 |
| 12 | REDIRECT EXAMINATION BY MR. RICKNER | 133 |
| 13 | **TERRENCE X. TRACY** | |
| 14 | DIRECT EXAMINATION BY MR. RICKNER | 155 |
| 15 | CROSS-EXAMINATION BY MR. KEANE | 165 |
| 16 | REDIRECT EXAMINATION BY MR. RICKNER | 181 |
| 17 | **BRIAN FISCHER** | |
| 18 | DIRECT EXAMINATION BY MS. PANOUSIERIS | 187 |
| 19 | CROSS-EXAMINATION BY MS. DURDEN | 192 |
| 20 | REDIRECT EXAMINATION BY MS. PANOUSIERIS | 199 |
| 21 | **ANTHONY J. ANNUCCI** | |
| 22 | DIRECT EXAMINATION BY MS. DURDEN | 214 |
| 23 | CROSS-EXAMINATION BY MR. RICKNER | 220 |
| 24 | REDIRECT EXAMINATION BY MS. DURDEN | 231 |
| 25 | RECROSS EXAMINATION BY MR. RICKNER | 236 |

```
                                                   377

1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3
4    JESUS SANTIAGO,                 :12-CV-2137 (KAM)

5          Plaintiff,               :

6                                   :United States Courthouse
                                    :Brooklyn, New York
7      -against-                    :
                                    :November 30, 2022, Wednesday
8                                   :9:00 a.m.
   BRIAN FISCHER, individually      :
9    and as Commissioner of the     :
   New York State Department of     :
10   Corrections and Community      :
   Supervision, et al.,             :
11                                  :
          Defendants.               :
12
13 - - - - - - - - - - - - - - - X

14          TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE KIYO A. MATSUMOTO
15          UNITED STATES DISTRICT COURT JUDGE

16 A P P E A R A N C E S :

17 For the Plaintiff:     RICKNER, PLLC
                          14 Wall Street, Suite 1603
18                        New York, New York 10005
                    BY:   ROBERT HOWARD RICKNER, ESQ.
19                        STEPHANIE PANOUSIERIS, ESQ.
20
   For the Defendant:     STATE OF NEW YORK
21                        OFFICE OF THE ATTORNEY GENERAL
                          LETITIA JAMES
22                        28 Liberty Street
                          New York, New York 10005
23                    BY: MICHAEL J. KEANE, ESQ.
                      BY: REBECCA A. DURDEN, ESQ.
24
25
```

Michele D. Lucchese, RPR, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
MLucchese1DNY@gmail.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

Proceedings                                378

1          (In open court - jury not present.)

2          THE COURT:  Good morning.

3          This is the continued trial in the case of Santiago

4     versus Fischer, et al.

5          I just wanted to report that all of the jurors are

6     present.  They are in the jury room.  They are resuming

7     deliberations.  They will be receiving lunch if they are still

8     deliberating at that time.

9          Please stay close and we will call you if we get a

10    note.

11         MR. RICKNER:  Thank you, Your Honor.

12         MR. KEANE:  Thank you, Your Honor.

13         THE COURT:  Thank you very much.

14

15         (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                                379

1          (In open court - jury not present.)

2          THE COURT:  We have a verdict.  The jurors have sent

3     a note, which we have marked Court Exhibit No. 4, indicating

4     that there is a verdict.  And I just want to note that all

5     counsel are present.

6          I would like to ask counsel whether they would like

7     the jury polled?  Does Plaintiff or Defendant?

8          MR. RICKNER:  I generally answer that question if I

9     find out if --

10         THE COURT:  Yes or no?

11         MR. RICKNER:  Am I allowed to ask later?

12         Let's go with yes.  Better safe than sorry.

13         THE COURT:  All right.  What I will advise them is

14    that they should listen carefully as I publish the verdict

15    because the parties have asked that the jury be polled.

16         Does the defense also want the jury to be polled?

17         MR. KEANE:  Fine.

18         MR. RICKNER:  Just for clarification, Your Honor,

19    you're going to read the entire verdict and just ask them if

20    the entire verdict rather than going question by question?

21         THE COURT:  Yes.  Anything else?

22         MR. RICKNER:  No, Your Honor.

23         THE COURT:  We will bring the jury in at this time.

24         (The jury enters at 11:52 a.m.)

25         THE COURT:  All right.  All jurors are present.

MDL        RPR        CRR        CSR

Proceedings                                380

1     Please have a seat, counsel.

2          We received a note from the jury foreperson that the

3     jury has reached a verdict.  And I ask, sir or ma'am, whether

4     the jury has, in fact, reached a unanimous verdict?  Who is

5     the foreperson?  Juror No. 1?

6          JUROR NO. 1:  Yes.

7          THE COURT:  Juror No. 1, may I have the verdict

8     form, please?

9          Thank you very much.  We will mark this as Court

10    Exhibit 5.

11         THE COURT:  I need to inspect the verdict form and

12    then what we will do is publish the verdict and I will give

13    you further instructions at that time.

14         All right.  Members of the jury, what I am going to

15    do now is publish the verdict, which means that I will read

16    the verdict form into the record.

17         After that happens, the parties have requested that

18    I poll the jury, which will simply be a question to each of

19    you individually whether the verdict as read reflects your own

20    true verdict.

21         Question 1:  Do you the jury unanimously find bring

22    a preponderance of the evidence that Plaintiff was injured by

23    the following defendants and their actions by refusing to

24    vacate the illegal post-release supervision, by refusing to

25    ask a judge to re-sentence the Plaintiff and/or by enforcing

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                                381

1     the illegal post-release supervision against Plaintiff which

2     led to his re-incarceration between June 12, 2007 to February

3     1, 2008 for violating PRS?

4          Anthony Annucci:  Yes.

5          Brian Fischer:  Yes.

6          Terrence Tracy:  Yes.

7          If your answer is "yes" as to any Defendant, proceed

8     to question 3.

9          Question 3:  Do you the jury unanimously find by a

10    preponderance of the evidence that Plaintiff has proven he is

11    entitled to compensatory damages against any Defendant?

12         Yes.

13         If your answer is "yes" to question 3, proceed to

14    question 4.

15         Question 4:  What amount of compensatory damages has

16    Plaintiff proven by a preponderance of the evidence?

17         Total amount $100,000.

18         Proceed to question 5.

19         Do you the jury unanimously find by a preponderance

20    of the evidence that Plaintiff has proven he is entitled to

21    punitive damages against any Defendant?

22         Yes.

23         If your answer is "yes" as to question 5, proceed to

24    question 6.

25         Question 6:  What amount of punitive damages has

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                     Proceedings              382

1    Plaintiff proven by a preponderance of the evidence against
2    each Defendant?
3              Anthony Annucci:  $250,000.
4              Brian Fischer:  $250,000.
5              Terrence Tracy:  $250,000.
6              Signed by the foreperson, November 30, 2022.
7              Juror No. 1, does the verdict as published reflect
8    your own true verdict?
9              JUROR NO. 1:  Yes.
10             THE COURT:  JUROR NO. 2?
11             JUROR NO. 2:  Yes.
12             THE COURT:  Juror No. 3?
13             JUROR NO. 3:  Yes.
14             THE COURT:  Juror No. 4?
15             JUROR NO. 4:  Yes.
16             THE COURT:  Juror No. 5?
17             JUROR NO. 5:  Yes.
18             THE COURT:  Juror No. 6?
19             JUROR NO. 6:  Yes.
20             THE COURT:  Juror No. 7?
21             JUROR NO. 7:  Yes.
22             THE COURT:  All right.  Members of the jury, I want
23   to thank you again for your service.  We are all very grateful
24   for your attention and hard work.
25             You will be dismissed at this time, however, we do
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                     Proceedings              383

1    have your lunches.  We will bring it back to the jury room.
2    You're welcomed to enjoy lunch there or take it with you.
3    What I would ask you to do is to make sure to stop by the
4    second floor jury room where you checked in this morning and
5    get your jury paperwork so you can receive your jury service
6    checks and we will have a certificate of your service.
7              Thank you very much.  Everybody stay safe and have a
8    good holiday season.
9              THE JURY:  Thank you.
10             THE COURT:  You're excused.
11             (Jury exits the courtroom.)
12             THE COURT:  All right.  We will be entering judgment
13   on this verdict.
14             Does any party want to make any motions?  If not, we
15   will adjourn.
16             MR. RICKNER:  I suspect the defendants will have a
17   motion, and my only request would be that any application for
18   fees and costs be deferred until after whatever I suspect that
19   they have rather than -- I think it's 14 days statutorily.
20             THE COURT:  I will hear from defense counsel.
21             MS. DURDEN:  Go ahead.
22             THE COURT:  You can have a seat if you'd like.
23             MR. KEANE:  Your Honor, yes, we would like to make a
24   motion.  We would like Your Honor to deem the motion made and
25   permit us a schedule for briefing.
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                     Proceedings              384

1              MS. DURDEN:  Your Honor, we are going to move to
2    vacate the payment of damage award.  We still don't believe
3    that there was sufficient evidence for the jury to find
4    callous or reckless indifference.
5              While we understand that Your Honor decided there
6    was sufficient evidence based upon, in part, the Betances
7    decision.  It was our contention that the decision had to be
8    made based on the evidence as presented to this jury and we
9    believe that that evidence was insufficient for a punitive
10   damage award, and therefore, we will be moving to vacate that
11   award.
12             THE COURT:  Well, you didn't make that argument at
13   any time until now.  All right.  You just asked me to preclude
14   the punitive damages instruction.  And based on my rulings,
15   which relied in large part on Betances, and the Second
16   Circuit's findings regarding the defendants' actions or lack
17   thereof, I believe that this was an issue that should go to
18   the jury, so I denied your request to preclude this
19   instruction on punitive damages.
20             There was not an argument made at any time that the
21   evidence was insufficient, I don't believe.  I'll look at the
22   transcript again.  But in any event, in my view, I believe the
23   evidence is sufficient.
24             These defendants testified that they knew about
25   Earley, that they didn't follow it and that they knew that
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

```
                     Proceedings              385

1    people were being held on invalid post-release supervision and
2    they knew that they were proceeding forward with incarcerating
3    individuals who were serving illegal, invalid PRS terms.
4              Now, if the jury followed my instructions that
5    punitive damages could be awarded based on a callous disregard
6    of someone's constitutional rights, I believe there was
7    evidence to have it go to the jury, if you have, in fact, made
8    that argument.
9              MS. DURDEN:  Your Honor, specifically under the Rule
10   50, we moved to dismiss the punitive damage claim on the
11   grounds that there was insufficient evidence, so I think the
12   record will bear that out.
13             THE COURT:  I don't know that you invoked Rule 50
14   and I was surprised because I thought that you hadn't, but I
15   will review the transcript.
16             MS. DURDEN:  Yes.
17             Your Honor, can we deem the motion made today and
18   have an extension of time to file the papers?
19             THE COURT:  How much time do you need?
20             MS. DURDEN:  Your Honor, can we have until the
21   second week of January so that we have time to do the papers
22   over the holidays?  30 days is the norm, which would bring us
23   to -- what's today?
24             MR. RICKNER:  The 30th.
25             MS. DURDEN:  It would bring us to January 30th.
```

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                    386

1    THE COURT:  Does the Defendant object?
2    MR. RICKNER:  Plaintiff.
3    THE COURT:  I mean, the Plaintiff.  Excuse me.
4    MR. RICKNER:  I have no objection because I actually
5  have a trial in the later part of January, so I would have
6  been asking for an opposition in February anyway because
7  otherwise I couldn't manage my schedule.
8    THE COURT:  I just realized again I start a trial on
9  Monday.  What date did you suggest, ma'am?
10    MS. DURDEN:  January 12th.
11    THE COURT:  All right.  Mr. Rickner, what date do
12  you want to respond?
13    MR. RICKNER:  Assuming the 12th of February is a
14  weekday, then that day.
15    THE COURT:  It is a Sunday, sir.
16    MR. RICKNER:  I will take the 13th instead, please.
17    THE COURT:  Is that President's Day by any chance?
18  You can still file.
19    MR. RICKNER:  I don't take days off really.
20    THE COURT:  February 13th?
21    MR. RICKNER:  That works, Your Honor.
22    MR. KEANE:  And then a week for reply, Your Honor.
23    THE COURT:  All right.  So I think I would like you
24  to observe the bundling rule again, and please give me two
25  courtesy copies of your motion papers, both of you.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                    387

1    You all have the transcript, right?
2    MR. RICKNER:  Yes, Your Honor.
3    MR. KEANE:  Yes, Your Honor.
4    THE COURT:  Okay.  The defendants will reply to the
5  motion on February 20th.
6    I want to thank parties again for their advocacy.  I
7  appreciate how smoothly this case went once it got tried.  I
8  will say I had tremendous concerns about the late arguments
9  that were made and that weren't briefed and it did put
10  tremendous burdens on us, especially over the Thanksgiving
11  holiday.  I'm glad this case has been tried after many long
12  years.  As I said, this is among the oldest case on my docket.
13  I'm glad all the parties had their day in court.  I want to
14  thank all the parties for their excellent advocacy in the
15  trial and I believe the conduct by the attorneys was entirely
16  appropriate and professional and I appreciate that.
17    Be stay safe.  We will enter judgment on this
18  verdict and I will await your motion papers.
19    MR. RICKNER:  Thank you, Your Honor.
20    MR. KEANE:  Thank you, Your Honor.
21    MS. PANOUSIERIS:  Thank you, Your Honor.
22    MR. RICKNER:  Sorry.  One brief question.
23    THE COURT:  Yes, sir.
24    MR. RICKNER:  I believe we have been accruing
25  interest since 2017.  Is that part of the judgment being

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                    388

1  entered or something else I have to do?
2    I'm only bringing it up in case there is a rule that
3  says I have to deal with this today rather than putting in
4  something later.
5    THE COURT:  I think that we will have to understand
6  the rate of interest and the date that you are claiming
7  interest, and I would like to hear from the defendants as well
8  because I'm sure it is significant.
9    MR. RICKNER:  It statutorily pegs to the T-Bill,
10  which means it is all over the place, and it's actually kind
11  of complicated because T-Bills aren't the same.
12    THE COURT:  Well, the federal T-Bill rate is used
13  for post-judgment interest.  For pre-judgment, I don't know if
14  you're looking at New York State interest, which is eight
15  percent or some other rate.
16    You can do the research and the parties should be
17  fully heard on pre-judgment interest.
18    MR. RICKNER:  Okay.
19    THE COURT:  So post-judgment interest will start
20  accruing when we enter judgment on this.
21    MR. RICKNER:  And to the extent that there's any
22  dispute about pre-judgment interest, perhaps we just include
23  it in the briefing schedule that you just mentioned.
24    THE COURT:  That's fine.  We will have to get
25  calculations at some point.  I may call upon the parties to

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Proceedings                    389

1  give me an updated pre-judgment interest amount once I decide
2  that issue.
3    MR. RICKNER:  Right.
4    THE COURT:  And as I said, post-judgment interest
5  will start accruing today or whenever we get that judgment
6  entered.
7    MR. RICKNER:  Understood, Your Honor.
8    THE COURT:  Thank you very much.
9    MR. RICKNER:  Thank you very much.
10    (Matter adjourned.)

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

253

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2
     ------------------------------x
 3                                    12-CV-2137(KAM)
     JESUS SANTIAGO,
 4                                    United States Courthouse
                Plaintiff,            Brooklyn, New York
 5
                - versus -            November 29, 2022
 6                                    9:00 a.m.
     BRIAN FISCHER, individually
 7   and as Commissioner of the
     New York State Department of
 8   Corrections and Community
     Supervision, et al.,
 9
                Defendants.
10
     ------------------------------x
11
              TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
12         BEFORE THE HONORABLE KIYO A. MATSUMOTO
                UNITED STATES DISTRICT JUDGE
13                    BEFORE A JURY
14   APPEARANCES
15   Attorney for Plaintiff: RICKNER, PLLC
                             14 Wall Street, Suite 1603
16                           NEW YORK, NEW YORK 10005
                             BY:  ROBERT HOWARD RICKNER, ESQ.
17                                STEPHANIE PANOUSIERIS, ESQ.
18   Attorney for Defendant: STATE OF NEW YORK
                             OFFICE OF THE ATTORNEY GENERAL
19                           28 LIBERTY STREET
                             LETITIA JAMES
20                           New York, New York 10005
                             BY:  MICHAEL J. KEANE, ESQ.
21                                REBECCA A. DURDEN, ESQ.
22   Court Reporter:         LEEANN N. MUSOLF, RPR, CCR
23                           Phone:  718-613-2374
                             Fax:    718-613-2267
24                           Email:  lmusolf.edny@gmail.com
25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

---

Charge Conference                               254

```
 1              (In open court; jury not present.)
 2         THE COURT:  This is civil cause for a charge
 3   conference in the case of Santiago versus Brian Fischer et al,
 4   Docket No. 12-CV-02137.
 5         Would the parties please state your appearances.
 6         MR. RICKNER:  Robert Rickner appearing for the
 7   plaintiff from Rickner PLLC.
 8         Good morning, Your Honor.
 9         THE COURT:  Good morning.
10         MS. PANOUSIERIS:  Stephanie Panousieris for the
11   plaintiff, as well, from Rickner PLLC.
12         Good morning, everyone.
13         THE COURT:  Good morning.
14         MR. KEANE:  Michael Keane for the defendants from
15   the Office of The Attorney General.
16         THE COURT:  Good morning.
17         MS. DURDEN:  Good morning, Your Honor.
18         Rebecca Durden from the Office of The Attorney
19   General.
20         THE COURT:  Good morning.
21         MS. KOEHLER:  Good morning, Your Honor.
22         Briana Koehler, legal intern from the Attorney
23   General's Office.
24         THE COURT:  Good morning.
25         Okay.  So we posted as Court Exhibits 1 and 1A the
```

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

---

Charge Conference                               255

```
 1   proposed charges based on your submissions, as well as the
 2   verdict sheet, and I'd like to just go through this as quickly
 3   as we can with the goal of being able to make the edits,
 4   repost as final, and then have the jury come in to hear your
 5   summations.
 6         So, I think the most effective way would be for each
 7   party to go through, I'm going to flip through each page, and
 8   if someone has an issue with the charge or the language, they
 9   should speak up.  So let's get started.
10         If the parties would please tell me whether there's
11   anything in the preliminary instructions, the first part, or
12   someone just speak up and tell me where they have an issue
13   identifying the page and the charge number, please, all right?
14         Someone speak up.
15         MR. RICKNER:  Plaintiff, I have no issue -- you're
16   talking about --
17         THE COURT:  Just tell me when there's an issue.
18   Someone speak up.
19         If you need a hard copy, Mr. Rickner, we can give
20   you a hard copy.
21         MR. RICKNER:  I was just going to say, Your Honor,
22   if we're talking about Part 1, I have no objections to any of
23   them.  I do agree with, I think your suggestion that maybe 13
24   and 14 are superfluous but I don't consider them harmful in
25   anyway.  So I just leave it in the Court's discretion as to
```

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

---

Charge Conference                               256

```
 1   whether or not to give those charges.
 2              (Court reporter interrupts for clarification.)
 3         MR. RICKNER:  Let me repeat that, my apologies.
 4         With respect to Part 1, subparts 1 through 15 are
 5   fine with Plaintiffs.  I think the Court is indicating,
 6   through the parentheses, 13 and 14 might be superfluous or not
 7   necessary.  I think that's true in this particular case but if
 8   the Court wants to charge it, I have no objection because I
 9   think it's harmless.
10         MR. KEANE:  Defendants think 13 and 14 should come
11   out so not to confuse the jury.
12         THE COURT:  All right.  So we will delete
13   Instruction Number 13 and 14.
14         What's next?
15         Anything?  Just speak up.
16         MR. KEANE:  Part 2, I guess, now.  It's Subsection
17   A, Subsection C, which is an instruction on nominal damages,
18   now, the -- the Kerman case, which we discussed at the
19   October 25, 2022 conference and was cited in your order,
20   states that, where there is a loss of liberty, which is only
21   one subtype of the compensatory damages, that nominal damages
22   are inappropriate, that the jury must award compensatory
23   damages for a loss of liberty.
24         I don't think that there's any view -- any
25   reasonable juror of these facts to determine that my client
```

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

**JA573**

Charge Conference                           257

1  did not suffer a loss of liberty in an injury. That's the
2  only conclusion here.
3          And I'll also note, and I frankly only found this
4  out yesterday, in the companion Betances litigation, the class
5  action, on the 18th of this month, that was actually
6  Magistrate Judge Lehrburger's exact ruling, which is that
7  punitive damages were not available. So I don't think that
8  this is a case where punitive damages --
9          THE COURT: Punitive damages were not to be nominal.
10         MR. RICKNER: Yes, nominal damages, sorry. Yes, all
11 right. I'll do better next time.
12         Yes, nominal damages were not available because
13 there's an -- then a determination that there was a due
14 process violation. I think there's no view of the facts that
15 there was a loss of liberty. He is entitled to something,
16 understandably. What that something is, is up for dispute,
17 but I think that nominal damages like in Betances should not
18 be charged.
19         THE COURT: Well, let me just say this: I'm aware
20 of the magistrate judge's decision. Obviously, that decision
21 is not binding on any District Court. We follow the Second
22 Circuit and I believe that the case you mentioned earlier is a
23 Second Circuit case.
24         MR. RICKNER: Kermen, yes.
25         THE COURT: Kermen. So with that being said, let me

Charge Conference                           258

1  just double check. I'm just going to look at it really
2  quickly.
3          The case is, for the court reporter and the record's
4  benefit, Kerman, K-E-R-M-A-N versus City of New York, reported
5  at 341 F.3d 91. We're looking at the decision now -- I'm
6  sorry 374 F.3d.
7          Do you have the general cite for the Kerman case
8  that you cited, Mr. Rickner?
9          MR. RICKNER: Yes, I do. I believe it is 15
10 Westlaw. Hold on, let me just find one of the asteric. I'm
11 wondering if on this version of Westlaw, it's just not showing
12 me the --
13         THE COURT: I think in Kerman, the issue was whether
14 the District Court erred by failing to instruct the jury on
15 compensatory damages. It appears the Court there instructed
16 only on nominal damages.
17         MR. KEANE: Your Honor.
18         THE COURT: Yes.
19         MR. KEANE: If I may. I believe, in Kerman, the
20 problem was that the District Court awarded nominal damages as
21 a matter of law, and then that's why Kerman went up to the
22 Circuit. So the Circuit remanded, I believe, for further
23 proceedings on the issue. But I think the reversal of the
24 District Court, as we read Kerman, was simply not that Kerman
25 was necessarily entitled to compensatory and not nominal, but

Charge Conference                           259

1  that the option should have been given to the jury.
2          THE COURT: No, I agree with you. That's just what
3  I said; that the error was not instructing on compensatory.
4  But where does the Circuit say that if there's a
5  constitutional injury, a nominal damage instruction may not be
6  given but only compensatory or punitive damages?
7          MR. RICKNER: It's Subsection 2, Kerman's claim of
8  loss of liberty. And I apologize for not having the cite.
9  It's Subsection 17, if you have Westlaw and you're using their
10 notes, and it, quote, it says, "In contrast, where the jury
11 has found a Constitutional violation and there is no genuine
12 dispute that the violation resulted in some injury to the
13 plaintiff, the plaintiff is entitled to an award of
14 compensatory damages as a matter of law."
15         And my argument here is that no reasonable jury
16 could find that my client suffered zero injury. Perhaps it's
17 not -- they'll decide it's not worth a lot, I understand that,
18 but zero is not a reasonable finding for a jury on these
19 facts.
20         THE COURT: But what you just said does not rule out
21 a nominal damages instruction.
22         MR. RICKNER: I agree with you.
23         THE COURT: And zero is not nominal, nominal is one
24 dollar. I get your point but I'm just saying that the Kerman
25 court found that the failure to give an instruction on

Charge Conference                           260

1  compensatory damages was error and there, the Court only gave
2  a nominal damages instruction. We're doing compensatory and
3  nominal and punitive.
4          MR. RICKNER: And I agree with Your Honor on the
5  first two points. The issue I have is that, as with any jury
6  instruction, where it's not reasonably at issue, there is no
7  reason to give the instruction. And here, because of the way
8  the facts came in, in the proof here, there is no reasonable
9  option, there is no permissible option for the jury to find
10 that there was zero loss of liberty due to defendants'
11 conduct.
12         THE COURT: No, I think that the loss of liberty has
13 been established through other cases, and the Second Circuit
14 has found there was a Constitutional violation, but the jury
15 still must decide whether -- there's a dispute here before the
16 jury, whether the violation resulted in some injury to the
17 plaintiff. And I know you argue that there's evidence, but
18 the jury may not adopt that view.
19         MR. RICKNER: Okay. Well, note my objection. I
20 don't believe the jury would be permitted to adopt that.
21         THE COURT: Well, the evidence that we have about
22 the injury is from Mr. Santiago's testimony. The jury may
23 weigh that evidence differently than you do or make
24 credibility findings, all right? So I don't think that
25 nominal damages are off the table. I don't think it would be

Charge Conference                      261

1   improper or reversible error for you to give the nominal
2   damages instruction, unless you're able to and can cite to
3   language in the Second Circuit's case law that says you cannot
4   give a nominal damage instruction if there is a constitutional
5   violation.
6           MR. RICKNER:  Right.  Well, I think another way of
7   --
8           THE COURT:  Because most trials do involve
9   allegations of constitutional violation.  And I tried a case
10  on this many years ago, where the jury found that there had
11  been the use of excessive force but that it was appropriate
12  due to the circumstances and gave one dollar.  So the juries
13  can find that there is nominal value in a constitutional
14  injury.
15          MR. RICKNER:  I think another way to look at this,
16  and this is coming out of a recent Supreme Court case and I am
17  going to mispronounce it horribly, it's U-Z-U-E-G-B-U-N-A-M
18  versus P-R-E-C-Z-E-W-S-K-I.
19          THE COURT:  Why didn't you cite it in your proposed
20  jury instructions or in some motion that said nominal damages
21  should not be on the table because of this Supreme Court case?
22          Look, we can do this piece by piece, instruction by
23  instruction, you all have had ample time to make motions and
24  to provide authority, and we'll look at the Supreme Court case
25  if you think this is the clencher to make sure we get it

Charge Conference                      262

1   right, because I want to do it right, I don't want to have to
2   do this trial over again, so we'll try to get it right.
3           So I think, respectfully, sir, your statement of
4   Kerman overstates the law.
5           MR. RICKNER:  I want to be clear about my arguments
6   regarding the Supreme Court case.
7           THE COURT:  Don't give me the case name, just give
8   me the cite, please.
9           MR. RICKNER:  Yes, I will in one second.  That's it.
10  It is 141 S. Ct. 792, and it's a standing case that explains
11  that nominal damages operate as a type of declaratory
12  judgment, which is what ultimately providing standing.
13          I acknowledge that this is not a jury instruction
14  case, but my argument here is, if you look at the ultimate
15  holding of this case, which is that nominal damages really do
16  operate as a way of saying you have been injured
17  constitutionally, my argument would be that a nominal damages
18  instruction is not necessary here because we have, in effect,
19  already won nominal damages.
20          THE COURT:  Well, the jury still has to decide
21  whether Mr. Santiago suffered an injury that entitles him to
22  compensatory damages.  So they can give him a dollar or they
23  can give him the compensatory.
24          MR. RICKNER:  I agree with you, Your Honor, but I
25  agree that the compensatory damages instruction is correct and

Charge Conference                      263

1   that any viable range within their -- within discretion.  What
2   I'm saying is for nominal damages, which is an entire separate
3   section, we've, in effect, already won that, so instructing
4   the jury is improper and it not proper for the defense to be
5   able to waive around give them one dollar, to give them one
6   dollar, as part of their closing.
7           That's my argument.
8           THE COURT:  Did you have a general cite for that
9   case, Mr. Rickner, because there's a lot of history how
10  nominal damages have long been awarded in common law.  Let's
11  just get to the point where you believe the holding supports
12  your view of the law.
13          MR. RICKNER:  Yes, that would be -- underneath
14  Subsection A(4), starting, "But cases at common law paint a
15  different picture.  Early courts require the plaintiff prove
16  actual monetary damages in every case."  And then it --
17  skipping over the citations, "Later courts, however, reasoned
18  that every legal injury necessarily causes damage, so they
19  awarded nominal damages absent evidence of other damages."
20          THE COURT:  Right.  I'm saying that I get the
21  history.  I'm looking for the holding that you said the
22  Supreme Court made in this case.
23          MR. RICKNER:  The ultimate holding was that because
24  you could prove nominal damages even without actual damages,
25  that allowed you to obtain standing.

Charge Conference                      264

1           And it's an odd way to bring up this principle, but
2   I think that under the Supreme Court's reasoning, the reason
3   you get standing is because you don't actually have to prove
4   monetary injury.  If you prove legal injury, you've proved
5   your nominal damages and, therefore, get your ticket into
6   court.  And that's the same thing I'm saying here.  We've
7   proven liability, we've proven the constitutional injury, and,
8   therefore, we've already, in effect, won nominal damages.
9           THE COURT:  I'm looking at Subsection 19 through 21,
10  the Supreme Court says, "We hold only that, for the purpose of
11  Article III standing, nominal damages provide the necessary
12  redress for a completed violation of a legal right.  Applying
13  this principle here is straightforward.  For purposes of this
14  appeal, it is undisputed that Uzuegbunam experienced a
15  violation of his constitutional Rights when respondents
16  enforced their speech policies against him.  Because, quote,
17  every violation of a right imports damages," citing Webb,
18  "nominal damages can redress Uzuegbunam's injury even if he
19  cannot or chooses not to quantify that harm in economic
20  terms."
21          So I don't -- again, respectfully, I don't think
22  that this case supports your view of the law.  I'm going to
23  give the nominal damage instruction because I think the jury
24  still has to decide whether Mr. Santiago has proven he
25  suffered injuries for which he can be compensated beyond

Charge Conference                           265

```
 1   nominal damages.  And if the jury finds that he has, then
 2   they'll award compensatory damages and not nominal damages.
 3              MR. RICKNER:  I understand, Your Honor.
 4              THE COURT:  Can we move on?
 5              MR. RICKNER:  And that, actually, is the end of my
 6   comments on the charge.
 7              THE COURT:  All right.
 8              Do the defendants have any issues regarding the
 9   damages instructions or anything else?  Because I don't want
10   you jumping up in the middle of my instructions telling me
11   that you have an issue.
12              MR. KEANE:  Thank you, Your Honor, that's fine.
13              Page 23, the -- and here, I think Your Honor's
14   statements during the trial were focused on this specific
15   case, and starting with the paragraph, I stress again,
16   "Defendants have been found liable for violating
17   Constitutional rights."  And then where the phrase -- the
18   clause begins, "By imposing post-release supervision where a
19   sentencing judge did not.
20              I think here, the evidence was that PRS was imposed
21   in 2004, pre-Earley, but the constitutional violation was the
22   third clause beginning with, "By refusing to ask a judge to
23   resentence the plaintiff and/or by enforcing the illegal
24   post-release supervision," I think that's where the
25   constitutional violation is.  I believe the Earley case did
```

Charge Conference                           266

```
 1   not require vacater, and I think since Earley is in evidence,
 2   we -- the second by-phrase could be deleted, as well.
 3              So, those three clauses, beginning by -- I think
 4   normally, the third one is applicable here.
 5              THE COURT:  I think that Betances has made pretty
 6   clear and very clear, and Betances said that Earley made it
 7   very clear, that the imposition by the defendants of
 8   post-release supervision where a sentencing judge did not, was
 9   a violation.  Now, granted, that was before the Earley
10   decision, but they found that the act of administrative
11   imposition of post-release supervision violated the
12   Constitution.
13              MR. KEANE:  That is correct, Your Honor.
14              THE COURT:  The Court also found that because it was
15   null and void, Betances said that the defendants have the
16   ability to vacate the illegal post-release supervision or to
17   ask a judge to resentence the plaintiff or -- and that by
18   enforcing the illegally imposed post-release supervision, he
19   was incarcerated.
20              Now, I'm just reading from the Betances Decision,
21   which I think resolves a lot of your arguments, sir, Betances,
22   B-E-T-A-N-C-E-S, versus Fischer, 837 F.3d 162 at page 173
23   under the section The Scope Of Defendants Responsibilities:
24              "The defendants seek to diminish the scope of their
25   obligations under Earley I by arguing that they reasonably
```

Charge Conference                           267

```
 1   believe that their only responsibility was to prepare for
 2   individual sentencing when requested by the defendants,"
 3   meaning the defendants who are incarcerated.  "This argument
 4   makes no sense when applied to the subject offenders who
 5   suffered post-active POS violations against those whom DOCS
 6   took into custody after we denied the hearing of Earley I,"
 7   that's Mr. Santiago.  "The appropriate remedy for these
 8   offenders was not to administratively add PRS terms," and I
 9   understand his was added before Earley, "and then prepare for
10   resentencing if and when requested.  DOCS's duty was to enter
11   the sentence imposed by the judge, and that sentence, only,
12   without the PSR term required by Section 70-45.  And then to
13   ensure that by the time the inmate left the custody of DOCS,
14   to begin serving any PRS term, the term had been pronounced by
15   the judge."
16              Here, we have a situation where Earley advised the
17   defendants that, and they all understood it and they all
18   decided affirmatively not to follow it in 2006, they knew that
19   they should not have imposed it.  It was not appropriate for
20   them to sit back and wait for a defendant to make a motion in
21   court, according to the Betances.  And between 2006 and 2007
22   when Mr. Santiago was brought back to New York to face the
23   consequences of his violation of PRS, they didn't bother to
24   get the minutes at that time or to figure out whether the PRS
25   had, in fact, been imposed or confirmed that, in fact, it had
```

Charge Conference                           268

```
 1   not been imposed, they charged ahead and sought to
 2   re-incarcerate him, so he was re-incarcerated, and so I think
 3   that's an issue, that evidence is in the case and it certainly
 4   is, in fact, what the Betances was dealing with.
 5              MR. KEANE:  Your Honor, I think you're holding, in
 6   this case, limited the -- or framed the constitutional
 7   violation as the events beginning in 2007 when -- and the
 8   situation there.  It is true --
 9              THE COURT:  All right.  So let's do this:  The first
10   sentence will come out, but it will be combined with the first
11   clause, okay?
12              So, what I'm striking is, "By imposing post-release
13   supervision where a sentencing judge did not."
14              MR. KEANE:  I'm sorry, Your Honor, you're leaving
15   that clause in?
16              MR. RICKNER:  Taking out.
17              MR. KEANE:  Taking out, I'm sorry.
18              THE COURT:  The next clause, "By refusing to vacate
19   the illegal post-release supervision," that stays because the
20   Betances makes clear that that's what they should have done.
21   "By refusing to ask a judge to resentence the plaintiff and/or
22   by enforcing the illegal post-release supervision against
23   plaintiff which led to his re-incarceration for violating his
24   invalid count of PRS."
25              All right.  So, Mr. Keane, we are striking that
```

Charge Conference                    269

1   first clause.

2           MR. KEANE:  And, Your Honor, I think we would just

3   put our objection on the record --

4           THE COURT:  You've objected, yes.

5           MR. KEANE:  -- the two clauses.

6           THE COURT:  Anything else?

7           MR. KEANE:  I think that's it, Your Honor, from the

8   defendants.

9           THE COURT:  Well, I think what you should do is also

10  consider what we talked about regarding whether the jury needs

11  to find each defendant liable for the damages.  I mean, I

12  could imagine a scenario where the jury find that Mr. Annucci

13  bears more responsibility for Mr. Santiago's damages than Mr.

14  Fischer or Mr. Tracy, sorry.

15          So I wanted to go over this with you all and I want

16  you to be able to look through the provisions in these

17  instructions, and let's just really make sure that there are

18  no problems with it.

19          Page 24, please look at that, Damages Generally.

20  Starting with the second full paragraph, "If you find that the

21  plaintiff has proven, etc.," I think that, generally, when we

22  have multiple defendants on trial, it is proper to tell the

23  jury they must make individualized determinations as to

24  damages as to each defendant.

25          I'm not sure that the defendants necessarily would

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

---

Charge Conference                    270

1   want a gross number awarded against them.  So, for example, if

2   the jury really believed that one of the defendants had no

3   responsibility for damages, that particular defendant would

4   not necessarily want a court record he owed damages,

5   compensatory damages for a constitutional violation.  And I'm

6   just wondering if we ought to leave the instruction that they

7   have to make individualized assessments against each

8   defendant.

9           MR. RICKNER:  Plaintiff's position -- and I was

10  going to talk about this with respect to the jury --

11          THE COURT:  Yes, but it's in the instruction so

12  let's talk about that first.

13          MR. RICKNER:  Well, I'm agreeing with you to the

14  extent of an individualized determination.  The question,

15  "Were there any damages proven caused, yes or no," doing that

16  individually does make sense in light of Your Honor's rulings

17  that we have not yet established as a matter of law for his

18  injury.

19          As to the number, I believe it is joint and several,

20  so that's why I was saying that I --

21          THE COURT:  Why do you believe that?

22          MR. RICKNER:  Because there's no contributions,

23  there's no division when there's a unitary injury.  I think

24  that -- and every other 1983 case that I've done, when it

25  comes to the number, it is a gross number.

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

---

Charge Conference                    271

1           Now, it may be that, let's say Mr. Fischer, there's

2   no establishment that he has caused the damages, he didn't --

3   he wasn't a participant in the injury, so to speak, only the

4   other two were.  So if the jury agreed with that, for the

5   first part of your verdict form, it would be yes, yes, no.

6   But then when it comes to the number, it would just be, you

7   know, for the defendants where damages were determined, it is

8   X.

9           THE COURT:  Well, can we talk about the instruction

10  on 24.  Do you have any quarrel with it?

11          MR. RICKNER:  No.  What I'm saying is I don't have

12  any quarrel with -- I think this is absolutely right on the

13  law.  I'm just saying the way that the jury is being asked to

14  notate it, I think is --

15          THE COURT:  All right.

16          Does the defense have any issue with it?

17          MS. PANOUSIERIS:  I think we're actually in

18  agreement.

19          THE COURT:  All right.  If there's nothing else,

20  we'll go to the verdict form.  I just need a statement on the

21  record from the lawyers if you have any issues or you agree

22  with it.  So thank you for both finally confirming that.

23          All right, Verdict Form.  Number 1.  Any issues with

24  that?

25          MR. RICKNER:  I think that --

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

---

Charge Conference                    272

1           THE COURT:  We'll strike, "Administratively imposing

2   an illegal sentence of post-release supervision."

3           MR. RICKNER:  I think that maybe if Your Honor is

4   going to include this piece, I guess this parenthetical, that

5   it should just match the jury instructions rather than being

6   similar but rephrasing them, which is how I see it here.

7           THE COURT:  Then -- so the jury instructions --

8   yeah, the jury instructions at page 23, re-enter the dates

9   which led to his re-incarceration between -- between, I'm

10  putting the dates, it would be June 2007 to February 2008.

11  You can get the exact dates.

12          MR. RICKNER:  June 12, 2007 to February 6, 2008, is

13  what is in the stipulation.

14          THE COURT:  Thank you.  So we'll put that date in

15  the charge on page 23 and I'll put the actual dates, June 12th

16  and February 6th.

17          MR. RICKNER:  Oh, my associate is noting, on page 24

18  at the top, the date says February 8th for the 2008 reentry

19  date, and I believe it's February 6th is the date --

20          MR. KEANE:  Yeah.  I do think, as far as

21  incarceration goes, I think the date is really February 1st.

22  The February 6th comes from -- that was the last date he

23  reported to parole.  So February 1st may be the more

24  appropriate date.

25          MR. RICKNER:  I agree.

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Charge Conference
273

1    THE COURT:  So we're going to change the February

2  date to February 1, 2008 in all places.

3    MR. RICKNER:  Yeah.

4    THE COURT:  Is that in the stip?

5    MR. RICKNER:  The stip actually says the 6th, but

6  I --

7    THE COURT:  We'll change it.

8    MR. RICKNER:  But I actually agree with Mr. Kerman

9  on Your Honor's point.

10    THE COURT:  We redid your stip, although we

11  probably, in retrospect, probably should have had you do it.

12    So paragraph 37, your stipulation, can you look at

13  that?  It should be February 1, 2008.

14    MR. RICKNER:  Yes.

15    THE COURT:  And then, so, paragraph 33, should that

16  date be -- somehow, we have to give, in the stip, the date he

17  was in New York State custody.

18    Does that happen when he's released by BOP in West

19  Virginia and extradited to New York or did that start when he

20  actually lands in New York?  Because you have June 12th.

21    MR. RICKNER:  So, the reason the June 12th date --

22  there's a few steps here.  He goes from a federal facility to

23  a county facility.

24    As of June 12th, my understanding of Your Honor's

25  prior ruling is, at this point, he's being -- he is

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Charge Conference
274

1  incarcerated, he's being held pursuant to the parole warrant.

2  There is some time before he gets to state.  But I think for

3  the basic fact he's incarcerated and he's incarcerated because

4  of the power of New York State --

5    THE COURT:  Right.

6    MR. RICKNER:  -- is correct.  So I think just

7  keeping it simple and keeping it June 12th is best.

8    THE COURT:  Well, that's not my question.  If you

9  look at paragraph 33 of the stipulation, it gives a date for

10  being released, so.

11    MR. RICKNER:  I see.

12    THE COURT:  I want to give the right date for when

13  he was in custody, and June 12th is the right date but where

14  do we put that date in?

15    MR. KEANE:  I think Mr. Rickner and I are in

16  agreement perhaps paragraph 33 should read, "On June" it

17  can keep reading, "June 6th he was released and extradited to

18  New York, but extradited on June 12, 2007."

19    (Continued on the following page.)

20

21

22

23

24

25

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Charge Conference
275

1    THE COURT:  Okay.  So what if we strike -- do you

2  want to take the June 6th date out and just say:  Mr. Santiago

3  was released from the Bureau of Prisons in West Virginia and

4  extradited to New York to answer the charges and was

5  incarcerated in New York as of June 12th?

6    MR. KEANE:  And I think the only -- he was

7  exclusively held on the parole warrant on June 12th.  It's not

8  clear whether he was in transit still at that time, so the

9  parole custody -- New York custody started June 12th, so maybe

10  -- and while he was released on June 6th, as Mr. Santiago

11  testified, I believe, he was held in a regional jail, not a

12  Bureau of Prisons, for a few days.  The key date -- the

13  relevant date for New York custody is June 12th, so --

14    THE COURT:  I'm just asking for the language,

15  Mr. Keane.

16    MR. KEANE:  I think we could say he was released

17  from the Bureau of Prisons and extradited on June 12th, 2007,

18  to New York .

19    THE COURT:  Okay.  Thank you.

20    Now, also, this says West Virginia.  We've heard

21  North Virginia, we've heard Virginia.  Which is it?

22    MR. KEANE:  In paragraph 33, it is West Virginia.

23    THE COURT:  Okay.  So we're taking out the date on

24  June 6th, 2007, at the beginning of paragraph 33.  It will

25  read:  Mr. Santiago was released from the Bureau of Prisons in

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference
276

1  West Virginia and extradited on June 12th, 2007, to New York,

2  et cetera, right?

3    MR. RICKNER:  Yes.

4    MR. KEANE:  That's fine with us.

5    THE COURT:  All right.  And everywhere else we have

6  those dates we have to change it.  June 12th, 2007, to

7  February 1st, 2008.  And that change in paragraph 37 will now

8  reflect that February 1st is the operative date.

9    MR. KEANE:  And I think the only other spot I see

10  that is at paragraph 40 where February 6th should be changed

11  to February 1st.

12    THE COURT:  Thank you.

13    All right.  Now, we'll go to the verdict sheet.

14    I'm sorry, one more catch on

15  paragraph 37, it's -- there's a February 2nd and that should

16  probably be changed to February 1st.

17    MR. RICKNER:  My understanding is -- not to be too

18  technical, he's in through February 1st, released on the 2nd.

19    MR. KEANE:  Okay.

20    MR. RICKNER:  So I think that's accurate and not

21  confusing.  I mean, we don't want to break it down to which

22  time of day and stuff.

23    THE COURT:  So what do you want?  Do you want

24  February 1st or February 2nd?

25    MR. RICKNER:  He was incarcerated on February 1st

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

```
                    Charge Conference              277

 1   and released on the 2nd.

 2           THE COURT:  So do you want paragraph 37 to say

 3   February 2nd?

 4           MR. RICKNER:  Yes.

 5           THE COURT:  Don't you think that's going to confuse

 6   the jury?

 7           MR. RICKNER:  He's in through the 1st and released

 8   on the 2nd.  I guess I don't find it confusing, but maybe I'm

 9   missing something here, otherwise we have to get the time of

10   day.

11           THE COURT:  All right.  So in paragraph 40, do you

12   want that to say February 2nd as well?

13           MR. RICKNER:  Yes -- the 1st.

14           THE COURT:  I'm sorry?

15           MR. RICKNER:  The 1st.  Incarcerated through the 1st

16   and released on the 2nd.

17           THE COURT:  I respectfully think that the simpler

18   you make this for the jury the better, and so we have been

19   giving them June 12th, 2007, to February 1st elsewhere

20   throughout this, but you want to put the date as February 2nd

21   in paragraph 37 and in paragraph 40.

22           MR. RICKNER:  I agree, Your Honor.  And I think

23   Mr. Keane agrees as well, if I'm understanding his hand

24   gesture.

25           MR. KEANE:  I think make it simple, as the judge
```

```
                    Charge Conference              278

 1   suggested.

 2           THE COURT:  Don't have inconsistent dates, all

 3   right?  Because I'm instructing the jury that they must accept

 4   the stipulation as established, so if you've got different

 5   dates here that are inconsistent, what are they supposed to

 6   do?  They are going to get confused.

 7           So we can add language that he was ordered released

 8   on February 2nd, but he didn't actually get released until

 9   February 2nd, if that's better for you.  There's so many dates

10   here; I would be confused if I were a juror.

11           MR. KEANE:  I think Mr. Rickner and I are in

12   agreement that --

13           THE COURT:  So give me the date --

14           MR. KEANE:  -- a single date of February 1 would

15   probably be the most accurate thing to say.

16           MR. RICKNER:  Fine.

17           THE COURT:  That's not what he said earlier.

18   February 1st is the date we're going to use, correct?

19           MR. RICKNER:  Yes.  We will use that.

20           THE COURT:  All right.  So can we return to the

21   verdict sheet now, please?

22           MR. RICKNER:  Yes, Your Honor.

23           THE COURT:  So the verdict sheet at paragraph 1 will

24   pull from the instruction where we stated the nature of the

25   constitutional violation and date will be June 12th through
```

```
                    Charge Conference              279

 1   February 1st, all right?

 2           And then do you have any issues with anything else

 3   in verdict sheet item one?

 4           MR. RICKNER:  No, Your Honor.

 5           THE COURT:  All right.  What about --

 6           MR. RICKNER:  For the second item, I think that in

 7   the second sentence we're missing a word.

 8           THE COURT:  Just a minute.  What we're going to do

 9   is -- the last clause in paragraph 1, I'm striking the number

10   two and paragraph -- what is now numbered paragraph 3 will

11   become number 2, all right?

12           And where is the word missing, Mr. Rickner?

13           MR. RICKNER:  If I'm reading section two, it says:

14   If your answer is yes as to any defendant, proceed to question

15   two.  If your answer is no as to any or all defendants, only

16   answer question six as to defendant.

17           And is it that defendants?  That defendant?  Those

18   defendants?  I'm just not getting the wording here.

19           THE COURT:  I think we can add the word "that

20   defendant."

21           MR. RICKNER:  And maybe with a parenthetical S or

22   something, because there could be two instead of one.

23           MS. DURDEN:  Why would they go to punitive damages

24   if the answer is no as to that defendant?

25           MR. RICKNER:  You can award punitive damages for a
```

```
                    Charge Conference              280

 1   violation of somebody's --

 2           MS. DURDEN:  No, no.  What I'm saying is question

 3   one asks if you find that the defendant is liable, if you

 4   answer no, then --

 5           MR. RICKNER:  I see --

 6           THE COURT:  All right.  So you want to take out the

 7   instruction to go to question six completely?

 8           MS. DURDEN:  Yes.

 9           MR. RICKNER:  Yes, I think that's the clearest.

10           MS. DURDEN:  Yes.

11           THE COURT:  Well, if their answer is no, then they

12   sign the verdict form and they're done, aren't they?

13           MS. DURDEN:  Right.  But this says they should go to

14   question number six.

15           THE COURT:  Right.  No.  I'm saying we're going to

16   strike out that second sentence, but if your answer is yes,

17   you proceed to question two, but if your answer is no, sign

18   the verdict sheet.

19           MS. DURDEN:  Yes, Your Honor.

20           MR. RICKNER:  I believe that they can award punitive

21   damages even if they only otherwise award nominal damages, so

22   I think the correct statement of the law would be:  If your

23   answer is no as to all defendants, move to question -- and I

24   think it would actually be five, because that's the punitive

25   damages one.
```

Charge Conference                          281

 1          MS. DURDEN:  You can't have punitive damages if they
 2   find that --
 3          THE COURT:  Right.
 4          MS. DURDEN:  -- there was no injury.
 5          MR. RICKNER:  Actually, I believe --
 6          MS. DURDEN:  You have to at least give nominal
 7   damages in order to get a punitive damage award in the absence
 8   of any injury.
 9          MR. RICKNER:  Well --
10          THE COURT:  Okay.  We had a little numbering error
11   here, so I think once we straighten that out, you won't be
12   confused.
13          All right.  So the last -- in paragraph 1 at the end
14   where we give them instructions, that should not be number 2.
15   Rather the following number 3 is now number 2.  Number 4 is
16   now number 3, et cetera, right?  Well, the point that
17   Ms. Durden is making is that if they don't find there is any
18   injury, then they can still consider nominals or they can't?
19   I think she's arguing they can't.
20          THE CLERK:  Do you feel that way if it goes to
21   nominals?
22          MS. DURDEN:  Do I feel that they can't go to
23   punitives if they --
24          THE COURT:  No.
25          THE CLERK:  No, no.  We never meant for it to go

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                          282

 1   straight to punitives.  Once we fix the numbering -- there's a
 2   formatting issue, the numbering got switched up, but what that
 3   statement was supposed to lead to was if you find no to any of
 4   the defendants, it would go straight to nominals.
 5          MR. KEANE:  I think correct.
 6          MS. DURDEN:  Yes, but we would ask that the nominal
 7   question be put directly after compensatory and before
 8   punitives.
 9          MR. RICKNER:  I think that's -- I'm in agreement,
10   which is to say that if no compensable damages are proven for
11   any defendant, that they would simply skip to the nominal
12   damages.  And then if they've awarded either nominal or
13   compensatory, they can move on to punitive damages.
14          THE CLERK:  Can you get punitive damages if they
15   were to only award nominal, though?
16          MR. RICKNER:  I believe you can.
17          MS. DURDEN:  I think you can.  But then there
18   becomes that whole issue with proportionality and --
19          THE COURT:  Right.  It may be unsustainable, but
20   you are still allowed to get it.
21          THE COURT:  Why do we want to create an issue?  You
22   know, it doesn't seem to me -- even if you can, I think the
23   case law is that if the punitive damages exceed the
24   compensatory or nominal damages, then you've got this great
25   sort of imbalance and it violates the Constitution.  Why do we

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                          283

 1   want to encourage them to do something that's not going to be
 2   sustainable in a post-trial motion or on appeal?
 3          MR. RICKNER:  It actually --
 4          THE COURT:  I would like to actually try to get it
 5   right, please.
 6          MR. RICKNER:  I understand, Your Honor.
 7          THE COURT:  So give me authority.  Look, you had
 8   opportunities, again, to submit verdict sheets, laws, motions,
 9   and here we are.  Give me a case law that for the concept that
10   if they find that Mr. Santiago has not proven that he was
11   injured by any of the defendants, that he should still be able
12   to get punitive damages.  That just seems so illogical.  How
13   could a person be liable for punitive damages if the jury
14   finds they haven't injured a plaintiff?  It's just unsound law
15   to me.
16          MR. RICKNER:  The answer is, is it's for the
17   provided constitutional violation even if they haven't proven
18   beyond nominal damages, they can still find the constitutional
19   violation to be sufficiently reckless, problematic, that then
20   punitive damages are awarded.
21          And I understand your multiplier argument, but my
22   understanding of the case law -- and I'm trying to find a
23   prior brief I wrote on this --
24          THE COURT:  Well, your brief isn't authority that
25   I'm going to follow.  Respectfully, I'm going to follow the

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                          284

 1   Second Circuit and the Supreme Court.
 2          MR. RICKNER:  Well, no, no.  I meant the citations
 3   that I can give to you, not that I thought my brief was
 4   authoritative.
 5          But my point being is that I believe there's a
 6   sliding scale that as the compensatory damages get smaller,
 7   the potential multiplier for a punitive damages award gets
 8   larger.
 9          (Pause.)
10          MR. RICKNER:  So I do have authority.
11          THE COURT:  Okay.  We have some, too.  Just one
12   moment.
13          (Pause.)
14          THE COURT:  There's authority, we're looking at
15   Payne vs. Jones, 711 F.3d 85, decided by the Circuit in 2013,
16   and that case was a little different because there was a
17   punitive damages award and a compensatory nominal damages
18   award of $1.  It was nominal and punitive together, not
19   compensatory, but they upheld the notion that you can have
20   both punitive damages and nominal damages where there's a
21   small injury but very reprehensible conduct.
22          So they cite a case Lee, 101 F.3d at 811, where the
23   plaintiff was awarded $1 in nominal damages and $200,000 in
24   punitive damages on a malicious prosecution claim, and the
25   Circuit in that case reduced the punitive damages award to

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                                         285

1   $75,000 and felt that a 1 to $75,000 ratio was appropriate on

2   the facts of that case.

3        In State Farm, the Supreme Court noted that when

4   compensatory damages are substantial, that a lesser ratio,

5   perhaps only equal to compensatory damages, can reach the

6   outermost limit.

7        So, all right, let's talk about the verdict sheet,

8   then.

9        So I think the jury should still be instructed to go

10  to question six, which is the nominal damages instruction.

11       Now, you want to move this all around.  I'm not

12  quite sure why.

13       Do you want to put the nominal damages as number

14  two?

15       MS. DURDEN:  Yes.

16       THE COURT:  Okay.  We're going to have to renumber

17  everything else, but that's okay.

18       MR. RICKNER:  I think I agree with defendants' view

19  on the flowchart here, which is first they address one and/or

20  two, depending on how they decide to rule, and then they move

21  to three if one and/or two is satisfied.  And three being

22  punitive.

23       THE COURT:  All right.  So why don't you help out

24  here.

25       MR. RICKNER:  Sure.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                                         286

1        THE COURT:  I appreciate that you are in agreement.

2        So now we have to restructure all the numbers and

3   the instructions.

4        So if your answer is yes to question one as to any

5   defendant, proceed to question two.  If your answer is no as

6   to any or all of the defendants, only answer question two as

7   to that defendant.

8        Right?

9        MR. RICKNER:  Mm-hmm.

10       THE COURT:  Okay.  And then I think an additional --

11  if your answer is no to all defendants, move on to the nominal

12  damages question, which I believe you have posed is going to

13  be three or four.

14       MS. DURDEN:  I think it will become four.

15       THE COURT:  So what was item seven and is now item

16  two will read:  What award of nominal damages not exceeding

17  one dollar do you award to plaintiff?  Only answer question

18  two if you answered no to question one.

19       Correct?

20       MR. RICKNER:  Yes.

21       MS. DURDEN:  That makes sense.

22       THE COURT:  And then number three stays the same?

23       MS. DURDEN:  Your Honor, I think counsel -- we're

24  all in agreement that that should just -- wait.  The new

25  three?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                                         287

1        THE COURT:  No.  What we've done now is we've taken

2   paragraph 7 of your request and moved it and changed it to

3   paragraph 2, and it's being moved right after paragraph 1.

4        Okay?

5        MR. RICKNER:  Mm-hmm.

6        THE COURT:  And then we have to give them

7   instructions.  On item two, which is the nominal damages item

8   -- well, rather than say yes or no, it will just have a blank

9   with a dollar sign, okay?

10       MR. KEANE:  Yes.

11       THE COURT:  It could be a dollar; it could be less

12  than a dollar.

13       Now, do they need to proceed to item three?  Then we

14  say proceed --

15       MR. KEANE:  If the answer to two is nominal damages,

16  then it would skip over the compensatory and go straight to

17  the punitive.

18       MS. PANOUSIERIS:  I believe, Your Honor, in your

19  instruction under number one it would say:  If your answer is

20  yes to any of the defendants, proceed to -- are we proceeding

21  to three, then?  Because we said:  If no, you proceed to two.

22       Is that correct?

23       MR. KEANE:  Right.

24       THE COURT:  I think that if they answer yes to any

25  defendant, that there has been proof of the injury -- you

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                                         288

1   still had asked me to move nominal damages, so they proceed to

2   question two.

3        MS. DURDEN:  Correct.

4        MR. KEANE:  Correct.

5        THE COURT:  And if your answer is no as to any or

6   all of the defendants, only answer question two as to that

7   defendant, right?

8        MS. DURDEN:  Yes.

9        MR. KEANE:  Yes.

10       THE COURT:  Now, question two, which was question

11  seven, says:  What award of nominal damages not exceeding one

12  dollar do you award to plaintiff?  Only answer question two if

13  you answered no to question one.  And then there's just going

14  to be a dollar, you know, amount to fill in.

15       MR. RICKNER:  Wouldn't that be no to question one as

16  to all defendants?

17       THE COURT:  Okay.

18       MS. DURDEN:  No objection.

19       THE COURT:  I beg your pardon?

20       MS. DURDEN:  I said we have no objection to that.

21       THE COURT:  So we need to give them instructions

22  after item two.

23       THE CLERK:  We'll write:  If your answer is one

24  dollar to question two, you should proceed to question five,

25  which is the punitive damages question then.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge Conference                    289

1      MS. DURDEN:  Yes.

2      MR. RICKNER:  Yes.

3      THE COURT:  So what was -- what is question five

4  will say:  If your answer is yes as to question five, proceed

5  to question six.

6      All right?

7      Last sentence is stricken.  If your answer is no,

8  proceed to question six.  That's out.

9      MR. RICKNER:  Correct.

10     THE COURT:  And then question six -- and then number

11 three should be fine.  If your answer -- but it says now:  If

12 your answer is yes to question three, proceed to question

13 four.

14     Right?

15     MS. DURDEN:  Yes.

16     MR. RICKNER:  Right.  With the change that I believe

17 we've agreed upon earlier, that question four will simply have

18 a single line as to total damages.

19     THE COURT:  I don't think that's what we agreed to,

20 sir.  I think what we talked about was making individualized

21 assessments as to whether the defendant owes damages to

22 Mr. Santiago, and then there's a total at the bottom.  Why

23 doesn't that work?

24     MR. RICKNER:  I thought we were in agreement with

25 this with the defendants, but I think as to whether or not

Charge Conference                    290

1  compensatory damages have been proven at all, the yes/no

2  question, that's individualized.

3      As to the ultimate damages award, it's a single

4  number which reflects the law because there's joint and

5  several liability for single injury under 1983, but also

6  avoids the double counting problem, which could cause some

7  mischief later.

8      MS. DURDEN:  Yes.  And we are in a hundred percent

9  agreement with that, that it should be just one line for the

10 amount of compensatory damages.

11     THE COURT:  So by preponderance of the evidence,

12 then, should we strike "against each defendant"?

13     MR. KEANE:  Yes.  Against defendants --

14     MS. DURDEN:  You have found liable.  Oh, no, not --

15 yeah, let's just strike it.  That might be the easiest thing.

16     MR. RICKNER:  Just plain.

17     MS. DURDEN:  Just plain, yes.

18     THE COURT:  So we'll have a question mark that

19 follows the word "evidence," and that's the end of it.  And

20 then "against each defendant" is stricken, right?

21     MR. KEANE:  Correct.

22     THE COURT:  And then we take out the individualized

23 lines for each defendant and then just write "amount."

24     MR. RICKNER:  Correct.

25     MR. KEANE:  Agreed.

Charge Conference                    291

1      THE COURT:  And the way to get to item three is

2  through item one.  I think for every instruction they have to

3  be told where to go depending on their answer, and that's what

4  makes it a bit challenging.

5      All right.  We're going to redraft this.  We still

6  have time before the jury shows up.  Maybe Ms. Long can email

7  it to all of you and we can look at it one last time so we

8  don't have to go up and print it and all of that.

9      MR. RICKNER:  That would be terrific.

10     Thank you.

11     THE COURT:  This is going to be Court Exhibit 2, the

12 instructions, and 2A.

13     (Court Exhibit 2 and 2A, were received in evidence.)

14     THE COURT:  And this is it, guys.

15     Just to be clear, what will be on the docket, then,

16 as Court Exhibit 2 and 2A, will be the charges as Court

17 Exhibit 2, the verdict sheet as Court Exhibit 2A, the word

18 "draft" will be eliminated wherever it appears on these

19 documents, and that will be the final.  Well, famous last

20 words.

21     MR. RICKNER:  Understood, Your Honor.

22     THE COURT:  We'll fix it before we post the final.

23 Hopefully no more fixes, but...

24     And do any of you want to undertake fixing the

25 stipulation?  This is the stipulation --

Charge Conference                    292

1      MR. KEANE:  Yes, we can do that.

2      THE COURT:  Why don't you take a look at it, pass it

3  around, and we'll print a clean copy and put it in the record

4  for the jury.

5      MR. RICKNER:  Yes, Your Honor.

6      Any chance this is going to settle now at the

7  eleventh hour?

8      MR. RICKNER:  We haven't discussed it, and I think

9  that --

10     THE COURT:  All right.  We're emailing each of you a

11 copy of the corrected stip.  And check the dates especially,

12 please, and the instructions, and verdict sheet.

13     MR. RICKNER:  Mm-hmm.

14     THE COURT:  May I ask how long the parties think the

15 summations will take?  You will want rebuttal?

16     MR. RICKNER:  I would like rebuttal.  I'm shooting

17 for the 15- to 20-minute range.

18     MS. DURDEN:  Same, Your Honor.

19     MR. RICKNER:  I may fail, Your Honor, but that is my

20 goal.

21     THE COURT:  I'm just thinking of timing.

22     So it is possible -- I'm planning to charge the jury

23 today and have them start deliberating.

24     MR. RICKNER:  I think they could be deliberating by

25 three o'clock, right?

**JA582**

```
                        Charge Conference              293
1            THE COURT:  Yes.  And we'll see if we get a verdict
2   today or tomorrow.
3            MS. DURDEN:  Your Honor, you're going to have
4   plaintiff, defendant, plaintiff for the closing?
5            THE COURT:  Yes.
6            MS. DURDEN:  Perfect.
7            THE COURT:  I know sometimes they flip that around.
8            MS. DURDEN:  So a lot of judges only will do
9   defendant, plaintiff, and that's it.
10           MR. RICKNER:  Which, for what it's worth, that is
11  the state law practice.
12           MS. DURDEN:  But that's what I usually have in
13  federal court.
14           THE COURT:  Seriously?
15           MS. DURDEN:  Yes.  Defendant, plaintiff in the civil
16  actions.
17           THE COURT:  In this courthouse?
18           MS. DURDEN:  In the Southern District.
19           THE COURT:  I've never done it that way, and I don't
20  know that my colleagues do it that way, but --
21           MS. DURDEN:  I will say may favorite was one of the
22  judges who actually charged the jury before closings so that
23  the jury would have in their mind the legal standards prior to
24  hearing the arguments.
25           THE COURT:  We could do that, too.  Would you
```

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

```
                        Charge Conference              294
1   rather?
2            MR. RICKNER:  I don't think I would rather.
3            THE COURT:  Well, because it -- you know, I think
4   that it seems a little awkward, and some judges don't like
5   lawyers trying to state the law to the jury, and, you know,
6   especially if there's a misstatement, so I think when a lawyer
7   gets up and says, The judge will instruct you that this is the
8   law, and they misstate it, and then I give them a different
9   instruction, it creates an issue.  So I could give them the
10  charges first, if you would prefer.
11           MR. RICKNER:  I was thinking the opposite way; that
12  if somebody misstates the law, and then you give the charge
13  afterwards, that there's a curative effect.
14           THE COURT:  Right.  I tell them ignore what the
15  lawyers say.
16           MR. RICKNER:  The very first thing you do is say
17  ignore everything I've said, I get it.
18           THE COURT:  Okay.  You all should get it.  Take a
19  few minutes.  Take a careful read, and then -- let's give our
20  court reporter a 15-minute break, and then we'll be back a
21  quarter of?  Thank you.  And if you have disagreements or
22  quibbles, please work it out.
23           Thank you.
24           (A recess in the proceedings was taken.)
25           (Continued on next page.)
```

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

```
                        Proceedings                    295
1            THE COURT:  All right.  All counsel are present and
2   this is the continued charging conference.
3            The parties have made some additional edits on the
4   charges and the jury verdict form.  We have not gotten it yet,
5   so we do not really know what those are.
6            MR. KEANE:  It should be in that.
7            THE COURT:  Were there any changes on the jury
8   charges, additional edits you wanted to make?
9            MR. RICKNER:  I did not.  Not for plaintiff.
10           MR. KEANE:  And not from defendants.
11           THE COURT:  Okay.  Great.  We are looking at the
12  verdict sheet.
13           THE COURT:  We are just going to put quotation marks
14  around the words "yes" and "no."
15           MR. RICKNER:  Okay.
16           (Pause in proceedings.)
17           THE COURT:  All right.  I think that is it then.
18           We will finalize everything, post it on the docket
19  as Court Exhibit 2 and 2A for the charges and the verdict
20  sheet.
21           MR. RICKNER:  I think that's correct, with one minor
22  cleanup on the first question, third paragraph, second
23  sentence.  It says --
24           THE COURT:  We are back on the instructions?
25           MR. RICKNER:  No, no, no, on the draft verdict
```

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

```
                        Proceedings                    296
1   sheet.  I apologize.
2            THE COURT:  Oh, okay.  Sorry.
3            MR. RICKNER:  It just says:  If your answer is no as
4   to all defendants, proceed to Question 2.  And I think that's
5   where the period should be.  "As to that defendant" now just
6   becomes confusing additional language.
7            THE COURT:  All right.  Yes.
8            Anything else?
9            MR. RICKNER:  No, Your Honor .
10           MR. KEANE:  Not from us, Your Honor.
11           THE COURT:  All right.  So the defendant does not
12  dispute the change that Mr. Rickner suggested with regard to
13  Question 1?
14           MR. KEANE:  "If the answer is no as to all
15  defendants, proceed to Question 2."
16           THE COURT:  Period.
17           MR. KEANE:  That's with respect to injury, yeah.
18           THE COURT:  Okay.
19           MR. RICKNER:  Sounds like a yes to me.
20           MS. DURDEN:  Yes.
21           MR. KEANE:  I think we are settled.
22           And we have the exhibits from plaintiff.
23           You want to look at them again.
24           MR. RICKNER:  I mean, I would like to have them in
25  hand just for closing.  I'm not going to mark them or
```

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

**JA583**

Proceedings                                    297

1  anything.  Just so we have something to show the jury.
2          THE COURT:  All of the exhibits?  Is that all of the
3  exhibits?
4          MR. KEANE:  They're only five.
5          MR. RICKNER:  Yeah, they're only five.
6          THE COURT:  And they are all clean?
7          MR. RICKNER:  Crystal.
8          THE COURT:  Okay.  The court exhibit is not in
9  there, correct?
10         MR. KEANE:  That's correct.  Stipulations.
11         THE COURT:  I mean not the court, it is a joint
12 exhibit.
13         MR. KEANE:  Yes.
14         THE COURT:  So we have to put it in.
15         MR. RICKNER:  Yes.  I mean, I think we can
16 hole-punch it, put it on the top right before the tabs or
17 something.
18         THE COURT:  Yes, that is a good place for it.
19         All right.  So the jurors, as you know, are coming
20 in at 1:30.  I wish I had brought them in earlier.  I think
21 maybe I thought this would take a lot longer than it did.  I
22 am happy it did not.
23         Why don't you come back to the courtroom by 1:25.
24         MR. RICKNER:  That would be great, Your Honor.
25         (Recess taken.)

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Proceedings                                    298

1          A F T E R N O O N   S E S S I O N
2          (In open court; jury not present.)
3          THE COURT:  Is everything in order and are we ready
4  to proceed?
5          Yes?
6          Has everybody gotten copies of the revisions?
7          MR. RICKNER:  Yes.
8          THE COURT:  Are all the jurors here, Ms. Jackson?
9          THE COURTROOM DEPUTY:  No, Judge.
10         THE COURT:  Okay.
11         (Pause in proceedings.)
12         THE COURT:  Okay.  They are all here.  We are going
13 to bring the jurors in.  All right?
14         (Jury enters.)
15         THE COURT:  All jurors are present.
16         Good afternoon, members of the jury.
17         Please have a seat everybody.
18         Now, members of the jury, you have now heard all the
19 evidence on the plaintiff's claim for damages.
20         Wait.  Were you wanting to sum up first before the
21 instructions?
22         All right.  I know we talked about that this
23 morning.
24         Now that you have heard all the evidence, it is time
25 for the parties to be given an opportunity to summarize the

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                        299

1  evidence for you and to argue to you as to what inferences or
2  findings you should make based on the evidence at the trial.
3          So, you will first hear from the plaintiff's lawyer.
4  The defense will then be allowed to make their summation.  And
5  then, the plaintiff has reserved the right to rebut or to be
6  given the opportunity to have the last word.
7          So with that, we will hear from plaintiff's counsel.
8          Are you ready to proceed, sir?
9          MR. RICKNER:  Yes.  Thank you, Your Honor.
10         THE COURT:  Thank you.
11         I remind the jurors that the summation of the lawyer
12 is not evidence.  Only the evidence that you have heard at the
13 trial through testimony or the documents or stipulations are
14 the proper considerations as you deliberate.
15         MR. RICKNER:  Members of the jury, I'd like to thank
16 you so much --
17         THE COURT:  Your microphone, sir.
18         MR. RICKNER:  Oh, you're right.
19         THE COURT:  And pull it closer, perhaps.
20         MR. RICKNER:  Members of the jury, thank you so much
21 for your service.  I'm glad we got through testimony in one
22 day and we greatly appreciate the time that you put into this
23 case.
24         Now, when I started, I said that this was a story
25 about the abuse of authority, about the system.  It's a story

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                        300

1  about how Jesus Santiago got caught up in that system and that
2  pattern and abuse, and I'd like to go over it with you.
3          Starting in 1998, DOCS, that's the Department of
4  Correctional Services, started adding post-release
5  supervision, a term you heard over and over in this case, they
6  started adding it to determinate sentences.  This was
7  unconstitutional.
8          Now, in 2002, Mr. Santiago is sentenced to three and
9  a half years determinate sentence, flat.  Now, he never
10 consented -- consented.  He never agreed, as part of his plea,
11 to include post-release supervision.
12         Now, Ms. Panousieris, if you could please bring up
13 Exhibit E, page 4, and zoom in on the lines between 9 and 20.
14         I'm seeing it here.  I'm not seeing it there.
15         Are the jurors seeing it?
16         THE COURTROOM DEPUTY:  Okay.
17         MR. RICKNER:  Now, you are going to have this
18 exhibit, you can read the whole thing.  It is going to be in a
19 binder that's being provided to you, but I just want to
20 highlight a bit of it.
21         First, you have the Court, starting on line 9:  In
22 addition to the three and a half years, there's a five-year
23 post-release supervision time that will be imposed.
24         Then it goes to the defendant that's Mr. Santiago:
25 They already gave me four years on parole.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                                    301

1    Now, if you remember, he had a federal sentence and
2    it had four years of post-release supervision and it had a
3    period of incarceration and it went concurrently, so he's
4    already on parole.  And that's what he tells the Judge.
5        Now, the Judge's response:
6        THE COURT:  I'm not sure how that would work out
7    with parole.  In effect, it's the same thing.  I don't know.
8    Most terms are concurrent.  I just don't know.  So I couldn't
9    make any promises to you.  Is this what you want to do?
10       ANSWER:  Yes.
11       So he never agrees to post-release supervision.  He
12   tells the Court that he's already on post-release supervision,
13   he doesn't need any more.
14       Now, when he was originally questioned, if you
15   remember, the defendants only went through lines 9 through 11.
16   Now, that's not the full story.  This up here is the full
17   story, and he never agreed to post-release supervision as part
18   of his sentence.  And lo and behold, he gets sentenced a
19   little while later and no post-release supervision is part of
20   the sentence.  It's just not included.  That's part of one of
21   the stipulated facts.
22       You can take this down, Ms. Panousieris.  Thank you.
23       It's one of the stipulated facts, and you're going
24   to see that in our binder that we give you as evidence.
25       So what happens?  DOCS ' policy, the Department of

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                                    302

1    Correctional Services, adds five years of post-release
2    supervision anyway, administratively.  And how do they do it?
3    They just put it into their mainframe.  That's how they add
4    it.  There's no court procedure, nothing else; they just do it
5    administratively.
6        Now, because of this illegal post-release
7    supervision, Mr. Santiago isn't allowed to leave the state.
8    Now, to be clear, it's unconstitutional; he should be allowed
9    to leave the state.  But according to the terms, he isn't
10   supposed to.
11       So what happens?  He gets arrested in Virginia, out
12   of the state, and he gets violated in federal court for that
13   sentence that is, remember, ran concurrent with the New York
14   sentence.  And in federal court he goes to prison for eight
15   months for the parole violation, but because of the illegal
16   New York sentence, he gets doubled up.  He does another
17   approximately eight months in New York because of the warrant,
18   he gets taken to Rikers, and he gets violated and he gets sent
19   upstate.
20       But let's talk about how that process happened.
21   June 9, 2006, the Earley case.  Really, you know, one of the
22   heroes of this story is Mr. Earley, who recognizes that he has
23   an illegal sentence and he goes to court and he goes all the
24   way up to the Second Circuit and he challenges it and he wins.
25       This is Exhibit 4.  And you can ask for it and it

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                                    303

1    will be part of the binder.  But just looking at the last
2    page, there's some important pieces of the ruling on Earley,
3    really powerful stuff.  And I quote:  Earley's sentence was
4    therefore never anything other than the six years of
5    incarceration imposed on him by the judge at his sentencing
6    hearing and recorded in his order of commitment.  The
7    additional provision of post-release supervision added by DOCS
8    is a nullity.  The imposition of a sentence is a judicial act,
9    only a judge can do it.  The penalty was administratively
10   added by the Department of Corrections, was quite simply never
11   part of the sentence.
12       Never part of the sentence.  This is not a vague
13   ruling.
14       And in that, they find that this was clearly
15   established law.  2006, it was clearly established law that
16   you had to have the judge sentence somebody, you couldn't have
17   somebody, a bureaucrat, add it administratively.
18       Now, one of the points that you may have heard
19   defendants make is that, well, Mr. Earley actually remained
20   incarcerated for another year before his post-release
21   supervision was removed.  And they act as though that's some
22   sort of defense.  It's not.  This shows the power of the abuse
23   of the system.  There is an order that says Mr. Earley's
24   post-release supervision is a nullity, it's not part of the
25   sentence.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                                    304

1    And the Court notes, and this is the last paragraph
2    of the decision, that there was a timing issue about the
3    habeas petition and they needed to go back and have the
4    District Court work it out.  And they said that if the State
5    wanted to try to resentence him they could.  Nothing in this
6    says you get to lock him up for another year.  Locking
7    Mr. Earley up for another year is exactly the kind of abuse
8    we're here to talk about.  This is not a point in their favor.
9        Now, all three defendants knew about Earley:
10   Annucci, July 20, 2006; Tracy, late 2006; and Fischer, when he
11   became commissioner in January 2007.  Annucci admitted that
12   the Earley Court, the Second Circuit Court of Appeals, is one
13   step away from the Supreme Court and it is the law of the land
14   as far as federal law goes, and that includes the U.S.
15   Constitution.  And the Supreme Court declined certiorari over
16   Earley, so that was it, that was the final ruling.  And
17   Annucci admitted that he recognized Earley had a wide-raging
18   impact.  And Tracy admitted that Earley would have a big
19   impact on his population of people on parole and post-release
20   supervision.  They knew, as of reading Earley, this clear
21   ruling, that the administratively-imposed post-release
22   supervision was quite simply never part of the sentence.
23       Now, this is a critical point.  Defendants know that
24   the post-release supervision was unconstitutional, they know
25   that it can't be enforced.  So what do they do?  They continue

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                    305

1    to restrain people's liberty.  And you're going to see a
2    pattern at every stage that they make the choice over
3    incarceration even in the face of imperfect information.  Even
4    in the face of knowing that it was illegal, they choose to
5    keep people incarcerated.  And there's a pattern.
6         Annucci's first step, the first thing he does,
7    July 20th, is he sends an e-mail to Court Administration.  He
8    testifies about this.  He says he begs them.  What does he beg
9    them to do?  Tell the judges, in the future, to add
10   post-release supervision.  Make people sentences longer, make
11   sure to do that.  What you didn't hear him testify is going to
12   the Office of Court Administration and saying wait, we could
13   have thousands of people with illegally-imposed sentences, we
14   need to do something about this right now.  His first reaction
15   was to make sure, going forward, people had these longer
16   sentences.  That was his fix.
17        Now, the next thing he does is he makes a database.
18   Now in theory, this is a good thing.  He gets together all of
19   the paperwork and he goes through to find out when the
20   sentence and commitment order, the documents that they have,
21   actually include post-release supervision so they can
22   determine when they were the ones who added it, now knowing
23   that it's unconstitutional.  The problem is, they didn't do
24   anything with that database.  Thousands of people where they
25   admit they have no evidence, they are silent as to whether or

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                    306

1    not post-release supervision was included on their claim, but
2    they don't do anything with that, they don't go out and tell
3    people this is a problem, they don't take affirmative action.
4         Now, I'd like to pause for a second.
5         Can you please put up Exhibit 1?  Just zoom out to
6    see the whole thing.
7         Now, in testimony, you heard that DOCS, the
8    Department of Correctional Services, gets documents like this.
9    And at the very top, you can see Sentence and Order of
10   Commitment.  Now, this is not the sentence, right?  The
11   sentence is actually a transcript.  It's a transcript made by
12   a professional court reporter of what a judge says on the
13   bench, and that's the real sentence.  But they don't have
14   that.  They have this.  Now, mind you, this is 2004.  2004.
15   Handwritten documents.  They have 50,000 people incarcerated
16   and this is their record.  That's not particularly reliable.
17   And they're supposed to have the sentencing minutes.  They've
18   known for years and years and years that they're supposed to
19   have the sentencing minutes, but they don't have them.  So,
20   they claim, well, our database might be inaccurate, we're not
21   going to do anything because we have imperfect information.
22   Well, it's their part -- it's their fault that they have
23   imperfect information, allegedly.  They were supposed to have
24   the sentencing minutes.  The sentencing minutes are the only
25   real sentence.  And they have a massive operation.  You heard

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                    307

1    50,000 people incarcerated, 50 plus facilities, multiple
2    people in different legal departments, who knows how many
3    staff; they can go get their paperwork right.  Because
4    remember, they admitted this.  They can only incarcerate
5    somebody if they have the lawful authority to do so.  And that
6    lawful authority, what Earley says and cases going way back
7    that are cited in Earley, says the sentencing minutes are the
8    lawful authority.  But they're not keeping track of them,
9    they're not keeping them.  They're reckless.  They're relying
10   on a handwritten, imperfect document.  So when they run into
11   this problem, they don't even have the information they need
12   to sort it out.
13        But that's also no excuse.  They're holding people
14   in custody.  They're holding people on parole.  And yet their
15   documents show no evidence that they have the authority to do
16   so.  So what did they do?  They choose incarceration.  They
17   choose restraining people's liberty.  Now, you think maybe you
18   want to err on the side of caution, err on the side of not
19   violating the Constitution, but no, they continue to hold
20   these people.  And their excuse?  They didn't have the right
21   records.
22        Now, you would also think in the face of Earley that
23   they'd start making some changes to policy.  These are policy
24   makers.  These are high-level people at the Department of
25   Correctional Services and the Division of Parole at the time

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                    308

1    period that's key in this case.  They keep the policies in
2    place.  They make an affirmative decision that despite getting
3    this clear instruction from Earley, this -- the sentences that
4    you've typed into your mainframe database, they don't count,
5    but they keep acting like they count.  They keep people in
6    jail, they keep issuing warrants, they keep issuing parole
7    violations.
8         And you heard them say:  I have no authority to
9    change things.  That makes no sense.  They have no authority
10   to go into the main -- into their database and add this period
11   of post-release supervision that could then lead to
12   incarceration?  Well, you know what, they have just as much
13   authority to go into their database and fix the problem for
14   thousands of people.
15        Now, second step, pretty logical.  Okay, you've got
16   a list of people.  Maybe you don't know it's perfect, but
17   you've got a list of thousands of people who have potentially
18   illegal sentences.  You could go tell them about it.  You can
19   put up some posters in the prison library.  You could write
20   them all letters.  Some of these people are incarcerated, on
21   parole, you know how to find them.  Go write them letters and
22   tell them that there's a problem.  They don't do that.  They
23   do nothing to tell people that they might have illegal,
24   unconstitutional sentences that they themselves caused to be
25   imposed.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                          309

1    Now, this comes to their next excuse:  You should
2    have figured it out yourself.  See, people are incarcerated,
3    they have access to a law library, they get newsletters from
4    non-profits, they can figure it out.  Well, there is a real
5    hypocrisy there.  Some of the testimony you heard is that this
6    was just such a complicated problem, that Earley was so
7    confusing that they just didn't know what to do.  But they
8    also expect somebody with limited resources in jail with
9    part-time access to a law library to figure it out for
10   themselves.  That's just not fair, right, telling people to go
11   help themselves without doing the slightest thing to help
12   them.
13       And what about the people who did figure it out?
14   Because there were some.  And you heard about the letters that
15   Annucci got.  People sent letters:  I have an illegal
16   sentence, help me.  You're the -- you know, you're counsel for
17   the Department of Correctional Services.  Go to court.  Right?
18   Because remember, every single time in the face of evidence
19   they choose incarceration, they choose restraint of liberty.
20   Go to court.
21       And so what happens to people when they get to
22   court?  You heard about Article 78s, you heard about habeas.
23   You got to fight.  They got evidence.  They got a
24   Second Circuit case that says this is an illegal sentence,
25   this is unconstitutional.  They have to go fight for their way

Summation - Mr. Rickner                          310

1    out.  And that's because all of the procedures stayed the same
2    and at every opportunity, even in the face of illegal or at
3    least imperfect information, they chose to fight, they chose
4    to keep people restrained.
5        Now, let's talk about the Division of Parole.  They
6    don't change the procedures either.  They do nothing.  In
7    fact, the counsel for the Division of Parole fully admits that
8    he just figured it was Mr. Annucci's problem and that he would
9    sort it out.  No conversation, no changes, even though he
10   admitted that he recognized that this Earley decision had
11   wide-ranging implications for the population under his care.
12   That's the post-release supervision, the people who are now
13   out, like Mr. Santiago.
14       Now, there's a lot of real common sense things you
15   can do here.  They're sending out warrants.  Okay, you send
16   out a warrant for somebody because you think they've violated,
17   they've left the state, something else.  Fine.  Go check the
18   sentencing minutes at least for that person before sending out
19   the warrant.  All right, so you picked somebody up on a
20   warrant, like Mr. Santiago.  Now he's brought to Rikers
21   Island.
22       Now, they point out Rikers Island is not a state
23   facility.  Well, it may not be a state facility, but they use
24   it as their courtroom.  They admitted that.  And they
25   deliberately bring people there and they certainly know what

Summation - Mr. Rickner                          311

1    the conditions are like there, which is why they're trying to
2    distance themselves from Rikers Island.  Rikers Island is not
3    our problem, right?  So they know they're bringing people to
4    Rikers on these parole violations.
5        And there's a judicial process called an
6    administrative law judge.  Okay, so now we have -- it's not
7    maybe a proper criminal courtroom, but you have a proceeding,
8    a hearing that's being managed by the Division of Parole.
9    You'd figure we know there's this big problem out there with
10   thousands of people, let's go look and get the sentencing
11   minutes, let's make sure this is a real sentence for
12   punishing somebody.  They don't do that.
13       Now, they aren't telling anybody about Earley, they
14   aren't telling anybody what it means.  And unfortunately,
15   Mr. Santiago has no idea that he's facing actually illegal
16   post-release supervision violation.  He doesn't know.  So he
17   pleads guilty to get off Rikers Island.  And who can blame
18   him?  It's dangerous.  So he decides, look, I got to plead
19   guilty, I was out of state, they got me.  Nobody tells him
20   that, in fact, the underlying process is unconstitutional.
21       So the defendants don't change their policies, they
22   don't tell people there's a problem.  They're fighting at
23   every point.  And what happens?  Mr. Santiago ends up with a
24   warrant, he ends up locked up, and he ends up on that bridge
25   to Rikers Island shuffling the deck.  You don't know what

Summation - Mr. Rickner                          312

1    you're gonna get; that's his testimony.  You don't know what
2    to expect.
3        So, he's trying to call his family.  First thing
4    that happens, he gets assaulted, right at the beginning.
5    That's Rikers Island.  He faces gang violence.  He's scared.
6    You could hear him, you could hear it in his voice.  He
7    doesn't want his wife to see him like that.
8        Now, it's an untenable situation.  He's not leaving
9    his cell.  He wants out and there's unfortunately, based on
10   his knowledge, one place he can go, and that's upstate.  So he
11   takes his plea August 2006 -- or 2007, rather.  He goes up to
12   Ulster and later Gouverneur Correctional.
13       Now, you heard Mr. Annucci try to convince you these
14   are nice places.  Nobody wants to be in these places.  All
15   right, they got handball courts.  They also have strip
16   searches; barbed wire; dangerous, violent people.  You have
17   gangs.  There are gangs there.  When you visit your family,
18   you have to get strip searched afterwards because they're so
19   worried about all of the weapons and drugs that are coming in
20   that make it a dangerous place.  You heard one of the
21   defendants talk about rape is a problem there, right?  They
22   were just implementing the Prison Rape Elimination Act.  Well,
23   the reason there's an elimination act is because there was a
24   problem.  This isn't a nice liberal arts college.  No one
25   chooses to be there unless they're an employee there.  There's

**JA587**

Summation - Mr. Rickner                313

1  a lock on the door.  It's up near the Canadian border where
2  nobody can come visit you.  It's terrible.  And I don't want
3  you to believe for a second that it was okay to send somebody
4  there illegally.  You could argue it's not even okay to send
5  somebody there legally.  It's degrading.
6       And I think he said it best:  It's like being buried
7  alive, like your life is on pause.  Whatever it is you wanted
8  to do, whatever it is you expected, that's gone, that's taken
9  away from you.  See, we only get to live so long and we don't
10 know how much.  When you take that away, that's the worst you
11 can do because you can't get back time.  We may ask for
12 monetary -- we're going to ask for monetary compensation.
13 That's all you get here.  We can't restore time.  We can't
14 restore the 234 days Mr. Santiago lost in custody.
15       Now, eventually, fast-forward to 2010,
16 Mr. Santiago's been -- you know, this is long after the
17 sentence we're talking about here for the parole violation.
18 They finally get him around to resentencing.
19       Now, you read this, this is in Exhibit 3 on page 3,
20 and the Court says, I'll just read this to you:  It appears
21 that there was no discussion or agreement concerning
22 post-release supervision as part of the defendant's sentence.
23       This is in 2010 .
24       Based on the consent of the people, the Court
25 declines to resentence the defendant and holds that no period

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Summation - Mr. Rickner                314

1  of post-release supervision constitutes part of the sentence
2  and any violation of prior revocation of a Department of
3  Corrections-imposed post-release supervision is deemed a
4  nullity and is vacated, so all of the other conditions of the
5  original sentence remain in effect.
6       Right?  It's a nullity.  And they issue an order.
7       Can you put up -- this is, I believe -- yes, this is
8  Exhibit 2.
9       And it's he not easy to read, but -- scroll down a
10 little bit.  You went a little too far.
11       DOCS' assessed period of PRS is deemed a nullity and
12 is vacated.
13       Right?  That's the order.  Why?  Because they
14 wouldn't change their policies, they wouldn't stop people
15 locking up, they forced people to go to court to prove their
16 innocence -- to prove that this was an illegal sentence.
17       Now, one of the things you heard is the defendants,
18 they don't know Mr. Santiago at all.  Not at all.  They didn't
19 know him.  They didn't do anything for him.  They never sent
20 any letters trying to get him resentenced or did anything to
21 fix the problem they created.  And they may say, well, you
22 know, we just can't be -- don't think of us as having done
23 anything to him because we didn't even know who he was.
24 That's not the point.  This is a case about recklessness.
25 They built a machine.  They built a machine that violates

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Summation - Mr. Rickner                315

1  people's rights, and the courts told them the machine you built
2  violates people's rights.  And what did they do?  They just
3  kept it grinding away, grinding away days and years of
4  people's lives, grinding away Mr. Santiago's life.  They're
5  indifferent.  They didn't care.
6       That's why, when I was in my opening, I said this
7  was about unelected bureaucrats.  See, this is the thing that
8  we really worry about in America.  This is the reason we have
9  a due process clause, is because people not elected with
10 power, real power, because they control the system.  Even with
11 the courts tell them not to, right, they keep going.  It's
12 hard to stop them as a practical level and they know they have
13 that power.
14       Now, speaking of power, we're going to come to you
15 and ask you to use your power because you're in federal court
16 and you're on a jury and you're in a remarkable position.
17       The first one we're going to ask you for is what's
18 called compensatory damages.  That means to compensate.  He
19 was injured; he lost part of his time.  We're asking for money
20 because we don't have a time machine and we don't have a way
21 to make him live longer, right?  It's all we have in the
22 American system, is to ask you to put a number on it, ask you
23 to put a number on his time in solitary confinement to protect
24 himself from the violent gangs, put in a number for the time
25 in Rikers, put in a number on those 234 days he was illegally

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Summation - Mr. Rickner                316

1  incarcerated.
2       But we're going to ask you to go further.  There's
3  also punitive damages.  That means to punish, flat out.  And
4  that's a tool.  See, the point is that sometimes compensation,
5  making somebody whole, isn't enough to get the point across.
6  Sometimes you need more.  And so we're going to ask you, think
7  about what it would take to punish these bureaucrats.  Think
8  of a number that says, you know what, knock it off, stop
9  violating people's rights, especially after the Second Circuit
10 Court of Appeals, one step from the Supreme Court, tells you
11 what you're doing is wrong.  Stop.  That's what punitive
12 damages are here, because of their reckless disregard for
13 people's rights.
14       Now, you're going to get a verdict sheet and it has
15 a bunch of questions on it.  It's a little bit of a
16 choose-your-own adventure.
17       The first question is:  Are each of the three
18 defendants, did they cause Mr. Santiago injury?  Yes.  We
19 submit the answer is yes for all three of them.
20       Now, for the second question there is punitive --
21 there is nominal damages.  That's if he hasn't proven any
22 injury.  We submit that's not what this evidence shows.  There
23 are no nominal damages here.  These are actual real damages.
24       So that brings you to Question 3:  Has he proven
25 that he's entitled to compensatory damages because he was hurt

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Summation - Mr. Rickner                           317

1   because he was illegally locked up?  We submit yes.

2           And the next question, we're going to ask you to put

3   a number on that.

4           Then the punitive damages.  Has he proven punitive

5   damages?  And then for each of the three, we ask you to

6   pick a number that shows this is what we say to knock it off.

7   This is your punishment for what you did to Mr. Santiago, for

8   how you violated people's rights.  And that's individual four

9   each defendant.

10          You know, because we've talked a lot about courts,

11  federal courts in particular.  And you're in federal court.

12  See, you know, Mr. Annucci told people, you know, if you don't

13  like your sentence, go to court.  Well, he didn't write that

14  letter to Mr. Santiago, but Mr. Santiago brought Mr. Annucci

15  and Mr. Tracy and Mr. Fischer to court because that's his

16  remedy, a Section 1983 lawsuit like the one he brought today.

17          And you're in a unique spot.  See, we always talk

18  about the Constitution and people's rights in this sort of

19  abstract way, but this is where the rubber hits the road.  You

20  are here to decide a real constitutional issue:  Due process

21  violation.  And you as jurors have more power than anyone

22  else.  You are the only people who get to make this decision.

23  And we trust you with it.  And I appreciate the attention that

24  you've given Mr. Santiago's case and that you've given me and

25  that you've given the evidence because my client's fate and

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Summation - Ms. Durden                            318

1   their fate is in your hands.

2           Thank you very much.

3           THE COURT:  Yes, please.  Thank you.

4           MS. DURDEN:  Thank you.

5           Good afternoon, ladies and gentlemen of the jury.

6           This has been a very, very short trial, and so I

7   will try to keep my remarks relatively short, but I do think

8   it's important to go over what Mr. Keane believe is the

9   relevant and important evidence in this matter.

10          Now, Counsel just got up and told you that this is a

11  case about abusive power.  The majority of his closing was

12  spent talking about an issue that had long been resolved by

13  this Court.  There is no dispute, none whatsoever that this

14  Court has found that Commissioner Annucci, Commissioner

15  Fischer and Counselor Tracy violated Mr. Santiago's rights.

16  You've known that from the moment you've walked in.  But what

17  this case has been about is whether plaintiff has met his

18  burden of proof in proving that he is entitled to damages in

19  this action.  And defendants contend that the only damages he

20  is entitled to are nominal.  And the Judge will instruct you

21  during the instructions what that actually means.

22          Now, why do defendants contend?  Well, first, as I

23  stated, there is no dispute that Mr. Santiago had unlawful

24  PRS.  The defendants contend that that doesn't end the

25  inquiry; that's just where the inquiry starts.  We know that

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Summation - Ms. Durden                            319

1   Mr. Santiago was returned to state custody because he broke

2   the rules; it's that simple.  Mr. Santiago was originally

3   released from state custody on November 4, 2004.  At that

4   time, he was subject to post-release supervision and federal

5   supervision, with one of the conditions being that he not be

6   allowed to leave the state.

7           And ladies and gentlemen of the jury, it's important

8   to note that in 2004, post-release supervision had not been

9   declared unconstitutional.  So at the time Mr. Santiago was

10  subjected to these rules, they had not been declared

11  unconstitutional by any court.

12          (Continued on the next page.)

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

---

Closing - Ms. Durden                              320

1   (Continuing.)

2           MS. PANOUSIERIS:  And what did Mr. Santiago do at

3   that time?  He told you, he left the state of New York because

4   he wanted to be with his family.  What didn't he do?  Well,

5   apparently, he didn't ask his parole -- his PRS parole officer

6   if he could have his PRS supervision transferred to another

7   state.  And you remember, at this particular moment, his

8   federal supervision had been transferred to New York and yet,

9   he never requested either the federal government or the state

10  whether that could also be transferred back to Virginia so he

11  can go and live with his family.

12          And what do we know next?  Mr. Santiago is arrested

13  in Virginia where he remains for a number of -- he gets

14  arrested in 2005 and then on November 9, 2006, he's sentenced

15  in the Eastern District of Virginia to eight months of

16  incarceration followed by 30 months of Federal Supervised

17  Release.  And it is only after he serves that sentence, that

18  he is brought back to New York State.

19          I submit to you, ladies and gentlemen, that while at

20  this particular time, Mr. Santiago had what is ultimately

21  deemed to be unlawful PRS.  If he had just followed the rules,

22  his re-incarceration never would have occurred.  Mr. Santiago

23  should not benefit from his personal choice to ignore the

24  rules.

25          And what else do we know?  We know that on July 19,

*LEEANN N. MUSOLF, RPR, CCR*
*Official Court Reporter*

Closing - Ms. Durden

321

```
 1   2017 -- 2007, excuse me, Mr. Santiago pleaded guilty to
 2   post-release supervision and he was before an administrative
 3   law judge and also represented by counsel.  At that point,
 4   Mr. Santiago did not raise the issue of PRS.  He stated that
 5   his attorney didn't tell him.  But, remember, Earley was
 6   decided in 2006.  Counsel, many counsel are aware of the
 7   decision and yet Mr. Santiago pleaded guilty and he pleaded
 8   guilty, he said, because he wanted to leave Rikers Island.
 9        And Mr. Santiago testified that he did not bring any
10   type of court proceeding while he was incarcerated because he
11   didn't know that he could.  Now, this is despite the fact that
12   there are law libraries at each of the facilities, that prison
13   legal services comes into these facilities to help the
14   incarcerated population, there are paralegals in the law
15   libraries to help the incarcerated population, that the
16   Circuit Court decisions are placed in the library, and that
17   there were, in fact, individuals who had brought proceedings
18   to have their PRS terminated by being resentenced before the
19   Court.
20        Now, maybe Mr. Santiago didn't know about any of the
21   available judicial proceedings that he could take, but at the
22   same time, Mr. Santiago is a person whom, after being
23   sentenced in federal court, knew enough to write to a state
24   court in New York City so that he could be returned from
25   Virginia, appear before the state court judge and be -- have a
```

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Closing - Ms. Durden

322

```
 1   sentence imposed so that he could serve that at the same time
 2   he was serving his Virginia sentence.  I submit to you, ladies
 3   and gentlemen, that Mr. Santiago knew a little bit more about
 4   the law than he led on.
 5        Now, as stated, defendants contend that Mr. Santiago
 6   is entitled to no more than nominal damages, but, obviously,
 7   as a jury, that's your decision.  So the next question
 8   becomes, if you, the jury, determine that Mr. Santiago is
 9   entitled to compensatory damages, the question becomes how
10   much.  The question becomes what compensatory damages did
11   Mr. Santiago prove to you by a preponderance of the evidence.
12        Interestingly, Mr. Santiago spent most of his time
13   testifying about Rikers Island.  He testified that it was a
14   dangerous place, there were fights all over, that someone put
15   a hit on him because of sneakers, and he wanted to get out of
16   Rikers and actually entered into the New York State system.
17        And remember, ladies and gentlemen, it is true,
18   Rikers Island is not a system run by the New York City
19   Department of Corrections and Community Supervision.  Their
20   offices are not trained by the state.  It is a city agency
21   and, significantly, although Mr. Santiago stated that he was
22   assaulted while he was at Rikers Island, he did admit that
23   although in the past he has filed lawsuits when he has been
24   the victim of violence at Rikers, on this particular case, he
25   did not file any.  He also testified that there are cameras
```

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Closing - Ms. Durden

323

```
 1   everywhere at Rikers Island, and yet, he was unable to
 2   determine who it was he was afraid of.  And think about how
 3   Mr. Santiago testified and what he spoke about when
 4   Mr. Santiago was first asked about if there were any fights at
 5   Ulster.  He responded, no.  When he was asked more about it,
 6   he said Ulster's a different environment because the COs isn't
 7   heavy-handed there, that Ulster was nothing like Rikers Island
 8   and Ulster is where he spent the majority of his time.  And
 9   yet, when counsel asked Mr. Santiago specifically, were you
10   ever assaulted by the officers at Ulster, all of a sudden,
11   Mr. Santiago remembers, oh, you know, it wasn't really as bad
12   at Rikers but I was roughed up.
13        But he also admitted he never filed a grievance
14   while at Ulster complaining about any of the officers or any
15   of his treatment there.  And what do we know?  If Mr. Santiago
16   didn't feel comfortable filing a grievance, Commissioner
17   Annucci testified he had the opportunity to write to the
18   superintendent, to write to the Commissioner.  And the
19   Commissioner testified, every letter that comes to him is
20   responded.  He could have written to the Office of Special
21   Investigations.  I submit to you, he didn't do any of the
22   above because he didn't face any harassment by officers while
23   he was at Ulster correctional facility -- I mean at Ulster or
24   at Gouverneur.
25        Now, mostly when Mr. Santiago talked about G he said
```

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Closing - Ms. Durden

324

```
 1   he didn't go to the mess hall or the yard and that was because
 2   of an apparent incident that happened at Rikers.  But there
 3   was no connection as to how something that occurred at Rikers
 4   followed him to Gouverneur.  It was very basic testimony
 5   without any detail.
 6        What Mr. Santiago did tell you about Gouverneur is
 7   that he spent a month in the Special Housing Unit.  He sat on
 8   the stand and he testified, oh, I was put in the SHU because I
 9   refused to shovel.  As if an officer can just say hey, you
10   know what, I don't like you today.  I'm going to throw you in
11   the SHU, lock the key -- throw away the key and you're going
12   to be here for an indefinite period of time.
13        But what did we hear when Commissioner Fischer
14   testified you can't just put someone in SHU in a correctional
15   facility.  He would have been given a disciplinary ticket, he
16   would have had a hearing, he would have been able to call
17   witnesses, if he had a medical condition that prevented him
18   from shoveling, he would have had an opportunity to prevent
19   that to a hearing officer.  And only after all of that, would
20   he have been in the Supervised Housing Unit.  So, again, if
21   Mr. Santiago was in the Supervised Housing Unit at Gouverneur
22   Correctional Facility it was not because of any misdeeds by
23   the officers but it was, again, because Mr. Santiago refused
24   to follow the rules.
25        And speaking about Mr. Santiago, I ask you to
```

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Closing - Ms. Durden                325

1  consider how reliable is his testimony.  Mr. Santiago
2  testified that when he appeared before the judge on
3  December 15, 2010 for his resentencing, the judge apologized
4  to him and told him he shouldn't have been there.  I invite
5  you to read Exhibit 3, which is the transcript of that
6  hearing.  Nowhere will you find that the judge apologized.  It
7  did not happen.  It's not -- it's not there in the transcript,
8  but Mr. Santiago, I submit to you, presented that testimony
9  because he wants you, the jury, to think that damages should
10 be awarded in this case because even a state court judge
11 couldn't get over how horrible this was that happened to him.
12 But, again, the testimony is not supported by the black and
13 white written document that he claims should be in there.
14        So, what do we know about Mr. Santiago's seven
15 months in state custody?  What damages has he actually proven?
16 And I will submit to you, ladies and gentlemen, none.
17 Mr. Santiago did not testify about what his life in a medium
18 security in prison was like.  He only responded, it's like
19 being alive, you're there but you don't exist, you're not
20 doing nothing, you're not moving forward.  But what did we
21 hear from Commissioner Annucci?  Gouverneur Correctional
22 Facility has multiple buildings where people can receive
23 vocational and educational training.  There's a whole culture
24 building, there's indoor and outdoor recreation, that the
25 individuals there have freedom of movement within the

Closing - Ms. Durden                326

1  facility.  So if Mr. Santiago is not moving forward, if he was
2  not doing anything, it's because Mr. Santiago chose not to
3  take advantage of the opportunities that were being presented
4  to him while he was at Gouverneur Correctional Facility.
5        And please understand, ladies and gentlemen, nobody
6  is saying that being at a medium security prison is like being
7  on a college campus, there are no late night pub crawls, you
8  can't just leave and come back when you want to.  It is a
9  correctional facility.  But when thinking about damages and
10 the time that Mr. Santiago spent incarcerated, it's important
11 to consider the environment he was in.
12        This is not a situation where Mr. Santiago was in
13 Sing Sing Correctional Facility confined to a cell.  He was in
14 a dormitory-type living situation in a cubicle where he had an
15 opportunity to engage in educational, vocational programs and,
16 apparently, chose not to.
17        Now, you heard counsel get up here and, as expected,
18 he said, oh, but it's a terrible place, there are gangs
19 everywhere, there are drugs everywhere, there are strip
20 searches.  But I ask you, ladies and gentlemen, how much of
21 that testimony came from Mr. Santiago and how much of that
22 testimony was in response to questions posed to the
23 Commissioners.  Because, ladies and gentlemen, Mr. Santiago
24 did not testify to being subject to strip searches, how often,
25 how they made him feel, when they occurred.  Mr. Santiago did

Closing - Ms. Durden                327

1  not testify that there was stabbings, although the
2  Commissioners were asked about that.  Again, he testified that
3  he did not see fights when he was in the medium security.
4        And, so, I ask you to ask yourself why did you not
5  hear this testimony from Mr. Santiago?  Why did it have to
6  come from the Commissioners and just to be 100 percent
7  transparent, Mr. Santiago did say that he was concerned about
8  gangs, but that was it.  There was no additional testimony;
9  who was he afraid of, why was he afraid of, how did that
10 affect his day-to-day living.  Again, all of the testimony
11 going to his damages was about as general and vague as
12 possible.
13        And, finally, if Mr. Santiago said it was like being
14 buried alive, if that was true, if being incarcerated was so
15 horrific for Mr. Santiago, you would think he would have done
16 everything within his power never to return.  But you will
17 see, as one of the stipulated facts, Mr. Santiago was
18 incarcerated in the state of Virginia from 2013 to 2015,
19 despite his outrage of having to serve time in New York State.
20 Mr. Santiago, we know, has spent time in federal custody,
21 state custody, and in the state of Virginia.
22        So, ladies and gentlemen, with respect to the
23 compensatory and nominal damages, defendants contend that
24 Mr. Santiago is entitled to no more than nominal damages in
25 this action.  But in addition to compensatory damages, counsel

Closing - Ms. Durden                328

1  has now asked that you award Mr. Santiago punitive damages.
2  And as counsel stated, it's to punish the defendants for their
3  reckless or callous indifference to the plaintiff's rights.
4  But, ladies and gentlemen, we submit to you that there is no
5  evidence that these defendants acted recklessly or in
6  indifference to Mr. Santiago or anybody else's rights.  These
7  are three individuals who have dedicated their life to working
8  with the incarcerated and under supervision population.
9        So what do we know?  Counsel did ask each of the
10 defendants, you took an oath to uphold the Constitution, yes,
11 you read the Early decision, yes.  And, yet, you didn't
12 immediately release Mr. Santiago, yes.
13        And for counsel, that was the end of the story.  But
14 for the defendants, it was only the beginning because what do
15 we know about the defendants when it comes to whether they
16 should be punished for the actions that they take?  Well, we
17 know that Commissioner Annucci has worked for the department
18 since 1989 and he has focused on legislation.  And what type
19 of legislation has he focused on?  He has focused on
20 sentencing reform legislation to allow individuals to earn
21 early release through such programs as the Shock Incarceration
22 Program, the Merit Time Program, the Limited Credit Time
23 Allowance Legislation, and the Rockefeller Drug Law Amendment,
24 all legislation that was brought about to decrease the amount
25 of time that an individual spends incarcerated; to decrease,

```
                    Closing - Ms. Durden            329

 1   not increase.

 2           And you heard from Commissioner Fischer, in the

 3   1990s when he was at Sing Sing Correctional Facility, he

 4   developed a state-wide work release program so each and every

 5   day, incarcerated individuals could leave the facilities, to

 6   go to work, could see their family, and return to -- return to

 7   the facility.

 8           And as Commissioner, he said he worked with the

 9   Office of Mental Health to treat and ultimately release sex

10   offenders, and Commissioner Fischer also said he worked on the

11   implementation of the Prison Rape Elimination Act and that

12   that was to help curtail bad behavior on the part of both the

13   incarcerated individuals and the staff.

14           And Commissioner Fischer never testified because it

15   was a rampant problem at Gouverneur Correctional Facility or

16   anywhere else.  What Commissioner Fischer testified to is that

17   it was federal legislation that was being implemented within

18   the state system.  But what was one -- one of the things

19   Commissioner Fischer was most proud of?  It was closing 12

20   facilities.

21           I ask you, ladies and gentlemen, do you close

22   facilities when you are trying to keep people in or are you

23   closing facilities when you are trying to decrease the

24   population and allow more people to be released and have less

25   incarcerated individuals within the state of New York?
```

```
                    Closing - Ms. Durden            330

 1           And also, Counselor Tracy, who worked for the

 2   Division of Parole, he told you about how he would meet with

 3   individuals work on alternative to incarceration programs,

 4   again, alternatives to incarceration.  He worked with the

 5   Legal Aid Society in order to help develop programs.  So,

 6   again, people do not need to be re-incarcerated, but that

 7   people can be successful while on post-release supervision and

 8   thereafter.

 9           We talked about the fact that there were drug

10   treatment programs, anti-aggression programs, all programs

11   that were developed in order to help, not to harm, those under

12   supervision.  And all three testified that they didn't just

13   ignore what was going on.  They testified that they needed a

14   court order in order to release an individual.  And

15   Commissioner Annucci testified if they received a court

16   order -- Counselor Tracy said the same thing, if they received

17   a court order, they immediately complied with the court order

18   in order to release the individual.

19           Did they come across on the stand was people who

20   were not interested in the rights of the individuals under

21   their care?  I submit to you that they did not.  And you heard

22   Commissioner Fischer say, I could not just release an

23   individual in the absence of a court order.

24           And, please, ladies and gentlemen, do not be

25   distracted, no court has ever ruled that you have to release
```

```
                    Closing - Ms. Durden            331

 1   somebody immediately with PRS that has been declared

 2   unconstitutional.  The Earley decision, which has been

 3   referenced time and time again, in that case, it was remanded

 4   and the ultimate disposition there was that Mr. Earley was

 5   resentenced.  The Second Circuit held that his PRS was

 6   unconstitutional and, yet, the Second Circuit and the District

 7   Court did not say, unconstitutional, that's it, it's over,

 8   it's done.  He went and he was resentenced.  The same thing

 9   that has happened for Mr. Santiago.

10           Now, ladies and gentlemen, despite what counsel want

11   you believe, Commissioner Fischer, Commissioner Annucci, and

12   Counselor Tracy did not just take a copy of the Early

13   decision, roll it up, throw it into the garbage and say, you

14   know what, we're going to do what we're going to do.  Because

15   we heard from Commissioner Annucci steps were taken after the

16   decision was rendered.  They immediately recognized that this

17   was going be a complicated and problematic decision to

18   implement and it was going to be labor-intensive.

19           Remember, Commissioner Annucci said that they had to

20   go back to when the law was first enacted, which was in 1998.

21   And that every month, approximately 1400 new commitments came

22   into the system.  1400 new commitments a month from 1998 on.

23   And it was a -- labor-intensive effort to manually examine

24   every single commitment that DOCS had where there had been

25   determinate sentence.
```

```
                    Closing - Ms. Durden            332

 1           And remember, ladies and gentlemen, this was all

 2   paper.  Commissioner Annucci testified that these are not

 3   computerized records.  He let -- he let the inmate record

 4   coordinators at the facilities know, they had to manually go

 5   through 40,000 records.  And, yes, it was time-consuming

 6   because they did not always have the sentencing minutes.  And,

 7   ladies and gentlemen, the defendants cannot be faulted because

 8   the New York State Judiciary did not follow the Penal Law.

 9           As Commissioner Annucci testified, the Penal Law

10   required the sentencing court to send the sentencing minutes

11   to the facility, and they did not always do that.  And, yes,

12   it has been a problem for decades but it is the problem caused

13   by the Judiciary.  And I submit to you, ladies and gentlemen,

14   that the acting Commissioner of the New York State Department

15   of Correctional Services and Community Supervision could not

16   dictate to the New York State Judiciary what they had to do

17   and when they had to do it, if they weren't following the law

18   on their own.

19           And also one of the things that Mr. Annucci

20   mentioned was that often when they did receive the sentencing

21   minutes, they wouldn't have the New York State identification

22   number and so they wouldn't even know in whose file it

23   belonged.  And then Commissioner Annucci also testified that

24   that was one of the issues that he rectified.  He rectified it

25   so that going forward, the number would always be placed on
```

```
                        Closing - Ms. Durden              333

1    the sentencing minutes, that were sent, so that they can
2    easily be identified with the individuals within the system.
3         And, also, Commissioner Annucci told you that
4    immediately after Earley, he had reached out to the Office of
5    Court Administration and practically begged that going
6    forward, the judges be told that they put the post-release
7    supervision as part of their sentence.  Not because he was
8    trying to extend the sentence of an individual, not because
9    he's like, oh, we can give them five years even if they don't
10   deserve it, but because the Court had stated, when
11   post-release supervision was warranted, it had to be
12   judicially imposed, and, apparently, the Judiciary did not
13   understand that.
14        So to rectify the situation, to make sure the
15   sentence was legally imposed and the individuals were
16   sentenced pursuant to the statute and the findings of this
17   court, Commissioner Annucci reached out to OCA.  And
18   Commissioner Annucci testified, this was a time-consuming
19   process, it required coordination between the Department of
20   Criminal Justice Services, the Division of Parole, the Office
21   of Court Administration, and his agency itself.  They had to
22   work collaboratively to develop a comprehensive process to
23   bring all of these cases back to court.  Because just like in
24   Earley, just like in Earley, what was going to be done was the
25   8,000 individuals were going to be sent back to the sentencing
```

```
                        Closing - Ms. Durden              334

1    court to be resentenced.
2         And my final point is that -- on this particular
3    issue, which is really everything, is that DOCS staff went
4    through over 40,000 paper files to determine whether a judge
5    had imposed PRS.  Ultimately, they came up with a list of
6    8,000, and those 8,000 individuals did receive letters and
7    they were referred back to the sentencing court in order to be
8    resentenced.
9         And Commissioner Annucci testified, they didn't just
10   send the individuals back to the sentencing court, but he had
11   his agency prepare appropriate letters for each case to make
12   it as expeditious as possible so that the judge would have the
13   ability to say either remove PRS, and then if there were no
14   additional holds on the individual, release him.
15        They sent the appropriate paperwork to speed up the
16   process.  Commissioner Annucci testified, whatever the outcome
17   was, we tried to make it as simple and as straightforward as
18   possible so that we could bring about the results that the
19   court determine appropriate without undue delay.
20        So, I ask you, ladies and gentlemen, does it sound
21   like Commissioner Fischer, Counsel Tracy -- and I -- and I
22   should mention Counsel Tracy who said the information that his
23   agency received was that -- was what was compiled by DOCS, or
24   Commissioner Annucci acted with conscious disregard, or does
25   it sound like Commissioner Annucci, Commissioner Fischer, and
```

```
                        Rebuttal - Rickner                335

1    Counsel Tracy were faced with a difficult situation and tried
2    to do their best?  Does it sound as if Mr. Santiago is asking
3    you to reward him for Commissioner Annucci, Commissioner
4    Fischer, and Counsel Tracy's actions and to excuse his own?
5         So, in the end, ladies and gentlemen of the jury,
6    defendants contend that there is no basis in which to punish
7    the defendants.  No court has ever held that incarcerated
8    individual had to be released after Earley was decided.  There
9    was that -- what DOCS determined, it was that they had to be
10   sent for resentencing.  And there is a significant difference
11   between opening a cell door and allowing a person to work out,
12   and a process that involved not just DOCS, but the New York
13   State Court System.
14        On behalf of myself, Mr. Keane, Commissioner
15   Fischer, Counsel Tracy, Commissioner Annucci, and Ms. Briana,
16   whose name I have forgotten, I'd like to thank you for your
17   time and attention.
18        THE COURT:  Rebuttal, sir?
19        MR. RICKNER:  Thank you, Your Honor, yes, please.
20        THE COURT:  All right.
21        MR. RICKNER:  Now, I'd like to you think about the
22   contrast between the first thing that counsel said and
23   everything else.
24        The first thing they said, there is no question that
25   the defendants violated my client's rights, and you just heard
```

```
                        Rebuttal - Rickner                336

1    an argument that could be summed up as there should be
2    absolutely no consequences, nothing should happen.  Be locked
3    up for 234 days, worth zero.  That was the argument, zero
4    nominal damages, effectively nothing.
5         Should the defendants be held responsible for the
6    policies they put in place?  No.  Nothing.  Absolutely nothing
7    should happen to them.  They took absolutely no responsibility
8    for violating peoples' rights.  You never once heard an
9    apology.  You never once heard an acknowledgment.  In fact,
10   two out of three of them said they didn't even bother to read
11   this court's order.
12        Now, one of the things you heard is no court ever
13   said that you had to release people after the Earley decision,
14   that Earley, which said it was a nullity, required you to either
15   fix the sentence while they are incarcerated or relieve them
16   of their illegal restraint of their liberty.  This Court --
17   this Court did.
18        You're going to listen to the jury instructions
19   carefully, I know you will, and you are going to hear why the
20   defendants were held responsible and they were held liable.
21   And the reason they were held liable was exactly the thing
22   that counsel just said didn't happen.
23        Now, there's something else that comes to mind.
24   Let's blame the victim, right?  The entire testimony was these
25   are commissioners, high-level people, except, despite having
```

Rebuttal - Rickner                337

1  all of this power, in fact, apparently the power to just
2  administratively impose sentences which then were enforced by
3  them and their staff, all of that power, everyone else is
4  responsible.
5       Now, first, they blame Mr. Santiago for breaking the
6  rules.  All right.  Now, he's on parole in Virginia.  Federal
7  court says he could be in Virginia, illegal sentence,
8  unconstitutional sentence in New York, says he's not allowed
9  to leave Virginia.  So that's their argument.
10      The bureaucracy puts an illegal arbitrary rule in
11 place and says you're not allowed to do this, even though they
12 had no authority, they said you're not allowed to do this, and
13 now they're saying, it's okay to punish you for breaking that
14 rule that we never should have put in place in the first
15 place.  And it says, well, in 2004, it hadn't been ruled
16 unconstitutional.  Well, they punished him in 2007 after it
17 had.  So they had a chance to fix their mistake and didn't and
18 that's why they're liable.
19      Now, they talked about all of the things he was
20 supposed to do, grievances, he was supposed to make different
21 complaints.  Now, one, you heard him, on the stand, say, I
22 asked for those records and I couldn't get them.  You know,
23 it's not that easy to get things with Rikers Island, like --
24 of who assaulted you, it's not that easy to find out who was
25 attacking you.  You never heard any testimony about nametags.

Rebuttal - Rickner                338

1       And it is real damage to be locked up.  They said
2  that being locked, you know, behind the chain-linked fence
3  with a razor wire, that that was zero, right?  And in order
4  for it to be zero, it has to be the same as being on the
5  outside like all of us, being able to walk free.  Is that the
6  same?  No.  That's not zero.  That's not nothing.  He
7  testified that he was separated from his family.  That means
8  something.  He was embarrassed to let them see him in that --
9  at Rikers.  That's real damage.  In fact -- and another thing
10 is that he testified that he stayed in his cell essentially
11 all the time because of his fear.  Yeah, he didn't leave to go
12 to the law library, not that, to be honest, any ordinary
13 person could have figured out Earley and figured out all of
14 these different things.  He stayed inside his cell because he
15 was scared, and you heard no testimony or documents otherwise.
16      Remember, this is their prison.  If there is all of
17 this evidence of what it was like in their prison, they have
18 it.  It's their facility.  They could have brought it to you.
19 He doesn't have that, and yet they blame him for that gap.
20      Now, they said he pled guilty to PRS.  Well, he
21 didn't know.  They have absolutely no evidence that he knew he
22 was facing an illegal sentence.  And use your common sense, if
23 he had known it was an illegal sentence, would he have just
24 simply pled guilty to it immediately?  No, of course not.
25      Now, they faulted him, they said he knew enough

Rebuttal - Rickner                339

1  about the law to write to the state court in 2002 to fix the
2  sentencing.  He testified he did that because his lawyer told
3  him it was a good idea.  It's not because he knew the law.
4  It's because he had a lawyer that, in that case, knew the
5  right thing to do.  So that point has no value.
6       Now, they make -- you really hear them try to
7  divorce themselves from Rikers Island because it's a city
8  agency.  They're acknowledging how bad it is but you know
9  what, they're the ones that run their parole courtroom, that's
10 Division of Parole, Tracy's agency, they run their parole
11 courtroom from Rikers Island.  They know full well that
12 they're bringing people into that incredibly dangerous
13 situation, and that's particularly egregious when somebody
14 shouldn't have been there in the first place.
15      They made a ding that one of the judges comments
16 doesn't appear on the record.  Well, that doesn't means it
17 didn't happen.  That means it just didn't happen on the
18 record.  Sometimes you're on the record, sometimes you're off
19 the record.  They didn't bring in anybody with firsthand
20 knowledge.  In fact, they didn't even challenge that testimony
21 for Mr. Santiago.  They could have asked him, well, that
22 didn't happen, it's not on the record.  They never
23 cross-examined him with that, no.
24      Now, they also claim that there's no evidence of
25 recklessness.  They talked about the dedication they've put,

Rebuttal - Rickner                340

1  they talk about other things.  This isn't about everything
2  else that they did.  And I'm not saying that every single
3  thing that they did in their work was bad, just like not every
4  single thing Mr. Santiago did was bad, right?  Family, right?
5  He's a person too.  Everybody has good sides and bad sides.
6       What I'm saying is the defendants, on this
7  particular issue, the one that's particularly important, they
8  had an obligation to either have people resentenced or get
9  them let out.  They had no authority, and they've conceded
10 this, they cannot hold somebody without lawful authority.
11 Every single one of them did it.
12      But, remember, when I talked about abuse of power
13 and bureaucracy, what they did is they stood up the
14 bureaucracy and all of the a sudden this becomes so
15 complicated because they hadn't gotten the sentencing minutes
16 and everything is on paper.  I mean, whose fault is it that
17 everything is on paper.  It's not Mr. Santiago's fault.  It's
18 the 2000s, you know.  If you can run an agency that uses a
19 computer, you don't have to run everything off paper.  That's
20 reckless.
21      So they hide behind the bureaucracy; oh, everything
22 is so complicated, everything is so hard.  Well, it wasn't
23 hard when they applied the illegal sentence.  They just
24 decided it was hard when it came time to remove it.  And they
25 didn't testify to a single thing they did in the relevant time

Rebuttal - Rickner                341

1   period, before they locked up Mr. Santiago, to comply with
2   Earley.  Not one thing.  And defense counsel did not highlight
3   a single fact to support that.  Instead, they just brought up
4   everything else, they blamed everyone else, they looked at
5   everything else, but they, themselves, despite having all of
6   the power they testified to, all the authority, well, for some
7   reason in this particular instance, they just couldn't do it.
8   And I'm saying that isn't a plausible explanation.  And the
9   one thing that we do agree on with the defense is they were
10  found liable for those failures.  That's the basic fact here.
11       And, so, when I talk about compensatory damages and
12  say zero, nominal, no.  He experienced real pain.  They're
13  musings about how maybe it wouldn't have been that bad,
14  doesn't -- doesn't really have any value, it should have no
15  weight.  It's not his testimony.  And, further, punitive
16  damages, they have never once apologized for, justified, or
17  truly explained their failure to comply with Earley, that's
18  why they're liable.  So we submit punitive damages are on the
19  table, as well.
20       This is the last thing I get to say to you before
21  you hear the charges and get to deliberate.  And I sincerely
22  appreciate the time.  And as I said and I keep saying, my
23  client and the defendants are in your hands.
24       THE COURT:  All right.  Thank you.
25       Members of the jury, at this time, I would advise

Proceedings                342

1   you of the law that you are to apply to the evidence as you
2   find it.
3        It will be somewhat lengthy, I'm happy to give you a
4   break right now if you want, to just take a quick break,
5   refresh yourselves, get some water or coffee or whatever it
6   is, and it will take some time.  And, in addition, I need to
7   speak to the lawyers about an issue that has come up, a legal
8   issue.  So if you will kindly return in the jury room.  We
9   will retrieve you as soon as we can.  Please don't talk about
10  the case.  Thank you.
11       (Jury exits the courtroom.)
12       THE COURT:  Have a seat.  My clerk was doing a final
13  readthrough of the instructions based on the conversations
14  that we had today, particularly regarding nominal damages and
15  we found a couple of other corrections we made and we hope
16  that we can get your agreement.
17       If you would turn to page 25 of the new version,
18  which Ms. Wong will give you, you can also refer to the old
19  version which was the one posted, but I think it will be
20  easier to use Court Exhibit 2, which we've just handed you.
21       So if you turn to the nominal damages page, we have
22  changed the word "may" to "must."  And I will explain why that
23  happened.  The word "must" occurs in the fourth line under
24  Subsection C, and the penultimate line of the first paragraph
25  of Subsection C, and in the first sentence of the following

Proceedings                343

1   paragraph.
2        In addition, if you go to page 26, the second full
3   sentence -- I'm sorry, the first full sentence on that page,
4   we've stricken the words, "or punitive" from the sentence.
5        And finally, the last sentence of that section, the
6   last line, the word "must" has been substituted for the word
7   "may."
8        Does anyone object?
9        MR. RICKNER:  No, Your Honor.
10       MR. KEANE:  No objection.
11       THE COURT:  All right.
12       So what I'm going to do is post this corrected
13  version as Court Exhibit Number 2 and it is this version I
14  will read to the jury, all right?
15       (Court Exhibit 2, was received in evidence.)
16       THE COURT:  Do you all want to take a little stretch
17  before we get going?
18       MS. PANOUSIERIS:  I'd like to run to the restroom.
19       THE COURT:  All right.  Five minutes, if you can.
20       (Recess taken.)
21       (Continued on the following page.)
22
23
24
25

Charge of the Court               344

1   (Continuing.)
2        (In open court; jurors not present.)
3        THE COURT:  All right.  We have all the lawyers
4   back.
5        I neglected to tell you about one other change on
6   page 27 under "Duty to Deliberate."  The word "may" is now
7   must in the last sentence on page 27.
8        MS. DURDEN:  Yes, Your Honor.
9        THE COURT:  Okay.  Good.  Plaintiff's counsel is
10  okay, too?
11       MR. RICKNER:  Yes.
12       THE COURT:  Okay.  All parties are onboard.
13       So we will get the jury now, Ms. Jackson, and we
14  will start them with their instructions.
15       Thank you.
16       THE COURTROOM DEPUTY:  Thank you.
17       THE COURT:  Ms. Durden, I want to apologize.  I
18  accidently hit the button that lifted the screen in the middle
19  of your closing, and I know it was distracting.  I'm sorry
20  about that.
21       MS. DURDEN:  Your Honor, I didn't even notice.
22       THE COURT:  Oh, good.  Well, I was mortified.  What
23  if she needs the screen?  Should I put it down?  That will
24  make noise.
25       (Jury enters.)

Charge of the Court 345

```
 1            THE COURT:  All jurors are present.
 2            Mr. Santiago hasn't come back to the courtroom.
 3            May we start without him, or would you like me to
 4  wait a few minutes?
 5            MR. RICKNER:  I see no reason not to start the
 6  conference, but she will make sure he comes back in without
 7  any intrusion, if that's okay.
 8            THE COURT:  All right.
 9            You can't really go into the men's room and find
10  him, so...
11            MR. RICKNER:  Well, no.
12            THE COURT:  So we'll start with your permission?
13            MR. RICKNER:  Yes, please, Your Honor.
14            THE COURT:  All right.
15            Members of the jury, now that the evidence on the
16  plaintiff's claim has been fully presented and the attorneys
17  for the plaintiff and the defendants have concluded their
18  closing arguments, it is my responsibility to instruct you on
19  the law that governs this case.  My instructions will be in
20  three parts.
21            First, I will instruct you regarding the general
22  rules that define and govern the duties of a jury in a civil
23  case and the way in which you are to review the evidence.
24            Second, I will instruct you on determining the
25  plaintiff's damages claims in this case, which the plaintiff
```

Denise Parisi, RPR, CRR
Official Court Reporter

Charge of the Court 346

```
 1  must prove by a preponderance of the evidence.
 2            And, third, I will give you some general rules
 3  regarding your deliberations.
 4            First with regard to the general rules.
 5            Please pay close attention during these
 6  instructions.  I will go as slowly as I can and be as clear as
 7  possible.  I told you at the very start of the trial that your
 8  principal function during the taking of testimony would be to
 9  listen carefully and observe each witness who testified.  It
10  has been obvious to me and counsel that each of you has
11  faithfully discharged this duty.  Your interest never lagged
12  and it is evident that all of you followed the testimony with
13  close attention.  I ask that you please now give me the same
14  careful attention that you gave as I instruct you on the law.
15            As I told you before, my duty is to instruct you on
16  the law, and it is your duty to accept these instructions of
17  the law and apply them to the facts as you determine them,
18  just as it has been my duty to preside over this trial and
19  decide what testimony and evidence is relevant under the law
20  for your consideration.
21            On these legal matters, you must take the law as I
22  give it to you.  If any attorney has stated a legal principal
23  different from any that I state to you in my instructions, it
24  is my instructions that you must follow.
25            Please do not single out any instruction as alone
```

Denise Parisi, RPR, CRR
Official Court Reporter

Charge of the Court 347

```
 1  stating the law.  Instead you should consider my instructions
 2  as a whole when you retire to deliberate in the jury room.
 3            You should not, any of you, be concerned about the
 4  wisdom of any rule that I state.  Regardless of any opinion
 5  that you may have as to what the law is or should be, it would
 6  violate your sworn duty to base a verdict upon any view of the
 7  law other than what I will give you.
 8            As members of the jury, you are the sole and
 9  exclusive judges of the facts.  You pass on the evidence.  You
10  determine the credibility of the witnesses.  You resolve such
11  conflicts as there may be in the testimony and you draw
12  whatever reasonable inferences you decide to draw from the
13  facts as you have determined them, and you determine the
14  weight of the evidence.
15            In determining these issues you must rely upon your
16  own recollection of the evidence.  What the lawyers have said
17  in their opening statements and in their closing arguments, in
18  their objections, or in their questions is not evidence.  What
19  I may have said or what I may say in these instructions about
20  a fact issue is not in evidence.
21            The evidence before you consists of, first, the
22  answers given by the witnesses -- the testimony they gave here
23  in open court; second, the exhibits that were received in
24  evidence; and, third, any agreements, also known as
25  stipulations, by the parties that were received in evidence.
```

Denise Parisi, RPR, CRR
Official Court Reporter

Charge of the Court 348

```
 1            Please bear in mind that a question put to a witness
 2  is never evidence.  Only the answers are evidence.  However,
 3  you may not consider any answer that I directed you to
 4  disregard or that I directed struck from the record.  Do not
 5  consider such answers.
 6            Because you are the sole and exclusive judges of the
 7  facts, I do not mean to indicate any opinion as to the facts
 8  or what your verdict should be.  The rulings I have made
 9  during the trial are not any indication of my own views of
10  what your decision should be as to whether or not the
11  plaintiff has proven his case.
12            I also ask you to draw no inference from the fact
13  that, upon occasion, I asked questions of certain witnesses.
14  These questions were not -- were only intended for
15  clarification or to expedite matters and certainly were not
16  intended to suggest any opinion on my part as to the verdict
17  that you should reach, or whether any of the witnesses may
18  have been more credible than any other witness.  The Court has
19  no opinion as to the verdict you should render in this case.
20            As to the facts, members of the jury, you are the
21  exclusive judges.  You are here to perform the duty of finding
22  the facts without bias or prejudice to any party.
23            Now, a word about the conduct of counsel during this
24  trial.
25            It is the duty of the attorney on each side of a
```

Denise Parisi, RPR, CRR
Official Court Reporter

Charge of the Court                                             349

1   case to object when the other side offers testimony or other
2   evidence which the attorney believes is not properly
3   admissible.  Counsel also have the right and the duty to ask
4   the Court to make rulings of law and to request conferences at
5   the sidebar out of the hearing of the jury.  All those
6   questions of law must be decided by me as the Court.  You
7   should not show any prejudice against any attorney or his
8   client because the attorney objected to the admissibility of
9   evidence, or asked for a conference out of the hearing of the
10  jury, or asked the Court for a ruling on the law.
11          As I already indicated, my rulings on the
12  admissibility of evidence do not, unless expressly stated by
13  me, indicate any opinion as to the weight or effect of such
14  evidence.  You are the sole judges of the credibility of all
15  of the witnesses and the weight and effect of all of the
16  evidence.
17          Your verdict should be based on the facts that you
18  find from the evidence admitted at this trial and the law as
19  instructed by the Court.
20          During the course of the trial, I may have had to
21  admonish or direct an attorney at this time.  You should draw
22  no inference against the attorney or the client.  It is the
23  duty of the attorneys to offer evidence and press objections
24  on behalf of their side.  It is my function to cut off counsel
25  from an improper line or argument or questioning, or to strike

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                             350

1   offending remarks, or to admonish counsel when I think it is
2   necessary.  But you should draw no inference from that.  It is
3   irrelevant whether you like a lawyer or whether you believe
4   that I like a lawyer.
5           In fact, in this case, I would like to express my
6   gratitude to all of the attorneys for their conscientious
7   efforts on behalf of their clients and for work well done.
8           I have not expressed nor have I intended to express
9   any opinion as to which witnesses are or are not worthy of
10  belief, and what facts are or are not established, or what
11  inference or inferences you should draw from the evidence.  If
12  any expression of mine has seemed to indicate on opinion
13  relating to any of these matters, I instruct you to disregard
14  it.  I repeat that you are the exclusive and sole judges of
15  all of the questions of facts submitted to you and of the
16  credibility of the witnesses.  Your authority, however, is not
17  to be exercised arbitrarily; it must be exercised with sincere
18  judgment, sound discretion, based on the evidence, and in
19  accordance with the rules of law which I give you.
20          In making your determination of the facts in this
21  case, your judgment must be applied only to that which is
22  properly in evidence.  Arguments of counsel are not in
23  evidence, although you may give consideration to those
24  arguments in making up your own mind on what inference to draw
25  from the facts that are in evidence.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                             351

1           From time to time, the Court has asked a question or
2   has been called upon to pass on the admissibility of certain
3   evidence, although I have tried to do so, insofar as it was
4   practicable, out of your hearing.  Do not be concerned with
5   the reasons for any such rulings, and do not draw any
6   inferences from them.  Whether evidence is admissible is
7   purely a question of law in the province of the court and
8   outside the province of the jury.
9           Now I'm going to review matters that you may not
10  consider.
11          Your verdict must be based solely upon the evidence
12  presented at this trial or the lack of evidence it would be
13  improper for you to consider any personal feelings that you
14  may have about one of the parties' race, religion, national
15  origin, gender, or age.  It would be equally improper for you
16  to allow any feelings you might have about the nature of the
17  damages claim against the defendants to influence you in any
18  way.  The parties in this case are entitled to a trial that is
19  free of prejudice.  Our judicial system cannot work unless you
20  reach your verdict through a fair and impartial consideration
21  of the evidence.
22          In this case, the defendants are state Government
23  officials who are involved with the criminal justice system
24  and law enforcement.  The mere fact that the defendants are
25  Government officials or involved with law enforcement and

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                             352

1   criminal justice does not mean that they are entitled to any
2   greater or lesser consideration by you.  All litigants are
3   equal before the law and are entitled to the same fair
4   consideration as you would give any other party.
5           Similarly, under your oath as jurors, you are not to
6   be swayed by fear or sympathy, or prejudice against a party.
7   You should be guided solely by the evidence presented during
8   the trial, without regard to the consequences of your
9   decision.
10          Does somebody need water?
11          You have been chosen to try the issues of fact and
12  reach a verdict on the basis of the evidence or lack of
13  evidence.  Do not let fear, sympathy, or prejudice interfere
14  with your clear thinking, because there is a risk that you
15  will not arrive at a just verdict if you do.  All parties to a
16  civil lawsuit are entitled to a fair trial.  You must make a
17  fair and impartial decision so that you will arrive at a just
18  verdict.
19          Now, a word about the burden of proof.
20          This is a civil case, and, as such, the plaintiff
21  has the burden of proving the material aspects of his damages
22  claim by a preponderance of the evidence.  To establish a fact
23  by the preponderance of the evidence means to prove that the
24  fact is more likely true than not.  A preponderance of the
25  evidence means the greater weight of the evidence.  It refers

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    353

1  to the quality and persuasiveness of the evidence, not to the
2  number of witnesses or the documents.  In determining whether
3  a claim has been proved by a preponderance of the evidence,
4  you may consider the relevant testimony of all of the
5  witnesses, regardless of who may have called that witness, and
6  all of the exhibits received in evidence, regardless of who
7  may offered those exhibits.
8        If you find that the credible evidence on a given
9  issue is evenly divided between the plaintiff and the
10  defendants -- that it is equally probable that one side is
11  right as it is the other side is right -- then you must decide
12  that issue against the plaintiff.  That is because the
13  plaintiff bears the burden of proof and must prove that simple
14  -- and must prove more than simple equality of evidence.  The
15  plaintiffs must prove his claims for damages by a
16  preponderance of the evidence.  On the other hand, the
17  plaintiff need not prove more than a preponderance.  So long
18  as you find that the scales tip ever so slightly in favor of
19  the plaintiff, then the element will have been proven by
20  preponderance of the evidence.
21        A preponderance of the evidence means the greater
22  weight of the evidence.  That does not mean the greater number
23  of witnesses or greater length of the time taken by either
24  side to present its case.  This determination is based on the
25  quality and persuasiveness of the evidence, the weight and

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    354

1  effect it has on your minds.
2        Some of you may have heard of proof beyond a
3  reasonable doubt, which is the proper standard for proof in a
4  criminal trial.  That requirement does not apply to a civil
5  case such as this and you should put it out of your mind.
6        Now, I will review, again, what is evidence.
7        You must determine the facts of this case based
8  solely on the evidence or those inferences which can be
9  reasonably drawn from the evidence.  I will now instruct you
10  on what evidence is and how you should consider it.
11        As I previously indicated, evidence has been
12  presented to you in the following forms:
13        First, sworn testimony from witnesses on direct
14  examination and cross-examination.  Again, I emphasize that it
15  is the witnesses answers that are evidence, not the questions
16  asked by the lawyers or the Court.
17        Second, exhibits that have been received in evidence
18  by the Court are properly considered by you.  If exhibits have
19  been marked for identification but have not been received in
20  evidence, you may not consider that exhibit as evidence.
21        And stipulations of fact, or agreements among the
22  parties that certain facts are true, you must regard such
23  facts as true.
24        The following are not evidence and are to be
25  disregarded by you in deciding what the facts are.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    355

1        Arguments, statements, or questions by the lawyers
2  or myself are not evidence.
3        Objections to the questions or the offered exhibits
4  are not evidence.  However, if an objection was over ruled,
5  treat the answer to that question or that testimony like any
6  other answer.
7        Testimony that has been excluded, stricken, or that
8  you have been instructed to disregard is not evidence.
9        Anything that I may have said or done is not
10  evidence.
11        And anything that you may have seen or heard outside
12  this courtroom is not evidence.
13        It is for you alone to decide the weight, if any, to
14  be given to the testimony you have heard and the exhibits you
15  have seen.
16        I've told you before that evidence comes in various
17  forms such as sworn testimony of witnesses, exhibits, and
18  stipulations.  These forms of evidence fall into two
19  categories -- direct and circumstantial.  You may use both
20  direct and circumstantial evidence in reaching your verdict in
21  this case.  The law does not distinguish between the weight,
22  that is, the value, of direct evidence as opposed to
23  circumstantial evidence.  Nor is a greater degree of certainty
24  required where something is to be proven by circumstantial
25  evidence as opposed to direct evidence.  You are to weigh all

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    356

1  of the evidence in this case, both direct and circumstantial.
2        So directed evidence is physical evidence or
3  testimony about a fact by an eyewitness or participant who
4  testifies to knowing that fact through one of the five senses.
5        Circumstantial evidence is the proof of a chain of
6  circumstances pointing to the existence or nonexistence of
7  certain facts.  Based on facts that you find have been proven,
8  you may draw such reasonable inferences or conclusions as seem
9  justified in light of your experience and common sense.
10  Whether a given inference should be drawn is entirely a matter
11  for you, the jury, to decide.  Please bear in mind, however,
12  that an inference is not to be drawn by guesswork or
13  speculation.
14        In drawing an inference, you should exercise your
15  common sense.  There are times when different inferences may
16  be drawn from different facts, whether they are proved by
17  direct or circumstantial evidence.  The plaintiff may ask you
18  to draw one set of inferences while the defendants may ask you
19  to draw another.  It is only for you, the jury, to decide what
20  inferences you draw from the facts which you decide have been
21  proven.
22        I also told you earlier that I would instruct you
23  further on witness credibility.  You have had the opportunity
24  to observe all of the witnesses here at this trial.  It is now
25  your job to decide the believability of each witness during

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                                357

1  their testimony.  You are the sole judges of the credibility

2  of each witness and of the importance of his or her testimony.

3          It must be clear to you by now that you are being

4  called upon to resolve various factual issues raised by the

5  parties in the face of very different pictures painted by both

6  sides.  In making these judgments, you should carefully

7  scrutinize all of the testimony of each witness, the

8  circumstances under which each witness testified, and any

9  other matters in evidence that may help you decide the truth

10  and the importance of each witness's testimony.

11          You should use all the tests for truthfulness that

12  you would use in determining matters of importance to you in

13  your everyday life.  You should consider any bias or hostility

14  that the witness may have shown for or against any party, as

15  well as any interest that the witness has in the outcome of

16  this case.  You should consider the opportunity that the

17  witness had to see, hear, and know the things about which she

18  or he has testified; the accuracy of his or her memory; and

19  his or her candor or lack of candor; his or her intelligence;

20  and the reasonableness and probability of his or her testimony

21  and its consistency or lack of consistency; and the

22  testimony's corroboration or lack of corroboration with other

23  credible testimony or evidence.

24          In deciding whether to believe a witness, you should

25  specifically note any evidence of hostility toward, or

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

358

1  alliances which the witness may have with, one of the other

2  parties.  Likewise, you should consider evidence of any other

3  interest or motive that the witness may have in cooperating

4  with one of the parties.

5          It is your duty to consider whether the witness has

6  permitted any such bias or interest to color his or her

7  testimony.  In short, if you find that a witness is biased,

8  you should view his or her testimony with caution, weigh it

9  with care, and subject it to close and searching scrutiny.

10          In evaluating the credibility of the witnesses, you

11  should take into account any evidence the witness may benefit

12  in some way from the outcome of the case.  For example, both

13  plaintiff and defendants have an interest in prevailing at

14  this trial.  An interest in the outcome may create a motive to

15  testify falsely and may sway a witness to testify in a way

16  that advances his or her interests.  Therefore, if you find

17  that any witness whose testimony you are considering may have

18  an interest in the outcome of this trial, then you should bear

19  that factor in mind when evaluating the credibility of his or

20  her testimony and decide with great care whether and how much

21  of the testimony to accept.

22          Keep in mind, though, that it does not automatically

23  follow that testimony given by an interested witness is to be

24  disbelieved.  There are many people who, no matter what their

25  interest in the outcome of the case, would testify truthfully.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                                359

1  It is for you to decide, based on your own perceptions and

2  common sense, to what extent, if at all, the witness's

3  interest has affected his or her testimony.

4          A word about the fact that there's no duty to call

5  every witness or to produce all the evidence.

6          The law does not require any party to call as

7  witnesses all persons who may have been present at any time or

8  place involved in this case, or who may appear to have some

9  knowledge of the matters at issue in this trial.  Nor does the

10  law require any party to produce as exhibits all papers and

11  things mentioned in the evidence in this case.  You should not

12  speculate about evidence that witnesses have mentioned, but

13  which has not been introduced in this case.  You must

14  disregard such references and decide the facts of this case

15  based only on the evidence that has been submitted and

16  admitted at this trial.

17          I will now turn to the second part of this charge

18  and instruct you as to the type of damages you may award, if

19  any, for the plaintiff's damages claims.

20          First, the governing statute is 42 U.S. Code,

21  Section 1983.

22          In this case, plaintiff's claims against the

23  defendants are brought under a federal law, 42 U.S.C.,

24  Section 1983, also referred to as a Section 1983 case.

25  Section 1983 is a federal civil rights law that creates a

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                                                360

1  federal remedy for persons who had been deprived by state

2  officials of rights, privileges, and immunities secured by the

3  United States Constitution or laws of the United States.

4  Section 1983 states in relevant part -- and I'm quoting here:

5  Every person who, under color of any statute, ordinance,

6  regulation, customs or usage of any state or territory or the

7  District of Colombia, subjects or causes to be subjected, any

8  citizen of the United States or other person within the

9  jurisdiction thereof to the deprivation of any rights,

10  privileges or immunities secured by the Constitution and laws,

11  shall be liable to the party injured in an action at law, suit

12  in equity, or other proper proceeding for redress.

13          In this case, the plaintiff has already established,

14  by a preponderance of the evidence, each of the following

15  three elements of his Section 1983 claim:

16          First, that the act or acts complained of were

17  committed by the defendants acting under color of state law;

18  second, that the defendants' conduct deprived the plaintiff of

19  rights, privileges or immunities secured by the Constitution

20  or laws of the United States; and, third, that the defendants'

21  acts were the proximate cause of injuries sustained by the

22  plaintiff.

23          I stress again that each of the elements above have

24  already been established against each of the defendants, and

25  the defendants have been found to have violated the

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

Charge of the Court                    361

1   plaintiff's constitutional rights under Section 1983, by
2   refusing to vacate the illegal post-release supervision, by
3   refusing to ask a judge to resentence the plaintiff, and/or by
4   enforcing the illegal post-release supervision against the
5   plaintiff which led to his re-incarceration between June 12th,
6   2007, and February 1st, 2008, because he was held to have
7   violated his post-release supervision.  As a result, the
8   plaintiff seeks damages because he was incarcerated for
9   violating an illegal term of post-release supervision between
10  June 12th, 2007, and February 1st, 2008.  You are to decide
11  whether the plaintiff has proven that he suffered damages,
12  whether he is entitled to damages, and the amount of damages,
13  if any, for the plaintiff's alleged injuries that resulted
14  from the defendants' violations of the plaintiff's
15  constitutional rights.

16      The fact that I am instructing you on how to award
17  damages does not mean that I have any opinion on whether any
18  of the defendants should pay damages in this case.  I am
19  instructing you about damages only so that you will have
20  guidance if you decide that plaintiff is entitled to recover
21  damages.

22      If you find that the plaintiff has proven that all
23  of the defendants are responsible for his injuries, you may
24  simply determine the overall total amount of damages for which
25  the defendants are liable.

Charge of the Court                    362

1       There are three defendants in this case, and it does
2   not follow that if you award damages against one defendant,
3   the other defendants must also pay damages.  Each defendant is
4   entitled to fair, separate, and individual consideration of
5   the plaintiff's damages claim without regard to your decision
6   as to the other defendants.  If you find, for example, that
7   only one or two of the defendants are responsible for a
8   particular injury, then you may impose damages for that injury
9   only upon those defendants and determine the amount to be paid
10  by each of those defendants.

11      Finally, one last reminder about the defendants.
12  You must remember that the defendants in this case are
13  individuals:  The State of New York and its agencies are not
14  on trial.  There is no claim here against New York State, the
15  New York State Department of Correctional Services -- or DOCS
16  -- or the New York State Division of Parole.  The defendants
17  are being sued by plaintiff in their individual capacities.
18  In order to consider the plaintiff's damages with respect to a
19  defendant, you must find by a preponderance of the evidence
20  that the defendant that you are deliberating about was
21  responsible for the plaintiff's damages.

22      I will now define the types of damages that you may
23  award.

24      First, compensatory damages.

25      The purpose of law of damages is to award, as far as

Charge of the Court                    363

1   possible, just and fair compensation for the loss, if any,
2   which results from a defendants' violation of a plaintiff's
3   rights.  If you find that the defendant you are considering is
4   liable for damages, as I have explained it, then you must
5   award the plaintiff sufficient damages to compensate him for
6   any injury proximately resulting from that defendant's
7   conduct.

8       Compensatory damages seek to compensate the
9   plaintiff for the damages that he suffered.  This might
10  include damages resulting from a plaintiff's physical injury,
11  pain and suffering, mental anguish, shock, and discomfort that
12  he has suffered as a result of a defendant's conduct.

13      You shall award compensatory damages only for those
14  injuries which you find that plaintiff has proven by a
15  preponderance of the evidence as to the specific defendant you
16  are considering.  Moreover, you may award compensatory damages
17  only for those injuries which you find plaintiff has proven to
18  have been the proximate result of the conduct of the defendant
19  in violation of Section 1983.  That is, you may not simply
20  award compensatory damages for any injury suffered by the
21  plaintiff -- you may award compensatory damages only for those
22  injuries that resulted from the conduct by the defendant that
23  violated plaintiff's federal rights under color of law.

24      Compensatory damages must not be based on
25  speculation or sympathy.  They must be based on the evidence

Charge of the Court                    364

1   presented at trial.

2       Should you decide to award damages, computing
3   damages may be difficult, but you must not let that difficulty
4   lead you to engage in arbitrary guesswork.  On the other hand,
5   the law does not require that the plaintiff prove with
6   exact -- prove the exact amount of his losses with
7   mathematical precision, but only with as much definitiveness
8   and accuracy as the circumstances permit.

9       I will now explain punitive damages.

10      Whether or not you award the plaintiff's
11  compensatory damages, you may also, in your discretion, make
12  an award of punitive damages.

13      You may, but are not required to, award punitive
14  damages only if you find that a particular defendant's conduct
15  was motivated by evil motive or intent, or the defendant's
16  conduct involved reckless or callous indifference to the
17  plaintiff's federal constitutional rights.  An award of
18  punitive damages, however, is discretionary; that is, if you
19  find that the legal requirements for punitive damages are
20  satisfied, then you may decide to award punitive damages, or
21  you may decide not to award them.

22      The purpose of punitive damages are not to
23  compensate the plaintiff but rather to punish the defendants
24  and to deter the defendants and others from committing similar
25  acts in the future.  You should also consider whether

```
                    Charge of the Court                    365

 1   compensatory damages standing alone are likely to deter or
 2   prevent a defendant from again performing any wrongful facts
 3   he may have performed, or whether punitive damages are
 4   necessary to provide deterrence.  Finally, you should consider
 5   whether punitive damages are likely to deter or prevent other
 6   persons from performing wrongful acts similar to those a
 7   defendant may have committed.  If you decide to award punitive
 8   damages, these same purposes should be considered by you in
 9   determining the appropriate sum of money to be awarded as
10   punitive damages.  That is, in fixing the sum to be awarded,
11   you should consider whether a particular defendant should pay
12   punitive damages at all and, if so, the degree to which each
13   particular defendant should be punished for his wrongful
14   conduct, and the degree to which an amount of punitive damages
15   will deter the defendant or others like him from committing
16   wrongful acts in the future.
17              I will now turn to nominal damages, which you've
18   heard about during summations.
19              If you conclude that the only injury that the
20   plaintiff suffered was the deprivation of his rights, without
21   any physical, emotional, or financial damage, you must award
22   nominal damages of one dollar.  In other words, if you find
23   that plaintiff has failed to prove by a preponderance of the
24   evidence that he suffered any compensatory or punitive
25   damages, then you must return an award of damages in the sum
```

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

```
                    Charge of the Court                    366

 1   of one dollar.
 2              You must also award nominal damages if you find that
 3   some injury resulted, but you are not able to compensate --
 4   I'm sorry, let me strike that.
 5              You must also award nominal damages if you find that
 6   some injury resulted, but you are unable to compute the
 7   monetary damages except by engaging in pure speculation or
 8   guessing.  You may not award both nominal damages and
 9   compensatory damages.  If the plaintiff was measurably
10   injured, you must award compensatory damages.  Because the
11   Second Circuit Court of Appeals has already found that the
12   defendants' actions violated plaintiff's constitutional
13   rights, you then -- and if you then find that the plaintiff
14   was not injured in any way by the defendants' violation of his
15   constitutional rights, then you must award nominal damages.
16              (Continued on following page.)
17
18
19
20
21
22
23
24
25
```

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

```
                    Charge of the Court                    367

 1   (Continuing.)
 2              THE COURT:  A word about mitigation of damages.
 3              The plaintiff has a duty to use reasonable efforts
 4   to mitigate damages.  To mitigate means to avoid or reduce
 5   damages.  You must determine whether the plaintiff could have
 6   done something, after the injurious conduct, to lessen the
 7   harm that he suffered.  The burden is on the defendant to
 8   prove the mitigation by a preponderance of the evidence, that
 9   the plaintiff could have lessened the harm that was done to
10   him and that he failed to do so.  If the defendant convinces
11   you that the plaintiff could have reduced the harm done to him
12   and failed to do so, the plaintiff is entitled only to damages
13   sufficient to compensate him for the injury that he would
14   still have suffered even if he had taken appropriate action to
15   reduce the harm done to him.
16              Now we are at the final part of these instructions
17   which instruct you about deliberations, your deliberations on
18   the damages claim.
19              Now that I have outlined for you the rules of law
20   applicable to damages in this case and the processes by which
21   you should weigh the evidence and determine the facts, I will
22   give you some guidance for use in your deliberations.
23              First, when you retire to the jury room, you should
24   select one member of the jury as your foreperson.  That person
25   will preside over the deliberations and speak for you, the
```

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

```
                    Charge of the Court                    368

 1   jury, here in open court, but his or her voice is not entitled
 2   to any greater weight than that of any other juror, just
 3   simply the organizer and the spokesperson for the jury.
 4              Each of you will be retiring to the jury room to
 5   decide this case and you will have the duty to deliberate.  In
 6   order to prevail, the plaintiff must sustain his burden of
 7   proof as I have explained it to you with respect to damages
 8   that he may receive from each defendant, if at all, for
 9   defendants' violation of his constitutional rights.  If you
10   find that plaintiff has succeeded in proving damages, you
11   should return a verdict in plaintiff's favor.  If you find the
12   plaintiff failed to sustain the burden of proving damages, you
13   should you return a verdict against the plaintiff and you must
14   award nominal damages for the constitutional violation.
15              It is your duty as jurors to consult with one
16   another, to listen to each other and deliberate with a view to
17   reaching a unanimous verdict.  Each of you must decide the
18   case for himself or herself, but you should do so only after
19   consideration of the case with your fellow jurors, and you
20   should not hesitate to change an opinion when convinced that
21   it is erroneous.  Your verdict must be unanimous, but you are
22   not bound to surrender your honest convictions concerning the
23   effect or weight of the evidence for the mere purpose of
24   returning a unanimous verdict or solely because the opinion of
25   other jurors.  Discuss and weigh your respective opinions
```

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Charge of the Court                    369

1  dispassionately, without regard to sympathy, without regard to
2  prejudice or favor for either party, and adopt that conclusion
3  which in your good conscience appears to be supported by the
4  evidence and in accordance with the truth and the law.
5         Again, each of you must make your own decision about
6  the proper outcome of this case based upon your consideration
7  of the evidence and your discussions with your fellow jurors.
8         Now, during your deliberations you will have all of
9  the exhibits that have been admitted with you in the jury
10  room.  If you want any of the testimony read back to you, you
11  may request that.  But please remember that it is not always
12  easy to locate the testimony that you might want to hear, so
13  be as specific as you possibly can in requesting portions of a
14  witness's testimony.
15         Any communication with the court, including your
16  requests for exhibits or testimony, should be made to me in a
17  writing, signed by your foreperson, and given to one of the
18  court security officers who will be stationed outside your
19  jury room.  You will be given a notebook by Ms. Jackson and
20  the foreperson should write a note, signed and dated,
21  requesting whatever testimony or other answers that the jury
22  may have.  Do not tell me or anyone else how the jury stands
23  on any issue until you reach a unanimous verdict.  You will be
24  receiving a copy of these instructions.  I will give you two
25  copies to share and review in the jury room.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Charge of the Court                    370

1         During your deliberations, you must not communicate
2  with or provide any information to anyone by any means about
3  this case, except among your fellow jurors in the jury room.
4  You must all be there in the jury room during deliberations.
5  If somebody steps out, stop your deliberations and wait until
6  that person returns.  You may not use any electronic device or
7  media to communicate to anyone any information about this case
8  or to conduct any research about this case until after I
9  accept your verdict.  This includes any phone or smart phone
10  or computer or tablet, any text or instant messaging service,
11  any internet website or service, or any social media platform.
12         In other words, you cannot talk to anyone on the
13  phone, correspond with anyone, or electronically communicate
14  with anyone about this case.  You can only discuss the case in
15  the jury room with all of your fellow jurors present during
16  your deliberations.
17         Now, when you have reached a unanimous verdict,
18  simply send me a note signed by your foreperson that you have
19  reached a verdict.  Do not indicate in the note what the
20  verdict is.  Your foreperson will fill out a verdict sheet
21  that has been given to you.  He or she will sign it and date
22  it, and advise the officer outside your door that you are
23  ready to return to the courtroom to publish your verdict.
24         I will stress that each of you should be in
25  agreement with the verdict which is announced in court.  Once

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Charge of the Court                    371

1  your verdict is announced by your foreperson in open court or
2  by me and officially recorded, the verdict cannot ordinarily
3  be revoked.
4         Damages in this case will be decided based on the
5  answers that you are to give to the questions that will be
6  submitted to you.  I have prepared a verdict form which we
7  marked as Court Exhibit 2A.  The instructions are Court
8  Exhibit 2.  Each of the questions calls for an answer.  There
9  are also spaces to indicate your verdict on each of the
10  plaintiff's damages claims against each defendant.  You must
11  return a verdict on each defendant.
12         Your general verdict and your answers to the special
13  questions must be unanimous and must reflect the conscientious
14  judgment of each juror.  So you will see the form, but there
15  are spaces for filling in.
16         When you have answered all of the questions that
17  require answers and the foreperson has signed the verdict
18  sheet, report that to the court.  Do not assume from the
19  questions or from the wording of the questions or from my
20  instructions on them what your answers should be.
21         I know that each of you will try the issues in this
22  case that have been presented to you according to the oath
23  that you have taken as jurors, in which you promised that you
24  would well and truly try the issues in this case and render a
25  true verdict.  If you follow that oath, and try the issues

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Charge of the Court                    372

1  without fear, prejudice, bias, or sympathy, you will arrive at
2  a true and just verdict.
3         Let me just ask the parties whether they have any
4  further instructions or comments before we excuse the jurors
5  to begin their deliberations.
6         MR. RICKNER:  No, Your Honor .
7         MR. KEANE:  No, Your Honor.
8         THE COURT:  All right.  So what we will do then is
9  bring you to the jury room.
10         Oh, I have an officer here.  He will be outside your
11  door, he or one of his colleagues.  He will be the person in
12  the conduit who will notify us of any notes you may have.
13         Sir, would you state your name for the record,
14  please.
15         COURT SECURITY OFFICER:  Wayne Pinsent,
16  P-i-n-s-e-n-t.
17         THE COURT:  Please raise your right hand.
18         THE CLERK:  Do you solemnly swear or affirm that you
19  will keep the jurors sworn in this cause together in a safe
20  and convenient place and shall not speak to them nor shall you
21  allow anyone to speak to them without direction from the
22  Court?
23         COURT SECURITY OFFICER:  I do.
24         THE COURTROOM DEPUTY:  Thank you.
25         THE COURT:  All right.  Thank you.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Jury Deliberations                                    373

1    So the court security officer and Ms. Jackson will

2    take you to the jury room.

3    We have all of the admitted exhibits in a binder.

4    We also have an exhibit list of the admitted exhibits.  And we

5    have a copy of the charges, two copies of the charges, one

6    copy of the verdict sheet.

7    Did Juror No. 5 ever get her notebook back?

8    JUROR NO. 5:  I don't need it.

9    THE COURT:  Okay, that is perfect.

10    Now, I would like you to deliberate until 5:30, if

11    that is convenient for everybody.  And what we will do is, we

12    will check on you at 5:30 and either excuse you for the day,

13    in which case you will come back tomorrow, or you may reach a

14    verdict before that time, and that is fine too.  All right?

15    Thank you very much, members of the jury.

16    (Jury exits to begin deliberations at 3:47 p.m.)

17    (In open court; jury not present.)

18    THE COURT:  All right.  So what I am going to ask

19    the lawyers to do is to please put your phone numbers, cell

20    phones numbers on a piece of paper.  Do not go more than

21    five minutes from the courthouse.  In fact, if you want to

22    hang out in the courtroom, that is fine.  But do not go far,

23    please, because if we get a note, we need to get everybody

24    back here.

25    Now, I know the attorneys ordered daily copy.  Do

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Jury Deliberations                                    374

1    you all have copies of the transcript?

2    MR. RICKNER:  For yesterday, yes, absolutely, I do.

3    MS. DURDEN:  Yes, we do as well.

4    THE COURT:  So if there is a note asking for

5    testimony, what you have to do is start looking quickly and

6    what I will do is, I have to make sure the parties agree, we

7    redact any extraneous information like my comments or

8    sidebars, and then we copy those redacted transcript pages and

9    send them back to the jury.

10    MR. RICKNER:  Understood.

11    THE COURT:  All right.  What we will do is, if it is

12    necessary for them to come back tomorrow, we will order them

13    lunch so they can deliberate through lunch.  And we do not

14    make any promises about lunch, just in order not to have any

15    influence on them.  All right?

16    Thank you.  All right.  I will see you later.

17    (Court is in recess awaiting verdict of the jury.)

18    (Continued on the next page.)

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    375

1    (Continuing.)

2    THE COURT:  Have a seat everybody.

3    All right, we have all counsel and the parties

4    present.

5    I was going to excuse the jurors for the evening,

6    just bring them in here, give them their admonishments about

7    research and talking about the case, and then ask them to

8    return by 9:00 a.m.

9    Should we ask them to report here or downstairs?

10    THE COURTROOM DEPUTY:  To the second floor.

11    THE COURT:  Second floor, all right.

12    So, we don't have a verdict, so they'll be back.

13    And we'll feed them lunch tomorrow, you can let them know.

14    THE COURTROOM DEPUTY:  Absolutely.

15    THE COURT:  Great.  They'll be in shortly.

16    (Jury enters the courtroom.)

17    THE COURT:  All right.  All jurors are present.

18    Please have a seat.

19    Members of the jury, thank you, again, for your

20    ongoing service to the Court and to the parties.  I appreciate

21    it.  At this point, I promised to excuse you at 5:30, so I'm

22    going to do that.  Tomorrow, if you would please report to the

23    jury room on the second floor by 9:00 a.m.  As soon as you're

24    all here, we can bring you up and you can resume your

25    deliberations.

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

Proceedings                                    376

1    The other thing I was going to mention is we will

2    bring you lunch tomorrow -- not bring you, but we will give

3    you menus so you can order your lunch so you don't have to go

4    out and you can work through lunch.

5    Thank you very much for your service.  Please don't

6    talk about the case and please don't do any independent

7    research.  Thank you very much.  You're excused, and have a

8    safe trip back.

9    Leave everything in the jury room.  We'll tidy up a

10    bit.  Thank you.

11    (Jury exits the courtroom.)

12    THE COURT:  So I'll see you back here by 9:00.

13    They're going to be here by 9:00.  As soon as they are all

14    here, they're going to be put in the jury room.  Hopefully, I

15    there won't be anything that we need to worry about in the

16    morning, but I think it would be good if you are all here by

17    9:00.

18    Goodnight, everybody.

19    *     *     *     *     *

20    (Proceedings adjourned at 5:31 p.m. to resume on

21    November 30, 2022 at 9:00 a.m.)

LEEANN N. MUSOLF, RPR, CCR
Official Court Reporter

**EXHIBIT**

**1**

NEW YORK STATE SUPREME COURT
Sentence and Order of Commitment    Kings County, Criminal Term

The People of the State of New York
vs

SANTIAGO, JESUS          DNR 1624

Defendant

9 4 8 8 4 4 0 P

Sex  M   D.O.B.          NYSID

S.C.I.
Indictment No. _1141-00_

Date _5-15-02_ Part _37_

Justice _G. KEKHDAH_

Court Reporter _J. MESSANO_

The defendant having been
convicted of the crime/s of:
☐ Adjudicated a Youthful Offender

it is the Judgment of the Court that the defendant is hereby sentenced to a term
of imprisonment:

|  | No. of Counts | Counts are to run Concur. Consec. | Minimum Years | Maximum Years | Determinate ☐ Definite (Specify: days, mos. or yrs) |
|---|---|---|---|---|---|
|  |  | ☐ Indeterminate |  |  | ☒ Determinate |
| CRIME |  |  |  |  |  |
| 1. CPW 2' 265.03-2 |  | ☐ ☐ |  |  | 3 1/2 yrs |
| 2. |  | ☐ ☐ |  |  |  |
| 3. |  | ☐ ☐ |  |  |  |
| 4. |  | ☐ ☐ |  |  |  |
| 5. |  | ☐ ☐ |  |  |  |

The sentence on all Crimes is to run CONCURRENTLY unless otherwise indicated:

Crimes numbered _____ shall run CONSECUTIVELY.

☐ Sentenced to Parole Supervision (410.91 CPL)    ☐ Designated a SEX OFFENDER

RECEIVED
APR 22 2004
ULSTER C.F.

As a:  ☐ Second Felony Offender    ☐ Second Violent Felony Offender    ☐ Persistent Felony Offender
☐ Persistent Violent Felony Offender    ☐ Probation Violator

☐ JUVENILE OFFENDER - Crime date_____ Must be housed in a secure facility of NYS Office of Children and Family Services.

And
☐ Pay a fine of $_____ from inmate funds or serve a term of _____ days
☒ Pay a Mandatory Surcharge of $ _150_ from inmate funds.
☐ Pay a Crime Victim Fee of $ _5_ from inmate funds

CONCURRENTLY with _Federal sentence being served_

This sentence shall run
CONSECUTIVELY to _____

The defendant is hereby committed to the custody of the New York City Department of Correction to be
delivered to and incarcerated in the appropriate correctional facility until released according to law.

REMARKS: _NUNC PRO TUNC APN 2 2002_
_sintence to be served in Federal Custody_

Commitment & Probation
Report Rec'd by NYC Dept.
of Correction

Correction Officer

Shield No.

A true extract of the minutes. _Arlen Ave_          Court Clerk

1st copy-Dept. of Correction    2nd copy- court file    3rd copy- Appellate Division (if required)          SC CR 5 rev. 8/98

EXHIBIT

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM PART 23

THE PEOPLE OF THE STATE OF NEW YORK

-----------------------------------------------X

-against-

Jesus Santiago

Defendant,

-----------------------------------------------X

INDICTMENT # 1141/00

HON. MICHAEL J. BRENNAN
POST RELEASE SUPERVISION
RE-SENTENCING ORDER

NYSID # 9488440P

The Court, having examined the Court file, the sentencing Judge's notes, the original commitment order, and all available stenographic minutes of the plea and/or sentence;

And, having heard from the Defense Attorney and the Assistant District Attorney;

Finds, there being no discussion or agreement concerning post release supervision as part of the Defendant's sentence reflected anywhere in the proceedings;

And in the interests of justice and equity, the Court respectfully declines to re-sentence the Defendant herein and holds that no period of post release supervision constitutes part of the Defendant's sentence. Original Sentence Stands.

Any pending violation or prior revocation of a DOCS assessed period of PRS is deemed a nullity and is vacated. All other conditions of the original sentence remain in effect including surcharges, fees, orders of protection, revocations and suspensions, and any special conditions.

This constitutes the findings and decision of this Court.

SO ORDERED:

DATED: 12/15/10

HON. GUSTIN L. REICHBACH
N.Y.S. SUPREME COURT

HON . MICHAEL J. BRENNAN, GLN
JUSTICE, SUPREME COURT
KINGS COUNTY

EXHIBIT

3

1

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS - CRIMINAL TERM - PART 27
2  ----------------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,
3
4                  -against-
5  JESUS SANTIAGO,
6                     DEFENDANT
   ----------------------------------------------X
7  POST-RELEASE RESENTENCE
   Indict. No. 1141/00          320 Jay Street
8                               Brooklyn, New York
                                December 15, 2010
9
10
11  B E F O R E:
12      HONORABLE GUSTIN REICHBACH,
                   Justice
13
14
15  A P P E A R A N C E S:
16          OFFICE OF CHARLES J. HYNES, ESQ.
            DISTRICT ATTORNEY - KINGS COUNTY
            For the People
17          BY:  COREY MEDOW
                   Assistant District Attorney
18
19
20          SAMUEL KARLINER, ESQ.,
            For the Defendant
21          26 Court Street
            Brooklyn, New York
22
23
24                     ESTHER STERNLICHT, RPR
                       OFFICIAL COURT REPORTER
25

                                                    es

1        THE CLERK:  Added to the calendar, indictment

2    number 1141 of 2000, Jesus Santiago.  This defendant comes

3    before the court, post-release supervision.

4        MR. KARLINER:  Good afternoon, Your Honor.

5    Samuel Karliner, 26 Court Street, for Mr. Santiago.

6        MS. MEDOW:  Corey Medow for the office of the

7    district attorney.

8        MR. KARLINER:  Your Honor, Mr. Santiago was

9    sentenced to a determinate sentence of three and a half

10   years.  There was no discussion or agreement between

11   counsel, court and the people regarding post-release

12   supervision nor was anything stated on the record.  After

13   his release he traveled out-of-state to Virginia for which

14   he was, I guess, violated by New York state department of

15   corrections and incarcerated on that violation.

16       THE COURT:  For leaving the state, that was the

17   probation violation?

18       MR. KARLINER:  Correct.  At this time we are

19   asking that it be terminated.

20       THE COURT:  He was on probation, he was violated

21   on parole.

22       MR. KARLINER:  Parole rather.

23       THE COURT:  So are we talking about post-release

24   supervision?

25       MR. KARLINER:  He wasn't placed on post-release

es

SENTENCE                                                    3

1    supervision.

2            THE COURT:  Well, I assume it had to be

3    corrections that put him because there is no parole.

4            MR. KARLINER:  I'm sorry, it was corrections

5    imposed, correct.  I misspoke, I'm sorry.

6            MS. MEDOW:  Corrections imposed five years,

7    judge, it appears.

8            MR. KARLINER:  Yes, I'm sorry, judge.

9            THE COURT:  The people consenting?

10           MS. MEDOW:  Yes, judge, based on the Williams

11   decision, since it was corrections imposed, we consent to

12   no post-release.

13           THE COURT:  All right.  This was not the Court's

14   case but having examined the file, it appears that there

15   was no discussion or agreement concerning post-release

16   supervision as part of the defendant's sentence.  Based on

17   the consent of the people, the Court declines to resentence

18   the defendant and holds that no period of post-release

19   supervision constitutes part of the sentence.  And any

20   violation of prior revocation of a department of

21   corrections imposed post-release supervision is deemed a

22   nullity and is vacated.  So all the other conditions of the

23   original sentence remain in effect, including surcharges,

24   fees, order of protections and the like.  That's the

25   decision of the Court.

                                                          e s

**JA608**

SENTENCE                                                4

1           MR. KARLINER:  Your Honor, my client has one

2      additional request, that he is requesting to be placed in

3      protective custody.

4           THE COURT:  Well, isn't he getting released now?

5      Is the only thing that's holding him in the post-release

6      supervision?

7           MR. KARLINER:  Correct, but he's asking to be

8      placed in PC until he's released.

9           THE COURT:  And what's that -- the basis for that

10      request is what?

11           THE DEFENDANT:  Your Honor, I've been -- I

12      understand that you're not familiar, like, with the

13      different places that I've been.  But I've been all over

14      United States, going through violations, to the feds, to

15      the state of Virginia.  Now I'm in here in New York.  All

16      types of stuff happens on Rikers Island.  This is the

17      closest I've been to be able to go home in three years.  I

18      don't want nothing to happen.

19           I've been in little issues here, little squabbles

20      or however you want to say it, on Rikers Island.  I don't

21      want nothing to happen.  I'm in fear for my life.  I just

22      want my safety.  I just want to put in an area where I

23      can't get to nobody, nobody can't get to me until I'm

24      released.

25           THE COURT:  We'll endorse the card.

es

1            COURT OFFICER:  There is no card.  There's

2       nothing to endorse here.

3            THE COURT:  Isn't there some slip we return to

4       corrections?

5            COURT OFFICER:  The order that says it's

6       satisfied.

7            THE COURT:  Protective custody but I don't

8       understand why he would be shipped upstate.

9            THE CLERK:  Because he's a state inmate.

10           THE COURT:  No, but he's a state inmate based on

11      a violation of illegally imposed post-release supervision

12      which has now been vacated.

13           THE CLERK:  He's going to be sent where he came

14      from, that would be upstate because the order is from

15      upstate.  I don't think -- I don't even know if Rikers has

16      the ability to cut him loose.

17           MR. KARLINER:  Well, I guess the question is

18      where does your order get attached, the Court's order?  If

19      the Court order is attached to his paperwork, they may

20      release him very well from Rikers.

21           THE COURT:  Well, we'll attach a copy.

22           MR. KARLINER:  Thank you, judge.

23           THE COURT:  This constitutes the finding and

24      decision of the Court.

25           MR. KARLINER:  Thank you.

es

6

1                    *                    *                    *

2   It is hereby certified that the foregoing is a true and
    accurate transcript of the proceedings.

3

4

5

6   _____Esther Sternlicht_____

7   ESTHER STERNLICHT, RPR
    OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

es

SENTENCE  3=6-0

| DETERMINATE – POST-RELEASE SUPERVISION |

NYSID NO.  9488440P

SANTIAGO, Jesus 04-R-1624 , now confined in Greene C.F. , who was convicted of ███████ and
sentenced in the county of Kings at a term of the Supreme Court, Judge Reichback presiding on
the 15th day of May 2002 for the term of 3-6-0 the maximum term of such sentence
expires on the 29th day of May 20 05 , has agreed to abide by the conditions to which (he) (she)

has signed (his) (her) name below, and is hereby released by virtue of the authority conferred by New York State Law.

SANTIAGO, Jesus , is additionally subject to a period of 5-0-0 years Post-Release Supervision,

which will commence on the release date of NY/26/04 11/5/04 and (he) (she) will be under the legal jurisdiction of the

Division of Parole until the Post-Release Supervision maximum expiration date of November 28, 05 20 09

Date of Release: NY/26/04 11/05/04

Post-Release Supervision Period: 5-0-0

Post-Release Supervision Maximum Expiration Date: NY/26/09 11/05/09

I, SANTIAGO, Jesus 04-R-1624 , voluntarily accept Parole Post-Release supervision. I fully
understand that my person, residence and property are subject to search and inspection. I understand that Parole Post-Release
Supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the Board of Parole or
its representatives. I understand that my violation of these conditions may result in the revocation of my release.
PO: Tanya Rogers(Sister) 2257 W. 11th Street, Apt.3G, Brooklyn, N.Y. 11223
tel:(718)265-3326  S.R.S &
CONDITIONS OF RELEASE

1. I will proceed directly to the area to which I have been released, and, within twenty-four hours of my release, make
my arrival report to the Office of the Division of Parole unless other instructions are designated on my release agreement
Report to Brooklyn VI Area Office, SPO Fleischman/PO Alvarez, 14 DeKalb Avenue, Brooklyn,
N.Y. 11201 Tele:(718)522-8700
2. I will make office and/or written reports as directed.
3. I will not leave the State of New York or any other State to which I am released or transferred, or any area defined
in writing by my Parole Officer without permission.
4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search
and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or
program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer
of any changes in my residence, employment or program status when circumstances beyond my control make prior
discussion impossible.
5. I will reply promptly, fully and truthfully to any inquiry of or communication by my Parole Officer or other
representative of the Division of Parole.
6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement
agency. I understand that I have a continuing duty to notify my Parole Officer of such contact or arrest.
7. I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to
have been adjudicated a Youthful Offender except for accidental encounters in public places, work, school or in any other
instance with the permission of my Parole Officer.
8. I will not behave in such manner as to violate the provisions of any law to which I am subject which provide for a
penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.
9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my
Parole Officer. I will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife,
dirk, razor, stiletto, or imitation pistol. In addition, I will not own, possess or purchase any instrument readily capable of
causing physical injury without a satisfactory explanation for ownership, possession or purchase.
10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to
the State of New York from any state in the Union and from any territory or country outside the United States. This waiver
shall be in full force and effect until I am discharged from Parole or Conditional Release. I fully understand that I have the
right under the Constitution of the United States and under law to contest an effort to extradite me from another state and
return me to New York, and I freely and knowingly waive this right as a condition of my Parole or Conditional Release.
11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper
medical authorization.
12. Special Conditions:
 1) I will seek, obtain and maintain employment and/or an academic/vocational program.
 2) I will submit to substance abuse testing as directed by the P.O.
 3) I will participate in a substance abuse treatment program as directed by the P.O.
 4) I will NOT consume alcoholic beverages.
 5) I will x abide by a curfew established by the P.O.
 6) I will participate in anti-aggression/anti-violence counseling as directed by the P.O
 7) I will NOT associate in any way or communicate by any means with the victim without
 the permission of the P.O.

13. I will fully comply with the instructions of my Parole Officer and obey such special additional written conditions as
he or she, a Member of the Board of Parole or an authorized representative of the Division of Parole, may impose.

I hereby certify that I have read and that I understand the foregoing conditions of my release and that I have received
a copy of this Certificate of Release.

Signed this _____ day of _____ 20 04

Releasee: _____ Witness: _____

3010PRS (12/00)

DEFENDANT'S
EXHIBIT
I

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
JESUS SANTIAGO,

                              Plaintiff,

            - against -                          12-CV-2137 (KAM) (SLT)

BRIAN FISCHER et al.,                       JOINT STIPULATIONS

                              Defendants.
---------------------------------------------------------

        Pursuant to the Order of the Hon. Kiyo A. Matsumoto, Plaintiff Jesus Santiago and

Defendants Brian Fischer, Anthony Annucci, and Terrence Tracy, hereby submit the following

stipulations of fact and law:

        1.      Jesus Santiago, the plaintiff in this action, at the relevant times, was an individual

incarcerated in the New York State Department of Corrections and Community Supervision

("DOCCS"), then known as two agencies, the Department of Correctional Services ("DOCS") and

the Division of Parole ("Parole").

        2.      In or around the first week of February, 2000, Mr. Santiago was arrested and

incarcerated until March 13, 2000.

        3.      Mr. Santiago was arraigned for that offense on March 13, 2000, in Kings County

Criminal Court, under Indictment No. 1141/2000, and released on bond pending a criminal trial.

        4.      On May 3, 2001, Mr. Santiago was incarcerated in federal prison.in the State of

Virginia.

        5.      On June 12, 2001, Mr. Santiago was taken into federal custody in Alexandria, Virginia

and incarcerated in in the Eastern District of Virginia.

        6.      On November 16, 2001, Mr. Santiago pleaded guilty in the United States District

Court for the Eastern District of Virginia.

**JA613**

7.  Mr. Santiago was sentenced on November 16, 2001 in the United States District Court for the Eastern District of Virginia, to 37 months of incarceration in the Federal Bureau of Prisons followed by 4 years of federal supervised release.

8.  Mr. Santiago was transferred to Hudson Correctional Facility in New York on January 2, 2002.

9.  On May 3, 2002, Mr. Santiago pleaded guilty under Indictment No. 1141/2000 in the Kings County Criminal Court before the Hon. Sheldon Greenberg.

10.  Judge Greenberg could not sentence Mr. Santiago that same day because the Kings County District Attorney had not yet prepared a pre-sentence report.

11.  Sentencing was scheduled for May 14, 2002.

12.  ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████

13.  ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

14.  On May 14, 2002, Mr. Santiago was sentenced in Kings County Criminal Court to a 3 ½ year term of incarceration.

**JA614**

15.     At Mr. Santiago's sentencing on May 14, 2002, there was no mention of post-release supervision.

16.     After his sentencing in Kings County Criminal Court, Mr. Santiago was returned to the United States Bureau of Prisons to complete his federal sentence.

17.     Mr. Santiago's New York State sentence from the Kings County Criminal Court ran concurrently to his federal sentence.

18.     On April 7, 2004, Mr. Santiago was released from the United States Bureau of Prisons to the custody of New York State DOCS to complete his New York State sentence from the Kings County Criminal Court in 2002.

19.      On April 22, 2004, upon entry to a New York State DOCS prison reception center, Mr. Santiago's New York State sentence was noted in DOCS' computer system, and calculated for a release date, his "maximum expiration date," after crediting his sentence with time served in federal prison.

20.     Mr. Santiago's maximum expiration date for his New York State sentence from the Kings County Criminal Court was November 7, 2004.

21.     On November 7, 2004, Mr. Santiago was released from New York State DOCS to the New York State Division of Parole to serve post-release supervision.

22.     New York State DOCS calculated that Mr. Santiago was to serve post-release supervision until November 7, 2009.

23.     At the same time, Mr. Santiago was required to serve a 4-year term of federal supervised release in connection with his sentence from the United States District Court from the Eastern District of Virginia.

24.     Mr. Santiago's federal supervised release from the Eastern District of Virginia was transferred to the United States Probation Office for the Eastern District of New York, in Brooklyn,

because he remained in New York to serve his post-release supervision from his New York sentence on parole under the supervision of the New York State Division of Parole.

25. Mr. Santiago's federal supervised release ran concurrently to his New York State post-release supervision.

26. Mr. Santiago was released from New York State DOCS November 4, 2004, on condition that he adhere to certain conditions of release, including, for both his federal supervised release, and his New York State post-release supervision, that he not leave the State of New York.

27. On October 30, 2005, Mr. Santiago was arrested in Fairfax County, Virginia.

28. Mr. Santiago was incarcerated in Fairfax County, Virginia from October 30, 2005 to November 17, 2005.

29. On June 9, 2006, the United States Court of Appeals for the Second Circuit ruled that post-release supervision in New York must be imposed at sentencing by a judge, and not calculated by DOCS.

30. The Second Circuit ruled that a sentence that contained a post-release supervision term that was calculated by DOCS, and not imposed by a judge violated due process rights under the United State Constitution.

31. On November 9, 2006, Judge Ellis of the United States District Court for the Eastern District of Virginia sentenced Mr. Santiago to 8 months of incarceration, to be followed by 30 months of federal supervised release.

32. Mr. Santiago served his 8 months of incarceration in Hazelton Federal Prison in West Virginia.

33. Mr. Santiago was released from the Bureau of Prisons in West Virginia and extradited on June 12, 2007 to New York to answer Division of Parole charges that he violated the terms and conditions of New York State post-release supervision.

34. On July 19, 2007, Mr. Santiago pleaded guilty to violations of his post-release

**JA616**

supervision before an Administrative Law Judge of the New York State Division of Parole, and received a time assessment of 12 months of incarceration.

35.    On August 6, 2007, Mr. Santiago was returned to Ulster Correctional Facility in New York State DOCS.

36.    Mr. Santiago's 12-month time assessment was credited with 55 days of jail time served in Rikers Island from June 12, 2007 to August 5, 2007.

37.    On February 1, 2008, Mr. Santiago was released to post-release supervision from Gouverneur Correctional Facility in New York State DOCS.

38.    On July 5, 2013, Mr. Santiago pleaded guilty to 2011 State of Virginia charges and was committed to the State of Virginia Department of Corrections.

39.    On May 20, 2015, Mr. Santiago was released from Virginia State prison.

40.    On October 30, 2017, Defendants Fischer, Annucci and Tracy were found liable to Mr. Santiago for violating his constitutional rights to due process for not referring him to his Kings County criminal sentencing court in the period from June 12, 2007 to February 1, 2008, a period when he was in the custody of DOCS or the New York State Division of Parole.

Dated: New York, New York
       November 22, 2022

LETITIA JAMES
Attorney General of the
State of New York
Attorney for Defendants
By:

_____/s_____
MICHAEL J. KEANE
REBECCA DURDEN
Assistant Attorneys General
28 Liberty Street, 18th Floor
New York, New York 10005
(212) 416-8550

**JA617**

To: Robert Rickner, Esq.

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| | |
|---|---|
| Jesus Santiago | ) |
| *Plaintiff* | ) Civil Action No. |
| v. | ) 12-cv-2137 |
| | ) (KAM)(SLT) |
| Brian Fischer et al. | ) |
| *Defendant* | |

## JUDGMENT IN A CIVIL ACTION

The court, having conducted a jury trial on November 28-29, 2022, and the jury having returned a verdict in favor of the plaintiff and against the defendants, orders entry of judgment that:

The plaintiff, Jesus Santiago, will recover compensatory damages in the amount of one hundred thousand dollars ($100,000), jointly against the defendants, Brian Fischer, Anthony J. Annucci, and Terence X. Tracy, plus pre-judgment interest, at a rate and in an amount to be determined at a later time, plus post-judgment interest at the rate provided by 28 U.S.C. § 1961.

The plaintiff will also recover punitive damages of two hundred fifty thousand dollars ($250,000) against each of the individual defendants, Brian Fischer, Anthony J. Annucci, and Terence X. Tracy, totaling seven hundred and fifty thousand dollars ($750,000), plus pre-judgment interest at a rate and in an amount to be determined at a later time, plus post-judgment interest at the rate provided by 28 U.S.C. § 1961.

This action was *(check one)*:

☑ tried by a jury with Judge _____Kiyo Matsumoto_____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☐ decided by Judge _____ on a motion for _____

Date: November 30, 2022

CLERK OF COURT

*Sandra Nelsen*

*Signature of Clerk or Deputy Clerk*

**JA619**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JESUS SANTIAGO,                            :       12 Civ. 2137 (KAM)
                                    :
              Plaintiff,         :       **NOTICE OF APPEAL**
                                    :
            -against-         :
                                    :
BRIAN FISCHER, former Commissioner of       :
the New York State Department of Correctional   :
Services (DOCS); ANTHONY J. ANNUCCI, former  :
Deputy Commissioner and Counsel for DOCS;    :
TERRENCE TRACY, former Chief Counsel for the  :
New York State Division of Parole,         :
                                    :
             Defendants.      :
-----------------------------------------------------------------------X

       Notice is hereby given that the defendants in the above-captioned action, Brian Fischer,

Anthony J. Annucci, and Terrence Tracy ("Defendants"), by and through their attorney, Letitia

James, Attorney General of the State of New York, appeal to the United States Court of Appeals for

the Second Circuit from each and every part of the judgment against them entered on November 30,

2022 (ECF No. 209), dated November 30, 2022, and each and every part of the Order denying

Defendants' Motion for Judgment as a Matter of Law and Motion for a New Trial pursuant to

Federal Rules of Civil Procedure 50(b) and 59, respectively (ECF No. 224), dated and entered on

April 16, 2023.

Dated: New York, New York
       May 16, 2023

                                   LETITIA JAMES
                                   Attorney General for the State of New York
                                   <u>Attorney for Defendants</u>
                                   By:
                                   <u>    /s Michael J. Keane       </u>
                                   MICHAEL J. KEANE
                                   REBECCA A. DURDEN
                                   Assistant Attorneys General
                                   28 Liberty Street / 18th Floor

New York, New York 10005
(212) 416-8550
Michael.keane@ag.ny.gov
Rebecca.durden@ag.ny.gov

To:     Rob Rickner, Esq.
        Rickner PLLC
        14 Wall Street
        Suite 1603
        New York, NY 10005
        (212) 300-6506
        rob@ricknerpllc.com

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Keane, hereby certify that on May 16, 2023, I caused the foregoing Notice of Appeal, dated May 16, 2023, to be filed electronically with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to Plaintiff's counsel at the e-mail address so designated by him:

Rob Rickner, Esq.
Rickner PLLC
14 Wall Street
Suite 1603
New York, NY 10005
(212) 300-6506
rob@ricknerpllc.com

and also e-mailed the same to Plaintiff's counsel at the above e-mail address. I further certify that the above document was served on all parties by the Court's CM/ECF system.

*/s/Michael J. Keane*
Michael J. Keane

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JESUS SANTIAGO,

                         Plaintiff,

      -against-

**BRIAN FISCHER, individually and as**
**Commissioner of the New York State**
**Department of Corrections and Community**
**Supervision, et. al.**,

                    Defendants.

**NOTICE OF CROSS APPEAL**

Index No. 12-CV-02137 (KAM) (ST)

        PLEASE TAKE NOTICE that plaintiff JESUS SANTIAGO hereby appeals to the United States Court of Appeals for the Second Circuit from the judgment of the United States District Court for the Eastern District of New York (Matsumoto, DJ) entered on September 30, 2017 (Dkt. No. 92), solely to the limited extent that summary dismissal was granted in Defendants' favor, and Plaintiff's motion for summary judgment on liability against Defendants was denied, for the time period after February 6, 2008.

Dated:  New York, New York
       May 30, 2023

                Rickner PLLC

                By:       /s/

                    Joel Wertheimer
                    Rob Rickner

                14 Wall Street, Suite 1603
                New York, New York 10005
                Phone: (212) 300-6506
                Fax: (888) 390-5401
                *Attorney for Plaintiff*

**JA623**